UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANTHONY BOWDEN,                        )
                                       )
        Plaintiff,                     )
                                       )
    v.                                 ) Civil Action No. 05-2202 RBW
                                       )
CRISTIÁN SAMPER, Acting Secretary,     )
 Smithsonian Institution,              )
                                       )
        Defendant.                     )
_____)

MOTION FOR JUDGMENT ON THE PLEADINGS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant, by and through counsel, hereby moves pursuant to
Fed. R. Civ. P. 12(h) to dismiss this action.  In the alternative,
Defendant moves for summary judgment in his favor, pursuant to
Fed. R. Civ. P. 56.  The Court is respectfully referred to the
accompanying memorandum of points and authorities in support of
this motion.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney

_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney

_____ /s/
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANTHONY BOWDEN,                    )
                                  )
          Plaintiff,              )
                                  )
     v.                           )  Civil Action No. 05-2202 RBW
                                  )
CRISTIÁN SAMPER, Acting Secretary, )
 Smithsonian Institution,         )
                                  )
          Defendant.              )
_____    )

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR JUDGMENT ON THE PLEADINGS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

INTRODUCTION

Plaintiff has alleged in his Second Amended Complaint Of Employment Discrimination And Breach Of Contract ("Complaint") that he was the victim of a hostile work environment at the Smithsonian Institution's National Zoological Park ("Zoo") based on his Race, Color, Sex, Religion, Disability, and based on Reprisal. (Counts I-VI). He also asserts that his Non-Selection for the Supervisory Exhibits Specialist, GS-1010-12 position announced in Vacancy Announcement No. 04SP-1005 was based on Race, Color, Disability, and Reprisal (Counts VII-X). Plaintiff further claims that, despite a desk audit of his GS-11 position on October 17, 2003, he was not compensated at the GS-12 level as he should have been, based on his Race, Color, Sex, Religion, Disability, and based on Reprisal. (Counts XI-XVI). Plaintiff also brings a claim that the agency breached a settlement agreement that resolved his earlier employment discrimination

case, Civil Action No. 97-545 JR (D.D.C.) by refusing to restore leave. (Count XVII). Lastly, he asserts that the agency has failed reasonably to accommodate his request for reasonable accommodations in the workplace in violation of the Rehabilitation Act. (Count XVIII).

ARGUMENT

The Supreme Court recently clarified the standards for evaluating whether a complaint satisfies Fed. R. Civ. P. 8. Bell Atlantic v. Twombly, 127 S.Ct. 1955, 1964-67 (2007). The Court held that, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," id. at 1964-65; that "[f]actual allegations must be enough to raise a right to relief above the speculative level," id.; and that a plaintiff must make "a 'showing,' rather than a blanket assertion, of entitlement to relief," id. at n.3.

In so holding, the Court rejected a literal reading of the Court's earlier statement in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed ... unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." The Court explained that this "phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard."

Bell Atlantic v. Twombly, 127 S.Ct. at 1959-60.  In addition, the
Court stressed that "[i]t is no answer to say that a claim just
shy of a plausible entitlement to relief can, if groundless, be
weeded out early in the discovery process through 'careful case
management.'"  Id. at 1967.  Instead, the Court admonished,
courts should "tak[e] care to require allegations" that meet the
Federal Rules' threshold pleading requirements.  Id.

     Under Federal Rule of Civil Procedure 56, a party is
entitled to summary judgment if there is no genuine issue of
material fact in dispute.  Tao v. Freeh, 27 F.3d 635, 638 (D.C.
Cir. 1994).  Under the summary judgment standard, the moving
party bears the "initial responsibility of informing the district
court of the basis for its motion, and identifying those portions
of the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits which it
believes demonstrates the absence of a genuine issue of material
fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
Plaintiff, in response to defendant's motion, must identify for
the Court specific facts showing that there is a genuine issue
for trial.  Id. at 324 (internal citations omitted).  In order
to successfully oppose a motion for summary judgment, the
plaintiff must produce competent evidence that the employer's
reason was mere pretext for discrimination/retaliation by showing
"both that the reason was false and that discrimination was the

real reason" for the challenged conduct.  Id. at 515.  Samii v. Billington, 195 F.3d 1, 3 (D.C. Cir. 1999)(citing Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998)(en banc)).  "Since the ultimate burden of persuasion in proving retaliation [and discrimination] remains with the plaintiff, summary judgment is appropriate where the employee is unable to satisfy this burden."  Samii, 195 F.3d at 3.  Moreover, simply casting doubt on the employer's proffered justification does not automatically enable the plaintiff to survive summary judgment. See Aka, 156 F.3d at 1290-91.  Rather, the plaintiff must proffer evidence beyond mere speculation when refuting the defendant's legitimate non-discriminatory reasons for its decisions.  See Brown v. Brody, 199 F.3d at 458.  "As courts are not free to second-guess an employer's business judgment," a plaintiff's mere speculations are 'insufficient to create a genuine issue of fact regarding [an employer's] articulated reasons for [its decisions] and avoid summary judgment.'"  Id. at 459 (quoting Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988)). Plaintiff's claims, it will become clear, are without merit.

I.  Plaintiff's Hostile Work Environment Claim (Counts I-VI).

Plaintiff asserts that he has been the victim of a hostile work environment.  His claims are unavailing and, instead, show nothing more than ordinary work-place slights insufficient to support an employment discrimination or retaliation claim.  The

standard that a plaintiff must meet to prevail on a hostile work environment claim is considerable.  Such an environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Id., quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-67 (1986); see also Clark County School District v. Breeden, 121 S. Ct. 1508, 1511 (2001); Chambliss v. National R.R. Passenger Corp., No. 07-7044, slip op. at 1, 2007 WL 4753685, 1 (D.C. Cir. Dec. 28, 2007) ("to the extent appellant raised a hostile work environment claim, he has failed to show he was subjected to discriminatory intimidation, ridicule, and insult that was so severe or pervasive it altered his conditions of employment and created an abusive working environment.") (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) and Hussain v. Nicholson, 435 F.3d 359, 366 (D.C. Cir. 2006)).  Plaintiff's complaint includes the following allegations:

    Heavy Projects and Work in the Lower Shop

    Plaintiff asserts that he was required to work alone and that he was required to work on heavy projects and move furniture and work in the lower shop area.  See Second Amended Complaint, ¶ 23(k)-23(l), 23(s).  Plaintiff has admitted, however, that there was a shortage of staff.  See May 21, 2003 E-mail from Bowden to

Tanner acknowledging "shortage of staff" (Plaintiff's Depo. Ex. 7) (Exhibit 1); Plaintiff's 12/4/07 Depo. (Exhibit 2) at 117-18. Plaintiff also has admitted that his coworkers were called upon to perform other functions, such as making vinyl signs. See Plaintiff's 12/4/07 Depo. at 67. At other times, Plaintiff, paradoxically, has complained that his supervisor, Mr. Baxter, has not given him enough to do. For example, plaintiff has asserted that Mr. Baxter has taken it upon himself to inquire of the work schedule of contract welders (something Plaintiff feels should have been his job) and have outside contractors work on a prototype sign in the Small Mammal house, asking why such jobs were being given to others. See Exhibit 3 (October 5, 2004 Memo from Plaintiff) at 2.[1]

Plaintiff also concedes that, while he may have been called upon to work with heavy objects, he had greater upper body strength than Grace Lopez, another worker in the production department. Indeed, Grace Lopez, weighed only about 110 pounds while Plaintiff was estimated to weigh as much as 175 pounds. See Plaintiff's 12/4/07 Depo. at 68-73.

Plaintiff also contends he should not have been made to work in the "unsafe" lower workshop. Second Amended Complaint ¶ 28(a). The lower shop, Plaintiff asserts, was unsafe because the

---

[1] Plaintiff admits, however, that 80% of the signs at the zoo are made by outside contractors. Plaintiff's 12/4/07 Depo. at 99.

saws were not bolted to the floor, and there was dust in the air when the saws were used and inadequate ventilation to remove the dust from the air.  Plaintiff's 2/20/08 Depo. (Exhibit 4) at 67-68.  But it was Plaintiff who ordered the majority of the equipment for the lower workshop, including the saws.  See Plaintiff's 12/4/07 Depo. at 78-80.  And it was Plaintiff who, with a coworker, installed the saws but never finished what needed to be done.  Plaintiff's 12/4/07 Depo. at 114-19.  In addition, Plaintiff was the safety officer with responsibility over the lower shop.  Plaintiff's 2/20/08 Depo. at 146; see also Plaintiff's 12/4/07 Depo. at 79-80  (plaintiff was acting in place of Mr. Hider when Hider left and Hider has been in charge of safety).

Significantly, on March 9, 2005, when Plaintiff was told by his supervisor, Jeff Baxter, that he (Mr. Bowden) should take responsibility for setting up the lower shop area as it should be set up and supervise a coworker if necessary, Plaintiff responded that "he [Mr. Baxter] was hired as the Exhibit supervisor and supervisor is not part of my title." (Exhibit 5) (Plaintiff's May 19, 2005 Affidavit) (Plaintiff's Depo. Ex. 85) at 3-4).  In any event, Plaintiff admits that he seldom used the saws in the lower shop because he felt they were not safe.  Plaintiff's 12/4/07 Depo. at 112, 119-21.  Plaintiff also agreed that a dust mask would protect him from the dust and that he had picked such

masks up at Home Depot or from other workers at the Zoo.
Plaintiff's 2/20/08 Depo. at 72-73.

Plaintiff also concedes that Grace Lopez was called upon to
work in the lower shop about the same amount of time under the
previous supervisor, Mr. Hider (who never discriminated or
retaliated against Plaintiff), as she has under Mr. Baxter.
Plaintiff's 12/4/07 Depo. at 64, 71.  Plaintiff further admits
that Grace Lopez used the vinyl sign-making machine before he
ever arrived at the Zoo, that she was good at using the machine,
and that the others who used the vinyl sign-making machine before
Plaintiff arrived were good with the machine as well.
Plaintiff's 12/4/07 Depo. at 75-77.

<u>Hostile Meetings</u>

Plaintiff also complains of hostile meetings, but has
explained that, in his view, a meting would be "hostile" if his
supervisor, Ms. Samiy, would say something like: "you are going
to do as I ask you to do." Plaintiff's 2/20/08 Depo. at 65-66.
Elsewhere, Plaintiff claimed that it was harassment to expect him
to attend meetings with supervisors, because he was not able to
keep up with upcoming projects, which made him feel
uncomfortable. <u>See</u> Plaintiff's May 19, 2005 Affidavit
(Plaintiff's Depo. Ex. 85) at 2; Baxter Depo. (Exhibit 6) at 160-
70.

<u>The Panda House</u>

- 8 -

Plaintiff complains that he was scolded by Mr. Baxter when Plaintiff and a coworker went to the Panda House to hang banners. Plaintiff's 2/20/08 Depo. at 225-30.  Plaintiff admits that his supervisor had explicitly instructed the workers to call him when they were ready to hang the banners. Plaintiff's 2/20/08 Depo. at 226.  Mr. Baxter wanted to be called so that he could explain the task and not have his workers waiting around doing nothing.  <u>See</u> Baxter Depo. at 219-20.  Plaintiff admits that he and his coworker ended up waiting some time for Mr. Baxter to arrive and told him so.  <u>See</u> Plaintiff's 2/20/08 Depo. at 227; Baxter Depo. at 219-20.  Mr. Baxter, understandably, was upset when he arrived to find the workers waiting around unable to proceed with the task because they had not followed his explicit instructions to give him a call first.  Baxter Depo. at 218-21.  Because Mr. Baxter was upset, he was animated in asking them why they had not called him.  Baxter Depo. at 220.  Plaintiff describes the discussion as follows:  Mr. Baxter "got really loud, and a little belligerent, and started hollering;  and said, you know, well what if I had been in a meeting. . ."  Plaintiff's 2/20/08 Depo. at 227.  Plaintiff did not lose any pay or benefits as a result of the events at the Panda House.  <u>See</u> Plaintiff's 2/20/08 Depo. at 230.

<u>     Scheduling Sick Leave</u>

Plaintiff complains that he was asked to schedule sick leave

in advance, where possible.  <u>See</u> Plaintiff's 2/20/08 Depo. at
154-56, 206; Exhibits 7-8 (Plaintiff's Depo. Ex. 56-57).
Plaintiff admits, however, that he was never denied sick leave
because a request for leave was made too late to satisfy his
supervisor.  <u>See</u> Plaintiff's 2/20/08 Depo. at 206.

<u>Performance Ratings</u>

Plaintiff also complains about certain performance ratings.
Plaintiff alleges, for instance, that in May 2004 and March 2005
he received performance ratings of "fully successful."  Second
Amended Complaint, ¶ 23®.  The fully successful ratings indicated
that Plaintiff had "met" each of the critical elements of his
job, but offered praise and constructive criticism in several
areas.  <u>See</u> Exhibit 9 (2004 Performance Appraisal Form); Exhibit
10 (2005 Performance Appraisal Form).

<u>The Elena Lopez Assault and Failure To Take Action</u>

Plaintiff complains that another employee, Elena Lopez, used
her body to push him and others out of the way on at least two
occasions.  Plaintiff's 2/20/08 Depo. at 177-78, 212-225; Second
Amended Complaint, ¶¶ 35-39.  Most significantly to Plaintiff,
Plaintiff felt that when he was "rammed" by Elena Lopez, the
agency should have done more to protect him.  Second Amended
Complaint, ¶ 39.[2]  Plaintiff admitted that he was not injured by

---

[2]  Plaintiff believes that Elena Lopez was angry with
Plaintiff because she blamed him for how her friend, Kathleen
Samiy, was being treated by the agency.  Plaintiff's 2/20/08

Elena Lopez in the incident.  Plaintiff's 2/20/08 Depo. at 215-16.  Mr. Baxter, who was talking with plaintiff at the time, noted that he saw Elena Lopez carrying cakes for a bridal shower, recognized that Plaintiff had reacted for some reason, and later assured Plaintiff that he had spoken to Elena Lopez's supervisor about the incident and intended to make the work environment a good and comfortable place to work.  See Baxter Depo. at 155-57 and Baxter Depo. Ex. 20 - Ex. 25 (Exhibits 11-16).  The incident, in fact, was reported to the police, who conducted an investigation, although the prosecuting attorney declined to prosecute.  See id.  Plaintiff concedes that, after the incident with and investigation of Elena Lopez, she never ran into him again.  Plaintiff's 2/20/08 Depo. at 225.  Under such circumstances, liability cannot be found.  See Faragher v. City of Boca Raton, 524 U.S. 775, 778 (1998).

Confirmation of Counseling Letter

Plaintiff complains that he was given a confirmation of counseling letter (Exhibit 17)(Plaintiff's Depo. Ex. 68), reminding him that it was improper to describe a co-worker, Elena Lopez, as a "crazy lady".  See Second Amended Complaint, ¶ 28(b); Exhibit 17 (Plaintiff's Depo. Ex. 68).  Plaintiff admitted using the term "crazy" in referring to Ms. Elena Lopez.  Plaintiff's 2/20/08 Depo. at 176-77.  Plaintiff further admitted that the

Depo. at 218-20.

- 11 -

counseling letter was written because Mr. Baxter's supervisor
told Mr. Baxter that it was inappropriate to use the word "crazy"
in describing Ms. Lopez.  Plaintiff's 2/20/08 Depo. at 181-82.
The counseling letter specifically advised Plaintiff that there
would be no further action on the matter other than "to remind
all staff that we work in an open office environment and that we
need to be mindful of the content and volume of our conversation,
including phone conversation. . . "  Exhibit 17 (Plaintiff's
Depo. Ex. 68).  The letter also stressed that it would "**NOT be
filed in your Official Personnel Folder**."  Id. (emphasis in
original).

    The Comments On Biking Clothes

    Plaintiff complains that his supervisor commented on his
wearing his biking clothes at work.  Plaintiff's 12/4/07 Depo. at
162-65.  Plaintiff has not alleged that any such discussion went
beyond a comment.  Id.

    Questioning about Plaintiff's whereabouts

    Plaintiff also complains that when he has been away from his
desk and his supervisor has been looking for him, his supervisor
would ask him where he was, even when he was simply going to the
bathroom for 20 minutes.  See Plaintiff's 2/20/08 Depo. at 206-
07, 287.

    The Attempt To Postpone Desk Audit

    Finally, Plaintiff asserts that there was an "attempt[] to

postpone" his desk audit on October 16, 2003, but that it went forward on October 17, 2003.  Plaintiff also asserts that the audit did not recite many of his duties.  Second Amended Complaint, ¶ 23(e)-23(g).  Plaintiff admits, of course, that the audit was not, in fact, postponed, and he was given the opportunity to participate in another desk audit, but refused. Id.; Exhibit 18 (Plaintiff's Depo. Ex. 40).

These workplace slights, if they can even be described as such, are not of a level that would amount to a hostile work environment.  See Harris v. Forklift Systems Inc., 510 U.S. 17 (1993).  The Harris case defined "severe and pervasive conduct" by noting that a reviewing court must consider: (1) would a reasonable person regard the conduct as hostile, offensive or abusive; and (2) did the complainant actually regard the conduct as hostile, offensive or abusive.  Id.  In addition, when considering whether the conduct was "severe and pervasive" a reviewing court must examine all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  George v. Leavitt, 407 F.3d 405, 416 (D.C. Cir. 2005).

The Supreme Court has also noted that "simple teasing, offhand comments, and isolated incidents (unless extremely

- 13 -

serious) will not amount to discriminatory changes in the terms and conditions of employment. <u>Faragher</u> v. <u>City of Boca Raton</u>, 524 U.S. 775, 778 (1998); <u>Singletary</u> v. <u>District of Columbia</u>, 351 F.3d 519, 526, 528-29 (D.C. Cir. 2003) (declining to grant summary judgment against a vocational rehabilitation specialist claiming hostile work environment where, when for over a year and a half after he complained, the employee was forced to work exclusively in a poorly lit, unheated, and unventilated storage room full of brooms and boxes in an area where he could get locked in);[3] <u>Hussain</u> v. <u>Nicholson</u>, 435 F.3d 359, 366-67 (D.C. Cir. 2006); <u>George</u> v. <u>Leavitt</u>, 407 F.3d 405, 408, 416 (D.C. Cir. 2005) (shouted insults, undesirable assignments do not constitute hostile work environment).

As Judge Collyer has explained:

> In order to prove a hostile work environment claim on the basis of race, "a plaintiff must demonstrate: (1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." <u>Moore</u> v. <u>Ashcroft</u>, 401 F.Supp.2d 1, 42 (D.D.C. 2005) (internal quotations and citations omitted). In assessing whether a plaintiff has adequately alleged a hostile work environment, courts should to look at "'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

---

[3]  Plaintiff, by contract, minimized the time he spent using the saws in the lower shop, spent substantial time on jobs throughout the zoo and had a desk. Plaintiff's 12/4/07 Depo. at 119-20; Baxter Depo. at 205-07

> mere offensive utterance; and whether it unreasonably
> interferes with an employee's work performance." <u>Faragher</u>
> v. <u>City of Boca Raton</u>, 524 U.S. 775, 787-88, 118 S.Ct. 2275,
> 141 L.Ed.2d 662 (1998) (<u>quoting</u> <u>Harris</u> v. <u>Forklift Sys.</u>,
> <u>Inc.</u>, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295
> (1993)).  Although a plaintiff is "not required to plead a
> *prima facie* case of hostile work environment in the
> complaint, the alleged facts must be able to support such a
> claim." <u>Moore</u>, 401 F.Supp.2d at 42 (<u>citing</u> <u>Sparrow</u> v. <u>United</u>
> <u>Air Lines, Inc.</u>, 216 F.3d 1111, 1114 (D.C. Cir. 2000)).

<u>Kriesch</u> v. <u>Johanns</u>, 468 F.Supp.2d 183, 187 (D.D.C. 2007).

Other courts have described the burden of proving a hostile

work environment claim as follows:

> [T]he Supreme Court has stated that "to establish
> hostile work environment, plaintiffs ... must show
> harassing behavior 'sufficiently severe or pervasive to
> alter the conditions of [their] employment.' "
> [<u>Pennsylvania State Police</u> v.] <u>Suders</u>, 542 U.S. [129]
> at 133, 124 S.Ct. 2342 (2004) (<u>quoting</u> <u>Meritor Savs.</u>
> <u>Bank, FSB</u> v. <u>Vinson</u>, 477 U.S. 57, 67, 106 S.Ct. 2399,
> 91 L.Ed.2d 49 (1986)).

<u>Veitch</u> v. <u>England</u>, 471 F.3d 124, 131 (D.C. Cir. 2006).

> "The workplace is 'hostile' for purposes of Title VII .
> . . only when the offensive conduct 'permeates [the
> workplace] with discriminatory intimidation, ridicule,
> and insult, that is sufficiently severe or pervasive to
> alter the conditions of the victim's employment and
> create an abusive working environment.'" <u>Bell</u> v.
> <u>Gonzales</u>, 398 F.Supp.2d 78, 91 (D.D.C. 2005) (<u>quoting</u>
> <u>Oncale</u> v. <u>Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75,
> 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (<u>in turn</u>
> <u>quoting</u> <u>Harris</u> v. <u>Forklift Sys., Inc.</u>, 510 U.S. 17, 21,
> 114 S.Ct. 367, 126 L.Ed.2d 295 (1993))).  In deciding
> whether the plaintiff has met this threshold
> requirement, the Court must examine all of the
> circumstances, including "the frequency of the
> discriminatory conduct; its severity; whether it is
> physically threatening or humiliating, or a mere
> offensive utterance; and whether it unreasonably
> interferes with an employee's work performance."
> <u>George</u> v. <u>Leavitt</u>, 407 F.3d 405, 416 (D.C. Cir. 2005)
> (<u>quoting</u> <u>Harris</u>, 510 U.S. at 23, 114 S.Ct. 367

(internal quotation marks omitted)).

* * *

Further, the Court [has] refused to permit the
plaintiff to "bootstrap" the same series of incidents
alleged as retaliation "into a broader hostile work
environment claim." Id. [Keeley v. Small, 391 F.Supp.2d
30, 50-51 (D.D.C. 2005).](citing Lester v. Natsios, 290
F.Supp.2d 11, 33 (D.D.C. 2003) ("Discrete acts
constituting discrimination or retaliation claims ...
are different in kind from a hostile work environment
claim that must be based on severe and pervasive
discriminatory intimidation or insult.")).

Edwards v. EPA, 456 F.Supp.2d 72, 84, 96 (D.D.C. 2006).  The

relevant allegations in the instant action do not meet this

standard.

Indeed, Plaintiff's allegations fail even to amount to

matters severe enough even to support a claim of retaliation,

under the lesser standard.  The assessment of a valid claim for

retaliation has been described slightly differently than for

other disparate treatment claims:

The anti-retaliation provision protects an individual
not from all retaliation, but from retaliation that
produces an injury or harm. . . . In our view, a
plaintiff must show that a reasonable employee would
have found the challenged action materially adverse,
"which in this context means it well might have
'dissuaded a reasonable worker from making or
supporting a charge of discrimination.' " Rochon [v.
Gonazles,], 438 F.3d [1211] at 1219 [(D.C. Cir. 2006)]
(quoting Washington [v. Illinios Dep't of Revenue], 420
F.3d [658] at 662 [(7th Cir. 2005)].

We speak of material adversity because we believe
it is important to separate significant from trivial
harms.  Title VII, we have said, does not set forth "a
general civility code for the American workplace."
Oncale v. Sundowner Offshore Services, Inc., 523 U.S.

75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); see
Faragher [v. City of Boca Raton], 524 U.S. [775] at 788
[(1998)](judicial standards for sexual harassment must
"filter out complaints attacking 'the ordinary
tribulations of the workplace, such as the sporadic use
of abusive language, gender-related jokes, and
occasional teasing'"). An employee's decision to
report discriminatory behavior cannot immunize that
employee from those petty slights or minor annoyances
that often take place at work and that all employees
experience.

* * *

We refer to reactions of a reasonable employee
because we believe that the provision's standard for
judging harm must be objective. An objective standard
is judicially administrable. It avoids the
uncertainties and unfair discrepancies that can plague
a judicial effort to determine a plaintiff's unusual
subjective feelings. We have emphasized the need for
objective standards in other Title VII contexts, and
those same concerns animate our decision here.

Burlington Northern and Santa Fe Ry. Co. v. White, 126 S.Ct.

2405, 2415 (2006). The great volume of allegations

notwithstanding, Plaintiff raises claims that do not satisfy this

standard. Rather, no reasonable jury could conclude that the

treatment of Plaintiff about which he complains (e.g., asking him

where he has been when he is away from his desk, scolding him for

wasting time, requiring him to attend meetings or to lift objects

necessary for production work, causing him on occasion to work in

the lower shop that he outfitted even if it meant he needed to

use a dust mask while sawing, and counseling him to avoid calling

his coworkers "crazy") would dissuade a reasonable employee from

pursuing his claims. In any event, the agency has articulated

its proper reasons for allowing these things to take place, and changed those it felt it could change before this action was commenced.  See Taylor v. Small, 350 F.3d 1286, 1294 (D.C. Cir. 2003).

Plaintiff also appears to assert that the events upon which he relies to support his hostile work environment claim could constitute independent adverse actions motivated by his race, color, sex, religion or disability.  Plaintiff is wrong.  Those claims, other than his non-promotion claim, are subject to dismissal because they fail to state an adverse employment action as defined in Brown v. Brody, 199 F.3d 446 (D.C. Cir. 1999).  See also Russell v. Principi, 257 F.3d 815 (D.C. Cir. 2001); Freedman v. MCI Telecommunications Corp., 255 F.3d 840, (D.C. Cir. 2001).

## II.  The Non-Selection (Counts VII-X).

Plaintiff was not selected for the position of Supervisory Exhibits Specialist (GS-1010-12), Vacancy Announcement No. 04SP-1005.  See Second Amended Complaint, ¶ 24.  Plaintiff alleges that defendant's failure to select him constitutes discrimination based on race (Count VII); see id. ¶¶ 66-69; color (Count Eight); see id. ¶¶ 70-73; disability (Count IX); see id. ¶¶ 74-77; and reprisal (Count X); see id. ¶¶ 78-81.  None of these claims has merit.

### A.   Factual Background

The position of Supervisory Exhibits Specialist was initially posted on August 18, 2003 as Vacancy Announcement No. 03SP-1309. <u>See</u> Exhibit 19.  Plaintiff applied for this vacancy. <u>See</u> Plaintiff's 12/4/07 Depo. at 148.  Because of the way the announcement was worded, it emphasized management skills over production skills. <u>See</u> Exhibit 20 (Deposition of Lynn Dolnick)("Dolnick Depo.") at 207-08.[4]  Lynn Dolnick, the selecting official, was not satisfied with the overall pool of candidates, which included persons "who had never done production." <u>See</u> <u>id.</u> at 207-09.  Ms. Dolnick worked with the personnel office to revise the announcement to place a greater emphasis on production skills. <u>See</u> <u>id.</u> at 208-10.[5]  The revised announcement was posted on January 9, 2004 as Vacancy Announcement No. 04SP-1005. <u>See</u> Exhibit 21.[6]

---

[4]  The "Selective Factors" — the mandatory requirements for the position — were drafted by the personnel office. <u>See</u> Dolnick Depo. at 207.

[5]  The record is not clear whether a certification list of qualified candidates was compiled for the initial vacancy announcement, No. 03SP-1309. <u>See</u> Dolnick Depo. at 212. Plaintiff claims he was scheduled to interview for the position, <u>see</u> Plaintiff's 12/4/07 Depo. at 149, but that the interview was cancelled when the announcement was withdrawn. <u>See</u> <u>id.</u>

[6]  It is not unusual to revise a vacancy announcement to emphasize certain job elements to better attract candidates with those skills. <u>See</u> Exhibit 22 (Deposition of Mary Rowker Tanner)("Tanner Depo.") at 73.  In the first Vacancy Announcement (No. 03SP-1309), the first Selective Factor was: "[a]bility to manage and direct a diverse staff." <u>See</u> Exhibit 19.  In the second Vacancy Announcement (No. 04SP-1005), the first Selective Factor was: "[s]kill in maintenance, installation and

- 19 -

Plaintiff applied for the revised vacancy announcement.  See Exhibit 23 (Plaintiff's application); Plaintiff's 2/20/08 Depo. at 271.  Out of thirteen applicants for Announcement Number 04SP-1005, four persons made the certification list, including plaintiff.  See Exhibit 24 (application documentation record); Exhibit25 (certification list).  Each candidate on the certification list was interviewed by a panel of three persons, including Ms. Dolnick.  See Dolnick Depo. at 228-29.  The panel had a list of written questions and, during the interviews, each candidate was asked the same questions. See id. at 229.

One of the candidates was Jeffrey Baxter, an experienced exhibits specialist with more than eighteen years of experience in planning, designing, and detailing for permanent and temporary exhibitions.  See Exhibit 25 (certification list); see also Exhibit 26 (Baxter application).  From January 1998 to August 2003, Mr. Baxter had been the Head of Exhibition Design and Production at the Cleveland Museum of Art.  See id.  In that position, "it was [Mr. Baxter's] responsibility to design, detail and supervise the fabrication/construction of exhibitions located

_____

fabrication of indoor, outdoor and interactive exhibits, both, electronic, mechanical, and print."  See Exhibit 21.  The second announcement contained other revisions to the Selective Factors as well, including "[a]bility to manage graphic production files using filemaker and Quark express."  See id.  The reasons for the inclusion of Quark Express, Microsoft Excel and Filemaker Pro software have been explained to Plaintiff.  See Plaintiff's 12/4/07 Depo. at 203 and Depo. Ex. 18 (8/28/03 E-mail from Lynn Dolnick to Plaintiff).

in galleries and public spaces." See id. Mr. Baxter also worked
for almost ten years as a Design Detailer at the Smithsonian's
Freer Gallery of Art and Arthur M. Sackler Gallery (from February
1988 to May 1997), and for four years as an Exhibit Detailer at a
design and production company (from 1984 to 1988). See id. In
both of these jobs, it was Mr. Baxter's "responsibility to
design, detail, and coordinate indoor, outdoor, and interactive
exhibits (both electronic, mechanical and print) for fabrication,
installation and maintenance." See id. Mr. Baxter's application
also detailed his other relevant experience, including his
management experience and his experience with production-managing
software. See id.

After the candidate interviews, Ms. Dolnick selected Mr.
Baxter for the Supervisory Exhibits Specialist position. See
Dolnick Depo. at 214. At her deposition, Ms. Dolnick stated that
Mr. Baxter had more "production knowledge," more "supervisory"
experience, more "budgeting" experience, and more "project
management" experience than plaintiff. See id. at 230. As she
explained in response to a question by plaintiff's counsel:

> Q: Why wasn't [plaintiff] hired if he was on [the
> certification list]?
>
> A: Because a more qualified candidate was hired.
> That's the whole point of a cert[ification]. You
> look at the candidate. You interview them. You
> look at their experience and you pick the most
> qualified. You aren't obliged to pick all of
> them.

Id. at 212; see also id. at 214 ("[t]here were countless reasons [Mr. Baxter] was selected[.]").

   B.   Legal Standard and Argument

        In a refusal-to-hire or refusal-to-promote discrimination case, the McDonnell Douglas prima facie factors are that: (I) the employee "belongs to a racial minority" or other protected class; (ii) the employee "applied and was qualified for a job for which the employer was seeking applicants"; (iii) despite the employee's qualifications, the employee "was rejected"; and (iv) after the rejection, "the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  In firing, demotion, or other adverse-action cases, the factors sometimes have been articulated as: (I) the employee belongs to a protected class; (ii) the employee was still qualified for the position; (iii) despite still being qualified, the employee was fired, demoted, or otherwise adversely acted upon; and (iv) if the employee was removed, either someone else filled the position or the employer sought other applicants. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).  Some of our decisions have allowed or required plaintiffs to present other evidence to satisfy the test and occasionally phrased the test more generally to require evidence that "the unfavorable action gives rise to an inference of discrimination." Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999); see also Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007); George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005).

Brady v. Office of the Sergeant At Arms, slip op. at 5, fn.1 (D.C. Cir. Mar. 28, 2008).

        [I]n considering an employer's motion for summary judgment or judgment as a matter of law in [a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision], the district court must resolve one central question:  Has the employee produced sufficient evidence for a reasonable jury to find that the

employer's asserted non-discriminatory reason was not
the actual reason and that the employer intentionally
discriminated against the employee on the basis of
race, color, religion, sex, or national origin? <u>See</u> <u>St.</u>
<u>Mary's Honor Ctr.</u> v.] <u>Hicks</u>, 509 U.S. [502,] 507-08,
511 [(1993)]; [<u>U.S. Postal Serv. Bd. of Governors</u> v.]
<u>Aikens</u>, 460 U.S. [711,] 714-16 [(1983)].

<u>Brady</u> v. <u>Office of the Sergeant At Arms</u>, slip op. at 7.

Defendant has produced a legitimate, non-discriminatory
reason for plaintiff's non-selection: the superior qualifications
of Mr. Baxter.  To defeat summary judgment, plaintiff must now
"produce sufficient evidence for a reasonable jury to find that
[defendant's] asserted non-discriminatory reason was not the
actual reason and the employer intentionally discriminated
against [him] on the basis of" race, color, disability, or
reprisal."  <u>See</u> <u>Brady</u>, <u>supra</u>.  Plaintiff cannot meet this
standard.

Plaintiff claims the failure to select him was
discriminatory because he "was significantly better qualified for
the position than Mr. Baxter and had been performing many of the
position's duties for some time."  Second Amended Complaint, ¶
24(b).  But plaintiff cannot satisfy his burden of demonstrating
pretext "simply based on his own subjective assessment of his own
performance."  <u>Waterhouse</u> v. <u>District of Columbia</u>, 124 F. Supp.
2d 1, 7 (D.D.C. 200), <u>aff'd</u>, 298 F.3d 989 (D.C. Cir. 2002)
(<u>citing</u> <u>Smith</u> v. <u>Chamber of Commerce of the United States</u>, 645
F.Supp. 604, 608 (D.D.C. 1986)).  Plaintiff has the duty to put

forth evidence of discrimination, not to "quibble about the
candidates' relative qualifications."  Vasilevsky v. Reno, 31
F.Supp.2d 143, 150 (D.D.C. 1998).  In the absence of any other
evidence that would allow a jury to infer that discrimination
took place, "slight questions of comparative qualifications do
not warrant a jury trial."  Walker v. Dalton, 94 F.Supp.2d 8, 16
(D.D.C. 2000).  Rather, the court must respect the employer's
unfettered discretion to choose among qualified candidates.  As
the D.C. Circuit has explained:

> "Title VII, it bears repeating, does not authorize a
> federal court to become a 'super-personnel department
> that reexamines an entity's business decisions.'"

Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting
Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986),
cert. denied, 479 U.S. 1066 (1987)).[7]

Indeed, the U.S. Supreme Court has cited with approval this
Circuit's standard that superior qualifications may be probative
of pretext if "a reasonable employer would have found the
plaintiff to be significantly better qualified for the job."  Ash
v. Tyson Foods, Inc., 546 U.S. 454, 458 (2006) (emphasis added)
(citing Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1294 (D.C.

---

[7] Even if a plaintiff could show superior qualifications to
the person selected, "the D.C. Circuit has recognized that courts
"may not 'second-guess' and employer's personnel decision absent
demonstrably discriminatory motive.'" Woodruff v. DiMario, 164
F.Supp.2d 1, 16 (D.D.C. 2001) (internal citations omitted),
aff'd, No. 01-5321, 2002 WL 449776 (D.C. Cir. Feb. 21, 2002).

Cir. 1998) (en banc)).  The Supreme Court also cited with
approval the Eleventh Circuit's standard for pretext that
"disparities in qualifications must be of such weight and
significance that no reasonable person, in the exercise of
impartial judgment, could have chosen the candidate selected over
the plaintiff for the job in question."  Ash, 546 U.S. at 457
(emphasis added) (citing Cooper v. Southern Co., 390 F.3d 695
(11th Cir. 2004)).  The Court also cited a Ninth Circuit
formulation of the standard, which permits an inference of
pretext where the plaintiff's qualifications are "clearly
superior" to those of the individual selected.  Ash, 546 U.S. at
457-58 (citing Raad v. Fairbanks North Star Borough Sch. Dist.,
323 F.3d 1185, 1194 (9th Cir. 2003)).

     The evidence demonstrates that Mr. Baxter, not plaintiff,
was more qualified for the Supervisory Exhibits Specialist
position.  Mr. Baxter had been the Head of Exhibition Design and
Production at a major museum for almost five years.  Although
plaintiff had been acting Head of Productions at the zoo for over
a year, see Exhibit 23 (plaintiff's application), plaintiff's
experience in the relevant areas simply was not as extensive or
as broad as Mr. Baxter's.  See Dolnick Depo. at 230.  Plaintiff
made the certification list, but he was not "significantly better
qualified for the job."  Aka, 156 F.3d at 1294.  There is no
basis on which to second guess defendant's selection decision.

See Woodruff, 164 F.Supp.2d at 16.

Plaintiff has alleged that the original Vacancy Announcement was rewritten to call for skills that "would have the effect of reducing [his] ability to compete and/or qualify for the position."  Second Amended Complaint ¶ 24(g); Plaintiff's 2/20/08 Depo. at 211.  But there is no record evidence to support that proposition.  Ms. Dolnick testified at her deposition that the announcement was revised to place a greater emphasis on production skills, see Dolnick Depo. at 208-10, and the revised announcement reflected that change in emphasis.  See Exhibit 21. This revised emphasis actually favored plaintiff.  See Dolnick Depo. at 207.

In a similar vein, Plaintiff has suggested that the third Selective Factor in the revised announcement — "[a]bility to manage graphic production files using filemaker and Quark express" — was devised to put him at a disadvantage for a discriminatory reason.  See Dolnick Depo. at 211, 213-14. According to plaintiff:  "No manager in this Exhibit Department is required to supervise or manage Filemaker and Quark Express. This system is still being developed and is not yet operational." See Exhibit 23 (Plaintiff's application).  But there is nothing discriminatory about seeking a candidate qualified to manage a

system "being developed . . . [but] not yet operational."[8]
Plaintiff acknowledged in his deposition that his department had
been trying for some time to install and utilize Filemaker and
that his supervisor "wanted [the software] to work."  Plaintiff's
2/20/08 Depo. at 91, 130; accord Plaintiff's 12/4/07 Depo. at 203
and Exhibit 40 (Plaintiff's Depo. Ex. 18) (8/28/03 E-mail from
Lynn Dolnick to Plaintiff explaining the significance of Quark
Express, Microsoft Excel and Filemaker Pro and encouraging
Plaintiff to apply for the vacancy) (Exhibit 40).  Plaintiff also
acknowledged that Quark express was used by the "Exhibit part of
the department," see Exhibit 36 (Plaintiff's Depo. Ex. 5) at 5,
and that it could also be used to reproduce signs, see
Plaintiff's 2/20/08 Depo. at 131, a responsibility of Production.
See Exhibit 40 (Plaintiff's Depo. Ex. 18).

     For all of these reasons, defendant is entitled to summary
judgment on the counts in Plaintiff's complaint challenging his
non-selection for the position of Supervisory Exhibits
Specialist.

III.  Desk Audit/Grading Of Plaintiff's Position(Counts XI-XVI).

     Defendant is entitled to summary judgment on Plaintiff's
claims relating to the alleged failure to properly compensate
plaintiff.   Plaintiff alleges that defendant "failed to properly

_____

     [8]  On his application, Plaintiff stated he had "[k]nowledge
of" Filemaker and Quark. See Exhibit 23 (Plaintiff's Application)
at 3.

compensate him for higher graded duties that he is actually performing" when defendant "improperly failed to classify his position and duties as a GS-12 on March 19, 2004." Second Amended Complaint, ¶ 25. Plaintiff alleges that a "desk audit of his position that was performed on October 17, 2005 . . . resulted in his position classification as a GS-1010-11 [on] March 19, 2004." Id.[9] According to plaintiff, the failure to classify his position as a GS-12 constitutes discrimination based on race under Title VII (Count XI); see id. ¶¶ 82-86; color under Title VII (Count XII); see id. ¶¶ 87-91; sex under Title VII (Count XIII); see id. ¶¶ 92-96; religion under Title VII (Count XIV); see id. ¶¶ 97-101; disability under the Rehabilitation Act (Count XV); id. ¶¶ 102-106; and reprisal under Title VII and the Rehabilitation Act (Count XVI); see id. ¶¶ 107-110. None of these claims has merit.

---

[9]  To the extent plaintiff alleges that Defendant failed properly to compensate him for earlier periods of time, see, e.g., Second Amended Complaint, ¶ 23(a) (alleging plaintiff took on supervisory responsibilities in 2001), such claims should be dismissed for failure to timely exhaust administrative remedies. A complainant is required to contact an EEO counselor within 45 days of the act complained of. See 29 C.F.R. 1614.105 (complainant must contact an EEO counselor within 45 days of the act complained of). If a complainant fails to exhaust administrative remedies, the complainant cannot raise the claim in district court. Park v. Howard Univ., 71 F.3d 904, 907-09 (D.C. Cir. 1995), cert. Denied, 117 S.Ct. 57 (1996). Plaintiff did not contact an EEO counselor on the failure to compensate issue until April 29, 2004. See Exhibit 27 (Report of Investigation in the Complaint of Anthony Bowden, Case Number: 04-16-080604).

A.    Factual Background

In July 2003, plaintiff met with his first-level supervisor, Kathleen Samiy, and Scarlitt Proctor, a Human Resources specialist, regarding plaintiff's belief that "his assigned duties deserved a promotion."  See Second Amended Complaint, ¶ 23(e).  At that time, plaintiff's position was classified as a GS-1010-11 (i.e., Series 1010, Grade 11).  See Exhibit 28 (Evaluation Statement) (Plaintiff's Depo. Ex. 88).  Plaintiff believed his duties warranted classification as a GS-12.  The parties "agreed that [plaintiff] would receive a desk audit," which Ms. Samiy formally requested on July 22, 2003.  See id.; Exhibit 29 (Samiy Depo. at 106-07).

The desk audit was conducted by an independent contractor, James Lewis.  See Exhibit 30 (Plaintiff's Depo. Ex. 39); Second Amended Complaint ¶ 23(f).  In conducting the audit, Mr. Lewis met with plaintiff on October 17, 2003.  Mr. Lewis also spoke with Ms. Samiy on October 20, 2003.  See id.  Mr. Lewis stated that "[t]he assistance and cooperation of Mr. Bowden and Ms. Samiy [was] very much appreciated."  See Exhibit 28 (Plaintiff's Depo. Ex. 88).

Mr. Lewis issued his evaluation on October 21, 2003.  See id. (Evaluation Statement); Exhibit 31 (Plaintiff's Depo. Ex. 41).  In conducting his review of plaintiff's position, Mr. Lewis relied on two publications issued by the Office of Personnel

Management ("OPM").  <u>See</u> Exhibit 28.  One of the publications,
"Grade Evaluation Guide for Visual Arts Work,"sets forth nine
factors for determining the grade level of positions in the GS-
1010 series, which series ranges from GS-7 to GS-12.  <u>See</u> <u>id.</u>
<u>See</u> <u>also</u> Exhibit 32 (Grade Evaluation Guide for Visual Arts Work)
(pages 699-714 of ROI for 04 admin complaint).  For each factor,
points are assigned based on the skill and level of work required
by the position.  <u>See</u> <u>id.</u>

    Mr. Lewis applied the nine factors to plaintiff's position
and arrived at a point total well within the range for GS-11.
<u>See</u> Exhibit 28 (crediting 2465 points; within the GS-11 range of
2355-2750) (Plaintiff's Depo. Ex. 88).  After summarizing his
analysis, Mr. Lewis concluded:  "[t]his position is correctly
classified as an Exhibits Specialist, GS-1010-11."  <u>See</u> <u>id.</u>; <u>see</u>
<u>also</u> Exhibit 30 ("It is our judgment that the extent of Mr.
Bowden's work in the areas of construction, installation and
repair of the exhibits meet the criteria described at the 11
level.") (Plaintiff's Depo. Ex. 39).  Plaintiff received the desk
audit shortly after it was completed.  <u>See</u> Exhibit 33 (November
6, 2003 letter from plaintiff to Lynn Dolnick) (Plaintiff's
2/20/08 Depo. Ex. 38).  Plaintiff contended the audit failed to
include numerous duties he claimed he was performing.  <u>See</u>
(Plaintiff's 2/20/08 Depo. at 115).

    On March 19, 2004, the Smithsonian Office of Human Resources

issued an updated position description for plaintiff's position,
titled Exhibits Specialist (General), which more clearly
identified plaintiff's duties and responsibilities.  See Exhibit
34 (Federal Position Description Cover Sheet and Position
Description) (pp 270-75; 04 EEO complaint file).  Many of the
position descriptions at the Zoo "hadn't been rewritten in years
to clarify duties," and management had been "working on rewriting
position descriptions and updating performance plans."  See
Dolnick Depo. at 83.  Plaintiff himself had been dissatisfied
with the position description he was working under, which led him
to request the desk audit.  See Second Amended Complaint, ¶
23(d), (e); see (Samiy depo. at 85-86).

    The updated position description classified plaintiff's
position as a GS-1010-11.  See Exhibit 34 (Federal Position
Description Cover Sheet and Position Description) (pp 270; 04 EEO
complaint file).  The Cover Sheet explained the rationale for the
classification.  For example, the Cover Sheet identified the
appropriate OPM standard for determining the position series for
plaintiff's position (Series 1010).  See id. (identifying "OPM
P[osition] C[lassification] S[tandard] for Exhibits Specialist,
GS-1010 (T[ransmittal]-103) D[a]t[e]d 05/91) (Box 32).  The Cover
Sheet also identified the appropriate OPM standard for
determining the Grade for plaintiff's position (Grade 11).  See
id. (identifying "P[osition] C[lassification] S[tandard] for

Grade Evaluation Guide for Visual Arts Work (T[ransmittal]-103) Dated 11-91).  The Cover Sheet further explained how points were awarded in determining the appropriate Grade under the nine point factor evaluation system and justified the Grade.  See id. (Factor Evaluation System).  Finally, the Cover Sheet contained a certification by Scarlitt Proctor, the Human Resources specialist, stating that: "I certify that this position has been classified as required by Title 5, US Code, in conformance with standards published by the OPM or, if no published standard applies directly, consistently with the most applicable published standards."  Id.

    B.   Legal Standard and Argument

Defendant has produced a legitimate, non-discriminatory reason for compensating plaintiff at the GS-11 rate, i.e., that GS-11 is the appropriate classification under the relevant OPM standards.  See Exhibit 34 (Federal Position Description Cover Sheet) (pp 270; 04 EEO complaint file).  To defeat summary judgment, then, plaintiff must "produce sufficient evidence for a reasonable jury to find that [defendant's] asserted non-discriminatory reason was not the actual reason and the employer intentionally discriminated against [him] on the basis of" race, color, sex, religion, disability, or reprisal.  Brady, 2008 U.S. App. LEXIS 6460 at *9-10.  Again, Plaintiff cannot meet this standard.

Plaintiff's principal argument that his classification as a GS-11 is discriminatory appears to be his contention that management "lied to the auditor about his duties in order to prevent him from receiving a promotion." See 2d Amd. Comp. ¶ 23(j). For example, shortly after receiving the desk audit, plaintiff alleged that, while he gave "the auditor all of the info that was needed for him to make a clear and accurate assessment of what my job is," due to "false info that was given to him by management the audit was not fact-based." Exhibit 35 (November 12, 2003 email from plaintiff to Lynn Dolnick) (Plaintiff's Depo. Ex. 40). Plaintiff has no evidence to support this assertion. Indeed, plaintiff has acknowledged that he does not know what information his supervisors provided to Mr. Lewis. See Exhibit 36 (Plaintiff's Response to Request for Admissions) (Plaintiff's Depo. Ex. 5); Plaintiff's 12/4/07 Depo. at 38). Moreover, notwithstanding plaintiff's dissatisfaction with the results of the audit, he informed his second-level supervisor in November 2003 that he "d[id] not think that it would be a good idea" to perform a second audit. See Exhibit 35 (November 12, 2003 email from plaintiff to Lynn Dolnick) (Plaintiff's Depo. Ex. 40).

Plaintiff also alleges "that management tried to include in his position description the additional duties he was performing so that he would not be promoted." See Second Amended Complaint,

¶ 23(j).  Plaintiff, again, has no evidence to support this
assertion.  Moreover, this claim is flatly inconsistent with
plaintiff's contention that the desk audit was discriminatory
because it "did <u>not</u> include many of the duties actually performed
by plaintiff." <u>see</u> <u>id.</u> ¶ 23(g) (emphasis added); Exhibit 35
(November 12, 2003 email from plaintiff to Lynn Dolnick)
(Plaintiff's Depo. Ex. 40).  Even taking this assertion at face
value, it makes no sense.  Classification decisions are based on
the nature of the duties assigned to a particular position.  <u>See</u>,
<u>e.g.</u>, Exhibit 32 (Grade Evaluation Guide for Visual Arts Work)
(pages 699-714 of ROI for 04 EEO complaint).  Including
additional duties in a position description would not prevent an
employee from being promoted as a result of a desk audit or
classification review.  For all of these reasons, defendant is
entitled to summary judgment on the counts in plaintiff's
complaint challenging his compensation.

<u>IV.  The Breach Of Contract Claim (Count XVII).</u>

This Court lacks subject matter jurisdiction over the Breach
of Contract claim under the Tucker Act, 28 U.S.C. § 1491(a)(1).[10]

_____

[10]  Plaintiff has not cited the Tucker Act, or any statutory
provision to support jurisdiction of a contract claim in support
of the Court's jurisdiction.  <u>See</u> Second Amended Complaint, ¶ 3.
This, in itself, could be fatal to such a claim.  <u>See</u> Fed. R.
Civ. P. 8(a)(1).  In any event, the Settlement itself provided
that the Court would retain jurisdiction only "as necessary to
enforce the terms of this Stipulation of Settlement and
Dismissal."  Att. A at 8.  Rather than seeking enforcement of the
terms of the Settlement, Plaintiff seeks damages for a

The courts routinely treat administrative settlements of discrimination claims as contracts.  See, e.g., Saksenasingh v. Secretary of Education, 126 F.3d 347, 348-49 (D.C. Cir. 1997); Bowden v. United States, 106 F.3d 433, 436 (D.C. Cir. 1997).  The D.C. Circuit has held that actions for breach of such contracts belong in the Court of Federal Claims where the amount sought exceeds $10,000, as does Plaintiff's claim.  See Second Amended Complaint, ¶¶ 46, 113; id. at 41-42;[11] Hansson v. Norton, 411 F.3d 231, 232-33, 235 (D.C. Cir. 2005) (dispute over the reasonableness of an award of attorney's fees where the Resolution Agreement provided that plaintiff would receive reasonable attorney's fees and costs where the agency awarded approximately one quarter of the fees sought).  The Court reasoned that such claims "neither requir[ed] an interpretation of Title VII with respect to [the] discrimination complaint nor [sought] equitable relief under Title VII."  Id. at 237; see Brown v. United States of America, 389 F.3d 1296, 1297 (D.C. Cir. 2004) (affirming dismissal of claim alleging breach of

theoretical breach.  See Second Amended Complaint at 9.

[11]  Plaintiff seeks $300,000.00 in this action and also specifically seeks "a declaratory judgment that Defendant breached the settlement agreement as reached in *Anthony Bowden v. Ira Michael Heyman, Secretary, Smithsonian Institution,* Civil Action No. 97-0545, JR (D.D.C.), in regard to reasonable accommodation of Plaintiff's disabilities and restoration of leave, and order that Defendant immediately abide by these terms of the settlement agreement."  Second Amended Complaint, ¶¶ 46, 113; id. at 41-42, subparagraphs f. and I.

administrative settlement of EEO charges "because this contract question arises in a suit against the United States for more than $10,000 in damages, jurisdiction to decide whether the Department breached the settlement agreement lies exclusively in the Court of Federal Claims.").[12]

> Defendant relies on recent D.C. Circuit jurisprudence indicating that district courts lack jurisdiction over claims for damages arising out of Title VII settlement agreements where the claims do not involve interpretation of Title VII. . . . (citing Hansson v. Norton, 411 F.3d 231, 232-33, 235 (D.C. Cir. 2005); Brown v. United States, 389 F.3d 1296, 1297 (D.C. Cir. 2004)).  Indeed, quite recently in Rochon v. Gonazles, [438 F.3d 1211 (D.C. Cir. 2006),] a case in which the plaintiff alleged both violations of Title VII and breach of a Title VII settlement agreement and sought both monetary damages and equitable relief, the D.C. Circuit stated that, "the combination of a claim for equitable relief brought under Title VII and a related claim for breach of contract does not give the district court jurisdiction over the contract claim that, if brought separately, would be exclusively in the Court of Federal Claims ...." 438 F.3d 1211, 1214 (D.C. Cir. 2006).

> However, in Rochon, the D.C. Circuit went on to note that it was "not immediately clear whether Rochon's claim, if brought separately, would fall within the jurisdiction of the Court of Federal Claims" because that court does not have jurisdiction over claims for damages sounding in tort.  Id. (noting, however, that the Court of Federal Claims may retain jurisdiction over a suit where the "primary thrust of a complaint is breach of contract") (citation and internal quotations omitted); see also Taylor v. United States, No. 05-1045 C, 2006 WL 2949283, *7 (Fed. Cl. Oct. 13, 2006) (Court of Federal Claims lacks

---

[12]  The D.C. Circuit emphasized that "[i]n order for Brown either to pursue remedies for breach of contract or to seek relief under Title VII, she must first prove the Department breached the settlement agreement."  Brown, 389 F.3d at 1297.

jurisdiction over Title VII claims).  As Defendant
acknowledges, it is equally unclear whether the Court
of Federal Claims would assert jurisdiction over
Plaintiff's breach of contract claim in this case. . .
.  That court has recently declined jurisdiction to
enforce a Title VII settlement agreement which, like
the Settlement Agreement in this case did not authorize
monetary damages as remedy for a breach, see Schnelle
v. United States, 69 Fed. Cl. 463, 466-67 (Fed. Cl.
2006), and it is undisputed that the Court of Federal
Claims cannot award an equitable remedy in the absence
of a viable claim for money damages, Taylor, 2006 WL
2949283 at * 13.

Munoz v. England, Civil Action No. 05-2472 CKK, 2006 WL 3361509,

*5 n.2 (D.D.C. Nov. 20, 2006).[13]

    Even if the Court had jurisdiction, Plaintiff would fail to

state a claim for relief under the Settlement Agreement.

        In this case, the court can construe plaintiff's
    complaint, on its face, to allege a common law breach
    of contract claim, and to request damages in the amount
    of $1,000,000.  As noted above, plaintiff must show
    the existence of a valid contract, a duty arising from
    that contract, a breach of that duty, and that the

_____

    [13]  This Court in Munoz noted the possibility of the Court
exercising ancillary jurisdiction where it already had
jurisdiction to award equitable relief.  See Munoz, 2006 WL
3361509, *5 n.2 (citing Rochon).  The Stipulation of Settlement
And Dismissal (Exhibit 37) resolved all aspects of Plaintiff's
earlier action, leaving no jurisdiction in this Court.  See
Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 378,
(1994) ("Enforcement of the settlement agreement, however,
whether through award of damages or decree of specific
performance, is more than just a continuation or renewal of the
dismissed suit, and hence requires its own basis for
jurisdiction.").

breach caused the damages claimed by plaintiff. . . .
[A]ssuming the 2002 settlement agreement is a valid
contract, plaintiff nevertheless fails to provide any
evidence that the government breached the contract.
Specifically, plaintiff does not allege that the
government failed to perform any of its duties under
the 2002 settlement agreement.  Indeed, all of the
evidence indicates that the government satisfied its
contractual obligations.  Thus, plaintiff fails to
state a claim for breach of contract.

Taylor v. United States, 73 Fed.Cl. 532, 545-46 (Fed. Cl. 2006).

As in Taylor, even were the Court to consider Plaintiff's
breach of contract claim, it is clear that the terms of the
settlement reached in his earlier case have not been breached by
the Defendant.  The Court of Appeals emphasized in Brown that
"[i]n order for Brown either to pursue remedies for breach of
contract or to seek relief under Title VII, she must first prove
the Department breached the settlement agreement."  Brown, 389
F.3d at 1297 (emphasis added).  In this case, the gravamen of the
case involves whether there was a breach of the contractual
obligation to restore leave to Plaintiff upon his timely
submission (within two pay periods of the February 18, 1999
approval of the Settlement Agreement) of "objective evidence"
that Plaintiff used the leave "as a direct result of his medical
condition . . ., panic disorder."  See Exhibit 37 (Stipulation Of
Settlement And Dismissal) at ¶ 6; Plaintiff's 12/4/07 Depo. at
12, 38.

Plaintiff's breach of contact claim is based solely on
plaintiff's assertion that the agency has failed to satisfy

paragraph 6 of the Stipulation Of Settlement And Dismissal.  Id.;

Plaintiff's 12/4/07 Depo. at 9-14, 38.  Paragraph six provides:

> The Smithsonian agrees to restore leave taken by Bowden
> from July 1994 to the present which Bowden can show, by
> objective evidence, was used as a direct result of his
> medical condition that is the basis for his claim
> pursuant to the Rehabilitation Act, i.e. panic
> disorder.  Such restoration shall be limited to the
> extent Bowden is compensated for such leave through a
> workers' compensation claim, a claim for which he
> currently has pending.  Bowden will provide
> documentation of the use of such leave in connection
> with his medical condition within two pay periods of
> the Court's approval of this stipulation.  The
> Smithsonian Institution will respond to plaintiff's
> documentation within 30 days of its submission.  Should
> plaintiff disagree with the Smithsonian's response,
> plaintiff shall notify the Smithsonian in writing
> within 30 days and give the Smithsonian 30 days to
> address the matters raised by plaintiff before seeking
> judicial review, if any is available.

Plaintiff's 12/4/07 Depo. at 13-14; 2/16/99 Stipulation Of

Settlement And Dismissal, ¶ 6.

The Stipulation Of Settlement And Dismissal in Civil Action

No. 05-2202 was approved by the Court on February 18, 1999.

Plaintiff's 12/4/07 Depo. at 24.[14]  Yet, the only thing submitted

to the agency by Plaintiff within the two pay periods following

the approval of the settlement agreement was a chart prepared by

Plaintiff with a list of leave taken and in another column

Plaintiff wrote simply "depressed or doctor or stressed."

Plaintiff's 2/20/08 Depo. at 11-13.

_____

[14]  The Stipulation of Settlement also provided for
Plaintiff's transfer from the Natural History Museum to the Zoo.
12/4/07 Plaintiff's Depo. at 47.

Plaintiff's submission of such a subjective and conclusory list cannot be said to satisfy the requirement of "objective evidence."  Thus, the condition precedent to the agency's obligation to restore Plaintiff's leave — the timely submission by him of "objective evidence" — never occurred.  Indeed, Plaintiff was repeatedly advised that his list, with its subjective remarks, was simply inadequate.  See, e.g., June 29, 1999 Letter to Alan Banov[15] from AUSA Zane  at 1-2 (Plaintiff's 2/20/08 Depo. at 9-10 and Depo. Ex. 19)("As you know, the only information submitted by Mr. Bowden was a list of leave taken with the reasons stated as 'depressed' or 'Doctor' or 'stressed' in addition to a scattering of dates for doctors appointments. Obviously, the objective evidence must be more than such conclusory, passing statements"); August 6, 1999 Letter to Alan Banov from AUSA Zane (Plaintiff's 2/20/08 Depo. at 9-10 and Depo. Ex. 19); August 27, 1999 Letter to Alan Banov from AUSA Zane (Plaintiff's 2/20/08 Depo. at 9-10 and Depo. Ex. 19).

As noted by then counsel for the defendant, "the chart that has been provided does not provide 'objective' evidence sufficient to restore the leave requested."  August 27, 1999 Letter to Alan Banov from AUSA Zane (Plaintiff's 2/20/08 Depo. at 9-10 and Depo. Ex. 19).  Indeed, the remarks on Plaintiff's chart

---

[15]  Mr. Banov was Plaintiff's attorney at the time. Plaintiff's 2/20/08 Depo. at 10.

were clearly lacking in any <u>objective evidence</u>.  <u>See</u> Plaintiff's
2/20/08 Depo. at 11-13.  Thus, even had Plaintiff timely pursued
his breach of contract claim, the defendant was justified in
refusing to restore leave based solely on Plaintiff's subjective
and unsupported suggestion that leave was taken for a reason
warranting restoration under Paragraph 6 of the agreement.  <u>Id.</u>;
<u>see</u> <u>Gaines</u> v. <u>Continental Mortg. and Inv. Corp.</u> 865 F.2d 375, 377
(D.C. Cir. 1989) (Since plaintiffs failed to meet the condition
precedent, the court properly released the defendants from their
obligations under the Settlement Agreement).

        Finally, Plaintiff's asserted breach of contract claim is
untimely.  A breach of contract action against the Federal
defendant must be filed within "six years after the right of
action first accrues."  28 U.S.C. § 2401(a).  Plaintiff asserts
that:

> Defendant willfully, maliciously and unlawfully
> violated and breached its settlement agreement under
> *Bowden v. Heyman*, Civil Action No. 97-0545 JR (D.D.C.),
> with Plaintiff when it failed to provide the reasonable
> accommodations it was required to under the terms of
> that agreement as described in ¶ 15, and when it failed
> to restore his leave, as described in ¶ 46 above.

Second Amended Complaint, ¶ 112.

        Insofar as Plaintiff may be seeking to challenge the failure
of the agency to restore leave, Plaintiff has admitted that any
breach took place by May 1999.  <u>See</u> Plaintiff's 12/4/07 Depo. at
48 (Q: "And you believe that as of May of 1999, you've done

- 41 -

everything you had to do to get the leave restored; is that right?"  [Plaintiff]: "To the best of my knowledge, yes."); <u>see also</u> <u>id</u>. at 18-20, 23-27, 33; June 29, 1999 Letter to Alan Banov at 1-2 (Depo. Exh. 19) ("As you know, the only information submitted by Mr. Bowden was a list of leave taken with the reasons stated as 'depressed' or 'Doctor' or 'stressed' in addition to a scattering of dates for doctors appointments. Obviously, the objective evidence must be more than such conclusory, passing statements"); <u>accord</u> August 27, 1999 Letter to Alan Banov from AUSA Zane (Exhibit 38).

Even if this Court had jurisdiction to entertain a breach of contract claim against the Federal defendant, that claim would be barred.  Plaintiff's claim accrued, at the latest, in May 1999. Yet Plaintiff did not file this lawsuit until November 10, 2005. Plaintiff filed suit outside the six-year statute of limitations, and his claim for Breach of Contract is therefore time-barred.[16]

---

[16]    If Plaintiff is seeking to treat the breach of the settlement agreement filed in the earlier civil action as one entered during the EEO complaint process, he was untimely in presenting the claim there as well and thus did not timely exhaust administrative remedies.  <u>See</u> 29 C.F.R. § 1614.504 ("If the complainant believes that the agency has failed to comply with the terms of a settlement agreement or decision, the complainant shall notify the EEO Director, in writing, of the alleged noncompliance within 30 days of when the complainant knew or should have known of the alleged noncompliance.").  Plaintiff has not provided any documentation showing a timely pursuit of his breach of settlement claim through the EEO Director or otherwise.

Similarly, even if not barred by the statute of limitations,

This claim should be dismissed.  <u>See</u> Settlement Agreement, ¶ 6; Plaintiff's 12/4/07 Depo. at 18-36.

## V.  Rehabilitation Act Accommodation Requests.  (Count XVIII).

Lastly, Plaintiff claims that his requests for reasonable accommodations have not been granted.  These claims seem to consume his challenge to his supervisors asking where he has been when he disappears for periods of time and the requirement that he attend meetings with all staff, even when Elena Lopez is invited to the meeting.  Second Amended Complaint, ¶¶ 29-30, 34, 38-39.  Plaintiff suggests that the agency's settlement of its earlier case with him specifically called for the agency to allow him to go to the bathroom when necessary.  <u>See</u> Exhibit 37 (Stipulation Of Settlement And Dismissal), ¶ 3.  Nowhere in the paragraph permitting "short breaks to go to the bathroom" are his supervisors forbidden from asking where he has been when he cannot be found for 20 minutes at a time.  <u>See</u> <u>id.</u>; Second

---

laches would bar Plaintiff's claim.  Equity may be invoked by the vigilant, not those who sleep on their rights.  <u>International Union, Allied Industrial Workers of America</u> v. <u>Local Union No. 589</u>, 693 F.2d at 672; <u>TRW Environmental Safety Systems, Inc.</u> v. <u>United States</u>, 16 Cl. Ct. 516, 519 (1989); <u>see also</u> <u>CarrAmerica Realty Corp.</u> v. <u>Kaidanow</u> 321 F.3d 165, 171-72 (D.C. Cir. 2003) (Laches applies where there has been an unfair and prejudicial delay by a plaintiff in bringing an action).  In the years since the settlement was reached, the actual submission by Mr. Banov has been lost.  Neither party has it available to them.  Although Plaintiff has admitted that his submission listed only his subjective description of the reason for his leave, were this claim to survive, Defendant would be unable to present the very information that was submitted by Plaintiff as his purported "objective evidence."  Because the key reason for rejecting Plaintiff's claim for leave was the insufficiency of his submission, Defendant would be severely prejudiced by its loss.

Amended Complaint, ¶¶ 29-30, 34.  Plaintiff's 2/20/08 Depo. at
207-10 (noting that Plaintiff may take bathroom brakes for up to
20 minutes, but that Plaintiff is unaware of any instances where
he lost pay due to his disappearances).  Plaintiff's supervisor,
however, asks all of his staff where they are at times.  Baxter
Depo. at 185.

Plaintiff's claim that he was required to attend meetings
where Elena Lopez was present based only on his stated desire to
be excused for health reasons was not reasonable under the
circumstances.  Mr. Baxter discussed the issue with Plaintiff and
considered the request to be excused, but concluded that the
meeting was required for the work of the office.  See Baxter
Depo. at 175.  There was "a lot of exchange of information that
[was] important."  Baxter Depo. at 174-77.  Mr. Baxter worked out
an accommodation for the meeting, allowing Plaintiff to sit in
the back or near an exit and allowing him to leave if he felt
uncomfortable.  Baxter Depo. at 175.  This accommodation was
permitted whenever the two attended the meetings that were
scheduled every two weeks.  Baxter Depo. at 183-84.

This compromise in the face of Mr. Bowden's unspecified
claim that he sometimes got upset was a very reasonable
accommodation, one designed to address the symptoms whenever they
arose, but also designed to maximize the value of the meetings
and their resultant exchange of information among all employees.
See Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d
1278, 1285-86 (11th Cir 1997) (individual with a disability

entitled "only to a reasonable accommodation").

CONCLUSION

WHEREFORE, the above civil action should be dismissed, or summary judgment entered in favor of the defendants.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney


_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


_____ /s/
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANTHONY BOWDEN,                          )
                                         )
          Plaintiff,                     )
                                         )
     v.                                  ) Civil Action No. 05-2202 RBW
                                         )
CRISTIÁN SAMPER, Acting Secretary, )
 Smithsonian Institution,                )
                                         )
          Defendant.                     )
_____  )


STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE DISPUTE

     Pursuant to Local Civil Rule 7(h), the defendant hereby
provides the following statement of material facts as to which
there is no genuine dispute:

     Plaintiff's Hostile Work Environment Claim (Counts I-VI).

     Heavy Projects and Work in the Lower Shop

     1.  Plaintiff asserts that he was required to work alone and
that he was required to work on heavy projects and move furniture
and work in the lower shop area.  See Complaint, ¶ 23(k)-23(l),
23(s).

     2.  Plaintiff has admitted, however, that there was a
shortage of staff (See May 21, 2003 E-mail from Bowden to Tanner
acknowledging "shortage of staff") (Plaintiff's Depo. Exh. 7)
(Exhibit 39); Plaintiff's 12/4/07 Depo. at 117-18, and that his

coworkers were called upon to perform other functions, such as work making vinyl signs. <u>See</u> Plaintiff's 12/4/07 Depo. at 67.

3. Plaintiff also admitted that a coworker not in the production section, Earnest Robinson, would sometimes help with heavy projects. Plaintiff's 12/4/07 Depo. at 83-84; Plaintiff's 2/20/08 Depo. at 23-24. Mr. Robinson, however, complained that he was being required to do this heavy production work because of his race, and thereafter Mr. Robinson was relieved of these production tasks. Plaintiff's 12/4/07 Depo. at 88-89, 96; Plaintiff's 2/20/08 Depo. at 25

4. Plaintiff has complained that his supervisor, Mr. Baxter, has taken it upon himself to inquire of the work schedule of contract welders (something Plaintiff feels should have been his job) and have outside contractors work on a prototype sign in the Small Mammal house, asking why such jobs were being given to others. <u>See</u> Exhibit 3 (October 5, 2004 Memo from Plaintiff) at 2.

5. Plaintiff admits, however, that 80% of the signs at the zoo are made by outside contractors. Plaintiff's 12/4/07 Depo. at 99.

6. Plaintiff also concedes that, while he may have been called upon to work with heavy objects, he had greater upper body strength than Grace Lopez, another worker in the production department, who weighed only about 110 pounds, while Plaintiff is estimated to weigh as much as 175 pounds. <u>See</u> Plaintiff's

12/4/07 Depo. at 68-73.

7.  Plaintiff asserts that the lower shop was unsafe because the saws were not bolted to the floor, and there was dust in the air when the saws were used and inadequate ventilation to remove the dust from the air.  Plaintiff's 2/20/08 Depo. at 67-68.

8.  It was Plaintiff who ordered the majority of the equipment for the lower workshop, including the saws.  See Plaintiff's 12/4/07 Depo. at 78-80.

9.  Plaintiff has admitted that it was he and a coworker who installed the saws, but never finished what needed to be done. Plaintiff's 12/4/07 Depo. at 114-19.

10.  Plaintiff was the safety officer until 2004. Plaintiff's 2/20/08 Depo. at 146; see also Plaintiff's 12/4/07 Depo. at 79-80  (plaintiff was acting in place of Mr. Hider when Hider left and Hider has been in charge of safety).

11.  On March 9, 2005, when Plaintiff was told by his supervisor, Jeff Baxter, that he (Mr. Bowden) should take responsibility for setting up the lower shop area as it should be set up, and when the supervisor told Mr. Bowden to act as team leader and to supervise a coworker if necessary, Plaintiff told his supervisor that "he [Mr. Baxter] was hired as the Exhibit supervisor and supervisor is not part of my title."  (Exhibit 5) (Plaintiff's May 19, 2005 Affidavit) (Plaintiff's Depo. Ex. 85) at 3-4).

12.  Plaintiff admits that he seldom used the saws in the

- 3 -

lower shop, because he felt they were not safe.  Plaintiff's
12/4/07 Depo. at 112, 119-21.

13.  Plaintiff agreed that a dust mask would protect him
from the dust and that he had picked such masks up at Home Depot
or from other workers at the Zoo.  See Plaintiff's 2/20/08 Depo.
at 72-73.

14.  Plaintiff also concedes that Grace Lopez was called
upon to work in the lower shop about the same amount of time
under the earlier supervision of Mr. Hider as she has after Mr.
Hider's departure.  Plaintiff's 12/4/07 Depo. at 64, 71.

15.  Mr. Hider never discriminated or retaliated against
Plaintiff.  Id.

16.  Plaintiff admits that Grace Lopez used the vinyl sign-
making machine before he ever arrived at the Zoo, and that she
was good at using the machine, as were the others who had used it
before Plaintiff arrived.  Plaintiff's 12/4/07 Depo. at 75-77.

"Hostile" Meetings

17.  Plaintiff also complains of hostile meetings, but has
explained that by this he meant that his supervisor, Ms. Samiy
would say in meetings things like: "you are going to do as I ask
you to do." Plaintiff's 2/20/08 Depo. at 65-66.

18.  Elsewhere, Plaintiff claimed that it was harassment
simply to expect him to attend meetings with supervisors, because
he was not able to keep up with upcoming projects, which made him
feel uncomfortable.  See Plaintiff's May 19, 2005 Affidavit

- 4 -

(Plaintiff's Depo. Ex. 85) at 2; Baxter Depo. at 160-70.

The Panda House

19.  Plaintiff also complains that he was scolded by Mr. Baxter when Plaintiff and a coworker went to the Panda House where they were to hang banners.  Plaintiff's 2/20/08 Depo. at 225-30.

20.  Plaintiff admits that his supervisor had explicitly instructed the workers to call him when they were ready to hang the banners. Plaintiff's 2/20/08 Depo. at 226.

21.  Mr. Baxter was upset when he arrived to find the workers waiting around unable to proceed with the task because they had not followed his explicit instructions to give him a call first.  Baxter Depo. at 218-21.

22.  The reason Mr. Baxter wanted to be called was so that he could explain the task and not have his workers waiting around doing nothing.  See Baxter Depo. at 219-20.

23.  Plaintiff admits that he and his coworker ended up waiting some time for Mr. Baxter to arrive and told him so.  See Plaintiff's 2/20/08 Depo. at 227; Baxter Depo. at 219-20.

24.  Because Mr. Baxter was upset, he was animated in asking them why they had not called him.  Baxter Depo. at 220.

25.  Plaintiff describes the discussion: Mr. Baxter "got really loud, and a little belligerent, and started hollering; and said, you know, well what if I had been in a meeting. . ."

- 5 -

Plaintiff's 2/20/08 Depo. at 227.

26.  Plaintiff did not lose any pay or benefits as a result
of the events at the Panda House.  <u>See</u> Plaintiff's 2/20/08 Depo.
at 230.

<u>     Scheduling Sick Leave</u>

27.  Plaintiff complains that he was asked to schedule sick
leave, where possible.  <u>See</u> Plaintiff's 2/20/08 Depo. at 154-56,
206; Exhibits 7-8 (Plaintiff's Depo. Ex. 56-57).

28.  Plaintiff admits, however, that he was never denied
sick leave because of his request for leave was made too late to
satisfy his supervisor.  <u>See</u> Plaintiff's 2/20/08 Depo. at 206.

<u>     Performance Ratings</u>

29.  Plaintiff alleged, for instance, that in May 2004 and
March 2005 he received performance ratings of "fully successful."
Second Amended Complaint, ¶ 23⊛.

30.  The fully successful ratings indicated that Plaintiff
had "met" each of the critical elements of his job, but offered
praise and constructive criticism in several areas.  <u>See</u> Exhibit
9 (2004 Performance Appraisal Form); Exhibit 10 (2005 Performance
Appraisal Form).

<u>     The Elena Lopez Assault and Failure To Take Action</u>:

31.  Plaintiff complains that another employee, Elena Lopez,
had used her body to push him and others out of the way on at
least two occasions.  Plaintiff's 2/20/08 Depo. at 177-78, 212-

225; Complaint, ¶¶ 35-39.

32.  Plaintiff felt that when he was "rammed" by Elena
Lopez, the agency should have done more to protect him.
Complaint, ¶ 39.[1]  Plaintiff admitted that he was not injured by
Elena Lopez in the incident.  Plaintiff's 2/20/08 Depo. at 215-
16.

33.  Mr. Baxter noted that he saw Elena Lopez carrying cakes
for a bridal shower, recognized that Plaintiff had reacted for
some reason, and later assured Plaintiff that he had spoken to
Elena Lopez's supervisor about the incident and intended to make
the work environment a good and comfortable place to work.  See
Baxter Depo. at 155-57 and Baxter Depo. Ex. 20 - Ex. 25 (Exhibits
11-16).

34.  In fact, however, the incident was reported to the
police, who investigated it and prosecution was declined.  See
id.  Moreover, Plaintiff agrees, that after the incident with and
investigation of Elena Lopez, she never ran into him again.
Plaintiff's 2/20/08 Depo. at 222-25.

    Confirmation of Counseling Letter

35.  Plaintiff complains that he was given a confirming
counseling letter (Plaintiff's Depo. Ex. 68), reminding him that
it was improper to describe a co-worker as a "crazy lady".  See

---

[1]  Plaintiff believes that Elena Lopez was angry with
Plaintiff because she blamed him for how her friend, Kathleen
Samiy was being treated by the agency.  Plaintiff's 2/20/08 Depo.
at 218-20.

Complaint, ¶ 28(b); Plaintiff's Depo. Ex. 68).

36.  Plaintiff admitted using the term "crazy" in referring to Ms. Elena Lopez.  Plaintiff's 2/20/08 Depo. at 176-77.  And he further admitted that the counseling letter was written because Mr. Baxter's supervisor told Mr. Baxter that it was inappropriate to use the word crazy in describing Ms. Lopez.  Plaintiff's 2/20/08 Depo. at 181-82.  The letter, a copy of which was marked at Plaintiff's deposition as exhibit 69, specifically advised Plaintiff that there would be no further action on the matter other than "to remind all staff that we work in an open office environment and that we need to be mindful of the content and volume of our conversation, including phone conversation. . . " Exhibit 17 (Plaintiff's Depo. Ex. 68).

37.  The confirmation of counseling memorandum also stressed that the document "**will NOT be filed in your Official Personnel Folder**."  Id. (emphasis in original).

        The Comments On Biking Clothes

38.  Plaintiff also complained that his supervisor commented on his wearing his biking clothes at work.  Plaintiff's 12/4/07 Depo. at 162-65.

39.  No mention is made by Plaintiff that the discussion went beyond a comment.  Id.

        Questioning about Plaintiff's whereabouts

40.  Plaintiff also complains that when his supervisor has been looking for him and he was not at his desk, the supervisor

would ask him where he was, even when he was simply going to the bathroom for 20 minutes.  See Plaintiff's 2/20/08 Depo. at 206-07, 287.

### The Attempt To Postpone Desk Audit

41.  Plaintiff asserts that there was an "attempt[] to postpone" his desk audit on October 16, 2003, but that it went forward on October 17, 2003, yet the audit did not recite many of his duties.  Second Amended Complaint, ¶ 23(e)-23(g).

42.  Plaintiff admits that the audit was not postponed, and he was given the opportunity to participate in another desk audit, but refused.  Id.; Plaintiff's Depo. Ex. 40.

### The Non-Selection (Counts VII-X).

43.  The position of Supervisory Exhibits Specialist was posted on August 18, 2003 as Vacancy Announcement No. 03SP-1309.  See Exhibit 19 (2003 Vacancy Announcement).

44.  The selecting official was not satisfied with the overall pool of candidates, which included persons who had never done production work.  See Exhibit 20 (Deposition of Lynn Dolnick) ("Dolnick Depo.") at 207-09.

45.  Vacancy Announcement No. 03SP-1309 was cancelled and revised to place a greater emphasis on production skills.  See Dolnick Depo. at 208-10.

46.  The position of Supervisory Exhibit Specialist was re-posted as Vacancy Announcement No. 04SP-1005.  See Exhibit 21

- 9 -

(2004 Vacancy Announcement).

47.  It is not unusual for management to revise a vacancy announcement to emphasize certain job elements to attract candidates with those skills.  See Deposition of Mary Rowker Tanner ("Tanner Depo.")at 73-74.

48.  Plaintiff applied for the Supervisory Exhibits Specialist position listed in Vacancy Announcement No. 04SP-1005. See Exhibit 23 (Plaintiff's application); February 20, 2008 Deposition of Anthony Bowden ("Plaintiff's 2/20/08 Depo.") at 271.

49.  Plaintiff made the certification list for this position.  See Exhibit 25 (Certification list).

50.  Plaintiff was interviewed for the position by a three-person panel.  See Dolnick Depo. at 229-30.  The panel had a list of written questions and, during the interviews, each candidate was asked the same questions.  See id. at 229.

51.  Jeffrey Baxter was selected for the Supervisory Exhibits Specialist position listed in Vacancy Announcement No. 04SP-1005.  See Dolnick Depo. at 214.

52.  Jeffrey Baxter was the most qualified candidate for this position.  See Dolnick Depo. at 212, 214, 230; see Exhibit 26 (Baxter application).

53.  Management wanted the Production department to utilize Filemaker and Quark Express software as part of their production duties.  Plaintiff's 2/20/08 Depo. at 91, 130, 131; Plaintiff's

- 10 -

12/4/07 Depo. at 203; Exhibit 40 (8/28/03 E-mail from Dolnick to Plaintiff) (Plaintiff's Depo. Ex. 18).

   Desk Audit

   54.  July 2003, plaintiff met with Kathleen Samiy, his first-level supervisor, and Scarlitt Proctor, a Smithsonian Human Resources specialist, regarding plaintiff's belief that "his assigned duties deserved a promotion." <u>See</u> Second Amended Complaint, ¶ 23(e).

   55.  Plaintiff's position was classified at that time as a GS-1010-11. <u>See</u> Exhibit 28 (Evaluation Statement) (Plaintiff's 2/20/08 Depo. Ex. 88).

   56.  On July 22, 2003, Ms. Samiy formally requested a desk audit of plaintiff's position. <u>See</u> Exhibit 29 (Samiy Depo.) at 106-07.

   57.  The desk audit was conducted by an independent contractor, James Lewis. <u>See</u> Exhibit 30 (Plaintiff's 2/20/08 Depo. Ex. 39).

   58.  In conducting the audit, Mr. Lewis met with plaintiff on October 17, 2003. <u>See</u> Exhibit 30 (Plaintiff's 2/20/08 Depo. Ex. 39). Mr. Lewis also spoke with Ms. Samiy on October 20, 2003. <u>See</u> <u>id.</u>

   59.  Plaintiff does not know what information Ms. Samiy or any other person in management  provided to Mr. Lewis. <u>See</u> Exhibit 36 (Plaintiff's Response to Request for Admissions) (Plaintiff's 12/4/07 Depo. at 38).

60.  Mr. Lewis issued his audit evaluation on October 21, 2003.  See Exhibit 31 (Plaintiff's Depo. Ex. 41).

61.  In conducting the audit, Mr. Lewis relied on OPM classification standards, including the OPM standard for "Grade Evaluation Guide for Visual Arts Work."  See Exhibit 28 (Evaluation Statement) (Plaintiff's 2/20/08 Depo. Ex. 88)

62.  Mr. Lewis applied the OPM standards to plaintiff's position and concluded that plaintiff's position was correctly classified as a GS-1010-11.  See Exhibit 28 (Evaluation Statement) (Plaintiff's Depo. Ex. 88).

63.  Plaintiff informed his second-level supervisor on November 12, 2003 that he "d[id] not think that it would be a good idea" to perform a second audit.  See Exhibit 35 (November 12, 2003 email from plaintiff to Lynn Dolnick) (Plaintiff's 2/20/08 Depo. Ex. 40).

64.  On March 19, 2004, the Smithsonian Office of Human Resources issued an updated position description for plaintiff's position which more clearly identified plaintiff's duties and responsibilities.  See Exhibit 34 (Federal Position Description Cover Sheet and Position Description) (pp 270-75; 04 complaint file).

65.  Plaintiff had been dissatisfied with the position description he was working under, which led him to request a desk audit.  See Second Amended Complaint, ¶ 23(d), (e); see Samiy Depo. at 85-86.

66.  The updated position description classified plaintiff's position as a GS-1010-11 based on OPM classification standards. See Exhibit 34 (Federal Position Description Cover Sheet and Position Description) (pp 270-75; 04 complaint file).

67.  The Federal Position Description Cover Sheet ("Cover Sheet") identified the relevant OPM standards for classifying plaintiff's position.  See Exhibit 34 (Federal Position Description Cover Sheet and Position Description) (pp 270-75; 04 complaint file).

68.  The Cover Sheet justified the Grade for plaintiff's position under the relevant nine point factor evaluation system. See Exhibit 34 (Federal Position Description Cover Sheet and Position Description) (pp 270-75; 04 complaint file).

69.  The Cover Sheet contained a signed certification by Ms. Proctor stating that: "I certify that this position has been classified as required by Title 5, US Code, in conformance with standards published by the OPM or, if no published standard applies directly, consistently with the most applicable published standards."  See Exhibit 34 (Federal Position Description Cover Sheet and Position Description) (pp 270-75; 04 complaint file).

Breach of Contract

70.  A true and correct copy of the Stipulation of Settlement And Dismissal in Civil Action No. 97-0545 JR was marked as Bowden exhibit number 1 at the deposition.  See Plaintiff's 12/4/07 Depo. at 10-12 and Exhibit 37 (Stipulation Of

- 13 -

Settlement And Dismissal).

71.  Plaintiff's breach of contact claim is based solely on plaintiff's assertion that the agency has failed to satisfy paragraph 6 of the Stipulation Of Settlement And Dismissal.  Id.; Plaintiff's 12/4/07 Depo. at 9-14, 38.

72.  Paragraph six of the Stipulation of Settlement And Dismissal provides:

> The Smithsonian agrees to restore leave taken by Bowden from July 1994 to the present which Bowden can show, by objective evidence, was used as a direct result of his medical condition that is the basis for his claim pursuant to the Rehabilitation Act, i.e. panic disorder.  Such restoration shall be limited to the extent Bowden is compensated for such leave through a workers' compensation claim, a claim for which he currently pending.  Bowden will provide documentation of the use of such leave in connection with his medical condition within two pay periods of the Court's approval of this stipulation.  The Smithsonian Institution will respond to plaintiff's documentation within 30 days of its submission.  Should plaintiff disagree with the Smithsonian's response, plaintiff shall notify the Smithsonian in writing within 30 days and give the Smithsonian 30 days to address the matters raised by plaintiff before seeking judicial review, if

any is available.

Plaintiff's 12/4/07 Depo. at 13-14; 2/16/99 Stipulation Of
Settlement And Dismissal, ¶ 6.

73. The Stipulation Of Settlement And Dismissal in Civil
Action No. 05-2202 was approved by the Court on February 18,
1999. Plaintiff's 12/4/07 Depo. at 24.

74. The only thing submitted to the agency by Plaintiff
within the two pay periods following the approval of the
settlement agreement was a chart prepared by Plaintiff with a
list of leave taken and in another column Plaintiff wrote simply
"depressed or doctor or stressed." Plaintiff's 2/20/08 Depo. at
11-13.

75. Plaintiff was repeatedly advised that his list with its
subjective remarks was simply inadequate. See, e.g., Exhibit 41
(June 29, 1999 Letter to Alan Banov from AUSA Zane) at 1-2
(Plaintiff's 2/20/08 Depo. at 9-10 and Depo. Ex. 19)("As you
know, the only information submitted by Mr. Bowden was a list of
leave taken with the reasons stated as 'depressed' or 'Doctor' or
'stressed' in addition to a scattering of dates for doctors
appointments. Obviously, the objective evidence must be more
than such conclusory, passing statements"); August 6, 1999 Letter
to Alan Banov from AUSA Zane (Plaintiff's 2/20/08 Depo. at 9-10
and Depo. Ex. 19); August 27, 1999 Letter to Alan Banov from AUSA
Zane (Plaintiff's 2/20/08 Depo. at 9-10 and Depo. Ex. 19).

76. Alan Banov was Plaintiff's attorney at the time of the

correspondence cited in Paragraph 75 above.  Plaintiff's 2/20/08
Depo. at 10.

77.  Insofar as Plaintiff may be seeking to challenge the
failure of the agency to restore leave, Plaintiff has admitted
that any breach took place by 1999.  See Plaintiff's 12/4/07
Depo. at 33 (Q: "Do you remember what year it was when you first
learned that the Smithsonian had denied your request for leave
under Paragraph 6 of Exhibit 1 [the Stipulation Of Settlement And
Dismissal]?" [Plaintiff]: "I'm pretty sure it was '99"); see also
id. at 18-20, 23-27, 33; June 29, 1999 Letter to Alan Banov at 1-
2 (Depo. Exh. 19) ("As you know, the only information submitted
by Mr. Bowden was a list of leave taken with the reasons stated
as 'depressed' or 'Doctor' or 'stressed' in addition to a
scattering of dates for doctors appointments.  Obviously, the
objective evidence must be more than such conclusory, passing
statements"); accord August 27, 1999 Letter to Alan Banov from
AUSA Zane (Exhibit 38).

Rehabilitation Act Accommodation Requests.  (Count XVIII).

78.  Plaintiff claims that his requests for reasonable
accommodations based on his supervisors asking where he has been
when he disappears for periods of time and the requirement that
he attend meetings with all staff, even when Elena Lopez is
invited to the meeting.  Second Amended Complaint, ¶¶ 29-30, 34,
38-39.

79.  Plaintiff suggests that the agency's settlement of its

earlier case with him specifically called for the agency to allow him to go to the bathroom when necessary.  See Exhibit 37 (Stipulation Of Settlement And Dismissal), ¶ 3.

80.  Nowhere in the paragraph of the Stipulation Of Settlement And Dismissal permitting "short breaks to go to the bathroom" are Plaintiff's supervisors forbidden from asking where he has been when he cannot be found for 20 minutes at time.  See Id.; Second Amended Complaint, ¶¶ 29-30, 34.

81.  Plaintiff is unaware of any instances where he lost pay due to his disappearances. Plaintiff's 2/20/08 Depo. at 207-10.

82.  Plaintiff's supervisor, Jeff Baxter, asks all of his staff, as he does Plaintiff, where they are at times.  Baxter Depo. at 185.

83.  Mr. Baxter discussed with Plaintiff the request that he be excused from all meetings that included Elena Lopez, and considered the request, but concluded that the meeting was required for the work of the office.  See Baxter Depo. at 175.

84.  There was "a lot of exchange of information that [was] important" to exchange in the staff meetings.  Baxter Depo. at 174-77.

85.  Mr. Baxter worked out an accommodation for the meetings that included Elena Lopez, allowing Plaintiff to sit in the back or near an exit and allowing him to leave if he felt uncomfortable.  Baxter Depo. at 175.

86.  The accommodation was permitted whenever Mr. Bowden and

Elena Lopez attended the meetings that were scheduled every two weeks.  Baxter Depo. at 183-84.

Respectfully submitted,


_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney


_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


_____ /s/
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

- 18 -

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that service of the foregoing Motion For Judgment On The Pleadings Or, In The Alternative, For Summary Judgment, supporting memorandum and a proposed Order has been made through the Court's electronic transmission facilities on this 17th day of April, 2008.

_____ /s/

W. MARK NEBEKER
Assistant United States Attorney
555 4th Street, N.W.
Civil Division
Washington, DC  20530
(202) 514-7230