**Anthony Bowden**

Page 1

1                UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3 ANTHONY BOWDEN,                    *

4              Plaintiff,    *  CIVIL ACTION NO.:

5 vs.                        *  05-2202 (RBW)

6 CHRISTIAN SAMPER, ACTING   *

7 SECRETARY, SMITHSONIAN      *

8 INSTITUTION,               *

9              Defendant.    *  Pages 1 - 215

10

11                          ORIGINAL

12           Deposition of Anthony Bowden

13                Washington, D.C.

14            Tuesday, December 4, 2007

15

16

17

18

19

20

21 Reported by:  Carla J. Briggs, RPR-RMR-CRR

22 Job No. 184035

EXHIBIT
2
CA-05-2202

**Anthony Bowden**

Page 2

```
 1
 2
 3
 4
 5                              December 4, 2007
 6                              10:12 a.m.
 7
 8
 9
10 Deposition of Anthony Bowden, held at the offices
11 of:
12
13
14          United States Attorney's Office
15          501 3rd Street, N.W., 4th Floor
16          Washington, D.C.  20530
17
18
19
20 Pursuant to agreement, before Carla J. Briggs,
21 RPR-RMR-CRR, a Notary Public of the District of
22 Columbia.
```

**Anthony Bowden**

Page 3

```
 1  APPEARANCES:
 2  On Behalf of the Plaintiff:
 3          STEVEN J. SILVERBERG, ESQUIRE
            900 17th Street, N.W.
 4          Suite 1250
            Washington, D.C.  20006
 5          (202) 785-8499
            sjsilverberg@erols.com
 6
 7  On Behalf of the Defendant:
 8          W. MARK NEBEKER, ESQUIRE
            ASSISTANT UNITED STATES ATTORNEY
 9          555 4th Street, N.W.
            Washington, D.C.  20530
10          (202) 514-7230
            mark.nebeker@usdoj.gov
11
12  On Behalf of the Smithsonian Institution:
13          MILDRED GLOVER, ESQUIRE
            ASSOCIATE GENERAL COUNSEL
14          SMITHSONIAN INSTITUTION
            1000 Jefferson Dr., S.W., #302
15          Washington, D.C.  20560-0012
            (202) 633-5097
16          gloverm@si.edu
17
18
19
20
21
22
```

**Anthony Bowden**

Page 7

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2  WHEREUPON --

 3                    ANTHONY BOWDEN,

 4  a Witness called for examination, having been first

 5  duly sworn, was examined and testified as follows:

 6                         EXAMINATION

 7            BY MR. NEBEKER:

 8      Q    Sir, in a loud, clear voice, would you

 9  please identify yourself for the court reporter.

10      A    Anthony Bowden.

11      Q    And, Mr. Bowden, where are you currently

12  employed?

13      A    Smithsonian Institution National Zoo.

14            MR. SILVERBERG:  Can we break for one

15  second?  I wasn't quite ready.

16            MR. NEBEKER:  Sure.

17            (Recess taken -- 10:22 a.m.)

18            (After recess -- 10:24 a.m.)

19            BY MR. NEBEKER:

20      Q    Mr. Bowden, have you ever had your

21  deposition taken before?

22      A    Yes, sir.
```

**Anthony Bowden**

Page 9

1    Q    Okay.  Are there any other times when

2  you've had your deposition taken?

3    A    No.

4    Q    Let me lay out a couple of ground rules.

5  I think you've heard them before, but I want to make

6  sure you recognize them from before, that they apply

7  today as well.

8         If you have any difficulty understanding

9  any of my questions either because my voice wasn't

10 loud enough or because you don't understand the

11 words that I used, please ask me to repeat or

12 rephrase the question; otherwise, we'll have to

13 assume that you understood the question as it was

14 asked, okay?

15    A    Okay.

16    Q    And the second thing is -- I think you've

17 already shown that you're good at this -- please

18 give audible responses because a nod of the head or

19 a shake of the head or an uh-huh or an uh-uh are

20 actually difficult for the court reporter to take

21 down, so would you please follow that rule as well?

22    A    Sure.

**Anthony Bowden**

1      Q    Okay.  And as we've already demonstrated,

2  if you or your lawyer wish to take a break at any

3  time during the deposition, please let me know and

4  we'll be happy to oblige.  If there's a question

5  pending, I might ask you to answer it first, but if

6  you need a break, please let me know.

7      A    Okay.

8           MR. NEBEKER:  Let me ask that we mark this

9  as Exhibit 1.

10          (Bowden Deposition Exhibit Number 1 was

11 marked for identification.)

12          MR. SILVERBERG:  Why don't we just assume,

13 you know, you're moving it in and I'm not objecting

14 unless I say "I object."  If you just want to just

15 say "this is 1," that's fine.

16          MR. NEBEKER:  That's perfect.

17          MR. SILVERBERG:  We aim to please.

18          BY MR. NEBEKER:

19     Q    Mr. Bowden, I just wanted to confirm.  You

20 spoke a little while ago about your 1997 civil

21 action, and I believe, if I'm not correct, that

22 you've referenced the settlement in that case in

**Anthony Bowden**

Page 11

1 your complaint in the pending civil case; is that

2 correct?

3    A    Yes, sir.

4    Q    Okay.  And is this Exhibit 1 a true and

5 accurate copy of the Stipulation of Settlement and

6 Dismissal that you entered into in your earlier

7 civil action against the Smithsonian?

8    A    Well, I haven't had a chance to really

9 read this.

10    Q    Please take your time.

11        (Witness reviews the document.)

12        MR. SILVERBERG:  Mark, if it looks like

13 mid afternoon and you know you're not going to

14 finish today, I prefer to break earlier today like

15 4:00.

16        MR. NEBEKER:  And then finish it up

17 another day?

18        MR. SILVERBERG:  Yes, because I have work

19 to do tonight, so --

20        MR. NEBEKER:  That would be fine.

21        MR. SILVERBERG:  But if it looks like

22 you'll finish it, let's try to finish it is what my

**Anthony Bowden**

Page 12

1 preference is.

2          MR. NEBEKER:  And mine as well.

3          MR. SILVERBERG:  Okay.

4     A    I believe this is it.

5     Q    Okay.  Now, am I to understand that part

6 of your current lawsuit -- that is, Civil Action

7 05-2202 -- is for breach of contract; is that right?

8     A    That's right.

9     Q    Okay.  And the Exhibit 1 to your

10 deposition today is the contract that you are

11 asserting was breached; is that correct?

12    A    That's correct.

13    Q    Okay.  And in what fashion do you believe

14 that the contract that's Exhibit 1 was breached?

15    A    You say in what fashion?

16    Q    Yeah.

17         MR. SILVERBERG:  I'm going to object to

18 the extent that you're asking the client who's not a

19 lawyer -- the plaintiff, my client, who is not a

20 lawyer -- for legal conclusions.  Go ahead and

21 answer.

22    A    I believe that it was breached because --

**Anthony Bowden**

Page 13

1          MR. SILVERBERG:  I'm also going to object

2 in that the document speaks for itself on its face.

3          MR. NEBEKER:  Understood.

4     A    I believe it was breached because of the

5 fact that it was part of the settlement agreement

6 which I have in front of me, and I think I made

7 every attempt to try to recoup my leave.  You know

8 what I mean?

9     Q    Okay.  And your claim is you did not get

10 your leave restored; is that correct?

11    A    Exactly.

12    Q    Okay.  Now --

13         MR. SILVERBERG:  Do you want to point to a

14 part in the complaint that you're referring to?

15         MR. NEBEKER:  Yeah.

16    Q    I'm going to draw your attention to

17 Paragraph 6, as a matter of fact.

18         MR. SILVERBERG:  I'm objecting again to

19 asking Mr. Bowden to make legal characterizations.

20    Q    Am I correct then that your claim is that

21 Paragraph 6 which indicates "The Smithsonian agrees

22 to restore leave taken by Bowden from July 1994 to

**Anthony Bowden**

Page 14

1   the present which Bowden can show, by objective

2   evidence, was used as a direct result of his medical

3   condition that is the basis for his claim pursuant

4   to the Rehabilitation Act, i.e., panic disorder.

5   Such restoration shall be limited to the extent

6   Bowden is compensated for such leave through a

7   workers' compensation claim, a claim for which he

8   currently has pending.  Bowden will provide

9   documentation of the use of such leave in connection

10   with his medical condition within two pay periods of

11   the Court's approval of this stipulation.  The

12   Smithsonian Institution will respond to plaintiff's

13   documentation within 30 days of its submission.

14   Should plaintiff disagree with the Smithsonian's

15   response, plaintiff shall notify the Smithsonian in

16   writing within 30 days and give the Smithsonian 30

17   days to address the matters raised by plaintiff

18   before seeking judicial review, if any is

19   available."

20           So is that the paragraph that you believe

21   was breached?

22      A    Yes, sir.

**Anthony Bowden**

Page 18

1 have to -- my old suite mate -- but I'm not sure --

2 this is years ago.  I'm not sure what's left of the

3 old documentation, but he's very meticulous about

4 keeping things.

5          MR. NEBEKER:  Mr. Bowden is?

6          MR. SILVERBERG:  Mr. Bowden is, yes.

7      Q    Mr. Bowden, if you can find it, we very

8 much need it.

9          Is it your recollection that you submitted

10 information to the Smithsonian and the Smithsonian

11 responded to your request for leave?

12     A    They denied it.

13     Q    Okay.  When did you submit the information

14 to the Smithsonian through Mr. Banov?  Let me

15 rephrase that because I don't want to exclude

16 Mr. Silverberg.

17          When did you first submit information to

18 the Smithsonian in response -- in support of your

19 claim for leave restoration under Paragraph 6 of

20 Exhibit 1?

21     A    I believe that that information was

22 actually -- I submitted it to my attorney, and I

**Anthony Bowden**

Page 19

1 believe he submitted it within that two-week period

2 of time that we had agreed upon what's inside of

3 this settlement agreement.

4     Q     And what is it that you base your belief

5 on that it was submitted to the Smithsonian within

6 two weeks of signing the agreement or the judge

7 approving the agreement?

8     A     I can remember something coming back to

9 him or, you know, that he showed me that showed that

10 they had denied, you know, the amount of leave or

11 whatever.

12     Q     Okay.  So you didn't actually see your

13 lawyer mail the information to the Smithsonian, but

14 you saw the Smithsonian had given a response to your

15 request?

16     A     Exactly.

17     Q     Okay.  What was the date of the response

18 that the Smithsonian gave?

19     A     You say the date of the response?

20     Q     Yes.

21     A     I don't think I'm understanding what

22 you're saying.

**Anthony Bowden**

Page 20

1     Q     Okay.   Did the Smithsonian respond in

2 writing?

3     A     Yeah, they responded in writing.

4     Q     Was it a letter?

5     A     It was a letter.

6     Q     Was the letter dated?

7     A     I'm pretty sure it was dated, but --

8     Q     Do you have any idea what the date was at

9 all?

10    A     No.

11    Q     Any idea what the year was at all?

12    A     I'm pretty sure it would have to be in

13 1999.

14    Q     And did you then -- and by "you" I mean

15 you or someone on your behalf like a lawyer -- ever

16 notify the Smithsonian in writing within 30 days of

17 receiving that Smithsonian response to address the

18 matters regarding leave?

19    A     I believe my attorney responded to that.

20    Q     And do you have a copy of your attorney's

21 response?

22    A     I'm not sure.

**Anthony Bowden**

1    Q    You believe it was -- the response was by

2 your attorney in writing?

3    A    Yes.

4    Q    Would you, likewise, look for that

5 correspondence as well when you're looking for the

6 other information?

7    A    Yes.

8         MR. SILVERBERG:  So you want Mr. Banov's

9 response to the Agency denial?  Is that what you

10 want?

11        MR. NEBEKER:  Yes.

12        MR. SILVERBERG:  I have no problem with

13 looking for this stuff, but I'm going to note if

14 that's a discovery request, that I object just to

15 the extent that the Agency should have all these

16 documents.  This is all stuff that was sent to the

17 Agency, so it's redundant.

18        MR. NEBEKER:  I haven't seen it.

19        MR. SILVERBERG:  In the spirit of

20 cooperation, I will look for it, but I --

21        MR. NEBEKER:  Thank you.

22        MR. SILVERBERG:  This is something the

**Anthony Bowden**

Page 22

1 Agency should have.  There were some semiformal

2 procedures here, you know, writing to us for ours,

3 so --

4      Q    Do you believe, Mr. Bowden, that your

5 lawyer's response to the Agency was consistent with

6 Paragraph 6 of Exhibit 1, made within 30 days of the

7 Agency's response to you?

8      A    I do.

9      Q    Okay.  Did you see that response that your

10 lawyer sent?

11     A    I did see it.

12     Q    Did he give you a copy?

13     A    I'm not sure because I'm -- I can remember

14 him saying that he was going to make phone calls as

15 well and so, you know, I'm thinking that --

16     Q    So it's safe to say that within three

17 months of you settling the 1997 case, that you had

18 submitted, in your recollection, the paperwork to

19 get leave restored and received a response from the

20 Smithsonian and sent through your lawyer yet another

21 response to what the Smithsonian had said regarding

22 the leave?

**Anthony Bowden**

Page 23

1    A    Can you repeat that?

2    **Q    Sure.  I'm trying to get a sense --**

3    MR. SILVERBERG:  I'm going to object that

4 it's a multiple question.

5    **Q    If all the timing was met, then the last**

6 **correspondence from your lawyer about the leave**

7 **under Paragraph 6 of Exhibit 1 --**

8    MR. SILVERBERG:  Which attorney are you

9 talking about?  Mr. Banov?

10    MR. NEBEKER:  Banov.  Thank you.

11    **Q    Do you believe that the deadlines in**

12 **Paragraph 6 of Exhibit 1 were met?**

13    A    I believe they were met.

14    **Q    Okay.  So --**

15    MR. SILVERBERG:  I'm going to object to

16 the extent you're asking him for knowledge of what

17 his attorney did and what he didn't do personally

18 and to the extent that it's asking for a legal

19 conclusion.  You know, there's different rules about

20 deadlines being met.

21    **Q    So the judge signed the settlement**

22 **agreement in your first case on February 18th of**

**Anthony Bowden**

Page 24

1  **1999; is that right?**

2       A       Can you repeat that again?

3       **Q       Sure.   The judge approved the settlement**

4  **agreement in your 1997 case on February 18th, 1999,**

5  **correct?**

6            MR. SILVERBERG:   Objection to the extent

7  the document speaks for itself, the settlement

8  agreement.

9       A       That's correct.

10      **Q       Okay.   Then two weeks after that, you say**

11  **you through your lawyer, Mr. Banov, submitted**

12  **documentation to get leave, right?**

13      A       I believe in part of the settlement

14  agreement, if I can remember, it would state that

15  that would be something that would be worked on, you

16  know what I mean?   You know, it was a -- in other

17  words, to me, I kind of feel as though that it

18  should have -- it probably should have been

19  something that should have been done before the

20  judge signed off, but we felt like something could

21  have been done in good faith and that it could have

22  came to an agreement, but it didn't happen, so --

**Anthony Bowden**

1    Q    Okay.  What I'm trying to understand is by

2 what -- what's the latest date you can say that the

3 last correspondence called for in Paragraph 6 --

4 that is, your attorney's response to the

5 Smithsonian's response to your request for

6 restoration of leave -- took place?

7    A    I can't really give you the latest date,

8 but I can --

9         MR. SILVERBERG:  Objection.  The document

10 speaks for itself to pay periods of the Court's --

11 well, he can answer to the extent he would know.  I

12 don't know how he's going to know when a pay period

13 ends, but go ahead.

14    Q    What I'm trying to figure out is did

15 you -- if all these time limitations were met, then

16 within certainly three months of the judge approving

17 the settlement agreement, you'd finished that last

18 requirement of Paragraph 6 that your lawyer send a

19 written response to the Smithsonian, correct?

20         MR. SILVERBERG:  I'm going to object, and

21 I'm increasingly uncomfortable with this line of

22 questioning because I may be wrong -- and, Counsel,

**Anthony Bowden**

Page 26

1 please correct me if I am -- but I think you're

2 trying to get him to give you a legal conclusion

3 that we already exhausted our right to seek this

4 leave, and I don't think it's appropriate to ask a

5 nonlawyer for legal conclusions, but you can go

6 ahead and answer to the best of your ability.  Go

7 ahead.

8       A     I think he's got to ask that question

9 again, because I'm lost.

10      Q     You want me to ask it again?

11      A     Yes.

12      Q     Okay.  Am I correct in saying that the --

13 that the -- if you're right and that the

14 correspondence called for under Paragraph 6 of

15 Exhibit 1 was timely produced, then within three

16 months of settling the case, your attorney,

17 Mr. Banov, had provided the written response to the

18 Smithsonian within that three months, correct?

19      A     I can't answer that.  You know what I

20 mean?  That's something I can't answer for

21 Mr. Banov.

22      Q     So you don't know whether these time

**Anthony Bowden**

Page 27

1 **limits were met?**

2     A    I'm pretty sure that the time limits from

3 the beginning were met.  I can remember him

4 struggling with this on several occasions, having

5 phone calls backwards and forward to the appropriate

6 people and -- you know, so I think the whole thing

7 was it was more like -- it was more so that it was a

8 struggle more so to say whether I should have got X

9 amount of leave or whether I should have, you

10 know -- or shouldn't have got X amount of leave.

11     **Q    Do you have any reason to believe that**

12 **your lawyer -- Mr. Banov's response to the**

13 **Smithsonian's denial under Paragraph 6 of Exhibit 1**

14 **occurred more than three months after the settlement**

15 **agreement was approved by the judge?**

16     A    I can't answer that, no.

17     **Q    Is that because you don't have any facts**

18 **to support the conclusion that it was done later?**

19     A    I know his --

20         MR. SILVERBERG:  Objection; argumentative.

21     A    I know that what we gave him -- you know,

22 what I had gave him and what he had sent out was

**Anthony Bowden**

Page 28

1 timely from the beginning.

2      **Q     Okay.  And do you have any reason to**

3 **believe that the Smithsonian didn't deny the request**

4 **within the 30 days?**

5           MR. SILVERBERG:  I'm going to also object

6 to the extent that Counsel is asking questions that

7 could all impinge on the attorney-client privilege,

8 but I'm not asserting the privilege.  You're going

9 more and more into his interactions with Mr. Banov,

10 but I'm not asserting it at this point.

11     **Q     Okay.  Do you have any reason to believe**

12 **that the Smithsonian took more than 30 days to deny**

13 **your leave request under Paragraph 6?**

14     A    I would say I'm not sure whether they took

15 more than 30 days to deny, so I can't speak on that.

16     **Q     Do you think you would have remembered if**

17 **they'd been untimely and raised that as a concern?**

18           MR. SILVERBERG:  Objection; argumentative,

19 vague, does he think -- hypothetical, does he think

20 he would have remembered.  Calls for speculation.  I

21 think I got them all.

22     **Q     Would you have remembered?**

**Anthony Bowden**

Page 29

1      A      Would I have remembered whether they

2 took more than 30 days?

3              MR. SILVERBERG:   Objection.

4      **Q      Yeah.**

5              MR. SILVERBERG:   Calls for speculation.

6 How can he answer a question like that?   I mean how

7 does one know if they would have remembered?   But go

8 ahead.   Only if I tell you not to, stop; but

9 otherwise, go ahead.

10     A      Well, I think I probably -- I'm pretty

11 sure I would have remembered if they took more than

12 30 days.

13     **Q      Do you have any recollection of them**

14 **taking more than 30 days?**

15     A      Do I have any recollection that it took

16 more than 30 days?

17     **Q      Yes.**

18             MR. SILVERBERG:   Now, this is the 30 days

19 to respond to Mr. Banov's objection of the denial?

20             MR. NEBEKER:   No.   His first submission.

21             MR. SILVERBERG:   The first submission,

22 plaintiff's supposed to respond -- okay.   Because

**Anthony Bowden**

Page 30

1 there's several 30 days in this.

2      A      I'm thinking that they did probably

3 responded within 30 days, but they denied the amount

4 of leave that I asked for.

5      Q      **Did they give you any leave?**

6      A      No.

7      Q      **Okay.  By the time that this process was**

8 **completed, had you resolved your workers'**

9 **compensation claim?**

10      A      Had I resolved it?

11      Q      **Yes.**

12      A      I'm not understanding.

13      Q      **Okay.  In Paragraph 13 of Exhibit 1, it**

14 **says you're not barred from pursuing a workers'**

15 **compensation claim, and then it says "As set forth**

16 **in Paragraph 6, to the extent Bowden is compensated**

17 **as a result of his workers' compensation claims for**

18 **hours of leave used, such compensation will be**

19 **offset against hours of leave the Smithsonian will**

20 **restore pursuant to Paragraph 6."**

21      A      I think with the workmen's compensation

22 claim, I don't think any leave was restored.

**Anthony Bowden**

Page 31

1    Q    Okay.  But did you get paid anything from

2 your workers' comp claim?

3    A    I think I got reimbursed for medication or

4 something.

5    Q    Okay.  Did you get reimbursed at all for

6 hours of leave that you had used?

7    A    No, not that I can remember.

8    Q    After Mr. Banov made the submission called

9 for in the last sentence of Paragraph 6 of the

10 settlement agreement, were there other times when

11 you or someone on your behalf submitted requests for

12 leave to the Smithsonian under Paragraph 6 of

13 Exhibit 1?

14    A    There was several times that he submitted

15 leave.  I think at one point, I was forced to -- to

16 actually -- to say that I will accept what they were

17 giving, you know, instead of me being able to have

18 any input on the amount of leave that I felt that

19 was used because of my illness.  It got to a point

20 where it felt as though I had to say "okay, well,

21 this is all the Agency is giving," so I think it got

22 to a point where as though that he just said "okay,

**Anthony Bowden**

1 well, let's just submit this out and see how they

2 respond to that." And from what I can remember,

3 there was no response at all.

4    Q    Okay.  So are you saying -- when you say

5 "he," do you mean Mr. Banov?

6    A    Yes, sir.

7    Q    And when he submitted this request that

8 you say indicated this deal was all you were going

9 to get, is that the response -- the first time he

10 responded to the Agency's denial of your leave

11 request under Paragraph 6 or was this a later time?

12    A    This was a later time.

13    Q    Okay.  Who wrote back to you from the

14 Agency?

15        MR. SILVERBERG:  Objection.  You're asking

16 him questions that may be just within the lawyer's

17 province, but answer to the best of your ability.

18    Q    Do you know who wrote the letter back from

19 the Smithsonian denying your leave request?

20    A    No, I don't know who wrote it.  They wrote

21 back to him.  They didn't write to me.

22    Q    But you saw the letter you say?

**Anthony Bowden**

Page 33

1    A    Right.

2    Q    And when did you see the letter?

3    A    I think at one point, I went down to

4 discuss with him, you know, and I asked him about,

5 you know, what was going on with the leave, and he

6 showed me the letter or whatever.  He showed me

7 several responses.

8    Q    Was that within a couple of months of the

9 settlement?

10    A    I'm not sure.

11        MR. SILVERBERG:  I'm going to object to

12 it's vague and the questions that Counsel asked

13 about what dates things were done when it's going

14 back many years and it's very hard for anyone to

15 remember such exact dates, so I think the questions

16 are, in effect, calling for speculation, but go

17 ahead.

18    Q    Do you remember what year it was when you

19 first learned that the Smithsonian had denied your

20 request for leave under Paragraph 6 of Exhibit 1?

21    A    I'm pretty sure it was '99.

22    Q    And after -- what other communications did

**Anthony Bowden**

1 you have with the Smithsonian after Mr. Banov wrote

2 to them in 1999?  And when I say "you," I mean you

3 or your attorneys.

4      A    Yeah, because I didn't really have too

5 many discussions about it.  I'm pretty sure that my

6 lawyer was the one that had the discussions about

7 the leave, so --

8      Q    Okay.  Are you aware of any other

9 communications on your behalf to the Smithsonian

10 seeking restoration of leave under Paragraph 6 of

11 Exhibit 1?

12      A    Am I aware -- say that again.

13      Q    Any other communications on your behalf in

14 an effort to secure leave under Paragraph 6 of

15 Exhibit 1?

16      A    I think back then -- no, I don't think

17 that I had any discussions.  I think I left that to

18 my attorney.

19      Q    That's what I mean.  My hunch is that the

20 requests would be made by your attorneys, but I

21 don't want to leave anybody out.

22      A    Right.

**Anthony Bowden**

Page 35

1    Q    Any requests made to the Smithsonian of

2 which you are aware in support of your request for

3 leave under Paragraph 6 of Exhibit 1 I would like

4 you to recite for us now.  You don't have to repeat

5 the ones you've already said.

6    A    I can't really recite that.

7    Q    So you don't know of any others?

8    A    No.

9    Q    Do you know if any others were made on

10 your behalf other than Mr. Banov's requests in

11 1999?

11    A    I can remember Mary Tanner saying that she

12 would restore the leave as a part of the -- you

13 know, if I decided to settle the case that I'm on

14 now.

15    Q    Got you.  Oh.  You mean the '05 case --

16 the 2005 case?

17    A    Right.  She tried to use that as a tool to

18 have me settle this case, but --

19    Q    Okay.  Are there any other communications

20 you or anyone on your behalf has made in an effort

21 to get leave restored under Paragraph 6 of

22 Exhibit 1?

**Anthony Bowden**

Page 36

1    A    I can't answer that.  I mean --

2    Q    Is that because you don't know of any

3  others?

4    A    I don't know of any others, no.

5    Q    Okay.  Now, a minute ago I think your

6  lawyer was indicating that he may have participated

7  in trying to secure some of that leave.

8    A    I think he did put something -- he did

9  write something, I'm pretty sure.

10    Q    When did he write that?

11    A    I think it was shortly after I had

12  attained him as my attorney, so that's when.

13    Q    Do you remember what year that was?

14    A    2004, 2005.  Somewhere around there.

15    Q    And have you provided a copy of that

16  correspondence in this case?

17    A    Have I provided a copy of --

18    Q    Of that request for leave in discovery in

19  this case.

20    A    I haven't provided it, no.

21    Q    Do you have a copy of that correspondence?

22    A    I may.

Page 38

1 it's our burden to produce stuff that the Agency

2 already has, but in the spirit of cooperation, I

3 will try my best to locate it.

4         MR. NEBEKER:  Thank you.

5     **Q    Mr. Bowden, are you claiming any other**

6 **violations of Exhibit 1, any other breaches?**

7     A    No.

8         MR. SILVERBERG:  Objection to the extent

9 you're calling for a legal conclusion.  I might have

10 some thoughts on that that he is not familiar with,

11 but at this point, answer it.

12    A    No.

13    **Q    Thank you.**

14        **Mr. Bowden, could you summarize for us the**

15 **allegations you made against your then supervisor in**

16 **the 1997 litigation?**

17    A    You say can I summarize?

18    **Q    Yes.**

19        MR. SILVERBERG:  I'm going to object to

20 the extent it's not relevant, that the substance of

21 the prior -- of the civil action, all that's

22 relevant is that he engaged in EEO activity, but go

**Anthony Bowden**

Page 47

1          When did you first start working with the

2 Smithsonian?

3      A    1984.

4      Q    Okay.  And when you first started working

5 with the Smithsonian, where were you employed?

6      A    Natural History Museum.

7      Q    Okay.  And as a result of the settlement

8 in the 1997 civil action, did you then transfer to a

9 different part of the Smithsonian?

10     A    Yes.

11          MR. SILVERBERG:  Objection to the extent

12 the settlement agreement speaks for itself.

13     Q    And where did you get transferred to?

14     A    To the National Zoological Park.

15     Q    Do you recall when that transfer took

16 place?

17     A    The only thing I can remember is I arrived

18 in April of '99 which was Easter Monday was my first

19 actual workday.

20     Q    Was there a time when your request for

21 restoration of leave under Exhibit 1 -- when you

22 stopped seeking that leave for a period of time?

**Anthony Bowden**

Page 48

1    A    There was a time that I think that I did

2 stop seeking it.

3    Q    And had you come to the conclusion that

4 you'd gotten all the leave restored that you were

5 going to get restored?

6    A    I came to the conclusion that the

7 Smithsonian just wasn't going to bend and give me

8 anything.

9    Q    Had they restored any -- let me back that

10 up.

11         Has the Smithsonian restored any leave to

12 you pursuant to Paragraph 6 of Exhibit 1?

13    A    In this here?

14    Q    Yes.

15    A    No.

16    Q    And you believe that as of May of 1999,

17 you've done everything you had to do to get the

18 leave restored; is that right?

19    A    To the best of my knowledge, yes.

20    Q    Who were your supervisors --

21         MR. NEBEKER:  Actually, let me ask that

22 these be marked as Exhibits 2 and 3.

**Anthony Bowden**

Page 64

1   when you transferred in April '99 to the National

2   Zoological Park?

3       A    Rick Hider.

4       Q    And his last name is --

5       A    Hider.

6       Q    How do you spell it?

7       A    H-I --

8            MR. SILVERBERG:  It's Y, isn't it?

9            THE WITNESS:  Huh?

10           MR. SILVERBERG:  H-Y?

11           THE WITNESS:  I think it's H-I.

12      Q    D-E-R?

13      A    Right.

14      Q    And how long was Mr. Hider your

15   supervisor?

16      A    From '99 to I believe 2001.

17      Q    Do you believe Mr. Hider ever

18   discriminated or retaliated against you on account

19   of your race or your color or your religion or

20   handicap?

21      A    No.

22      Q    And what happened in 2001 that Mr. Hider

**Anthony Bowden**

Page 67

1    A    It was Ernest Long, Levi Murrell, Grace

2 Lopez and myself.

3    Q    At that time was Grace Lopez doing most of

4 the vinyl sign work?

5    A    At that time, no.  I think, you know, we

6 were doing some of it.  You know what I mean?  She

7 probably was doing most, but we were doing a lot of

8 it I'd say.

9    Q    Do you believe that 80 percent of her work

10 in Production under Mr. Hider was spent with her

11 doing the vinyl sign production?

12    A    No.

13    Q    What percentage -- well, first of all,

14 were you in a position to observe how much of her

15 work involved using the vinyl machine?

16    A    Yes, I was.

17    Q    Okay.  Can you give an estimate then of

18 what percentage of her work was working with the

19 vinyl sign-making machine?

20    A    I would say probably 30 percent or

21 something.  About 30 percent.

22    Q    What other duties did she have under

**Anthony Bowden**

Page 68

1  Mr. Hider?

2      A    I mean, her duties were basically the same

3  as ours.

4      Q    Did she ever go out under Mr. Hider's

5  supervision and work in the park clearing snow?

6      A    Clearing snow off the signs, yes.

7      Q    And did Grace Lopez under Mr. Hider's

8  supervision lift heavy objects on a routine basis at

9  the zoo?

10     A    She assisted with it, yes, sir.

11     Q    Can you identify any heavy objects that

12  she assisted in lifting with Mr. Hider's

13  supervision?

14     A    I mean, you know, large components from

15  Exhibits, signs that needed to be put in the ground,

16  things of that nature.

17     Q    And how much do you believe -- would you

18  estimate Grace Lopez to weigh during the time that

19  she worked with you at the National Zoo?

20          MR. SILVERBERG:  Objection.  Calls for

21  speculation.

22     A    Estimate?

**Anthony Bowden**

Page 69

1    Q    Yes.

2    A    Maybe 110.  Something like that.

3    Q    And how much do you weigh?

4    A    How much do I weigh?

5    Q    Yes.

6    A    At this point now?

7    Q    We'll start with right now.

8    A    Right now I'm about 165, 170.  Somewhere

9 in that area.

10    Q    And has that -- has your weight changed

11 over your time with the National Zoo?

12    A    Yeah.  Actually, it went up at this time.

13    Q    How much did you -- would you estimate you

14 weighed or do you recall weighing when you were --

15 let me start over again.

16        How much did you weigh when you started

17 working at the National Zoo in April of '99?

18    A    Probably about 145, 150.

19    Q    Am I to understand that you -- one way to

20 stay in shape is to ride your bike to work?

21    A    Not now, no.

22    Q    Was there a time when you rode your bike

**Anthony Bowden**

Page 70

1  to work?

2      A      Right.

3      Q      And does that change with the seasons or

4  did that change as you grew older?

5      A  .   It changed because of the depression.

6      Q      Okay.  When did you -- well, let me ask

7  this:  When you showed up at the zoo in April of

8  '99, were you riding your bike routinely to work?

9      A      No, not when I first showed up.

10     Q      When did you begin riding your bike to

11 work routinely?

12     A      I think probably in 2001 or something like

13 that.

14     Q      And when did you stop riding your bike to

15 work, if any?

16     A      I would probably say back in 2004, 2005.

17 Somewhere along there.

18     Q      Do you ride your bike on the weekends?

19     A      No.

20     Q      Under Mr. Hider's supervision, what period

21 of time would you say Grace Lopez spent working in

22 the lower shop area?

**Anthony Bowden**

Page 71

1      A      Can you ask that again?

2      Q      Uh-huh.  When Mr. Hider was supervising

3 Grace Lopez, how much -- what percentage of her

4 workday did Grace Lopez typically spend in the lower

5 shop area?

6      A      I don't think her -- at that time her

7 working in the lower shop was too much different

8 from the time that we worked.  It wasn't too much

9 different from, you know, the time that we worked in

10 it.  I mean, everybody was in and out, so --

11     Q      So when Grace Lopez worked under

12 Mr. Hider, she worked in the shop about the same

13 amount of time as when Grace Lopez worked under

14 later supervisors?  Is that what you're saying?

15     A      Right.  I would say maybe a little less,

16 but about the same.

17     Q      And what was it about the work that Grace

18 was doing under Mr. Hider that made it so she didn't

19 spend as much time in the lower shop?

20     A      Nothing that I know of.  I mean --

21     Q      What were the types of duties that Grace

22 Lopez was doing under Hider?

**Anthony Bowden**

Page 72

1    A    Basically, the same thing we were doing, I

2 guess, about as much -- she didn't have as much

3 experience probably in -- you know, she probably

4 didn't build anything, but she assisted a lot of

5 times with us building things, you know.

6    Q    Has that changed over time -- over her

7 time with the National Zoo since you've been there?

8    A    You mean as far as her experience?

9    Q    Her work.

10    A    Yeah, it did change.

11    Q    Okay.  How did Grace Lopez's work change

12 after -- over time?

13    A    She was more so -- she had a cushy job

14 more so at, you know, the time; that she'd just

15 spend a lot of time in -- like we had, like, an

16 upper shop/office space which she spent most of her

17 time, you know.

18    Q    Were there times under Mr. Hider's

19 supervision that you observed Grace Lopez helping to

20 lift items that you could have lifted by yourself?

21    A    That I could have lift by myself?

22    Q    Yes.

**Anthony Bowden**

Page 73

1          MR. SILVERBERG:  Objection.  Calls for

2 speculation.

3     A    I'm not understanding that.

4     Q    Sure.  Grace Lopez -- you outweigh Grace

5 Lopez by 50 percent, right, almost?

6     A    No.

7     Q    You were -- oh, I'm sorry.  You're 150 now

8 and she's 110; is that right?

9     A    You say I'm 150 now?

10    Q    Isn't that what you said?

11         MR. SILVERBERG:  No.

12    Q    Oh, no.  I'm sorry.  165 to 70 now?

13    A    Right.

14    Q    Okay.  When you were working with Grace

15 Lopez under Mr. Hider's supervision, you were 145 to

16 150, right?

17    A    Right.

18    Q    Okay.  And is it fair to say that you have

19 greater upper body strength than Miss Lopez does?

20         MR. SILVERBERG:  Objection.  Calls for

21 speculation.

22    A    I would say yes.

**Anthony Bowden**

Page 74

1    Q    You believe you do have greater upper body

2 strength than Miss Lopez?

3    A    But not lower body strength.

4    Q    Is that because of your back?

5    A    Back, knees.

6    Q    Do you lift weights?

7    A    No.

8    Q    What do you do to stay in shape?

9    A    What do I do to stay in shape?

10 Basically --

11         MR. SILVERBERG:   I'm going to object as to

12 relevance.

13    A    I mean, I coach high school kids.

14    Q    In what sport?

15    A    Track and field.

16    Q    Do you run as part of that?

17    A    Light jog a little bit behind them or

18 something, but I can't run as much as I used to

19 because I had surgery on both knees.

20    Q    Okay.  When did you have the surgery?

21    A    Back in the '90s or something like that.

22    Q    Before you came to the zoo?

**Anthony Bowden**

1      A      Yeah, before I came to the zoo.  I think I

2 had -- did I have surgery after I came to the zoo?

3 I think I may have had surgery on one knee after I

4 came to the zoo.  I'm not sure.

5      Q      **What did the surgery entail?**

6      A      I had torn cartilage.

7      Q      **Was this arthroscopic surgery?**

8      A      Right.  I had 30 percent of my cartilage

9 removed in one knee and I think maybe 20 percent

10 removed in the other.

11      Q      **Has the use of the vinyl sign that -- the**

12 **vinyl sign machine that Grace Lopez tends to use,**

13 **has that increased over your period of time at the**

14 **National Zoo or has it been constant?**

15      A      I'm not understanding that one.

16      Q      **There's a machine that makes the vinyl for**

17 **signs, right?**

18      A      Uh-huh.

19      Q      **Was it there in 1999 when you showed up?**

20      A      Sure.

21      Q      **And is it there today?**

22      A      It's there.

**Anthony Bowden**

Page 76

1    Q    Okay.  What I'm trying to figure out is

2 has it been used pretty much the same amount through

3 the whole time you spend at the zoo?

4    A    Yes, I believe so.

5    Q    Who was using the vinyl sign machine

6 mostly when you first showed up at the National Zoo

7 in 1999?

8    A    When I first showed up, it was Ernest

9 Long, Grace Lopez, Levi Murrell, and I was just

10 basically being introduced to it at that time.

11    Q    Did you ever use it?

12    A    Yes, I used it, but I mean, you know, back

13 then, I didn't really have the experience to use it,

14 you know, because I was fresh coming in, so --

15    Q    What kind of training did it take for you

16 to be able to use it?

17    A    I mean, you know, just basically working

18 along with the guys, you know what I mean, and they

19 basically showed me exactly what needed to be done,

20 so -- it's on-the-job training.

21    Q    So did Grace Lopez's -- is she good with

22 using the machine?

**Anthony Bowden**

Page 77

1       A     Is she good?

2       Q     **Was she good when she was working?**

3             MR. SILVERBERG:  Objection.  Calls for an

4 opinion.

5       A     I think everybody was good.

6       Q     **Did you ever have any complaints with her**

7 **work when she used the machine?**

8       A     No, I didn't have any complaints with her

9 work when she used it.

10      Q     **When she used the vinyl sign machine and**

11 **she -- if I understand correctly, the machine would**

12 **punch out the letters for a particular sign,**

13 **correct?**

14      A     I'm going to say cut them out.

15      Q     **Cut them out?**

16      A     Yes.

17      Q     **And then would that sign -- would the**

18 **person who used the vinyl sign machine to cut the**

19 **letters out then take those letters and apply them**

20 **to something or would they pass them off to someone**

21 **else in Production to apply to a sign?**

22      A     If I was the one that, you know, did the

**Anthony Bowden**

Page 78

1 actual processing of the letters, then I would apply

2 them myself to a sign or board or whatever.

3    Q    **Were there things that -- what was in the**

4 **lower shop?**

5    A    Junk.

6    Q    **Was there any equipment in the lower shop?**

7    A    No, not when I first arrived there.

8    Q    **No tools?**

9    A    No.  Maybe, you know, pliers and wrenches

10 and stuff like that.

11    Q    **Did there come a time when more equipment**

12 **started arriving or was placed into the lower shop?**

13    A    Yes.

14    Q    **And when was that?**

15    A    I'd say around 2002.

16    Q    **What equipment showed up in 2002 that went**

17 **in the lower shop?**

18    A    You mean what equipment did I order?

19    Q    **Are you the one that ordered all the**

20 **equipment for the lower shop?**

21    A    Well, the majority of it, I ordered.

22    Q    **What did you order for the lower shop?**

**Anthony Bowden**

Page 79

1     A     A table saw, handsaw, jigsaw.  It's a few

2 machines.

3     Q     And who decided that you should order

4 these saws for the lower shop?

5     A     I decided.

6     Q     And what was the task that you could

7 perform with this equipment that you couldn't

8 perform before?

9     A     Well, we wasn't able to actually cut wood

10 and, you know, build our own signs and stuff like

11 that within our own shop itself.

12     Q     I see.  Would you have to go to someone

13 else's shop?

14     A     Yeah.

15     Q     At the time that you ordered that

16 equipment for the lower shop, were you the safety

17 officer?

18     A     Was I the safety officer?

19     Q     Yes.

20     A     No.

21     Q     Who was the safety officer?

22     A     I think Rick Hider was the safety officer

**Anthony Bowden**

Page 80

1 then and then he passed it on to me as well.

2      Q      When did Rick Hider leave?

3      A      He left I think in probably -- let's say

4 late 2001, early 2002.  Somewhere around that area.

5      Q      And what was your understanding when

6 Mr. Hider left of who was going to take his

7 position?

8      A      My understanding was that I was going to

9 take on his duties and responsibilities which he

10 told me by me taking on those responsibilities, he

11 said it would be more moolah.

12     Q      More money?

13     A      Right.

14     Q      And when he initially handed off these

15 responsibilities to you, did you do it on an acting

16 basis?

17     A      I would say I don't know if it would be an

18 acting basis or something, but it's more sort of

19 like a -- I guess you would call it an acting basis

20 because we didn't have anybody really, you know, to

21 fill in the gaps, whatever, or responsibilities

22 which was his job.

**Anthony Bowden**

Page 83

1       Q       Can you describe for us some of the jobs

2   that Grace Lopez -- strike that.

3               Did you indicate earlier that Mr. Robinson

4   would use the vinyl machine along with Grace Lopez

5   under Mr. Hider's supervision?

6       A       You say did I indicate that?

7       Q       Yes.

8       A       Yes, I did.

9       Q       Okay.  And did there come a time when

10  Ernie Robinson got moved from the Production side to

11  the Design side of the office?

12      A       Not when I was there, no.

13      Q       Okay.  Is Mr. Robinson still working with

14  you?

15      A       Yes.

16      Q       And is he still doing Production work?

17      A       No, not now.

18      Q       What's he doing now?

19      A       He's doing Design work.

20      Q       Okay.  So when did Mr. Robinson stop

21  working in Production and start working in Design?

22      A       Well, he always worked in Design, so I

**Anthony Bowden**

Page 84

1 think he was just kind of doing both.

2     Q     Okay.  And were there times when

3 Mr. Robinson would be helping you put up signs at

4 the National Zoo?

5     A     Yes.

6     Q     And that's more Production work, correct?

7     A     Right.

8     Q     Was Mr. Robinson -- are there different

9 supervisors -- at the time Mr. Robinson was helping

10 you put up signs, were there different supervisors

11 for people in Production and people in Design?

12     A     No.

13     Q     So it was the same hierarchy?

14     A     Right.

15     Q     And was Mr. Hider then in charge of both

16 Production and Design?

17     A     I think he was in charge of probably the

18 overall department including photography and the

19 writers as well.

20     Q     And what's that department called?

21     A     The Exhibits Department.

22     Q     And under Mr. Hider's supervision, did he

**Anthony Bowden**

Page 99

1 with this.  Would you put up the signs in front of

2 the panda house saying "this is a panda"?

3      A     Yes.

4      Q     Okay.  Now, typically, would someone in

5 the Exhibits office prepare the sign?

6      A     No.

7      Q     Okay.  Were there times when there were

8 signs created and they were done completely in-house

9 at the zoo?

10     A     Sometimes were, yes.

11     Q     Okay.  What percentage of the signs at the

12 zoo would you say were written, designed and

13 fabricated and installed solely by employees of the

14 zoo?

15     A     Probably 20 percent.

16     Q     Okay.  And the other 80 percent were signs

17 that would include some amount of an independent --

18 a private contractor preparing the sign?

19     A     Yes.

20     Q     Would there be times when the private

21 contractor would prepare the sign and they would

22 deliver it to the zoo and someone in Production

**Anthony Bowden**

Page 112

1 correct?

2    A    Right.

3    Q    So all these four groups used the lower

4 production shop?

5    A    They didn't use the shop, but they were

6 storing -- you know, they were storing items from

7 their own shop.

8    Q    In 2002, were you using the lower

9 production shop just to store items as well?

10    A    At that point, yeah, maybe, and then just

11 doing some small assembling of signs and stuff like

12 that.

13    Q    Were any of these other organizations

14 using it to do assembly of signs or small jobs like

15 that?

16    A    No.  I think they was just using it more

17 so to store things like tools and boxes of

18 pamphlets, you know what I mean?

19    Q    In 2002, am I correct that the lower

20 production shop did not yet have the saws and the

21 equipment that you later ordered for it; is that

22 correct?

Anthony Bowden

Page 114

1    A    Yeah.  I mean, it's just that they were

2 probably scaled down some.

3    Q    Okay.  Was there any equipment that was

4 ordered for the lower shop that didn't get scaled

5 down before it got purchased?

6    A    Probably the band saw.

7    Q    So you recommended we buy a band saw and

8 they bought a band saw, correct?

9    A    Correct.

10    Q    Okay.  And did the band saw come

11 assembled?

12    A    No.

13    Q    Who had to assemble it?

14    A    I think we assembled it when it came in.

15    Q    And who is we?

16    A    I guess Levi, myself, and whomever else

17 was there at that time.

18    Q    Was there a person in charge of the three

19 people that put the saw together?

20    A    You say was there a person in charge?

21    Q    Right.

22    A    Yeah.

**Anthony Bowden**

Page 115

1    Q    And who was that?

2    A    That would have been actually Rick Hider,

3 but I think between the two of us, that's how we got

4 this stuff ordered, so --

5    Q    So was Rick Hider -- Rick Hider left in

6 mid 2002, right?

7    A    I'm not sure.

8    Q    In September of 2002, you wrote this memo

9 as the acting head of Production?

10    A    Right.

11    Q    Now, did you take on that title after he

12 left or while he was still there?

13    A    This title came after he had left.

14    Q    Okay.  So by --

15    A    This title came when Samiy came on board.

16    Q    So when you wrote this memo in September

17 of 2002, did you already have the band saw, for

18 instance, in the shop?

19    A    Did we have the band saw?  Yeah, I'm

20 pretty sure we did have it.

21    Q    Was there other equipment that you had in

22 the shop?

**Anthony Bowden**

Page 116

1       A       The table saw.

2       Q       Okay.  And was Mr. Hider there to

3 supervise the installation of the table saw?

4       A       I think what had happened, I think around

5 the time that he ordered it, it was like everything

6 kind of sat in boxes -- most of it -- so --

7       Q       So was Mr. Hider still there when the

8 stuff was taken -- when the saws that were put in

9 the lower shop --

10      A       He was there when they came.

11      Q       Right.  Let me finish the question so that

12 the court reporter gets the whole thing down.

13              By the time the saws got uncrated and put

14 together and installed in the lower production shop,

15 were you the acting head of Production?

16      A       No, I wasn't.

17      Q       Okay.  Had Mr. Hider left yet?

18      A       I'm thinking that -- I'm not sure.

19      Q       Okay.  Do you remember if Mr. Hider was

20 down there actually putting nuts and bolts together

21 in the saws to put them together?

22      A       I don't remember that at all.

**Anthony Bowden**

Page 117

1    Q    Okay.  Would that have been the type of

2 thing he would have done given his position at the

3 zoo?

4    A    No.

5    Q    Okay.  So who actually put the nuts and

6 bolts together to -- and uncrated the saws to put

7 them in the lower production shop?

8    A    I think it was between me and -- maybe me

9 and Ernest Robinson I think.

10    Q    By this point, was Mr. Robinson in Design

11 or Production?

12    A    He was in Design, but I think he was

13 allowed to do production work at that time.

14    Q    Did you ever get any special permission

15 from someone to have him help you put the saw

16 together?

17    A    Did I get special permission?

18    Q    Right.  Or did anyone need to get special

19 permission for him to help you put the saws

20 together?

21    A    No.  I think it was actually stated that

22 they knew that we were shorthanded, you know what I

**Anthony Bowden**

Page 118

1 mean, within the shop.

2      Q    Who would have said that?

3      A    This would have been said by Lynn Dolnick

4 and, you know --

5      Q    Kathy Samiy?

6      A    I'm saying Lynn Dolnick.  I don't know

7 about Kathleen Samiy, but I can remember her saying

8 that we were shorthanded and that -- you know, and I

9 asked if anyone wanted to volunteer time to kind of

10 help, you know what I mean, in Production at some

11 point, so I think that's how --

12      Q    And so it was you and Ernest Robinson that

13 put together the saws in the lower shop?

14      A    Right.

15      Q    And installed the saws?

16      A    You said installed them?

17      Q    Yes.  Put them in the lower shop.

18      A    I mean, we put them together, you know

19 what I mean, but we never got a chance to actually

20 finish what needed to be done.

21      Q    How many saws were there?

22      A    Two that I can recall.


**Anthony Bowden**

Page 119

1    Q    Okay.  And did Mr. Robinson help you with

2 both of them?

3    A    I think he did.

4    Q    Did you get them to the point where they

5 would run?

6    A    Yeah, we got them to the point where they

7 would run.

8    Q    And was there some problem with not having

9 the saws bolted down to the floor that made them, in

10 your view, a safety hazard?

11    A    Right.

12    Q    Did you recognize that right away?

13    A    Yes.

14    Q    Were they on wheels?

15    A    No.

16    Q    What size wood would you typically cut

17 with the saws?

18    A    We couldn't really cut anything big

19 because they wasn't really industrial saws or

20 machinery.

21    Q    So it was fairly small wood?

22    A    Yes.  Just small pieces or something, you

**Anthony Bowden**

Page 120

1 know what I mean?  Some maybe 2x4s or something like

2 that.

3    Q    Did you ever cut plywood with it?

4    A    No.

5    Q    And so you'd use -- if you got a 2x4,

6 would you use the band saw or would you use a table

7 saw?

8    A    To cut a 2x4, you would probably use a

9 table saw.

10    Q    Do you actually remember using the band

11 saw to cut anything?

12    A    Not much.  I don't think so.

13    Q    Do you remember anything at all?

14    A    No.

15    Q    What percentage of time when you were

16 working the lower production shop were you using one

17 of the saws after they were installed?

18    A    Well, not much because I complained about

19 the unsafety of the saws, you know, not having the

20 proper ventilation, exhaust, you know what I mean,

21 stuff like that, so --

22    Q    So at that point, you didn't work that

**Anthony Bowden**

Page 121

1 much in the lower shop?

2     A     Not as far as cutting wood, no.

3     Q     Okay.  What else did you do in the lower

4 shop, if anything?

5     A     I mean, you know, we assembled signs and

6 stuff like that.  You know what I mean?

7     Q     And assembling the signs, that didn't

8 involve using -- putting a lot of sawdust in the

9 air; is that correct?

10     A     The signs were made of metal.

11     Q     Right.  So there wouldn't be any sawdust

12 in the air from assembling a sign that was metal

13 rather than cutting it, correct?

14     A     Correct.

15          MR. NEBEKER:  Let me ask that we mark this

16 as Exhibit 7.

17          (Bowden Deposition Exhibit Number 7 was

18 marked for identification.)

19          BY MR. NEBEKER:

20     Q     Mr. Bowden, can you identify for us what

21 Exhibit 7 is?

22          (Witness reviews the document.)

**Anthony Bowden**

Page 148

1 is that right?

2    A    You said is reflected in Exhibit 12?

3    Q    Yeah.

4         MR. SILVERBERG:  What is reflected in

5 Exhibit 12?

6    Q    Is this a vacancy announcement you applied

7 for or is this your application?

8    A    This is my application.

9    Q    Okay.  So Exhibit 12 is the second job you

10 applied for a promotion in at the zoo, correct?

11    A    Yes.

12    Q    And tell me about the third one.

13    A    And the third one was the one that

14 Mr. Baxter received.

15    Q    Okay.  And this second one that you

16 applied for, was this position ever filled, to your

17 knowledge?

18    A    The second one?

19    Q    Correct.

20    A    No.

21    Q    Okay.  So they withdrew this vacancy

22 announcement and substituted one that later on

**Anthony Bowden**

Page 149

1  Mr. Baxter got; is that correct?

2      A     They called me and told me that I was

3  going to be -- that I was going to be interviewed.

4      Q     Is that for the 03SP1309 position, the one

5  reflected in Exhibit 12, or was that for the one

6  that Mr. Baxter ultimately was selected for?

7      A     That was the one that they withdrew.   I

8  was supposed to have been interviewed for the one

9  that they withdrew.

10      Q     Okay.  And that's Exhibit 12, right?

11      A     Right.

12      Q     Okay.  Can you give me every fact upon

13  which you relied to support the conclusion that the

14  reason to withdraw the position reflected in the

15  vacancy announcement 03SP1309 was based upon either

16  discrimination or retaliation?

17      A     Sure.  I can give you the facts on when I

18  was doing the job, I think we ended up doing a desk

19  audit and a lot of things were omitted from that,

20  you know what I mean, and --

21      Q     Anything else?

22      A     Illegal interviewing practices that they

**Anthony Bowden**

Page 162

1     Q     Isn't it a fact that your shoulders are

2 broader than Grace Lopez's?

3     A     It may be a fact that my shoulders are

4 broader than Grace Lopez's.  And by the way, I did

5 used to work out at a gym years ago, but I had

6 people that came in, you know what I mean, that were

7 probably, you know, maybe a hundred pounds or

8 110 pounds that probably could outlift me, so I

9 mean, it's not the thing of how you're built that

10 makes you stronger.

11     Q     Do you think Grace Lopez was one of those

12 people?

13     A     I don't know.  You know what I mean?  It's

14 nobody that I would challenge.  I think Grace Lopez

15 was in good shape.  She rode a bike to work every

16 day, and she still does.

17     Q     Was there a time that you were concerned

18 about a comment made about you having your biking

19 clothes on at the office?

20     A     You said that I was concerned?

21     Q     Yes.  Did that ever bother you when

22 someone commented that you had your biking clothes

**Anthony Bowden**

Page 163

1 **on at the office?**

2     A     Yeah, it bothered me because I mean, I

3 kind of -- you could have construed that as the same

4 thing as a woman coming in, you know what I mean,

5 with a dress that may be cut short or something.  I

6 don't know.  You know what I mean?  So it shouldn't

7 make a difference about me wearing my bike clothes.

8 They didn't complain about Grace having hers on.

9 Why would they complain about me having mine on?

10     **Q     When you biked to work, you did have**

11 **biking clothes, correct?**

12     A     Yeah, for the most part.

13     **Q     Okay.  And then when you got to work,**

14 **would you change your clothes?**

15     A     At some points.  Sometimes I would and

16 sometimes I wouldn't.  It just depends on, you

17 know --

18     **Q     Describe the biking clothes that you would**

19 **typically wear to work.**

20     A     I would probably have on -- what do you

21 call it?  The pants that are tight to your skin?

22 They were biking pants.

**Anthony Bowden**

Page 164

1    Q    Are they shorts or long pants?

2    A    They would be -- I mean they were long

3 pants and shorts depending on the time of year.

4    Q    Obviously biking clothes, though, correct?

5    A    Right.

6    Q    Did they have the padded seat?

7    A    They had the padded seat, but it's also I

8 kept a long shirt on over top of that, so I don't

9 understand why that was an issue.

10    Q    And was there a -- would you wear a biking

11 jersey?

12    A    A jersey?  No.  More so a T-shirt.

13    Q    And when you were working at the zoo, was

14 there a particular uniform you were supposed to

15 wear?

16    A    No.  We didn't have any dress code.

17    Q    What percentage of the time would you say

18 you biked to work and then changed clothing into

19 something that didn't include biking shorts, for

20 instance?

21    A    Probably maybe 50 percent of the time.

22    Q    So half the time, you would change your

**Anthony Bowden**

Page 165

1 clothes, correct?

2    A    Right.

3    Q    **When you would come in to change your**

4 **clothes, would you tend to do it right after you got**

5 **to work?**

6    A    Yeah, I would do it right after I got to

7 work.

8    Q    **Was there a room for you to change in?**

9    A    You just go in the restroom.

10    Q    **All right.  And there was a men's room and**

11 **a ladies' room, I assume, right?**

12    A    Right.

13          MR. SILVERBERG:  We'll stipulate to that.

14    A    I mean, well, why didn't they have a

15 problem with Mr. Ferster?  He rode a bike every

16 day -- and still does -- and he wore the same type

17 of clothes.

18    Q    **Is it Mr. Forrester you're saying?**

19    A    Ferster.

20    Q    **Oh.  Ferster.**

21    A    They didn't have a problem with him doing

22 it.

**Anthony Bowden**

Page 203

1 Exhibit 17?

2          (Witness reviews the document.)

3     A    Okay.

4     Q    Do you remember the question?

5     A    No.

6     Q    Is Exhibit 18 the response you got for the

7 Exhibit 17?

8     A    I believe it is.

9     Q    Okay.  And so Lynn Dolnick sent you an

10 E-mail with this response?

11    A    Yes.

12    Q    Do you have any reason to doubt the

13 accuracy of the information contained in Exhibit 18?

14          MR. SILVERBERG:  Objection.  I don't know

15 how he would know if what she says is accurate,

16 but --

17          MR. NEBEKER:  That's exactly why I'm

18 asking.

19    A    Are you asking if this is accurate?

20    Q    I'm asking if you have any information

21 that would suggest that any of the information

22 contained in Exhibit 18 is inaccurate.  You may just

**Anthony Bowden**

Page 213

1 CERTIFICATE OF REPORTER/NOTARY PUBLIC

2 DISTRICT OF COLUMBIA, to wit:

3          I, CARLA J. BRIGGS, a Notary Public of the

4 District of Columbia, do hereby certify that the

5 within-named witness personally appeared before me

6 at the time and place herein set out, and after

7 having been duly sworn by me, according to law, was

8 examined by counsel.

9          I further certify that the examination was

10 recorded stenographically by me and this transcript

11 is a true record of the proceedings.

12          I further certify that I am not of counsel

13 to any of the parties, nor in any way interested in

14 the outcome of this action.

15          As witness my hand and notarial seal this

16 10th day of December, 2007.

17

18          *Carla J. Briggs*

19          Carla J. Briggs, RPR-RMR-CRR

             Notary Public

20

21

22 My commission expires:  October 31, 2011