Page 1

IN THE U.S. DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

                       :

ANTHONY BOWDEN,            :

                       :

         Plaintiff,      :

                       :

     v.                  : Civil Action No.

                       : 05-2202

DR. CRISTIAN SAMPER,     :

SMITHSONIAN INSTITUTION,  : Vol. II

                       :

         Defendant.      :

                       :

- - - - - - - - - - - - - - - - x

                      Washington, D.C.

                      February 20, 2008

Deposition of

                ANTHONY BOWDEN

a witness of lawful age, taken on behalf of the Defendant in

the above-entitled action, before Debra S. Derr, Notary

Public in and for the District of Columbia, at 501 3rd

Street, Northwest, Washington, D.C., commencing at 10:15 a.m.

EXHIBIT

tabbies

4

CA 05- 2202

APPEARANCES:


On Behalf of the Plaintiff:

>       STEVEN J. SILVERBERG, ESQ.
>       900 17th Street, Northwest
>       Suite 1250
>       Washington, D.C.  20006


On Behalf of the Defendant:

>       W. MARK NEBEKER, ESQ.
>       Assistant United States Attorney
>       Civil Division
>       555 4th Street, Northwest
>       Washington, D.C.  20530

1                    P R O C E E D I N G S

2    Whereupon,

3                        ANTHONY BOWDEN

4    was called as a witness and, having been first duly sworn,

5    was examined and testified as follows:

6              EXAMINATION BY COUNSEL FOR THE DEFENDANT

7              BY MR. NEBEKER:

8         Q    Good morning, Mr. Bowden.  I wanted to just remind

9    you of a request I had for you and your agreement last time

10   when you were deposed, in which I asked if you would please

11   answer a yes or no question with a yes or a no as opposed to

12   an um-hmm or a mm-mmm or a nod of the head or a shake of the

13   head, because the court reporter has trouble getting that

14   down.  Okay?  Would you agree to do that again today?

15        A    Yes.

16        Q    And if you have any difficulty understanding once

17   again any of my questions because my voice isn't loud enough

18   or because you don't understand the words that I use, would

19   you please ask me to restate or rephrase the question rather

20   than trying to answer the question that you're not sure if

21   you fully understood?

22        A    Yes.

23        Q    Mr. Bowden, have you had any drugs or alcohol that

24   would impact or affect your ability to answer truthfully the

25   questions that are put to you today?

1    A    No.

2    Q    Mr. Bowden, do --

3         MR. NEBEKER:  Let me ask that we mark this as

4    Deposition Exhibit Number 19.

5                          (Exhibit No. 19 was marked for

6                          identification.)

7         BY MR. NEBEKER:

8    Q    Mr. Bowden, I will reiterate something I think I

9    said to you last time.  If you feel you need to take a break

10   for any reason, just to get a breath of fresh air or to use

11   the facilities, please speak up and we'll take a break.  If

12   there's a question pending, I might ask you to finish

13   answering that if you could, but otherwise just speak up and

14   we'll be happy to take a break at the earliest possible time.

15   A    Okay.

16   Q    Now, would you look over Exhibit 19, which is

17   actually a number of different letters spanning October 30,

18   1998 through August 27 of 1999.

19        And, Mr. Bowden, have you seen any letters like

20   this -- I know these do not have signatures on them, but any

21   letters like this with or without signatures?

22   A    I can't quite remember --

23   Q    Do you have any doubt that these were, in fact,

24   then sent to your attorney Alan Banov regarding the

25   restoration of leave issue that you have asserted was a

1    **breach of contract?**

2    A    It appears to be, but --

3    **Q    They appear to be legitimate letters?**

4         MR. SILVERBERG:  I'm going to object that these

5    weren't letters sent to him, so he doesn't know.  And also,

6    aren't these letters part of settlement negotiations and

7    therefore inadmissible?

8         MR. NEBEKER:  I think we're going to get to

9    admissibility of these ultimately.  But for now, I just want

10   to find out if --

11        MR. SILVERBERG:  Well, I just object to that, on

12   that basis that it wasn't sent to him directly so he doesn't

13   know for sure that these are part of settlement negotiations.

14        BY MR. NEBEKER:

15   **Q    If I may, Mr. Bowden --**

16        MR. SILVERBERG:  Before the case was resolved.

17        BY MR. NEBEKER:

18   **Q    For the period of October 1998 through August of**

19   **1999, was Mr. Banov acting as your attorney and as your**

20   **agent?**

21   A    Yes.

22                         (Exhibit No. 20 was marked for

23                         identification.)

24        BY MR. NEBEKER:

25   **Q    And let me ask you to look at Exhibit Number 20.**

Page 11

1    And I'll ask if you are familiar with Exhibit Number 20.

2        A    Vaguely.  I mean --

3        Q    Okay, do you believe that letter, Exhibit Number

4    20, was sent by Mr. Banov as your attorney and agent, to

5    Assistant United States Attorney Daria Zane back on May 3,

6    2000?

7            MR. SILVERBERG:  Again, objection.  You're asking

8    him about a letter that he didn't write or send.

9            THE WITNESS:  I mean, it appears to be, but --

10            BY MR. NEBEKER:

11        Q    Okay.  Do you have any reason to doubt that this is

12    a true and accurate copy of the letter sent by Mr. Banov to

13    Ms. Zane?

14        A    I don't have any -- I mean, it appears to be, as I

15    said.  That's all I can tell you.

16        Q    And if you would go back to Exhibit Number 19, on

17    the June 29, 1999, letter to Mr. Banov -- June 29, 1999, page

18    2, the top full paragraph.  It says, as you know, the only

19    information by Mr. Bowden was a list of leave taken with the

20    reasons stated as depressed or doctor or stressed, in

21    addition to a scattering of dates for doctors appointments.

22    Do you see that?

23        A    Yes.

24        Q    Okay.  Do you dispute that that accurately

25    describes the information that Mr. Banov had forwarded on

1    your behalf under the settlement agreement?

2        A    You said, do I dispute it?

3        Q    Correct.

4        A    I mean, I didn't write it.  So --

5        Q    So you have no way of knowing whether that

6    accurately describes what Mr. Banov sent to Ms. Zane?

7        A    It sounds like it, but I'm not sure.

8        Q    Did you provide the attachment that Mr. Banov sent

9    to Ms. Zane to -- in an effort to satisfy your obligations to

10   provide objective evidence of your leave taken?

11       A    The attachment?  Is the attachment here?

12       Q    I haven't seen it, and that's why I was going to

13   ask about that.

14       A    I did provide something to him.  But I don't know

15   if it was an attachment --

16       Q    Okay.  And the thing that you provided to him is

17   the thing that was a list of leave taken and then you wrote

18   in another column next to the list, where the leave was

19   taken, the dates of the leave, you wrote depressed or doctor

20   or stressed; is that correct?

21       A    It sounds -- it sounds familiar.

22       Q    You don't dispute that that's what was submitted to

23   Ms. Zane on your behalf, do you?

24       A    I can't dispute it.

25       Q    Was there --

1          MR. SILVERBERG:  I'm objecting to the extent you're

2    asking him to speculate.  I don't think he knows exactly the

3    answers to these questions from years ago.  He doesn't have

4    documents in front of him.

5          BY MR. NEBEKER:

6    **Q    And do you have any recollection yourself of**

7    **submitting to Ms. Zane either medical records or reports from**

8    **your doctor or any other objective evidence describing the**

9    **purposes for which you took leave on the dates that you**

10   **summarized in that listing that you just described?**

11   A    You say do I have any evidence?

12   **Q    Correct, did you submit any evidence to Ms. Zane?**

13   A    I didn't submit anything to Ms. Zane.

14   **Q    And do you have any reason to believe that Mr.**

15   **Banov submitted anything other than the list that you**

16   **provided showing the dates and the terms such as depressed or**

17   **doctor or --**

18         MR. SILVERBERG:  Objection.  You may be asking him

19   a question beyond his scope of knowledge.

20         THE WITNESS:  I would have to see it.  But --

21         BY MR. NEBEKER:

22   **Q    You're not aware of any, are you?**

23   A    No, not aware of it.

24                         (Exhibit No. 21 was marked for

25                          identification.)

Page 23

1    about was that he was no longer in production and yet he was

2    being required to help do production work sometimes, correct?

3         A    It kind of went backwards and forward a little bit

4    as far as that.  Because I think Mr. Robinson -- because at

5    one point, they were allowing him to do the production work

6    because we were short on staff.

7         Q    Right, and he wanted to chip in and help out.

8         A    Right, so he kind of tried to chip in and help out.

9         Q    Help you put up signs, for instance, out in the

10   zoo?

11        A    Well, not just to help put up signs.  I wouldn't

12   say that.  I would say --

13        Q    It was among the things he did, wasn't it?

14        A    No.  Because --

15        Q    He never helped you put up signs?

16        A    I mean, he may have been there at some point, but

17   more so with the heavier tasks.

18        Q    Such as?

19        A    Like projects and stuff like that that we were

20   working on.

21        Q    What kind of heavy projects did he help you with?

22        A    I would say probably when we were working in the

23   panda house or something like that, you know, hanging

24   pictures, you know, and also when I was trying to restructure

25   the shop itself and clean it up, there was a lot of heavy

Page 24

1    stuff that needed to go into a dumpster that we had ordered.

2        Q    **What period of time were you doing the panda house?**

3        A    What period of time?

4        Q    **Yeah, when you were talking about him helping you**

5    **out with the heavy work in the panda house?**

6             MR. SILVERBERG:  Who is him?

7             BY MR. NEBEKER:

8        Q    **Mr. Robinson.  What -- what time period was Mr.**

9    **Robinson helping you with the heavy work in the panda house?**

10       A    I'm not understanding what you're saying when

11   you're saying what time period.

12       Q    **You said Mr. Robinson helped you with some of the**

13   **heavy work in the panda house, putting up signs, for**

14   **instance, didn't you?**

15       A    Well, they were not signs; they were photographs.

16       Q    **Oh, putting up photographs.  Sorry.**

17       A    A they were large, large photographs.

18       Q    **Was there any text on the photographs?**

19       A    There was text.  There were some -- there was one

20   sign that was probably maybe, I would say, eight by four

21   feet.  Which is something that I couldn't handle by myself.

22       Q    **And Mr. Robinson, although he wasn't doing the**

23   **production work that you were doing, he came to help put up**

24   **the sign that was too big to put up -- for you to put up by**

25   **yourself, correct?**

Page 25

1    A    Correct.

2    Q    **Okay, now when was that?**

3    A    I can't -- I can't remember the exact dates.

4    Q    **Do you remember if it was before or after Mr.**

5    **Robinson raised his EEO complaint?**

6    A    I would say that it was -- it probably -- it may

7    have been a little bit before, but I'm not sure.

8    Q    **And was that before December of 2003 when the cards**

9    **came out?**

10    A    I'm almost certain it was.

11    Q    **So anyway, you started to say you were called into**

12    **Ms. Samiy's office was it or Ms. Dolnick's office?**

13    A    Ms. Samiy's office.

14    Q    **Ms. Samiy's office to talk about Mr. Robinson.  And**

15    **was the gist of the conversation that he wasn't going to be**

16    **able to helping with such things as putting up signs?**

17    A    No, I think the conversation was about her saying

18    that because of him putting in the complaint, you know what I

19    mean, that things were going to have to change within the

20    workplace, as far as the way that she was treating us.  And

21    that -- if I can remember, I wasn't -- I myself and probably

22    other people weren't going to have the flexibility or the

23    freedom, you know what I mean, to -- you know, to go out and

24    do projects, you know, without her having some type of

25    control or, you know, management or managing over top of them

1       A      Yeah, because I've had discussions with them and

2    I've disagreed with Kathleen as well as Lynn of the way they

3    were treating him.  I was saying, you know, I was telling

4    them that, hey, you know, you can't have a guy in two places.

5    You know, but all the time I knew what they were trying to do

6    because I've been through this before.  I know that, you

7    know, they try to make work impossible for you, you know,

8    they try to overload you.  And basically that's what they

9    were trying to do was to overload him, you know what I mean,

10   and trying to make him responsible for.

11       Q      **What facts do you rely on for that conclusion?**

12       A      The fact that I've spoken to him about it.

13       Q      **Anything else?**

14       A      That's it.

15       Q      **Hostile meetings with Kathleen Samiy where Kathleen**

16   **Samiy raises her voice, ignores issues that pertain to the**

17   **park safety, ADA rules and regulations, work safety and**

18   **health and wellbeing of the workers.  That's paragraph number**

19   **9 on page 4, Exhibit 21.  Do you see that?**

20       A      Um-hmm.  I sure do.

21       Q      **Okay, would you explain in detail the facts you**

22   **rely on to support this statement.**

23       A      The hostile meetings were meetings that, you know,

24   I think after Ernie had --

25              MR. SILVERBERG:  I'm sorry, did you say beatings or

Page 66

1    meetings?

2              THE WITNESS:  Meetings.  Meetings.

3              That they were held between me and her and between

4    the other males and after Ernie had filed his complaint and

5    how she would raise her voice and holler and scream and foam

6    at the mouth at us.  So I don't --

7              BY MR. NEBEKER:

8         Q    What did she scream at you in these meetings?

9         A    More so things like, you're going to do as I ask

10   you to do and blah, blah, blah, you know.  It wasn't pleasant

11   at all.  It wasn't like, okay, somebody is asking you to do

12   something, I mean, in a pleasant way.  I mean, it was more so

13   hostile.

14        Q    Anything else?

15        A    More so the voice mails, you know what I mean, by

16   me having to leave voice mails, that was one of the issues

17   I'd raise.

18        Q    Anything else?  To support the assertions in

19   paragraph number 9 on page 4 or Exhibit 21.

20        A    It seemed to at some point get to a point that

21   although she didn't know anything about production, you know

22   what I mean, it seemed as though that she started, you know,

23   more so, you know, how would I say it?  She started making

24   things out of more than an argument, you know what I mean,

25   instead of trying to, you know, reason or be reasonable about

1    things that I may have came to her about or things that she

2    brought to my attention.

3    **Q    Did you ever bring the same issue to her on more**

4    **than one occasion?**

5    A    I think we just discussed similar to that, which

6    was the electrical problem.

7    **Q    Anything else?**

8    A    It's been many things that I brought to her on more

9    than one occasion, but I mean --

10    **Q    Identify them, if you would.**

11    A    I would say like the safety of the shop is

12    something that I brought to her attention on more than one

13    occasion.

14    **Q    This was the lower shop where the saw was?**

15    A    Right.

16    **Q    Okay.  And --**

17        MR. NEBEKER:  To whose attention?

18        THE WITNESS:  To Kathleen.

19        BY MR. NEBEKER:

20    **Q    And in the lower shop, it was that there wasn't**

21    **sufficient ventilation to run the saw and the saw wasn't**

22    **bolted to the floor; is that correct?**

23    A    No, it's just the -- I think the things that I

24    brought to her was that the place was filthy and --

25    **Q    Okay, so that was your only safety concern you**

Page 68

1    raised with Kathleen Samiy over the lower shop?

2        A    Right, and probably the issues with the saws and

3    stuff like that, too.

4        Q    Okay, tell me about what do you mean by stuff like

5    that?

6        A    I'm just saying, machinery in general.

7        Q    What machinery, specifically.

8        A    The saw, the -- another one was a band saw or

9    something that was there.

10       Q    Was that also --

11       A    Not having proper ventilation, not having the

12   proper equipment, you know what I mean, as far as breathing

13   fumes and dust and --

14       Q    Okay.  Did you have any face masks that you would

15   wear?

16       A    Face masks?

17       Q    Yeah, anything to cover your mouth and nose when

18   you were in the shop?

19       A    I mean, we had borrowed them from other units or

20   stuff like that, but we wasn't really given the things that

21   we needed to actually perform what they was asked.

22       Q    You had to go get them?

23       A    Right.  We had to go probably to another shop or

24   something.

25       Q    And after you got them, could you reuse them?

Page 72

1      Q    Okay, what store would you go to?

2      A    Like Home Depot or lumber store or something like

3    that.

4      Q    And they have gas -- they have respirators, right?

5      A    Right.

6      Q    Okay.  Did you ever ask her to buy a respirator so

7    that you could work in the lower shop?

8      A    I can't ask her to buy a respirator for the work --

9      Q    Did you ever ask her to approve the purchase of a

10    respirator?

11      A    I have asked her on many occasions.  But it takes a

12    lot to get a respirator.  And it's not something that I am an

13    expert at, okay?  Because first of all, I think what happens

14    is that process has to go downtown and it has to be approved

15    by safety.

16      Q    To get one of those paper masks?

17      A    You just said "respirator."

18      Q    Okay, but let's talk about the paper dust mask.

19      A    Right.

20      Q    Okay.  That would protect you from sawdust,

21    correct?

22      A    Right.

23      Q    Okay.  So if you -- that was a safety concern for

24    you, couldn't you, when you were at Home Depot, say, can I

25    pick up a pack of these -- these dust masks?

Page 73

1    A    I mean, we've done it.

2    Q    **You have done it?**

3    A    Right, we've picked up --

4    Q    **All right.**

5    A    You get like five in a pack or something like that.

6    Q    **All right, so you could get them yourself when you**

7    **went to Home Depot so that they would be down there in the**

8    **lower shop, is that what you're saying?**

9    A    You're saying I could get them myself?

10    Q    **Yeah.**

11    A    No, I couldn't get them myself.  I had to go

12    through her.

13    Q    **Right, but then she'd pay for them, you'd have the**

14    **dust masks for the lower shop, right?**

15    A    No, she didn't pay for anything.

16    Q    **Well, she approved the payment for the Smithsonian**

17    **for things like the dust masks, correct?**

18    A    I mean, every so often, yes.  I would say, yes.

19    Q    **Did she ever specifically tell you, no, we can't**

20    **afford or I'm not going to approve dust masks for the lower**

21    **shop?**

22    A    No, I think what she did is just ignored what my

23    requests were a lot of times.

24    Q    **And how long did you go without dust masks in the**

25    **lower shop because of that?**

Page 88

1    A    I can't say that you are, because there was so many

2    of them.  It might have been 10 of these things.

3    Q    **What were the significant differences between the**

4    **performance plans that were proffered that you rejected?**

5    A    Well, the thing was, the way they described it to

6    me was that I was supposed to -- my performance plan was

7    supposed to have been based on the outcome of the desk audit

8    that we had did.  And the outcome of the desk audit didn't

9    have me doing any type of managerial type skills, no leader

10    skills, no nothing.  So --

11    Q    **Did the -- any of the performance plans that were**

12    **proffered to you prior to June 5, 2006, have you as a team**

13    **leader or a project leader?**

14    A    I can remember Jeff having two performance plans in

15    his office, and he presented me with one and when I went to

16    read it, you know what I mean, and I explained to him that he

17    had had project leader on top of it as well, and then he

18    said, oh, no, this is the wrong one, took it back, went in

19    his drawer and gave me another one.

20    Q    **And was that one, one of these, 26, 27, 28 or 29,**

21    **exhibit numbers?**

22    A    This kind of rings a bell a little bit.

23    Q    **29, you believe to be -- this says position title,**

24    **exhibit specialist.  So is this the one that Mr. Baxter**

25    **pulled out of the drawer and said, oh, this is the accurate**

1    one?

2        A    It rings a bell like that, I think.

3        Q    That's Exhibit 29, correct?

4        A    Right.

5        Q    All right.  Let me go through a few e-mails if I

6    may and see if you can just tell us if they are true and

7    accurate copies of e-mails that you sent or received while

8    you were working for the agency.

9                        (Exhibit No. 31 was marked for

10                        identification.)

11            BY MR. NEBEKER:

12        Q    All right, I'm looking at Exhibit 31, Mr. Bowden.

13    Is that a true and accurate copy of an e-mail sent to you

14    from Herman Krebs on or about August 28, 2003?

15        A    I can see where it was sent to me.

16        Q    And is it in fact true that in about August of

17    2003, the agency was in fact upgrading their QuarkXPress

18    licenses to Version 6?

19        A    That, I wouldn't know, because I'm not a designer.

20        Q    Was QuarkXPress something -- well, Mr. Krebs, was

21    he a designer?

22        A    He's a designer.

23        Q    Do you have any reason -- you don't have any reason

24    to doubt Mr. Krebs that they were in fact upgrading their

25    QuarkXPress license to Version 6, do you?

1    machine?

2        A    Yeah, I did.

3        Q    And did she get it to work on your machine?

4        A    No, it never did.  As a matter of fact, it just

5    didn't work on my machine; it didn't work on anybody's

6    machine.

7        Q    But it did get installed on the machine?

8        A    Right, it ended up being on my machine, but it

9    never did work.

10        Q    Do you have any reason to doubt that the

11    efforts -- let's keep all these together -- that Ms. Samiy's

12    efforts to get the software up and running on your machine or

13    on everybody's machine were genuine?

14        A    Were genuine?

15        Q    She wanted it to work, right?

16        A    She wanted it to work, but I think it was she just

17    didn't know what she was doing and was kind of spinning her

18    wheels with it.  It just never actually became an actual

19    software that anybody could use.

20                        (Exhibit No. 33 was marked for

21                         identification.)

22        BY MR. NEBEKER:

23        Q    Have you got Exhibit 33 in front of you now?

24        A    Yes.

25        Q    Is this an e-mail from you to Lynn Dolnick dated

Page 96

1    know what I mean?

2       Q     Okay, did you use the word bitch?

3       A     No.

4       Q     Did you use any words that someone may have

5    mistaken for that word, "bitch"?

6       A     Not that I can remember, but I think -- because I

7    can remember Elena did go back to Lynn and say that I had

8    said something to this nature and I think Lynn went and

9    talked to Sherod and Grace and she found out that it wasn't

10   true or something.  So I think that may be that letter.

11      Q     So you think that this blowout that Melissa was

12   talking about was really just you having a conversation with

13   Grace and Sherod?

14      A     Right.

15      Q     And Elena is in the room?

16      A     Right.

17      Q     And she's clearly offended by something, but it

18   really isn't something that you said offensive about Elena?

19      A     I think she was in the room and she probably was

20   snooping, but she caught probably the tail end of what was

21   going on or just caught something and didn't quite hear what

22   I was saying to the other person.

23      Q     Okay.  And so ultimately Lynn Dolnick didn't take

24   any action against you as a result of any allegations about

25   you calling Elena anything, correct?

Page 115

1      Q      The next exhibit is 37.   Mr. Bowden, is this an

2   e-mail from you to Kathleen Samiy?

3      A      Yes.

4      Q      Dated November 6, 2003?

5      A      Yes.

6      Q      Did you get approval to go home early that day?

7      A      I think I did.

8                         (Exhibit No. 38 was marked for

9                         identification.)

10         BY MR. NEBEKER:

11     Q      On to 38.

12     A      On 37?

13     Q      Yes, sir.

14     A      Yeah, I think I did.

15     Q      Okay.   Is Exhibit 38 a document that you wrote to

16   the associate director at Smithsonian National Zoological

17   Park on November 6, 2003?

18     A      Yes.

19     Q      And did you write this?

20     A      Yes.

21     Q      Where -- do you know what the checkmarks are?

22     A      The checkmarks are the things that were left that

23   weren't mentioned in the desk audit.

24     Q      Okay, and did you put the checkmarks on there?

25     A      Yes.

Page 130

1          MR. SILVERBERG:  I am going to object to this

2    exhibit, just that it's not to Mr. Bowden, so --

3          MR. NEBEKER:  Sure.

4          THE WITNESS:  I don't know.

5          BY MR. NEBEKER:

6    Q    You've never seen this before?

7    A    I don't remember seeing this.

8    Q    Okay.  In -- let me ask this.  In number seven on

9    the exhibit, it references the ability to manage and track

10   graphic signs and files for purposes of reprinting.  Do you

11   understand what that entails?

12   A    Yeah.

13   Q    And is -- was File Maker and QuarkXPress, were they

14   designed to make that job -- I'm not saying they worked, but

15   was it the intention that those pieces of software could be

16   used to manage and track graphic signs and files for purposes

17   of reprinting?

18   A    Well, I mean, Quark is not a tool that you use to

19   track.  File Maker would be a tool that you could use to

20   track, but File Maker was something that they never, like I

21   said, could actually get up and running.

22   Q    If they could, that's what it would have done,

23   though, correct?

24   A    Right, exactly.

25   Q    And what about QuarkXPress?  Could you use

1    **QuarkXPress to manage and track graphic signs and files for**

2    **purposes of reprinting?**

3        A    No, you can't use QuarkXPress to manage and track.

4        **Q    Could you use QuarkXPress for printing?**

5        A    For printing?

6        **Q    Yes.**

7        A    I mean, you can print.  You can print File Maker.

8    You can print anything.  But QuarkXPress is more of a design

9    tool, you know what I mean.  The design is used to actually,

10   you know, design things.  It has nothing to do with tracking.

11       **Q    So QuarkXPress would be used to design a sign?**

12       A    Right.

13       **Q    If you had a sign that you wanted to reproduce,**

14   **could you use QuarkXPress to reproduce the sign?**

15       A    You could.

16       **Q    And could you yourself, do you have the ability to**

17   **use -- for the QuarkXPress program, or would you have**

18   **somebody else do it for you?**

19       A    Well, I would probably more so have somebody else

20   to do it for me.  I had a little knowledge of it but not --

21           MR. NEBEKER:  Can we go off the record for a

22   second?

23           (Recess.)

24                      (Exhibit No. 43 was marked for

25                       identification.)

Page 146

1      Q      Were you at the time of January 8th through January

2   16, 2004, the EO safety officer?

3      A      Yes.

4      Q      What is an EO safety officer?

5      A      Well, I was the exhibit office safety person.

6      Q      And at the -- in January 2004, was it your

7   responsibility to keep the shop floor clean -- the shop floor

8   clean, organized and within all safety regulations?

9      A      Was it my responsibility?

10      Q      Yes, sir.

11      A      That wasn't something that I could handle alone,

12   no.  But I could keep the shop clean and swept but not

13   actually lift the heavy equipment and move stuff around.  The

14   place was just like a -- it wasn't really a shop, it was

15   actually like a -- I wouldn't even call it a warehouse; it

16   was just a place that people dumped, you know, old exhibits

17   and junk that they didn't want, old books and boxes of

18   pamphlets and just trash, you know what I mean?  The place

19   was a mess.

20      Q      Okay, so you're saying it was not your

21   responsibility to keep it within all safety regulations?

22      A      Was it my responsibility?

23      Q      Yes.

24      A      My responsibility as far as the safety thing was to

25   check the fire extinguishers and stuff like that.  It had

Page 154

1       Q    One, two, three, fourth sentence.

2       A    I see it.  I see it.

3       Q    Okay, did you in fact tell Kathleen Samiy that, due

4  to the work load that you were already responsible for, you

5  did not feel comfortable taking on any more work around March

6  of 2004?

7       A    Yes.

8                            (Exhibit No. 54 was marked for

9                            identification.)

10      BY MR. NEBEKER:

11      Q    Mr. Bowden, is this an e-mail exchange that took

12  place between you and Lynn Dolnick in March of 2004?

13      A    Um-hmm.

14      Q    I'm sorry?

15      A    Yes.

16                           (Exhibit No. 55 was marked for

17                           identification.)

18      BY MR. NEBEKER:

19      Q    Mr. Bowden, is Exhibit Number 55 an e-mail exchange

20  between you and Ms. Dolnick from April of 2004 -- late March,

21  early April of 2004?

22      A    Yes.

23                           (Exhibit No. 56 was marked for

24                           identification.)

25      BY MR. NEBEKER:

Page 155

1       Q     Mr. Bowden, is this an e-mail that you received

2    from Kathleen Samiy on or about March 16, 2004, this Exhibit

3    56?

4       A     Um-hmm.

5       Q     And do you see at the bottom of her e-mail, she

6    lists several dates in March on which she asserts you were

7    out during the month?  Do you have any facts that would

8    contradict that you were out those periods of time?

9       A     You say do I have any what?

10      Q     In fact, were you -- let me ask it this way.  Has

11   she accurately recounted days that you were out sick or left

12   the office or left the work?

13      A     I would say that this could be true, you know what

14   I mean?  I can't remember that far back.

15            MR. SILVERBERG:  Say that louder.  I don't think

16   she heard.

17            THE WITNESS:  I said, I would say that this could

18   be true but I can't remember that far back.

19            BY MR. NEBEKER:

20      Q     No reason to doubt that it's true, is there?

21            MR. SILVERBERG:  Well, he already said he doesn't

22   remember that far back.

23            BY MR. NEBEKER:

24      Q     You don't specifically remember being at work any

25   of the times she says you weren't, right?

Page 156

1          A     Huh?  Say that again?

2          Q     You don't specifically recall being at work any of

3     the times listed on Exhibit 56 that she says you were out of

4     work?

5          A     I couldn't speak on that.

6                                    (Exhibit No. 57 was marked for

7                                     identification.)

8          BY MR. NEBEKER:

9          Q     Would you look at Exhibit 57, sir?  Mr. Bowden, is

10    that a copy of an e-mail that you sent to Mr. Dolph Sand on

11    April 16, 2004?

12         A     Yes.  Yes.

13         Q     And that responded to an e-mail also on that

14    exhibit that Mr. Sand had sent to you, correct?

15         A     Yes.

16                                   (Exhibit No. 58 was marked for

17                                    identification.)

18         BY MR. NEBEKER:

19         Q     On to 58.  And can you tell us if Exhibit 58 is a

20    true and accurate copy of an e-mail exchange between you and

21    Mr. Dolph Sand in April of 2004?

22         A     Yes.

23         MR. NEBEKER:  Off the record.

24         (Recess.)

25    //

Page 176

1       Q     Is this a confirmation of counseling letter you

2   received from Jeff Baxter on or about December 17, 2004?

3       A     Yes.

4       Q     Do you know if this was ever withdrawn?

5       A     No, it wasn't.

6       Q     And do you recall ever referring to Ms. Lopez as

7   crazy or a crazy lady?

8       A     Not to Ms. Lopez, no.

9       Q     Okay, did you ever refer to her, even outside of

10  her presence, as crazy or a crazy lady?

11      A     I can remember saying to them that she must be

12  crazy to keep, you know, using my name or whatever the case

13  may be.  Or --

14      Q     But you never used the term "crazy lady"?

15      A     Huh?  No.

16      Q     Did you ever use the term "crazy lady" in referring

17  to Ms. Lopez, Grace Lopez?  Or Elena Lopez?

18      A     I just remember saying that she must be crazy.

19      Q     Which Lopez was it that you said was crazy?

20      A     This was Elena.

21      Q     Elena.  Okay.  Why did you say Elena was crazy?

22      A     I said she must be crazy?

23      Q     Why did you say she must be crazy?

24      A     Because of the fact of all the drama that she kept

25  going in the work -- kept up in the workplace.

1    Q    And in whose presence did you say that Elena Lopez

2    must be crazy?

3    A    This was in front of Chuck Fillah.  And if I

4    believe it was Susan Ades, who both were supervisors at that

5    time.

6    Q    Was anybody else there?

7    A    I think the supervisor overtop of -- overtop of the

8    administrative office or somebody may have been there, which

9    is all of them in our division.  Because what I pointed out

10   to Susan, I said that, you know, that Elena has even got into

11   it with you, and I said she's got into it with you as well,

12   to Folami.  It was Folami.

13   Q    Elena spoke ill of Folami?

14   A    Yes.  They almost got into a fight.

15   Q    And what happened then?

16   A    What do you mean what happened?

17   Q    They got in a verbal fight or fisticuffs?

18   A    They almost went blows to blows.  It was --

19   Q    Were you present for that?

20   A    I was there.  Everybody was there.

21   Q    When was that?

22   A    That was probably maybe -- I would say maybe about

23   a couple of months, two or three months before this incident

24   happened.

25   Q    Before you described Ms. Lopez must be crazy?

1       A    Right.  And then the incident where she had knocked

2    a young lady off the computer.

3       Q    Who knocked whom off the computer?

4       A    Elena Lopez took her body and rammed it into a

5    young lady while she was using the printer --

6       Q    Oh, the printer.  Who is the lady?

7       A    Her name was -- her name -- she's still there.  Her

8    name is Amanda Parez.  And then the incident when she had

9    took some aerosol spray, a spray can or something, and

10   sprayed it into Stacey Tabellario's face.

11      Q    This is Elena Lopez?

12      A    Yes.

13      Q    And did that take place before or after December

14   10th of 2004?

15      A    That took place before.  And then it was just chaos

16   with her all the time.  And the reason why is because

17   Kathleen and Lynn just let her get away with it, so she did

18   whatever she wanted to do, basically.

19      Q    And do you have any reason to believe that Mr.

20   Baxter's issuance of a confirmation of counseling letter was

21   meant to do anything other than try and stem the use of name

22   calling in the agency?

23      A    I have a feeling that -- I mean, this letter of

24   counseling shouldn't have never even been written because,

25   for number one, it wasn't like I went to Elena and said it to

Page 181

1          MR. SILVERBERG:  Did you just ask that?

2          BY MR. NEBEKER:

3     Q     **From the office?**

4     A     No, I was told by the Smithsonian's doctor to seek

5     more medical attention than what he could offer.

6     Q     **All I'm asking is, did the -- did the agency make**

7     **available to you sick leave to cover the pay for that period**

8     **of time?**

9     A     I don't know what they made available because

10    I -- I mean, at that point it didn't make a difference.  I

11    mean, at that time, I was under suicide watch.

12    Q     **You have no reason to believe that you didn't get**

13    **paid for those days?**

14    A     I don't know.

15    Q     **Do you believe you did not?**

16    A     I don't know if I did or if I didn't.

17    Q     **Okay.  Mr. Fillah was present at the time when you**

18    **discussed Ms. Lopez, that she must be crazy; is that correct?**

19    A     Correct.

20    Q     **And was Mr. Fillah Mr. Baxter's supervisor?**

21    A     Yes.

22    Q     **And do you believe Mr. Fillah was the one telling**

23    **Mr. Baxter that he, Mr. Fillah, felt it was appropriate to do**

24    **a confirmation of counseling letter for your use of the word**

25    **crazy in describing Ms. Lopez?**

Page 182

1      A    Well, I believe that Mr. Baxter had no intention on

2   doing a confirmation of counseling.

3      **Q    Right, but Mr. Fillah was his supervisor and told**

4   **him to because Mr. Fillah thought it was inappropriate to use**

5   **the word crazy in describing Ms. Lopez, correct?**

6      A    That wasn't the way he explained it to me.

7      **Q    Who explained it to you?**

8      A    That wasn't the way that Jeff explained it to me.

9   He said he was made to do it.

10     **Q    He was made to do it?**

11     A    Exactly.

12     **Q    And did you ever discuss with Mr. Fillah why Mr.**

13  **Fillah had Mr. Baxter do the confirmation of counseling**

14  **letter?**

15     A    Well, once he said that, I was done.  Once Mr.

16  Baxter told me what he had to say, I was done.  And what

17  I -- I think my words to him was that maybe he needed to

18  stand up and be more of a man and make decisions on his own

19  and not let somebody else push you into doing something that,

20  you know, that you really don't want to do.  So --

21     **Q    So you never talked to Chuck Fillah about why he**

22  **had Mr. Baxter do the confirmation of counseling letter,**

23  **correct?**

24     A    I don't think anybody wanted to talk to Chuck

25  Fillah at that time.

Page 206

1   don't care about blacks.

2        Q    Is it fair to say that you don't trust him?

3        A    Is it fair to say?  I mean --

4        Q    You don't trust Mr. Fillah?

5        A    It's not Mr. Fillah.

6        Q    I'm sorry, Mr. Baxter.

7        A    Is it fair to say at this point if he feels that

8   way about me, yes, I don't trust him.  I mean --

9        Q    And do you feel he trusts you?

10       A    Do I feel he trusts me?

11       Q    Yes.

12       A    No, he's already spoken about it.  So that already

13  tells it.

14       Q    And has he ever docked your pay or denied you sick

15  leave because you didn't schedule sick leave sufficiently in

16  advance?

17       A    He's harassed me about sick leave, you know what I

18  mean?

19       Q    Has he ever docked your pay or denied you sick

20  leave because he believes you submitted the sick leave too

21  late, the request for leave too late?

22       A    Not that I can remember.

23       Q    Okay.  And I understand that one of your complaints

24  is that you have been questioned about your whereabouts at

25  the workplace; is that correct?

1       A     Right.

2       Q     **And that's because you had to step to the restroom;**

3   **is that right?**

4       A     Right.

5       Q     **And so you believe that you're singled out because**

6   **people ask where you have been when you're in the restroom?**

7       A     Not people; that's him that's asking.

8       Q     **Just Mr. Baxter?**

9       A     Right.

10      Q     **And --**

11      A     And I mean, when Kathleen was there, it was the

12  same thing.

13      Q     **How many times did Kathleen ask you about your**

14  **whereabouts when she couldn't find you and you were in the**

15  **restroom?**

16      A     Jesus, who knows?  You know what I mean?  I mean, I

17  couldn't answer -- it's getting to the point that I feel like

18  I'm almost in jail.  And that's the way it always has been, I

19  mean, even with Kathleen.  I mean, I can't get up and go to

20  the bathroom without you asking where I am?  And that's why I

21  go to work right now on the day, you know what I mean, I

22  don't even really trust myself to go down the hallway to get

23  a candy bar, you know what I mean?  Because what I'm going to

24  basically do all day is just sit at my desk, you know what I

25  mean?

1    Q    Would you say that --

2    A    If I don't have anything to do, I try to stay in

3    place, because I know that they're looking for any little

4    thing.

5    Q    Would you say that you were questioned by Kathleen

6    about your whereabouts when she couldn't find you on more

7    than 10 occasions?

8    A    I would say on more than 50 occasions.  It's almost

9    like they sit there and they wait for you to move or

10   something and then they come in and, you know, you come back,

11   okay, where you been?

12   Q    And when you explain where you've been, does she

13   have something to talk to you about?

14   A    No, she don't really have nothing to talk to me

15   about.  I mean, I say -- like I've only been gone for a

16   minute or two.  I mean --

17   Q    What's the longest you've ever gone when she asked

18   you about your whereabouts?

19   A    Probably about 15, 20 minutes.

20   Q    Now, what about Mr. Baxter?

21   A    Same thing, about 15, 20 minutes.

22   Q    How many times has Mr. Baxter --

23   A    I mean, that still happens.  I mean, it's nothing

24   changing.

25   Q    How many times has Mr. Baxter asked you about your

1    whereabouts?

2        A    I mean, should we say 100, 200, I don't know.

3        Q    **You think it's as many as 200?**

4        A    Yes, I mean, it's like almost every day or every

5    other day, I mean.

6        Q    **And typically, when he asks you about your**

7    **whereabouts, have you always been at the bathroom?**

8        A    Either that, or I might have stepped out, and

9    sometime it would be -- it's so ironic, because he would send

10   me to do a job and I would come back and he would say where

11   were you?  And I'm like, what do you mean, where was I?

12   Didn't you just send me to do this, this or this?  So you're

13   fishing.

14       Q    **And is that --**

15       A    You know what I mean?

16       Q    **And is it always true that where you have been is**

17   **to do a job?**

18       A    Right.  I'm not saying as that, but I'm saying even

19   when I went to the restroom, it's crazy.  I can't go to the

20   restroom?  And you get questioned, how long does it take for

21   me to use the restroom?  Is that a good thing to do?

22       Q    **Have you ever been -- have you ever lost pay or**

23   **been docked pay or leave because you were in the restroom or**

24   **getting a candy bar?**

25       A    I may have.  I don't know.  They've been doing so

1    many things.  I can't identify anything, but there ain't no

2    telling what they're doing, you know what I mean?  It's not

3    pretty there.

4        Q    You can't identify any specific date or time when

5    you've been docked, because --

6        A    I can't identify any.  But I mean, I don't -- I'm

7    just not like I'm going to trust them.  They may be taking

8    leave from me right now.  Well, they are, I mean, while I'm

9    sitting here.  I'm using leave now, ain't I?  I mean, I

10   shouldn't be losing leave, but I'm losing it.

11       Q    I understand on March 1 of 2005, you claim that you

12   were given a fully successful performance appraisal; is that

13   correct?

14       A    Fully successful?

15       Q    Yes.

16       A    That would be correct.

17       Q    Okay.  And do you believe that you were successful?

18   You successfully accomplished all of the critical elements on

19   your performance -- in your performance plan in the period

20   preceding March 1 of 2005?

21       A    No.

22       Q    Where do you believe you did not successfully

23   complete the critical elements of your performance appraisal?

24       A    I didn't say anything about did not.

25       Q    Oh, sorry --

Page 211

1            MR. SILVERBERG:  I think he misunderstood the

2    question.

3            BY MR. NEBEKER:

4       Q    Do you believe that you were -- you successfully

5    completed each of the critical elements of your performance

6    plan leading up to the March 1, 2005, performance appraisal?

7       A    I believe that I went above successfully --

8       Q    And were there elements that you believe you were

9    rated lower than you fairly should have been rated?

10      A    Yes.

11      Q    Which elements were those?

12      A    I don't know unless I had it in front of me.  Or

13   actually all of them.

14      Q    You think that all of them were lower than they

15   should have been?

16      A    Exactly.

17      Q    Do you believe that in each element of your

18   performance appraisal you should have scored at the highest

19   level?

20      A    Yes.

21      Q    And that there are no areas for your improvement

22   during the year that preceded March 1 of 2005?

23      A    Not as far as performance, no.

24      Q    Is there any way that you could improve your

25   performance as -- could have improved your performance as an

1   employee for that year that was reflected in the March 1,

2   2005, performance appraisal?

3        A     Probably only one way that I know of?

4        Q     And that would be?

5        A     To spend the night.

6        Q     And another instance you indicate that on May 9,

7   2005, the agency failed to take appropriate action regarding

8   an assault by Elena Lopez; do you recall that?

9        A     Yes.

10       Q     And this was the instance when Elena Lopez came and

11  her shoulder struck you while you were talking with Mr.

12  Baxter; is that correct?

13       A     I don't think that's what I wrote.

14       Q     Were you speaking with Mr. Baxter at the time you

15  claim you were assaulted by Elena Lopez?

16       A     Yes, I was.

17       Q     Okay.  And Mr. Baxter was looking at a piece of

18  paper; is that correct?

19       A     No.

20       Q     What was Mr. Baxter doing?

21       A     He was looking me right in my face.

22       Q     And what were you talking about?

23       A     I can't remember -- I think we was talking about a

24  job or something, but I can't remember exactly what the job

25  was.

Page 213

1          Q     Do you remember -- you don't remember what the

2     question was?

3          A     I don't remember exactly what job we were talking

4     about.

5          Q     How many people were in the room?

6          A     Anywhere from maybe about -- anywhere from 15 to 20

7     people.

8          Q     Okay, and are any of those people friends of yours?

9          A     Friends of mine?

10         Q     Yes.

11         A     I don't really consider them as friends.  I mean,

12    they're my coworkers.

13         Q     So you don't have any coworkers who are friends of

14    yours?

15         A     I mean, I don't -- I don't really have what you

16    call friends like that, you know what I mean?

17         Q     Could you identify for us everyone that you recall

18    being in the room when you were speaking to Mr. Baxter and

19    you claim Elena Lopez assaulted you?

20         A     You mean when she rammed into me?

21         Q     If that's your claim, who was in the room?

22         A     The whole exhibit team.  I mean, it was -- I can

23    almost look on this list and tell you.

24         Q     You're looking at Exhibit 65?

25         A     Right.  This would help me.

Page 214

1           It would be Kara Blond, Judy Tasse, I don't

2    think -- I don't remember if Ken Stuart was still there.  Of

3    course, Elena Lopez was there.  Amanda Parez.

4           I don't remember whether Aaron Ferster was there.

5           I think Satcey Tabellario probably was there.

6    Herman Krebs, Ernest Robinson, Grace Lopez, Sherod Mangum,

7    Jeff Baxter, Judy -- I already said Judy Tasse.  Who else

8    would it be?  Susan Ades, Chuck Fillah, Patrice Paine.

9           That's probably about it that I can remember.

10      **Q      How much did Elena Lopez weigh?**

11      A      How much did she weigh?

12           MR. SILVERBERG:  Objection.  Asking him to assume

13    or speculate.

14           THE WITNESS:  I'm not a scale.

15           BY MR. NEBEKER:

16      **Q      Can you estimate Elena Lopez's weight back on**

17    **May -- May 2005?**

18      A      She was just as fat as I am, so how much do it look

19    like I weigh.

20      **Q      You tell me, how much do you weigh?**

21      A      Probably about 165, 170.

22      **Q      Okay, and so you believe Elena Lopez weighed 165,**

23    **170?**

24      A      May have.  She's pretty healthy.

25      **Q      And is she taller than you or shorter than you?**

1        A       About my size.

2        Q       And how tall are you?

3        A       I'm 5'5".

4        Q       And do you believe that Sherod is not a friend of

5    yours?

6        A       Do I believe he's not a friend of mine?

7        Q       Is he a friend of yours?

8        A       No, he's not; he's a coworker.

9        Q       Is Ernie Robinson a friend of yours?

10       A       No, he would be a coworker, too.

11       Q       Is Herman Krebs a friend of yours?

12       A       No.

13       Q       Is Patrice Paine a friend of yours?

14       A       No.

15       Q       Did you note whether -- did you ask any of these

16   other people who were in the room whether they witnessed

17   Elena Lopez assault you in May of 2005?

18       A       Yeah, I did.

19       Q       And did any of them say they saw her assault you in

20   2005?

21       A       I'm almost certain Sherod said he saw it.  I know

22   Ernie said he got a glimpse of what was going on, but, you

23   know what I mean, I don't -- I don't remember asking nobody

24   besides those two.

25       Q       And did you -- were you physically injured by the

1    alleged assault by Ms. Lopez?

2        A    Physically injured?

3        Q    Yes, suffer any bruises, any broken bones, any

4    lasting effects?

5        A    Just heartbroken.

6        Q    Nothing else?

7        A    Nothing else.

8        Q    But you found that her conduct was unacceptable,

9    fair to say?

10        A    Fair to say.

11        Q    And did you notice whether Mr. Baxter's expression

12    changed at all when Ms. Lopez hit you?

13        A    Mr. Baxter, to me, actually didn't tell the truth

14    in his deposition.  Because when -- after -- when it

15    happened, before that had happened, I had already warned him

16    and told him that she was doing things like bumping me and

17    blocking doorways, you know what I mean, and doing all kinds

18    of -- well, I can't say the word "crazy" can I?

19        Q    And had you ever done any blocking the doorways or

20    any bumping of her?

21        A    I had no reason to, you know?

22        Q    But did you?

23        A    No.

24        Q    Okay.

25        A    But I'm saying, by me explaining that to him, he

Page 217

1      told me that he had to actually see it. And I was like,

2      well, why can't you just speak to her about it and let's get

3      this thing in the open and at least she'll know that you're

4      aware of it. But he never made her aware of it.

5          Q    And when did you have that conversation with Mr.

6      Baxter?

7          A    This was -- as a matter of fact, this was a little

8      before, a little time before she had actually made those

9      little allegations against me.

10         Q    Okay, which allegations do you say she had made

11     against you.

12         A    The one where they had wrote me up or whatever.

13         Q    Is this where you used the phrase crazy or crazy

14     lady?

15         A    Right, "she must be crazy."

16         Q    But she wasn't there when that took place, correct?

17         A    You mean, when I had the conversation with Mr.

18     Baxter?

19         Q    Right.

20         A    No, she wasn't there when I had the conversation

21     with Mr. Baxter about her. But I was hoping that Mr. Baxter

22     would go back to her and have a conversation with her to say,

23     hey, at least that he's aware of it, so --

24         Q    This instance where she blocked the door, was this

25     prior to the May 9, 2005, incident with Ms. Lopez?

Page 218

1        A    May 9th?  Yeah, this was way prior to that.

2        Q    **Where were you ---**

3        A    Her conduct was terrible when Kathleen was there.

4   It was just --

5        Q    **Where were you when she blocked the doorway?**

6        A    I was coming from the printer into the -- what's

7   now the design office.  It used to be our office, you know

8   what I mean, and she stood there --

9        Q    **Is there only one door to get between those two**

10  **areas?**

11       A    It is one door unless you go all the way around.

12  So that's what I ended up doing, actually just going all the

13  way around.

14       Q    **Did you ask her to step out of the way?**

15       A    I tried to say excuse me, but -- I mean, you know

16  what she up to.  Come on.

17       Q    **What was she doing?**

18       A    Huh?

19       Q    **What was she doing?**

20       A    Just standing there, you know what I mean.

21       Q    **Was she talking to anybody?**

22       A    Like daring me.  No.

23       Q    **Okay.  And then so you walked around?**

24       A    I walked around.

25       Q    **Was there ever a time when she blocked the doorway**

Page 219

1    that you managed to get past the doorway, anyway?

2         A    No, I'd normally just turn and go the other way.

3    That was her way of getting back at me, I guess, because of

4    what was happening to her girlfriend.

5         Q    Who was her girlfriend?

6         A    Kathleen.

7         Q    Kathleen Samiy?

8         A    Right.

9         Q    Do you believe she blamed you for Kathleen Samiy's

10   departing the agency?

11        A    I think that she probably was angry and probably

12   felt that I had some involvement or something.

13        Q    Do you believe you did have involvement?

14        A    I don't know whether I did or not.  I mean, there's

15   separate reasons, I mean, that she probably left.  But I can

16   only hope that --

17             MR. SILVERBERG:  Objection.  You're calling for his

18   opinion.  Go ahead.

19             BY MR. NEBEKER:

20        Q    Did Elena Lopez have anything in her hands when she

21   rammed you, I guess is the word you used?

22        A    I didn't actually see what was in her hands; I just

23   felt my body swing around.

24        Q    Oh, you didn't see her coming?

25        A    Huh?

Page 220

1      Q      You didn't see her coming past you?

2      A      No, I didn't actually see her coming past me.  I

3  just saw her once she made impact.

4      Q      Okay, and where did she make impact on you?

5      A      On my shoulder.

6      Q      Which shoulder?

7      A      The right shoulder.

8      Q      And did she make impact from behind or from in

9  front?

10     A      It was kind of like from the side, like.

11     Q      So do you know where she was prior to -- with

12 respect to where you were standing, prior to bumping you?

13     A      You mean, did I know where she was standing or --

14     Q      Yeah, where did she come from?  Do you know where

15 she came from?

16     A      I don't know where she was coming from.

17     Q      But you believe that she struck your right shoulder

18 and she struck it shall we say in the same direction that

19 your shoulder -- that your shoulders run from left to right?

20     A      It seemed as though that she might have caught

21 somewhat from the front and the side at the same time.

22     Q      Okay.

23     A      And I can't remember if I asked you this already.

24 But did you fall over?

25     A      No, but I did have to twist and take a couple of

Page 221

1    steps to keep my balance.

2        Q    And what did Mr. -- did any words exchange between

3    you and Ms. Lopez or you and Mr. Baxter after that?

4        A    I said nothing to her.  I asked -- I told Jeff, I

5    said, did you see that?  And he said, yes.  I said, so now

6    you got a chance to see it, right?  And he said, yes, you

7    know what I mean?

8             And then I asked him, what did you see?  He said,

9    well, I saw her when she rammed you, I saw your shoulders

10   turn.  That's what he said.

11       Q    And he used the term "rammed"?

12       A    Right.

13       Q    And what -- then what?

14       A    Then after that, all of a sudden, I guess once he

15   took it where he needed to take it, to his supervisor and

16   discussed it with her supervisor, then all of a sudden, he

17   wanted to change his story a little bit, to soften it as

18   though it wasn't as bad.

19       Q    And who was his supervisor and who was her

20   supervisor?

21       A    Chuck Fillah was his supervisor.

22       Q    And who was Elena Lopez's supervisor?

23       A    I think it was Susan at the time.

24       Q    Susan Ades?

25       A    Right.  And I had a conversation with her and she

Page 222

1    got nasty, so I asked her, I mean, what she was going to do

2    about it.  I think what had happened, Ernie was talking to

3    her at the time, and he was asking her to at least get Elena

4    to apologize or something. . And so they had somewhat -- I

5    don't know if it was like a little heated conversation.  But

6    when I walked up, I told Ernie to just leave it alone, you

7    know what I mean, don't even worry about it.

8            And then I said, well, the main thing is, I

9    asked -- I asked Susan, well, what are you proposing to do

10   about this incident?  And she said to me, nothing.  Now what?

11   In a smart -- in a smart voice.

12       Q    And that was who?

13       A    Susan Ades.

14       Q    Do you believe Susan Ades was friends with Elena

15   Lopez?

16       A    Well, Susan Ades was there, she was friends with

17   Lynn.  That's how she got the job she got.

18       Q    She's friends with Lynn Dolnick?

19       A    Right.

20       Q    And was Lynn Dolnick friends with Elena Lopez?

21       A    Lynn Dolnick was probably closer with Kathleen, so

22   that made the connection with Elena.

23       Q    Do you know whether anyone ever spoke to Elena

24   Lopez about the incident?

25       A    Do I know whether they spoke to her?

Page 223

1      Q      Yes.

2      A      It didn't appear to, no.  It didn't -- they

3  didn't --

4      Q      You were never present when they spoke with Ms.

5  Lopez, correct?

6      A      I wasn't present, no.  But I'm saying, from what

7  they told me, they wasn't going to do anything about it.

8  So --

9      Q      You assume that they didn't?

10     A      I assume that they didn't.  And that's why,

11  because -- that's one of the reasons why I say, well, if I

12  can't, you know, protect myself, then I'm going to have to

13  call the police.  And that's why I called the police.

14     Q      Oh, and the police were brought in, they did an

15  investigation, correct?

16     A      They did -- you know, I wasn't there when they

17  investigated.  But from what I understand, is it's like they

18  did a half investigation or something.  They didn't really

19  fully investigate what had really happened, they didn't

20  question all the people that were in the room.

21     Q      Who didn't they question?

22     A      You know what I mean?  They only questioned certain

23  people, you see what I'm saying?

24     Q      Yeah.  Did you give them a list of people to

25  question?

Page 224

1      A    I didn't give them a list of anything.  I mean, the

2    thing is, they went to the supervisors, I guess, to try to

3    figure out who was there and who wasn't there.  I wasn't

4    asked to give a list.

5      Q    But did they interview you?

6      A    They interviewed me.  I gave them a writeup, you

7    know what I mean?  And I think after that, from what I can

8    remember, I probably left.

9      Q    And did the police pursue any criminal charges

10   against Elena Lopez?

11     A    I'm pretty sure that they sent something down to

12   the courts or something.  And when I talked to the captain,

13   the captain, Captain McCreedy, he told me that -- I don't

14   know if it's the prosecuting attorney or whoever it was that

15   said that they didn't feel as though it was something that

16   they should have to really handle on their level, that it

17   should have been something that the agency should have been

18   able to handle itself.

19     Q    And who gave you that information?

20     A    And speaking to one of the other officers, he said,

21   you know, believe -- the guy that actually did the writeup,

22   he said, believe me, if you would have bumped, you know what

23   I mean, one of the white folks in there, you know what I

24   mean, believe me, they'd have walked you to the gate, they'd

25   have had us to walk you to the gate today.

Page 225

1    **Q**    **Who told you that?**

2    A    That was one of the black officers.  I don't know

3    his name.  But I still see him around.

4    **Q**    **Was he involved in the investigation?**

5    A    He was involved in the investigation.

6    **Q**    **Did you give him the names of people to investigate**

7    **or to question about the incident?**

8    A    As I said, I think at that time, after that had

9    happened, I think I just went on and I either took leave for

10    the rest of the day or something.  So --

11    **Q**    **And did Elena Lopez ever ram you again?**

12    A    Did she ever ram me again?  No.

13    **Q**    **I also understand that you claim that Mr. Baxter**

14    **subjected you to hostile work environment on a time when you**

15    **were assigned a work ticket to hang banners at the panda**

16    **house; is that correct?**

17    A    That's correct.

18    **Q**    **And was this in January of 2006?**

19    A    2006?  That doesn't --

20    **Q**    **Could it have been August of 2005?**

21    A    I don't remember exactly what the date was.  I

22    don't remember exactly that.

23    **Q**    **You go into the panda house to hang banners,**

24    **correct?**

25    A    No.

Page 226

1      Q    Tell me about the incident then?

2      A    I was going to the panda house to see exactly what

3    he was talking about as far as hanging banners.  In other

4    words, we went to scope out the job.

5      Q    You didn't have the banners with you?

6      A    No, we were trying to figure out, okay, how does he

7    want this job done, you know what I mean?

8      Q    Had Mr. Baxter told you to come get him when you

9    were ready to go to the panda house?

10     A    He told us to give him a call or something like

11   that when you're ready to hang the banners, not when you're

12   ready to go to the panda house.

13     Q    Right, when you went to the panda house, was that

14   in anticipation of hanging the banners?

15     A    No, because we didn't have a real location as to

16   where he wanted them.  We had somewhat of an idea, but

17   when -- I think when me and Sherod had sat down and thought

18   about it, we said that, hey, the way he explained it to us,

19   it was like he wanted the banners to be hung somewhat

20   parallel from one pole to a fence or something, and we were

21   trying to get a good understanding of what he was talking

22   about.

23     Q    And how long did you try and get this understanding

24   at the panda house?

25     A    How long?

Page 227

1      Q    Yeah, how long were you there trying to figure out

2   what he was talking about?

3      A    Probably about maybe five or 10 minutes or so.

4      Q    Did he come up to the panda house?

5      A    You know what we did, we called him, you know what

6   I mean?  I had called him, you know what I mean.  And I asked

7   him to, you know, come up and try to explain to us what was

8   going on.  And once I called him, he came up and said, got

9   really loud, and a little belligerent, and started hollering

10  and said, you know, well, what if I had been in a meeting

11  and, you know?  And I was like, if you was in a meeting and

12  if I'm calling you, if the meeting was that important, you

13  just didn't have to answer the phone.  I mean --

14     Q    Is that what you told him?

15     A    Yeah.  I said, it's no big deal.  We just want to

16  know, you know, exactly what you want done here.  You said

17  for us to give you a call, so I'm giving you a call.  And he

18  said, well, why did you come up here?  You know what I mean,

19  I told you not to come up here, you know what I mean, you

20  know, and hang those banners.

21          I said, well, we're not hanging them, we're just

22  looking to see, you know what I mean?  We happened to be up

23  here in the area, we stopped, we're looking, and it was --

24     Q    Oh, so you didn't go off to the panda house with

25  the idea of checking the panda house out for the banners, you

Page 228

1    **just happened to be there?**

2        A    We just -- well, I think we were in the park and we

3    were doing something else and we were really close to that

4    area, so we just said, hey, because it's almost like where

5    the panda house is at is where we swing the truck out to come

6    outside the park.

7        Q    **I see.**

8        A    So I think the two of us said, well, let's see

9    exactly what he wants here.

10       Q    **As you were driving by?**

11       A    Right, you know what I mean?  So we stopped and --

12       Q    **Did you explain all that to him before he got up**

13   **there and was angry?**

14       A    I didn't -- there wasn't anything to explain.  I

15   told him that we were up here, I mean, look, sighting, and

16   trying to figure out what it is you want us to do here.  It

17   had nothing -- I mean, it's no reason for him to come up

18   there and break bad.  You can almost tell what that was

19   about.  He had just got finished talking to one of them

20   investigators that came into the workplace, so he was angry.

21       Q    **How do you know that?**

22       A    How do I know?  I mean, I knew when the

23   investigators came.

24       Q    **How do you know that?**

25       A    What do you mean, how do I know?

Page 229

1      Q    Did you see the investigator?

2      A    I saw him.

3      Q    So you were down where he was when the investigator

4  was there?

5      A    It was like a couple days -- in other words, what

6  I'm saying, it was like a day or two after that, so he was

7  agitated.

8      Q    Oh, a few days after.

9      A    Right.  He was still agitated.

10     Q    Had you had any communications with Mr. Baxter in

11  the -- earlier in the day that you went to the panda house?

12     A    No.

13     Q    When was it that Mr. Baxter told you to come get

14  him when you go hang the banners at the panda house?

15     A    You said, did I have any communication earlier in

16  the day about going to the panda house?  Let's make sure --

17     Q    Earlier on the day --

18     A    Yeah.  Yeah.  We had --

19     Q    -- when you went to the panda house?

20     A    Right, I had a communication, there was

21  communication with him.

22     Q    And how did that communication go?

23     A    He just said that he needed some banners hung at

24  the panda house.

25     Q    Nothing unusual about that conversation?

Page 230

1       A    Right, nothing unusual, you know what I mean?

2       Q    And you didn't think it was unusual that he wanted

3   to go to the panda house with you to deal with the banners,

4   correct?

5       A    I didn't think it was unusual.  I mean, because the

6   thing is, in my mind, I already knew that, hey, I don't know

7   exactly where you want them.  You got a rail that might be

8   running, say, let's say 100 meters down.  I don't know

9   exactly where you want them on that rail, but --

10      Q    And did you lose any pay or benefits as a result of

11  the incident at the panda house?

12      A    No, but I lost a lot of sleep.  Many sleepless

13  nights.

14      Q    And also I understand that you claim you were

15  discriminated based on race and color and disability and/or

16  reprisal when on February 3, 2006, you received a needs

17  improvement rating; is that correct?

18      A    That's correct.

19      Q    Now, can you tell us all the facts you have to

20  support the conclusion that the rating review as needs

21  improvement was based upon race, color, disability or

22  reprisal?

23      A    I know for a fact it was on reprisal and my race,

24  disability and everything else.

25      Q    And explain the facts you rely on for that

Page 271

1          (Exhibit No. 86 was marked for

2              identification.)

3      BY MR. NEBEKER:

4      Q    I would ask if you would look at Deposition Exhibit

5  86 and ask if this is a true and accurate copy of your

6  application for vacancy announcement 04SP1005.  I see your

7  Social Security number has been redacted out.  Aside from

8  that, is this what you submitted?

9      A    Seems to be.

10     Q    And do you believe it was accurate and complete

11 when you submitted it?

12     A    Yes.

13     Q    And do you see on here on page 3 -- actually page 4

14 of the exhibit, but it says in the upper right-hand corner,

15 Anthony Bowden, p. 3?

16     A    Um-hmm.

17     Q    And do you see that?

18     A    Right.

19     Q    And do you see you have listed as you have

20 knowledge of computer software including Quark and File

21 Maker.  Was that accurate?

22     A    That's accurate.

23     Q    Do you believe you had -- how would you describe

24 your abilities with the software Quark?

25     A    I mean, I would describe mine not to be any less or

1    they came up with this thing, with me being a team leader,

2    somebody which is Ernest Long's, I believe, description that

3    was dated in 19988.

4        Q    Were you ever a team leader?

5        A    No, I never was a team leader.

6        Q    Are other people asked about their whereabouts?

7        A    No.

8        Q    By Jeff Baxter, other people asked about their

9    whereabouts?

10       A    No.

11       Q    How long are you usually gone for?

12       A    I mean, the longest I can remember really being

13   gone for is like maybe 20 minutes, you know what I mean?

14       Q    Are they bathroom breaks?  What are they?

15       A    He questioned me about that.  He said, why does it

16   take you so long?  I mean, why would it take you 20, 25

17   minutes to use the bathroom?  And I explained to him, it

18   depends on what I'm doing.

19       Q    Are some of these times that you're gone from work

20   having to do with your job?  You have to go somewhere to --

21       A    Yeah, I mean, most of my jobs are done -- the zoo

22   consists of probably 100 and some acres.  So this guy can

23   give me a job and forget where he actually sends me.  That

24   can be another problem, too.

25            But, I mean, he could see me one minute sitting at

C E R T I F I C A T E

THE UNITED STATES OF AMERICA   )

IN THE DISTRICT OF COLUMBIA   )

      I, Debra Derr, Notary Public, before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing pages was duly sworn by me; that the testimony of said witness was reported by me by stenomask, and thereafter reduced to typewritten form; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto,k nor financially or otherwise interested in the outcome of this action.


                          Debra Derr
                     Notary Public in and for the
                     District of Columbia

My commission expires:

March 14, 2008

**Diversified Reporting Services, Inc.**
1101 Sixteenth Street, NW  Second Floor
Washington, DC  20036
(202) 467-9200