Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ANTHONY BOWDEN,                    *

      Plaintiff,               *

                       *

    vs.                          *    Civil Action No.

                       *    05-2022

LAWRENCE M. SMALL,                 *

Secretary, Smithsonian            *

Institution,                      *

      Defendant.                *

* * * * * * * * * * * * * * * * * * * * * * * *

      The deposition of JEFFERY BAXTER took

place on Wednesday, September 28, 2007, beginning

at 12:21 p.m. at Federal District Attorney's

Office, 501 North 3rd Street, 4th Floor,

Washington, D.C., before Stacey L. Daywalt, Court

Reporter.

* * * * * * * * * * * * * * * * * * * * * * * *

Reported by:

      Stacey L. Daywalt, Court Reporter

EXHIBIT
6
CA 05-2202

Al Betz & Associates, Inc.
www.albetzreporting.com



1    APPEARANCES:

2

3        On behalf of the Plaintiff:

4        STEVEN SILVERBERG, ESQUIRE

5        900 17th Street, N.W.

6        Suite 1250

7        Washington, D.C. 20006

8        (202) 785-8499 (Voice)

9

10       On behalf of the Defendant:

11       MARK NEBEKER, ESQUIRE

12       Federal District Attorney's Office

13       501 3rd Street, N.W.

14       4th Floor

15       Washington, D.C. 20001

16

17

18

19

20

21

1                    P R O C E E D I N G

2    Whereupon --

3                         JEFF BAXTER,

4    a witness, called for examination, having been

5    first duly sworn, was examined and testified

6    as follows:

7                    EXAMINATION BY MR. SILVERBERG:

8        Q.    Could you state your full name for the

9    record, Mr. Baxter?

10       A.    Jeffery Lynn Baxter.

11       Q.    And I want to start out by saying, well

12   asking, have you ever been deposed before?

13       A.    No.

14       Q.    I'm Steve Silverberg.  I'm the attorney

15   for Anthony Bowden in this Anthony Bowden action

16   versus the Smithsonian.  You're familiar with the

17   case?

18       A.    Yes.

19       Q.    I'll just give you quickly the rules of

20   deposition that I'm going to ask you a lot of

21   questions and you can take your time or just ask

Page 155

1    can't do anything?

2        A.    I thought I was responding to the earlier

3    ones that he said it was ongoing.

4        Q.    We accept.

5        A.    Now, I did present a statement in regards

6    to the one that happened I think it's the same time

7    as this one where she was carrying a number of

8    cakes for a bridal shower.  Tony and I were going

9    over a work ticket and we were looking at the work

10   ticket and each other, and I do believe somebody

11   walked by and then Tony looked at me.  I

12   immediately looked over to see who walked past him,

13   and it was Elena and by Tony's expression I knew

14   that she must have bumped into him.

15       Q.    Now, Mr. Robinson says in here I noticed

16   that she had rammed, rammed into Anthony Bowden.  I

17   approached Elena after she apologized to Tony for

18   ramming into him.  Was this incident reported to

19   you?

20           MR. NEBEKER:  I'm sorry.  I'm going to

21   object because I don't know which one you mean.

Page 156

1          BY MR. SILVERBERG:

2          Q.    The incident described in the 5/23/05

3     police report saying that Elena had rammed into

4     Tony.

5               MR. NEBEKER:  I don't understand your

6     question.  He's never seen this.

7               THE DEPONENT:  I haven't seen this.

8               BY MR. SILVERBERG:

9          Q.    But did you know about the incident?

10         A.    I knew about the incident because I was

11    there.  Tony was facing --

12         Q.    You saw the incident?

13         A.    No.  Let me explain.  We had our exhibit

14    staff meeting.  At the end of the exhibit staff

15    meeting I asked Tony to come over because I had

16    some work tickets I wanted to go over with him very

17    quickly.  I'm sitting down in a chair.  Tony is

18    facing me and bending over and looking at the work

19    ticket.  I'm looking at the work ticket and then

20    back up at Tony.  Somebody walked by behind Tony.

21    Tony looked up at me.  I looked over to see who was

1    behind him.  It was Elena Lopez.  Basically, the

2    only way I knew that there was contact was Tony

3    looking up at me.

4        Q.    Did Tony tell you what had happened?

5        A.    He said that she had bumped into him.

6        Q.    Did he say it like that?

7        A.    I don't know the exact words he said.

8    What I do remember is I'd have to go back and look

9    at my statement and realizing that something had

10   occurred I immediately made a phone call to Elena's

11   first line supervisor, typed up what I had

12   witnessed as clearly as I could, went to a meeting,

13   took a copy of that because I knew Chuck Fillah was

14   going to be in that meeting.  By the time I came

15   back I think I had an e-mail from Tony on this or a

16   voice mail.  I'm not sure which it was at that

17   point.

18       Q.    What was Mr. Bowden alleging?

19       A.    Assault.

20       Q.    Did he go to the police with it?

21       A.    When he used the word assault basically

1    with everybody.

2         Q.    And had you heard that from anyone else?

3         A.    I don't know.

4         Q.    Had you ever heard any complaints about

5    Elena Lopez's behavior besides what Tony had to

6    say?

7         A.    That she could be difficult to work with

8    at times.

9         Q.    You personally experienced those

10   difficulties?

11        A.    No.   You asked if I heard.

12        Q.    You heard that she could be difficult?

13        A.    Yes.

14        Q.    Difficult how?

15        A.    Just hard to work with.

16        Q.    Why did you issue this confirmation of

17   counseling letter?  Why did you counsel Plaintiff?

18        A.    It was a statement that was of serious

19   nature said in a public forum where other people

20   could hear calling someone a crazy lady.

21        Q.    Which he denies he said?

1       A.    I can -- I would suggest that you ask

2   Chuck Fillah.

3       Q.    Well, I might, but do you know what Miss

4   Lopez was saying about Tony that might have

5   elicited a comment like she must be crazy?

6       A.    No, unless it was basically involved with

7   my investigation of an open office environment

8   where she perceived she heard something.

9       Q.    Do you recall Tony requesting to meet

10  with Chuck Fillah to seek clarification what his

11  rights were with this issue with Miss Lopez?

12          MR. NEBEKER:  Objection, vague.

13          THE DEPONENT:  I don't recall.

14          BY MR. SILVERBERG:

15      Q.    Do you recall a meeting with Chuck Fillah

16  and Mr. Bowden when he said, discussing this issue?

17      A.    It's possible.  It's been a while.  I

18  don't know which meeting.  Meetings get confused.

19      Q.    Had plaintiff ever been counselled or

20  written up for anything before to your knowledge?

21      A.    Not by me.

Page 162

1    Q.    Not by you.  Didn't Sherod Magman, wasn't

2   he there and he says that he didn't hear Mr. Bowden

3   making that phrase?

4    A.    Which phrase are you referring to?  The

5   top part of the letter.

6    Q.    Yes, the top part.

7    A.    Yes.  He said he didn't hear and Grace

8   also said she didn't hear it.  That's why it's

9   stated in there that nothing else was going to

10  happen here.  It was meant, the top part of the

11  letter of counseling was meant to clarify that one

12  issue.  The letter of counseling was primarily

13  meant for calling Miss Lopez a crazy lady.

14   Q.    I'm a little confused.  The top part of

15  the letter?

16   A.    Let me go back to it.

17       MR. NEBEKER:  We're talking about

18  Exhibit 19, counselor?

19       MR. SILVERBERG:  Yes, Counselor.

20       BY MR. SILVERBERG:

21   Q.    The top part of the letter?

Page 163

1          A.     The first two paragraphs.

2          Q.     Refers to what?

3          A.     The conversation that Miss Lopez

4    allegedly said she heard.

5          Q.     That Tony said she was a crazy lady?

6          A.     No.  From in the 12/10/04 meeting we also

7    discussed, 12/9/04, that was a different incident.

8    These are two different instances.  The first top

9    two paragraphs are one incident and the rest of it

10   is another incident.

11         Q.     So, this is a confirmation of counseling.

12   It looks like it's referring to both incidents.

13         A.     It was not intended that way.  It was

14   meant to wrap up the first instance and say there

15   is nothing else here other than to say everyone

16   needs to be mindful of an open office environment

17   so people aren't perceiving that they're hearing a

18   conversation.

19         Q.     So, he was only counselled on the second

20   incident?

21         A.     Correct.

Page 164

1     Q.    And what was the first incident?

2     A.    The first incident here was where Miss

3  Lopez accused Mr. Bowden of inappropriate comments

4  in the workplace.

5     Q.    Not she must be crazy or she's crazy?

6     A.    No.  Miss Lopez is a crazy lady happened

7  in the hallway with Chuck Fillah present and

8  another EO supervisor.

9     Q.    Did the fact that Grace Lopez and Sherod

10  Magman stated they don't remember hearing the

11  phrase made you question Miss Lopez's voracity or

12  credibility?

13     A.    She may have heard a conversation and

14  misheard it.  I don't know what she heard.

15  Sometimes conversations can get loud in workplaces.

16  My intention was to make sure that this was

17  cleared.

18     Q.    Didn't you tell Mr. Bowden he might be

19  disciplined for this?

20     A.    I don't believe so.

21     Q.    Didn't you try to pursue the issue at one

Page 165

1    point?

2        A.    I just basically checked all the

3    witnesses.  I asked.

4        Q.    Do you know --

5            MR. NEBEKER:  I don't think he was done

6    answering his question.

7            THE DEPONENT:  Basically, I asked

8    everyone who was present so we could get clarity on

9    it, and if it was true then there would have been a

10   letter of counseling, but since there was no

11   validity to it, no witnesses, nothing was going to

12   happen.

13           BY MR. SILVERBERG:

14       Q.    Do you know why Mr. Bowden felt he had to

15   go to Mr. Fillah?

16           MR. NEBEKER:  Objection.

17           BY MR. SILVERBERG:

18       Q.    Do you know if Mr. Bowden went to

19   Mr. Fillah because he was concerned what you were

20   going to do?

21           MR. NEBEKER:  Objection, there's no basis

Page 166

1  for him to know what was in Plaintiff's mind.

2         THE DEPONENT:  I don't know.

3         BY MR. SILVERBERG:

4      Q.   Something Mr. Bowden might have told?

5      A.   I don't remember.  Again, this is from

6  '04.

7      Q.   Did you feel that Mr. Bowden had reported

8  you to Mr. Fillah, had spoken critically about you

9  about this incident to Mr. Fillah?

10     A.   That would be between Mr. Bowden and

11  Mr. Fillah at that point.

12     Q.   But did you feel Mr. Bowden was

13  criticizing you to your supervisor?

14     A.   Like I said, it really didn't matter to

15  me at that point.  What I was reacting to was the

16  statement that was being said in the hallway and

17  was reported to me by my first line supervisor.

18         MR. SILVERBERG:  I'll do it separately,

19  but we'd like a copy of his police report, and if

20  you have a copy of the State's Attorney's findings.

21         MR. NEBEKER:  Send us a formal request,

1    please.

2            BY MR. SILVERBERG:

3        Q.    Are you aware that Mr. Fillah told

4    Mr. Bowden that they could discuss what Mr. Bowden

5    wanted to discuss in an open setting?

6        A.    I do believe I heard that statement from

7    Tony, I mean Mr. Bowden.

8        Q.    Was that appropriate that this be

9    discussed in an open setting?

10       A.    I think if it needed to be, a topic of

11   sensitive nature needed to be pulled behind closed

12   doors is what I would have suggested by either

13   parties.

14       Q.    But Mr. Bowden said Mr. Fillah said it

15   should be an open setting.  Is that correct?

16       A.    I don't know.

17       Q.    But Mr. Bowden said that Mr. Fillah said

18   it?

19       A.    Yes.

20       Q.    Did Mr. Bowden express to you that he

21   felt you weren't protecting him from false

Page 168

1    allegations from another employee?

2        A.    I'm not sure what conversations I had

3    with Tony, Mr. Bowden, in regards to this, but I

4    felt that by doing the initial investigation on

5    this that I was trying to clear it up as quickly as

6    possible and answer it.

7        Q.    So, when he used the word, when you were

8    there but you didn't see it, the incident where he

9    said she rammed him in the shoulder?

10       A.    I was there at that point.

11       Q.    But you didn't see it?

12       A.    I basically was looking up at Tony and

13   Tony looked up at me and I knew something had

14   occurred.

15       Q.    I know I asked this before, but what did

16   you do then?  You reported it to who?

17       A.    I had to go to a meeting right after our

18   exhibits meeting.  I immediately tried getting in

19   contact with Elena Lopez's first line supervisor.

20   I quickly typed down my notes from what my

21   perception was of the event and then I took a copy

1   of that to the meeting I was going to where I knew

2   Chuck Fillah was going to be at.

3        Q.   You say you talked to Susan Ades about

4   it?

5        A.   Susan Ades.

6        Q.   She was Elena's supervisor?

7        A.   Correct.

8        Q.   What did Miss Ades do, if anything?

9        A.   I do believe she had conversations with

10  Elena Lopez.  To what degree I don't know.

11       Q.   Would it have been appropriate for you to

12  write something since you were there?

13            MR. NEBEKER:  Objection.

14            THE DEPONENT:  Write something in what

15  manner?  To Elena Lopez?

16            BY MR. SILVERBERG:

17       Q.   Yeah.

18       A.   No.  I think it would have had to come

19  through her first line supervisor.

20       Q.   Did Elena Lopez leave the agency?

21       A.   Yes.

Page 170

1      Q.    And why did she leave the agency?

2      A.    I don't know what her reasons were.

3      Q.    Was she fired?

4      A.    I don't know why she left.

5      Q.    Was she ever reprimanded for assaulting

6  Mr. Bowden?

7      A.    I do not know to what extent Miss Ades

8  spoke with her about this incident, but I do

9  believe that there were meetings in regards to it.

10         (Baxter Deposition Exhibit Number 21,

11  E-mail, for identification.)

12         THE DEPONENT:  This is the e-mail that I

13  was referring to earlier.

14         BY MR. SILVERBERG:

15     Q.    This is an e-mail where he told you that

16  she physically made contact with him by essentially

17  ramming her, and she says you said that you saw my

18  shoulder turn and saw the look on my face.

19     A.    I don't believe I said his shoulder

20  turned.  I believe I said came up and looked at me,

21  saw the look on his face.  I'd have to go back and

Page 174

1    while back.  So, I'm trying to pull from memory.  I

2    didn't want -- I would have rather this never have

3    happened, that this case had, the perceived assault

4    have taken place.

5         Q.    Did you tell Mr. Bowden you weren't going

6    to do anything about it?

7         A.    I had already done a number of things

8    about it, and when it was in the police's hands it

9    was pretty much out of my hands.

10        Q.    Do you know why he went to the police?

11        A.    He felt it was at the level of an

12   assault.

13        Q.    Are you aware from this e-mail and other

14   communications that Mr. Bowden felt that the

15   workplace was making him sick?

16        A.    Yes, but I also am aware that I'm not

17   sure if I was out a couple days around this time or

18   not, but Chuck Fillah had also talked with Mr.

19   Bowden and asked him if he was feeling safe now and

20   his response was yes.

21              (Baxter Deposition Exhibit Number 23,

Page 175

1    E-mail dated 5/23/05, for identification.)

2          BY MR. SILVERBERG:

3      Q.    Do you remember getting this from

4    Mr. Bowden to you?

5      A.    Yes.

6      Q.    Where he said I felt very uncomfortable

7    in today's meeting, 5/23/05.  I asked you last

8    Monday for permission not to attend the meeting

9    because of my feeling uncomfortable around Elena.

10     A.    Yes.

11     Q.    Did you tell him to attend a meeting

12   where Elena was attending?

13     A.    Yes.  He asked if he could be excused

14   from the meeting, and I told him I'd think about it

15   but I really did want him to be there but I'd think

16   about it.  I had thought about it, and I says I

17   need you to be there.  There is a lot of exchange

18   of information that is important.  I have no

19   problem with you sitting on the back or near an

20   exit and if you start feeling uncomfortable leave,

21   but I do need you to be at this meeting.

Page 176

1      Q.    Do you see he said before the second part

2  of the meeting he got up to vomit again?  You see

3  he says that in that first paragraph?

4      A.    I do see that.

5      Q.    I don't understand why you --

6      A.    My request for him --

7      Q.    Why you -- let me finish.

8            MR. NEBEKER:  He's going to finish his

9  question.  Then I'm going to finish my objection.

10           BY MR. SILVERBERG:

11     Q.    I don't understand why you ordered him to

12 go to a meeting with someone who he just claimed

13 assaulted him.

14           MR. NEBEKER:  Objection, argumentative

15 and not a question.

16           BY MR. SILVERBERG:

17     Q.    Why did you?

18           MR. NEBEKER:  Objection, vague.

19           MR. SILVERBERG:  Objection what?

20           MR. NEBEKER:  Vague.

21           BY MR. SILVERBERG:

Page 177

1      Q.    Why did --

2      A.    There was a lot.

3            MR. NEBEKER:  There's no question

4  pending.

5            BY MR. SILVERBERG:

6      Q.    Why did you make him go to this meeting

7  after he objected to it?  Why did you make him go

8  to this meeting?

9      A.    Informational exchange.  There was a lot

10  of information going on that's important and that

11  needed, one, it needed and wanted his input on

12  items that were being reviewed.

13     Q.    And did you consider that it could be an

14  explosive situation or uncomfortable one for Mr.

15  Bowden?

16           MR. NEBEKER:  Objection, compound.

17           THE DEPONENT:  I did.

18           BY MR. SILVERBERG:

19     Q.    But the information part in your mind

20  outweighed the discomfort part?

21     A.    I had also for counsel, I'm trying to

Page 183

1    was Mr. Bowden made to attend meetings with Miss

2    Lopez?

3        A.    I'm trying to, I think we were having

4    exhibit meetings like every other week.

5        Q.    So, it was every other week he had a?

6        A.    Every two weeks.

7        Q.    So, every other week he had to be at the

8    same meeting with Miss Lopez?

9        A.    Yes.

10       Q.    And did you ever consider changing your

11   position on that?

12       A.    The information was still going on.  I

13   still maintained that if Mr. Bowden could position

14   himself so if he started feeling overly

15   uncomfortable he could get out of there I had no

16   problem with him --

17       Q.    You mean physically sit near the end?

18       A.    Physically sit near the end so he could

19   remove himself if he needed to.  There was still

20   the exchange of information and his input, but it's

21   a lot of it cross information that helps keep the

Page 184

1    staff informed.

2        Q.    Moving on.  Do you know, aware that

3    Mr. Bowden maintains that you harass him when he

4    takes bathroom breaks?

5        A.    No.

6        Q.    Do you know that he alleges that you

7    harass him when he takes short breaks to get a

8    snack so he can take his medicines?

9        A.    No.

10       Q.    Do you know why he would think those

11   things?

12            MR. NEBEKER:  Objection.

13            BY MR. SILVERBERG:

14       Q.    All right.  Did you do anything to

15   Mr. Bowden that might make him feel you're

16   harassing him that you know of?

17            MR. NEBEKER:  Objection, speculative.

18            THE DEPONENT:  No.

19            BY MR. SILVERBERG:

20       Q.    When he says he has to take a break do

21   you always ask him where he's going?

Page 185

1    A.    No.

2    Q.    But sometimes?

3    A.    Not unless we're in the middle of a

4  meeting, but I don't believe so.

5    Q.    And did you ever assign him to different

6  areas of the zoo and then question him where he

7  was?

8    A.    There may have been times where I asked

9  where he was at and if he was working on a project

10  or I just needed to know where he was at.  I'm

11  trying to think how to word this.  Yes, there are

12  times when I ask where my staff are at, and I would

13  do this to all my staff.  It's not just Mr. Bowden.

14  If I'm expecting someone to be working on the bird

15  house and they're not there and they've shifted

16  their schedule it's good for me to know.  If

17  they're out in the park or with coming in early and

18  going to be with a contractor it's good for me to

19  know that they're in working with a contractor.

20    Q.    Did you ever instruct him to work in

21  certain areas of the zoo and then forget where you

Page 205

1    Q.    Was he treated differently by you because

2    he was under work stress?

3            MR. NEBEKER:  Same objection.  Strike

4    that last one.

5            THE DEPONENT:  Other than trying to use

6    the reasonable accommodations, no, I do not feel

7    that he was treated differently.

8            BY MR. SILVERBERG:

9    Q.    Do you believe any of the jobs you

10   assigned to Mr. Bowden were unsafe?

11   A.    Not intentionally, and I mentioned to my

12   staff if they feel that they've gone into a

13   situation that is unsafe that I have no problem

14   with them stepping out or finding an alternative

15   way to do it.

16   Q.    How often did he have to work in the

17   lower shop?

18   A.    Primarily, the jobs that we do are

19   working maintenance throughout the whole park.

20   There are times when we have to go down to the shop

21   to do setups.  At one point I had the safety

Page 206

1   officer come down to let us know what we could or

2   could not do in the exhibit office at that time,

3   and basically we were told that we could use the

4   chop saw after the table saw was bolted down, we

5   could use that, and we could do anything general

6   construction that we could do in any of the houses.

7         Q.   Wasn't the lower shop dirty and unheated

8   and had chemical smells?

9              MR. NEBEKER:   Objection, compound.

10             THE DEPONENT:   We've talked about the

11  heating issue before.

12             BY MR. SILVERBERG:

13        Q.   What about chemical smells?

14        A.   Chemicals, if someone was using paint

15  they would more than likely try to either go

16  outside or go down to the lower spray booth.

17  Sometimes people made the mistake of trying to

18  paint inside.  And so, we put a fan on.

19        Q.   Wasn't it dirty?

20        A.   It's dusty, yes.

21        Q.   Was it properly ventilated?

Page 207

1    A.    It was properly ventilated for the amount

2  of work that the safety office said we could do.

3    Q.    So, it was ventilated as much as it

4  needed to be?

5    A.    For the amount of work that we were told

6  we could do.  We could do chop saw.  We could run

7  the table saw a bit, but there is also a hookup for

8  a Shop Vac to go on that, but what we were allowed

9  to do was basically anything you could do within

10  any of the buildings there.  We could do assembly

11  there.  A lot of the cutting could be done down in

12  the OFEO shops and come back up for assembly.

13    Q.    Was it ventilated as well as your office

14  was ventilated?

15    A.    I don't think so.

16    Q.    Would you call the lower shop unsafe?

17    A.    For certain tasks I would say it's not

18  what I would want to do certain tasks in there, but

19  for assembly I would say it's fine.

20    Q.    Is part of Mr. Bowden's responsibility to

21  clean up animal enclosures?

Page 218

1          BY MR. SILVERBERG:

2      Q.   Well, that he called you and left a voice

3   mail and you came by 10 to 15 minutes later towards

4   him and also Mr. Magman who were working on it, and

5   in a very loud and unpleasant voice questioned him

6   what he was doing at the panda house and yelled at

7   him in front of zoo visitors?

8          MR. NEBEKER:   Objection, compound.

9          BY MR. SILVERBERG:

10     Q.   Are you aware that he alleges there is an

11  incident where you yelled at him in front of zoo

12  visitors?

13     A.   Yes.

14     Q.   And what is your position on that?

15         MR. NEBEKER:   Objection, vague.

16         BY MR. SILVERBERG:

17     Q.   Do you disagree with him that you yelled

18  or criticized him in front of visitors?

19         MR. NEBEKER:   Objection, compound.

20         BY MR. SILVERBERG:

21     Q.   Let me start again.   Was there an

Page 219

1    incident where you yelled at Tony on or about

2    August 19th, 2005 in front of visitors at the zoo?

3         A.    There was an incident where I was upset

4    about something.   There was a work ticket that went

5    out to hang three signs, posters at the panda pen.

6    I had given verbal instructions or I do believe

7    verbal instructions or written that I wanted to be

8    notified when they were going up because there was

9    something about the hanging that I wanted to look

10   at because it was attaching it to a fence.   When I

11   went down to the shop I asked Grace where Tony and

12   Sherod were, and she specified or said that they

13   had gone up to hang the signs, posters which I had

14   asked to be called before they went up so nobody's

15   waiting around.   On my way up I got a phone call

16   saying that we're up here trying to hang the

17   posters but we have some questions.

18         Again, I specified that I wanted to be

19   called before they went up there so nobody was

20   waiting.   By his statement he was waiting around 10

21   to 15 minutes.   When I got up there I was probably

Page 220

1  more animated than I usually am and I felt that I

2  did not -- I conducted myself professionally,

3  but probably not as professionally as I would have

4  liked to do.

5      Q.    Did you raise your voice?

6      A.    I was somewhat animated.

7      Q.    Did you raise your voice?

8      A.    I don't know.  I can't perceive how much

9  I raised it or not.

10     Q.    Did you criticize the men in front of

11  visitors at the zoo?

12     A.    I don't know if there were visitors

13  around at that time.

14     Q.    There might have been?

15     A.    I don't know.  I basically asked them why

16  they didn't call me when they were going up and

17  that way we could have looked at it and resolved it

18  because I wanted to look at the placement, the

19  positioning and the mounting bracket.

20     Q.    Why were you so upset?

21     A.    Because I had specifically asked to be

Page 221

1  notified before they go up so that nobody's

2  waiting, because a lot of times -- I don't like it

3  when people are waiting on me.  If I'm in a meeting

4  or if I can't get to them then basically people are

5  standing around, and I really didn't want them just

6  burning up their time because they have a lot of

7  things on their palettes to do.

8      Q.   Weren't they just coming to you with

9  questions though?

10     A.   I had asked specifically to be notified

11  though.

12     Q.   So, do the employees have a right to go

13  out and check out the job to see how it's going to

14  be done?

15          MR. NEBEKER:  Objection, vague.

16          THE DEPONENT:  Yes, but I had

17  specifically said when you go up there please give

18  me a call so nobody's waiting around.  And I don't

19  normally do that, but in this instance I had

20  specified it.

21          BY MR. SILVERBERG: