UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANTHONY BOWDEN,             )
                                   )
     Plaintiff,             )
                                   )
     v.                    )
                                 )     Civil Action No. 05-2202 RBW
                                 )
CRISTIÁN SAMPER, Acting Secretary,   )
Smithsonian Institution,        )
                                 )
     Defendant.       )

**PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGMENT ON THE PLEADINGS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Plaintiff Anthony Bowden by and through his attorney, Steven J. Silverberg submits his

Opposition to Defendants' Motion for Judgment on the Pleadings or, in The Alternative, for

Summary Judgment, and respectfully requests that this Court deny the Motion. Plaintiff

respectfully refers the Court to the accompanying Memorandum of Points and Authorities in

Support of this Opposition, and to Plaintiff's Statement of Facts as to which there is Genuine

Issue.

        Respectfully submitted,

        */s/Steven J. Silverberg*

        _____

        Steven J. Silverberg
        DC Bar #377376
        Attorney for Plaintiff
        900 17th St, N.W. Suite 1250
        Washington DC 20006
        Phone: 202/785-8499
        FAX: 202/785-8470
        E-mail: sjsilverberg@ erols.com

## CERTIFICATE OF SERVICE

I hereby certify that service to counsel for Defendant of the foregoing Plaintiff's Opposition to Defendants' Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment; Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment; Plaintiff's Statement of Facts as to Which There is a Genuine Issue; Plaintiff's List of Exhibits and Exhibits to Plaintiff's Statement of Facts as to Which There is a Genuine Issue; and proposed Order, has been made through the Court's electronic transmission facilities on this 30th day of July, 2008.

Respectfully submitted,

*/s/ Steven J. Silverberg*

_____

Steven J. Silverberg
DC Bar #377376
Attorney for Plaintiff
1819 L. Street N.W., Suite 700
Washington, D.C.  20036
Tel:  (202) 785-8499
Fax:  (202) 785-8470
E-Mail:  sjsilverberg@erols.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ANTHONY BOWDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-2202 RBW |
| | ) | |
| | ) | |
| CRISTIÁN SAMPER, Acting Secretary, | ) | |
| Smithsonian Institution, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Anthony Bowden (hereafter "Mr. Bowden" or "Plaintiff") works in the Exhibits

Department at the National Zoo Park[1] in Washington, DC. (Complaint ¶¶ 1, 5.) The Zoo has

subjected him to a longstanding and continuing pattern of discriminatory treatment because of

his race, color, sex, disability, religion, and retaliation because of his prior EEO activity.

(Complaint ¶¶ 1-45.) These acts and omissions include severe, ongoing harassment of Mr.

Bowden by his managers and co-workers, the Zoo's refusal to promote Mr. Bowden, its refusal

to pay him adequately, its failure to enforce a settlement agreement, and the Zoo's failure to

accommodate Mr. Bowden's disability. (Complaint ¶¶ 1-45.) Mr. Bowden requests legal and

equitable relief to correct the discriminatory acts and to compensate him for his damages.

(Complaint, ¶¶ 46-117; prayer for relief.)

---

[1] The Zoo is officially part of Defendant Smithsonian Institution (hereafter "Defendant," "NZP," "Smithsonian," "Agency," "National Zoo," or "Zoo"). Mr. Bowden named Mr. Samper in his official capacity as Acting Secretary of the Smithsonian.

1

## ARGUMENT

### I.     Judgment on the Pleadings Is Not Warranted

Defendant has moved for Judgment on the Pleadings[2] pursuant the Rule 12(h)[3]. In support Defendant cites two long excerpts from *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-67, 2007 U.S. LEXIS 5901 (2007), without discussion or explanation. (Defendant's Brief, pp. 2-3). However, *Twombly*, an anti-trust case, does not apply in a Title VII context. Prior to *Twombly*, the Supreme Court's leading case on motions to dismiss in the Title VII context was *Swierkiewicz v. Sorema,* 534 U.S. 506, 122 S. Ct. 992 (2002). *Twombly* does not overrule *Swierkiewicz.* In fact, *Twombly* expressly reaffirmed *Swierkiewicz.* ("*Swierkiewicz* did not change the law of pleading, but simply re-emphasized ... that the Second Circuit's use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules' structure of liberal pleading requirements." *Twombly*, 127 S. Ct. at 1973.)

Just as the plaintiff in *Swierkiewicz*, Mr. Bowden's Second Amended Complaint detailed the events leading to the adverse employment actions, provided relevant dates, and included the religion, race, color, sex, disability and EEO status of the relevant persons involved with his employment. *See Swierkeiewicz*, 534 U.S. at 511-514, 122 S. Ct. at 997-999. By this measure,

---

[2] Defendant timely filed its Motion for Judgment on the Pleadings, Or, In the Alternative Motion for Summary Judgment ("MSJ") on April 17, 2008. *See* Docket entry #31, Civil Docket for Case #1:05-cv-02202-RBW. This due date had been entered pursuant to an April 4, 2008 minute order granting Defendant an extension of time to file. Docket entry 30. (This was Defendant's sixth extension of time to file its dispositive motion, all consented to or unopposed by Plaintiff.) But Defendant was six days late with its supporting exhibits, which it failed to file until April 23, 2008. *See* Docket entry # 32. Defendant belatedly filed the Exhibits to the MSJ without Court permission, without agreement from undersigned counsel, and without other explanation, and in contravention of Local Rule 7 (a) and Rule 7(h). Plaintiff objects to Defendant's failure to meet its deadline, and asks for appropriate sanctions, including denial of Defendant's Motion or rejection of its exhibits. *See Dage v. Johnson,* 537 F. Supp. 2d 43, 52 (D.D.C. 2008):

"The courts in this circuit demand "strict compliance" with Local Rule 7(h), which 'is justified both by the nature of summary judgment and by the rule's purposes.' *Gardels v. Central Intelligence Agency*, 205 U.S. App. D.C. 224, 637 F.2d 770, 773 (D.C. Cir. 1980). A nonmovant's "failure to file a proper Rule [7(h)] Statement in . . . opposing a motion for summary judgment may be fatal to the delinquent party's position." *Id.* at 773 (citations omitted).

[3] Defendant presumably bases its underlying Motion for Judgment on the Pleadings on Fed. R. of Civ. P. 12(c), although both the text of Defendant's Motion and Memorandum of Points and Authorities in Support fail to cite specifically to that Rule. [Defendant instead cites Fed. R. Civ. P. Rules 8 and 12(h)].

Mr. Bowden's complaint easily satisfies the requirements of the general rules of pleading set forth in Fed. R. Civ. P. 8(a)(2) ("a short and plain statement of the claim showing that the pleader is entitled to relief"), because it provided Defendant fair notice of the basis for his claims. Defendant's Motion for Judgment on the Pleadings should therefore be denied.

## II.    Standard for Summary Judgment

Defendant has alternatively moved for Summary judgment pursuant to Fed. R. of Civ. P. 56. However, summary judgment is only proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255, 106 S. Ct. 2505, 2510, 2513 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S. Ct. 993 (1962). The trial court may grant summary judgment only if there is no significant probative evidence to support the complaint. *Shields v. E.I. Lilly and Co.*, 895 F.2d 1463 (D.C. Cir. 1990).

To warrant summary judgment, the record "should show the right of the [movant] to judgment with such clarity as to leave no room for controversy and . . . should show affirmatively that the [adverse party] would not be entitled to [prevail] under discernible circumstances." *Weiss v. Kay Jewelry Stores*, 470 F.2d 1259 (D.C. Cir. 1972), *citing Traylor v. Black, Sivalls & Byrson, Inc.*, 189 F.2d 213, 216 (8th Cir. 1950). Summary judgment in discrimination cases must be approached with special caution and the court "must be extra-

careful to view all the evidence in the light most favorable" to plaintiff. *Ross v. Runyon*, 859 F.

Supp. 15, 21-22 (D.D.C. 1994); *see also Hayes v. Shalala*, 902 F. Supp. 259, 260 (D.D.C. 1995).

When ruling on a motion for summary judgment ('MSJ"), the court may not weigh or

resolve issues of fact. *Empire Electronics v. United States*, 311 F.2d 175, 179 (2nd Cir. 1962).

One of the strongest restatements of this principle is found in *Leonard v. BHJK Corporation*, 469

F.2d 108, 110 (D.C. Cir. 1972), where the Court observed that:

> even where one reasonably may surmise that Plaintiff is unlikely to
> prevail upon a trial, is not sufficient basis for refusing him his day
> in court with respect to issues which are not shown to be sham,
> frivolous, or so insubstantial that it would obviously be futile to try
> them. *id.* at 110, quoting *Sprague v. Vogt*, 150 F.2d 795, 801, (8th
> Cir. 1945).

Summary judgment is inappropriate where there are witness credibility issues. The

advisory committee's notes to the 1963 amendment to Fed. R. Civ. P. 56(e) states "Where an

issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in

order to evaluate their credibility, summary judgment is not appropriate." "Indeed, when a

dispute concerns the credibility of witnesses, only a trial jury, and not a judge weighing summary

judgment pleadings, is able to assess the demeanor and attitude of witnesses." *Cunningham v.

United Nat. Bank of Wash.*, 710 F. Supp. 861, 862 (D.D.C. 1989); *Hayes,* 902 F. Supp. at 265

(The credibility of witnesses may raise a genuine issue of fact that might determine the outcome

of a case). The credibility of witnesses is key because summary judgment is not a "trial by

affidavit." *Anderson, supra*, 477 U.S. at 255, 406 S. Ct. at 2513 (Fed. R. Civ. P. 56 "by no means

authorizes trial on affidavits. Credibility determinations, the weighing of evidence and the

drawing of legitimate inference from the facts are jury functions and not those of a judge."). As

this Circuit has said, "even when a directed verdict would be proper after hearing the evidence,

the district court should not try the case in advance by summary judgment." *Ross*, 759 F.2d at

364. Finally, when, as here, summary judgment involves more than one claim, each claim and its elements must be dissected, analyzed and decided individually. *Pafford v. Secretary of Labor*, 148 F.3d 658 (7th Cir. 1998).

The D. C. Circuit in *Aka v. Washington Hospital Center*, 156 F. 3d 1284 (D.C. Cir. 1998), similarly refused to grant summary judgment where there were key questions of credibility that should be resolved by the jury. The Court observed that a key evidentiary issue in Mr. Aka's employment discrimination case turned on conflicting accounts of his job interview, a question that hinged on the credibility of the witnesses, and therefore "an issue that is quintessentially one for the finder of fact." *Aka*, 156 F. 3d at 1299. Whether an employer's reasons for the adverse employment action (be it non-selection; failure to promote; imposing a hostile environment; or other action) are "unworthy of credence is for a jury to determine." *Desmond v. Mukasey*, 2008 U.S. App. LEXIS 13803, slip opn. at 53. (D.C. Cir. 2008). Whether or not a plaintiff's explanations are "persuasive" is for a jury to decide. *Mukasey*, slip opn. at 57. The *Aka* Court continues, quoting *George v. Leavitt*, 407 F. 3d 405 (D. C. Cir. 2005):

> "[a]lthough a jury may ultimately decide to credit the version of the events described by [the defendant Agency] over that offered by [the Plaintiff employee], this is not a basis upon which a court may rest in granting a motion for summary judgment." *Mukasey*, 2008 U.S. App. slip opn. at 58, citing *George,* 407 F.3d at 413.

A plaintiff is not required to produce direct evidence of discrimination and, in most cases, proves discrimination by inference in a Title VII case. *See Gates v. Georgia-Pacific Corp.,* 326 F. Supp. 397, 399 (D. Or. 1970) (direct evidence of discriminatory animus is basically impossible to produce), *aff'd*, 492 F.2d 292 (9th Cir. 1974); *see also United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S. Ct. 1478, 1482 (1983). Reliance on circumstantial evidence and inference is commonly required because there is

seldom "'eyewitness' testimony as to the employer's mental processes." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 140, 120 S. Ct. 2097, 2105 (2000) (*quoting, United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 at 716, 103 S. Ct. 1478, 1482 (1983)). *See also Hunt v. Cromartie*, 526 U.S. 541, 553,119 S. Ct. 1545, 1552 (1999) ("Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely on other evidence."). The D.C. Circuit's recent *Brady* decision—cited extensively by defendants— concedes the *Reeves* observation that "discrediting an employer's asserted reason is often quite probative of discrimination." *See Brady v. Office of the Sergeant-at-Arms*, 520 F. 3d 490, 496, fn.4 (D.C. Cir. 2008).

In the typical case, reliance is placed on circumstantial evidence in employment discrimination cases based on a tripartite allocation of proof. First, it is the plaintiff's burden to establish a *prima facie* case of discrimination. Second, the employer must "articulate some legitimate, non-discriminatory reason" for the employment action. Third, "the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" "Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."*Reeves,* 530 U.S at 143, 120 S. Ct. 2097 at 2106 (quoting *Burdine,* 450 U.S. at 253, 101 S. Ct. 1089, 1093).

In applying these precepts to a motion for summary judgment, the D.C. Circuit recently instructed that a plaintiff must present sufficient evidence so that "a reasonable jury could conclude that she was terminated for a discriminatory reason." *Waterhouse v. District of Columbia*, 298 F.3d 989, WL 18363322 (D.C. Cir. 2002) at 3992, citing *Aka,* 156 F.3d at 1290.

As the Court pointed out there, the question is: [W]hether the jury could infer discrimination

from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff

presents to attack the employer's proffered explanation for its actions; and (3) any further

evidence of discrimination that may be available to the plaintiff (such as independent

evidence of discriminatory statements or attitudes on the part of the employer)....

*Id.* citing *Aka* at 1289; *see Reeves,* 530 U.S. at 151, 120 S. Ct. at 2110.

A plaintiff need not show direct proof of discriminatory intent, however. He may survive

the motion for summary judgment by offering evidence including "discriminatory statements by

the employer or other attitudes suggesting the decision maker harbors discriminatory animus as

well as data demonstrating discriminatory hiring patterns." *Brown v. Small,* 2007 LEXIS 3920,

*citing Holcomb v. Powell,* 433 F.3d 889, 899 (D.C. Cir 2006). Once the plaintiff has rebutted the

employer's non-discriminatory explanations for its actions, "the jury is permitted to search for

others, and may in appropriate circumstances draw an inference of discrimination." *Aka,* 156

F.3d at 1292. On a motion for summary judgment, the court's duty is only to decide whether a

reasonable jury might draw an inference of discrimination, not to draw its own inferences.

In a non-selection case, where a plaintiff is attacking a qualifications-based explanation,

the plaintiff "is not limited to comparing his qualifications against those of the successful

candidate. The plaintiff can instead seek to expose other flaws in the employer's explanantion."

*Aka,* 156 F.3d at 1295. Such other flaws include inconsistent, shifting and incorrect

explanations for the non-selection. *EEOC v. DC Public Schools,* 277 F. Supp. 2d 44, 51 (D.D.C.

2003)*; Jones v. Mukasey*, 2008 U.S. LEXIS 52621, Slip. Opn. at 29 (D. D. C. 2008)

Two decisions by the U.S. Court of Appeals for the D.C. Circuit applied these standards

in denying motions for summary judgment in a Title VII case. In *George v. Leavitt*, 407 F. 3d

405 at 413, the Court admonished:

> At the summary judgment stage, a judge may not make credibility determinations, weigh the evidence, or draw inferences from the facts—these are jury functions, not those of a judge ruling on a motion for summary judgment.

Additionally, because plaintiff George "vigorously disputed" the validity of the EPA's stated reasons for her (George's) termination, she thereby "creat[ed] a genuine dispute over these material facts. *Id.* The Appeals Court reiterated these principles just days ago in *Desmond v. Mukasey*, 2008 U.S. App. LEXIS 13803, slip opn. pp. 51-52. (D.C. Cir. 2008).

### III.    Summary Judgment Should be Denied Regarding Counts I-VI Because A Reasonable Jury Could Find Ample Evidence To Support Plaintiff's Hostile Environment Claim

   1.   The Legal Standard

The degree of hostility or abuse to which Plaintiff was exposed can only be determined by examining the *totality* of the circumstances. *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S. Ct. 367, 371  (1993). Relevant considerations "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* "' *See also George v. Leavitt, supra.* When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75,  78, 118 S. Ct. 998, 1001 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 at 21, 114 S. Ct. 367 at 370 (1993) (citations and internal quotation marks omitted)). *George v. Leavitt*, 407 F.3d  at 416. To be actionable, the conduct must create an objectively hostile or abusive work environment, and the victim must also perceive the environment to be abusive. *Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177, 183 (4th Cir. 1998). The conduct in question must be judged by both an objective

8

and a subjective standard: the conduct must be severe or pervasive enough to create an

environment that a reasonable person would find hostile or abusive and the victim must

subjectively regard that environment as abusive. *Harris*, *supra*, 510 U.S. at 21-22, 118 S. Ct. at

370-71; *see also, e.g., Conner v. Schrader-Bridgeport Intern, Inc.*, 227 F.3d 179, 192 (4th Cir.

2000).

The Supreme Court has again held that *it is the total environment and cumulative effect*

*on the individual that is the violation, not individual discrete act*s: [t]he "unlawful employment

practice" therefore cannot be said to occur on any particular day. It occurs over a series of days

or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be

actionable on its own. … Such claims are based on the cumulative effect of individual acts."

*AMTRAK, v. Morgan,* 536 U.S. 101, 115, 122 S. Ct. 2061, 2073-74 (2002).

    2.  <u>Defendant Created a Hostile Work Environment in the Exhibits Department for</u>
       <u>Anthony Bowden</u>

<u>Overview</u>: Mr. Bowden's Complaint, his affidavits, several depositions, and other record

evidence clearly demonstrate that management at the National Zoo subjected Mr. Bowden to

appalling working conditions, individually and cumulatively creating an actionable hostile work

environment. Notably, Defendant never denies the evidence supporting Mr. Bowden's claim of

a hostile environment. Rather, Defendant merely seeks to minimize the impact on Mr. Bowden,

brushing off its undisputed history of insults, favoritism, and even physical assault as mere

"workplace slights." Alternatively, Defendant blames the victim. A fair examination of the

evidence, however, reveals a persistent, severe, and pervasive pattern of abuse and mistreatment,

from which any reasonable jury could conclude the workplace was "permeated with

discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the

conditions of [Mr. Bowden's] employment and create an abusive working environment." *George*

*v. Leavitt*, 407 F. 3d at 416. The facts follow:

9

Evidence of harassment: Mr. Bowden detailed the circumstances of the Zoo's egregious treatment of him at great length in his Complaint, and in his Statement of Facts as to Which There is a Genuine Issue ("Plaintiff's Statement of Facts"). Defendant's Statement of Material Facts and Brief both grouped Mr. Bowden's Hostile Work Environment claims into several sub-categories (all of which Mr. Bowden will address.) His intolerable physical working conditions; tolerating and failing to prevent physical assaults; explosive, humiliating temper outbursts from his supervisor; abusive supervisory oversight; discriminatory criticism of Mr. Bowden's appearance and work habits; discriminatory curtailing of sick leave; retaliatory performance ratings; and inequitable imposition of discipline. Defendant's Motion for Summary Judgment and supporting papers completely ignored several additional documented examples of abuse, however. Mr. Bowden presents nearly two dozen additional pieces of direct and circumstantial evidence in Paragraphs 42a-r, ("Bowden's Supplemental Response Supporting Counts One Through Six", Plaintiff's Statement of Facts, pp. 31-33), summarized below. The Court should include this additional evidence in deciding whether a jury might conclude that the "totality" of circumstances endured by Mr. Bowden amounted to a hostile work environment.

Racial Insults. Jeff Baxter, the white man who was selected for the supervisory position of the Exhibits Department over Mr. Bowden, referred to his African-American subordinates as "you people" on three separate occasions. (Ernest Robinson Dep. Ts. at 70, 231, Plaintiff Exhibit ("Pl. Ex.") 2); Bowden 02/02/08 Dep. Ts. at 282-285, Pl. Ex. 10.) Baxter admitted he "may have said" this. (Jeff Baxter Dep. Ts. at 113, Pl. Ex. 11.) Baxter also told the African-American employees, and not the white employees, that they had to "earn his trust." (Robinson Dep. Ts. at 70, Pl. Ex. 2); (Bowden 02/20/08 Dep. Ts. at 284, Pl. Ex. 10.) Baxter admitted he used the phrase "you people." (Baxter Dep. Ts. at 111-12, 118, 122, Pl. Ex. 11.) Baxter conceded he may have damaged race relations by making the comment to the three African-American employees in his

10

department, Ernest Robinson, Sherod Mangum, and Mr. Bowden. (Baxter Dep. Ts. at 123-24,

Pl. Ex. 11.) Baxter also made an offensive racist comment to Mr. Robinson concerning the angle

of his baseball cap, accusing Mr. Robinson of having an "attitude." (Robinson Dep. Ts. at 70,

152-55, Pl. Ex. 2.) Baxter tried to laugh it off as the type of comment that he'd previously

directed toward his brothers; Mr. Robinson was not persuaded, however, and viewed the "joke"

as another indication of Baxter's insensitivity. (*Id.* at 155.) One black co-worker in the Exhibits

department was so stressed and traumatized by earlier harsh treatment from the white, female

head of the Exhibits department at the Zoo, Ms. Lynn Dolnick, that he had a nervous breakdown

and was forced to retire. (*Id.* at 222-224.) Baxter also made inappropriate, racist jokes about

Asians. (*Id.* at 232.)

Race-and Gender-Based Work Assignments: Several witnesses acknowledge that Mr.

Bowden was made to do most of the heavy work. *See, e.g.,* Lynn Dolnick Dep. Ts. at 145-46, Pl.

Ex. 1. This was despite a job description that required *any* Zoo exhibits specialist to be able to

lift 45 pounds. Defendant's Brief, Ex. 34, Doc. 32-35, p.6, ¶ 8. *See also* Robinson Dep. Ts. at

59, Pl. Ex. 2 (Everyone had to lift 50 pounds); *See also* Herman Krebs Dep. Ts. at 196, Pl. Ex. 3

("Grace never had to do heavy lifting.") Mr. Bowden's second-line supervisor, Lynn Dolnick,

acknowledged that the position description required the ability to lift heavy weight. (Dolnick

Dep. Ts. at 145, Pl. Ex. 1.)

Kathleen Samiy, Mr. Bowden's immediate supervisor in 2003-04, whose title was

"supervisory visual information specialist," and Grade Gs-12, admitted that she required Bowden

to do more outside work than Grace Lopez. (Kathleen Samiy Dep. Ts. at 172, Pl. Ex. 4.)

Dolnick, in speaking with Mr. Bowden's white, female co-worker Melissa Gaulding,

stereotyped Mr. Bowden, and other African-American males, as the "broad shoulders" of the

11

Exhibits Department, and exclusively assigned them heavy moving, lifting, and other heavy work projects. (Bowden 12/04/07 Dep. Ts. at 160-161, Pl. Ex. 5.) Gaulding protested to Dolnick on behalf of Mr. Bowden and Mr. Robinson, arguing to Lynn Dolnick that the "blacks were being made to do. . .the heavy work of lifting furniture." (*Id.* at 161.) Lynn Dolnick and Melissa Gaulding told Mr. Bowden and Mr. Robinson that they were the "broad shoulders" of the Production Department. (*Id* at 160-161.) Others have testified that African-Americans were made to do the heavy lifting. (Krebs Affidavit, Pl. Ex. 8.) Mr. Robinson also heard the black males referred to as the "broad shoulders," and testified that blacks were required to move office furniture for white colleagues. (Robinson Dep. Ts. at 197-98, Pl. Ex. 2.)

Ms. Gaulding testified that Dolnick and Samiy used race-based work assignments, in defiance of job descriptions that required <u>all</u> Exhibits Specialists, male and female alike, white, brown, or black, to be able to lift heavy objects. She confirmed Mr. Bowden's complaint regarding furniture moving:

> Jobs that required physical exertion were given to men (even in situations where women had the same physical requirements in their jobs), and specifically African American men—and often these jobs were not related to projects, but things like moving furniture in a supervisor's office. (Melissa Gaulding affidavit, ROI Case No. 04-16-080604, Tab. 14, p. 5, Pl. Ex. 13).

Ms. Samiy denied that only black staff members were made to move the furniture. (Samiy Dep. Ts. at 158, Pl. Ex. 4). Her denial creates a material issue of fact regarding paragraph 1.

Grace Lopez has no "mental or physical disability that substantially impacts a major life activity," or that would have prevented her from performing all duties expected of Exhibits Specialists. (Grace Lopez affidavit, Pl. Ex. 6.)

12

The Zoo attempts to blame the exclusive, race-and-gender based assignment on alleged "staff shortages," and erroneously cites Mr. Bowden's testimony in support. Yet the particular e-mail cited by Defendant does not "admit" to an ongoing or chronic shortage of staff, and the cited memo certainly has no evidentiary merit beyond the date, May 21, 2003. Mr. Bowden simply alerts Mary Tanner, Deputy Director of the National Zoo, and who was then Mr. Bowden's third-line supervisor, that he is "the only one working in Exhibit Production. Do[sic] to shortage of staff." Tanner is a white, female, Roman Catholic. (Tanner Dep. Ts. at 7, 23, Pl. Ex. 22.)

There also is no evidence that management's practice of exclusively assigning black men to the dirty, heavy work was a response to temporary, occasional staff shortages on May 21, 2003, or on any other date during the time in question, and no other defensible excuse exists for the gender-stratified work distribution assignments in the Exhibits Department (lighter-skinned women assigned to indoor office space in clean, well-lit, well-heated rooms; dark men assigned to dank, cold, poorly lit and unventilated, hazardous workspaces).

The Zoo then shifts its explanations, claiming that it exclusively assigned the physical labor in the Exhibits Department for the "broad-shouldered" blacks in order to protect "tiny" Grace Lopez from the burdens of heavy work. The Zoo thus cites Mr. Bowden's alleged admission of greater "strength" than Ms. Lopez as justification for its discriminatory actions. This argument fails on several levels. First, as stated above, the position description required all exhibits personnel to have the same amount of minimum physical strength. Defendant's Brief Ex. 34, Doc. 32-35, p.6, ¶ 8. Second, Defendant cites no evidence that Ms. Lopez had an accommodation or other special need that exempted her from the physical labor expressly required of all persons employed as Exhibit Specialists—not just the black men. Notably, Grace

13

Lopez confirms that she has no "mental or physical disability that substantially impacts a major life activity," or that would prevent her from performing all duties expected of Exhibits Specialists. (Lopez affidavit, Pl. Ex. 6.)

Third, while Mr. Bowden admitted that he weighed more than Ms. Lopez, he repeatedly emphasized that he had no way of knowing her actual upper body strength (Bowden 12/04/07 Dep. Ts. at 162, Pl. Ex. 5.)  He also testified that he lacked lower body strength, especially because of knee problems, *Id.* at 74-75. Mr. Bowden also disputed the suggestion that body weight correlated to strength, (*see* Bowden 12/04/07 Dep. Ts. at 162, Pl. Ex. 5), and also observed that Grace Lopez was in "good shape." *Id.* Ernest Robinson also testified that the job description required *all* Exhibit Specialists to be able to lift at least "50 pounds." (Robinson Dep. Ts. 59). The official position description requires the ability to lift 45 pounds. *See* Defendant's Brief Ex. 34, Doc. 32-35, p.6, ¶ 8.

It is undisputed that Grace Lopez was never required to do any heavy lifting.  (Krebs Dep. Ts. at 196, Pl. Ex. 3; Robinson Dep. Ts. at 137, Pl. Ex. 2.)  Charles Fillah, Mr. Bowden's third line supervisor, also admitted that Mr. Bowden lifted "more heavier" items than Grace Lopez. (Fillah Dep. Ts. at 54, Pl. Ex. 7.)  Fillah also admits that the sign-making work is not physically demanding, like lifting and sawing. (Fillah Dep. Ts. at 47, Pl. Ex. 7.) Others have testified that African-Americans were made to do the heavy lifting. (Krebs Affidavit, Pl. Ex. 8.) Charles Fillah also admitted that Mr. Bowden worked in the lower shop more than Grace Lopez. (Fillah Dep. Ts. at 83, Pl. Ex. 7.) Notably, the only person that the Zoo assigned to help Mr. Bowden with the heavy work in the shop was Ernest Robinson—another black man. As Defendant admitted in paragraph three  of its Statement of Material Facts, the assignment was

short-lived, as the Zoo granted Mr. Robinson's requests to be relieved of the heavy production

work, which he felt that he was required to do because of his race.

The Zoo states that Mr. Bowden's co-workers were called upon to "perform other

functions," and that this was the likely cause of the misallocation of work. But it is equally likely

that the gender-and-race-based allocation of duties among the Exhibits Specialists contributed to

any so-called "shortage" of help in the workshop. This is the heart of Mr. Bowden's complaint:

that the heavy, dirty, physical production assignments were exclusively race-and-gender based.

Mr. Bowden was also skilled at vinyl sign production, a job performed upstairs, and testified that

he picked up the skill through observation and on-the-job training. (Bowden 12/04/07 Dep. Ts.

at 76-77, Pl. Ex. 5.) Vinyl sign cutting was something that "anybody" could do. (Robinson Dep.

Ts. at 137, 60-61, Pl. Ex. 2.) Yet only the women were assigned the cleaner, less physically

demanding vinyl sign-making work; the black men were sent to the basement, even though all

personnel in Exhibits were supposed to be versed in all tasks.   There is no dispute that Grace

Lopez, an Exhibits Specialist like Mr. Bowden, did a majority of vinyl sign work—also called

"Gerber work." (Fillah Dep Ts. at 47, Pl. Ex. 7.) If Grace Lopez was assigned exclusively to the

upstairs shop and vinyl sign production, then by necessity the outdoor shop and lifting work

would be understaffed. Ms. Lopez's disproportionate responsibility for vinyl sign production

meant that she spent much less time in the lower workshop than the other Exhibits Specialists.

(*See, e.g.,* Krebs Dep. Ts. at 134, Pl. Ex. 3.)

There was never any system in place for tracking and coordinating workflow to alleviate

staffing issues, a problem that persists to this day. (Robinson Dep. Ts. at 100-101; 104-105, Pl.

Ex. 2.) Work orders are still not being tracked. (Bowden 12/04/08 Dep. Ts. 205; *See also*

15

Bowden's Response to Par. 53, Plaintiff's Statement of Facts.) The Zoo therefore has no way to document, nor defend, its practice of race-based job assignments.

Unsafe Working Conditions: The lower workshop was an undisputedly nasty place to have to work, and it was beyond Mr. Bowden's power to improve the situation. Mr. Bowden repeatedly complained about the dirt, dust, unsafe equipment, and inadequate ventilation therer. (Bowden 12/04/07 Dep. Ts. at 69-70, 73, 118, Pl. Ex. 5; Bowden 02/20/08 Dep. Ts. at 70-71, 146, 186, 262, 268, Pl. Ex. 10.) Exhibits department co-workers Herman Krebs and Ernest Robinson backed up Bowden's complaints concerning safety, dust, dirt, and fumes (Robinson Dep. Ts. at 12-13, Pl. Ex. 2; Krebs Dep. Ts. at 216, Pl. Ex. 3.) Plaintiff's supervisor Jeff Baxter, who insisted that Mr. Bowden work in the space, admitted that the workshop was dirty, dusty, filled with chemical smells, and only ventilated as he saw "necessary." (Baxter Dep. Ts. at 205-07, Pl. Ex. 11.) Not only was the space filled with inadequately installed equipment, *see also,* affidavit of James Hilton, Pl. Ex. 9, but it was used by other entities at the Zoo, including Facilities, and the "Friends of the National Zoo" volunteer group, as a storage space. (Bowden 12/04/07 Dep. Ts. at 112, Pl. Ex.5.) It was therefore overstuffed with used, worn, or discarded materials. (Bowden 02/20/08 Dep. Ts. at 146, Pl. Ex. 10.) Herman Krebs described the workshop as follows:

> It's a mess. The most unsafe thing about it is that it's a huge mess. It doesn't have venting, I don't believe, for any of the equipment that's set up in it. . .There's sawdust, there's dust, there's dirt, there's – I mean it's kind of just a big giant room full of junk. (Krebs Dep. Ts. at 132-33, Pl. Ex. ).

Charles Fillah, Mr. Bowden's third line supervisor, confirmed this assessment when he described the lower shop as "like a warehouse, . . .a warehouse building  . . .[that] gets dirty. (Fillah Dep Ts. at 38-40, Pl. Ex. 7.) Defendant has admitted that the space could be very cold, 52 degrees Fahrenheit in winter, with no working heat. (Baxter Dep. Ts. at 135-139, Pl. Ex. 11.)

16

Contrary to the Zoo's assertions, Mr. Bowden lacked the budgetary and supervisory power and authority to bring the shop to acceptable standards of safety and occupancy. Mr. Bowden was not formally asked to "set up the lower shop" until March 9, 2005, when Mr. Baxter assigned him the task. *See* Second Amended complaint, ¶28g. Even then, Baxter failed to extend Mr. Bowden necessary supervisory authority to be able to require other employees to assist him in the task. *Id.*

Bowden described the task of completing the workspace as "impossible." (Bowden 2/20/08 Dep. Ts. at 262, Pl. Ex. 10.) In fact, Mr. Bowden was never authorized to order or install adequate safety measures to complete the task of making the basement area safe. (*Id.* at 70-71, 268, Pl. Ex. 10.) Kathleen Samiy, his supervisor, ignored Bowden's earlier repeat requests, and requisitions for adequate time, help, and equipment for securing the shop space. (Bowden 12/04/07 Dep. Ts. 69-70; Bowden 02/20/08 Dep. Ts. 73). Even had he wanted to perform the work himself, Mr. Bowden was not skilled or qualified to bolt the saws to the floor, for instance, because he was not a concrete mason. (Bowden 02/20/08 Dep. Ts. at 186, PL. Ex. 10).

Defendant offers no evidence that Mr. Bowden has the heating, ventilation, or air-conditioning ("HVAC") training or skills to vent the space. Not only was the space filled with inadequately installed equipment, *see* affidavit of James Hilton, Pl. Ex. 9 (the space was adequate only for hand-held equipment; workers should relocate to other, outdoor space for other projects); but it was also used as a storage space and was overstuffed with used, worn, or discarded materials. (Bowden 02/20/08 Dep. Ts. at 146, Pl. Ex. 10.)

Mr. Bowden denied he was the safety officer at the time he ordered the equipment for the shop. (Bowden 12/04/07 Dep. Ts. at 79, Pl. Ex. 5.) To the extent he succeeded Rick Hider, Mr. Bowden's unofficial role of safety officer was limited, mainly requiring him to make sure the fire

17

extinguishers were working. (Bowden 02/20/08 Dep. Ts. at 147, Pl. Ex. 10.) The "safety officer"

designation did not include any supervisory, budgetary, or spending authority, and did not

specifically authorize him to take all steps necessary to renovate the basement workshop, and

Bowden could not independently order additional necessary equipment to improve the space. (*Id.*

at 70-71, Pl. Ex. 10.) At any rate Bowden's 2001 "promotion" to Hider's position was only

temporary. (Bowden 12/04/07 Dep. Ts. at 81, Pl. Ex. 5.) It was the supervisor's responsibility to

make the lower workshop space safe, not Mr. Bowden's. (Robinson Dep. Ts. at 113, Pl. Ex. 2.)

Mr. Bowden was otherwise thwarted by management in his efforts to make the workplace

safer. Ms. Samiy repeatedly ignored his requests to go to Home Depot, even when requesting

permission to buy the face masks. (Bowden 02/20/08 Dep. Ts. at 73, Pl. Ex. 10.) Mr. Bowden

elsewhere testified that the workspace was still unsafe for any projects generating fumes, and

that it lacked proper ventilation. (*Id.* at 68, Pl. Ex. 10.) Mr. Bowden's supervisor Kathleen

Samiy refused to pay for the face masks, (*Id.* at. 73, Pl. Ex. 10), and supervisors often forbade

Mr. Bowden from taking time to go to Home Depot to purchase supplies. (*Id.* at 74, Pl. Ex. 10.)

Failure to Prevent Physical Assault, and "Punishing the Messenger." The Zoo does not

dispute that Elena Lopez physically assaulted Mr. Bowden, but it denies that it had any

responsibility to prevent the assault.[4] However, the record shows that the Zoo not only rebuffed

Mr. Bowden's warnings of Elena Lopez's erratic, violent behavior, but punished him for his

frank assessment of the danger that she posed. Mr. Bowden had specifically alerted Mr. Baxter to

Elena Lopez's physical aggressiveness, and "told him that she was doing things like bumping

[him] and blocking doorways." (Bowden 2/20/08 Dep. Ts. at 216, Pl. Ex. 10.) In addition, in

---

[4] The Agency erroneously asserted that Mr. Bowden was "not injured" by the assault. Mr. Bowden refuted that
assertion in his Statement of Material Issues, at p. 22: "Mr. Bowden suffered and continues to suffer, compensable
damages from the incidents creating the hostile environment—including the physical assault by Ms. Lopez-- due to
the additional anxiety, stress, and their attendant physical and emotional traumas."

18

about December of 2004, Mr. Bowden privately met with Charles Fillah, Mr. Baxter, and others in order to warn them about Ms. Lopez. Unfortunately, in a classic example of attacking the messenger for presenting an unwelcome message, Mr. Bowden was chided and officially "counseled" for his private comment about Ms. Lopez, in which he mused that "she must be crazy," while Ms. Lopez was apparently never disciplined or remonstrated for her violent behaviors. (*See Id.* at 288, Pl. Ex. 10; Krebs. Dep. Ts. at 220, Pl. Ex. 3.)

The evidence shows that Mr. Bowden made his statement regarding Ms. Lopez in a perplexed tone of voice in response to direct questioning from his supervisors in what he had thought was a confidential setting --their office. (Fillah Ts. at 87, Pl. Ex. 7.) (Bowden described Ms. Lopez's actions to Mr. Fillah in the context of seeking help because Lopez had made false allegations against Mr. Bowden); (Bowden 02/20/08 Dep. Ts. at 177, 179, Pl. Ex. 10.) Mr. Bowden uttered his remark in reaction to reports that Ms. Lopez had assaulted co-workers by shoving one into a copy machine (Bowden 02/20/08 Dep. Ts. at 178, Pl. Ex. 10), and that she had also sprayed another co-worker in the face with a glass-cleaning solvent.(!) (Krebs Dep. Ts. at 219, Pl. Ex. 3; Robinson Dep. Ts. at 229-30, Pl. Ex. 2.) Mr. Bowden did not "describe" Elena Lopez as 'crazy, but, rather, mused, colloquially, whether she "must" be crazy. See Exhibit 17, Defendant's Brief (Bowden Dep. Ex. 68.) This incident exemplifies the continuing pattern of hostility and workplace harassment, as well as disparate treatment, to which the Agency subjected Mr. Bowden.  Mr. Bowden was reprimanded for attempting to alert supervisors that Ms. Lopez behaved erratically, while Ms. Lopez remained free to assault her co-workers.  It is cold comfort to Mr. Bowden that the "confirmation of counseling" memorandum was never placed in his personnel folder, and the fact that Mr. Baxter went against his so-called "better judgment" in issuing the letter only underscores the lengths to which Zoo management will go in

19

its vendetta against Mr. Bowden. *See* Plaintiff's Statement of Facts, Response to par. 36-7, pp. 24-25.

Unfortunately, Mr. Bowden was to be one of Ms. Lopez's next victims. It is undisputed that in May of 2005, Ms. Lopez "rammed" Mr. Bowden in the presence of his supervisor and several co-workers. Mr. Bowden also filed a police report in connection with the assault. *See* Answer to Plaintiff's Second Amended Complaint of Employment Discrimination and Breach of Contract, ¶36-37. (Admitting "that Plaintiff reported that he had been assaulted to [supervisors] Mr. Baxter [and] Mr. Fillah, [and co-worker] Ms. Ades and the National Zoological park police.") Mr. Bowden's testimony that Ms. Lopez had assaulted him was corroborated by Mr. Robinson (Robinson Dep. Ts. at 120, Pl. Ex. 2); Mr. Krebs (Krebs Dep. at Ts. 217, Pl. Ex. 3); and Mr. Baxter, who was standing next to him, (Baxter Dep. Ts. at 157, Pl. Ex. 11) and in Mr. Bowden's report to Park Police (Bowden 02/20/08 Dep. Ts. at 224, Pl. Ex. 10.)

The Zoo attempts to paper over the incident with self-serving testimony that Mr. Baxter "spoke to Ms. Lopez" and "sought to make the workplace safe." The statements are immaterial in the face of unrefuted testimony that Mr. Bowden had specifically alerted Mr. Baxter to Elena Lopez's physical aggressiveness more than six months *before* she assaulted Mr. Bowden. Whether or not she attempted a second assault, and whether or not the District of Columbia prosecutors brought charges, are immaterial to the fact that the assault incident occurred. Defendant's counsel also elicited inadmissible, speculative testimony from Mr. Bowden concerning Ms. Lopez's alleged frame of mind, but Counsel for Mr. Bowden properly objected to this speculative testimony. (Bowden 02/20/08 Dep. Ts. at 219, Pl. Ex. 10.)   The testimony therefore is contested, at issue, and may not be used to establish a "material" fact.

The investigating park police officer who took Mr. Bowden's statement acknowledged the toxic racial politics among Zoo staff, as he told Mr. Bowden that, had the tables been turned, and Mr. Bowden--a black male—assaulted a non-black female, Mr. Bowden would have been escorted off the property. (Bowden 02/20/08 Dep. Ts. at 224, Pl. Ex. 10.)

"Scheduling" Sick Leave. To add insult to injury, no sooner had Mr. Bowden recovered from the stress of the unjust punishment, but he was told, nonsensically, to "schedule his sick leaves." Mr. Baxter does not deny that he said this to Mr. Bowden. (Baxter Aff., Pl. Ex. 14.) Mr. Bowden suffered compensable damages from these events due to the additional anxiety, stress, and their attendant physical and emotional traumas.  See Bowden October 8, 2004 Affidavit, Pl. Ex. 16; See also Second Amended Complaint ¶ 46.

Refusal to Accommodate. As is also discussed with respect to count 18, Mr. Baxter insisted that Mr. Bowden continue to attend staff meetings where Elena Lopez would be present, refusing any requested accommodation by Mr. Bowden in recognition of Mr. Bowden's anxiety and depression—much less making any provision for his protection from further assault. Mr. Bowden testified that the stress related to Lopez had already caused him to seek hospital treatment and miss three days of work. (Bowden 02/20/08 Dep. Ts. at 180, Pl. Ex. 10.) Notably, the Defendant fails to include any evidence that Mr. Baxter considered any of the widely available, simple technologies for accommodating Mr. Bowden's request, including using a speakerphone, a remote microphone, taping the meeting, providing Mr. Bowden a transcript of the meeting, using an internet hook-up, providing Mr. Bowden an advance printed copy of the meeting agenda, or providing other remote audio-visual access.

To sum up:  The Zoo punished Mr. Bowden for his warnings of Lopez's violent behavior; failed to prevent a subsequent attack on Mr. Bowden; implies, in its Brief, that he should be

grateful he wasn't physically injured; and refuses to impose any discipline on Lopez, the

assailant. The Defendant argues, in its Brief, p.11 that Mr. Bowden has nothing to complain

about since Lopez didn't repeat her attack, then insisted Mr. Bowden continue to attend staff

meetings where the assailant would also be present.

Management Hostility. The Zoo distorts its sorry record of management hostility with its

misrepresentation of Mr. Bowden's complaint of hostile meetings. Mr. Bowden testified in vivid

detail the basis for his allegations that the tone, tenor, content and purpose of certain staff

meetings called and chaired by Ms. Samiy was to harass him and were in furtherance of creating

a hostile working environment:

> After Ernie had filed his complaint and how she would raise her voice and
> holler and scream and foam at the mouth at us. . . .It wasn't like, okay, somebody
> is asking you to do something . . it was more go hostile. . . (Bowden 02/20/08
> Dep. Ts. at 66, Pl. Ex. 10.)

Mr. Bowden's co-worker Eugene Robinson corroborated the harassing tone toward Mr.

Bowden adopted by Samiy during staff meetings. (Robinson Dep. Ts. at 239, Pl. Ex. 2) (hostile

"in her tone of voice"); as did co-workers Judy Tasse, Grace Lopez, and Herman Krebs in their

affidavits concerning Samiy's treatment of Bowden (and other males, especially black males, on

staff). See Lopez, Krebs, and Tasse excerpts from ROI case No. 04-16-080604. Robinson noted

that Samiy and Dolnick spoke harshest to the black males in the Department.  (Robinson

Dep.Ts.at at 41, Pl. Ex. 2.) See also affidavit of Melissa Gaulding, documenting Ms. Samiy's

imperious and abusive treatment of Mr. Bowden. (Gaulding affidavit, Pl. Ex. 13.)

Aaron Ferster also described Ms. Samiy's "hostile and inappropriate management

activities" in great detail and bears repeating at length:

> "the tone . . changed from what I would characterize as 'mismanagement'
> to 'hostile' shortly after Lynn Dolnick . . .hired Kathleen Samiy to lead the office
> as the supervisor. Ms. Samiy cultivated a hostile work environment, in which

employees, particularly males, were regularly subjected to threats of official reprimand, hostile and accusatory confrontations, ambiguous work responsibilities for which they would be 'held accountable,' and threats ranging from withholding of sick and annual leave to outright dismissal. Throughout, Ms. Dolnick openly supported and sided with Ms. Samiy, effectively facilitating and encouraging the hostile atmosphere. (Aaron Ferster affidavit, ROI case No. 04-16-080604, tab 8, pp. 2-4).

Managers denunciation of Mr. Bowden's bike clothes and their non-stop demands that he detail his whereabouts perpetuated the hostile atmosphere. There was no dress code at the Zoo, (Bowden 12/04/07 Dep. Ts. at 164, Pl. Ex. 5), yet Plaintiff was criticized for his clothing. (*Id.* at 162-65, Pl. Ex. 5); (Krebs Dep. Ts. at 169-171, Pl. Ex. 3.) Mr. Bowden's bike-riding colleagues were not similarly criticized for their biking clothes. For instance, Aaron Ferster, White, Jewish, was never criticized for wearing bike clothes. (Bowden 12/04/07 Dep. Ts. at 165, Pl. Ex. 5; *See also* Krebs Dep. Ts. at 196, Pl. Ex. 3.) Grace Lopez rode her bicycle daily, yet was never criticized. (*Id.* at 223, Pl. Ex. 3.) The Zoo erroneously claims that the comment was an isolated event. Defendant's Brief, p. 12. Not so. Supervisor Kathleen Samiy "repeatedly" voiced criticism, not only regarding clothing, but also regarding Mr. Bowden's toileting habits, his workplace whereabouts, and his daily routine. Herman Krebs corroborated the testimony. (Krebs. Dep. Ts. at 208, Pl. Ex. 3.) *See also* Judy Tasse affidavit, Pl. Ex. 12. To characterize Samiy's nonstop refrain as "a simple comment" misstates the record. This remains a genuine issue. The criticism also perpetuated the hostile environment endured by Mr. Bowden, and contributed to his additional anxiety, depression, stress, and their attendant physical and emotional traumas. (*See* Bowden October 8, 2004 Affidavit, Pl. Ex. 16; Krebs Aff., Pl., Tab 5,Pl. Ex. 8; *See also* Second Amended Complaint ¶ 46.)

Mr. Bowden testified that his supervisor, Kathleen Samiy, asked Mr. Bowden to account for his whereabouts, "more than 50 times." (Bowden 02/20/08 Dep. Ts. at 206-10, Pl. Ex. 10.)

The questioning was "fairly constant."(Krebs Dep. Ts. at 208-210, Pl. Ex. 3.) Ms. Samiy, however, denied she ever asked him his whereabouts. (Samiy Dep. Ts. at 145, Pl. Ex. 4.) This contradictory evidence creates an additional issue of fact. Mr. Bowden's next supervisor, Mr. Baxter, also frequently quizzed Mr. Bowden concerning his whereabouts when Bowden had simply been in the park, working on assignment. (Bowden 02/20/08 Dep. Ts. at 209, Pl. Ex. 10.) Additional record testimony confirms that Mr. Bowden was singled out for this harassment, alone among his co-workers. (Tasse affidavit, Pl. Ex. 12.) Whites were not asked their whereabouts. (Bowden 02/20/08 Dep. Ts. at 294, Pl. Ex. 10.)

The Panda House. This incident is yet another example of hostile management. Resolution of the conflicting testimonial evidence describing supervisor's Jeff Baxter's ugly outburst toward Mr. Bowden and another black co-worker at the NZP Panda House requires precisely the sort of credibility determinations reserved for a jury. The incident apparently stemmed from serious miscommunication, but it quickly escalated into yet another occasion for harassing Mr. Bowden.

None of the deposition testimony concerning this incident is in agreement.  Mr. Baxter insists that he expressly forbade Mr. Bowden and his colleague from inspecting the Panda House site for banner installation until after they had telephoned him in advance and to alert him to their arrival.  (Baxter Depo. at 218-21, Exhibit 6, Defendant's Brief.) Mr. Bowden and his colleague say they happened to be in the area, and in the interests of time and efficiency "swung by" for a quick look, then telephoned Mr. Baxter to report their observations.  (Bowden 2/20/08 Dep. Ts. at 228.) *See also* Mangum Response to Interrogatories, Pl. Ex. 18. This call apparently set off Mr. Baxter's explosive tirade.  From that point in the narrative, the testimony diverges further.

24

Mr. Baxter says that Mr. Bowden and his colleague waited "10 to 15 minutes," (Baxter Dep. Ts. at 219, Pl. Ex. 11), while Mr. Bowden says it was "five to 10 minutes." (Bowden 2/20/08 Dep. Ts. at 227, Pl. Ex. 10.) Mr. Baxter says that Mr. Bowden called him from the Panda house saying he was "up here trying to hang the posters, but we have some questions, (Baxter Dep. Ts. at 219, Pl. Ex. 11), while Mr. Bowden testified that he did not have the banners with him when he (Bowden) made the call, nor was he actually ready to hang the banners when he made the call. (Bowden 2/20/08 Dep. Ts. at 226-7, Pl. Ex. 10.) These conflicting facts must be resolved at trial.

Mr. Bowden, in fact stated that he and the co-worker were *already* in the area of the panda house "doing something else and we were really close to that area, so . . . they decided to "swing the truck out" to check out the panda house. (Bowden 2/20/08 Dep. Ts. at 228, Pl. Ex. 10.) *See also* Mangum Response to Interrogatories, Pl. Ex. 18. Bowden and Mangum decided to be "pro-active" here. Mr. Bowden was therefore making efficient use of his and his co-worker's time—as well as Mr. Baxter's—by combining two tasks.

Defendant's euphemistic characterization of Mr. Baxter's tirade as a "scolding" soft-pedals the import and emotional impact of the event at issue. Mr. Baxter even admitted that he failed to conduct himself as "professionally as [he] would have liked to." (Baxter Dep. Ts. at 220, Pl. Ex. 11.) In that context, his self-serving description of his demeanor toward Mr. Bowden and his co-worker Sherod Mangum as merely "animated," (*see* ¶24, Plaintiff's Statement of Facts), defies credulity. Mr. Mangum described Baxter's demeanor that day as "noticeably agitated." (Mangum Interrogatory Responses, ROI Case No. 06-13-052606, Pl. Ex. 18.) Mr. Bowden's eyewitness testimony directly refutes this euphemistic and extremely watered-down characterization of Baxter's behavior on the day in question. Mr. Bowden testified that Mr.

25

Baxter "just came up and exploded" at him and his co-worker (Bowden Dep. Ts. at 288-89, Pl. Ex. 10.) "There were tourists there" and "it was embarrassing" for Mr. Bowden and Mr. Mangum. *Id.* In short, this was a humiliating episode. Defendant's euphemism, "animated," conceals the full force of rage and fury Baxter vented at Bowden and his co-workers. Nor does the bland, deceptively benign term "animated" begin to capture the full brunt of the humiliation endured by Mr. Bowden and others to be screamed at and dressed down in front of visiting members of the public who were standing at the Panda Exhibit that day. *Id.* Mr. Mangum described Baxter as "noticeably agitated." (Mangum Interrogatory Responses, ROI Case No. 06-13-052606, Pl. Ex. 18.)

The contrasting descriptions of the interchange (Bowden's use of the terms "belligerent hollering," versus Baxter's "animated") confirm that the circumstances surrounding this ugly incident are incapable of resolution at summary judgment. Mr. Baxter was so consumed by his rage at Mr. Bowden and Mr. Mangum that he either retained no recollection of his surroundings that day, or is not telling the truth, when he testified that he "didn't know" if there were visitors present during the incident. (Baxter Dep. Ts. at 220, Pl. Ex. 11.)

Mr. Bowden ties the outburst to a retaliatory motive, as he believes that he (Mr. Baxter) overreacted because he had just been interviewed by EEO investigators, and he (Mr. Baxter) remained agitated as a result. (Bowden Dep. Ts. at 229, 289, Pl. Ex. 10.)

Downgraded Performance Ratings. No sooner had Mr. Bowden complained that he was discriminatorily denied the supervisory position, his performance then was suddenly downgraded.[5] The "Fully Successful" performance ratings represented a significant and sudden

---

[5] These downgrades meet the test of "adverse employment actions" set out in *Holcomb v. Powell,* 433 F. 3d 889, 902 (D.C. Cir 2006): "Adverse employment actions are not confined to hirings, firing, promotions, or other discrete incidents. . . . [s]o long as a plaintiff meets the statutory requirement of being 'aggrieved' by an employer's action."

26

marked reversal in Mr. Bowden's long career of nearly uniform top ratings ("Outstanding" and "Highly Successful"). (Bowden October 8, 2004 Affidavit, Pl. Ex. 16; *See also* Lopez affidavit, Pl. Ex. 6) (Bowden's work was consistent throughout the evaluation period); Krebs Aff., p. 7, Pl. Ex. 8 (Bowden's performance did not drop in 2004); *See also* Krebs Dep. Ts. at 194, Pl. Ex. 3 (affirming Affidavit testimony). *And see* Gaulding Aff., Pl. Ex.13, p. 3 (Mr. Bowden's Rating went down without any notice to him that his performance had changed), *Id.* at 4 (Mr. Bowden appeared to be working harder than when he received a higher rating under an earlier supervisor); Robinson Dep. Ts. at 225-6, Pl. Ex. 2 (Mr. Bowden was always "exceptional," and better than "Fully Successful.")

The 2004 Appraisal was suspect for additional reasons. Kathleen Samiy testified that her superior, Lynn Dolnick, "didn't like" Ms. Samiy's evaluations, and rewrote many of them in around January 2004.  (Samiy Dep. Ts. at 128-130, Pl. Ex. 4.)  Ms. Samiy was unsure whether Dolnick changed the ratings for the various elements (*Id.*) Dolnick wrote the 2004 performance appraisal two months after Ms. Samiy had left; accordingly, Ms. Dolnick "had no idea what anybody in the office did for that appraisal period." (Krebs Dep. Ts. at 127, Pl. Ex. 3.) In any event, Dolnick, who was Mr. Bowden's second-line supervisor, and not his immediate supervisor, violated Agency procedures when she completed the contested 2004 performance appraisal. *See* Smithsonian Directive 212, Federal Personnel Handbook, Chapter 430-4(j), Pl. Ex. 15 (requiring immediate supervisors to do evaluations).

There is also evidence that Mr. Bowden's evaluation was lowered in retaliation for his EEO activity. (Bowden 02/20/08 Dep. Ts. at 230, Pl. Ex. 10.) *See* Gaulding Aff., p. 4, Pl. Ex. 13 (lower performance rating one way Bowden was punished for speaking out against mismanagement). Finally, there is evidence—and suspicion—that the performance appraisal was

27

lowered to justify, after the fact, the failure in March 2004 to select Mr. Bowden for the Supervisory Exhibits Position for which he had twice applied. (Robinson Dep. Ts. at 219, 224, Pl. Ex. 2).

Mr. Bowden also contests the lowered rating in the 2005 performance appraisal signed by Mr. Baxter. Bowden should have scored the highest level for each element of the appraisal, because his performance was identical to his highest-level-rated performance in earlier years (Bowden 02/20/08 Dep. Ts. at 210-211, Pl. Ex. 10.)

Argument. Unlike the plaintiff's allegations of hostile treatment in *George v. Leavitt, supra*, where she documented only two apparently isolated instances where co-workers told her "go back where you came from," Anthony Bowden's experience at the National Zoo was replete with precisely the sort of humiliating, hostile, severe, and pervasive treatment deemed a hostile environment in the D.C. Circuit. *See George* at *407 F.3d 405, 416.* Mr. Bowden's physical environment was unremittingly grim. He was subject to racist taunts, demanding physical work, hostile and humiliating management oversight, physical assault, unwarranted punishment for attempting to forestall physical assault; refused reasonable accommodations, and then found his performance appraisals downgraded.

3.   The Evidence of a Hostile Work Environment Also Supports a Retaliation Claim.

As Defendant properly acknowledges, a lesser level of harm need be alleged when examining claims of retaliation (as opposed to claims of disparate treatment.) *See* Defendant's Brief at 16. The D.C. Circuit has held in retaliation cases that the acts complained of only need to be severe enough to cause a reasonable employee to be dissuaded from making or supporting a charge of discrimination. *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir 2006) ("[w]e hold Title VII makes unlawful any act of retaliation by an employer that well might dissuade a reasonable employee from making or supporting a charge of discrimination pursuant to Title

28

VII."). Note that this standard was adopted by the U. S. Supreme Court in *Burlington Northern and Santa Fe Railway Company v. White*, __ U.S. __, 126 S. Ct. 2405 (2006).

In the context of reprisal cases, the conduct need only serve to inhibit the EEO process to constitute actionable retaliation. *EEOC Compliance Manual*, § 8-II (D)(3), p. 8-13, *citing Hashimoto v. Dalton*, 118 F.3d 671, 676 (9th Cir. 1997); *EEOC v. L. B. Foster,* 123 F.3d 746, 754 (3d Cir. 1997). As the EEOC has explained, "The statutory retaliation clauses prohibit any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *EEOC Compliance Manual*, § 8-II(D)(3), pp. 8-13.

The totality of the circumstances involved in the series of events described herein sufficiently state a claim that the Zoo's actions created a retaliatory hostile environment, one in which a reasonable employee could be dissuaded from making or supporting an EEO claim after seeing the hostile environment to which Mr. Bowden was subjected.[6]

IV.    **Summary Judgment Should be Denied Regarding Counts Seven through Ten Because A Reasonable Jury Could Find Ample Evidence To Support Plaintiff's Claim that the Zoo Discriminated Against Him when It Promoted a White Male Instead of Him .**

Counts Seven through Ten of Mr. Bowden's complaint alleged that the Agency unlawfully passed over his application in filling the position of Exhibits Manager, GS-12. The Agency instead rewrote the job specifications to justify selecting a particular employee who they mistakenly assumed had the additional specialized technical computer skills added to the rewritten job announcement.[7] The entire selection process was corrupted by unorthodox

---

[6] An agency action is retaliatory if it might dissuade a reasonable employee from making or supporting a charge of discrimination.

[7] As it turns out, these specialized technical computer skills were not needed for the Supervisory Exhibits Specialist position. N\either Quark, a specialized graphic design computer program, nor Filemaker, a work flow computer program, is essential to daily operations work in the Zoo's sign shop. Mr. Bowden's workflow is still managed by

practices, disparate treatment, and other evidence sufficient to convince a reasonable jury that the stated reasons for hiring the white candidate were either pretextual, and/or that the entire selection process was permeated with wrongful discrimination.

In order to establish a *prima facie* case of discrimination here, Mr. Bowden must demonstrate that (1) he is a "member of a protected class," (2) he "suffered an adverse employment action," and (3) the "unfavorable action gives rise to an inference of discrimination." *Stella v. Minetta*, 284 F.3d 135, 144-45 (D.C. Cir. 2002), *citing with approval*, *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999). This required showing is "not onerous," *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 254-55,  101 S. Ct. 1089, 1093-94 (1981), and can "vary" depending on context in which the case arises. *Swierkiewicz v. Sorema N.A., supra.*  For this reason, among others, the plaintiff is not even required to show at this stage that one or more employees outside of the protected class were selected to fill the position that he sought. Rather, all that is required is for the plaintiff to show that his rejection is not attributable to ""the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." *Stella*, 284 F.3d at 145, *citing McDonnell Douglas Corp. v. Green,* , 411 U.S. 792, 802, n. 13; 93 S. Ct. 1817, 1824 (1973). This result follows because the "[e]limination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one." *Id.* Given these standards, Defendant appears to concede that Plaintiff has established a *prima facie* case of discrimination on the basis of his "race, color, disability, and reprisal" (at least for purposes of the pending summary judgment motion). *See* Defendant's Brief, p. 23.

---

use of "slips," and not the Filemaker program required by the amended job description. Robinson Dep. Ts. at 100-101, 104-105, Pl. Ex. 2; Krebs Dep. Ts. at 71,124, 187-88, Pl. Ex. 3; Bowden Dep. 12/04/07 Dep. Ts. at 205-06, Pl. Ex. 5; Bowden 02/20/08 Dep Ts. at 91, Pl. Ex. 10; Robinson Dep. Ts. at 107, Pl. Ex. 2

**A. Plaintiff Has Presented Sufficient Probative Evidence To Demonstrate Pretext And/Or Show that the Process Was Tainted By Discriminatory Animus concerning His Non-Selection for Supervisory Exhibits Specialist..**

It is well established that a plaintiff can rebut defendant's articulated reasons by showing pretext, either by presenting evidence directly showing that the "discriminatory reason more likely motivated the employer, or, indirectly,  by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S. Ct. at 1094. In the final analysis, the plaintiff must persuade the ultimate finder of fact that the proffered reasons are pretextual and that the employment decision was the result of discriminatory intent. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S. Ct. 2742, 2749 (1993). "The fact finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *St. Mary's Honor Center*, *supra. Accord, Reeves v. Sanderson Plumbing Products ,Inc.*, 530 U.S. 133, 151, 120 S. Ct., 2097, 2109, (2000)  ("[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier-of-fact to conclude that the employer unlawfully discriminated.")

There is ample evidence here to support a finding of pretext, and to support the ultimate inference of discrimination. The Agency claims it withdrew the initial job posting and rewrote the qualifications to "add production experience." Yet there is evidence that the revisions merely added qualifications aimed at excluding Mr. Bowden from qualifying for the position.  (Krebs Dep. Ts. at 187-88, Pl. Ex. 3; Robinson Dep. Ts. at 217-22, Pl. Ex. 2; Krebs affidavit, Pl. Ex. 8.)

In an attempt to rebut Mr. Bowden's claim of pretext, the Agency at p. 19, fn. 6, of its Brief improperly offers what appears to be Mary Tanner's "expert" opinion testimony

concerning civil service hiring procedures regarding the frequency and purpose of changes in vacancy announcements. The Agency has not laid a proper foundation for the expert testimony under Federal Rules of Evidence 702, 703, 704(a) and 705. Ms. Tanner has also not yet been identified as an expert in this case pursuant to Fed. Rules of Civil Procedure 26(a)(2), and the testimony is therefore not admissible for the purposes of deciding a motion for summary judgment and should be excluded.[8]

There is plenty additional evidence of pretext. For instance, there is evidence casting doubt on the requirements Ms. Dolnick added to the vacancy announcement following Mr. Bowden's September, 2003 application for the position. There is also evidence that the additional "qualifications" were not even germane to the job. To date there is no computerized system in place in the Exhibits Department to manage workflow. (Robinson Dep. Ts. at 100-101, 104-105, Pl. Ex. 2.) Work orders are still not being tracked. (Bowden 12/04/07 Dep. Ts. at 205, Pl. Ex. 5.) At the time of his application Baxter, the selected candidate, was not in fact well-versed in using the two computer programs FileMaker and Quark Express, and was not an expert in either system. (Robinson Dep. Ts. at 219, Pl. Ex. 2.) He did not, apparently, subsequently develop skills using either program. There is no evidence that Mr. Baxter has ever used the Filemaker Pro or Quark Express software, proficiency at which Lynn Dolnick added to the re-written job posting for Supervisory Exhibits Specialist. (Krebs Dep. Ts. at 71, 124, 187-88, Pl. Ex. 3; Bowden Dep. 12/04/07 Dep. Ts. at 205-06, Pl. Ex. 5; Bowden 02/20/08 Dep Ts. at 91, Pl. Ex. 10; Robinson Dep. Ts. at 107, Pl. Ex. 2.) Finally, Mr. Bowden obtained evidence that Baxter may have misstated his museum experience. (Bowden 02/20/08 Dep. Ts. at 275-76, Pl. Ex. 10.)

---

[8] Plaintiff would be making a motion *in limine* were this evidence introduced at trial.

Equally probative is a pattern of adverse and disparate treatment, including denials of career enhancing opportunities, on the part of a supervisor or employer when directed against a member of a protected class. *Stella v. Minetta*, 284 F.3d at 145 ("plaintiff only needs to demonstrate that the employer treated her worse than others because she was a member of the protected class"); *see also Parker v. Housing and Urban Development*, 891 F.2d 316, 321 (D.C. Cir. 1989). Here, Dolnick only promoted white and/or Jewish employees to ranks at or above GS-11. (Bowden October 8, 2004 Affidavit, Pl. Ex. 16; *see also* Dolnick Dep. Ts. at 98-100,103-106, Pl. Ex. 1.)  Because of Ms. Dolnick's prejudice, African-American males could not reasonably expect to cultivate the kind of relationship with Ms. Dolnick necessary to lead to advancement at the Zoo.  (Aaron Ferster December 21, 2004 Affidavit, Pl. Ex. 17). In the words of Herman Krebs, a white, male co-worker:

> Promotions were given almost exclusively to staff members of Jewish origin. Performance ratings were based on how 'comfortable' Ms. Dolnick felt with staff members rather than any professional considerations. . .and she felt uncomfortable both with men and with African Americans. . . ."(Krebs Affidavit, ROI Case No. 04-16-080604, Tab 9, pp. 3,4, Pl. Ex. 8.)

Another white co-worker, Judith Tasse, testified that she

> believed that the Complainant's race could have been a factor against him during the selection for the Supervisory Exhibits Specialist position, due to the institutional racism that appears to prevail in [the Exhibits] office.  There are no people of color in supervisory positions in this office, while the Production unit workers are 100% minority." (Tasse affidavit, ROI Case No. 04-16-080604, Tab 11, pp. 3-4, Pl. Ex. 12).

In fact, Ms. Dolnick never promoted any blacks as high as GS-12 during Mr. Bowden's tenure at the Zoo, (Dolnick Dep. Ts. at 201, Pl. Ex.1); although she testified that she did promote Ernest Long, an African-American (Dolnick Dep. Ts. at 108, Pl. Ex. 1), in the 1990s.  Dolnick could not recall, however, whether she promoted Mr. Long any higher than GS-11.  (Dolnick

33

Dep. Ts. at 108, 123, Pl. Ex. 1.) Dolnick and Samiy were more comfortable with whites than

blacks, and particularly black men. (Ferster Dep. Ts. at 169-71, Pl. Ex. 19.)

There is also evidence that Ms. Dolnick vowed never to promote Mr. Bowden to a salary

level equal to Mr. Bowden's first-line supervisor[9], Kathleen Samiy, a white woman, and that Ms.

Dolnick laughed at the notion of Mr. Bowden being a supervisor. (Bowden 02/20/08 Dep. Ts. at

77-79, Pl. Ex. 10.)

Evidence that a Defendant resorts to shifting, after-the-fact and/or inherently incredible

reasons offered to justify a promotion decision supports an inference of discriminatory or

retaliatory animus. *See, e.g. EEOC v. DC Public Schools,* 277 F. Supp. 2d 44, 51 (D.D.C. 2003);

*Jones v. Mukasey,* 2008 U.S. LEXIS 52621, Slip. Opn. at 29 (D. D. C. 2008) *[citing Southwest*

*Merchandising Corp. v. N.L.R.B.,* 311 U.S. App. D.C. 370, 53 F.3d 1334, 1344 (D.C. Cir. 1995),

and *Aka, supra,* at 1295]; *Barbour v. Merrill,* 48 F.3d 1270, 1276 (D.C. Cir. 1995) (finding that a

jury may infer pretext from discrediting the proffered reasons for an employment decision);

There is ample evidence of that here. Lynn Dolnick urged Mr. Bowden to apply for a promotion

to a position (Supervisory Exhibits Specialist) for which she had no intention of hiring him; she

had full knowledge of his credentials, and she withdrew the posting after his first application

cycle.

Mr. Bowden applied for this position on September 2, 2003. (Bowden 12/04/07 Dep. Ts.

12; 142-43; 147-49, Pl. ex. 5) This was the second time that he had applied for a promotion

within the Exhibits Department, (*Id.* at 148, Pl. Ex. 5), and Ms. Dolnick claims she urged him to

apply for the position (Dolnick Dep. Ts. at 206, Pl. Ex. 1.) Yet Ms. Dolnick withdrew the

vacancy announcement after Mr. Bowden applied, and cancelled his interview for the position.

(Bowden 12/04/07 Dep. Ts. at 149, Pl. Ex. 5.)

---

[9] Dolnick denied this allegation. (Dolnick Dep. Ts. at 202, Pl. Ex. 1.)

There is a great deal of evidence discrediting Ms. Dolnick's (the selecting official) self-serving testimony concerning her alleged reasons for "dissatisfaction with the pool of candidates." First, there is evidence that Ms. Dolnick held stereotyped, antiquated views of the type of work suitable for African-American employees. This evidence creates doubts concerning any testimony in which she describes her motives behind rejecting a short list of candidates for Exhibits Supervisor when it included Mr. Bowden, an African-American. For instance, Lynn Dolnick and Melissa Gaulding told Mr. Bowden and Mr. Robinson that they were seen as the "broad shoulders" of the production department. (Bowden 12/04/07 Dep. Ts. at 160-161, Pl. Ex. 5.) Others have testified that African-Americans were made to do the heavy lifting. (Bowden October 8, 2004 Affidavit, ROI Case No. 04-16-080604, Tab 5, p. 14, Pl. Ex. 16.)

There is additional evidence casting doubt on the integrity of the hiring process, which raises an inference of discrimination. As described in Plaintiff's Response to Par. 43, Statement of Facts, Ms. Dolnick went outside the official hiring process to recruit and interview candidates even before the official Vacancy Announcement was posted in August, 2003. Dolnick's testimony cited in Paragraph 44 of Defendant's Statement of Material Facts is also contestable creating a material issue of fact, because she had earlier testified that she had encouraged and solicited Mr. Bowden's application ("I encouraged him many, many times to apply for this job," Dolnick Dep. Ts. at 206, Pl. Ex. 1) and told him that she was working on a promotion for him (Bowden October 8, 2004 Affidavit, ROI Case No. 04-16-080604, Tab 5, p. 3, Pl. Ex. 16.) Yet the Agency now apparently concedes that Mr. Bowden was never in serious contention, since Dolnick withdrew the Vacancy Announcement because she was "not satisfied with the overall pool of candidates." (Dolnick Dep. Ts. at 207, Pl. Ex.1.)

35

So, too, an agency's failure to abide by its own stated policies provides relevant evidence of discriminatory intent. *Kolstad v. American Dental Assoc.*, 108 F.3d 1431, 1436 (D.C. Cir 1997), *vacated on other grounds* 139 F.3d 958 (D.C. Cir. 1998) (violation of its own procedures served to discredit the employer's proffered reason for its decision); *Shelborne v. Runyon*, No. 95-0641, 1997 U.S. Dist. LEXIS 13583 (D.D.C. 1997) (agency's failure to follow its own hiring criteria in selection process is evidence of discriminatory animus); *Fischbach v. District of Columbia Department of Corrections,* 86 F.3d 1180 (D.C. Cir.1996) ("Evidence indicating that an employer misjudged an employee's performance or qualifications is, of course, relevant to the question whether its stated reason is a pretext masking prohibited discrimination, if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so." *Id.* at 1183 (internal citation omitted).

Again, there is ample evidence that the Agency failed to abide by its own stated policies here. For example, Lynn Dolnick, Mr. Bowden's second-line supervisor, signed his 2003 performance evaluation instead of his immediate supervisor, in contravention of Smithsonian Directive 212, Federal Personnel Handbook, Chapter 430-4(j).  Ms. Dolnick also engaged in highly unorthodox hiring procedures when she asked subordinate workers ranked at GS-11 to review applications for their prospective supervisor.  Second, there is evidence that Dolnick introduced unorthodox, if not outright not outright impermissible irregularities in the selection process. During the hiring of Kathleen Samiy for the position of Production Supervisor, Dolnick asked staff members of a lower grade level than the position being selected to provide her an advance review of candidates.  (Dolnick Dep. Ts. at 90-91, 219, Pl. Ex. 1.) In particular, she asked Melissa Gaulding and Susan Ades to help her decide who would be interviewed for the position of Supervisory Graphic and Production Specialist.  That is, Ms. Dolnick asked the

36

lower-graded employees, GS-11 or below, to review applications for their next supervisor. (*Id.* at 90-91, 219-224.)

Evidence of the pre-selection of a candidate likewise supports, but does not necessarily compel, an inference of pretext and/or discriminatory animus. *Kolstad*, 108 F.3d at 1436; Here, there was evidence of pre-selection the first time Mr. Bowden sought a promotion. The record shows that, in advance of the August posting of this position, and in violation of OPM procedures, Lynn Dolnick and Kathleen Samiy, Mr. Bowden's second-and-first-line supervisors respectively, discussed the opening with and interviewed possible candidates. Mr. Bowden learned this directly from a candidate, "Lance," who had been called in for interviews for the position. (Bowden 12/04/07 Dep. Ts. 150-51; 153, Pl. Ex. 5.) Dolnick and Samiy interviewed at least one other candidate for the Supervisory Exhibits Specialist position, Becky Donnelly, around the same time. (*Id.* at 150-56). There is evidence of communications between Samiy and potential recruits for the supervisory job. *See Id.* at 175-183. Melissa Gaulding, a co-worker in the Exhibits Department, provided Mr. Bowden with a copy of private e-mail correspondence dated August 26, 2003 documenting Becky Donnelly's pre- posting interview with Dolnick and Samiy. (*Id* at 175-182; Bowden 12/04/07 Dep. Exhibit 15).

This record is replete with highly probative evidence from which a properly instructed jury can reasonably infer pretext and conclude that the entire promotion selection process was tainted by discriminatory animus. Plaintiff has presented specific evidence of discriminatory animus that motivated his non-selection for the position of Exhibit Manager GS 12. At the very least, however, this body of evidence is sufficient to permit a reasonable jury to infer the existence of discrimination after a full trial on the merits. For this reason alone, Defendant's motion for summary judgment should be denied.

## V.    SUMMARY JUDGMENT SHOULD BE DENIED AS TO THE RETALIATION CLAIMS BECAUSE A REASONABLE JURY COULD FIND THAT THE AGENCY SUBJECTED PLAINTIFF TO RETALIATION, BECAUSE ITS ACTIONS AGAINST HIM COULD HAVE DISSUADED HIM FROM MAKING OR SUPPORTING A CHARGE OF DISCRIMINATION.

### The Evidence shows that a Jury Could Find That the Agency Subjected Mr. Bowden to Retaliatory Harassment, a Hostile Environment, Failure to Accommodate a Disability, Failure to Enforce his Settlement Agreement , Failure to Promote Him, or Subject His Position to a Proper and Legitimate Desk Audit.

As previously stated, the standard for proving retaliation is less stringent than proving

discrimination. All a plaintiff need show is that

> "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Burlington Northern v. White*, 126 S. Ct. 2405, 2415 (2006) (*citing Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006).

As documented in Mr. Bowden's deposition testimony, and as confirmed by the

deposition and affidavit testimony of several of his co-workers, the Zoo has subjected him to an

ongoing and continuing pattern of retaliatory treatment because of his EEO activity[10], as detailed

in Section III, above. A jury could easily find that these adverse employment actions would have

dissuaded a worker from making or supporting Mr. Bowden's charges of discrimination.

This course of adverse actions and and disparate treatment taken against Plaintiff that

could have dissuaded a reasonable worker from making or supporting a charge of discrimination

includes the denial of promotion to the Exhibits Supervisory positions for which he was equally

well qualified as the selectee. The Agency passed over Plaintiff on three successive occasions in

filling the GS-12 Exhibits Supervisor position, including the 1999 personnel action specifically

referenced in the administrative complaint, and the position referenced in the Complaint filed in

---

[10] Defendant is well aware of Plaintiff's history of EEO activity.

this case, (Vacancy No. 04SP-1005.) *Russell v. Principi*, 257 F.3d 815 at 818-19 (DC Cir. 2001) (quoting *Brown v. Brody*, 199 F.3d at 457).

In addition to these overt adverse employment actions, the Agency has subjected Plaintiff to other adverse actions, including refusal to properly compensate him; downgrading his annual performance appraisal forms shortly after Mr. Bowden complained of discriminatory treatment, and while his application for promotion was pending; a course of hostile, harassing, and humiliating actions (such as constantly questioning Mr. Bowden where he goes, including to the bathroom); assigning him inappropriate (sometimes dirty) work; failure to abide by the terms of a settlement agreement, and failure to accommodate his disabilities. All or any of these adverse actions could have easily dissuaded a reasonable worker from making or supporting a charge of discrimination.

Also, note that the Zoo treated Mr. Bowden in a manner much more onerous than the examples given in *Burlington Northern, supra, e.g.,* a schedule change for an employee and excluding an employee from a weekly training lunch. Certainly if these two examples in *Burlington Northern, supra,* suffice to meet the retaliation standard set forth in *Burlington Northern, supra, i.e.* , the challenged action might have dissuaded a reasonable worker from making or supporting a charge of discrimination, the way that the Zoo treated Mr. Bowden meets the standard for retaliation.

### VI.    Plaintiff Stated a Proper Claim for Violation of Settlement Agreement in Count Seventeen

Defendant's attack on Count Seventeen focuses solely on Mr. Bowden's allegations in Par. 16 of his Complaint that the Agency failed to restore unpaid sick leave.   In May of 2008, almost three years after the commencement of this litigation, the Agency produced documentation to Counsel for Mr. Bowden showing that worker's compensation funds paid for

Mr. Bowden's claims for sick leave.  Based on the Agency's representations, Mr. Bowden is

willing to withdraw only that part of his Breach of Contract Claim relating to the unpaid leave.[11]

Defendant completely ignores, however, the first half of Mr. Bowden's claim for

violation of the Settlement Agreement. Paragraph 15 of the Complaint details the terms of the

Agreement whereby the Agency had agreed to make certain specific reasonable accommodations

to Mr. Bowden's medical conditions.[12]  Mr. Bowden further complains of the instances in which

the Agency failed to live up to its Agreement by "fail[ing] to provide Plaintiff the reasonable

accommodations to which he is entitled by law and to which the Agency specifically previously

agreed by Court settlement. . . " (Complaint Par. 23t), by complaining to supervisors on

numerous occasions in 2002 that he was not being provided reasonable accommodations,

including "not being permitted to get something to eat with his medication, [and] not being

allowed to take frequent restroom breaks, and/or to get 'fresh air.'" (Complaint Par. 26),

questioning of his whereabouts (Complaint Par. 28d), supervisor Baxter actually required

Bowden to schedule his sick leave in advance, despite awareness that Plaintiff needed sick leave

for routine and non-routine purposes and that there was no way which Plaintiff could know in

advance when he would be sick, (Complaint Par.28c), by Baxter "continually questioning

Plaintiff's whereabouts when Plaintiff goes to the restroom), take short breaks, and/or gets

something to eat" as permitted by the settlement agreement (Complaint Par. 28d); and by failure

to take appropriate action regarding an assault on Plaintiff by his co-worker Elena Lopez

(Complaint Par. 29).

---

[11] The Settlement Agreement (Pl. Ex. 37) states in Par. 6 that "[s]uch restoration [of leave] shall be limited to the extent Bowden is compensated for such leave through a workers' compensation claim."
[12] In footnote 11 of its Brief, at page 35, Defendant hints at this part Mr. Bowden's claim for violating the Agreement by reference to subparagraphs f. and i. of Mr. Bowden's prayer for relief.

All the elements of a breach of contract claim are properly pleaded: a contract; a duty arising from the contract; breach of duty; and injury. Defendant admits the contract, and does not deny its duty to provide the accommodations agreed to therein. Mr. Bowden alleged several instances of breach, including refusal to permit him bathroom breaks at his own discretion (*see, especially*, Complaint par. 30;) constant questioning of Mr. Bowden of his whereabouts, (and thus undermining and burdening his right to the accommodation) even when management was aware of its agreement of the need for bathroom and fresh air breaks (Complaint Par. 34), and other general allegations of breach. Defendant has not alleged or provided evidence supporting any material facts concerning the portion of Count Seventeen, set out in Complaint Par. 112, which summarizes the provisions of the Settlement Agreement requiring the Agency to "make certain specific reasonable accommodations to Plaintiff's medical conditions." (Complaint Par. 15.) Mr. Bowden's Complaint easily satisfies the notice pleading requirements of Fed. R. Civ. P. 8(a) (*see* Part 1, p. 3, above) because it provided Defendant fair notice of the basis for his claims. Defendant's Motion for Judgment on the Pleadings should therefore be denied as to this portion of the second Amended Complaint. Mr. Bowden therefore asks that the Court deny Defendant's Motion for Judgment on the pleadings with respect to the remaining parts of Count Seventeen.[13]

### VII.    Mr. Bowden's Claims of Rehabilitation Act Violations Should Also Go Before A Jury.

Using the bathroom is not tantamount to 'disappearing" for "periods of time, and Mr. Bowden objects strenuously to the Defendant's mischaracterization of his allegations. The Agency's relentless belittling of Mr. Bowden evidenced throughout its Motion for Summary Judgement supporting papers highlights the vicious and gratuitous manner in which it has

---

[13] Which includes everything in count Seventeen except leave restoration.

41

obliterated Plaintiff's civil rights. The Agency's unsupported references to alleged 20 minute "disappearances" reveals the pervasive nature of the Agency's hostility to Mr. Bowden. In the single record evidence concerning this accusation, Mr. Bowden directly testified that the "longest he had ever gone," when asked his whereabouts by his supervisors Samiy or Baxter, was "20 minutes." (Bowden 2/20/08 Dep. Ts. at 208, Pl. Ex. 10.) This so-called "absence" also included times when Mr. Bowden was on duty inspecting the park, attending to his installation responsibilities, and other work tasks. Defendant completely fails to distinguish among different reasons for Mr. Bowden's so-called "absence" from immediate availability to his supervisors.

Not only has the Agency failed to live up to the terms of its Settlement Agreement, but it has further engaged in a course of overbearing, demeaning conduct, querying Mr. Bowden's every visit to the toilet, or his occasional fresh-air breaks mandated by his Settlement Agreement with the Smithsonian. The record confirms that Mr. Bowden was singled out for this harassment about his bathroom habits, alone among his co-workers. He was questioned about his medical appointments, when co-workers were not. (Krebs Dep. Ts. at 233, Pl. Ex. 3) (Tasse affidavit, Pl. Ex. 12.) *See also* response to 40, in Plaintiff's Statement of Facts.

Nowhere does the Settlement Agreement *authorize* supervisors to undercut the terms of the Settlement by infantilizing Plaintiff with constant surveillance of his bathroom habits. Implicit in the "right" to go to the bathroom is the freedom to do so without constant monitoring, hectoring, badgering, and oppressively intrusive supervision.

As described in part III, above, "Refusal to Accommodate," after the May, 2005 assault Mr. Baxter insisted that Mr. Bowden continue to attend staff meetings where Elena Lopez would be present, refusing any accommodation in recognition of Mr. Bowden's anxiety and depression—much less making any provision for his protection from further assault. Mr.

42

Bowden had already testified that job stress related to Lopez (created by the letter of counseling he earlier received in response to his cautioning supervisors about Lopez's erratic behavior) caused him to seek hospital treatment and miss three days of work. (Bowden 02/20/08 Dep. Ts. at 180, Pl. Ex. 10.) Defendant has admitted that Mr. Bowden's supervisors—including Baxter-- were on notice that Mr. Bowden had a disability for which he was already supposed to receive certain accommodations under the terms of a Court-approved settlement agreement. Although Mr. Bowden felt unsafe in such close proximity to his assailant, he nonetheless attended such meetings under duress, for fear of otherwise losing his job. (*Id.* at 234-35.)

Notably, the Defendant failed to state whether Mr. Baxter considered any of the widely available, simple technologies for accommodating Mr. Bowden's request, including using a speakerphone, a remote microphone, taping the meeting, providing Mr. Bowden a transcript of the meeting, using an internet hook-up, providing Mr. Bowden an advance printed copy of the meeting agenda, or providing other remote audio-visual access.

## VIII. REQUEST FOR HEARING

Plaintiff respectfully requests a hearing on Defendant's Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment.

## CONCLUSION

For all of the foregoing reasons, Defendant's Motion for Judgment on the Pleadings or in the Alternative for Summary Judgment should be denied in its entirety. Defendant's Motion does not meet the standard for a Motion for Judgment on the Pleadings. Also, given the numerous issues of material fact, a properly instructed jury as the ultimate trier-of-fact case must not only make numerous and significant credibility determinations, but also draw necessary inferences

from the disputed and undisputed facts that have been previewed in respective submissions made

by the parties on summary judgment in this Title VII case.

Respectfully submitted,

*/s/ Steven J. Silverberg*

_____

Steven J. Silverberg
D. C. Bar #377376
Attorney for Plaintiff
900 17th St, N.W. Suite 1250
Washington DC  20006
Phone:  202/785-8499
FAX:  202/785-8470
E-mail:  sjsilverberg@erols.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANTHONY BOWDEN, )
)
    Plaintiff, )
)
        v. )
)    **Civil Action No. 05-2202 RBW**
)
CRISTIÁN SAMPER, Acting Secretary, )
    Smithsonian Institution, )
)
    Defendant. )

## PLAINTIFF'S STATEMENT OF FACTS
## AS TO WHICH THERE IS A GENUINE ISSUE

Pursuant to Local Civil Rule 7(h), Plaintiff Anthony Bowden (hereafter "Plaintiff" or

"Mr. Bowden") hereby provides his statement of genuine issues. The statement contains specific

refutations controverting the accuracy, materiality, admissibility, relevance, and adequacy of so-

called "facts" identified by the movant for summary judgment, Defendant Secretary of the

Smithsonian Institution.   In further support thereof, Mr. Bowden sets forth all material facts as

to which he contends there exists a genuine issue necessary to be litigated.

### Defendant's Asserted "Material" Facts:

Plaintiff's Hostile Work Environment Claim (Counts I-VI).

Heavy Projects and Work in the Lower Shop

"1. Plaintiff asserts that he was required to work alone and that he was required to work
on heavy projects and move furniture and work in the lower shop area. See Complaint,
23(k)-23(l), 23(s)."

**Bowden's Response:** Plaintiff admits that he made these assertions. Also, several

witnesses acknowledge that Mr. Bowden was made to do heavy work. *See, e.g.,* Lynn Dolnick

Deposition Transcript [ ("Dep.Ts.") at 145-46 (attached hereto as Plaintiff's Exhibit ("Pl. Ex.")

1]. The Exhibits Specialist position description required all Zoo Exhibit Specialists to be able to lift 45 pounds. Defendant's Motion for Summary Judgment ("MSJ") Ex. 34, Document ("Doc.") 32-35, page ("p.") 6, ¶ 8.  *See also* Robinson Dep. Ts. at 59, (Pl. Ex. 2) (Everyone had to lift 50 pounds); *See also* Krebs Dep. Ts. at 196 (Pl. Ex. 3) ("Grace never had to do heavy lifting."). Mr. Bowden's second-line supervisor, Lynn Dolnick, head of the Exhibits Department at the Zoo, acknowledged that the position description required the ability to lift heavy weight.  (Dolnick Dep. Ts. at 12, 145, Pl. Ex. 1.)   Dolnick is white, female, and Jewish. (Dolnick Dep. Ts. at 9, Pl. Ex. 1.)

Kathleen Samiy, Mr. Bowden's first line supervisor in 2003-04, whose job title was "Supervisory Visual Information Specialist," and Grade GS-12, admitted that she required Bowden to do more outside work than Grace Lopez, a female Filipino-American Exhibits Specialist, religion unknown. (Kathleen Samiy Dep. Ts. at 20, 172, Pl. Ex. 4.)  Samiy is a white, female, Roman Catholic. (Samiy Dep. Ts. at 8-9.) Dolnick, in speaking with  white, female co-worker Melissa Gaulding, stereotyped Mr. Bowden, and other African-American males, as the "broad shoulders" of the Exhibits department, and exclusively assigned them heavy moving, lifting, and other heavy work projects. (Anthony Bowden 12/04/07 Dep. Ts. at 160-161, Pl. Ex. 5.)  Gaulding protested to Lynn Dolnick on behalf of Mr. Bowden and Ernest Robinson, an African-American male co-worker, arguing to Dolnick that the "blacks were being made to do. . .the heavy work of lifting furniture." (Bowden 12/04/07 Dep. Ts. at 161, Pl. Ex. 5.)  Lynn Dolnick and Melissa Gaulding told Mr. Bowden and Mr. Robinson that they were the "broad shoulders" of the production department. (Bowden 12/04/07 Dep. Ts. at 160-161, Pl. Ex. 5.) Others have testified that African-Americans were made to do the heavy lifting.  (Herman Krebs Affidavit, Report of Investigation ("ROI") Case No. 04-16-080604, p. 3, Pl. Ex. 8).

2

Mr. Robinson also heard the black males referred to as the "broad shoulders," and testified that blacks were required to move office furniture for white colleagues. (Ernest Robinson Dep. Ts. at 197-98, Pl. Ex. 2.) See also paragraph 3, below, confirming Mr. Robinson's protest of race-based work assignments.

Ms. Gaulding testified that Dolnick and Samiy used race-based work assignments, in defiance of job descriptions that required all Exhibits Specialists, male and female alike, white, brown, or black, to be able to lift heavy objects. She confirmed Mr. Bowden's complaint regarding furniture moving:

> Jobs that required physical exertion were given to men (even in situations where women had the same physical requirements in their jobs), and specifically African American men—and often these jobs were not related to projects, but things like moving furniture in a supervisor's office. (Melissa Gaulding affidavit, ROI Case No. 04-16-080604, Tab. 14, p. 5, Pl. Ex. 13.)

Kathleen Samiy denied that only black staff members were made to move the furniture. (Samiy Dep. Ts. at 158, Pl. Ex. 4.) Her denial creates a material issue of fact regarding Paragraph One.

Aaron Ferster, a white, Jewish, male co-worker, testified that Samiy treated men worse than women, but that she treated black men worst of all. (Aaron Ferster Dep. Ts. at 149-52, Pl. Ex. 19.) Ferster testified that Dolnick and Samiy were more comfortable with their white employees than the black employees. (Ferster Dep. Ts. at 169-71, Pl. Ex. 19.)

Grace Lopez has no "mental or physical disability that substantially impacts a major life activity," or that would have prevented her from performing all duties expected of exhibits specialists. (Grace Lopez affidavit, ROI Case No. 04-16-080604, Tab. 12, p.1, Pl. Ex. 6.) As an Exhibits Specialist, she should have done her share of heavy work.

"2. Plaintiff has admitted, however, that there was a shortage of staff (See May 21, 2003 E-mail from Bowden to Tanner acknowledging "shortage of staff") (Plaintiff's Depo. Exh. 7)

3

(Exhibit 39); Plaintiff's 12/4/07 Depo. at 117-18, and that his coworkers were called upon to perform other functions, such as work making vinyl signs. *See* Plaintiff's 12/4/07 Depo. at 67."

**Bowden's Response:** Mr. Bowden's e-mail, dated May 21, 2003, cannot be read to support Defendant's expansive interpretation. Mr. Bowden does not "admit" to an ongoing or chronic shortage of staff, and the memo has no evidentiary value beyond the date in question, May 21, 2003. The memo merely informs Mary Tanner, Deputy Director of the National Zoo, and who was then Mr. Bowden's third-line supervisor, that he is "the only one working in Exhibit Production. Do[sic] to shortage of staff." Tanner is a white, female, Roman Catholic. (Mary Tanner Dep. Ts. at 7, 23, Pl. Ex. 22.)

There also is no evidence that management's practice of exclusively assigning black men the dirty, heavy work was a response to temporary, occasional staff shortages, on May 21, 2003, (the date of Plaintiff's e-mail) or on any other date during the time in question, and no support for the gender-stratified work distribution assignments in the Exhibits Department (lighter-skinned women assigned to indoor office space in clean, well-lit, well-heated rooms; dark men assigned to dank, cold, poorly lit and unventilated, hazardous workspaces). There is evidence, however, that job assignments were made based on race, and not position description. *See* Response to Paragraph ("Par.") 1, above. (Gaulding Affidavit, Pl. Ex. 13.)

Bowden was also skilled at vinyl sign production, and testified that he picked up the skill through observation and on-the-job training. (Bowden 12/04/07 Dep. Ts. at 76-77, Pl. Ex. 5.) It is equally likely that the gender-and-race-based allocation of duties among the Exhibits Specialists contributed to any so-called "shortage" of help in the workshop. There is no dispute that Grace Lopez, an Exhibits Specialist like Mr. Bowden, did a majority of vinyl sign work— also called "Gerber work." (Charles Fillah Dep Ts. at 47, Pl. Ex. 7.) If Grace Lopez was assigned exclusively to the upstairs shop and vinyl sign production, then by necessity the outdoor

4

shop and lifting work would be understaffed.  There was also never any system in place for

tracking and coordinating workflow to alleviate staffing issues, a problem that persists to this

day.  (Robinson Dep. Ts. at 100-101; 104-105, Pl. Ex. 2.)  Work orders are still not being tracked.

(Bowden 12/04/08 Dep. Ts. at 205, Pl. Ex. 5.)  *See also* Bowden's Response to Par. 53, below.

"3. Plaintiff also admitted that a coworker not in the production section, Earnest  [sic]
Robinson, would sometimes help with heavy projects. Plaintiff's 12/4/07 Depo. at 83-84;
Plaintiff's 2/20/08 Depo. at 23-24. Mr. Robinson, however, complained that he was being
required to do this heavy production work because of his race, and thereafter Mr. Robinson was
relieved of these production tasks. Plaintiff's 12/4/07 Depo. at 88-89, 96; Plaintiff's 2/20/08
Depo. at 25."

**Bowden's Response:**  Plaintiff admits.  Also, this statement of fact confirms Mr.

Bowden's allegations that work assignments in his Department were race-based.  Mr. Robinson,

who is black, and was assigned heavy projects like Mr. Bowden, testified that he agreed that the

lower workshop was not safe to work in.  (Robinson Dep. Ts. at 112-1, Pl. Ex. 2.)  *See also*

Responses to 1, 2, and 3, above.

"4. Plaintiff has complained that his supervisor, Mr. Baxter, has taken it upon himself to
inquire of the work schedule of contract welders (something Plaintiff feels should have been his
job) and have outside contractors work on a prototype sign in the Small Mammal house, asking
why such jobs were being given to others. See Exhibit 3 (October 5, 2004 Memo from Plaintiff)
at 2."

**Bowden's Response:**  Plaintiff admits.  Exhibit 3 speaks for itself, and gives a detailed

summary of several of Mr. Bowden's concerns regarding management of contractors.  Mr.

Jeffrey Baxter's (white male Baptist) predecessor supervisor, Ms. Kathleen Samiy, also

dismissed Mr. Bowden's expertise in favor of outside contractors.  (Gaulding affidavit, ROI Case

No. 04-16-080604, Tab. 14, p. 5, Pl. Ex. 13.)

"5. Plaintiff admits, however, that 80% of the signs at the zoo are made by outside
contractors. Plaintiff's 12/4/07 Depo. at 99."

**Bowden's Response:** This statistic is immaterial. At any rate, Mr. Bowden's pointed out that he wanted to return sign-making projects in-house, where they could be produced more effectively and efficiently at a lower cost. (Bowden 12/04/07 Dep. Ts. at 100, 104, Pl. Ex. 5.)

"6. Plaintiff also concedes that, while he may have been called upon to work with heavy objects, he had greater upper body strength than Grace Lopez, another worker in the production department, who weighed only about 110 pounds, while Plaintiff is estimated to weigh as much as 175 pounds. See Plaintiff's 12/4/07 Depo. at 68-73."

**Bowden's Response:** This remains a genuine issue and Defendant misstates Mr. Bowden's testimony. While Mr. Bowden admitted that he weighed more than Ms. Lopez, he repeatedly emphasized that he had no way of knowing her actual upper body strength (Bowden 12/04/07 Dep. Ts. at 162, Pl. Ex. 5). He also testified that he lacked lower body strength, especially because of knee problems, *Id.* at 74-75. Mr. Bowden also disputed the suggestion that body weight correlated to strength, (*see* Bowden 12/04/07 Dep. Ts. at 162, Pl. Ex. 5,) and also observed that Grace Lopez (Filipino-American female) was in "good shape." *Id.* Ernest Robinson also testified that the job description required *all* Exhibit Specialists to be able to lift at least "50 pounds." (Robinson Dep. Ts. at 59, Pl. Ex. 2.) The official position description requires the ability to lift 45 pounds. *See* Defendant's MSJ Ex. 34, Doc. 32-35 at p. 6, ¶ 8.

It is undisputed that Grace Lopez was never required to do any heavy lifting. (Krebs Dep. Ts. at 196, Pl. Ex. 3; Robinson Dep. Ts. at 137, Pl. Ex. 2.) Charles Fillah, Mr. Bowden's third line supervisor, also admitted that Mr. Bowden lifted "more heavier" items than Grace Lopez. (Fillah Dep. Ts. at 54, Pl. Ex. 7.) Fillah is associate director of the Zoo, of Middle Eastern descent, and of the Christian religion. (Fillah Dep. Ts. at 25-26, Dep. Ex. 7.) Fillah also admits that the sign-making work is not physically demanding, like lifting and sawing. (Fillah Dep. Ts. at 47, Pl. Ex. 7.) Lynn Dolnick and Melissa Gaulding told Mr. Bowden and Mr. Robinson that they were the "broad shoulders" of the Production Department. (Bowden 12/04/07

6

Dep. Ts. at 160-161, Pl. Ex. 5.) Others have testified that African-Americans, but not Grace

Lopez, were made to do the heavy lifting. (Krebs Affidavit, ROI case No. 04-16-080604, p. 3,

Pl. Ex. 8; Ferster Dep. Ts. 163, Pl. Ex. 19.) Charles Fillah also admitted that Mr. Bowden

worked in the lower shop more than Grace Lopez. (Fillah Dep. Ts. at 83, Pl. Ex. 7.)

Defendant cites no evidence that Ms. Lopez had an accommodation or other special

need that exempted her from the physical labor expressly required of all persons employed as

Exhibit Specialists—not just the black men. Notably, Grace Lopez confirms that she has no

"mental or physical disability that substantially impacts a major life activity," or that would

prevent her from performing all duties expected of exhibits specialists. (Lopez affidavit, ROI

Case No. 04-16-080604, Tab. 12, p. 1, Pl. Ex. 6).

"7. Plaintiff asserts that the lower shop was unsafe because the saws were not bolted to
the floor, and there was dust in the air when the saws were used and inadequate ventilation to
remove the dust from the air. Plaintiff's 2/20/08 Depo. at 67-68."

**Bowden's Response:** Plaintiff admits. Mr. Bowden repeatedly complained about these

problems. [(Bowden 12/04/07 Dep. Ts. at 69-70, 73, 118; Pl. Ex. 5; Bowden 02/20/08 Dep. Ts.

at 70-71, 146, 183-186 (and Dep. Ex. 69); 262, 268, Pl. Ex. 10.] Exhibits Department co-

workers Herman Krebs and Ernest Robinson backed up Bowden's complaints concerning safety,

dust, dirt, and fumes (Robinson Dep. Ts. at 12-13, Pl. Ex. 2; Krebs Dep. Ts. at 216, Pl. Ex. 3.)

Mr. Bowden's supervisor Jeff Baxter, who insisted that Mr. Bowden work in the space, admitted

that the workshop was dirty, dusty, filled with chemical smells, and only ventilated as he saw

"necessary." (Baxter Dep. Ts. at 205-07, Pl. Ex. 11.) Baxter's title is "Supervisory Exhibit

Specialist, GS-12. (Baxter Dep. Ts. at 7, Pl. Ex. 11.) Baxter is a white male, whose religion is

Baptist. (Baxter Dep. Ts. at 10, P. Ex. 11.)

7

Not only was the space filled with inadequately installed equipment, *see also,* affidavit of

James Hilton, Safety Officer, ROI Case No. 05-10-031805, Tab F-4 (Pl. Ex. 9) (the space was

adequate only for hand-held equipment; workers should relocate to other, outdoor space for other

projects); but it was used by other entities at the Zoo, including Facilities, and the "Friends of the

National Zoo" volunteer group, as a storage space.  (Bowden 12/04/07 Dep. Ts. at 112.)  It was

overstuffed with used, worn, or discarded materials. (Bowden 02/20/08 Dep. Ts. at 146, Pl. Ex.

10.)  Herman Krebs described the unsafe lower workshop as follows:

> It's a mess.  The most unsafe thing about it is that it's a huge mess.  It
> doesn't have venting, I don't believe, for any of the equipment that's set up in it. .
> .There's sawdust, there's dust, there's dirt, there's – I mean it's kind of just a big
> giant room full of junk. (Krebs Dep. Ts. at 132-33, Pl. Ex. 3.)

Charles Fillah, Mr. Bowden's third line supervisor, confirmed this assessment when he

described the lower shop as "like a warehouse, . . .a warehouse building  . . .[that] gets dirty.

(Fillah Dep Ts. at 38-40, Pl. Ex. 7.) Defendant has admitted that the space could be very cold, 52

degrees Fahrenheit in winter, with no working heat. (Jeffrey Baxter Dep. Ts. at 135-139, Pl. Ex.

11).

"8. It was Plaintiff who ordered the majority of the equipment for the lower workshop,
including the saws. *See* Plaintiff's 12/4/07 Depo. at 78-80."

**Bowden's Response:** Plaintiff admits, but please *see* Responses to paragraphs. 7, 9, and

10 herein, listing the budgetary and other constraints that limited Mr. Bowden's ability properly

to equip the lower shop.

"9. Plaintiff has admitted that it was he and a coworker who installed the saws, but never
finished what needed to be done. Plaintiff's 12/4/07 Depo. at 114-19."

**Bowden's Response:**  This is a misstatement of the record.  Mr. Bowden was not

formally asked to "set up the lower shop" until March 9, 2005, when Mr. Baxter assigned him

the task.  *See* Second Amended complaint, ¶28g.  Even then, Baxter failed to extend Mr. Bowden

necessary supervisory authority to be able to require other employees to assist him in the task. *Id.* Mr. Bowden disputes this paragraph for additional reasons. Bowden described the task of completing the workspace as "impossible." (Bowden 2/20/08 Dep. Ts. at 262, Pl. Ex. 10.) In fact, Mr. Bowden was never authorized to order or install adequate safety measures to complete the task of making the basement area safe. (Bowden 02/20/08 Dep. Ts. at 70-71; 268, Pl. Ex. 10) Kathleen Samiy, his supervisor, ignored Bowden's earlier repeat entreaties, requests, and requisitions for adequate time, help, and equipment for securing the shop space. (Bowden 12/04/07 Dep. Ts. at 69-70, Pl. Ex. 5; Bowden 02/20/08 Dep. Ts. at 73, Pl. Ex. 10.) Even had he wanted to perform the work himself, Mr. Bowden was not skilled or qualified to bolt the saws to the floor, for instance, because he was not a concrete mason. (Bowden 02/20/08 Dep. Ts. at 186, Pl. Ex. 10.) Defendant offers no evidence that Mr. Bowden has the "HVAC" (heating, ventilation, and air-conditioning) training or skills necessary to vent the space. Not only was the space filled with inadequately installed equipment, *see also,* affidavit of James Hilton, Safety Officer, ROI Case No. 05-10-031805, Tab F-4, Pl. Ex. 9 (the space was adequate only for hand-held equipment; workers should relocate to other, outdoor space for other projects), but it was also used as a storage space and was overstuffed with used, worn, or discarded materials. (Bowden 02/20/08 Dep. Ts. at 146, Pl. Ex. 10.) *See also* Bowden's response to paragraph 7, above.

"10. Plaintiff was the safety officer until 2004. Plaintiff's 2/20/08 Depo. at 146; see also Plaintiff's 12/4/07 Depo. at 79-80 (plaintiff was acting in place of Mr. Hider when Hider left and Hider has been in charge of safety)."

**Bowden's Response:**  Mr. Bowden denies that he was the Safety Officer at the time he ordered the equipment for the shop. (Bowden 12/04/07 Dep. Ts. at 79, Pl. Ex. 5.) To the extent he succeeded Rick Hider, Mr. Bowden's unofficial role of safety officer was limited, mainly

requiring him to make sure the fire extinguishers were working. (Bowden 02/20/08 Dep. Ts. at 147, Pl. Ex. 10.) The position did not have the authority of a Ssafety Officer. The "safety officer" designation did not include any supervisory, budgetary, or spending authority, and did not specifically authorize him to take all steps necessary to renovate the basement workshop, and Bowden could not independently order additional necessary equipment to improve the space. (Bowden 02/20/08 Dep. Ts. at 70-71, Pl. Ex. 10.) At any rate Bowden's 2001 "promotion" to Hider's position was only temporary. (Bowden 12/04/07 Dep. Ts. at 81, Pl. Ex. 5.) It was the supervisor's responsibility to make the lower workshop space safe, not Mr. Bowden's. (Robinson Dep. Ts. at 113, Pl. Ex. 2.)

An accredited Safety Officer, James Hilton, testified that only hand-held tools should be used in the lower shop. (Affidavit of James Hilton, Safety Officer, ROI Case No. 05-10-031805, Tab F-4, Pl. Ex. 9.) The shop was therefore not in compliance with safety recommendations, as it contained several, heavy stationery tools, however, including the table saw that was improperly installed. (Bowden 02/20/08 Dep. Ts. at 186, Pl. Ex. 10.)

"11. On March 9, 2005, when Plaintiff was told by his supervisor, Jeff Baxter, that he (Mr. Bowden) should take responsibility for setting up the lower shop area as it should be set up, and when the supervisor told Mr. Bowden to act as team leader and to supervise a coworker if necessary, Plaintiff told his supervisor that "he [Mr. Baxter] was hired as the Exhibit supervisor and supervisor is not part of my title." (Exhibit 5) (Plaintiff's May 19, 2005 Affidavit) (Plaintiff's Depo. Ex. 85) at 3-4)."

**Bowden's Response:** *See* Bowden's Response to 8-10, above. Furthermore, Mr. Bowden contests Baxter's assertion that he in fact gave Bowden full authority to carry out the task. (Bowden 12/04/07 Dep. Ts. 118, Pl. Ex. 5.)

"12. Plaintiff admits that he seldom used the saws in the lower shop, because he felt they were not safe. Plaintiff's 12/4/07 Depo. at 112, 119-21."

10

**Bowden's Response:**  Mr. Bowden was never able to finish the proper installation of the saws.  (Bowden 12/04/07 Dep. Ts. at 118, Pl. Ex. 5.)  Mr. Bowden noted elsewhere that the saws were never properly bolted down (Bowden 02/20/08 Dep. Ts. at 191, Pl. Ex. 10), that he repeatedly asked Kathleen Samiy to have them bolted (*Id.*); and explained that he lacked necessary concrete mason training to bolt them himself. (Bowden 02/20/08 Dep. Ts. at 186, Pl. Ex. 10.)

Also, Mr. Hilton, the safety officer, recommended the use of only hand-held tools in the space. *See* Hilton testimony, *supra*.  The shop was therefore not in compliance with safety recommendations, as it contained several heavy stationery tools, however, including the table saw that was improperly installed. (Bowden 02/20/08 Dep. Ts. at 186, Pl. Ex. 10.)

Mr. Robinson confirmed that the lower shop was unsafe, and is "still unsafe." (Robinson Dep. Ts. at 112-14, Pl. Ex. 2.)

"13. Plaintiff agreed that a dust mask would protect him from the dust and that he had picked such masks up at Home Depot or from other workers at the Zoo. See Plaintiff's 2/20/08 Depo. at 72-73."

**Bowden's Response:**  In that same excerpted deposition testimony, Mr. Bowden also testified that Ms. Samiy repeatedly ignored his requests to go to Home Depot, even when requesting permission to buy the face masks. (Bowden 02/20/08 Dep. Ts. at 73, Pl. Ex. 10.)

Mr. Bowden elsewhere testified that the workspace was still unsafe for any projects generating fumes, and in that it lacked proper ventilation. (Bowden 02/20/08 Dep. Ts. at 68, Pl. Ex. 10.)  Mr. Bowden's supervisor Kathleen Samiy refused to pay for the face masks, (Bowden 02/20/08 Dep. Ts. at 73, Pl. Ex. 10), and supervisors often forbade Mr. Bowden from taking time to go to Home Depot to purchase supplies. [Bowden 02/20/08 Dep. Ts. at 74, 142, (Dep. Ex. 49), Pl. Ex. 10.]

"14. Plaintiff also concedes that Grace Lopez was called upon to work in the lower shop about the same amount of time under the earlier supervision of Mr. Hider as she has after Mr. Hider's departure. Plaintiff's 12/4/07 Depo. at 64, 71."

**Bowden's Response:** This is a misreading of ambiguously worded witness testimony. The colloquy between Counsel for Defendant and Mr. Bowden is confused and unclear, and an insufficient basis on which to draw this conclusion. An equally valid, consistent, and compelling reading of the text in its entirety would suggest that Grace Lopez worked about the same amount of time in the lower shop with Mr. Bowden and others under the earlier supervisor, Mr. Hider, but that she worked more often in the upper shop after Hider left.[1] Mr. Bowden described her position as "cushy," in answer to Defense counsel's question, how her work changed over time:

---

[1] Here is the relevant excerpt:   A   (Mr. Bowden) Can you ask that again?

**Q   (Counsel for Defendant) Uh-huh.  When Mr. Hider was supervising Grace Lopez, how much -- what percentage of her workday did Grace Lopez typically spend in the lower shop area?**

A   I don't think her -- at that time her working in the lower shop was too much different from the time that we worked.  It wasn't too much  different from, you know, the time that we worked in it.  I mean, everybody was in and out, so --

**Q   So when Grace Lopez worked under Mr. Hider, she worked in the shop about the same amount of time as when Grace Lopez worked under  later supervisors?  Is that what you're saying?**

A   Right.  I would say maybe a little less but about the same.

**Q   And what was it about the work that Grace was doing under Mr. Hider that made it so she didn't spend as much time in the lower shop?**

A   Nothing that I know of.  I mean --

**Q   What were the types of duties that Grace Lopez was doing under Hider?**

A   Basically, the same thing we were doing, I  guess, about as much -- she didn't have as much experience probably in -- you know, she probably didn't build anything, but she assisted a lot of times with us building things, you know.

**Q   Has that changed over time -- over her time with the National Zoo since you've been there?**

A   You mean as far as her experience?

**Q   Her work.**

A   Yeah, it did change.

She'd just spend a lot of time in –like we had, like, an upper shop/office space which she spent most of her time, you know.
(Bowden 12/04/07 Dep. Ts. at 118, Pl. Ex. 5).

"15. Mr. Hider never discriminated or retaliated against Plaintiff. Id.

**Bowden's Response:**  Mr. Hider's left the Zoo in 2001, before the events complained of in this lawsuit . (Bowden 02/20/08 Dep. Ts. at 190, Pl. Ex. 10.) Hider's actions are therefore immaterial and irrelevant to the case at hand and outside the scope of this lawsuit.

"16. Plaintiff admits that Grace Lopez used the vinyl signmaking machine before he ever arrived at the Zoo, and that she was good at using the machine, as were the others who had used it before Plaintiff arrived. Plaintiff's 12/4/07 Depo. at 75-77."

**Bowden's Response:**  Mr. Bowden did not therein, and does not in any way, concede or agree that Lopez's prior facility with the vinyl sign-cutting machine was sufficient grounds for the race-based task assignments in the exhibits department.  Mr. Bowden also testified, in that same passage, that "everybody" was good at using the vinyl sign-cutting machine.  (Bowden 12/4/07 Dep. Ts. at 75-77, Pl. Ex. 5).  Although Ms. Lopez was allowed to develop a niche doing the work, vinyl sign cutting was something that "anybody" could do.  (Robinson Dep. Ts. at 60-61, 137, Pl. Ex. 2.) However, it is undisputed that Ms. Lopez's disproportionate responsibility for vinyl sign production meant that she spent much less time in the lower workshop than the other Exhibits Specialists.  (*See, e.g.,* Krebs Dep. Ts. at 134, Pl. Ex. 3.)

"Hostile" Meetings"

"17. Plaintiff also complains of hostile meetings, but has explained that by this he meant that his supervisor, Ms. Samiy would say in meetings things like: "you are going to do as I ask you to do." Plaintiff's 2/20/08 Depo. at 65-66.

---

**Q   Okay.  How did Grace Lopez's work change after -- over time?**

A   She was more so -- she had a cushy job more so at, you know, the time; that she'd just spend a lot of time in -- like we had, like, an upper shop/office space which she spent most of her  time, you know.

**Bowden's Response:** Paragraph 17 seriously misrepresents Mr. Bowden's testimony on p. 66, which states:

> After Ernie had filed his complaint and how she [Ms. Samiy]would raise her voice and holler and scream and foam at the mouth at us. . . .It wasn't like, okay, somebody is asking you to do something . . it was more go hostile. . . Bowden 2/20/08 Dep. Ts. at 66, Pl. Ex. 10

Mr. Bowden thus testified in vivid detail the basis for his allegations that the tone, tenor, content and purpose of certain staff meetings called and chaired by Ms. Samiy was to harass him and were in furtherance of creating a hostile working environment. (Bowden 02/20/08 Dep. Ts. at 66, Pl. Ex. 10.) He testified elsewhere about Ms. Samiy's overall hostility and "attitude." (Bowden 12/04/07 Dep. Ts. at 198-199, Pl. Ex. 5.)

Mr. Bowden's co-worker Ernest Robinson (black male) corroborated the harassing tone toward Mr. Bowden adopted by Samiy during staff meetings. (Robinson Dep. Ts. at 239, Pl. Ex. 2) (hostile "in her tone of voice"), as did Judy Tasse, Grace Lopez, and Herman Krebs in their affidavits concerning Samiy's treatment of Bowden (and other males, especially black males, on staff). *See* Lopez, Krebs, and Tasse affidavit excerpts from ROI case No. 04-16-080604, Pl. Exs. 6, 8, and 12. Robinson noted that Samiy and Dolnick spoke harshest to the black males in the department. (Robinson Dep.Ts. at 41, Pl. Ex. 2.) *See also* affidavit of Melissa Gaulding, documenting Ms. Samiy's imperious and abusive treatment of Mr. Bowden. [Gaulding affidavit, ROI Case No. 04-16-080604, Tab. 14, p. 4 (Pl. Ex. 13.)] Aaron Ferster also described Ms. Samiy's "hostile and inappropriate management activities" in great detail (Ferster affidavit, ROI case No. 04-16-080604, tab 8, pp.2-4, Pl. Ex. 17.) *See also* Ferster Dep. Ts. at 155-57, Pl. Ex. 19. (Samiy threatened to withhold Ferster's sick leave, yet never threatened women).

Mr. Ferster's detailed testimony bears repeating at length:

"the tone . . changed from what I would characterize as 'mismanagement' to 'hostile' shortly after Lynn Dolnick . . .hired Kathleen Samiy to lead the office as the supervisor. Ms. Samiy cultivated a hostile work environment, in which employees, particularly males, were regularly subjected to threats of official reprimand, hostile and accusatory confrontations, ambiguous work responsibilities for which they would be 'held accountable,' and threats ranging from withholding of sick and annual leave to outright dismissal.  Throughout, Ms. Dolnick openly supported and sided with Ms. Samiy, effectively facilitating and encouraging the hostile atmosphere. (Ferster affidavit, ROI case No. 04-16-080604, tab 8, pp. 2-4, Pl. Ex. 17.)

Ferster reaffirmed his affidavit during his deposition, where he confirmed Samiy's hostile

treatment.  (Ferster Dep. Ts. at 107, Pl. Ex. 19.)  Ferster also reaffirmed his testimony that

Dolnick and Samiy treated whites better than blacks.  (Ferster Dep. Ts. at 169-71,Pl. Ex. 19.)

"18. Elsewhere, Plaintiff claimed that it was harassment simply to expect him to attend meetings with supervisors, because he was not able to keep up with upcoming projects, which made him feel uncomfortable. See Plaintiff's May 19, 2005 Affidavit  (Plaintiff's Depo. Ex. 85) at 2; Baxter Depo. at 160-70."

**Bowden's Response:**  Plaintiff admits.

The Panda House

"19. Plaintiff also complains that he was scolded by Mr. Baxter when Plaintiff and a coworker went to the Panda House where they were to hang banners. Plaintiff's 2/20/08 Depo. at 225-30."

**Bowden's Response:**  Defendant's euphemistic characterization of Mr. Baxter's tirade as

a "scolding" soft-pedals the importance and emotional impact of the event at issue.  Mr. Baxter

even admitted that he failed to conduct himself as "professionally as [he] would have liked to."

(Baxter Dep. Ts. at 220, Pl. Ex. 11.) In that context, his self-serving description of his demeanor

toward Mr. Bowden and his co-worker Sherod Mangum as merely "animated," (*see* Par.24,

below), defies credulity. Mr. Mangum described Baxter's demeanor that day as "noticeably

agitated." (Sherod Mangum Response to Interrogatories, ROI Case No. 06-13-052606, Tab F6,

Response #7) (Pl. Ex.18.)

"20. Plaintiff admits that his supervisor had explicitly instructed the workers to call him when they were ready to hang the banners. Plaintiff's 2/20/08 Depo. at 226."

**Bowden's Response:**  The record citations documenting Mr. Bowden's inspection of the Panda House, his approach to the project, Mr. Baxter's initial work assignment, and the sequence and course of actions relating to the Panda House incident are fiercely contested. For example, Mr. Baxter says that Mr. Bowden and his colleague waited "10 to 15 minutes," (Baxter Dep. Ts. at 219, Pl. Ex. 11) while Mr. Bowden says it was "five to 10 minutes." (Bowden 2/20/08 Dep. Ts. at 227, Pl. Ex. 10.) Mr. Baxter says that Mr. Bowden called him from the Panda House saying he was "up here trying to hang the posters, but we have some questions, (Baxter Dep. Ts. at 219, Pl. Ex. 11) while Mr. Bowden testified that he did not have the banners with him when he made the call, nor was he actually ready to hang the banners when he made the call. (Bowden 2/20/08 Dep. Ts. at 226-7, Pl. Ex. 10.) Furthermore, as detailed in response to paragraph 22, below, Mr. Bowden and Mr. Mangum were being pro-active and efficient in their use of time and resources by calling Mr. Baxter when they had taken stock of the situation at the Panda House. At the very least, the incident arose from serious miscommunication, but it quickly escalated into yet another occasion for harassing Mr. Bowden.

"21. Mr. Baxter was upset when he arrived to find the workers waiting around unable to proceed with the task because they had not followed his explicit instructions to give him a call first. Baxter Depo. at 218-21."

**Bowden's Response:**  This is a material issue. See Responses to Par. 19 and 20, above. In addition, Mr. Baxter's deposition testimony euphemistically, and self-servingly describes his demeanor as "animated." See Par. 24 below. Defendant now changes course and describes Baxter variously, as "upset," during the interchange.

Furthermore, Mr. Bowden believes that Mr. Baxter overreacted because he (Mr. Baxter) had just been interviewed by EEO investigators, and remained agitated as a result. (Bowden Dep. Ts. at 229; 289, Pl. Ex. 10.)

"22.The reason Mr. Baxter wanted to be called was so that he could explain the task and not have his workers waiting around doing nothing. See Baxter Depo. at 219-20.

**Bowden's Response:** To the extent Mr. Baxter's self-serving attributions of benign motives are relevant, this testimony underscores the radically differing evidence concerning the Panda House issue, and demonstrates that the question cannot be resolved at this point in the litigation, and thus needs to go to trial. *See* Mr. Bowden's response to Par. 20, above.

In addition, Mr. Baxter's deposition testimony originally (in euphemistic and self-serving terms) soft-pedaled his demeanor as "animated." *See* Par. 24, below. Defendant now describes him as "upset." Both descriptions are extremely subjective terms, and determination of the sequence of events—reported in radically opposed testimony from Mr. Baxter, Mr. Mangum, and Mr. Bowden—is not capable of resolution at summary judgment.

"23. Plaintiff admits that he and his coworker ended up waiting some time for Mr. Baxter to arrive and told him so. See Plaintiff's 2/20/08 Depo. at 227; Baxter Depo. at 219-20."

**Bowden's Response:** This is a misstatement. Mr. Bowden testified that he waited no longer than "about maybe five or 10 minutes or so," (Bowden 2/20/08 Dep. Ts. at 227, Pl. Ex. 10) **not "*some time.*"** Furthermore, Mr. Bowden stated that he and the co-worker were *already* in the area of the panda house "doing something else and we were really close to that area, so . . . they decided to take the initiative and "swing the truck out" to check out the panda house. (Bowden 2/20/08 Dep. Ts. at 228, Pl. Ex. 10.) *See also* Mangum Response to Interrogatories, Response #7, Pl. Ex. 18. (Bowden and Mangum decided to be "pro-active."). Mr. Bowden was

therefore making efficient use of his and his co-worker's time—as well as Mr. Baxter's—by combining two chores.

"24. Because Mr. Baxter was upset, he was animated in asking them why they had not called him. Baxter Depo. at 220."

**Bowden's Response:**  Mr. Bowden's eyewitness testimony directly refutes this euphemistic and extremely watered-down characterization of Baxter's behavior on the day in question. Mr. Bowden testified that Mr. Baxter "just came up and exploded" at him and his co-worker Mr. Mangum. (Bowden Dep. Ts. 288-89.) "There were tourists there" and "it was embarrassing" for Mr. Bowden and Mr. Mangum.  *Id.*  In short, this was a humiliating episode. Defendant's euphemism, "animated," conceals the full force of rage and fury Baxter vented at Bowden and his co-workers. Nor does the bland, deceptively benign term "animated" begin to capture the full brunt of the humiliation endured by Mr. Bowden and others to be screamed at and dressed down in front of visiting members of the public who were standing at the Panda Exhibit that day. *Id.*   Mr. Mangum described Baxter as "noticeably agitated." (Mangum Interrogatory Answers, Response #7, Pl. Ex. 18.)

"25. Plaintiff describes the discussion: Mr. Baxter "got really loud, and a little belligerent, and started hollering; and said, you know, well what if I had been in a meeting. . ." Plaintiff's 2/20/08 Depo. at 227."

**Bowden's Response:**  This contrasting description of the interchange (Bowden's use of the terms "belligerent . . .hollering," versus Baxter's  "animated", par. 24, above) again shows that the circumstances surrounding this incident are incapable of resolution at summary judgment.  Either Mr. Baxter is not telling the truth here, or he was apparently so consumed by his rage at Mr. Bowden and Mr. Mangum that he retained no recollection of his surroundings that day, testifying that he "didn't know" if there were visitors present during the incident. (Baxter Dep. Ts. at 220, Pl. Ex. 11.) The issue of what actually happened regarding this

18

conflicting testimony, and Mr. Baxter's credibility must be examined at trial (as well as Mr.

Bowden's and Mr. Mangum's credibility).

"26. Plaintiff did not lose any pay or benefits as a result of the events at the Panda House. See Plaintiff's 2/20/08 Depo. at 230."

**Bowden's Response:** Mr. Bowden testified that he "lost a lot of sleep. Many sleepless

nights." (Bowden 2/20/08 Dep. Ts. at 230, Pl. Ex. 10.) He has therefore suffered compensable

damages from these events due to the additional anxiety, stress, and their attendant physical and

emotional traumas. *See* Bowden October 8, 2004 Affidavit, ROI Case No. 04-16-080604, Tab 5,

damages assessment, Pl. Ex.16; *See also* Second Amended Complaint ¶ 46.

<u>Scheduling Sick Leave</u>

"27. Plaintiff complains that he was asked to schedule sick leave, where possible. See Plaintiff's 2/20/08 Depo. at 154-56, 206; Exhibits 7-8 (Plaintiff's Depo. Ex. 56-57)."

**Bowden's Response:** Mr. Bowden agrees that he has complained of being asked to

"schedule" his sick leave, but Defendant has used an erroneous deposition citation. Pages 154-56

of the February Bowden deposition transcript are *not* related to the sick leave issue. Mr.

Bowden's supervisor at the time, Mr. Baxter, does not deny that he said this to Mr. Bowden.

(Baxter Aff., ROI 05-10-031805, Tab F3, p. 6, ¶14, Pl. Ex. 14.)  Furthermore, as Mr. Bowden

explained in response to paragraph 37, below, this irrational request (to schedule his sick leave

"ahead of time") was imposed on Mr. Bowden immediately upon his return from sick leave after

suffering stress in connection with wrongful discipline. Mr. Bowden suffered compensable

financial damages from these events due to the additional anxiety, depression, stress, and their

attendant physical and emotional traumas. *See* Bowden October 8, 2004 Affidavit, ROI Case

No. 04-16-080604, Tab 5, damages assessment, Pl. Ex. 16; *See also* Second Amended Complaint

¶ 46.

"28. Plaintiff admits, however, that he was never denied sick leave because of his request for leave was made too late to satisfy his supervisor. See Plaintiff's 2/20/08 Depo. at 206."

**Bowden's Response:** Mr. Bowden complains of a hostile environment, one element of which is that his supervisors subject him to yet another element of disparate treatment, here consisting of unpleasant, overbearing supervision, of which the advance requests for sick leave were merely one element. Mr. Bowden does not seek compensation for unpaid sick leave for the years 2004-05. Mr. Bowden suffered compensable damages from these events due to the additional anxiety, stress, and their attendant physical and emotional traumas. *See* Bowden October 8, 2004 Affidavit, ROI Case No. 04-16-080604, Tab 5, damages assessment, Pl. Ex. 16; *See also* Second Amended Complaint ¶ 46.


"Performance Ratings"

"29. Plaintiff alleged, for instance, that in May 2004 and March 2005 he received performance ratings of "fully successful." Second Amended Complaint, ¶ 23®[sic]."

**Bowden's Response:** The "Fully Successful" performance ratings represented a significant and sudden marked reversal in Mr. Bowden's long career of nearly uniform top ratings (outstanding and highly successful). (Bowden October 8, 2004 Affidavit, ROI Case No. 04-16-080604, Tab 5, p. 14, Pl. Ex. 16.) *See also* Lopez affidavit, ROI Case No. 04-16-080604, Tab. 12, ¶. 3, p. 4, Pl. Ex. 6) (Bowden's work was consistent throughout the evaluation period;) Krebs Aff., ROI Case No. 04-16-080604, Tab 9, p. 7, Pl. Ex. 8 (Bowden's performance did not drop in 2004); *See also* Krebs Dep. Ts. 194, Pl. Ex. 3 (affirming Affidavit testimony.) *And see* Melissa Gaulding Aff., ROI 04-16-080604, Tab 14, p. 3, Pl. Ex. 13 (Mr. Bowden's Rating went down without any notice to him that his performance had changed); Gaulding Aff., ROI 04-16-080604, Tab 14, p. 4, Pl. Ex. 13 (Mr. Bowden appeared to be working harder than when he

received a higher rating under an earlier supervisor); Robinson Dep. Ts. at 225-6, Pl. Ex. 2 (Mr.

Bowden was always exceptional, and better than "Fully Successful.") Aaron Ferster testified

that Mr. Bowden always got the job done, (Ferster Ts. at 69-70, Pl. Ex. 19), and that Mr. Bowden

was a good worker who took pride in the National Zoo. (Ferster Ts. at 176, Pl. Ex. 19.)

      The 2004 Appraisal was suspect for additional reasons. Kathleen Samiy testified that her

superior, Lynn Dolnick, "didn't like" her (Ms. Samiy's) evaluations, and that Dolnick rewrote

many of them in around January 2004. (Samiy Dep Ts. at 128-130, Pl. Ex. 4.) Ms. Samiy was

unsure whether Dolnick changed the ratings for the various elements (*Id.*) Dolnick wrote the

2004 performance appraisal two months after Ms. Samiy had left; accordingly, Ms. Dolnick "had

no idea what anybody in the office did for that appraisal period." (Krebs Dep. Ts. at 127, Pl. Ex.

3.) In any event, Dolnick, who was Mr. Bowden's second-line supervisor, and not his immediate

supervisor, violated Agency procedures when she completed the contested 2004 performance

appraisal. *See* Smithsonian Directive 212, Federal Personnel Handbook, Chapter 430-4(j), at

ROI 05-510-031805, Tab G-7 (Pl. Ex. 15) (requiring immediate supervisors to do evaluations.)

      There is other evidence that Kathleen Samiy tampered with employee evaluations. Aaron

Ferster discovered that Samiy had changed and downgraded his performance appraisals after

they had been tallied and turned in. (Ferster Dep. Ts. at 147, Pl. Ex. 19.) Ms. Samiy lied about

her actions when confronted with evidence of the changed documents. (Ferster Dep. Ts. at 172-

73, Pl. Ex. 19.)

      There is also evidence that Mr. Bowden's evaluation was lowered in retaliation for his

EEO activity. (Bowden 02/20/08 Dep. Ts. at 230, Pl. Ex. 10.) *See* Gaulding Aff., ROI 04-16-

080604, Tab 14, p. 4, Pl. Ex. 13 (lower performance rating one way Bowden was punished for

speaking out against Agency discrimination and mismanagement.) Finally, there is evidence—

and suspicion—that the performance appraisal was lowered to justify, after the fact, the failure in

March 2004 to select Mr. Bowden for the supervisory exhibits position for which he had twice

applied. (Robinson Dep. Ts. at 219, 224, Pl. Ex. 2.)

Mr. Bowden also contests the lowered rating in the 2005 performance appraisal signed by

Mr. Baxter. Bowden should have scored the highest level for each element of the appraisal.

(Bowden 02/20/08 Dep. Ts. at 210-211, Pl. Ex. 10.)

"30. The fully successful ratings indicated that Plaintiff had "met" each of the critical
elements of his job, but offered praise and constructive criticism in several areas. *See* Exhibit 9
(2004 Performance Appraisal Form); Exhibit 10 (2005 Performance Appraisal Form).

**Bowden's Response:**  Mr. Bowden contests both performance appraisals. *See* Response

to 29, above.   He has also stated that the "whole" 2004 form was "inaccurate" (Bowden

12/04/07 Dep. Ts. at 135, Pl. Ex. 5.) Mr. Bowden also strenuously objected to the lowered

rankings. (Bowden 02/20/08 Dep.Ts. at 262, 290, Pl. Ex. 10.) The 2004 "Fully successful" rank

was a drop of two full rankings below any previous rating of Mr. Bowden, and was at least one

ranking below any peer's. (*See* citations in response to 29, above; *See also* Bowden 02/20/08

Dep. Ts. at 257, Pl. Ex. 10.) The fairness and accuracy of the ratings themselves are therefore at

issue.  The evidence shows that Mr. Bowden's performance did <u>not</u> drop in this time.  (Bowden

October 8, 2004 Affidavit, ROI Case No. 04-16-080604, Tab 5, p.14, Pl. Ex. 16; *See also* Ferster

Dep. Ts. at 69-70, Pl. Ex. 19; *See* also Krebs Testimony ROI Case No. 04-16-080604, Tab 9, p.

5, Pl. Ex. 8.) In marked contrast, Mr. Bowden's white and female co-workers' ratings did not

drop during this time. (*See, e.g.*, Lopez affidavit, ROI Case No. 04-16-080604, Tab. 12, ¶. 3, p.4,

Pl. Ex. 6.)

The 2004 Form is inherently unreliable for the additional reasons set forth in 29, above,

including Ms. Samiy's departure, Ms. Dolnick's unfamiliarity with Mr. Bowden's performance,

evidence of reprisal, and evidence of racial bias. Finally, Mr. Bowden incorporates by reference his Response to Par. 29, above, as if set forth fully.

<u>"The Elena Lopez Assault and Failure To Take Action:"</u>

**Bowden's Response:** Mr. Bowden notes that this section of Defendant's Statement of Material Facts as to Which there is No Genuine Dispute, comprising paragraphs 31 through 34, presents the "facts" out of chronological order, and thus distorts the actual sequence of events relating to Mr. Bowden's concern about Elena Lopez's erratic, violent behavior and her later unprovoked-- and unpunished --assault on him. Elena Lopez's assault of Mr. Bowden described in paragraphs 31-34 of Defendant's Statement of Material Facts actually took place six months *after* the events described in paragraphs 35-37 of Defendant's Statement. That is to say, Mr. Bowden had warned management of Elena Lopez's erratic and aggressive behavior *more than six months before* she assaulted him. (The assault is referred to in paragraphs 31-34). Mr. Bowden had specifically alerted Mr. Baxter to Elena Lopez's physical aggressiveness, and "told him that she was doing things like bumping [him] and blocking doorways." (Bowden 2/20/08 Dep. Ts. at 216, Pl. Ex. 10.) Yet Mr. Bowden was singled out for a reprimand for his private expression of concern to a supervisor, Charles Fillah, while Lopez was apparently not held accountable for her violence towards co-workers, and indeed remained free to continue to assault and attack her co-workers. *See also* Mr. Bowden's responses to Pars. 35-39, below.

"31. Plaintiff complains that another employee, Elena Lopez, had used her body to push him and others out of the way on at least two occasions. Plaintiff's 2/20/08 Depo. at 177-78, 212-1 Plaintiff believes that Elena Lopez was angry with Plaintiff because she blamed him for how her friend, Kathleen Samiy was being treated by the agency. Plaintiff's 2/20/08 Depo. at 218-20. 225; Complaint, ¶¶ 35-39."

**Bowden's Response:** Defendant Agency had admitted that it was on notice of Ms. Lopez's physical attack on Mr. Bowden. *See* Defendant's Answer to Plaintiff's Second Amended Complaint of Employment Discrimination and Breach of Contract, ¶36-37. (Admitting "that Plaintiff reported that he had been assaulted by Lopez to Mr. Baxter, Mr. Fillah, Ms. Ades and the National Zoological park police.") Mr. Bowden's testimony that Ms. Lopez had assaulted him was corroborated by Mr. Robinson, (Robinson Dep. Ts. at 120, Pl. Ex. 2); Mr. Krebs, (Krebs Dep. Ts. at 217, Pl. Ex. 3); and Mr. Baxter, who was standing next to Mr. Bowden at the assault (Baxter Dep. Ts. at 157, Pl. Ex. 11); and in Mr. Bowden's subsequent report to Park Police. (Bowden 02/20/08 Dep. Ts. at 223-4, Pl. Ex. 10.)

Defendant's counsel elicited inadmissible speculative testimony from Mr. Bowden concerning Ms. Lopez's alleged frame of mind, and Counsel for Mr. Bowden properly objected to this speculative testimony. (Bowden 02/20/08 Dep. Ts. at 219, Pl. Ex. 10.) The testimony in Par. 31 therefore is contested, at issue, and may not be used to establish a "material" fact.

"32. Plaintiff felt that when he was "rammed" by Elena Lopez, the agency should have done more to protect him. Complaint, ¶ 39.1 Plaintiff admitted that he was not injured by Elena Lopez in the incident. Plaintiff's 2/20/08 Depo. at 215-16.

**Bowden's Response:** Given that Mr. Bowden had warned management of Elena Lopez's erratic behavior more than six months earlier, Mr. Bowden correctly believed that the Agency could have done more to protect him. Mr. Bowden had specifically alerted Mr. Baxter to Elena Lopez's physical aggressiveness, and "told him that she was doing things like bumping [him] and blocking doorways." (Bowden 2/20/08 Dep. Ts. at 216, Pl. Ex. 10.) Although he fortunately escaped physical injury from the May, 2005 assault, Mr. Bowden suffered and continues to suffer, compensable damages from the incidents creating the hostile environment— including the physical assault by Ms. Lopez-- due to the additional anxiety, depression, stress,

and their attendant physical and emotional traumas. *See* Bowden October 8, 2004 Affidavit, ROI Case No. 04-16-080604, Tab 5, damages assessment, Pl. Ex. 16; *See also* Second Amended Complaint ¶ 46.

"33. Mr. Baxter noted that he saw Elena Lopez carrying cakes for a bridal shower, recognized that Plaintiff had reacted for some reason, and later assured Plaintiff that he had spoken to Elena Lopez's supervisor about the incident and intended to make the work environment a good and comfortable place to work. See Baxter Depo. at 155-57 and Baxter Depo. Ex. 20 - Ex. 25 (Exhibits 11-16).

**Bowden's Response:**  Mr. Baxter's self-described good intentions fail to mitigate the damages suffered by Mr. Bowden on account of the assault. Whether or not Mr. Baxter spoke to Ms. Lopez or wanted to make the Zoo a "good and comfortable work place" is immaterial. Mr. Bowden had specifically alerted Mr. Baxter to Elena Lopez's physical aggressiveness more than six months before the May, 2005 assault, having "told him that she was doing things like bumping [him] and blocking doorways." (Bowden 2/20/08 Dep. Ts. at 216, Pl. Ex. 10.)  Yet Mr. Baxter admits he failed to take any measures sufficient to prevent the attack on Mr. Bowden. In contrast, Mr. Bowden was punished for his candor.

Mr. Bowden suffered and continues to suffer, compensable damages from all of the incidents in this complaint that contributed to creating a hostile environment—including the physical assault by Ms. Lopez.  The assault was yet another incident compounding Mr. Bowden's anxiety, depression, stress, and their attendant physical and emotional traumas. *See* Bowden October 8, 2004 Affidavit, ROI Case No. 04-16-080604, Tab 5, damages assessment, Pl. Ex. 16 ; *See also* Second Amended Complaint ¶ 46.

"34. In fact, however, the incident was reported to the police, who investigated it and prosecution was declined. See *id*. Moreover, Plaintiff agrees, that after the incident with and investigation of Elena Lopez, she never ran into him again. Plaintiff's 2/20/08 Depo. at 222-25. Confirmation of Counseling Letter.

25

**Bowden's Response:** Defendant Agency admits that it was on notice of Ms. Lopez's physical attack on Mr. Bowden. *See* Defendant's Answer to Plaintiff's Second Amended Complaint of Employment Discrimination and Breach of Contract, ¶36-37. (Admitting "that Plaintiff reported that he had been assaulted to Mr. Baxter, Mr. Fillah, Ms. Ades and the National Zoological park police.") Mr. Bowden's testimony that Ms. Lopez had assaulted him was corroborated by Mr. Robinson, (Robinson Dep. Ts. at 120, Pl. Ex. 2); Mr. Krebs, (Krebs Dep. Ts. at 217, Pl. Ex. 3); and Mr. Baxter, who was standing next to him, (Baxter Dep. Ts. at 157, Pl. Ex. 11); and in Mr. Bowden's report to Park Police (Bowden 02/20/08 Dep. Ts. at 224, Pl. Ex. 10.)

The investigating park policeman told Mr. Bowden that, had the tables been turned, and he--a black male—assaulted a non-black female, Mr. Bowden would have been escorted off the property. (Bowden 02/20/08 Dep. Ts. at 224, Pl. Ex. 10.)

The fact that Elena Lopez did not attempt a second assault on Mr. Bowden is immaterial to his complaint, as is the discretionary decision of the D.C. prosecutor's office to decline to press charges on Mr. Bowden's behalf. These facts do not take away from the fact that Ms. Lopez had assaulted Mr. Bowden. Mr. Bowden suffered and continues to suffer, compensable damages from all the incidents in this complaint that contributed to creating a hostile environment—including the physical assault by Ms. Lopez. *See* Bowden October 8, 2004 Affidavit, ROI Case No. 04-16-080604, Tab 5, damages assessment, Pl. Ex. 16 ; *See also* Second Amended Complaint ¶ 46.

"35. Plaintiff complains that he was given a confirming counseling letter (Plaintiff's Depo. Ex. 68), reminding him that it was improper to describe a co-worker as a "crazy lady". See Complaint, ¶ 28(b); Plaintiff's Depo. Ex. 68).

**Bowden's Response:** Admitted. This incident exemplifies the continuing pattern of hostility and harassment to which the Agency subjected Mr. Bowden. Here Mr. Bowden was reprimanded for attempting to alert supervisors that Ms. Lopez behaved erratically and dangerously, while Ms. Lopez remained free to assault her co-workers. Ms. Lopez was never disciplined for her actions. (Bowden 02/20/08 Dep. Ts. at 288, Pl. Ex. 10; Krebs Dep. Ts. at 220, Pl. Ex. 3.)

There also is evidence that Baxter initially hesitated to send Mr. Bowden the "confirming counseling" memorandum, yet did so against his better judgment, under orders from his superior Charles Fillah. Mr. Baxter reportedly told Mr. Bowden that he "had no choice" but to send the memorandum. (Bowden 02/20/08 Dep. Ts. at 180, Pl. Ex. 10; Krebs. Dep. Ts. at 144, Pl. Ex. 3.)

"36. Plaintiff admitted using the term "crazy" in referring to Ms. Elena Lopez. Plaintiff's 2/20/08 Depo. at 176-77. And he further admitted that the counseling letter was written because Mr. Baxter's supervisor told Mr. Baxter that it was inappropriate to use the word crazy in describing Ms. Lopez. Plaintiff's 2/20/08 Depo. at 181-82. The letter, a copy of which was marked at Plaintiff's deposition as exhibit 69, specifically advised Plaintiff there would be no further action on the matter other than "to remind all staff that we work in an open office environment and that we need to be mindful of the content and volume of our conversation, including phone conversation . . ."

**Bowden's Response:** Defendant's misleading, selective use of the factual record leaves this material fact at issue. Mr. Bowden testified that his exact phrase was: "she must be crazy." (Bowden 02/20/08 Dep. Ts. at 176, 217, Pl. Ex. 10.) (*See also* Robinson Dep. Ts. at 116-117, Pl. Ex. 2.) Defendant isolates Mr. Bowden's use of the word "crazy" from its essential context. As is clear from his deposition testimony, Mr. Bowden made his statement in a perplexed tone of voice in response to direct questioning from his supervisors in what he had thought was a confidential setting --their office. (Fillah Ts. at 87, Pl. Ex. 7.) (Bowden described Ms. Lopez's actions to Mr. Fillah in the context of seeking help because Lopez had made false allegations against Mr. Bowden); (Bowden 02/20/08 Dep. Ts. at 177, 179, Pl. Ex. 10.) Mr. Bowden uttered

his remark in reaction to reports that Ms. Lopez had assaulted co-workers by shoving one into a copy machine, (Bowden 02/20/08 Dep. Ts. at 178, Pl. Ex. 10) and that she had also sprayed another co-worker in the face with a glass-cleaning solvent, (Krebs Dep. Ts. at 219, Pl. Ex. 3; Robinson Dep. Ts. at 229-230, Pl. Ex. 2; Ferster Dep. Ts. at 144-45, Pl. Ex. 19.) Mr. Bowden did not "describe" Elena Lopez as a 'crazy lady,' (Defendant's Exhibit 17,) but, rather, in response to reports of false rumors that Lopez was spreading, mused, colloquially that she "must be crazy." (Bowden 2/20/08 Dep. Ts. 176, 217, Pl. Ex. 10.) Furthermore, in a classic example of attacking the messenger for presenting an unwelcome message, Mr. Bowden was chided and officially "counseled" for his comment about Ms. Lopez, while Ms. Lopez was apparently never disciplined or remonstrated for her violent behaviors. (*See* Bowden 02/20/08 Dep. Ts. at 288, Pl. Ex. 10; Krebs. Dep. Ts. at 220, Pl. Ex. 3; Ferster Dep. Ts. at 144-45, Pl. Ex. 19.)

Mr. Baxter's self-serving testimony about creating a "good" workplace environment cited in paragraph 33, above, rings particularly hollow in the face of evidence that he resisted his better judgment and bowed to orders with from his superior Charles Fillah (with whom he, Baxter, would now have us believe he apparently disagreed) in order to personally write and send Mr. Bowden the counseling memorandum. Mr. Baxter told Mr. Bowden that he "had no choice" but to send the memorandum; but at the very least Mr. Baxter could have privately disagreed with Mr. Fillah about sending the memo-- before sending it anyway because he was ordered to do so.

(Bowden 02/20/08 Dep. Ts. at 180, Pl. Ex. 10; Krebs. Dep. Ts. at 144, Pl. Ex. 3.)

"37. The confirmation of counseling memorandum also stressed that the document "**will NOT be filed in your Official Personnel Folder.**" Id. (emphasis in original)."

**Bowden's Response:** The text of this memorandum speaks for itself. Nonetheless, Mr. Bowden was thereby subject to disparate treatment, in that supervisory personnel reprimanded

him yet failed to control Ms. Lopez. Elena Lopez was never disciplined. (Krebs Dep. Ts. at 220, Pl. Ex. 3.) At any rate, whether or not the memo was "filed" in Mr. Bowden's Official Personnel Folder was immaterial. It is still a negative action against an employee that affects him or her. Mr. Bowden testified that he had to be hospitalized and miss three days of work because of the stress created by this letter. (Bowden 02/20/08 Dep. Ts. at 180, Pl. Ex. 10.)

Furthermore, upon Mr. Bowden's return from the hospital, Mr. Baxter promptly added to Mr. Bowden's stress by demanding that Bowden start scheduling his sick leave "ahead of time." (*See* Defendant's Exhibit 7 to its Motion for Summary Judgment, Bowden May 19, 2005 affidavit, p. 2.) Mr. Bowden thus suffered and continues to suffer, compensable damages from the incidents creating the hostile environment—including the counseling memorandum and the physical assault by Ms. Lopez-- due to the additional anxiety, depression, stress, and their attendant physical and emotional traumas. *See* Bowden October 8, 2004 Affidavit, ROI Case No. 04-16-080604, Tab 5, damages assessment, Pl. Ex. 16; *See also* Second Amended Complaint ¶ 46.

"The Comments On Biking Clothes

"38. Plaintiff also complained that his supervisor commented on his wearing his biking clothes at work. Plaintiff's 12/4/07 Depo. at 162-65."

**Bowden's Response:**  Again, this uncontested statement is incomplete and misleading. There was no dress code at the zoo. (Bowden 12/04/07 Dep. Ts. 164, Pl. Ex. 5.) Yet Mr. Bowden's supervisor, Ms. Samiy, criticized Mr. Bowden for his clothing. (Bowden 12/04/07 Dep. Ts. at 162-65, Pl. Ex. 5; Krebs Dep. Ts. at 169-171, Pl. Ex. 3.) Mr. Bowden's white or female bike-riding colleagues were not similarly criticized for their biking clothes. For instance, Plaintiff's co-worker, Aaron Ferster, White, Jewish, was never criticized for wearing bike clothes. (Bowden 12/04/07 Dep. Ts. at 165, Pl. Ex. 5; *See also* Krebs Dep. Ts. at 196, Pl. Ex. 3;

Ferster Dep. Ts. at 55, Pl. Ex. 19.) Aaron Ferster and Grace Lopez, a Filipino-American woman,

rode their bicycles daily, yet Samiy never criticized them.  (Krebs Dep. Ts. at 223, Pl. Ex. 3;

Ferster Dep. at 55, Pl. Ex. 19.)

"39. No mention is made by Plaintiff that the discussion went beyond a comment. *Id.*"

**Bowden's Response:**  This "fact" is erroneous, incomplete, and misstates the record.

Mr. Bowden testified that Ms. Samiy "repeatedly" voiced criticism, not only regarding clothing,

but also regarding Mr. Bowden's bathroom use, his workplace whereabouts, and his daily

routine. Plaintiff's co-worker Herman Krebs corroborated the testimony. (Krebs. Dep. Ts. at 208,

Pl. Ex. 3.) *See also* Judith Tasse affidavit, ROI Case No. 04-16-080604, Tab 11, p. 3, Pl. Ex. 12.

To characterize Samiy's nonstop refrain as "a simple comment" misstates the record.  This

remains a genuine issue. The criticism also perpetuated the hostile environment endured by Mr.

Bowden, and contributed to the additional anxiety, stress, and their attendant physical and

emotional traumas. *See*  Bowden October 8, 2004 Affidavit, ROI Case No. 04-16-080604, Tab 9,

p.3., Tab 5, damages assessment, Pl. Ex. 16; *See also* Second Amended Complaint ¶ 46.

"Questioning about Plaintiff's whereabouts"

"40. Plaintiff also complains that when his supervisor has been looking for him and he
was not at his desk, the supervisor would ask him where he was, even when he was simply going
to the bathroom for 20 minutes. See Plaintiff's 2/20/08 Depo. at 206- 07, 287."

**Bowden's Response:**  This statement minimizes and mischaracterizes Mr. Bowden's

deposition testimony. Mr. Bowden testified that Ms. Samiy constantly, frequently asked Mr.

Bowden to account for his whereabouts, "more than 50 times."  (Bowden 02/20/08 Dep. Ts. at

206-10, Pl. Ex. 10.) The questioning was "fairly constant."(Krebs Dep. Ts. at 208-210, Pl. Ex. 3.)

Samiy did not subject anyone else to the same treatment. (Bowden 02/20/08 Dep. Ts. at 98-99,

Pl. Ex. 10.) Mr. Bowden's supervisor, Kathleen Samiy, however, denied she ever asked him his

30

whereabouts. (Samiy Dep. Ts. at 144-5, Pl. Ex. 4.) This contradictory evidence creates an additional issue of fact.

Mr. Bowden's next supervisor, Mr. Baxter, also frequently quizzed Mr. Bowden concerning his whereabouts when Bowden had simply been in the park, working on assignment. (Bowden 02/20/08 Dep. Ts. at 209, Pl. Ex. 10.) Additional record testimony confirms that Mr. Bowden was singled out for this harassment, alone among his co-workers. (Tasse affidavit, ROI Case No. 04-16-080604, Tab 11, p.3, Pl. Ex. 12.) Whites were not asked their whereabouts. (Bowden 02/20/08 Dep. Ts. at 294, Pl. Ex. 10; Ferster Dep. Ts. at 69-70, Pl. Ex. 19) (Ferster, a white male, was never monitored). Mr. Bowden did not go to the bathroom more than his co-workers. (Ferster Dep. Ts. at 98, Pl. Ex. 19.)

"The Attempt To Postpone Desk Audit"

"41. Plaintiff asserts that there was an "attempt[] to postpone" his desk audit on October 16, 2003, but that it went forward on October 17, 2003, yet the audit did not recite many of his duties. Second Amended Complaint, ¶ 23(e)-23(g).

**Bowden's Response:** Plaintiff admits. The allegations speak for themselves.

"42. Plaintiff admits that the audit was not postponed, and he was given the opportunity to participate in another desk audit, but refused. Id.; Plaintiff's Depo. Ex. 40"

**Bowden's Response:** The text of Mr. Bowden's e-mail, attached to Defendant's MSJ as Defendant's Ex. 35, goes on to explain his reasoning behind Mr. Bowden's decision to abandon his pursuit of a fair, accurate desk audit:

> I feel that I have given the auditor all of the info that was needed for him to make a clear and accurate assessment of what my job is. However, due to false info that was given to him by management the audit was not fact-based.

### 42a-p: Bowden's Supplemental Response Supporting Counts One Through Six:

In its zeal to oppose Counts one through six of Mr. Bowden's Second Amended complaint (the "Hostile Environment Claims"), Defendant selectively omits key evidence

supporting Mr. Bowden's allegations of a hostile work environment of racial animus, favoritism, and bias. The following unrefuted evidence supporting these claims is also material to Mr. Bowden's complaint of employment discrimination based on a hostile environment:

a. Jeff Baxter, the white man who was selected for the supervisory position over Mr. Bowden, referred to the African-American employees in the Exhibits Department as "you people" on three separate occasions (Robinson Dep. Ts. at 70, 231, Pl. Ex. 2; Bowden 02/02/08 Dep. Ts. at 282-285, Pl. Ex. 10).

b. Baxter admitted he "may have said" this ("you people.") (Baxter Dep. Ts. at 113, Pl. Ex. 11.)

c. Baxter also told the African-American employees, and not the white employees, that they had to "earn his trust." (Robinson Dep. Ts. at 70, Pl. Ex. 2); (Bowden 02/20/08 Dep. Ts. at 284, Pl. Ex. 10). Baxter admitted he said this. (Baxter Dep. Ts. at 111-12, 118, 122, Pl. Ex. 11.) Baxter conceded he may have damaged race relations by making the comment to the three African-American employees in his department, Ernest Robinson, Sherod Mangum, and Mr. Bowden. (Baxter Dep. Ts. at 123-24, Pl. Ex. 11.)

d. Baxter made inappropriate, racist jokes about Asians. (Robinson Dep. Ts. at 232, Pl. Ex. 2.)

e. Baxter made an offensive racist comment to Mr. Robinson concerning the angle of his baseball cap, accusing Mr. Robinson of having an "attitude." (Robinson Dep. Ts. at 70, 152-55, Pl. Ex. 2.) Baxter tried to laugh it off as the type comment that he'd previously directed toward his brothers; Mr. Robinson was not persuaded, and viewed the "joke" as another indication of Baxter's insensitivity and racism. (Robinson Dep. Ts. at 155, Pl. Ex. 2.)

f. One black co-worker in the Exhibits Department was so stressed and traumatized by harsh treatment from Ms. Dolnick that he had a nervous breakdown and was forced to retire. (Robinson Dep. Ts. at 222-224, Pl. Ex. 2.)

g. Baxter required Mr. Bowden to clean animal feces off the wall of the Giraffe House, even though Mr. Bowden was not on the maintenance staff, and therefore lacked proper inoculations against TB and other contagious feces-borne animal diseases. (Bowden 2/20/08 Dep. Ts. at 278-80, Pl. Ex. 10.) TB was a special hazard at the Giraffe House, because an elephant, who was also apparently housed in the Giraffe House, had died of TB. *Id.*

h. Whites were never reprimanded for tardiness after extended coffee breaks. (Robinson Dep. Ts. at 236, Pl. Ex. 2.)

i. Whites were not asked their whereabouts. (Bowden 02/20/08 Dep. Ts. at 98, 287, 294, Pl. Ex. 10; Ferster Dep. Ts. at 69-70, Pl. Ex. 19.)

j.    Whites were allowed to work from home; Blacks were not. (Robinson Dep. Ts. at 239, Pl. Ex. 2); (Bowden 02/20/08 Dep. Ts. at 285-86, Pl. Ex. 10.)

k.    Whites were allowed to work "flextime" hours; Blacks were not. (Bowden 02/20/08 Dep. Ts. at 164-65, Pl. Ex. 10.)

l.    Several whites received promotions to GS-12 through accretion of duties, but no Blacks. (Bowden 02/20/08 Dep. Ts. at 133-34, Pl. Ex. 10.)

m.    Lynn Dolnick was the daughter of wealthy donors who gave substantial donations to the non-profit "Friends of the Zoo" organization, (Krebs Dep. Ts. at 196-98, Pl. Ex. 3). Dolnick herself "left" the Zoo not long after several male employees in the Exhibits department, including Mr. Bowden, filed a "notice of intent" to file a discrimination complaint against her. (Krebs Aff., ROI Case No. 04-16-080604, Tab 9, p. 3, Pl. Ex. 8.)

n.    Kathleen Samiy disclosed confidential medical information about Mr. Bowden's condition, including details of his mental illness and course of treatment, in staff meetings. (Dolnick Dep. Ts. at 55-58, Pl. Ex. 1; Bowden Dep. Ex. 53, Pl. Ex. 10.)

o.    Samiy specifically told Mr. Bowden's co-workers to be careful around him because he had a mental disorder and was on medication. (Bowden EEO Complaint, ROI Case No. 04-16-080604, Exhibit 5A, p. 6, Pl. Ex. 16.)

p.    Samiy left confidential medical leave sign-out sheets posted publicly, so that Mr. Bowden's personal information was out in the open for all to see. [Bowden Dep. Ex. 53, Pl. Ex. 10; ROI Case No. 05-10-031805— May 19, 2005 Affidavit of Anthony Bowden, Pl. Ex. 21 (Also Defendant's Exhibit 5.)]

q.    Lynn Dolnick fired Kathleen Samiy, but allowed Samiy to stay on the payroll six months after she was asked to leave the zoo. (Dolnick Dep. Ts. at 21-22, Pl. Ex. 1; Krebs Aff., ROI Case No. 04-16-080604, Tab 9, p. 3, Pl. Ex. 8.)

r.    Mr. Bowden believes Samiy was fired because of her treatment of him. (*See* Bowden EEO Complaint, ROI Case No. 04-16-080604, Exhibit 5A, Pl. Ex. 16 [Rebuttal to Mary Tanner aff.])

The Non-Selection (Counts VII-X)."

"43. The position of Supervisory Exhibits Specialist was posted on August 18, 2003 as Vacancy Announcement No. 03SP-1309. See Exhibit 19 (2003 Vacancy Announcement)."

**Bowden's Response:** This statement is incomplete. The record shows that, in advance of the August posting of this position, and in violation of the Federal Office of Personnel Management procedures, Lynn Dolnick and Kathleen Samiy, Mr. Bowden's second-and-first-

line supervisor, respectively, discussed the opening with and interviewed possible candidates. Mr. Bowden learned this directly from a candidate, "Lance," who had been called in for interviews for the position. (Bowden 12/04/07 Dep. Ts. at 150-51, 153, Pl. Ex. 5.) Dolnick and Samiy interviewed at least one other candidate for the Supervisory Exhibits Specialist position, Becky Donnelly, around the same time. (Bowden 12/04/07 Dep. Ts. at 150-56.) There is evidence of communications between Samiy and potential recruits for the supervisory job. *See* Bowden 12/04/07 Dep. Ts. at175-183, Pl. Ex. 5. Melissa Gaulding, a co-worker in the Exhibits department, provided Mr. Bowden with a copy of private e-mail correspondence dated August 26, 2003,  documenting Becky Donnelly's pre- posting interview with Dolnick and Samiy. (Bowden Dep. Ts. at 175-182; Bowden Dep. Exhibit 15, Pl. Ex. 5.)

"44. The selecting official was not satisfied with the overall pool of candidates, which included persons who had never done production work. See Exhibit 20 Deposition of Lynn Dolnick (Dolnick Depo.") at 207-09."

**Bowden's Response:**  This explanation is fiercely contested. Mr. Bowden applied for this position on September 2, 2003. (Bowden 12/04/07 Dep. Ex. 12; Bowden 12/04/07 Dep. Ts. at 142-43 147-49, Pl. Ex. 5) This was the second time he applied for a promotion within the Exhibits Department. (Bowden 12/04/07 Dep. Ts. at 148, Pl. Ex. 5), and Ms. Dolnick claims she urged him to apply for the position (Dolnick Dep. Ts. at 206, Pl. Ex. 1.) Yet Ms. Dolnick withdrew the vacancy announcement after Mr. Bowden applied, and cancelled his interview for the position. (Bowden 12/04/07 Dep. Ts. at 149, Pl. Ex. 5.)

There is a great deal of evidence discrediting Ms. Dolnick's (the selecting official) self-serving testimony concerning her alleged reasons for "dissatisfaction with the pool of candidates." First, there is evidence that Ms. Dolnick held stereotyped, antiquated views of the type of work suitable for African-American employees. This evidence creates doubts concerning

34

any testimony in which she describes her motives behind rejecting a short list of candidates for

Exhibits Supervisory when it included Mr. Bowden, an African-American. Also, Lynn Dolnick

and Melissa Gaulding told Mr. Bowden and Mr. Robinson that they were seen as the "broad

shoulders" of the Production Department. (Bowden 12/04/07 Dep. Ts. at 160-161, Pl. Ex. 5.)

Others have testified that African-Americans were made to do the heavy lifting. (Bowden

October 8, 2004 Affidavit, ROI Case No. 04-16-080604, Tab 5, p. 14, Pl. Ex. 16.)  Black men

were given the dirty work. (Ferster Dep. Ts. at 141-42, Pl. Ex. 19.)

Dolnick only promoted white and/or Jewish employees to ranks at or above GS-11.

(Bowden October 8, 2004 Affidavit, ROI Case No. 04-16-080604, Tab 5, pp.10, 13, Pl. Ex. 16);

*see also* Dolnick Dep. Ts. at 98-100, 103-107; 201, Pl. Ex. 1.)   African-American males could

not reasonably expect to cultivate the kind of relationship with Ms. Dolnick necessary to lead to

advancement at the Zoo.  (Aaron Ferster December 21, 2004 Affidavit, ROI Case No. 04-16-

080604, Tab 9, p. 3, Pl.  Ex.17). In the words of a white co-worker, Herman Krebs:

> Promotions were given almost exclusively to staff members of Jewish
> origin. Performance ratings were based on how 'comfortable' Ms. Dolnick felt
> with staff members rather than any professional considerations. . .and she felt
> uncomfortable both with men and with African Americans. . . ."(Krebs Affidavit
> ROI Case No. 04-16-080604, Tab. 9, pp.3; 4, Pl. Ex. 8.)

Another white, female, co-worker testified that she

> believed that the Complainant's race could have been a factor against him
> during the selection for the Supervisory Exhibits Specialist position, due to the
> institutional racism that appears to prevail in [the Exhibits] office.  There are no
> people of color in supervisory positions in this office, while the Production Unit
> workers are 100% minority." (Tasse affidavit, ROI Case No. 04-16-080604, Tab
> 11, pp. 3-4, Pl. Ex. 12.)

In fact, Ms. Dolnick never promoted any blacks as high as GS-12 during Mr. Bowden's

tenure at the Zoo, (Dolnick Dep. Ts. at 201, Pl. Ex. 1); although she testified that she did

promote Ernest Long, an African-American (Dolnick Dep. Ts. at 108, Pl. Ex. 1), in the 1990s.

Dolnick could not recall, however, whether she promoted Long any higher than GS-11. (Dolnick Dep. Ts. at 108, 123, Pl. Ex. 1.) Dolnick and Samiy were more comfortable with whites than blacks, and particularly black men.  (Ferster Dep. Ts. at 169-71, Pl. Ex. 19.)

There is also evidence that Ms. Dolnick vowed never to promote Mr. Bowden to a salary level equal to Mr. Bowden's first-line supervisor[2], Kathleen Samiy, a white woman, and that Ms. Dolnick laughed at the notion of Mr. Bowden being a supervisor.  (Bowden 02/20/08 Dep. Ts. at 77-79, Pl. Ex. 10.) There is additional evidence casting doubt on the integrity of the hiring process.  Apparently Ms. Dolnick went outside the official hiring process to recruit and interview candidates even before the official Vacancy Announcement was posted in August, 2003. *See* Response to Par. 43, above, incorporated by reference herein. Second, there is evidence that Dolnick introduced unorthodox, if not outright impermissible irregularities in the selection process. During the hiring of Kathleen Samiy for the position of production supervisor, Dolnick asked staff members of a lower grade level than the position being selected to provide her an advance review of candidates.  (Dolnick Dep. Ts. at 90-91, 219, Pl. Ex. 1.) In particular, she asked Melissa Gaulding and Susan Ades to help her decide who would be interviewed for the position of supervisory graphic and production specialist.  That is, Ms. Dolnick asked the lower-graded employees, GS-11 or below, to review applications for their next supervisor.  (Dolnick Dep. Ts. 90-91, 219-224, Pl. Ex. 1.)

Dolnick's testimony regarding the selection process for the position of Exhibits Manager cited in paragraph 44 is also contestable, creating a material issue of fact, because she had earlier testified that she encouraged and solicited Mr. Bowden's application ("I encouraged him many, many times to apply for this job" Dolnick Dep. Ts. at 206, Pl. Ex. 1) and told him that she was working on a promotion for him (Bowden October 8, 2004 Affidavit, ROI Case No. 04-16-

---

[2] Dolnick denied this allegation. (Dolnick Dep. Ts. at 202, Pl. Ex. 1.)

080604, Tab 5, p. 3, Pl. Ex. 16.) Yet the Agency now apparently concedes that Mr. Bowden was

never in serious contention, since Dolnick withdrew the Vacancy Announcement because she

was "not satisfied with the overall pool of candidates." (Dolnick Dep. Ts. at 207, Pl. Ex. 1.)

"45. Vacancy Announcement No. 03SP-1309 was cancelled and revised to place a greater emphasis on production skills. See Dolnick Depo. at 208-10."

**Bowden's Response:** Plaintiff admits that this was Ms. Dolnick's testimony, admits that

the vacancy announcement was cancelled, and admits that the revised version placed greater

emphasis on production skills. However, Plaintiff fiercely contests Ms. Dolnick's motivations

for taking the actions described in par. 45. As with paragraph 44, there is a great deal of evidence

discrediting Ms. Dolnick's self-serving testimony. This evidence is set out in Mr. Bowden's

response to paragraph 44, and incorporated by reference herein as if set forth fully. Furthermore,

there is evidence that the revisions added qualifications aimed at excluding Mr. Bowden from

qualifying for the position. (Krebs Dep. Ts. at 187-88, Pl. Ex. 3; Robinson Dep. Ts. at 217, 222,

Pl. Ex. 2; Krebs affidavit, ROI Case No. 04-16-080604, Tab 9, p. 3, Pl. Ex. 8.)

Dolnick's testimony cited in paragraph 44 creates a material issue of fact, because she

had earlier testified that she encouraged and solicited Mr. Bowden's application ("I encouraged

him many, many times to apply for this job," Dolnick Dep. Ts. at 206, Pl. Ex. 1) and told him

that she was working on a promotion for him (Bowden October 8, 2004 Affidavit, ROI Case No.

04-16-080604, Tab 5, p. 3, Pl. Ex. 16.) Yet the Agency now makes the inherently contradictory

claim that Ms. Dolnick wanted to "place more emphasis on production skills" and that Mr.

Bowden was therefore "arguably more qualified for the second," revised position. (Dolnick Dep

Ts. at 208-10, 211, Pl. Ex. 1.) If Ms. Dolnick truly wanted Mr. Bowden to apply for the job, and

therefore truly believed him qualified and suited to the position, then why did she withdraw the

position as soon as he took up the challenge and submitted his application?

"46. The position of Supervisory Exhibit Specialist was reposted as Vacancy Announcement No. 04SP-1005. See Exhibit 21 (2004 Vacancy Announcement)."

**Bowden's Response:**  Admit.  However, it must be emphasized that this position's reposting was not a neutral bureaucratic or administrative act.  Mr. Bowden shows that the reposting was motivated by discriminatory and retaliatory animus, aimed at disqualifying him from the newly revised position, and by reference to the facts set forth in response to paragraphs 43, 44, and 45, above.

There is also evidence that the revisions to the vacancy announcement were added for the purpose of excluding Mr. Bowden from qualifying for the position.  (Robinson Dep. Ts. at 217, 226, Pl. Ex. 2; Krebs Dep. Ts. at 187-188, Pl. Ex. 3.)  (*See also* Krebs Affidavit, ROI Case No. 04-16-080604, Tab 9, p.3, Pl. Ex. 8; *See also* responses to 52 and 53 below.)

"47. It is not unusual for management to revise a vacancy announcement to emphasize certain job elements to attract candidates with those skills. See Deposition of Mary Rowker Tanner ("Tanner Depo.") at 73-74."

**Bowden's Response:**   Mary Tanner's testimony concerning civil service hiring procedures regarding vacancy announcements is apparently being offered, without proper foundation, as an expert opinion under Federal Rules of Evidence 702 (Testimony by Experts), 703 (Bases of Opinion Testimony by Experts), 704(a) (Opinion on Ultimate Issue), and 705 (Disclosure of Facts or Data Underlying Expert Opinion). Ms. Tanner has not yet been identified as an expert in this case pursuant to Federal Rules of Civil Procedure 26(a)(2) (Disclosure of Expert Testimony),and the testimony is therefore not admissible for the purposes of deciding a motion for summary judgment. It must be excluded at this stage of the litigation.

Even if the testimony of Ms. Tanner cited in paragraph 47 is prematurely admitted over these objections as to admissibility and lack of foundation for expert opinion testimony, there is also evidence—creating a material issue--that Dolnick's revisions to the vacancy announcement

added qualifications for the purpose of excluding Mr. Bowden from qualifying for the position. (Robinson Dep. Ts. at 217, 226, Pl. Ex. 2; Krebs Dep. Ts. at 187-188, Pl. Ex. 3.) (*See also* Krebs Affidavit, ROI Case No. 04-16-080604, Tab 9, p. 3, Pl. Ex. 8.) There is substantial evidence, detailed in response to paragraphs 44-47 above, and incorporated by reference, casting serious doubt on Ms. Dolnick's impermissible, biased motivations for withdrawing and revising Vacancy Announcement No. 03SP-1309, cancelling a scheduled interview of Mr. Bowden for the position, and reposting the new Vacancy Announcement No. 04SP-1005. *See also* Responses to 52 and 53 below. Ms. Tanner's blanket "expert" testimony concerning "management" practices is either not germane to the instant question, or is so thoroughly undermined by Ms. Dolnick's suspicious actions and motives that it creates another material issue not susceptible to summary disposition before trial.

"48. Plaintiff applied for the Supervisory Exhibits Specialist position listed in Vacancy Announcement No. 04SP-1005. See Exhibit 23 (Plaintiff's application); February 20, 2008 Deposition of Anthony Bowden ("Plaintiff's 2/20/08 Depo.") at 271."

**Bowden's Response:** This was Mr. Bowden's third attempt at applying for a promotion in the Exhibits Department. (Bowden 12/04/07 Dep. Ts. at 147, Pl. Ex. 5.) He had not made the certification list for the first Supervisory position for which he had applied. *Id.* That position was ultimately filled by Kathleen Samiy.

Bowden's Response to Paragraphs 43 through 45, above, describe in great detail Mr. Bowden's thwarted attempt to apply for the Supervisory Exhibits Specialist position when it was first listed in Vacancy Announcement No. 03SP-1309, and his responses detailed the suspicious circumstances, which raise an inference of discrimination, under which Dolnick revised and reposted the Vacancy Announcement. These responses are incorporated by reference herein as if set forth fully.

"49. Plaintiff made the certification list for this position. See Exhibit 25 (Certification list)."

**Bowden's Response:** As detailed in response to paragraphs 43 to 48 above, and paragraph 50, below, Mr. Bowden's inclusion on the list was a sham.

"50. Plaintiff was interviewed for the position by a three person panel. See Dolnick Depo. at 229-30. The panel had a list of written questions and, during the interviews, each candidate was asked the same questions. See id. at 229."

**Bowden's Response:** As detailed in response to paragraph 50, below, Mr. Bowden's inclusion on the list was a sham. Mr. Bowden's interview lasted a mere 15 minutes, during which he was told, "we already know everything about you." (Bowden affidavit, ROI Case No. 04-16-080604, Tab. 5, p. 13, Pl. Ex. 16.)

"51. Jeffrey Baxter was selected for the Supervisory Exhibits Specialist position listed in Vacancy Announcement No. 04SP-1005. See Dolnick Depo. at 214."

**Bowden's Response:** Admit, but Mr. Bowden disputes that the selection was valid, has evidence that Mr. Baxter was not the most qualified candidate (*see* Answer to 52, below), and has presented evidence that the Vacancy Announcement was revised for the purpose of disqualifying him (Mr. Bowden) (*see* answers to 43-47, above).

"52. Jeffrey Baxter was the most qualified candidate for this position. See Dolnick Depo. at 212, 214, 230; see Exhibit 26 (Baxter application)."

**Bowden's Response:** This is highly contested, remains a material issue, and Mr. Bowden disputes the "qualifications" added by Ms. Dolnick following his initial September, 2003 application for the position, in order to disqualify him as a viable candidate for the promotion. Furthermore, there is evidence Baxter misstated his background, (Bowden 02/20/08 Dep. Ts. at 275-76, Pl. Ex. 10.) Baxter was not well-versed in using the computer systems FileMaker and Quark Express, and was not an expert in either system. (Robinson Dep. Ts. at 219, Pl. Ex. 2.) There is no evidence that Mr. Baxter has ever used the Filemaker Pro or Quark

Express software, proficiency at which was an added-in requirement for the position when the position was re-advertised. (Krebs Dep. Ts. at 71,124, 187-88, Pl. Ex. 3; Bowden Dep. 12/04/07 Dep. Ts. at 205-06, Pl. Ex. 5; Bowden 02/20/08 Dep Ts. at 91, Pl. Ex. 10; Robinson Dep. Ts. at 107, Pl. Ex. 2.) There was no structure for tracking jobs efficiently. (Ferster Dep. Ts. at 13, Pl. Ex. 19.) To date there is no computerized system in place in the Exhibits Department to manage workflow. (Robinson Dep. Ts. at 100-101, 104-105, Pl. Ex. 2.) The filemaker program never worked on anyone's computer. (Bowden 2/20/08 Dep. Ts. at 91, 130.) Work orders are still not being tracked. (Bowden 12/04/07 Dep. Ts. at 205.)

There is also evidence that Lynn Dolnick vowed never to let Bowden be made a supervisor.[3] (Robinson Dep. Ts. 218; Bowden 02/2 0/08 Dep. Ts. at 79), and that she "laughed" at the idea of Mr. Bowden joining the ranks of management and completing his COTR certification class. (Bowden 02/20/08 Dep. Ts. at 78-79, Pl. Ex. 10.) ("COTR" stands for "contracting officer technical representative, and is someone who has finished a special training course to supervise the work of private contractors in the Government Agency.) (Dolnick Dep. Ts. at 118-121, Pl. Ex. 1.)

Dolnick also expressed unease at the prospect that promoting Mr. Bowden would raise him to the same level as his immediate supervisor Kathleen Samiy. (Bowden 02/20/08 Dep. Ts. at 58-59, Pl. Ex. 10.) In addition, there is evidence that Samiy objected that promoting Mr. Bowden to the open position would raise his salary to the same level as hers. (Bowden 02/20/08 Dep. Ts. at 77, Pl. Ex. 10.) There is also evidence that Mr. Bowden was denied the promotion in retaliation for his protests of "inappropriate procedures put into place by Ms. Samiy." (Gaulding affidavit, ROI Case No. 04-16-080604, Tab. 14, p. 3, Pl. Ex. 13.)

---

[3] Dolnick denied this allegation. (Dolnick Dep. Ts. at 202, Pl. Ex. 1.)

Evidence of multiple irregularities in the selection process (e.g., advance review of candidates by the GS-11s on staff; evidence of Dolnick recruiting her cronies; the decision to 'pull' the first announcement after Mr. Bowden applied), which rasies material issues, prevents resolution of the issue, and it cannot cannot be resolved on the inherently contradictory and unreliable paper record. *See also* Answers to 43 through 47, above.

Finally, Mr. Bowden possessed several qualifications for the job that Mr. Baxter lacked, including a COTR certification and two years' experience as acting Exhibits Supervisor for the period between the departure of Rick Hider and the hiring of Kathleen Samiy. (Dolnick admitted that Bowden was made acting head of production when Rick Hider left the Department. (Dolnick Dep. Ts. at 88, Pl. Ex. 1.) Co-workers viewed Mr. Bowden as the most qualified for the position. (*See, e.g.*, Krebs Dep. Ts. at 189, Pl. Ex. 3.)

"53. Management wanted the Production department to utilize Filemaker and Quark Express software as part of their production duties. Plaintiff's 2/20/08 Depo. at 91, 130, 131; Plaintiff's 12/4/07 Depo. at 203; Exhibit 40 (8/28/03 E-mail from Dolnick to Plaintiff) (Plaintiff's Depo. Ex. 18).

**Bowden's Response:** These statements are highly contested. The evidence suggests that "management," that is, Ms. Dolnick, added these requirements to the position description (in the second, revised announcement) in order to "make [Mr. Bowden] ineligible." (Krebs. Dep. Ts. at 188, Pl. Ex. 3; Krebs Affidavit ROI Case No. 04-16-080604, Tab. 9, p. 3, Pl. Ex. 8.) No one in the Exhibits department used Quark Express. (Krebs. Dep. Ts. at 187-88, Pl. Ex. 3.) *See* Response to 52, above. Quark Express is a program for designers, not managing workflow for production personnel. (Krebs Dep. Ts. at 71, Pl. Ex. 3; Robinson Dep. Ts. at 107, Pl. Ex. 8.) To date, the Department has never used either of these computer programs in the production process. (Krebs Dep. Ts. at 124, Pl. Ex. 3; Bowden 12/04/07 Dep. Ts. at 205-06, Pl. Ex. 5; Bowden 02/20/08 Dep. Ts. at 91, 130, Pl. Ex. 10.) Managers did not need Quark Express.

(Ferster Dep. Ts. at 13, Pl. Ex. 19.) There is also still no system to manage workflow in the

Exhibits department. (Robinson Dep. Ts. at 100-101, 104-105, Pl. Ex. 2; Ferster Dep. Ts. at 17,

Pl. Ex. 19.) Work orders are still not being tracked. (Bowden 12/04/08 Dep. Ts. at 205, Pl. Ex.

5.)

Finally, the evidence set out in response to paragraphs 43 through 47, above, and in

response to paragraph 52, below, create grave doubts as to the credibility and motivation of Ms.

Dolnick with respect to her withdrawal of and revisions to the Vacancy Announcement for the

position of Supervisory Exhibits Specialist.

Desk Audit

"54. July 2003, plaintiff met with Kathleen Samiy, his first-level supervisor, and Scarlitt
Proctor, a Smithsonian Human Resources specialist, regarding plaintiff's belief that "his
assigned duties deserved a promotion." See Second Amended Complaint, ¶ 23(e). "

**Bowden's Response:** Admit.

"55. Plaintiff's position was classified at that time as a GS-1010-11. See Exhibit 28
(Evaluation Statement) (Plaintiff's 2/20/08 Depo. Ex. 88).

**Bowden's Response:** Plaintiff admits, although Bowden has argued strenuously

throughout this case and in the EEO complaints filed preceding it that he was mis-classified, and

under-classified as a GS-1010-11, that his duties warranted reclassification, back-pay, and other

remedies. *See, e.g.,* Second Amended Complaint, ¶ ¶23(o), 23(p), 23(q); October 18, 2004

Affidavit of Bowden, ROI Case No. 04-16-080604, p. 2, Pl. Ex. 16.)

"56. On July 22, 2003, Ms. Samiy formally requested a desk audit of plaintiff's position.
See Exhibit 29 (Samiy Depo.) at 106-07."

**Bowden's Response:** Admit.

"57. The desk audit was conducted by an independent contractor, James Lewis. See
Exhibit 30 (Plaintiff's 2/20/08 Depo. Ex. 39)."

**Bowden's Response:** Admit, although Mr. Bowden alleges that the so-called "audit" was incomplete, based on false information, and was therefore fatally defective. See Responses to paragraph 42, above, and 61, below.

"58. In conducting the audit, Mr. Lewis met with plaintiff on October 17, 2003. See Exhibit 30 (Plaintiff's 2/20/08 Depo.Ex. 39). Mr. Lewis also spoke with Ms. Samiy on October 20, 2003. See id."

**Bowden's Response:** Admit, although it is unclear whether Lewis interviewed Samiy on the phone or in person; furthermore, it is unclear whether Lewis ever interviewed Mr. Bowden's second line supervisor, Lynn Dolnick. (Bowden 02/20/08 Dep. Ts. at 124-25, Pl. Ex. 10.) Lewis's truncated meeting with Mr. Bowden was a cursory interview, omitting several key areas, and failed to ask Mr. Bowden about more than 30 key work responsibilities. *See* Bowden 02/20/08 Dep. Ts. at 124-25, Pl. Ex. 10; Bowden Dep. Exhibit 38, (attached as Exhibit 33 to Defendant's Statement of Material Facts)

There is other evidence casting serious doubts about the integrity of Ms. Samiy's supervisory documentation. Aaron Ferster discovered that Samiy had tampered with his evaluations after the fact; Samiy lied when confronted with her duplicity. (Ferster Dep. Ts. at 147, 172-73, Pl. Ex. 19.) Samiy also manipulated position descriptions to suit her purposes, alternatively using position descriptions "for" or "against" employees, depending on the outcomes she sought. (Ferster Dep. Ts. at 133, Pl. Ex. 19.) *See also* response to Par. 29, above, citing Dolnick testimony that Dolinick "re-did" Samiy's evaluation of Plaintiff.

"59. Plaintiff does not know what information Ms. Samiy or any other person in management provided to Mr. Lewis. See Exhibit 36 (Plaintiff's Response to Request for Admissions) (Plaintiff's 12/4/07 Depo. at 38)."

**Bowden's Response:** Admit, but it is also unclear what information Mr. Lewis consulted in conducting the audit, since he failed to include any items from Mr. Bowden's list of

more than 30 tasks and responsibilities involved in his job. *See* Bowden 02/20/08 Dep. Ts. at

124-25, Pl. Ex. 10; Bowden Dep. Exhibit 38, (attached as Exhibit 33 to Defendant's Statement of

Material Facts). There is also evidence that Ms. Samiy often breached position descriptions,

especially requiring black employees to do manual labor outside their description. (Ferster Dep.

Ts. at 134, Pl. Ex. 19.)

"60. Mr. Lewis issued his audit evaluation on October 21, 2003. See Exhibit 31
(Plaintiff's Depo. Ex. 41)."

**Bowden's Response:**  Plaintiff cannot admit this allegation, because Exhibit 31 is not

authenticated, the author is unknown (possibly someone known on the e-mail only as "Jim"),

there is no way to determine whether the alleged author of the e-mail is Mr. Lewis, the auditor,

and no copy of the audit evaluation is attached to the Exhibit.


"61. In conducting the audit, Mr. Lewis relied on OPM classification standards, including
the OPM standard for "Grade Evaluation Guide for Visual Arts Work." See Exhibit 28
(Evaluation Statement) (Plaintiff's 2/20/08 Depo. Ex. 88)"

**Bowden's Response:**  It is not clear what documentation Mr. Lewis consulted in

conducting the audit, since he failed to include any items from Mr. Bowden's list of more than

30 tasks and responsibilities involved in his job. Also, Bowden has no way of knowing what

Lewis actually did in performing the audit. *See* Bowden 02/20/08 Dep. Ts. at 124-25, Pl. Ex. 10;

Bowden 2/20/08 Dep. Exhibit 38, (attached as Exhibit 33 to Defendant's Statement of Material

Facts).

"62. Mr. Lewis applied the OPM standards to plaintiff's position and concluded that
plaintiff's position was correctly classified as a GS-1010-11. See Exhibit 28 Evaluation
Statement) (Plaintiff's Depo. Ex. 88)."

**Bowden's Response:**  This is a major issue in the case.  While Mr. Lewis apparently

signed a statement to this effect, Mr. Bowden strongly disputes the conclusion, as it was based

on flawed data. Mr. Lewis failed to include any items from Mr. Bowden's list of more than 30

tasks and responsibilities involved in his job. Also, Bowden has no way of knowing what Lewis

actually did in performing the audit. *See* Bowden 02/20/08 Dep. Ts.124-25, Pl. Ex. 10; Bowden

2/20/08 Dep. Ts. Exhibit 38, (attached as Exhibit 33 to Defendant's Statement of Material Facts).

"63. Plaintiff informed his second-level supervisor on November 12, 2003 that he "d[id]
not think that it would be a good idea" to perform a second audit. See Exhibit 35 (November 12,
2003 email from plaintiff to Lynn Dolnick) (Plaintiff's 2/20/08 Depo. Ex. 40).

**Bowden's Response:**  Admit. The document speaks for itself. *See also* Response to Par.

59, above.

"64. On March 19, 2004, the Smithsonian Office of Human Resources issued an updated
position description for plaintiff's position which more clearly identified plaintiff's duties and
responsibilities. See Exhibit 34 (Federal Position Description
Cover Sheet and Position Description) (pp 270-75; 04 complaint file)."

**Bowden's Response:**  Mr. Bowden acknowledges the authenticity of the document, but

disputes the conclusory allegation that the updated description "more clearly identified" his

duties and responsibilities. Mr. Bowden performed several duties omitted from the desk audit,

including being the COTR (contracting office), managing contractors, and supervising other

Exhibits Specialists.  (Report of Investigation, Case No. 04-16-080604—October 8, 2004

Affidavit of Anthony Bowden, Tab 5, p. 17, Pl. Ex. 16).  The position description is similarly

flawed. As stated in Response to 62, above, the audit and position description were based on

inherently flawed and incomplete data, because the auditor of the position description, James

Lewis, failed to include any items from Mr. Bowden's list of more than 30 tasks and

responsibilities involved in his job. *See* Bowden 02/20/08 Dep. Ts. at 124-25, Pl. Ex. 10;

Bowden Dep. Exhibit 38, (attached as Exhibit 33 to Defendant's Statement of Material Facts).

"65. Plaintiff had been dissatisfied with the position description he was working under,
which led him to request a desk audit. See Second Amended Complaint, ¶ 23(d), (e); see Samiy
Depo. at 85-86.

**Bowden's Response:** Admit.

"66. The updated position description classified plaintiff's position as a GS-1010-11 based on OPM classification standards. See Exhibit 34 (Federal Position Description Cover Sheet and Position Description) (pp 270-75; 04 complaint file)."

**Bowden's Response:** Although the cover sheet, a standard U.S. Government form, states that the attached position description is "based on OPM classification standards," neither the cover sheet nor the description cite to any relevant OPM classification or regulation, and Plaintiff therefore denies the assertion that the position is "based on OPM classification standards." Plaintiff continues to dispute the completeness, accuracy, and thoroughness of the desk audit on which the description is based. *See* Responses to 59, 62, and 64, above.

"67. The Federal Position Description Cover Sheet ("Cover Sheet") identified the relevant OPM standards for classifying plaintiff's position. See Exhibit 34 (Federal Position Description Cover Sheet and Position Description) (pp 270-75; 04 complaint file)."

**Bowden's Response:** Although the cover sheet, a standard U.S. Government form, states that the attached position description is "based on OPM classification standards," and while the description does include nine separate categories, neither the cover sheet nor the description cite to any relevant OPM classification or regulation, and Plaintiff therefore denies the assertion that "The Federal Position Description Cover Sheet ("Cover Sheet") identified the relevant OPM standards for classifying Plaintiff's position." Plaintiff continues to dispute the completeness, accuracy, and thoroughness of the desk audit on which the description is based. *See* Responses to 59, 62, and 64, above.

"68. The Cover Sheet justified the Grade for plaintiff's position under the relevant nine point factor evaluation system. See Exhibit 34 (Federal Position Description Cover Sheet and Position Description) (pp 270-75; 04 complaint file)."

**Bowden's Response:** Plaintiff fiercely contests that the Grade for the Exhibits Specialist position as carried out by him was "justified" by the flawed position description. Although the cover sheet, a standard U.S. Government form, states that the attached position description is "based on OPM classification standards," and while the description does include nine separate categories, neither the cover sheet nor the description cite to any relevant OPM classification or regulation, and Plaintiff therefore denies the assertion that the position is "based on OPM classification standards." Plaintiff continues to dispute the completeness, accuracy, and thoroughness of the desk audit on which the description is based. *See* Responses to Pars. 59, 62, and 64, above.

"69. The Cover Sheet contained a signed certification by Ms. Proctor stating that: "I certify that this position has been classified as required by Title 5, US Code, in conformance with standards published by the OPM or, if no published standard applies directly, consistently with the most applicable published standards." See Exhibit 34 (Federal Position Description Cover Sheet and Position Description) (pp 270-75; 04 complaint file)."

**Bowden's Response:** Plaintiff admits that Ms. Proctor signed the document, and admits that the document contained the certification language quoted here. However, Plaintiff fiercely contests that the Grade for the Exhibits Specialist position as carried out by him was "justified" by the flawed position description, and therefore denies that the Grade was determined "in conformance" with OPM standards. Although the cover sheet, a standard U.S. Government form, states that the attached position description is "based on OPM classification standards," and while the description does include nine separate categories, neither the cover sheet nor the description cite to any relevant OPM classification or regulation, and Plaintiff therefore denies the assertion that the position is "based on OPM classification standards." Plaintiff continues to dispute the completeness, accuracy, and thoroughness of the desk audit on which the description is based. *See* Responses to Pars. 59, 62, and 64, above.

"Breach of Contract"

"70. A true and correct copy of the Stipulation of Settlement And Dismissal in Civil Action No. 97-0545 JR was marked as Bowden exhibit number 1 at the deposition. See Plaintiff's 12/4/07 Depo. at 10-12 and Exhibit 37 (Stipulation Of Settlement And Dismissal)"

**Bowden's Response:** Admit. The document speaks for itself.

"71. Plaintiff's breach of contact claim is based solely on plaintiff's assertion that the agency has failed to satisfy paragraph 6 of the Stipulation Of Settlement And Dismissal. Id.; Plaintiff's 12/4/07 Depo. at 9-14, 38."

**Bowden's Response:** This is a misreading of Mr. Bowden's Complaint and his deposition testimony and other affidavits and sworn testimony in the record. As shown in the record, Counsel for Mr. Bowden strenuously objected to the form and content of the questions— calling for legal conclusions—used to elicit the testimony Defendant cites in Paragraph 71. (attached to Defendant's MSJ as Defendant's Exhibit 2.) For that reason alone, it is not admissible for the purposes of resolving a motion for summary judgment.

Additionally, Defendant leaves out a significant portion of Plaintiff's Rehabilitation Act Claim. The face of Plaintiff's Second Amended Complaint clearly states **two, separate** bases for the breach of contract claim, at paragraphs 15 and 16: the former, requiring specific, reasonable accommodations to Plaintiff's medical conditions, and the latter, requiring the Smithsonian to restore approximately 294 hours of previously uncompensated leave time taken as a result of his medical condition.[4] (These two bases for the breach of contract claim are both set forth as a breach of contract claim at ¶ 112 of Plaintiff's Second Amended Complaint.)

"72. Paragraph six of the Stipulation of Settlement And Dismissal provides:

The Smithsonian agrees to restore leave taken by Bowden from July 1994 to the present which Bowden can show, by objective evidence, was used as a direct result of his medical condition that is the basis for his claim pursuant to the Rehabilitation Act, i.e. panic disorder. Such restoration shall be limited to the

---

[4] Mr. Bowden concedes that the Agreement also allowed Defendant to offset the uncompensated leave time with any payments Mr. Bowden received from a pending Worker's Compensation Claim.

extent Bowden is compensated for such leave through a workers' compensation
claim, a claim for which he currently pending.  Bowden will provide
documentation of the use of such leave in connection with his medical condition
within two pay periods of the Court's approval of this stipulation. The
Smithsonian Institution will respond to plaintiff's documentation within 30 days
of its submission. Should plaintiff disagree with the Smithsonian's response,
plaintiff shall notify the Smithsonian in writing within 30 days and give the
Smithsonian 30 days to address the matters raised by plaintiff before seeking
judicial review, if any is available. Plaintiff's 12/4/07 Depo. at 13-14; 2/16/99
Stipulation Of Settlement And Dismissal, ¶ 6."

**Bowden's Response:**  Plaintiff agrees that this is an excerpt from the Agreement, and

draws the Court's attention to the language of the last sentence, above, in which the parties agree

that Plaintiff might have to seek "*judicial review*" if it disagreed with the Smithsonian's response

to his leave restoration response. . (Italics added).  Thus the Agreement contemplated that

Plaintiff had the right to go to court if he was dissatisfied with the Agency's response, and that

he was not limited to administrative remedies.

"73. The Stipulation of Settlement And Dismissal in Civil Action No. 05-2202 was
approved by the Court on February 18, 1999. Plaintiff's 12/4/07 Depo. at 24.

**Bowden's Response:**  Plaintiff's Second Amended Complaint, par. 14, stated that the

action was "settled, and approved by the Court on February 18,1999, and filed with the Court on

February 19, 1999."  Counsel for Plaintiff objected to the form of question by which this

testimony cited by Defendants here was elicited, and pointed out that the "document speaks for

itself." *See* p. 24 of Plaintiff's Deposition, attached to Defendant's MSJ as Exhibit 2.

"74. The only thing submitted to the agency by Plaintiff within the two pay periods
following the approval of the settlement agreement was a chart prepared by Plaintiff with a list of
leave taken and in another column Plaintiff wrote simply "depressed or doctor or stressed."
Plaintiff's 2/20/08 Depo. At 11-13."

**Bowden's Response:**  Bowden strenuously objects to, and contests, the legal conclusions

drawn in this so-called statement of material "fact.'  The requirement of Plaintiff having to

provide "objective evidence" to show when his leave was used "as a direct result of his medical

condition" is found in Par. 6 of the Settlement Agreement. However, the term "objective evidence" was never defined in the Settlement Agreement, and Bowden never agreed to provide doctor's statements, clinical records, or any other form of what the Government later deemed "obvious". . ."objective evidence" sufficient to force it to abide by the Agreement and open its purse strings. The Settlement Agreement used the term "documentation," together with its term "objective evidence," but also never defines exactly what "documentation" means in this context.

"75. Plaintiff was repeatedly advised that his list with its subjective remarks was simply inadequate. See, e.g., Exhibit 41 (June 29, 1999 Letter to Alan Banov from AUSA Zane) at 1-2 (Plaintiff's 2/20/08 Depo. at 9-10 and Depo. Ex. 19) ("As you know, the only information submitted by Mr. Bowden was a list of leave taken with the reasons stated as 'depressed' or 'Doctor' or 'stressed' in addition to a scattering of dates for doctor appointments. Obviously, the objective evidence must be more than such conclusory, passing statements"); August 6, 1999 Letter to Alan Banov from AUSA Zane (Plaintiff's 2/20/08 Depo. at 9-10 and Depo. Ex. 19); August 27, 1999 Letter to Alan Banov from AUSA Zane (Plaintiff's 2/20/08 Depo. at 9-10 and Depo. Ex. 19)."

**Bowden's Response:**  Bowden strenuously objects to, and contests, the legal conclusions drawn in this so-called statement of material "fact." The requirement of "objective evidence," was undefined in the Settlement Agreement, and Bowden never agreed to provide doctor's statements, clinical records, or any other form of what the Government later deemed "obvious". . ."objective evidence" sufficient to force it to open its purse strings. The Settlement Agreement used the term "documentation," together with its term "objective evidence." The Government cannot now be heard to have unilaterally redefined the scope of "documentation" required under the Agreement, nor can it be heard to impose a condition subsequent to the execution of the Agreement.

"76. Alan Banov was Plaintiff's attorney at the time of the correspondence cited in Paragraph 75 above. Plaintiff's 2/20/08 Depo. at 10."

**Bowden's Response:**  Immaterial and not germane to issues at hand, but Plaintiff

51

admits.

"77. Insofar as Plaintiff may be seeking to challenge the failure of the agency to restore leave, Plaintiff has admitted that any breach took place by 1999. See Plaintiff's 12/4/07 Depo. at 33 (Q: "Do you remember what year it was when you first learned that the Smithsonian had denied your request for leave under Paragraph 6 of Exhibit 1 [the Stipulation Of Settlement And Dismissal]?" [Plaintiff]: "I'm pretty sure it was '99"); see also id. at 18-20, 23-27, 33; June 29, 1999 Letter to Alan Banov at 1- 2 (Depo. Exh. 19) ("As you know, the only information submitted by Mr. Bowden was a list of leave taken with the reasons stated as 'depressed' or 'Doctor' or 'stressed' in addition to a scattering of dates for doctors appointments. Obviously, the objective evidence must be more than such conclusory, passing statements"); accord August 27, 1999 Letter to Alan Banov from AUSA Zane (Exhibit 38)."

The fact that Bowden testified that he first learned that the Smithsonian had denied his

request for leave under the Agreement in 1999 does not mean that he admitted that any breach

took place by 1999.

"Rehabilitation Act Accommodation Requests. (Count XVIII)."

"78. Plaintiff claims that his requests for reasonable accommodations based on his supervisors asking where he has been when he disappears for periods of time and the requirement that he attend meetings with all staff, even when Elena Lopez is invited to the meeting. Second Amended Complaint, ¶¶ 29-30, 34, 38-39."

**Bowden's Response:**  Using the bathroom is not tantamount to 'disappearing" for

"periods of time, and Mr. Bowden never stated that he "disappeared." He strenuously objects to

this mischaracterization of his allegations in ¶¶ 29-30 and 34 of his Second Amended Complaint,

which speak for themselves.  The remaining allegations of "fact" in paragraph 78 extend far

beyond the sole record citations to the Second Amended Complaint, and constitute a gratuitous

attack.  Mr. Bowden therefore requests that this paragraph be stricken.

Also, Plaintiff must note that he really cannot answer par. 76 because it is unintelligible,

and therefore, again moves to strike the paragraph.

Defense counsel's venomous, sarcastic tone in paragraph 78 perpetuates and perfectly

encapsulates the nasty tone of ongoing harassment directed by the Agency against Mr. Bowden

and his attempts to vindicate his rights under the Rehabilitation Act, even when he thought he had the "protection" of a Stipulated Dismissal and Agreement. Furthermore, additional record testimony confirms that Mr. Bowden was singled out for this harassment about his bathroom habits, alone among his co-workers. He was questioned about his medical appointments, when co-workers were not. (Krebs Dep. Ts. at 233.) (Tasse affidavit, ROI Case No. 04-16-080604, Tab 11, p.3). *See also* response to 40, above.

Regarding the requirement that Mr. Bowden attend meetings unprotected from physical assault by his co-worker Elena Lopez, (and the attendant stress and trauma created thereby) please see Mr. Bowden's responses to paragraphs 85 and 86, below.

Finally, Defendnat is well aware that Plaintiff's requests for reasonable accommodations went far beyond what is stated in ¶ 78.

"79. Plaintiff suggests that the agency's settlement of its earlier case with him specifically called for the agency to allow him to go to the bathroom when necessary. See Exhibit 37 (Stipulation Of Settlement And Dismissal), ¶ 3."

**Bowden's Response:** The Agreement speaks for itself.

"80. Nowhere in the paragraph of the Stipulation Of Settlement And Dismissal permitting "short breaks to go to the bathroom" are Plaintiff's supervisors forbidden from asking where he has been when he cannot be found for 20 minutes at time. See Id.; Second Amended Complaint, ¶¶ 29-30, 34."

**Bowden's Response:** The allegations in ¶¶ 29-30 and 34 of his Second Amended Complaint speak for themselves, as do the terms of the Stipulated Dismissal. Defense counsel's sarcastic tone in paragraph 80 perpetuates and perfectly encapsulates the nasty tone of ongoing harassment directed by the Agency against Mr. Bowden and his attempts to vindicate his rights under the Rehabilitation Act, even when he thought he had the "protection" of a Stipulated Dismissal and Agreement.

The remaining allegations of "fact" in paragraph 80 extend far beyond the sole record citations to the Settlement and to the Second Amended Complaint Mr. Bowden, and thereby constitute a gratuitous attack. Mr. Bowden therefore requests that this paragraph be stricken. Nowhere does the Stipulation *authorize* supervisors to undercut the terms of the settlement by infantilizing Plaintiff with constant surveillance of his bathroom habits.    Implicit in the "right" to go to the bathroom is the freedom to do so without constant monitoring, hectoring, badgering, and oppressively intrusive supervision.

Furthermore, additional record testimony confirms that Mr. Bowden was singled out for this harassment about his bathroom habits, alone among his co-workers. (Tasse affidavit,  ROI Case No. 04-16-080604, Tab 11, p. 3, Pl. Ex. 12.)  Mr. Bowden did not spend more time in the bathroom than other employees.  (Ferster Dep. Ts. at 98, Pl. Ex. 19.) *See also* Bowden's response to 40, above.

"81. Plaintiff is unaware of any instances where he lost pay due to his disappearances. Plaintiff's 2/20/08 Depo. at 207-10."

**Bowden's Response:**  This statement is based on a false premise. There is no evidence that Mr. Bowden ever "disappeared," and he therefore asks that the question be stricken in this form. Mr. Bowden directly testified that the "longest he had ever gone," when asked his whereabouts by his supervisors Samiy or Baxter, was "20 minutes." (Bowden 2/20/08 Dep. Ts. at 208, Pl. Ex. 10.)

The sarcastic tone of paragraph 81 perpetuates the ongoing harassment directed by the Agency against Mr. Bowden and his attempts to vindicate his rights under the Rehabilitation Act, even when was supposedly "protected" by the enforcement of the Stipulated Dismissal and Agreement. Mr. Bowden complains of a hostile environment, one element of which is that his supervisors singled him out for unpleasant, overbearing supervision, of which the constant

monitoring of his bathroom habits was merely one element. Mr. Bowden does not seek

compensation for time in the bathroom.

Mr. Bowden suffered compensable damages from these events due to the additional

anxiety, stress, and their attendant physical and emotional traumas. *See* Second Amended

Complaint ¶ 46.

"82. Plaintiff's supervisor, Jeff Baxter, asks all of his staff, as he does Plaintiff, where
they are at times. Baxter Depo. at 185."

**Bowden's Response:** While Mr. Baxter did make this statement in his deposition, it is

beside the point. The issue question is not whether Baxter occasionally asked after all his

employees. The question is whether he questioned their whereabouts with the same frequency

and for the same purpose as he questioned Mr. Bowden's whereabouts. This testimony does not

answer that question, nor does it address the Rehabilitation Act requirements that Mr. Bowden's

disabilities be reasonably accommodated.

Furthermore, additional record testimony confirms that Mr. Bowden was singled out for

this harassment about his bathroom habits, alone among his co-workers. (Tasse affidavit, ROI

Case No. 04-16-080604, Tab 11, p.3); (Bowden  2/20/08 Dep. Ts. at 208). *See also* Bowden's

response to paragraph 40, above.

"83. Mr. Baxter discussed with Plaintiff the request that he be excused from all meetings
that included Elena Lopez, and considered the request, but concluded that the meeting was
required for the work of the office. See Baxter Depo. at 175."

**Bowden's Response:** Plaintiff admits this discussion. Mr. Bowden had already testified

that job stress related to Lopez (created by the letter of counseling he earlier received in response

to his cautioning supervisors about Lopez's erratic behavior) caused him to seek hospital

treatment and miss three days of work.  (Bowden 02/20/08 Dep. Ts. at 180, Pl. Ex. 10.)

Defendant has admitted that Mr. Bowden's supervisors—including Baxter-- were on notice that

Mr. Bowden had a disability for which he was already supposed to receive certain accommodations under the terms of a court-approved settlement agreement. Although Mr. Bowden felt unsafe in such close proximity to his assailant, he nonetheless attended such meetings under duress, for fear of otherwise losing his job. (Bowden 02/20/08 Dep. Ts. at 233-35, Pl. Ex. 10; Dep. Ex. 69; Dep. Ex. 73, & Dep. Ex. 74)).

Notably, the Defendant fails to include any evidence that Mr. Baxter considered any of the widely available, simple technologies for accommodating Mr. Bowden's request, including using a speakerphone, a remote microphone, taping the meeting, providing Mr. Bowden a transcript of the meeting, using an internet hook-up, providing Mr. Bowden an advance printed copy of the meeting agenda, or providing other remote audio-visual access.

"84. There was "a lot of exchange of information that [was] important" to exchange in the staff meetings. Baxter Depo. At 174-77."

**Bowden's Response:** Although Mr. Bowden felt unsafe in such close proximity to his assailant, he nonetheless attended such meetings only under duress, for fear of otherwise losing his job. (Bowden 02/20/08 Dep. Ts. at 233-35, Pl. Ex. 10; Dep. Ex. 69; Dep. Ex. 73, & Dep. Ex. 74)). Mr. Bowden testified that the stress related to Lopez (created by her assault of him and the letter of counseling he earlier received in response to his cautioning supervisors about Lopez's erratic behavior) had already caused him to seek hospital treatment and miss three days of work. (Bowden 02/20/08 Dep. Ts. at 180, Pl. Ex. 10.) Notably, the Defendant fails to include any evidence that Mr. Baxter considered any of the widely available, simple technologies for accommodating Mr. Bowden's request, including using a speakerphone, a remote microphone, taping the meeting, providing Mr. Bowden a transcript of the meeting, using an internet hook-up, providing Mr. Bowden an advance printed copy of the meeting agenda, or providing other remote audio-visual access. These technologies could have relayed the important information

56

exchanged at staff meetings to Mr. Bowden without him having to physically attend the meeting with Ms. Lopez.

Baxter's unilateral plan therefore failed as an "accommodation."

Defendant has freely admitted that the Agency admittedly previously on notice that Mr. Bowden had a disability for which he had received certain accommodations.

"85. Mr. Baxter worked out an accommodation for the meetings that included Elena Lopez, allowing Plaintiff to sit in the back or near an exit and allowing him to leave if he felt uncomfortable. Baxter Depo. at 175."

**Bowden's Response:** Mr. Bowden still felt unsafe in such close proximity to his assailant and attended such meetings under duress, for fear of otherwise losing his job.  (Bowden 02/20/08 Dep. Ts. at 234-35, Pl. Ex. 10.)  Mr. Bowden testified that the stress related to Lopez (created by her assault on him and by the letter of counseling he earlier received in response to his cautioning supervisors about Lopez's erratic behavior) had already caused him to seek hospital treatment and miss three days of work.  (Bowden 02/20/08 Dep. Ts. at 180). Notably, the Defendant fails to include any evidence that Mr. Baxter considered any of the widely available, simple technologies for accommodating Mr. Bowden's request, including using a speakerphone, a remote microphone, taping the meeting, providing Mr. Bowden a transcript of the meeting, using an internet hook-up, providing Mr. Bowden an advance printed copy of the meeting agenda, or providing other remote audio-visual access.

Baxter's unilateral plan therefore failed as an "accommodation."

"86. The accommodation was permitted whenever Mr. Bowden and Elena Lopez attended the meetings that were scheduled every two weeks. Baxter Depo. at 183-84."

**Bowden's Response:** *See* responses to 83-85.

## CONCLUSION

Defendant distorts the record, omits key facts, shades the truth, and otherwise muddies the very real, and very troubling story of the National Zoo's abominable, discriminatory and retaliatory treatment of Anthony Bowden. The Motion does not meet the standard for a Motion for Judgment on the Pleadings. The "material facts" asserted by Defendants sow the seeds of genuine issues that cannot be resolved at summary judgment. Conflicting testimony; issues of credibility; missing documents; inferences to be drawn against the moving party, and more, compel entry of an order denying Defendant's Motion for Judgment on the Pleadings or, in the Alternative, Summary Judgment and setting the matter for trial.

Respectfully submitted,

*/s/ Steven J. Silverberg*

Steven J. Silverberg
DC Bar #377376
Attorney for Plaintiff
900 17th St, N.W. Suite 1250
Washington DC  20006
Phone:  202/785-8499
FAX:  202/785-8470
E-Mail:  sjsilverberg@erols.com