# PLAINTIFF'S EXHIBIT 1

Dolnick Deposition Excerpts—pp. 9, 12-13, 88, 90-91, 99-108, 118-121, 145-56, 201-02, 219-224

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ANTHONY BOWDEN,                       *

       Plaintiff,                 *

                               *

vs.                                   *   Civil Action No.

                               *   05-2022

LAWRENCE M. SMALL,                    *

Secretary, Smithsonian                *

Institution,                          *

       Defendant.                 *

* * * * * * * * * * * * * * * * * * * * * * * *

       The deposition of LYNN DOLNICK took place on Thursday, September 27, 2007, beginning at 10:20 a.m. at Federal District Attorney's Office, 501 North 3rd Street, 4th Floor, Washington, D.C., before Stacey L. Daywalt, Court Reporter.

* * * * * * * * * * * * * * * * * * * * * * * *

Reported by:

       Stacey L. Daywalt, Court Reporter

Al Betz & Associates, Inc.
www.albetzreporting.com

Page 6

1    PROCEEDING
2
3    Whereupon --
4        LYNN DOLNICK,
5    a witness, called for examination, having been
6    first duly sworn, was examined and testified
7    as follows:
8        EXAMINATION BY MR. SILVERBERG:
9    Q.  Good morning, Miss Dolnick. I'm Steve
10   Silverberg. I'm the attorney for Anthony Bowden in
11   the case Bowden v. Smithsonian Institution. Have
12   you ever been deposed before?
13   A.  No.
14   Q.  Well, I'm sure you talked to Mr. Nebeker
15   about it, but I'm going to be asking you a series
16   of questions. I'd just ask you to answer them
17   truthfully. If you don't know a question, an
18   answer, just say I don't know. If you need a break
19   you can ask for a break, but not between me asking
20   the question -- after the answer is done you can
21   ask for a break.

Page 7

1    You can consult Mr. Nebeker when you need
2    to. He will be making objections throughout, and
3    typically we go ahead anyway because there's not a
4    Court, there's not a judge, to sustain or deny
5    objections but he does it for the record. Listen
6    to your counsel. If he advises you not to answer a
7    question do what he says.
8        I try to keep it kind of flexible and not
9    too complicated, and if you have questions of me
10   about what's going on or something to clarify
11   please ask. And please don't take any of this
12   personally. This is just the case. Okay?
13   A.  Mm-hmm.
14   Q.  You can't say mm-hmm and you can't nod
15   your head because she's -- the court reporters
16   can't record those things.
17       MR. SILVERBERG: Mark, I'll see, but I
18   have a good number of exhibits for this case. So,
19   we're going to have to plow through them.
20       MR. NEBEKER: Okay.
21       BY MR. SILVERBERG:

Page 8

1    Q.  Can you state your full name?
2    A.  Lynn Dolnick, Lynn Golden Dolnick I
3    guess.
4    Q.  And where are you currently working?
5    A.  I'm not currently. Well, I am on a
6    number of boards. That's what I'm doing.
7    Q.  And what religion are you?
8    A.  I have no religion.
9    Q.  You have no religion. How about
10   ethnically?
11   A.  I'm white.
12   Q.  Are you Jewish?
13   A.  What's your definition of Jewish?
14       MR. SILVERBERG: Off the record.
15       MR. NEBEKER: No. I think we should
16   probably stay on the record.
17       BY MR. SILVERBERG:
18   Q.  You're asking what my definition is?
19   A.  Yeah.
20   Q.  I really was hoping -- I don't know the
21   point of arguing about what a Jew is. It's been

Page 9

1    debated 2,000 years, but I'm going to define it as,
2    I'm going to define it Jewish as opposed to
3    Judaism. It's not a religion, but -- I mean,
4    Judaism is clearly a religion, but being Jewish you
5    don't have to believe in the religion but be of
6    that ethnicity. Your parents were Jewish. Like
7    you would be Italian or Irish or Polish.
8    A.  My father was Irish. My mother was
9    Jewish.
10   Q.  Thank you. Have you ever had any EEO
11   complaints filed against you?
12   A.  Not to my knowledge except this I guess.
13   Q.  Now, what is your background? When did
14   you work at the Smithsonian?
15   A.  I started working there in 1986 I think.
16   Q.  And how long were you there?
17   A.  For 19 years, something like that.
18   Q.  What job did you start as?
19   A.  I started as the head of a thing called
20   NOAHS Center, New Opportunities in Animal Health
21   Sciences.

Page 10

1   Q.  The whole time you were at the
2   Smithsonian were you at the zoo?
3   A.  Mm-hmm.
4       MR. NEBEKER:  You have to say yes.
5       THE DEPONENT:  Yes.  Sorry.
6       BY MR. SILVERBERG:
7   Q.  So, you started as what?
8   A.  I was working on an initiative for
9   biomedical research for wild animals called New
10  Opportunities in Animal Health Sciences, NOAHS
11  Center.
12  Q.  What was your job title?
13  A.  Director.
14  Q.  And what grade were you then?
15  A.  I don't remember.
16  Q.  What other jobs did you have at the zoo?
17  A.  I was special assistant to the director
18  to help him do science in the park, and in that
19  capacity I was the project manager for a major
20  exhibit that we did.  Then I was -- I don't
21  remember the titles of the job.

Page 11

1   Q.  Could you roughly say the years too?
2   A.  These years blur together.
3   Q.  Yeah.  I know.
4   A.  Don't you have that in the record?  I
5   mean, my employment record.  I don't remember.
6   Q.  Well, I'm asking you.  Well, just briefly
7   what jobs did you have?
8   A.  I was the head of interpretation.  Well,
9   I was the special assistant to the director and I
10  honestly don't remember the sequence of years.  And
11  then I was the head of interpretation, which is,
12  which means writing the signage and interpreting
13  the exhibits for the public.  That's what
14  interpretation means in this case.  And then I was
15  head of the exhibit department.
16  Q.  What grades were you during this time?
17  A.  I don't remember the grades.  And then I
18  was the associate director for exhibits in
19  outreach.
20  Q.  What was your last position there?
21  A.  Associate director for exhibits in

Page 12

1   outreach.
2   Q.  And when did you leave?
3   A.  This is '08.  Probably '05, 4.  I'm not
4   sure.
5   Q.  And how long were you associate director
6   for exhibits in outreach?
7   A.  I honestly don't remember the years.
8   Four.
9   Q.  Do you remember what your grade was then?
10  A.  I think 15.
11  Q.  And what was your job before then?
12  A.  Head of exhibits.
13  Q.  Was associate director of exhibits in
14  outreach a higher position ahead of exhibits?
15  A.  Yes, because that I oversaw more
16  departments and was in the executive management
17  team.
18  Q.  But before you were director of exhibits?
19  A.  No.  I don't think I said director.
20  Q.  What did you say?
21  A.  I said head of exhibits.

Page 13

1   Q.  You said head.  How many people did you
2   supervise as associate director of exhibits in
3   outreach?
4   A.  I would say it was around 30 or 40.
5   Q.  And you think you left the zoo when
6   again?  About 2004 you said?
7   A.  Five maybe.
8   Q.  And you were associate director for about
9   how many years?
10  A.  I think four.  I really don't know.  I
11  really don't know.
12  Q.  Do you know Tony Bowden, Anthony Bowden?
13  A.  Sure.
14  Q.  How do you know him?
15  A.  He worked in my department.
16  Q.  So, you supervised him?
17      MR. NEBEKER:  Objection, vague.
18      THE DEPONENT:  I supervise --
19      MR. NEBEKER:  I have to get the objection
20  on the record, but you can go ahead and answer if
21  you understand.

Al Betz & Associates, Inc.
www.albetzreporting.com

Page 86

BY MR. SILVERBERG:
Q. Wouldn't it be easier to not promote him to a 12 though?
A. I don't know what easy means. What does that mean? I'm asking for clarification.
Q. If his position description says leader at a Grade 11, couldn't it just be said he doesn't deserve a promotion although he's doing managerial type duties because he's just doing his job which is leader?
A. If personnel tells me his position is a 12 then it's a 12.
Q. Didn't putting leader on this position description make it harder to promote him?
A. Harder? No. Why would that make it harder to promote him?
Q. Well, you're asking the questions, but I'll answer. Because they would say everything he's doing is in his position description. He doesn't need a higher position description because he's a leader.

Page 87

A. And if that position is the description of his position and it's graded at a certain level I don't understand the argument.
Q. But he was never to your knowledge officially made leader was he?
MR. NEBEKER: Objection, vague.
THE DEPONENT: I don't know specifically what position he was operating under.
BY MR. SILVERBERG:
Q. He had several position descriptions given to him. Did he not?
A. Okay. I don't know. We were rewriting position descriptions.
Q. When Mr. Hider transferred departments did Mr. Bowden take on more responsibilities than he was previously responsible for when Mr. Hider was supervisor of exhibits?
A. Yes.
MR. SILVERBERG: You want to take a break?
MR. NEBEKER: I think that would be

Page 88

great.
(Recess taken -- 12:32 p.m.)
(After recess -- 1:04 p.m.)
BY MR. SILVERBERG:
Q. I'd like to get Tony's history straight. When Ric Hider left Tony was put in his job or Tony --
A. No.
Q. -- did his job duties?
A. Tony may have been acting head of production, but the job duties were not the same as Ric's.
Q. Was he acting head of production?
A. I don't recall what specifically.
Q. Isn't it true that first he was just doing some of Ric's job duties and then he was made acting head of direction -- production?
A. I don't recall the sequence of events, but --
Q. He was acting head of production, Tony?
A. Yes, but --

Page 89

Q. For a while. Right?
A. I don't remember how long and he wasn't doing all the duties. He wasn't doing the computer tracking, the work orders that Ric had been reporting as I recall.
Q. Was he doing some of the leadership duties?
MR. NEBEKER: Objection, vague.
THE DEPONENT: Yeah, vague. I'm not quite clear what you mean leadership duties.
BY MR. SILVERBERG:
Q. Well, he was acting head of production. So, what did that mean, acting head?
A. Yeah. That meant that he would work with the supervisor to get work done that production needed to have done.
Q. Who was the supervisor when Mr. Hider left?
A. Well, as I say there were gaps. I don't remember what the sequence of events, if Kathleen was already there or not. I don't remember the

23 (Pages 86 to 89)

Al Betz & Associates, Inc.
www.albetzreporting.com

Page 90

1  sequence of events.
2      Q.  Wasn't Mr. Bowden acting head of
3  production even when Kathleen was hired?
4      A.  He may have been.  I don't recall what
5  the details were.  And with Kathleen's hire I want
6  to -- I'll just, when I advertised that position
7  and the, I voluntarily asked the staff to form a
8  committee to pick a few people to interview the
9  candidates as well as for advisory.
10     Q.  For Kathleen's position?
11     A.  Yes, for advisory purposes only to tell
12 me their thoughts, and they all went around the zoo
13 with each candidate and gave me their feedback and
14 they all encouraged me to hire Kathleen.
15     Q.  Who was on the advisory committee?
16     A.  I don't remember.  I remember Herman and
17 Grace.
18     Q.  Is that a little unorthodox?
19     A.  Yes, it is.
20     Q.  Because?
21     A.  Because I wanted the staff's feedback.  I

Page 91

1  wanted their input.
2      Q.  Why is it unorthodox?  Typically a
3  manager doesn't involve the staff in selections of
4  a manager job.  Right?
5      A.  Correct.  Correct.
6      Q.  And they were what?  GS-11s?
7      A.  Yes.
8      Q.  And the job was for a GS-12?
9      A.  It was not official.  I had a panel,
10 rating and ranking panel.
11     Q.  Was it a job 12/13?
12     A.  I don't remember.
13     Q.  Didn't Mr. Bowden apply?
14     A.  For the head of design?
15     Q.  For Kathleen's job.
16     A.  I don't recall.  He may have.
17     Q.  You don't remember?
18     A.  I don't remember, but that was a design
19 position.
20     Q.  And you don't agree that putting the word
21 leader on a job description would give the agency

Page 92

1  the latitude to say to Mr. Bowden you're just doing
2  your job as a leader, you don't need to be promoted
3  to a leader?
4      A.  What I have to assume and what I operated
5  on the entire time I was at the Smithsonian is that
6  the personnel office's rating and ranking panel, I
7  mean position description panel, they had this
8  giant, mysterious way that they ranked positions.
9  I had zero input into did I want this to be a 12 or
10 11 or whatever.  As a manager I wanted fairness for
11 my employees, wanted their positions graded at the
12 appropriate level.  So, there's no motivation for
13 them to be otherwise.  The way the process worked
14 is we submitted to personnel a position description
15 and they graded it.
16         (Dolnick Deposition Exhibit Number 7,
17 Letter dated 7/23/03, for identification.)
18         BY MR. SILVERBERG:
19     Q.  Do you recognize this letter?  I'm moving
20 in a letter from Kathleen Samiy to Dan, Lynn and
21 Scarlitt dated 7/23/03, and above it it says from

Page 93

1  Scarlitt Proctor to Lynn Dolnick, Kathleen Samiy,
2  Dan Winewon, 7/23/03.  Do you recognize this
3  letter?
4      A.  I don't know what recognize means.
5      Q.  Do you remember it?
6      A.  It makes sense to me that it would have
7  happened.  I don't have a specific recollection of
8  this e-mail.
9      Q.  Now, this e-mail is from, the bottom is
10 from Miss Samiy.  Correct?
11     A.  Correct.
12     Q.  And you're one of the people it's to.
13 Correct?
14     A.  Correct.
15     Q.  And she formally requests a desk audit.
16 In her next paragraph she says Tony's been
17 performing for E & O for well over one year.  It's
18 clear the job description is very old, outdated and
19 does not include duties, tasks and responsibilities
20 he's fulfilling.  Our hope is a desk audit will
21 clarify his job description and bring clarity to

Page 98

1  promotion for that higher grade?
2     A.  No.  The job description that we wrote
3  describing the additional duties we wanted her to
4  take on was ranked at the higher grade.
5     Q.  So, what did she go?  From what to what?
6  You said 11 to 13?
7     A.  No.  I think she started at the zoo at a
8  7.  I know a lot of production people did.  Levi
9  Murrell I promoted if that's your word.  He
10 increased his responsibilities.  I think when I
11 came he was like a 5 or some very low grade, and I
12 was shocked at that and looked -- so, it's about
13 the job.
14    Q.  Grace Lopez received a higher grade
15 because?
16    A.  Of the job.
17    Q.  Because you gave her a new position
18 description which included more duties?
19    A.  Correct.
20    Q.  But there was no desk audit?
21    A.  No.

Page 99

1     Q.  Grace Lopez is female.  She's Hispanic.
2  Is that right?
3     A.  No.
4     Q.  She's white?
5     A.  No.  She's Phillipine.
6     Q.  Who authorized her promotion?
7     A.  Her supervisor.
8     Q.  Who was that?
9     A.  I don't remember the sequence of time.
10    Q.  Did you have to approve it?
11    A.  Probably.
12    Q.  What about Aaron Ferster?  Is that his
13 name, Ferster?
14    A.  Mm-hmm.
15    Q.  Did he receive a higher grade?
16    A.  Mm-hmm.
17    Q.  He didn't get a desk audit either.
18 Right?
19    A.  The desk audit was Tony requested a desk
20 audit because he felt the work he was doing --
21    Q.  That's not what I'm asking.  We got a lot

Page 100

1  of work to cover and I'm going to try to rush a
2  little.
3     A.  That would be great.
4     Q.  What I'm asking is did Aaron Ferster get
5  a job?
6     A.  Based on a new position description, yes.
7     Q.  And who wrote the new position
8  description?
9     A.  I don't remember.
10    Q.  What was the impetus behind writing him a
11 new position description?
12    A.  New responsibilities.
13    Q.  Did you coordinate that?  You said that
14 he needs a new PD?
15    A.  I don't remember who was supervising him
16 at the time.
17    Q.  Did you approve the job?
18    A.  Probably.
19    Q.  The position, the grade increase?
20    A.  Probably.
21    Q.  Did you approve the grade increase for

Page 101

1  Miss Lopez?
2     A.  Probably.
3     Q.  Aaron Ferster a white male?
4     A.  Probably.
5     Q.  Probably?
6     A.  Is he a white male?  Yes.
7     Q.  Is he Jewish?
8     A.  Yes.
9     Q.  So, you authorized his promotion?
10    A.  Authorized, I'm in the chain of command.
11    Q.  You approved it?
12    A.  Yes.
13    Q.  Susan Ades, didn't she get a higher
14 grade?
15    A.  Susan Ades took on -- I don't know which
16 time you're talking about, but took on an entirely
17 new job.  It's not a higher grade.  She applied for
18 a new job that was competitively advertised as did
19 Aaron as I recall, and Susan was the head of our
20 exhibit planning department and coordinating major
21 exhibits.  It was different.

26 (Pages 98 to 101)

Page 102

1    Q. But didn't Aaron get a higher job without
2  competing?
3    A. I don't remember.
4    Q. Didn't you just say though because he had
5  increased duties?
6    A. I said we wrote a job description that we
7  needed work to be done. It was ranked at a certain
8  level. This isn't like some law firm that you hand
9  out promotions or bonuses or something. The
10 personnel system at the Smithsonian is -- I don't
11 control those things.
12   Q. But didn't Aaron Ferster get a higher job
13 based on the job he was doing higher graded duties?
14   A. Yes.
15   Q. Was that the same for Grace Lopez?
16   A. All those jobs are based on the duties,
17 and which ones they had to apply for is again this
18 complex personnel thing of how the steps work. I
19 mean, it's all this black box of personnel.
20   Q. I'm just asking did Aaron Ferster compete
21 for the job or was it just --

Page 103

1    A. I don't remember.
2    Q. And did Lopez, Ferster or Ades have desk
3  audits to your knowledge, just yes or no?
4    A. No.
5    Q. Is Susan Ades Jewish?
6    A. Yes.
7    Q. And she received a promotion?
8    A. She got a different job.
9    Q. What about Jessie Kohem? Who's he?
10   A. She.
11   Q. She.
12   A. She's the photographer.
13   Q. What was Susan Ades' position?
14   A. She was the head of exhibit planning.
15   Q. And what was Aaron Ferster's position?
16   A. Writer and project manager.
17   Q. And what was Grace Lopez's position?
18   A. Exhibit specialist.
19   Q. When they got new positions did their
20 positions change or just the grade?
21   A. Often they changed.

Page 104

1    Q. Do you know what they changed to?
2    A. Aaron's for instance went from writer to
3  writer and project manager or something.
4    Q. So, something was added to writer?
5    A. Sure.
6    Q. What about Susan Ades? What to what?
7    A. She went from an interpretation manager.
8  I don't remember the specifics of it.
9    Q. Just do your best.
10   A. But she went from managing a specific
11 project to managing a whole bunch of projects and
12 supervising a bunch of people. She became a
13 supervisor.
14   Q. What about Grace Lopez?
15   A. Grace was an exhibit specialist, and
16 based on the work that she was doing it was graded
17 at a higher level.
18   Q. Did she stay an exhibit specialist?
19   A. I don't remember the title of the job.
20   Q. And Jessie Kohem, what did she go? From
21 what to what?

Page 105

1    A. I'm not sure. I think she went from 11
2  to 12.
3    Q. From what job to what job?
4    A. She was a photographer in both cases, but
5  the job of photographer has changed dramatically in
6  the last 15 years to extraordinary amount of
7  technical computer management that is highly
8  skilled.
9    Q. Did she compete for a higher position or
10 is it because the photographer job changed she got
11 the higher grade?
12   A. We did not advertise that position as I
13 recall. I'm not sure. I don't know.
14   Q. Did you advertise Grace Lopez's increase?
15   A. As I say I don't remember.
16   Q. Well, it sounds to me outside of Susan
17 Ades which I'm not sure about, the others, Lopez,
18 Ferster and Kohem got new position grades because
19 their job changed or were added to. Is that
20 correct?
21   A. In personnel's opinion.

Page 106

1  Q. And you approved all of these. Correct?
2  A. Right.
3  Q. And did any of them, did any of these
4  people, weren't all these people acting head of
5  their respective departments?
6  A. I don't knowing what that means.
7  Q. Acting as leader.
8  A. Was Grace acting as head you mean?
9  Q. Yes.
10 A. And was Jessie? There was no department
11 for Jessie. She oversaw a couple of people, but
12 there wasn't a department.
13 Q. But what about Lopez, Ferster, Ades? Did
14 they act as head of their division?
15 A. I don't know what you mean division. If
16 Aaron oversaw other writers?
17 Q. Yeah.
18 A. He had responsibility to coordinate a
19 number of different projects. I don't think he --
20 he certainly wasn't a supervisor.
21 Q. I guess what I'm asking is why did all

Page 107

1  these people get promoted based on higher duties
2  and at least three of them didn't compete --
3  A. Because that's the way personnel --
4  Q. Let me finish. And Mr. Bowden had to go
5  through a desk audit?
6  A. He didn't have to go through the desk
7  audit. He requested a desk audit because he didn't
8  agree with the position descriptions that were
9  given him.
10 Q. But given Miss Dolnick's e-mail and given
11 your knowledge of what Mr. Bowden was doing and
12 given you also said he was acting head for at least
13 a while do you believe he should have been bumped
14 up like all these other people?
15 A. No, I'm not saying I believe or don't
16 believe. It's not my job to believe. It's my job
17 to work with personnel to be sure that every
18 employee is treated fairly and honestly.
19 Q. Don't you put input into the promotions?
20 Don't you have a say in it?
21 A. I have a say in this is an increased

Page 108

1  level of responsibility and does it merit an
2  increase in pay.
3  Q. Did anyone else at the zoo within your
4  tenure become a leader within the exhibits
5  department?
6  MR. NEBEKER: Objection, vague.
7  BY MR. SILVERBERG:
8  Q. Well, Tony's PD says leader. Did anyone
9  get the designation leader?
10 A. Yes. As I recall the job was written for
11 Ernest Long who then became the supervisor of
12 production.
13 Q. Wasn't Mr. Hider the supervisor and not
14 Mr. Long?
15 A. That was before Ric Hider.
16 Q. Who promoted Ernest Long? Did you?
17 A. Yeah.
18 Q. To what grade?
19 A. I don't remember.
20 Q. Isn't it true he stayed a Grade 11?
21 A. I don't remember. The grades are

Page 109

1  determined by personnel, not by me.
2  Q. But you might have knowledge of it. I
3  would think you would know what your staff's grades
4  are.
5  A. I don't remember.
6  MR. SILVERBERG: We would like
7  information about Mr. Long's grade, what grade he
8  was.
9  BY MR. SILVERBERG:
10 Q. So, Lopez, Ferster, Ades and Kohem, were
11 they made leaders before they were promoted?
12 A. I don't, I mean I don't know what you
13 mean by leaders.
14 Q. Well, the way Mr. Bowden PD says leader
15 on it, did their PDs change to say leader?
16 A. Their PDs changed. Leader first of all
17 isn't necessarily the criteria for higher grade as
18 I understand it nor is it a requirement for a
19 higher grade.
20 Q. Well, what I'm asking is isn't it true
21 that they weren't made leaders. They just got the

28 (Pages 106 to 109)

Page 118

1 Right?
2 A. But then there was follow-up to be sure
3 that complaints were --
4 Q. But he only interviewed Tony once. Isn't
5 that true?
6 A. I have no idea.
7 Q. What's I guess this is pronounced COTR?
8 A. COTR.
9 Q. It means contracting officer technical
10 representative. Right?
11 A. Right.
12 Q. Do you know that Tony had COTR training?
13 A. Yes. We sent him.
14      (Dolnick Deposition Exhibit Number 10,
15 Certificate of training, for identification.)
16      BY MR. SILVERBERG:
17 Q. Is this the result, the certificate of
18 training that Anthony as a COTR, Anthony Bowden, as
19 far as you can see? Is this the result of that
20 training as far as you can see?
21 A. It's the certificate that he finished the

Page 119

1 course.
2 Q. So, he was a COTR. Right?
3 A. He finished the course as a COTR. You
4 have to be designated on a specific contract to be
5 a contracting officer technical representative.
6 Q. But he had the qualifications once he
7 finished the course?
8 A. Right.
9 Q. Do you know if he was working as a COTR?
10 A. In any jobs?
11 Q. Yeah.
12 A. Yeah, I think there were a couple as I
13 recall. Some small ones. Not big projects. I
14 can't remember.
15      (Dolnick Deposition Exhibit Number 11,
16 E-mail, for identification.)
17      (Dolnick Deposition Exhibit Number 12,
18 E-mail dated 2/24/04, for identification.)
19      (Dolnick Deposition Exhibit Number 13,
20 E-mail, for identification.)
21      BY MR. SILVERBERG:

Page 120

1 Q. These are e-mails. Number 11 is from
2 Kathleen to Darren H, whoever that is, but it says
3 yes, and sorry but Tony is COTR. Needs to do a
4 written approval for downtown.
5 A. Yeah. That's an exhibit firm that is
6 getting, wants something. Yeah.
7 Q. So, Tony was a COTR for that?
8 A. For this project.
9 Q. And what about 2/24/04, D-12 from
10 Anthony --
11 A. Yeah, that's for an installation.
12 Q. As COTR you should be lock step. That's
13 from Kathleen Samiy?
14 A. Right.
15 Q. So, is that another contract?
16 A. Yeah. These sound to me like she was
17 unhappy with his performance on them, but yes.
18 Q. You know, I'm going to ask you to only
19 answer the question. That was an editorial you
20 just injected in to make your position. I did not
21 ask you whether she was happy with his performance.

Page 121

1 I asked you was he acting as a COTR on that
2 contract.
3 A. Yes.
4 Q. Okay. What about the third one, Dolnick
5 13, where it says from Lynne to Tony, Tony, can you
6 be sure to oversee the installation as the zoo's
7 COTR. So, was he the COTR on that project?
8 A. Mm-hmm.
9 Q. Was that a yes?
10 A. I mean, obviously. That's what it says.
11 Q. So, he's acting head of production. He's
12 a COTR which is a more responsibility. I don't
13 understand --
14 A. COTR --
15 Q. Let me finish. I know you're going to
16 say it wasn't your decision. It was personnel,
17 blah, blah, blah, blah. But I don't understand how
18 these other people I named because they were doing
19 higher graded duties became a higher graded job and
20 Mr. Bowden wasn't?
21 A. Where's the question?

31 (Pages 118 to 121)

Page 122

1   Q. The question is why did these other
2  people get promotions -- and I'll use the word
3  promotion. If you're going from an 11 to 12 that's
4  a promotion. I know something about federal
5  personnel stuff too. Why did they get promotions,
6  but Mr. Bowden who was doing higher duties than he
7  originally was hired for and was a COTR even,
8  why --
9   A. Because they were ranked at the 11.
10  Q. You don't let me finish my -- why didn't
11 he get a promotion?
12  A. Because they didn't warrant it by
13 personnel. If you look at our department and
14 compare the duties even within horticulture, which
15 is a department I also oversaw, and certainly
16 within the OFEO, or the facilities management side,
17 our department, in fact I got grief from other
18 supervisors that we had so many 11s in our
19 departments because there were people doing similar
20 jobs for lower pay in other departments.
21  Q. So, people in your department were

Page 123

1  actually over graded?
2   A. According to people in horticulture and
3  OFEO.
4   Q. I guess I'm asking, and I know you're not
5  personnel, but the guy's acting head of production
6  and doing the duties of a COTR. What does he have
7  to do to get a promotion if he's doing the duties
8  of a --
9   A. A COTR does not equal a 12.
10  Q. But acting head of production?
11  A. Does not equal a 12. As I recall, Ernest
12 Long was an 11 as the head of production, but I'm
13 not sure about that.
14  Q. What about the 30 or so duties that
15 Mr. Bowden claimed weren't counted?
16  A. As I recall they were considered in the
17 desk audit.
18  Q. So, you disagree with Mr. Bowden's letter
19 to you?
20  A. Yes.
21  Q. Where he named 30 something duties that

Page 124

1  weren't --
2   A. Yes.
3   Q. But wouldn't he know what duties were
4  considered and what weren't?
5   A. How?
6   Q. By questions asked him and not asked him.
7   A. No, because the supervisor is the key
8  piece of the desk audit.
9   Q. And by his evaluation. There was an
10 evaluation form.
11    (Dolnick Deposition Exhibit Number 14,
12 Desk audit evaluation, for identification.)
13    BY MR. SILVERBERG:
14  Q. What is this evaluation statement?
15  A. I don't know. Is this from the desk
16 audit? I don't know what this is.
17  Q. I'll say yes. Did you ever see this? On
18 the third page it's signed at the bottom James
19 Lewis. His name is James Lewis. It says this
20 position is correctly classified as exhibit
21 specialist 101011. Couldn't Mr. Bowden have seen

Page 125

1  this evaluation statement and make certain
2  conclusions about what was considered and what
3  wasn't?
4    MR. NEBEKER: Objection.
5    MR. SILVERBERG: Why?
6    MR. NEBEKER: Calls for speculation.
7    BY MR. SILVERBERG:
8   Q. Isn't it true that Mr. Bowden to your
9  knowledge was given this evaluation statement?
10  A. I don't know.
11  Q. You don't know. Looking at the
12 evaluation statement isn't the evaluation statement
13 stating what factors were evaluated in the audit?
14    MR. NEBEKER: Objection, lacks
15 foundation.
16    BY MR. SILVERBERG:
17  Q. Doesn't this explain what was considered
18 in the audit?
19    MR. NEBEKER: Objection.
20    THE DEPONENT: If you're asking me to
21 examine this and examine whether or not Tony's

Page 142

1  of that.
2    Q. And Tony was an exhibit specialist?
3    A. Yes.
4    Q. And basically what does an exhibit
5  specialist do? They tend to the exhibits of the
6  zoo?
7    A. There's a lot of different jobs in
8  exhibit specialist. There's a lot of different
9  responsibilities. Do you want me to describe them?
10   Q. Can you just very briefly give an
11 overview of what an exhibit specialist does? If
12 somebody asked me what a lawyer does I maybe after
13 two days I could finish describing it.
14   A. Yeah. So, an exhibit specialist, the
15 exhibits department was responsible for getting new
16 things made, maintaining old things and creating a
17 lot of signage throughout the zoo. Grace's primary
18 job was creating signage for special events, and
19 she did the majority of the production work for a
20 particular kind of signage, the majority of it.
21       Tony's primary responsibilities were for

Page 143

1  installation and maintenance and not as much in
2  producing the materials that were put in the park.
3    Q. Isn't it true that Tony was given a lot
4  of heavy and dirty duties to do?
5    A. It's true that installation and
6  maintenance of exhibits in the zoo requires work in
7  the zoo out in the park.
8    Q. How many other exhibit specialists were
9  there at the time that Tony was an exhibit
10 specialist?
11   A. Well, it varied from time to time and I
12 don't quite remember who Tony overlapped with,
13 whether he was there when Levi was there and
14 Sherod.
15   Q. Do you know he was requested to go out in
16 all types of weather, hot and cold?
17   A. I know that we have work that needs to be
18 done in all types of weather, hot and cold, and I
19 know that what we tried to do was have everybody,
20 have the people in production come in early so they
21 could get work done before the crowds came and

Page 144

1  before the heat came in the summer.
2    Q. Was Grace Lopez ever asked to go out in
3  inclement weather?
4    A. Sure.
5    Q. She was?
6    A. Was out in the park in inclement weather,
7  sure.
8    Q. I mean, was she asked to do work out in
9  the park in inclement weather?
10   A. Sure. She did a lot of installation of
11 the signs that she produced.
12   Q. Did she have to lift heavy objects?
13   A. I can't imagine that she could. She is
14 about four foot, 11 and weighs probably 85,
15 90 pounds. She's tiny.
16   Q. Did she have to build exhibits?
17   A. No. That wasn't her -- I mean, yes. She
18 did a lot of production of signage.
19   Q. Did she install the signs?
20   A. A lot, yes.
21   Q. You're aware that Mr. Bowden had to lift

Page 145

1  heavy objects, build exhibits and install signs?
2    A. Yeah. As I recall it says so in his
3  position description.
4    Q. Does Miss Lopez, does she ever have to
5  install large signs?
6    A. Are you saying I'm discriminating that
7  Grace can't lift heavy things?
8    Q. You're asking me a question again. I'm
9  just asking. You may have a logical reason why she
10 didn't have to.
11   A. I didn't assign the jobs in production.
12 The jobs in production were overseen by the
13 production supervisor.
14   Q. Was Grace in production?
15   A. Yes.
16   Q. And you were her second line supervisor?
17   A. Correct.
18   Q. Do you Mr. Bowden had to do lifting,
19 pulling, push heavy objects and dig?
20   A. Yes.
21   Q. And build exhibits, indoor and outdoors

37 (Pages 142 to 145)

Al Betz & Associates, Inc.
www.albetzreporting.com

Page 146

1  and maintenance duties?
2     A. Yes.
3     Q. Did Grace do any of that?
4        MR. NEBEKER: Objection, compound.
5        THE DEPONENT: I think she did some, yes.
6        BY MR. SILVERBERG:
7     Q. I asked did she do any of those. What
8  about the other exhibit specialists? Were they
9  made to do those kind of maintenance duties?
10    A. Yes.
11    Q. They were? Isn't it true that most of
12 the maintenance and dirty duties fell on male
13 exhibit specialists instead of female?
14       MR. NEBEKER: Objection.
15       THE DEPONENT: Well, we only had one
16 female in the department.
17       BY MR. SILVERBERG:
18    Q. Isn't it true that the ones who were
19 assigned to do the dirty jobs were generally the
20 black employees?
21       MR. NEBEKER: Objection, vague.

Page 147

1        THE DEPONENT: Well...
2        BY MR. SILVERBERG:
3     Q. Go ahead unless he tells you not to.
4     A. We only, we didn't have any white male
5  exhibit specialists.
6     Q. Could other people have done some of
7  those jobs?
8     A. Other humans?
9     Q. No, that weren't exhibit specialists.
10    A. Could they have? I could have.
11    Q. Did the maintenance jobs just fall to
12 the --
13    A. Exhibit specialist.
14    Q. Yes?
15    A. Yes.
16    Q. What was Ernest Robinson's position?
17    A. When I first came in the department he
18 was a production, an exhibit specialist and then he
19 became a designer.
20    Q. As a designer wasn't he made to do a lot
21 of this heavy and dirty work?

Page 148

1     A. That's a very interesting question
2  because it goes to the word made. In fact, Ernie
3  was counselled a number of times to stop doing
4  that, that he needed to do design. He preferred to
5  see projects from start to finish including
6  installation and we had a hard time getting him to
7  let go of that.
8     Q. Is he black?
9     A. Yes.
10    Q. Hold on one second.
11    A. And he often, especially when we were
12 under a crunch if he knew an exhibit was opening or
13 something he was very willing and eager and often
14 asked if he could participate in installation. He
15 was not made to do any of that.
16    Q. Did Grace Lopez put in an application for
17 a designer position?
18    A. Yeah, I think she did.
19    Q. Was she asked to withdraw her application
20 from the cert?
21    A. No.

Page 149

1     Q. You didn't ask her to withdraw her
2  application?
3     A. No.
4     Q. Did Elena Lopez make the cert at the same
5  time?
6     A. You're talking about a cert for design?
7     Q. Yes. Who got the position?
8     A. Elena.
9     Q. And you don't know if Grace withdrew her
10 application?
11    A. I don't.
12    Q. After the position was filled by Elena --
13 I assume no relative to Grace?
14    A. Elena was Hispanic.
15    Q. And Grace was Filipino?
16    A. Correct.
17    Q. And neither were Jewish?
18    A. Not to my knowledge.
19    Q. After that position was filled do you
20 know how long it took for Grace to become, go from
21 a 9 to an 11?

Page 150

1  A. No.
2  Q. Did you tell Miss Lopez, Grace Lopez,
3  that her job duties would not increase as a result
4  of her receiving a promotion?
5  A. No.
6  Q. Did she take on more responsibilities
7  prior to receiving a promotion to a GS-11?
8  A. Did she take on more responsibilities
9  prior? Yes, I think.
10  Q. Was Tony the only one made to clean both
11  the upper and lower shops?
12  A. I can't imagine. I vacuumed the office
13  we had. So, I don't know.
14  Q. Did you vacuum the shops or your office?
15  A. The office and office area, the whole
16  area where we were. I mean, I don't know what that
17  question's about. If he was asked to clean it?
18  Certainly, I have very strong recollection of
19  asking Ernie Robinson when he was in production to
20  clean the shops and Ernie Long.
21  Q. Are they both black?

Page 151

1  A. Yes, although I don't understand the
2  connection.
3  Q. I'm going to ask you to refrain from
4  doing that. This is a lawsuit in Federal Court.
5  There are certain rules.
6      MR. SILVERBERG: Counsel, she does keep
7  editorializing beyond the question. I can't stop
8  her.
9      MR. NEBEKER: I disagree with your
10  characterization, Counsel. I think she's trying to
11  answer your question.
12      MR. SILVERBERG: When she says I don't
13  see the connection that doesn't go beyond? I asked
14  if these two men were black. Yes or no is the, or
15  one of them is the only answers possible.
16      (Dolnick Deposition Exhibit Number 19,
17  Letter, for identification.)
18      BY MR. SILVERBERG:
19  Q. Did you ever see this letter for the male
20  employees? I guess all black males. No. I'm
21  sorry. One is white.

Page 152

1  A. Two are white.
2  Q. Two are white. To Mary Tanner saying
3  that Kathleen Samiy created a hostile work
4  environment in the department of exhibits and
5  outreach. Specific examples stated by a hundred
6  percent of the permanent male staff. Did you ever
7  see this letter?
8  A. No, I don't think I did see this letter.
9  Q. Well, you had said before though you
10  thought the men went to Mary Tanner.
11  A. Yes.
12  Q. So, this is probably it. Right?
13  A. Yeah.
14  Q. Are you aware that these four men who I
15  guess were central to the staff felt that the men
16  were being discriminated against by Miss Samiy?
17  A. Yes.
18  Q. And did you ever talk to Miss Samiy in
19  saying, inquiring of whether she was treating the
20  men fairly?
21  A. I would argue that she was -- I think as

Page 153

1  I recalled she sent these -- they're not
2  reprimands, these cards to all her staff. I
3  certainly spoke to her, but I had no evidence
4  whatsoever that she was distinguishing between
5  males and females. I mean, I know one woman who
6  was very upset with the distribution.
7  Q. Do you know why --
8  A. Judy Taz.
9  Q. Do you know why these men felt that she
10  was unfair to the men?
11  A. No.
12  Q. Well, this is signed by Anthony Bowden,
13  Aaron Ferster, Herman Krebs and Ernest Robinson.
14  These are all exhibit staff?
15  A. Mm-hmm. No. No. I mean, they're all
16  exhibit staff, yes. They're not all exhibit
17  specialists. There's two designers, a writer and a
18  production.
19  Q. But they're all exhibits department
20  staff?
21  A. Yes.

39 (Pages 150 to 153)

Al Betz & Associates, Inc.
www.albetzreporting.com

Page 154

1    Q. Did you read over the civil action that
2  we filed in court before coming here today?
3    A. I read it months ago when I got it.
4    Q. I'm going to quote from it. It's already
5  in the record obviously. It doesn't have to be an
6  attachment to a deposition exhibit.
7       MR. NEBEKER: As long as there's a
8  question at the end.
9       (Whereupon, a discussion was held off the
10 record.)
11      MR. NEBEKER: I wonder if we could take
12 just a short break.
13      (Recess taken -- 2:30 p.m.)
14      (After recess -- 2:38 p.m.)
15      BY MR. SILVERBERG:
16   Q. I was going to read you from the
17 complaint and these are taken by, were given as
18 affidavits or statements in the report of
19 investigation in this case, EEO report of
20 investigation. Aaron Ferster, weren't you and Miss
21 Samiy -- you were second line and she was his first

Page 155

1  line supervisor?
2    A. Correct.
3    Q. A writer editor. Right? Now, he says he
4  and Plaintiff, Tony, were part of a group of males
5  that have been subjected to hostile and
6  inappropriate management activities by their mutual
7  supervisor Kathleen Samiy. No offense. I'm just
8  reading what it says. The tone changed from
9  mismanagement to hostile shortly after Lynn Dolnick
10 hired Kathleen Samiy. It cultivated a hostile work
11 environment, particularly males who were regularly
12 subjected to threats of official reprimand, hostile
13 and accusatory confrontations. Treatment of
14 certain individuals related to their race and
15 gender, there was a clear distinction between those
16 employees who were subjected to the most hostile
17 behavior. They were male and African American
18 males in particular.
19      Herman Krebs says I've been managed
20 atrociously for at least 15 years, and Lynn Dolnick
21 created suspicion, unfairness and incompetence.

Page 156

1  There were different rules for different people.
2  Promotions were given almost exclusively to staff
3  members of Jewish origin.
4       Ernest Robinson said he was present at a
5  meeting with Kathleen Samiy and Lynn Dolnick when
6  they promised Mr. Bowden he would be promoted for
7  the duties he was then performing.
8    A. Are you saying that they testified that
9  I --
10   Q. I'm asking the questions.
11   A. No. I just, I didn't understand what you
12 just read.
13   Q. They wrote these statements.
14   A. They wrote that I had promised him?
15   Q. These were affidavits given by them in
16 the report for investigation. I'm sorry I jumped
17 at you. That was clearly a clarifying question. I
18 could go on. I'm just asking you where -- do you
19 have any idea where these guys got these ideas that
20 males, especially black males were mistreated?
21   A. Well, no, because first of all these are

Page 157

1  four males two of whom are white and two of whom
2  are black who are complaining that they're being
3  mistreated. And I'm supposed to be nice to Jews.
4  Right?
5    Q. I think that's a great idea. I'm all for
6  that.
7    A. So, where did it come off that it's
8  mostly black?
9    Q. No one says you're supposed to be nice to
10 Jews. The allegation is that you favor Jewish
11 people in promotions and jobs and such. That's the
12 allegation.
13   A. Do we want to go through which ones of
14 those I hired versus other people?
15   Q. I'm really going to ask you to stop doing
16 that. That's not a question. That's a cutting
17 remark.
18      MR. SILVERBERG: Counsel.
19      BY MR. SILVERBERG:
20   Q. I understand you're on the hot seat all
21 day and it's a horrible position to be here and you

Page 198

1  for Ric Hider's position for a while. Wasn't he?
2        MR. NEBEKER: Objection, vague.
3        THE DEPONENT: I'm not going to speculate
4  about the time and the sequence of events.
5        BY MR. SILVERBERG:
6     Q. Well, why not? You were second line
7  supervisor.
8     A. Because I don't remember dates and events
9  in that way.
10    Q. Did you ever tell Mr. Bowden that Aaron
11 Ferster and Jessie Kohem had received their GS-12
12 because they had an increase in duties?
13    A. I don't recall. That makes sense.
14       (Dolnick Deposition Exhibit Number 29,
15 E-mail dated 4/18/04, for identification.)
16       BY MR. SILVERBERG:
17    Q. This is an e-mail to Dolph Sand from Tony
18 dated April 18th, '04. The part that's highlighted
19 said I had a meeting with Lynn Dolnick on April
20 2nd. I asked why Aaron and Jessie received their
21 GS-12 without all this hassle. She said they had

Page 199

1  an increase in duties. I believe that the reason.
2  Do you remember meeting with him, telling him in
3  April that these two had gotten their promotion
4  because of an increase in duties?
5     A. If you're asking me if I specifically
6  remember a specific meeting where I said that the
7  answer is no. I don't understand the word hassle,
8  but there's a tremendous amount of paperwork when
9  you do anything in the federal system and Aaron's
10 and Jessie's increase in responsibilities and
11 concomitant increase in pay scale as I recall took
12 forever.
13    Q. I still don't understand though. You
14 agree it's consistent with what happened that you
15 told Mr. Bowden that Aaron and Jessie got their
16 GS-12s because of increase in duties?
17    A. Correct.
18    Q. I still don't understand why some people
19 have increases and get promoted and it didn't work
20 for Mr. Bowden.
21    A. Because of the complexity of the work

Page 200

1  that they were doing was far more complex than the
2  work that Tony was even being asked to do, let
3  alone was doing at the time, and personnel rates it
4  based on those factors and those factors determine
5  grade.
6     Q. But why did he need a desk audit?
7     A. He asked for a desk audit.
8     Q. I understand. But why didn't the others
9  who were promoted have to get a desk audit? Why
10 didn't someone just know their duties were?
11    A. They didn't know. We said they were.
12    Q. Why couldn't you say the same for Tony?
13 Why did you need a desk audit?
14    A. Tony's -- what we were told by personnel
15 is that the GS-11 position covered all the duties
16 that he was doing. He didn't agree with that. So,
17 we did a desk on it that, A, it was 11 and that we
18 had captured all of his duties under the PD. So,
19 we did the desk audit so that we could be sure that
20 we were being fair, open and honest.
21    Q. Are Aaron and Jessie both white?

Page 201

1     A. Yes.
2     Q. At the time you were associate director
3  of exhibits department did any black staff members
4  were ever promoted to GS-12? And don't include the
5  horticulture department, just exhibits department.
6     A. I don't remember what Ernie Long's. And
7  why shouldn't I include exhibits?
8     Q. No. I said horticulture.
9     A. Why shouldn't I include them? I oversaw
10 them just as much as I oversaw exhibits.
11    Q. You're asking me a question.
12    A. Excluding horticulture, were any blacks
13 promoted to a 12? Is that what you're asking me?
14    Q. Well, I'm focussing on the department was
15 in, the exhibits department. Were any blacks made
16 GS-12s?
17    A. No.
18    Q. Did you and Miss Samiy ever have any
19 conversation regarding giving Tony a promotion?
20    A. Yes, we had a tremendous amount of
21 conversations.

Page 202

1  Q. You and Miss Samiy?
2  A. Yes. I take that back. I object to the
3  word promotion. Talking about --
4  Q. Higher grade.
5  A. Whether or not he was doing 12 work.
6  Yes, we had countless discussions about it, and
7  with Scarlitt.
8  Q. Wouldn't he have been the same grade as
9  Miss Samiy if he had received the GS-12?
10  A. I don't remember.
11  Q. Did that have anything to do with him not
12  getting promoted, that they would be the same
13  grade?
14  A. No.
15  Q. Didn't you tell him that you couldn't
16  promote him because he would be the same grade as
17  Miss Samiy?
18  A. No.
19  Q. Didn't you tell him that he may get a
20  promotion but he'll never be a supervisor?
21  A. No. What I did tell him -- do you want

Page 203

1  me to clarify what I -- what I did tell him is that
2  even if he weren't selected as supervisor that was
3  not the only path to a GS-12.
4  Q. Did you talk to Miss Tanner about giving
5  Tony a promotion?
6  A. Again, I don't like that word.
7  Q. A higher grade.
8  A. I don't remember if I talked
9  specifically. I mean, she was well aware of all
10  this desk audit stuff.
11  Q. I have to tell you in all the years I've
12  done this I've never heard someone distinguish
13  between a promotion and a higher grade. I
14  understand your point though. You can object as
15  editorial.
16  (Dolnick Deposition Exhibit Number 30,
17  E-mail announcing position opening, for
18  identification.)
19  THE DEPONENT: The reason I object to
20  that is because a promotion implies I'm happy with
21  your work. Therefore, you get more pay. From my

Page 204

1  point of view happiness with work doesn't do that.
2  BY MR. SILVERBERG:
3  Q. Wouldn't you agree that --
4  A. It's about the duties.
5  Q. But wouldn't you agree that -- I don't
6  even know why I'm getting into this point, but that
7  in general if someone goes up a grade it can be
8  generically called a promotion as opposed to they
9  go down a grade it can be called a demotion?
10  A. No.
11  Q. Okay. Don't agree. I'd like to -- this
12  is from Kathleen Samiy and it's to 1, 2, 3, 4, 5,
13  6, 7, 8, 9 --
14  A. Well, it goes dot, dot, dot. So, it just
15  didn't print out.
16  Q. It says OPR has announced the following
17  positions for our exhibit department, supervisor
18  exhibit specialist production manager. Isn't that
19  the position that Jeff Baxter received?
20  A. Yes.
21  Q. Was selected for?

Page 205

1  A. Yes.
2  Q. Do you see this e-mail to Tony Bowden at
3  all?
4  A. As I said the dot, dot, dot means that
5  the thing didn't print out the rest of the
6  addresses.
7  Q. So, his name's not on it?
8  A. But that doesn't mean --
9  Q. It may have gone to him and it may not
10  have?
11  A. Correct.
12  Q. Were you holding interviews for this
13  position in production? Were you holding
14  interviews for the supervisory exhibit position
15  prior to it being posted?
16  A. No.
17  Q. Do you remember ever saying that Tony may
18  be qualified for the position but he doesn't know
19  what he's in for and he'll be sorry if he gets the
20  job?
21  A. I remember this conversation, and I

52 (Pages 202 to 205)

Page 218

1  software.
2       MR. SILVERBERG: That's not what I asked
3  though. I'm not obligated to word it a certain
4  way.
5       MR. NEBEKER: But I think she's allowed
6  to give a complete answer too.
7       MR. SILVERBERG: I think she's going
8  beyond and she's arguing her points with me.
9       THE DEPONENT: I'm trying to tell the
10 whole truth.
11      MR. SILVERBERG: And nothing but the
12 truth.
13      BY MR. SILVERBERG:
14   Q. The position that Miss Samiy was selected
15 for, the supervisor, graphic and production
16 specialist, do you know why Tony was never given an
17 interview?
18   A. Because that was an extensively heavy
19 design position and Tony had no background in that.
20   Q. Wasn't it design and production?
21   A. Well, if you look at the selective

Page 219

1  factors in that job description there was extensive
2  design knowledge. There was some production, but
3  extensive design and he didn't meet the selective
4  factors.
5    Q. One second. Have you ever had staff
6  members of a lower grade level than the position
7  being selected go through applications to make a
8  determination to be selected? I think this is what
9  we've discussed before.
10   A. Yes, an advisory basis. And then there
11 were cases where I asked specifically if it was
12 okay because those people had the best skills in
13 the department to evaluate.
14   Q. Didn't you have Melissa Galding and Susan
15 Ades help you decide who would be interviewed for
16 the position of supervisory graphic and production
17 specialist?
18   A. Yes.
19   Q. And they were both a lower grade level
20 than the position. Right?
21   A. Correct.

Page 220

1    Q. So, they knew how to advise you for a
2  position that was above them?
3    A. Yes, because what that involves is going
4  through the factors and ranking them. It's not a
5  decision making process. It's a knowledge of the
6  job and then it becomes an administrative
7  secretarial.
8    Q. And did you receive specific permission
9  at all?
10   A. Yes.
11   Q. From who?
12   A. Scarlitt.
13   Q. I've never heard of this practice being
14 done. Have you ever seen it or heard it before?
15   A. I told you I did.
16   Q. You didn't?
17   A. I did.
18   Q. Had you seen anyone else ever use that
19 practice of using subordinate workers?
20   A. I haven't watched people rate and rank.
21   Q. Doesn't that go -- isn't there a specific

Page 221

1  rating and ranking procedure in the federal
2  government and in the agency that nowhere does it
3  include using subordinate employees to advise?
4    A. No.
5    Q. What's no?
6    A. I'm not aware of any stipulation in that
7  case because these are not, as I said, this is not
8  a decision making process.
9    Q. Let me ask you this. Did Miss Ades and
10 Miss Galding, what were their positions?
11   A. They were both exhibit project managers.
12 I'm not sure exactly what the title of their job
13 was.
14   Q. And didn't both of them -- what grade
15 were they?
16   A. Well, you just said they were 11. I
17 don't remember what grade they were at that time.
18   Q. Were either of them in production or
19 design?
20   A. No.
21   Q. Yet you used them for a position that had

56 (Pages 218 to 221)

Page 222

1  to do with production and design?
2      A. Yes.
3      Q. And did they review any of the
4  applications?
5      A. That's what they did. That's what I'm
6  saying.
7      Q. Did they help rank and rate the
8  applications?
9      A. They gave their opinion which I then
10 reviewed.
11     Q. But they weren't part of an official
12 rating and ranking panel?
13     A. No. The rating and ranking is done by
14 personnel.
15     Q. So, they kind of vetted what to send to
16 personnel?
17     A. They vetted this pile seems to make the
18 cut and this pile doesn't. It's just the ranking,
19 I mean, the selective factors, and that's the job
20 that I then as I said asked for from the staff an
21 advisory panel to interview the candidates and they

Page 223

1  took them around the park. It was purely advisory.
2      Q. And Miss Proctor okayed this?
3      A. The advisory panel, yes, as long as it's
4  not a decision making process.
5      Q. And if I told you I've never seen that
6  used before in the federal government would you be
7  surprised?
8      A. Yeah, I would, because it's a shame that
9  the federal government never asks the employees for
10 input.
11     Q. I would agree with that totally, but I'm
12 not asking that. I'm just saying I haven't seen it
13 practiced.
14     A. Okay.
15     Q. Have you outside of yourself?
16     A. As I say, I had a job that I was doing
17 which was not personnel and I didn't watch other
18 people. I know that that practice was done in
19 other jobs actually.
20     Q. Did you have questions whether the
21 project was shall we say kosher?

Page 224

1      A. Yes, and I asked. This was in an effort
2  to be open and exclusive.
3      Q. Now, after -- isn't it true that Tony met
4  with you in March '02 or on or about March '02
5  asking why he hadn't been considered for the
6  position of supervisory graphic and production
7  specialist, and you said to him you had something
8  else in mind and you were working on it and you
9  said he'd be very happy with it. Do you remember
10 saying words at all to that effect?
11     A. No.
12     Q. You never during the time Tony was acting
13 hinted to him or implied to him that he'd be
14 getting something good, just be patient?
15     A. No. What I did tell him repeatedly is
16 that there was plenty of responsibility to do,
17 there was plenty of work to do and that if he, he
18 had ample opportunity to take on more
19 responsibility. I saw my first duty as to the zoo
20 and getting work done.
21     Q. Did Miss Samiy have any production skills

Page 225

1  when she was selected for the position?
2      A. She certainly had extensive experience in
3  overseeing various kinds of production.
4      Q. Would you say you made a mistake hiring
5  her?
6      A. In the private sector.
7      Q. Would you say you made a mistake in
8  hiring her?
9      A. Yes.
10     Q. Would you say her skills weren't matched
11 to the job?
12     A. No.
13     Q. You wouldn't say that?
14     A. No. I would say her abilities weren't
15 matched to the job. Her skills as designer and
16 knowing what looks good and all that sort of thing,
17 what quality looks like, were excellent. Her
18 organizational abilities.
19     Q. Would you say that, was Plaintiff, Mr.
20 Bowden, was he ever, any announcements made to the
21 exhibit staff that he would be acting head of

57 (Pages 222 to 225)

Page 266

1  turnaround for that. I told you I'm leaving the
2  country on Tuesday.
3       MR. NEBEKER: Well, it will be a few
4  days, weeks even before we get the draft.
5       Mr. Silverberg, I hope you'll be patient
6  in getting back the errata from her. She's going
7  to be out of town.
8       MR. SILVERBERG: It's okay.
9       (Whereupon, the deposition was adjourned
10 at 5:12 p.m.)

Page 268

1  AL BETZ & ASSOCIATES, INC.
2       Administrative Offices
3       P.O. Box 665
4       Westminster, Maryland 21158
5  VOICE - (410)752-1733  FAX - (410)875-2857
6  e-mail- productiondept@albetzreporting.com
7       www.albetzreporting.com
8
9  DATE: October 18, 2007
10 JOB NUMBER: SD25892D
11 CASE CAPTION: ANTHONY BOWDEN vs. LAWRENCE M. SMALL
12 COURT: U.S. District Court
13 CASE NUMBER: 05-2022
14 DEPONENT: LYNN DOLNICK
15 DATE OF DEPOSITION: September 27, 2007
16 ATTORNEYS/FIRMS:
17 STEVEN SILVERBERG, ESQUIRE
18 MARK NEBEKER, ESQUIRE
19 Federal District Attorney's Office

Page 267

1  District of Columbia, to wit:
2       I, Stacey L. Daywalt, a Notary Public of
3  the District of Columbia, do hereby certify that
4  the within-named witness personally appeared before
5  me at the time and place herein set out, and after
6  having been duly sworn by me, according to law, was
7  examined by Counsel.
8       I further certify that the examination
9  was recorded stenographically by me and this
10 transcript is a true record of the proceedings.
11      I further certify that I am not of
12 counsel to any of the parties, nor an employee
13 of counsel, nor related to any of the parties,
14 nor in any way interested in the outcome of this
15 action.
16      As witness my hand and Notarial Seal
17 this 17th day of October, 2007.
18
19 _____
20      Stacey L. Daywalt, Notary Public
21 My Commission Expires: 11/14/2010.

Page 269

1  Dear Madam:
2
3       Bound herewith is the transcript of the
4  above-referenced deposition. Please read the
5  transcript and sign the errata pages. Any
6  additions or corrections should be listed on the
7  errata sheets provided. Please remove the signed
8  completed errata sheets, and return them to the
9  address listed above for processing.
10
11      If this process has not been completed
12 within (30) thirty days from the date of this
13 letter, we will assume that the right to read the
14 deposition has been waived. This is in accordance
15 with Rule 30(e) of the Federal Rules of Civil
16 Procedure and Rule 411 Section (a) of the Maryland
17 Rules of Procedure.