# PLAINTIFF'S EXHIBIT 2

Robinson Deposition Excerpts—pp. 12-13, 41, 59-61, 70, 112-14, 116-17, 120, 152-55, 229-30, 239

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ANTHONY BOWDEN,                :

    Plaintiff,             :

vs.                            : Civil Action No.

LAWRENCE M. SMALL,             : 05-2202 (RBW)

SECRETARY, SMITHSONIAN         :

INSTITUTION,                   :

    Defendant.             :

_____/

DEPOSITION OF ERNEST ROBINSON

Tuesday, November 6, 2007

Washington, D.C.

Job No.: 184033

Pages 1 - 254

Reported by: Kathy Savich, RPR

Page 10

1 somebody outside the zoo prepare it?
2   A.   Yes, uh-huh.
3   Q.   And would Exhibits and Park
4 Management be responsible for arranging to
5 have both types of signs made and put in place
6 at the zoo?
7   A.   Yes.
8   Q.   Would they -- now, when you're
9 preparing a sign, is it fair to say that you
10 have to first figure out what words you want
11 on the sign and then figure out how to reduce
12 that to an actual sign?
13   A.   Yes.
14   Q.   All right.  And do you -- do you
15 have a -- where is your role in that process?
16   A.   My role is actually the design and
17 layout of a particular sign, graphic, or it
18 can be a banner or an interpreted panel or
19 part of an exhibit, but just basically the
20 visual aesthetic part of the sign or graphic
21 is what I do.
22   Q.   And what are the other jobs that go

Page 11

1 into the creation of a sign from the
2 beginning?
3   A.   Okay.  The design part is one thing
4 we have interpreters or writers that actually
5 write and craft the text that is actually
6 going into a particular sign.
7         The writing and the text has a lot
8 to do with the space and the location, you
9 know, of the sign or exhibit, but I normally
10 work closely with the writer in order to get
11 the text ready to fit into this graphic.
12   Q.   Okay.  And then do you at some
13 point hand off the project to somebody in
14 production for them to produce the actual
15 sign?
16   A.   Yes and no.  If it's done by an
17 outside contractor, then I would contract
18 [sic] the -- you know, the contractor myself
19 and explain the details, or if it was done
20 inside the zoo, then I would pass it on to the
21 production department.
22   Q.   Have there been times when -- first

Page 12

1 of all, have you ever worked in the production
2 department?
3   A.   Yes, I have.
4   Q.   So would you say you're one of the
5 employees who is -- in design who is the most
6 knowledgeable about --
7   A.   Production.
8   Q.   -- the actual nuts and bolts of
9 producing the sign?
10   A.   Yes.
11   Q.   And have you on occasion been known
12 to lend a hand in the actual production of the
13 sign that you have designed?
14   A.   In terms of installation, I've
15 actually went out and helped to do installs.
16   Q.   And that's actually putting up the
17 sign out in the --
18   A.   Yes.
19   Q.   -- zoological park somewhere?
20   A.   Right.
21   Q.   Can you tell me if you know a
22 person by the name of Anthony Bowden?

Page 13

1   A.   Yes, I do.
2   Q.   And how do you know Mr. Bowden?
3   A.   Through my work at the Smithsonian.
4 He works in the exhibit department.
5   Q.   And what part of the exhibit
6 department does he work in?
7   A.   In exhibit production, in the
8 production part.
9   Q.   So he would be actually making and
10 hanging signs; is that correct?
11   A.   Yes.
12   Q.   How long has he been doing that?
13   A.   From as far as I know, as long as
14 he's been employed at the zoo, which I guess
15 has been about -- about eight years or so.
16   Q.   And just for the record, Mr. Bowden
17 is in the room with us; is he not?
18   A.   Yes.
19   Q.   Would you consider yourself a
20 friend of Mr. Bowden's?
21   A.   We have a working relationship and
22 I mean if you want to consider a friendship

Page 38

1  there came a time when you were being told to
2  let Mr. Bowden put the sheet, the graphic
3  sheet that you designed, onto the metal plate,
4  correct?
5      A.  Correct.
6      Q.  And do you believe that the reason
7  that you were told to let Mr. Bowden do that
8  was because management was trying to address
9  your concern that you were being forced to
10 do --
11     A.  No.
12     Q.  -- production work --
13     A.  No.
14     Q.  -- that Mr. Krebs wasn't?
15     A.  No.
16     Q.  Why do you say no?
17     A.  I say no because in this particular
18 instance I don't think that was even an issue.
19     Q.  Why do you say that?
20     A.  I just don't -- on the particular
21 project that we're talking about, that wasn't
22 an issue, because he and I both understood

Page 39

1  what our roles were.
2      Q.  "He" being Mr. Bowden?
3      A.  I mean, Mr. Bowden clearly
4  understood what his role was as well as
5  myself.  Now, what I'm saying is that I was
6  told that I, for some reason, shouldn't work
7  with him, even though we were both given the
8  same project and scope of work to work from,
9  okay.
10     Q.  Who told you that?
11     A.  Lynn Dolnick told me this.
12     Q.  And Ms. Dolnick -- was Ms. Dolnick
13 aware that you had complained that you were
14 being required to do production work that
15 Mr. Krebs wasn't required to do?
16     A.  No.  This, I don't feel like this
17 really has any real relevance to this
18 particular project that we're talking about.
19     Q.  But bear with me.  I know you
20 don't, but I want to find out, did she -- did
21 Ms. Dolnick know that you had complained that
22 you were being required to do production work

Page 40

1  that Mr. Krebs wasn't?
2      A.  No.
3      Q.  So you never complained to
4  Ms. Dolnick about it?
5      A.  No.
6      Q.  To whom did you complain that you
7  were being required to do things that
8  Mr. Krebs wasn't required to do?
9      A.  It was mentioned to probably
10 Kathleen Samiy and it was really -- it was
11 based -- that was part of my complaint,
12 basically, which I had submitted.
13     Q.  Did you submit it in writing?
14     A.  Yes, it was in writing.
15     Q.  Did it ever get into a federal
16 court as opposed to at the agency level or the
17 EEO?
18     A.  No.
19     Q.  What happened with your case?
20     A.  They settled.  I think it was
21 settled out of court.
22     Q.  And do you know what -- can you

Page 41

1  tell us what you got?  Was it confidential?
2          MR. SILVERBERG:  Objection.  It may
3  be confidential.
4          THE WITNESS:  Yes.
5  BY MR. NEBEKER:
6      Q.  It was agreed to be confidential?
7      A.  Yes.
8      Q.  Okay.  Can you tell us when it was
9  resolved?
10     A.  I'd say around 2004.
11     Q.  Did you ever prepare an affidavit
12 in that case?
13     A.  Yes, I think I did.
14     Q.  Let me ask, you saw some statements
15 that I identified for you before you started
16 your deposition today, correct?
17     A.  Yes.
18     Q.  Do you remember if any of those
19 were the statement that you're talking about?
20         MR. SILVERBERG:  Could you -- could
21 you say what statements he saw?
22         MR. NEBEKER:  Yeah.  I was going

Page 58

1 space with Grace Lopez?
2  A.  For about a year.
3  Q.  And am I right, Grace Lopez is a
4 fairly slight person in stature?
5  A.  Fairly slight in terms of small?
6  Q.  Yes.
7  A.  Yes.
8  Q.  Well, what would you think? About
9 98 pounds?
10  A.  Yes.
11      MR. SILVERBERG: Objection. Calls
12 for --
13 BY MR. NEBEKER:
14  Q.  About how tall was she?
15      MR. SILVERBERG: -- real
16 speculation.
17 BY MR. NEBEKER:
18  Q.  About how tall was she?
19  A.  She's about five feet, I'd say.
20 She is not tall.
21      MR. SILVERBERG: Same objection.
22 BY MR. NEBEKER:

Page 59

1  Q.  And how would you compare her upper
2 body strength to the upper body strength of
3 Mr. Bowden?
4      MR. SILVERBERG: Objection. Calls
5 for subjective -- subjective answer,
6 speculation. He may have no basis on which to
7 base any knowledge on. Calls for opinion.
8 Quite a question.
9 BY MR. NEBEKER:
10  Q.  Okay. You can answer.
11      MR. SILVERBERG: I can't believe
12 you asked it.
13      THE WITNESS: We're -- basically,
14 we're all required to be able to lift at least
15 50 pounds.
16 BY MR. NEBEKER:
17  Q.  Who is stronger, Ms. Grace Lopez or
18 Mr. Bowden?
19      MR. SILVERBERG: Same objection.
20      THE WITNESS: Mr. Bowden.
21      MR. SILVERBERG: Should they arm
22 wrestle? Do you want to --

Page 60

1 BY MR. NEBEKER:
2  Q.  Mr. Bowden, would you guesstimate
3 how many pounds -- how much he weighs?
4      MR. SILVERBERG: Same objections.
5      THE WITNESS: Maybe about 200
6 pounds.
7 BY MR. NEBEKER:
8  Q.  Do you know if he works out at the
9 gym lifting weights?
10  A.  I don't know.
11  Q.  And about how tall is Mr. Bowden?
12  A.  I'd say about 5'6," maybe.
13      MR. SILVERBERG: I'm going to -- it
14 may be relevant, these questions, but at this
15 point I'm going to object as to relevance.
16 It's not clear to me.
17 BY MR. NEBEKER:
18  Q.  Is it true that Ms. Lopez tended to
19 do most of the work creating signs from vinyl?
20  A.  Yes.
21  Q.  Do you know how to use the machine
22 that creates the vinyl signs as well?

Page 61

1  A.  Yes.
2  Q.  And was it part of your
3 responsibilities to create signs -- signage
4 from the vinyl work as well?
5  A.  No.
6  Q.  And how was it that -- let me ask
7 this first. Was Grace Lopez in design or in
8 production?
9  A.  Production.
10  Q.  And when you learned how to use the
11 vinyl machine, was that when you were in
12 design or production?
13  A.  When I was in production.
14  Q.  About how -- did Mr. Bowden know
15 how to use the -- did you ever see Mr. Bowden
16 use the machine to create the vinyl signage?
17  A.  On occasion.
18  Q.  And was he able to do it without
19 any problems?
20  A.  Well, anybody could do it, I mean,
21 if they were given the opportunity to.
22  Q.  Does the work with the vinyl sign

Page 70

1  A.  In one particular incident, he
2  actually made it to me.  And our office is a
3  very casual workplace.  We wear blue jeans and
4  baseball caps if we choose to.  I was on my
5  computer working, and I had a baseball cap on.
6  And on that particular day I had it turned
7  around backwards.  And Mr. Baxter walked into
8  the room and just said out loud, referring to
9  me, he said, "Baseball cap on backwards,
10 attitude."  And I didn't see it as being a
11 joke.  I didn't find the humor in it or
12 anything.
13       In other instance we were actually
14 in a meeting, and this was when Mr. Baxter
15 first came to the zoo, Mr. Baxter made a
16 comment that -- he said, "I don't trust you
17 people and you people have to earn my trust."
18 Okay.  And I actually heard this myself, for
19 myself.
20  Q.  Any other incidents where you heard
21 what you believe to be racial epithets or
22 racial remarks --

Page 71

1  A.  No.
2  Q.  -- at the zoo at all?
3  A.  Well, I've heard them outside of my
4  department, you know, but it's got nothing to
5  do with his particular case.
6  Q.  Okay.  So these didn't involve the
7  Exhibits and Park Management, correct?
8  A.  No.
9  Q.  They didn't involve Ms. Dolnick; is
10 that correct?
11 A.  No.
12 Q.  And they didn't involve Ms. Samiy,
13 correct?
14 A.  No.
15 Q.  We have to make sure we're getting
16 the nos and yeses in the right order.  Let me
17 start over again just to make sure.  Did you
18 ever hear --
19       Let me do it this way.  Did you
20 ever hear Ms. Dolnick ever use racial epithets
21 or remarks?
22 A.  No.

Page 72

1  Q.  Did you ever hear Mr. Bowden claim
2  that he overheard Ms. Dolnick use any racial
3  epithets or remarks?
4  A.  No.
5  Q.  Did you ever overhear Ms. Samiy use
6  any racial epithets or remarks?
7  A.  No.
8  Q.  Did you ever overhear Mr. Bowden to
9  say that he had heard Ms. Samiy use racial
10 epithets or remarks?
11 A.  No.
12 Q.  Did you ever hear anybody in the
13 Exhibits and Park Management supervisory staff
14 use racial epithets or remarks while
15 Mr. Bowden or you were at the zoo?
16 A.  Yes.
17 Q.  And who was that?
18 A.  Well, I just explained it to you
19 the incident that I had with Mr. Baxter.
20 Q.  Okay.  Aside from those --
21 A.  Yes.
22 Q.  -- anything else -- were there any

Page 73

1 other remarks that you have overheard --
2  A.  No.
3  Q.  -- by anybody in Exhibits and Park
4 Management that could be deemed by anyone to
5 be racially charged remarks --
6  A.  No.
7  Q.  -- or epithets?
8  A.  But then, you know, they didn't
9 necessarily have to operate under remarks, I
10 mean, you know.
11 Q.  Let me go back to the claims that
12 Mr. Bowden has made in the case.  Actually,
13 let me back up one step.
14       Is there anything else other than
15 what you have testified to today which you
16 believe would support Mr. Bowden's claim that
17 he was the victim of discrimination based upon
18 race?
19 A.  You're saying is there anything
20 else that I --
21 Q.  Any other facts that you're aware
22 of other than what you have testified to in

Page 110

1  Q.  Whose job did you think it was to
2  do inventory?
3  A.  For the most part, that's someone
4  in production, basically, that manages and
5  keeps the signs that we have in stock stacked,
6  and they are supposed to let me know when they
7  need something, you know, so that I could
8  actually, you know...
9  Q.  And when were you complaining that
10 you shouldn't have to do this work that should
11 be being done in production?
12 A.  When?
13 Q.  Yes.
14 A.  That was actually part of my
15 complaint which took place back in 2003.
16 Q.  And how long was your complaint
17 pending?
18 A.  I'd say for a year.
19 Q.  Do you remember when in 2003?
20 A.  I'd say from probably somewhere
21 around April of 2003 up until April, May,
22 June, July -- up until January, maybe, of

Page 111

1  2004.
2  Q.  Was that the same period of time
3  that Mr. Bowden was the acting head of
4  production?
5  A.  Yes, I would probably say.
6  Q.  And so you were saying that
7  Mr. Bowden's shop should have been doing that
8  work, not you; is that fair to say?
9  A.  Which?
10 Q.  Mr. Bowden -- the production work.
11 A.  Yeah, but at that particular time I
12 was told to do specific things, like inventory
13 and things of that nature.
14 Q.  And who told you to do that?
15 A.  My supervisor, Kathleen Samiy.
16 Q.  So Samiy saw that it wasn't getting
17 done by the people in personnel and she was
18 asking you to do it?
19 A.  Well, I'm not sure to say that it
20 wasn't getting done.  I was in a position
21 whereas that I depended on a writer and an
22 editor to forward me text so that I could then

Page 112

1  put it in a layout form to have these signs
2  printed, and at certain periods I would
3  actually have free time that I would actually
4  have to wait for work to come to me.
5        And in the process of waiting, I
6  mean, I would -- you know, I would do other
7  things, I mean, because I went to work to
8  work.  And if I didn't have work to do in one
9  particular area, I mean, then I felt like I
10 needed to do whatever needed to be done.
11       But when I had my own work to do, I
12 expected to be able to do my own work and not
13 to be asked to go out into the shops or into
14 the production shop to work in that capacity.
15 Q.  Now, did you ever hear Mr. Bowden
16 complain that the lower workshop was not safe?
17 A.  Yes.
18 Q.  What did he tell you was unsafe
19 about the lower workshop?
20 A.  It wasn't then, and it's still not.
21 It's supposed to be a fabrication shop, which
22 is like a production shop whereas that they

Page 113

1  have saws and they have drills and they have
2  compressors and they have tools.
3        And you know, none of these tools
4  have the proper safety devices on them.  None
5  of these tools were actually fastened to the
6  floor.  It was just a lot of situations,
7  basically, that were -- that were hazardous.
8  Q.  The saw is now fastened to the
9  floor, correct?
10 A.  I'm not sure if it's fastened to
11 the floor or not.
12 Q.  Has it been awhile since you've
13 been down there in the workshop?
14 A.  Yes, it's been awhile since I --
15 I've been in there, but I haven't spent that
16 much time or tried to pay attention to what
17 was going on in the place.
18 Q.  What do you remember -- let me
19 rephrase that.
20       Would it have been the
21 responsibility of someone in the design shop
22 to make the lower workshop safe?

| Page 114 | Page 116 |
|---|---|
| 1  A.  No. | 1  Mr. Bowden told you that he had been heard to |
| 2  Q.  Would the workers in production who | 2  use? |
| 3  have been in a better position to make sure | 3  A.  I think the language was that he |
| 4  that the equipment in the lower workshop was | 4  said that she was crazy, to that extent, "She |
| 5  maintained in a safe condition? | 5  must be crazy," to that extent.  And if I'm |
| 6  A.  It was the supervisor's | 6  not mistaken, he was probably written up for |
| 7  responsibility, I would think, to make sure | 7  maybe making that statement. |
| 8  that the shop was within a reasonable code of | 8  Q.  You don't have any reason to |
| 9  safety. | 9  believe he lost any pay, do you? |
| 10  Q.  And who would -- as a supervisor, | 10  A.  I don't know. |
| 11  would you expect that Ms. Dolnick or Ms. Samiy | 11  MR. SILVERBERG:  Objection. |
| 12  would go and bolt the saw to the floor in the | 12  BY MR. NEBEKER: |
| 13  lower workshop? | 13  Q.  Did Mr. Bowden tell you he ever |
| 14  A.  I'm not sure they would actually be | 14  lost any pay or benefits as a result of |
| 15  the ones that would do so. | 15  calling Ms. Lopez a crazy lady? |
| 16  Q.  They might delegate that authority | 16  MR. SILVERBERG:  Objection.  He |
| 17  to someone in production, correct? | 17  didn't say "crazy" -- Mr. Robinson didn't say |
| 18  A.  It's possible. | 18  "crazy lady."  He said, "Mr. Bowden said she |
| 19  Q.  It would have made more sense to do | 19  must be crazy." |
| 20  that than delegate it to someone in design, | 20  THE WITNESS:  I don't know. |
| 21  wouldn't it -- | 21  BY MR. NEBEKER: |
| 22  A.  Sure. | 22  Q.  Did you ever hear Mr. Bowden say |

| Page 115 | Page 117 |
|---|---|
| 1  Q.  -- or a writer, correct? | 1  that he had been advised that he called her a |
| 2  A.  Right. | 2  crazy lady? |
| 3  Q.  Do you recall Mr. Bowden ever using | 3  A.  If I can remember, he did make that |
| 4  inappropriate language to describe Ms. Elana | 4  comment from what he may have told me. |
| 5  Lopez?  And I'll be more specific if I have | 5  Q.  Okay.  So Mr. Bowden told you that |
| 6  to. | 6  he called Elana Lopez a crazy lady? |
| 7  MR. SILVERBERG:  Yes.  Objection as | 7  A.  Well, he -- I think he explained it |
| 8  to what "inappropriate" means. | 8  to me -- he explained to me the conversation |
| 9  THE WITNESS:  I didn't witness it. | 9  that he and Chuck Fillah had, I guess, in |
| 10  BY MR. NEBEKER: | 10  reference to that particular incident. |
| 11  Q.  Did you ever hear anybody say that | 11  Q.  Did Mr. Bowden ever tell you what |
| 12  Mr. Bowden had used inappropriate language to | 12  he called Ms. Lopez, Elana Lopez? |
| 13  describe Elana Lopez? | 13  A.  "She must be crazy."  That's all I |
| 14  A.  I heard it said. | 14  understand that was said.  I mean, that's all |
| 15  Q.  Who did you hear say that | 15  I remember that was said. |
| 16  Mr. Bowden used inappropriate language to | 16  Q.  Had you ever heard Mr. Bowden refer |
| 17  describe Elana Lopez? | 17  to Ms. Lopez as a bitch? |
| 18  A.  Actually, I heard it from him, I | 18  A.  No. |
| 19  mean, you know, from Mr. Bowden that he used | 19  Q.  Had you ever heard anybody accuse |
| 20  inappropriate language, which is what they | 20  Mr. Bowden of using that word to describe |
| 21  described as inappropriate language. | 21  Elana Lopez? |
| 22  Q.  And what was the language that | 22  A.  No. |

Page 118

1  Q.  Had you ever heard Mr. Bowden use
2  any other, say, derogatory terms to describe
3  Elana Lopez?
4      A.  No.
5      Q.  Did you think Elana Lopez was
6  crazy?
7      A.  I thought she had some serious
8  issues, and I'm not a psychologist, but she --
9  she had some problems.
10     Q.  Tell me about the things that you
11 observed Ms. Elana Lopez do that caused you to
12 believe she had issues.
13     A.  I think there was one incident that
14 we were in the office -- and probably that
15 same incident that these questions are leading
16 from -- and I think it resulted in her bumping
17 or pushing, you know, Mr. Bowden during the
18 course of one of our staff meetings.
19     Q.  Is this the one where Mr. Baxter
20 was seated and Mr. Bowden was talking to him?
21     A.  Yes, I think that's correct.
22     Q.  Did you witness the event?

Page 119

1      A.  I didn't witness it.  I was in the
2  area, but I actually didn't witness the actual
3  event itself.
4      Q.  Did you overhear any remarks by
5  Mr. Bowden about Ms. Lopez hitting him or
6  running into him?
7      A.  Yes.
8      Q.  Was this at the time of the
9  incident?
10     A.  Yes, relatively around the time of
11 the incident.
12     Q.  I mean, are we talking about the
13 same day or talking about a couple of minutes?
14     A.  Yes, we're talking about the same
15 day within the same hour.  Because there
16 was -- there was a lot of movement going on
17 and people were kind of...
18     Q.  How many people were in the room?
19     A.  It was, I'd say, maybe about ten
20 people or so, you know.
21     Q.  And did you hear -- at the time
22 Mr. Bowden claims he was struck, did you hear

Page 120

1  Mr. Bowden say anything?
2      A.  I did hear him ask Mr. Baxter,
3  which is what got my attention, he asked me
4  [sic], "Did you see that?"
5      Q.  Mr. Bowden asked Mr. Baxter, "Did
6  you see that?"
7      A.  Yes.
8      Q.  Okay.  And at the time, did you
9  know what Mr. Bowden was talking about?
10     A.  Well, I kind of assumed that
11 something had pretty much taken place, because
12 as I looked up I saw her continue on, you
13 know.  I mean, she didn't look back and say
14 anything, and I just assumed that she had, you
15 know, probably ran into him or did something,
16 you know.
17     Q.  Had you been looking at where
18 Mr. Bowden was standing and talking to
19 Mr. Baxter at the time?
20     A.  I was pretty much aware of where
21 they were, uh-huh.
22     Q.  And did you see where Mr. -- the

Page 121

1  relative positions between Mr. Baxter and
2  Mr. Bowden before Ms. Elana Lopez entered the
3  room?
4      A.  I would say I was aware of the fact
5  that they were both probably standing
6  together.
7      Q.  And after you -- or at the time you
8  saw Mr. Bowden say "did you see that" to
9  Mr. Baxter, had Mr. Bowden moved at all?
10     A.  I think he may have separated
11 himself to say, you know -- I mean, to move.
12 I mean, it wasn't a relaxed posture at that
13 point.  I mean, I figured something had
14 transpired.
15     Q.  I'm trying to get a sense of
16 whether Mr. Bowden's feet moved when Ms. Lopez
17 passed by him or hit him.
18     A.  Well, like I said, I didn't see the
19 actual incident.  I was in the room and
20 everybody was pretty much trying to prepare
21 theirselves for a meeting, and I was probably
22 looking in this direction, and they were

Page 150

1  he is Jewish?
2      A.   Yes, he probably did.
3      Q.   Do you have any reason to doubt
4  that Mr. Ferster is Jewish?
5      A.   Yes.
6      Q.   Did you and Aaron Ferster and
7  Anthony Bowden and Herman Krebs talk about the
8  specific things that were being done to them
9  that caused them to believe that they were the
10 victims of discrimination?
11     A.   Yes, we had discussions.
12     Q.   And are those things among -- the
13 things that were discussed, did they include
14 everything you guys could think of that caused
15 you to believe you were the victims of gender
16 discrimination?
17     A.   Yes.
18     Q.   Okay.  Are those reflected in
19 Exhibit 4?
20     A.   Yeah, for the most part.
21     Q.   What's missing, if anything?
22 What's missing?

Page 151

1      A.   I think that this is pretty --
2  covers a lot, I'm pretty sure.
3      Q.   You can't think of anything that's
4  left out, can you?
5      A.   No, I can't.
6      Q.   Did you ever receive a promotion
7  while you were working under Samiy?
8      A.   No.
9      Q.   Who did receive a promotion?
10     A.   I'm not sure.  Aaron Ferster, I
11 think he received a promotion, but he wasn't
12 necessarily working under Kathleen Samiy.
13     Q.   Can you describe any derogatory
14 emails you're aware of Kathy Samiy -- Kathleen
15 Samiy sending?
16     A.   I had received several emails from
17 her as well, so I know from past experience
18 that some of the emails that she sent, you
19 know, could be pretty hostile.
20     Q.   Now, they weren't racially tinged
21 or --
22          MR. SILVERBERG:  Who are we

Page 152

1  referring to now?  I'm sorry.
2          MR. NEBEKER:  Kathleen Samiy.
3  BY MR. NEBEKER:
4      Q.   Or they didn't have any religious
5  overtones to you, did they?
6      A.   No.
7      Q.   They would indicate that she wasn't
8  happy with the way things were; is that
9  correct?
10     A.   Right.
11     Q.   And did they ever indicate that she
12 was getting pressure from her supervisor to
13 get things working better?
14     A.   I don't know of the -- if you could
15 call it indication.  I think she was just
16 doing basically what she was told to do.
17     Q.   Did you ever get any harassment
18 about the clothes that you wore?
19     A.   Well, as I said in an earlier
20 statement, I was commented about a baseball
21 cap.
22     Q.   What were the exact words that

Page 153

1  Mr. Baxter used?
2      A.   He used the term "cap on backwards,
3  attitude," and I guess he thought it was a
4  joke, but I took it a little bit differently
5  than that, because I guess as a black man, to
6  put my hat on backwards means that I have an
7  attitude, and I didn't have an attitude, you
8  know.
9      Q.   Did he ever explain to you that his
10 brother would wear a baseball cap not facing
11 forward?
12     A.   Yeah, that's what the, you know,
13 excuse was.
14     Q.   You don't have any reason to doubt
15 that he has a brother, do you?
16     A.   I don't have any reason to doubt,
17 you know --
18     Q.   -- that he has a brother?
19     A.   Yes, I don't doubt that.
20     Q.   And do you doubt that his brother
21 sometimes wears his hat other than facing the
22 brim forward?

39 (Pages 150 to 153)

Page 154

1   A.   Well, I mean, that's his brother's
2 prerogative, you know, and I think jokes start
3 when people are insensitive to the other
4 person, and I -- you know, I -- to me it was a
5 stereotype, because I don't know if he felt
6 like his brother had an attitude because he
7 wore his hat backwards, you know.
8   Q.   Did Mr. Baxter ever apologize to
9 you for any insensitivity in that remark?
10   A.   He -- he just -- he tried to
11 justify what he meant by it.
12   Q.   Did he explain what he meant by it?
13   A.   Well, he said that his brother wore
14 his hat backwards, and he didn't say whether
15 or not his brother had an attitude or didn't
16 have an attitude, but he just said, "Well,
17 hey, my brother wears his hat backwards," you
18 know, but yeah.
19   Q.   After he had explained that, did
20 you get the sense that he intended to somehow
21 slight you because of your race with the
22 comment about the hat?

Page 156

1 to even make that kind of a statement, you
2 know.
3   Q.   Right.  But he didn't intentionally
4 use it, did he?
5   A.   I don't know what his intentions
6 were.  Okay.
7   Q.   You say in -- well, at statement --
8 Exhibit Number 4 indicates that, "No females
9 are being harassed, threatened or asked to do
10 anything outside of their job descriptions."
11        How were you harassed, threatened
12 or asked to do something outside of your job
13 description?
14   A.   As I said before, I mean, I was
15 asked, you know -- on, you know, occasions to
16 go down into the shop areas and perform
17 certain duties.  I was --
18   Q.   These are duties that should have
19 been performed by people in production,
20 correct?
21   A.   Yes.
22   Q.   And who would those people have

Page 155

1   A.   I just -- yes, I thought that it
2 was -- it was stereotypical, you know, to
3 assume that just because I had my hat on
4 backwards meant that I had an attitude, and I
5 didn't have an attitude on that particular
6 day.
7   Q.   You don't think he intended to give
8 you a hard time in any way based on your race
9 with that remark about the cap, did you?
10   A.   Yes, because he didn't know me.  He
11 didn't know me that well at that particular
12 time.  He didn't know me.  He didn't know my
13 position that day.  He didn't know how I felt.
14 He didn't know anything about me to even make
15 that kind of a statement.
16        So why would he just come out of
17 the clear blue?  I took it as a negative, as
18 a --
19   Q.   Right.
20   A.   -- negative kind of statement.  And
21 for him to assume that I had an attitude I
22 just think was very poor judgment on his part

Page 157

1 been?
2   A.   During that time, it was a
3 gentleman by name Levi Murrell.  I think
4 Mr. Bowden was a part of production.  And that
5 was about it, I think, at that particular
6 time.
7   Q.   And Levi, is he African-American?
8   A.   Yes.
9   Q.   What color is his skin?
10   A.   He's black male.
11   Q.   And same for plaintiff, Mr. Bowden?
12   A.   Yes.
13   Q.   Did anyone ever call you Ernestine
14 in the office?
15   A.   Yes.  This was another -- a lady in
16 our office basically that worked in our budget
17 and finance office.
18   Q.   Did you ever ask her to stop?
19   A.   I, you know, made it known to her
20 that I didn't find it amusing at all.
21   Q.   What did you say?
22   A.   I'm not sure exactly what I said.

Esquire Deposition Services
D.C. - 1-800-441-3376
MD - 1-800-539-6398
VA - 1-800-752-8979

1  Q.  Is Mr. Murrell still there?
2  A.  No, he's not.
3  Q.  How was he treated by management?
4  A.  He was actually threatened, if you
5  will, and almost -- I think it got to the
6  point where it affected his health so bad
7  until he was actually forced to retire.
8  Q.  What do you mean he was threatened?
9  A.  He had --
10       MR. NEBEKER:  Objection.  Lacks
11 foundation.
12       THE WITNESS:  -- told them that he
13 had --
14 BY MR. SILVERBERG:
15  Q.  Who is "them"?
16  A.  Well, management.  He told Lynn
17 Dolnick that he was going to use up some leave
18 that he actually had to use.  And it was --
19 could have been maybe two or three months'
20 worth of leave.  And he told them that once he
21 used his leave that he would probably be ready
22 to retire.  But when he returned from using

Page 223

1  his leave, he decided that he wasn't quite
2  ready to retire.
3       And after that, basically, I think
4  he started to receive real harsh treatment,
5  you know, from management.
6   Q.  And he was black?
7   A.  Yes.
8   Q.  Do you think this was race
9  discrimination?
10       MR. NEBEKER:  Objection.  Lacks
11 foundation.
12       THE WITNESS:  Yes.
13 BY MR. SILVERBERG:
14  Q.  On what basis do you make that
15 assertion?
16  A.  Well, I mean, just like the rest of
17 us --
18  Q.  Who is "us"?
19  A.  I'm talking about the black
20 employees.  Since -- you know, we were the
21 ones that had the least bit of authority to
22 make any decisions, but we seemed to be the

Page 224

1  first ones that were actually attacked and
2  harassed.  I mean...
3   Q.  Do you know the condition of Mr. --
4  what's it -- Murrell, his health when he
5  retired?
6   A.  I think he may have had a nervous
7  breakdown, from what I understand.
8   Q.  Do you know what he attributed that
9  to?
10  A.  Stress.  I would say work-related
11 stress.
12  Q.  Do you know of any whites who you
13 believe were, quote, forced to retire?
14  A.  No.
15  Q.  On letter (A), the second (A) on
16 page 5, you say, "It appeared that management
17 lowered its performance rating to justify not
18 selecting him for the supervisory exhibit
19 specialist position."
20      Why do you say that?
21      MR. NEBEKER:  Objection.
22 Foundation.

Page 225

1       THE WITNESS:  I am assuming that,
2  with a lower performance appraisal, that would
3  automatically not qualify him to be a
4  successful candidate for that position.
5  BY MR. SILVERBERG:
6   Q.  Did you work with white coworkers
7  who had performance ratings lowered comparably
8  to you and Mr. Bowden's lowering?
9   A.  Not that --
10       MR. NEBEKER:  Objection.  Lack of
11 foundation.
12       THE WITNESS:  Not that I can
13 recall.
14 BY MR. SILVERBERG:
15  Q.  You say in the next answer that
16 when you worked with him on a variety of
17 projects and performance, "Mr. Bowden was
18 always exceptional."
19      Do you stand by that?
20  A.  Yes.
21  Q.  Do you think he was better than
22 fully successful?

Page 226

1  A.  Yes.
2  Q.  Do you think he was qualified for
3 the supervisor position job?
4      MR. NEBEKER:  Objection.  Lack of
5 foundation.
6      THE WITNESS:  I feel that he was
7 qualified for it when it was first posted.
8 But when it was taken back and reposted a
9 second time, then I could see that it
10 disqualified him for that position.
11 BY MR. SILVERBERG:
12  Q.  Was Mr. Baxter qualified, as far as
13 you could see?
14      MR. NEBEKER:  Objection.  Lacks
15 foundation.
16      THE WITNESS:  No.
17 BY MR. SILVERBERG:
18  Q.  Okay.  Now, the last (A) -- answer,
19 it says, "Being an African-American male in
20 this office, I was also subjected to being
21 asked to perform duties outside of my normal
22 position description and not credited for it."

Page 227

1      What duties are you talking about?
2  A.  Well, those are the duties when I
3 was asked, like I said, to go out into the
4 park on several occasions and asked to help
5 with installations and -- of signs and exhibit
6 material.
7  Q.  You say, "Non-blacks did not have
8 these kind of problems."
9      Is that accurate?
10  A.  Yes.
11  Q.  I want to show you Exhibit 2, the
12 Metropolitan Police Department report.
13  A.  Yes.
14  Q.  It says on the one, two, three,
15 four, fifth line -- or fourth line, "I noticed
16 that she" -- meaning Elana -- Elaina [sic]
17 Lopez, rather -- "had rammed into Anthony
18 Bowden as he was talking to supervisors."
19      So do you see it?
20  A.  No, I -- I didn't see it.
21  Q.  Then how do you know it happened?
22  A.  Well, from what he communicated to

Page 228

1 me.
2  Q.  Did you see his reaction, though?
3  A.  Yes.
4  Q.  And what was his reaction?
5  A.  He responded, I think to
6 Mr. Baxter, asking him, did he see it, you
7 know.  And I could tell by the expression on
8 his face that something had happened.
9      I, for some reason, you know,
10 wasn't quite focused on him at that particular
11 time --
12  Q.  But you saw his reaction?
13  A.  Yes, I saw his reaction to it.
14  Q.  You say later that you approached
15 Elana and asked if she would apologize to Tony
16 for ramming into him.
17  A.  Yes.
18  Q.  What did she say?
19  A.  Her response was she didn't think
20 that it -- needed to be apologized.  She
21 didn't think it was that big of an issue.
22  Q.  Did she deny she rammed into him?

Page 229

1  A.  No, she didn't.
2  Q.  Did she admit it?
3  A.  She didn't deny it.
4  Q.  Did she act like it had happened?
5      MR. NEBEKER:  Objection.  Vague.
6      THE WITNESS:  Yes.
7 BY MR. SILVERBERG:
8  Q.  Do you know anything about the
9 incident that Mr. Bowden apparently said, "she
10 must be crazy"?
11  A.  Only from what I heard.  I
12 didn't -- wasn't -- I didn't witness what he
13 said.
14  Q.  Do you know why he said it?
15  A.  I don't -- I assume he said it
16 because, by the way that she acted -- and I
17 figured he assumed that she was crazy or
18 something was wrong with her.
19  Q.  Now, did she spray aerosol in
20 someone's face?
21  A.  Yes.
22  Q.  Who was that?

Esquire Deposition Services
D.C. - 1-800-441-3376
MD - 1-800-539-6398
VA - 1-800-752-8979

### Page 230

1  A. It was -- the lady's name was
2 Stacey. I didn't get her last name.
3  Q. In Exhibit 3, your other affidavit,
4 on the last page you say, "There is an obvious
5 level of discrimination and discomfort in the
6 way Baxter relates to black males and other
7 groups."
8    How so?
9  A. In terms of the comments that he
10 makes with no real understanding or sense of
11 sensitivity towards, you know, blacks.
12  Q. You heard him say "you people"?
13  A. Yes.
14  Q. Who did he say that to?
15  A. He said that to Mr. Bowden, Sherod
16 Mangum and Chuck Fillah and Jeff Baxter.
17    We asked to meet with management to
18 talk about the way that we felt like we were
19 treated by Mr. Baxter -- and this was maybe
20 the first month, month or so, when he came
21 into the department. And we just wanted to
22 kind of sit down and kind of hash out some

### Page 231

1 things with him.
2    And Mr. Bowden had already said
3 that Mr. Baxter had made that particular
4 comment to him, and I really didn't believe
5 it. But once he --
6  Q. This was a meeting with who?
7  A. With the -- Chuck Fillah, which is
8 the -- he was the --
9  Q. Was he Baxter's supervisor?
10  A. Yes, it was Jeff Baxter's
11 supervisor.
12  Q. So Baxter, Tony, you and Fillah?
13  A. Yes.
14  Q. And Baxter used the term "you
15 people" at that meeting?
16  A. Yes.
17  Q. And how do you know he meant
18 blacks?
19    MR. NEBEKER: Objection.
20    THE WITNESS: Because --
21    MR. SILVERBERG: Listen, I'm trying
22 to get through --

### Page 232

1    THE WITNESS: He was specifically
2 referring to those of us that were present.
3 BY MR. SILVERBERG:
4  Q. And that was you and Tony?
5  A. And Sherod.
6  Q. And -- oh, okay. And Fillah?
7  A. And Fillah.
8  Q. How do you know he wasn't referring
9 to Fillah?
10  A. Fillah doesn't work under him,
11 which I assume is why it didn't refer to
12 Fillah.
13  Q. Did he ever make a remark,
14 Mr. Baxter, about Asians?
15  A. I recall he did make a joke down in
16 one of the shops to one of the Asian
17 employees.
18  Q. What did he say?
19  A. It had something to do with -- it
20 could have been dry cleaning or something.
21 And this guy was a metal craftsperson, and it
22 was something -- a comment that he made -- I

### Page 233

1 guess it was a joke in reference to most Asian
2 people that actually do laundry, if I'm not --
3 I don't totally remember the whole joke,
4 actually, but it was meant to be, I guess, an
5 Asian joke, you know.
6  Q. Did he mention extra starch?
7  A. Yes. Yes, that's what it was.
8  Q. Was that racial, from what you
9 could see?
10    MR. NEBEKER: Objection. Calls for
11 speculation.
12    THE WITNESS: I, you know, just
13 figured it was in line, you know, with any
14 type of, you know -- I mean, he was Asian, so
15 I guess they have jokes that apply to Asians.
16 BY MR. SILVERBERG:
17  Q. Who was Asian?
18  A. The gentleman that Mr. Baxter made
19 the joke to.
20  Q. Who did Aaron Ferster work under?
21 Who was his supervisor?
22  A. I think he worked under Lynn

Page 238

1  Q. 5, "harassed about clothes that are
2  worn"?
3  A. Yes.
4  Q. Were women harassed?
5  A. Not that I can recall.
6  Q. 4, "No male has received a
7  promotion."
8     Was this true at this time?
9  A. Yes.
10 Q. Had females received a promotion?
11 A. I don't know.
12 Q. On page 3 at the bottom, on
13 number 7, it says, "We were told by Kathleen
14 Samiy we couldn't take vacation, use or lose."
15    Who is "we"? Is that the men?
16 A. More than likely.
17 Q. On page 6, "Kathleen Samiy" --
18 number 6 -- "shows favoritism to the female
19 staff members."
20    Was that true?
21 A. Yes.
22 Q. How did she show favoritism?

Page 239

1  A. Where -- in terms of their
2  attendance, I don't think that -- I mean, from
3  what I could see, they weren't held at any
4  type arrival times or times for leaving. In
5  other instances, they were given the
6  opportunity to work on the weekends or -- you
7  know, nor were they questioned about their
8  whereabouts or the time that they took breaks
9  or anything.
10 Q. Were they given the opportunity to
11 work from home?
12 A. Yes.
13 Q. Women?
14 A. In some cases I heard that they
15 actually were given the opportunity.
16 Q. Were men given the opportunity to
17 work at home?
18 A. No, not that I know of.
19 Q. It says, 8, "Kathleen Samiy is
20 hostile towards males."
21    How was she hostile?
22 A. In just her tone of voice that she

Page 240

1  spoke.
2  Q. Did she ever speak that way to
3  females?
4  A. Not that I can recall.
5  Q. Number 12 on page 7, "Kathleen
6  Samiy lets her female staff members come and
7  go as they wish. The males are treated
8  different."
9     How was that?
10 A. As I said before, I mean, we --
11 everybody had a particular time that they were
12 supposed to be in the office and, in most
13 cases, that just did not -- wasn't enforced
14 around the --
15 Q. Did Lynn Dolnick or Kathleen Samiy
16 speak harshly to the women, as far as you
17 could see?
18 A. No.
19 Q. Did they both speak harshly to the
20 men?
21 A. Yes.
22 Q. Was that in particular to the black

Page 241

1  men?
2     MR. NEBEKER: Objection. Vague.
3  BY MR. SILVERBERG:
4  Q. That they spoke harsher -- the
5  harshest to black males?
6  A. Yes.
7  Q. How do you know this whole thing
8  isn't just bad management as opposed to
9  discrimination because of race and sex? How
10 do you know just -- they just treated everyone
11 lousy?
12 A. Well, I mean, to me, bad management
13 doesn't -- shouldn't allow you to attack no
14 one particular group of people, okay, because,
15 to me, I think bad management means that it's,
16 in general, bad management. But when you
17 start to blame and target, you know, I mean
18 one particular race, then, I mean -- is that
19 bad management or does -- you know, I mean,
20 it's kind of hard for me to believe that
21 that -- you know, that's bad management when
22 you only attack a certain group of people.

Page 250

1    A.  I am not sure. I've only heard of,
2 you know, a couple of --
3    Q.  And from whom did you hear it?
4    A.  When she didn't show up for work at
5 a particular time, I mean, it was -- I was
6 told that she would probably be working from
7 home.
8         MR. NEBEKER: I have nothing
9 further.
10        MR. SILVERBERG: Okay. You have
11 the ability to read the transcript, if you
12 would like, and then make any corrections that
13 you feel need to be made because the court
14 reporter wrote something down incorrectly or
15 misspelled something. You also can waive your
16 right to do that, whichever you wish.
17        THE WITNESS: Is there any way that
18 she could fax me a copy --
19        (Discussion held off the record.)
20        (Whereupon, signature not having
21 been waived, the taking of the deposition
22 concluded at 6:21 p.m.)

Page 252

1         REPORTER'S CERTIFICATE
2         I, Kathy Savich, the undersigned
3 Registered Professional Reporter and Notary
4 Public in and for the District of Columbia, do
5 hereby certify that the above-named witness,
6 after having been first duly sworn to testify
7 to the truth, did testify as set forth in the
8 foregoing pages, that the testimony was
9 reported by me in stenotype and transcribed
10 under my personal direction and supervision,
11 and is a true and correct transcript.
12        I further certify that I am not of
13 counsel, not related to counsel or the parties
14 hereto, and not in any way interested in the
15 outcome of this matter.
16        SUBSCRIBED AND SWORN TO under my
17 hand.
18
19 My Commission Expires:  1/1/2012
20
   _____
21 Kathy Savich, RPR
   Notary Public in and for the
22 District of Columbia

Page 251

1              *   *   *
2
3         ACKNOWLEDGMENT OF DEPONENT
4
5         I, Ernest Robinson, do hereby
6 acknowledge I have read and examined the
7 foregoing pages of testimony, and the same is
8 a true, correct and complete transcription of
9 the testimony given by me, and any changes
10 and/or corrections, if any, appear in the
11 attached errata sheet signed by me.
12
13 _____    _____
14 Date              Signature
15
16
17
18
19
20
21
22

Page 253

1
  November 28, 2007
2
3 Steven J. Silverberg, Esquire
  900 17th Street, Northwest
4 Suite 1250
  Washington, D.C.  20006
5
6 Re: Bowden v. Small
      Deposition of Ernest Robinson
7
  Dear Mr. Silverberg:
8
     Enclosed for review is your copy of the
9 above-referenced deposition. Please have the
  deponent read the copy of the transcript and
10 sign the enclosed certificate of deponent.
  Also enclosed is an errata sheet which the
11 deponent should use to note corrections and
  the reasons for such corrections. This and
12 any additional errata sheets should be signed
  and dated by the deponent.
13
   The deponent has thirty days in which to
14 read and sign the transcript. After the
  deponent has reviewed the copy of the
15 transcript, please return the certificate of
  deponent and any errata sheets to 1020 19th
16 Street, Northwest, Suite 620, Washington, D.C.
  20036.
17
  Sincerely,
18
19
20 Kathy Savich, RPR
21
22