# PLAINTIFF'S EXHIBIT 3

Krebs Deposition Excerpts—pp. 169-72, 189, 196, 219-220, 217, 223

```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3    ------------------------------- X

 4    ANTHONY BOWDEN,                 )

 5          Plaintiff,                )

 6       vs.                          )   Case No.

 7    CRISTIAN SAMPER, ACTING         )    05-2202 (RBW)

 8    SECRETARY, SMITHSONIAN          )

 9    INSTITUTION,                    )

10          Defendants.               )   Pages 1-246

11    ------------------------------- X

12

13

14              DEPOSITION OF HERMAN KREBS

15           Wednesday, November 11, 2007

16                  Washington, D.C.

17

18

19

20

21    Reported by:  Sara A. Watt

22    Job No. 184151
```

Page 166

1  the period of time he was being questioned about?
2     A.  Not always.
3     Q.  Wasn't with you, for instance?
4     A.  Some of the times -- some of the times I
5  knew where he was. A few of the times, I didn't.
6     Q.  And did he -- the times you knew where he
7  was, was he where he belonged?
8     A.  Yes.
9        MR. SILVERBERG: Objection. I don't know
10 what that means.
11       THE WITNESS: He was usually at his desk.
12 Kathleen was late, so she was suspicious that he
13 hadn't been there on time, but he had.
14 BY MR. NEBEKER:
15    Q.  Were there times when he would come in
16 and then leave and she would arrive at work and
17 then he would come in, return, and she would think
18 that he had been late?
19    A.  Yes, because he would come in, get set
20 up, and go out to the park to work. And by the
21 time she rolled in, he wasn't in the office. So
22 when he came back from the park at 9:00 or 10:00

Page 167

1  o'clock, she would sometimes think that he had just
2  arrived at work.
3     Q.  And she would ask him where he had been?
4     A.  Yes.
5     Q.  And he would tell her?
6     A.  Yes.
7     Q.  And she would shut up?
8     A.  Well, then I think it got into Kathleen
9  asking him to call her and leave her a message
10 every morning when he came in so that she could
11 check on her phone and make sure that he had gotten
12 in and she got the message at 7:00 instead of 7:01.
13    Q.  What time did you start work?
14    A.  7:00 o'clock.
15    Q.  And were you typically on time?
16    A.  Typically.
17    Q.  Okay. Was Mr. Bowden ever late?
18    A.  Not that I recall.
19    Q.  Would you necessarily recall if he was a
20 few minutes late?
21    A.  No, I wouldn't.
22    Q.  Were there any times when Ms. Samiy

Page 168

1  was -- refused to accept Mr. Bowden's explanation
2  of where he was?
3     A.  Yes.
4     Q.  And was this in your presence?
5     A.  Yes.
6     Q.  What transpired on that or those
7  occasions?
8     A.  Well, that was sort of no different than
9  her refusing to believe what any of her male
10 employees told her. But in that case it was she
11 didn't believe that he had arrived on time, she
12 didn't see his car in the parking lot.
13    Q.  Car in the parking lot. His car was
14 broken, right?
15    A.  Right.
16    Q.  Okay. So she knew what his car looked
17 like and she saw that it wasn't there?
18    A.  Yes.
19    Q.  Okay. And did you see him arrive at work
20 on time that day?
21    A.  Yes, I did. I believe he biked in that
22 day.

Page 169

1     Q.  Okay. And was there some assertion that
2  she or somebody in management gave Mr. Bowden a
3  hard time about being in his biking clothes?
4     A.  Yes. I think Kathleen gave him a hard
5  time about that. That, I think, was instigated by
6  Elena Lopez.
7     Q.  What makes you say that? Did you hear
8  Elena Lopez talk to Ms. Samiy?
9     A.  Not that particular time, but it's
10 certainly the kind of thing she did with most of
11 the staff.
12    Q.  What did she do?
13    A.  She -- things like, well, running to
14 Kathleen is what she did a lot. She would walk
15 into Aaron's office, Aaron would be on the phone
16 and say, wait a minute. She would walk out, go get
17 Kathleen, bring Kathleen back into Aaron's office.
18 And then the two of them would stand there until
19 Aaron got off the phone so that Elena could talk to
20 Aaron. It was that kind of running to mommy
21 behavior.
22    Q.  Gotcha. And that didn't endear her to

43 (Pages 166 to 169)

Page 170

1  any of the employees at the Park Service, did it?
2      A.  No, it didn't. Especially because it
3  ended up working for her so well.
4      Q.  What was the business about the clothes,
5  though?
6      A.  I think Elena had a problem with Tony
7  wearing his biking clothes and I don't know why. I
8  don't know if she felt it was inappropriate or --
9      Q.  Oh, it was the skintight clothes,
10 correct?
11     A.  Probably, yes.
12     Q.  Did you ever see Mr. Bowden in his biking
13 clothes?
14     A.  Uh-huh, yes.
15     Q.  And were they in fact the tight-fitting
16 ones?
17     A.  Yes.
18     Q.  And did you ever overhear either
19 Ms. Elena Lopez or Samiy or Dolnick, for that
20 matter, giving Plaintiff, Mr. Bowden, a hard time
21 for being in the biking clothes?
22     A.  I sort of recall Kathleen mentioning it

Page 171

1  at some point.
2      Q.  Okay. And what did she say to Mr. Bowden
3  in your presence?
4      A.  I don't remember the words, but I have
5  just a vague recollection of her saying that the
6  clothing was inappropriate.
7      Q.  And was it the clothing that he was
8  wearing during work hours or prior to work hours?
9      A.  It was usually prior to work hours.
10     Q.  Oh, but occasionally it was during work?
11     A.  And then he would change in the morning.
12     Q.  But occasionally -- I'm sorry. By saying
13 that "usually," that means that once or twice he
14 might have been in his bike clothes after he was on
15 the clock?
16     A.  I don't recall him being in his --
17 spending the day in his bike clothes.
18     Q.  No, no, I don't mean spending the day. I
19 just mean after whenever his check-in time was, was
20 he standing around for any period of time in his
21 bike clothes?
22     A.  Probably.

Page 172

1      Q.  Okay. And that was probably what
2  Elena -- no, what Samiy was troubled with?
3          MR. SILVERBERG:  Objection. Speculating.
4          THE WITNESS:  It might have been.
5          MR. SILVERBERG:  You're asking for him to
6  speculate.
7          THE WITNESS:  Although Grace Lopez did
8  the same thing.
9  BY MR. NEBEKER:
10     Q.  Did she bike in, too?
11     A.  Yes, wore bike clothes, and frequently
12 wear them most of the day and no complaints.
13     Q.  Did she -- were they also the
14 tight-fitting bike clothes?
15     A.  Yes, uh-huh.
16     Q.  And she would wear them most of the day?
17     A.  Yes.
18     Q.  Okay. Was this the same time that
19 Mr. Bowden was?
20     A.  Yes.
21     Q.  Did Mr. Bowden ever talk to you about
22 seeing Grace Lopez in biking clothes during the

Page 173

1  day?
2      A.  Yes.
3      Q.  And did he ever complain, to your
4  knowledge, to Samiy or Elena Lopez?
5      A.  Not to Elena, I'm sure. But I -- I don't
6  know that he complained to --
7      Q.  You weren't present?
8      A.  -- Samiy. I would suspect he did.
9      Q.  Why do you think so?
10         MR. SILVERBERG:  Objection. Speculation.
11         THE WITNESS:  I would suspect that --
12         MR. SILVERBERG:  Lack of foundation.
13         THE WITNESS:  -- it's what's fair is
14 fair. How can you -- I mean it's kind of a natural
15 defense.
16         MR. NEBEKER:  Let's go off the record for
17 just a second.
18         (Discussion off the record at 5:12 p.m.)
19         (Deposition resumed at 5:12 p.m.)
20         MR. NEBEKER:  I have nothing further at
21 this time. Thank you, Mr. Krebs.
22         EXAMINATION BY COUNSEL FOR PLAINTIFF

Page 186

1  the question.
2       THE WITNESS: I'm not sure who would have
3  known. So I don't know if there was retaliation
4  for that in particular or not.
5  BY MR. SILVERBERG:
6       Q. Do you know who he claimed were the
7  alleged discriminating officials or the responding
8  management officials? Was Ms. Dolnick -- were
9  Ms. Dolnick and Ms. Samiy?
10      A. I'm sure, because they were his two --
11  his supervisor and next supervisor up.
12      Q. So do you stand by your statement that
13  men were treated worse than women by Ms. Dolnick
14  and Ms. Samiy?
15      A. Yes.
16      Q. Do you stand by your statement that black
17  men were treated worse than white men by those two
18  women?
19      A. Yes.
20      Q. Do you stand by your statement that
21  Jewish people were favored?
22      A. Yes.

Page 187

1       Q. On the bottom of page 3, answer A, you
2  talk about the selection process of a job
3  announcement which Mr. Bowden applied for which was
4  written and revised several times.
5       It seemed to me the announcement was
6  rewritten. Each time the announcement was
7  rewritten the revisions seemed to increasingly
8  exclude the Complainant from qualifying for the
9  position.
10      So what exactly are you saying here?
11      A. Pretty much just what I wrote, that I saw
12  at least three revisions as this was being
13  developed and where Mr. Bowden was clearly
14  qualified for the first one, by the time the third
15  revision came around he was no longer qualified for
16  the job.
17      Q. How do you know that it was done most
18  likely to exclude him?
19      A. I don't, but I see no reason for
20  QuarkXPress to be part of that job description.
21      Q. That was a later rewrite?
22      A. That was a later rewrite. And there

Page 188

1  are -- there's no need in that position to know
2  QuarkXPress.
3       Q. Have you ever seen other job vacancy
4  announcements rewritten?
5       A. Yes. But I've never seen another
6  supervisor at the National Zoo who knew Quark.
7       Q. Did you ever see job descriptions
8  rewritten I guess three times?
9       A. Yes.
10      Q. How do you know this was done to exclude
11  Mr. Bowden?
12      A. I'm guessing. Jeff Baxter was hired, he
13  has no Quark experience.
14      Q. So why was Quark experience brought into
15  the job description to your knowledge?
16      A. I think to make Tony ineligible.
17      Q. The first time the job description went
18  out, was Tony qualified for the position as
19  supervisor of this job, supervisor exhibit
20  specialist?
21      A. The first version I saw, yes. And I'm
22  not sure if that version went out or not.

Page 189

1       Q. Do you --
2       A. Things were pretty confusing in there and
3  I'm not sure which announcements actually went out.
4       Q. Do you believe if the first one went out,
5  he should have been selected under the first
6  announcement?
7       MR. NEBEKER: Objection.
8  BY MR. SILVERBERG:
9       Q. That he was the best qualified at the
10  time under the first announcement, if you know?
11      MR. NEBEKER: Objection.
12      THE WITNESS: I don't know. He was
13  certainly the most qualified person --
14      MR. NEBEKER: Let me put it on the
15  record, if I may. Lacks foundation and is vague as
16  to "best qualified."
17  BY MR. SILVERBERG:
18      Q. He was certainly the most qualified what?
19      A. At the zoo.
20      Q. For?
21      A. For the supervisory position.
22      Q. On the next page you say, on top, on page

Page 194

1  Q. In the middle on page 5 you say, I did
2  not see Mr. Bowden's performance drop during this
3  period, so no, I do not believe lowering his rating
4  was justified.
5      Do you stand by that?
6  A. Yes.
7  Q. Above that you talk about, "Some people
8  benefitted from this unfairness and many of us did
9  not. Some people were given promotions and awards,
10 while other individuals who managed larger projects
11 and budgets were given flat ratings. I think
12 Mr. Bowden certainly fell in that latter category."
13     Were any women given lesser ratings that
14 you know of?
15 A. I'm not aware of that.
16 Q. On the last page, yeah, on page 6 of 7,
17 you talk about heavy-lifting projects were assigned
18 to males or African-Americans in the office.
19     Do you still stand by that?
20 A. Yes.
21 Q. Who worked down below in the shop?
22 A. That would have been Mr. Bowden and

Page 195

1  Sherod Mangum at the time that Kathleen Samiy was
2  there.
3  Q. Are both African-American males?
4  A. Yes.
5  Q. Did Grace Lopez have the same job as
6  Mr. Bowden?
7      MR. NEBEKER: Objection. Vague.
8      THE WITNESS: Same classification.
9  BY MR. SILVERBERG:
10 Q. Did she ever -- was she ever told to work
11 down below? Or how often did she?
12 A. I don't know how often she did, but I
13 know she did occasionally. She did when she was
14 working on the Traffic project with me.
15 Q. Did she work down there as often as
16 Mr. Bowden or Mr. Magnum?
17 A. No.
18 Q. Is it Mangum?
19 A. Mangum, yes.
20 Q. In fact, she worked down there much less?
21 A. Yes.
22 Q. How about you, you worked down there?

Page 196

1  A. Only that brief time while I was working
2  with the Way-Finding.
3  Q. So most of the heavy lifting and dirty
4  projects were assigned to Mr. Mangum and
5  Mr. Bowden?
6      MR. NEBEKER: Objection. Vague.
7      THE WITNESS: Grace Lopez got her share
8  of dirty projects, too, but no heavy-lifting
9  projects.
10 BY MR. SILVERBERG:
11 Q. Didn't Mr. Bowden have more dirty
12 projects than Ms. Lopez?
13 A. Probably.
14     MR. NEBEKER: Objection. Vague.
15 BY MR. SILVERBERG:
16 Q. If Ms. Dolnick you said had no working
17 experience maybe at all and not in this field or a
18 related field or no managerial experience, do you
19 have any idea why she got the job?
20 A. She -- what I heard was that she met the
21 director at a cocktail party, told him she wanted
22 to work at the zoo, and offered him a check.

Page 197

1  Q. Offered him a check?
2  A. Yes. Her family owns the New York Times.
3  So Lynn has given money to the zoo as long as she's
4  worked there.
5  Q. So you think she bought the job, in
6  essence?
7  A. Absolutely.
8  Q. And who hired her?
9  A. I have no doubt about that.
10 Q. Who hired her?
11 A. Michael Robinson, who was the director at
12 the time.
13 Q. And how do you know this?
14 A. Everybody at the zoo knows it.
15 Q. How do you have no doubt about it?
16 A. It -- which part? The bought the job
17 part or the money coming in?
18 Q. Yes.
19 A. Everyone knows about the money coming in.
20 There are donor plaques all over the zoo from her
21 mother.
22 Q. Who's her mother?

Page 214

1 office?
2    A.  No, they don't.
3    Q.  Who do they talk to?
4    A.  They talk mostly to Cara Blond. That's
5 blond without an E.
6    Q.  That's a woman?
7    A.  Yes. And she's the project manager on
8 the Asia Trail project.
9    Q.  Is she Jewish?
10   A.  I believe she is.
11   Q.  Do you know anything about whether she's
12 up for any kind of promotion?
13   A.  I believe she's up for a promotion right
14 now.
15   Q.  To --
16   A.  They just created a supervisory
17 information specialist position that I know Judy
18 Tasse plans to apply for. And my suspicion, and
19 Judy's too, is that it was written for Cara and
20 it's going to go to Cara.
21   Q.  Did you ever hear Mr. Baxter use the
22 phrase "you people"?

Page 215

1    A.  No, I haven't.
2    Q.  Are you --
3    A.  I've heard that he did, but I haven't
4 heard him.
5    Q.  Who did you hear that from?
6    A.  Mr. Bowden and Sherod Mangum.
7    Q.  And they're both African-American males?
8    A.  Yes, they were.
9    Q.  Were they upset by that?
10   A.  They were.
11   Q.  It's accurate to say Grace Lopez did not
12 work, what do you call it, downstairs, in the
13 basement? What do you call that area?
14       MR. NEBEKER: Objection. Leading.
15       THE WITNESS: There were two shops. One
16 is kind of called the sign shop still, I think,
17 which is inside the building.
18 BY MR. SILVERBERG:
19   Q.  The other one's the lower shop?
20   A.  The other one's a shop out in the shop
21 alley, where table saws and that kind of equipment
22 are.

Page 216

1    Q.  Is that the lower shop?
2    A.  That's the lower shop.
3    Q.  Is that the one that's kind of dirty?
4    A.  Yes, it is.
5    Q.  You think it's unsafe?
6    A.  It's not great.
7    Q.  You think it's unsanitary?
8    A.  It could use a cleaning and straightening
9 up.
10   Q.  Are there fumes coming out of that shop?
11   A.  Not that I'm aware of.
12   Q.  And was it mainly Mr. Mangum and
13 Mr. Bowden who worked that shop?
14   A.  Yes.
15   Q.  Much more than Ms. Lopez?
16   A.  Yes.
17   Q.  Did she ever work there at all?
18   A.  When she was working on the traffic signs
19 with me, yes, she did.
20   Q.  Was that a short period?
21   A.  It was four or five months.
22   Q.  How long has Mr. Bowden and Mr. Mangum

Page 217

1 worked in that shop, would you guess?
2    A.  Oh, since they both started.
3    Q.  Are they still assigned to it?
4    A.  Well, they're assigned -- actually, they
5 both have computers and desks and cubicles in the
6 same place as Grace Lopez did. But when it comes
7 time to cut the wood and do all of that stuff, then
8 they go down to the lower shop to do that.
9         So it's not so much assigned to that
10 shop, as the requirements of whatever job you're
11 working on mean you'll need to go down there and
12 use those tools.
13   Q.  So over the years up to now when duties
14 needed to be done in the lower shop, generally
15 Mr. Bowden and Mr. Mangum were asked?
16       MR. NEBEKER: Objection. Vague.
17 BY MR. SILVERBERG:
18   Q.  Is that accurate?
19   A.  Yes, as long as they've both been there.
20   Q.  You were there when Mr. Bowden claimed
21 Ms. Elena Lopez rammed into him?
22   A.  Yes, I was.

55 (Pages 214 to 217)

Page 218

1 Q. But your back was to them?
2 A. It was.
3 Q. So you didn't see it?
4 A. No, I didn't.
5 Q. But you heard him say, "Did you see
6 that?"
7 A. Yes.
8 Q. Was it your judgment that something had
9 happened based on Mr. Bowden's statement?
10 A. Yes.
11 Q. Why was that your judgment?
12 A. I believe he followed, "Did you see
13 that?" with something like She practically knocked
14 me over, or She bowled right into me, or something
15 like that. It was some reference to what had just
16 happened.
17 Q. Did you believe that happened?
18 A. Yeah. I didn't have any reason not to.
19 Q. How well do you know Ms. -- how long have
20 you worked with Elena Lopez?
21 A. She is gone now, but I worked with her
22 for her entire two-year career or whatever it was.

Page 219

1 Q. Would you say it was within her character
2 to knock -- to try to knock down Mr. Bowden?
3     MR. NEBEKER: Objection to the form of
4 the question and lacks foundation.
5     THE WITNESS: She was aggressive towards
6 her co-workers in general.
7 BY MR. SILVERBERG:
8 Q. You said she sprayed -- who did she spray
9 in the face?
10 A. Stacy Tabellario, the videographer.
11 Q. What did she spray?
12 A. Glass cleaner.
13 Q. In Ms. --
14 A. Tabellario's.
15 Q. Face?
16 A. Yes.
17 Q. Do you have any reason to disbelieve
18 Mr. Bowden's description that he was rammed by
19 Ms. Elena Lopez?
20 A. No, I don't.
21 Q. Was Ms. Lopez disciplined to your
22 knowledge?

Page 220

1 A. I'm sure she wasn't.
2 Q. Why are you sure?
3 A. She could do no wrong there. Kathleen
4 would back her up if it cost her the entire staff.
5 And Elena was well aware that she had that level of
6 support.
7 Q. Were you questioned by the police?
8 A. No, I wasn't.
9 Q. Do you know anything about the incident
10 where Mr. Bowden allegedly said Ms. Lopez must be
11 crazy or is a crazy lady or something like that?
12 A. I just vaguely know about it from Tony's
13 description of it.
14 Q. Do you know if he said it in response to
15 anything?
16 A. I believe he did.
17 Q. What was that?
18 A. I believe Chuck Fillah asked him why
19 would she do that, or why would she say that if it
20 wasn't true.
21 Q. Say what?
22 A. Whatever it was she had said.

Page 221

1 Q. Who asked who why did --
2 A. Chuck asked Tony that question. And I
3 believe Tony's response was that statement.
4 Q. Do you know if she had said something
5 negative about Tony?
6 A. Yes, I'm sure she did.
7 Q. Do you know if Mr. Bowden's disability
8 ever affects him in any way that he has to respond
9 to it in a certain way?
10     MR. NEBEKER: Objection. Vague.
11     THE WITNESS: I don't know.
12 BY MR. SILVERBERG:
13 Q. So you don't know if it affects his daily
14 activities or not?
15 A. No, I don't.
16 Q. Do you know if he has to take breaks?
17 A. I don't know.
18 Q. Did you ever see him -- hear him say that
19 he could fall asleep at meetings?
20 A. Yes, that I have heard him say.
21 Q. Did you see him sleep at meetings?
22 A. I don't know that I have.

Herman Krebs

Page 222

1  Q. Did he say --
2  A. I've seen him close his eyes at meetings.
3  I don't think I've seen him sleep at meetings.
4  Q. Did he say why he might fall asleep at
5  meetings?
6  A. I believe he said it was his medication.
7  Q. Who did he tell this to?
8  A. I believe he told it to the whole staff
9  at a staff meeting at some point.
10  Q. Now, you're saying there was a time when
11  Mr. Bowden had done a job but Ms. Samiy took credit
12  for the scope of work that Mr. Bowden did?
13  A. I believe she took credit for the scope
14  of work that he had written, and treated it as
15  something she had written.
16  Q. How did she take credit?
17  A. With Lynn Dolnick, just told her that she
18  had done that.
19      MR. NEBEKER: Did you overhear that?
20      THE WITNESS: No.
21  BY MR. SILVERBERG:
22  Q. Elena Lopez came in tight biking clothes?

Page 223

1  A. Grace Lopez.
2  Q. Grace Lopez. Is that right?
3  A. Yes.
4  Q. How often did she do that?
5  A. Frequently. She biked nearly every day.
6  Q. Was she ever criticized by that as far as
7  you know by management?
8  A. Not as far as I know.
9  Q. Who criticized Mr. Bowden for it?
10  A. I believe it was Ms. Samiy.
11      MR. NEBEKER: Did you overhear that?
12      THE WITNESS: Yes.
13  BY MR. SILVERBERG:
14  Q. You heard her -- what did you hear
15  Ms. Samiy say to Mr. Bowden?
16  A. Just some mention about dressing
17  appropriately to work.
18  Q. You had said Mr. Bowden -- I guess a time
19  you used the word "belligerent" or "combative"; is
20  that right?
21  A. Uh-huh.
22  Q. Is that a yes or no?

Page 224

1  A. Yes, right.
2  Q. Was that only with Jeff Baxter?
3  A. Yes.
4  Q. Did he treat Ms. Dolnick and/or Ms. Samiy
5  that way?
6  A. No, he didn't.
7  Q. So it was more of a tense thing between
8  Mr. Bowden and Mr. Baxter?
9  A. Yes.
10  Q. And how are they getting along now?
11  A. Now they seem to be getting along fine.
12  Q. Did you ever hear Ms. Samiy warn
13  co-workers or her staff, whatever, at a meeting
14  about Mr. Bowden's behavior?
15  A. No.
16  Q. Or to be careful around him because he
17  was on medication?
18  A. Not to my recollection.
19  Q. Mr. Bowden wasn't the only black male
20  that was mistreated by Ms. Dolnick and Ms. Samiy;
21  is that correct?
22      MR. NEBEKER: Objection. Leading.

Page 225

1      THE WITNESS: Correct.
2  BY MR. SILVERBERG:
3  Q. You think both Ms. Samiy and Ms. Dolnick
4  were uncomfortable with black males?
5      MR. NEBEKER: Objection. Vague.
6      THE WITNESS: Based on their behavior,
7  yes.
8  BY MR. SILVERBERG:
9  Q. Do you know if Mr. Bowden was ever denied
10  leave for doctor appointments?
11  A. I don't know. I do believe he was
12  questioned by both Ms. Samiy and Ms. Dolnick about
13  doctors' appointments.
14      MR. NEBEKER: Did you overhear that?
15      THE WITNESS: Yeah, uh-huh.
16  BY MR. SILVERBERG:
17  Q. When did you hear that? What were the
18  circumstances?
19  A. I heard -- with Ms. Samiy it was a pretty
20  frequent thing. She questioned all of the men's
21  leave, medical appointments, anything.
22      MR. NEBEKER: Did you overhear all of

57 (Pages 222 to 225)

---

Page 242

1  MR. NEBEKER: Okay. You would not waive,
2  you would like to read it?
3      THE WITNESS: I would love to have a copy
4  if that's possible.
5      MR. NEBEKER: Very good. I think we're
6  done.
7      - - -
8      (Deposition concluded at 6:26 p.m.)
9      - - -
10
11
12
13
14
15
16
17
18
19
20
21
22

---

Page 243

1      ACKNOWLEDGMENT OF DEPONENT
2      I, HERMAN KREBS, do hereby acknowledge that I
3  have read and examined the foregoing two hundred
4  forty-two (242) pages of testimony, and the same is
5  a true, correct and complete transcription of the
6  testimony given by me, and any changes and/or
7  corrections appear on the attached errata sheet
8  signed by me.
9
10
11
12
13  (Date)      HERMAN KREBS
14
15
16
17
18
19
20
21
22

---

Page 244

1  ESQUIRE DEPOSITION SERVICES
2  1020 19th Street, Northwest
3  Suite 620
4  Washington, D.C. 20036
5
6          ERRATA SHEET
7  Case Name: Bowden v. Samper
8  Witness Name: HERMAN KREBS
9  Deposition Date: November 11, 2007
10 Job No.: 184151
11 PAGE   LINE       CORRECTION
12
13
14
15
16
17
18
19
20
21
22  Signature                Date

---

Page 245

1  CERTIFICATE OF STENOTYPE REPORTER - NOTARY PUBLIC
2
3  I, Sara A. Watt, Registered Professional Reporter,
4  the office before whom the foregoing deposition was
5  taken, do hereby certify that the witness named
6  herein was duly sworn by me; that the foregoing
7  transcript is a true, correct, and complete record
8  of the testimony given; that said testimony was
9  taken by me stenographically and thereafter reduced
10 to typewriting by me; and that I am neither counsel
11 for, related to, nor employed by any of the parties
12 to this litigation and have no interest, financial
13 or otherwise, in its outcome.
14     IN WITNESS WHEREOF, I have hereunto set
15 my hand and affixed my notarial seal.
16
17
18     Sara A. Watt, Notary Public in
19     and for the District of Columbia
20 My Commission expires June 30, 2008.
21
22

---