# PLAINTIFF'S EXHIBIT 4

Samiy Deposition Excerpts—pp. 8-9, 143-45, 158, 172

'HONY BOWDEN                                          KATHLEEN ADIB-SAMIY
RRENCE M. SMALL, SECRETARY, SMIITHSONIAN INSTITUTION                      June 21, 2007

| | Page 5 | | Page 7 |
|---|---|---|---|

Page 5

really what I'm asking?

    A.  Yes.  I received a deposition from someone at my door.

    Q.  A Notice of Deposition?

    A.  Yes.

    Q.  Was that a subpoena?

    A.  I'm not familiar with the legal terms, but if a deposition is a subpoena, I guess, yes.

    Q.  All right.  Have you ever been deposed before?

    A.  Never.  This is all new to me.

    Q.  I'm sure you'll do fine, seriously.

    I'm going to ask you a lot of questions involving mainly your time at the Smithsonian and Mr. Bowden's working for you.

    I try to keep it informal.  If you want a break, just tell me you want a break.  If you want to ask Mr. Nebeker a question, that's fine, although I would ask you not to do that in between when I'm asking you a question and asking you for the answer.  But between questions you can certainly talk to Mr. Nebeker.

Page 7

1    Are you familiar with Mr. Bowden's
2 complaint in civil court, in U.S. Federal Court,
3 U.S. District Court?
4    A.  All I know is what I've read based on
5 this document that Mark e-mailed me the other day.
6    Q.  Did you read what was named the Second
7 Amended Complaint of Employment Discrimination and
8 Breach of Contract?
9    A.  Yes.  It says nature of claim,
10 plaintiff.
11    Q.  Above the yellow.
12    A.  Second amended complaint.
13    Q.  Yes.
14    A.  Yes.
15    Q.  You've read that?
16    A.  I've read the whole document.
17    Q.  So you're familiar with that?
18    A.  I read the whole thing.
19    Q.  Where do you work now?
20    A.  I work for myself.
21    Q.  What do you do?
22    A.  I am a graphic designer.

Page 6

    If you don't understand anything, just tell me please repeat that or please explain it or please clarify it.

    I would ask you not to nod your head or say um-hum, because the court reporter can't pick that up.

    A.  I'm sorry.  Those are a little bit of personal habits.

    Q.  Everybody does it.  Um-hum.

    A.  Yes.

    Q.  And I just ask you to answer the questions as truthfully as possible.

    Mr. Nebeker is going to make a lot of objections for the record.  But the way it works in deposition is you should still answer unless Mr. Nebeker instructs you not to.

    Listen to whatever he tells you.  He's your lawyer here for today.  But in general when objections are made, it's for the record in a deposition.

    It's not like court where it stops and the judge rules against you.

Page 8

1    Q.  So what does a graphic designer do?
2    A.  I design publications, advertisements,
3 exhibits.
4    Q.  And do different companies pay you for
5 your work product?
6    A.  Yes.
7    Q.  What is your education?
8    A.  I have a bachelor of fine arts from
9 Boston University.
10    Q.  When was that?
11    A.  In 1981.
12    Q.  Anything beyond that?
13    A.  No.
14    Q.  Now, this case is about race, color,
15 sex, religion, disability, discrimination and
16 reprisal for prior EEO activity, at least the
17 allegations of that.
18    So I'm going to ask your race?
19    A.  I'm white, caucasian.
20    Q.  Color?
21    A.  White.
22    Q.  I know we all know the answer to these

2 (Pages 5 to 8)

'HONY BOWDEN                                                   KATHLEEN ADIB-SAMIY
WRENCE M. SMALL, SECRETARY, SMIITHSONIAN INSTITUTION                    June 21, 2007

Page 9

questions, but for the record, sex, female?
   A. Female.
   Q. Religion?
   A. Catholic.
   Q. Do you have any disability?
   A. No. I mean, do you want to qualify
that? There's nothing wrong with me health -- I
mean, I take thyroid medicine. I don't know if that
qualifies it.
   Q. You have a thyroid condition?
   A. Yes. Is that a disability?
   Q. You don't think that interferes with
your daily life activities?
   A. No.
   Q. Have you ever been involved in any
kind of EEO activity?
   A. Never.
   Q. Did anyone ever file anything against
you before Mr. Bowden at the agency?
   A. I did -- Ernie Robinson did file some
things against me. And I left the zoo, I did meet
with someone.

Page 10

   Q. Ernie Robinson is who?
   A. Ernest Robinson was also on my staff.
   Q. What was his job?
   A. He was a visual information
specialist.
   Q. Was it a race discrimination
allegation?
   A. I think so.
   Q. Is he African American?
   A. Yes, he is.
   Q. So did he file a formal EEO complaint?
   A. That I don't know. I know there was
something through the Smithsonian, if that's
considered formal. It wasn't similiar to this.
   Q. It wasn't in court?
   A. No. I didn't have a deposition.
   Q. But he filed something through the
Smithsonian?
   A. Yes.
   Q. That would have been about what year?
   A. In 2004.
   Q. Do you know what he alleged? What was

Page 11

1    the discrimination that he alleged against you?
2        A. He felt that it had to do with where
3    he sat in the office. And he felt that I had,
4    because of his race, not allowed him to sit where he
5    wants to sit.
6        Q. Do you know how that was resolved,
7    that complaint?
8        A. I think the Smithsonian dismissed it.
9        Q. Did it go any further or you don't
10   know?
11       A. I don't know.
12       Q. I have to say I'm surprised you said
13   your religion was Catholic. I thought you were
14   Jewish.
15       A. Well, I don't know where you got that
16   impression.
17       Q. You've been Catholic your whole life?
18       A. Yes.
19       Q. Is Ms. Lynn Dolnick Jewish, to your
20   knowledge?
21       A. I don't know. I don't know. She may
22   be. I think there was -- but I don't know. I never

Page 12

1    asked her religion.
2        Q. When did you first become aware that
3    Mr. Bowden had filed EEO activity? And I'm also
4    including a previous court case. But when did you
5    first become aware?
6        A. When Mark first called me, which was a
7    few weeks ago. He asked me if I would talk to the
8    Smithsonian counsel and a psychologist regarding
9    this case.
10       Q. Who's the psychologist?
11       A. I don't remember her name.
12       Q. You did speak to her?
13       A. I did, but I told her I didn't feel
14   comfortable talking about any psychological problems
15   with Tony. And I would prefer not to unless I was
16   required to.
17       Q. So basically you told her you felt it
18   was a privacy thing?
19       A. I told her I didn't feel that I was in
20   a position to talk to her about Tony's psychological
21   state.
22       Q. Let me ask you before we get on a

SLR REPORTING
(301) 340-0042



BOWDEN

SMALL, SECRETARY, SMITHSONIAN INSTITUTION

KATHLEEN ADIB-SAMIY

June 21, 2007

---

Page 141

And people are called visual
specialists. And they can be an art
or a graphic designer or creative director.
all kinds of different colloquial terms that

Q. Tony wasn't employed at the zoo in
that true?
I don't know when he started at the
was there when I arrived.

Q. Do you know if an announcement was
other staff members that Tony was a leader,

There was an announcement -- when the
and Tony submitted, there was an
that he had been accepted to fulfill
as per that announcement, which was to
the work of other exhibit specialists.

Q. Were there any other staff members
tenure that became a leader?

MR. NEBEKER: Objection; vague.

MR. SILVERBERG: (RESUMED)

Q. The title was up to leader?

---

Page 142

I think Grace may have had a project
but I don't remember.

Q. Grace Lopez?
Yes. I think she did, but I don't
sure.

Q. Do you remember a meeting you had with
January 13, '04, to discuss him having to
on large and heavy projects and he asked
?

No.

Q. You don't ever remember him discussing
you?

No.

Q. Do you remember him telling you he
back while doing heavy lifting?
I don't remember.

Q. Do you remember a meeting with him
yelled at him?

you said how dare you question
that effect?

---

Page 143

1    Q.  Where you got angry with him?
2    A.  No.
3    Q.  Even if you didn't show your anger,
4  you don't remember ever feeling angry at him?
5    A.  No. I had a motto called four hands.
6  That's a project that needs four hands. I was very
7  clear to staff not to do anything that didn't -- to
8  use their judgment, but there were certain
9  parameters. And safety was huge.
10    Q.  Did you ever address the issue of Tony
11  having to work with large and heavy projects?
12    A.  It was addressed with all the staff,
13  especially those in exhibit specialist job
14  descriptions, because their work entailed installing
15  signs and work that was on the heavier end. But
16  they had to be careful and not -- they had
17  parameters not to hurt themselves.
18    Q.  Do you remember stating in a staff
19  meeting to be careful around Tony because he has a
20  mental disorder?
21    A.  Absolutely not.
22    Q.  The agency with the desk audit

---

Page 144

1  classified him as a GS-11; is that true?
2    A.  I don't know.
3    Q.  Did Ms. Dolnick, to your knowledge,
4  ever tell Mr. Bowden that she couldn't make him a
5  GS-12 because you were a GS-12?
6    A.  Absolutely not. I don't know anything
7  about that.
8    Q.  You don't know one way or the other,
9  do you?
10    A.  I don't know.
11    Q.  Do you remember on various times Mr.
12  Bowden complaining to Lynn and to you that he wasn't
13  being provided the reasonable accommodations to his
14  disability that he had been promised by the agency
15  in the settlement agreement?
16    A.  I was not aware of any disability of
17  Tony other than that he fell asleep in meetings.
18    Q.  Did you know why he fell asleep?
19    A.  No.
20    Q.  Do you know he was on medication?
21    A.  No.
22    Q.  Did you continuously question Tony as

---

36 (Pages 141 to 144)

TONY BOWDEN

KATHLEEN ADIB-SAMIY

LAWRENCE M. SMALL, SECRETARY, SMITHSONIAN INSTITUTION

June 21, 200?

**Page 145**

...why he took so many bathroom breaks?

A. No.

Q. Do you remember times when he asked to leave for a doctor's appointment? Do you remember times when he had a doctor's appointment?

MR. NEBEKER: Objection to the form of the question. It was a compound.

BY MR. SILVERBERG: (RESUMED)

Q. Do you remember Tony having doctor's appointments?

A. Yes.

Q. Did you always okay the doctor appointments, that he could go for the doctor appointments?

A. I think so.

Q. There was no time where you interfered with him going?

A. I remember there was one time there was an issue that he had left to go to a doctor's appointment but hadn't told anybody, and there was no leave slip in for it. So there was a question if he had left to go to a doctor's appointment.

**Page 146**

Q. What did you do with that?

A. I don't remember.

Q. Did you increase his workload while he worked under you?

A. I think everyone did a lot more work while I was there. From what I could gather, they did one exhibit every three years. And when I was there, they did at least three, maybe five in the year and a half that I was there. So the quantity of work increased significantly while I was there.

Q. Did you tell people that Tony was on medication?

A. No.

Q. You never mentioned the mental disorder to people?

A. No. No.

Q. Do you remember specifically on or about March 30, '04, informing Tony of an increase in his work duties?

A. When?

Q. In March. You were gone, weren't you? Scratch that.

**Page 147**

1 I'm going to have this marked as the
2 next exhibit.
3 (Document marked Exhibit No. 7)
4 Q. Do you remember this e-mail at the
5 bottom that you sent on 10/21/03 to Tony?
6 A. Tony's behavior started changing
7 markedly in the fall. And he was feeling very
8 angry. And his behavior towards me changed
9 markedly.
10 And there were a few incidents that I
11 was concerned about that related to why he was
12 behaving this way. And he wasn't showing up to
13 meetings. He wasn't performing as he had in the
14 past.
15 He was performing on an inconsistent
16 -- there was inconsistency where there had never
17 been in our early days of working together.
18 And I know that he really, really
19 wanted the position of production manager, and there
20 was a lot of bad feelings. And I guess if I wrote
21 this, I'm sure this is mine.
22 Q. So you're saying here --

**Page 148**

1 A. But there's also huge issues of people
2 arriving on time amongst all staff.
3 Q. Actually, I just asked did you write
4 this e-mail?
5 A. Yes.
6 Q. And this e-mail says --
7 A. You missed the monthly meeting
8 yesterday. You are a critical part of our
9 operation. We couldn't meet without you.
10 Q. It says my perception is that you're
11 not arriving at 7 am.
12 A. Right, because I arrived --
13 Q. Let me finish. This may not be the
14 reality, but on numerous occasions such as today and
15 two days last week when I looked for you, I can't
16 find you on the premises. Your car is not in the
17 lot, or if you've ridden your bike, you still have
18 your attire on at 9 am.
19 A. Right.
20 Q. How big is the zoo? Do you know how
21 many acres it is? It's big, isn't it?
22 A. It's big.

THONY BOWDEN                                          KATHLEEN ADIB-SAMIY
RENCE M. SMALL, SECRETARY, SMIITHSONIAN INSTITUTION                June 21, 2007

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - x

ANTHONY BOWDEN,

    Plaintiff,

vs                          CA No. 05-2202

LAWRENCE M. SMALL, SECRETARY,
SMITHSONIAN INSTITUTION,
    Defendant.

- - - - - - - - - - - - - x

          Thursday, June 21, 2007
          Washington, D.C:

DEPOSITION OF:
        KATHLEEN ADIB-SAMIY,
called for oral examination by counsel for the
plaintiff, taken at the Department of Justice,
601 Third Street, Northwest, Washington, DC,
beginning at 10:10, a.m. on Thursday, June 21, 2007,
before Maureen Donelson, Court Reporter, Notary
Public in and for the State of Maryland, when were
present on behalf of the respective parties:

---

**Page 2**

On BEHALF OF THE PLAINTIFF:
    STEVEN J. SILVERBERG, ESQUIRE
    1819 L Street, Northwest
    Washington, D.C. 20036
    (202) 785-8499
    Sjsilverberg@erols.com


ON BEHALF OF THE DEFENDANT:
    DEPARTMENT OF JUSTICE
    BY: W. MARK NEBEKER, ESQUIRE
    555 4th Street, Northwest
    Washington, DC. 20530
    (202) 514-7230
    mark.nebeker@usdoj.gov


    SMITHSONIAN INSTITUTION
    BY: MILDRED GLOVER, ESQUIRE
    ASSOCIATE GENERAL COUNSEL
    1000 Jefferson Drive, Southwest
    Washington, DC  20560
    (202) 633-5097

---

**Page 3**

1        I N D E X
2
3  DEPOSITION OF KATHLEEN ADIB-SAMIY
4  EXAMINATION BY:      PAGE
5    Mr. Silverberg--------  4, 175
6    Mr. Nebeker-----------  172
7    Ms. Glover------------   –
8    INDEX OF DEPOSITION EXHIBITS
9  EXHIBITS:      PAGE:

10  1 - Position description document   86
11  2 - Position description document   88
12  3 - E-mails                        105
13  4 - Performance appraisal form     127
14  5 - Letter                         137
15  6 - Certificate of training        137
16  7 - E-mails                        147
17  8 - E-mails                        154
18  9 - E-mails                        164
19  (Exhibits attached to original and copy)
20
21
22

---

**Page 4**

1      P R O C E E D I N G S
2  Whereupon,
3      KATHLEEN ADIB-SAMIY,
4  called for examination by counsel for the plaintiff,
5  and having been duly sworn by the Notary Public, was
6  examined and testified as follows:
7    EXAMINATION BY COUNSEL FOR THE PLAINTIFF
8  BY MR. SILVERBERG:
9    Q. Ms. Samiy, I'm Steven Silverberg. I'm
10  plaintiff's attorney, Anthony Bowden's attorney.
11  I'll either call him Mr. Bowden or the plaintiff
12  throughout this.
13    What is it that brought you here
14  today?
15    A. I received a call from Mark asking me
16  to come talk to you about this complaint that Tony
17  has filed.
18    Q. Mark Nebeker?
19    A. Yes.
20    Q. For the record.
21    A. I'm sorry, yes.
22    Q. Are you here pursuant to a subpoena is

---

SLR REPORTING
(301) 340-0042

ANTHONY BOWDEN                                   KATHLEEN ADIB-SAMIY
LAWRENCE M. SMALL, SECRETARY, SMITHSONIAN INSTITUTION    June 21, 2007

Page 157

1    the fact. That's what I'm reading in this.
2        Q.  Do you remember telling him it was a
3    priority?
4        A.  No.
5        Q.  Did you ever use the word priority for
6    certain assignments?
7        A.  I used priority all the time for all
8    staff. This is a priority.
9        Q.  What does priority mean?
10       A.  It means it's important. It should be
11   done first.
12       Q.  And did you use it for this --
13       A.  It doesn't mean it should be done in
14   lieu of attending a meeting. It means it's a
15   project that needs to be done first.
16       Q.  Did you use it for the panda photo
17   contest?
18       A.  I don't remember.
19       Q.  Do you remember which employees were
20   made to move furniture?
21       A.  No. Lots of -- there were some
22   employees that moved furniture when I didn't want

Page 158

1    them to move furniture because I felt it was too
2    heavy, especially when we renovated the office.
3        Q.  Isn't it true that only black staff
4    members were made to move furniture?
5        A.  No.
6        Q.  Isn't it true that black staff members
7    moved furniture for white co-workers?
8        A.  No. They may have, but it wasn't a
9    common practice.
10       Q.  Who was Elena Lopez?
11       A.  She was first a contractor, then a
12   visual information specialist at the zoo.
13       Q.  Did you treat her the same as other
14   employees? Did she work under you?
15       A.  Yes.
16       Q.  Did you treat her the same as other
17   employees who worked under you?
18       A.  Yes, as best I could.
19       Q.  Did you know her before she worked at
20   the zoo?
21       A.  I had met her when she worked on a
22   contract at the Holocaust Museum. And then I hired

Page 159

1    her to work on a contract for the Pope John Paul
2    Center.
3        Q.  Did she ever work as your nanny?
4        A.  No. My nanny?
5        Q.  Yes.
6        A.  No.
7        Q.  So you knew her at the Holocaust
8    Museum?
9        A.  She was hired on a contract at the
10   Holocaust Museum as a graphic designer.
11       Q.  And you met her there?
12       A.  Yes.
13       Q.  Did you hire her?
14       A.  She was -- I hired a company that was
15   a -- they had a pool of graphic designers, and you
16   could call them as you had projects that they could
17   -- you would tell them what you needed and they
18   would send you someone. She was hired in that
19   capacity on a project.
20       Q.  Now, did Elena Lopez apply for a
21   designer position?
22       A.  She did.

Page 160

1        Q.  Did she get that position?
2        A.  She did.
3        Q.  Was that a promotion, a higher grade
4    level than what she had?
5        A.  I think it was the same. It was one
6    job description.
7        Q.  Who's Grace Lopez?
8        A.  She is an exhibit specialist at the
9    zoo.
10       Q.  Didn't she apply for that same
11   position?
12       A.  I don't remember. She may have.
13       Q.  Didn't she make the cert list?
14       A.  She may have.
15       Q.  Do you remember if she was asked to
16   withdraw her application from the cert?
17       A.  I don't remember. I do remember
18   having a discussion with her, asking her if she
19   wanted to be -- she was an exhibit specialist and
20   did she want to be a visual information specialist.
21   But she didn't want to be a visual information
22   specialist. She told me she wanted to stay as an

40 (Pages 157 to 160)

ANTHONY BOWDEN
vs. LAWRENCE M. SMALL, SECRETARY, SMITHSONIAN INSTITUTION

KATHLEEN ADIB-SAMIY
June 21, 2007

Page 169

1  expressions of anxiety or concern or fear or
2  complaint from black employees than white employees?
3       A.  No.  I had a white employee that I
4  found to be very -- from the moment I got on the
5  premises, very afraid of my being there.
6       Q.  Who was that?
7       A.  Herman.  He never left his office.
8       Q.  Herman Krebs?
9       A.  Yes.
10      Q.  Did you ever make Tony acting
11 supervisor of design and production in your
12 absences?  I guess he would be acting.
13      A.  I think once when I went away, I had
14 to put someone in charge.  And I think it may have
15 been Tony.  I don't remember exactly.  I knew that
16 once -- I think once I had to do that.
17      Q.  Do you know the people Ms. Dolnick
18 promoted?
19      A.  I don't know -- I think Lynn told me
20 she had promoted Aaron from an 11 to a 12.
21      Q.  Aaron Forster?
22      A.  Yes.

Page 170

1       Q.  Is he Jewish?
2       A.  Yes, I believe so.
3       Q.  Did people ever, I guess according to
4  your testimony, make the mistake that you were
5  Jewish, that they thought you were Jewish?
6       MR. NEBEKER:  Objection; vague.
7       BY MR. SILVERBERG:  (RESUMED)
8       Q.  I'll get specific then.  That there
9  were jokes -- nothing bad -- that it was funny that
10 I guess -- I don't mean to get personal, but just to
11 make the point about being Jewish -- that you were
12 married to someone from the Middle East, I guess
13 someone who was from Arab descent, and that it was
14 funny that you as a Jew were married to an Arab?  Do
15 you remember any kind of jokes made like that?
16      A.  I have never heard anything like that.
17      Q.  Were you married to someone of Arab
18 descent?
19      A.  No.
20      Q.  Middle Eastern descent?
21      A.  Yes.
22      Q.  Did Grace Lopez have the same duties

Page 171

1  as Tony?
2       MR. NEBEKER:  Objection; vague.
3       BY MR. SILVERBERG:  (RESUMED)
4       Q.  Isn't Grace Lopez an exhibit
5  specialist?
6       A.  She is.
7       Q.  Did she do the same duties as Tony?
8       A.  She had some overlapping duties and
9  some separate duties.
10      Q.  Did she ever have to work out in the
11 cold and heat when the weather was bad?
12      A.  Yes.
13      Q.  She did?
14      A.  Yes.  She installed -- she produced --
15 she designed, produced and installed banners.
16      Q.  Did she ever have to lift heavy
17 objects?
18      A.  That's a question for Grace.
19      Q.  Did she install signs?
20      A.  What kind of signs?  There was all
21 kinds of signs.  Grace primarily made banners and
22 vinyl graphics.

Page 172

1       Q.  Isn't it true her work was of a
2  lighter nature than Tony's in terms of heavy versus
3  light?
4       A.  Tell me something more specific.
5       Q.  Tony did the heavy work?
6       A.  That's very general.  Tony did more
7  things with sign installations of printed, laminated
8  signs that were affixed to metal that were 24 by 36
9  inches or 12 by 48 inches.  And he did framework.
10      Grace did signs and banners.
11      Q.  Didn't Tony work outside more than
12 Grace?
13      A.  You'd have to quantify that to tell
14 me.  Probably.  I guess generally.  If you want to
15 say generally, probably yes, because more of her
16 work was at the computer and at the desk.
17      Q.  I have no further questions.
18      MR. NEBEKER:  I have a few questions.
19      EXAMINATION ON BEHALF OF THE DEFENDANT
20 BY MR. NEBEKER:
21      Q.  A couple of times in your testimony
22 you referred to here and this report, and you

43 (Pages 169 to 172)

NY BOWDEN

; M. SMALL, SECRETARY, SMIITHSONIAN INSTITUTION

KATHLEEN ADIB-SAMIY
June 21, 2007

Page 177

8 SELINE WAY
MAC, MARYLAND 20854
340-0042
IOWDEN VS. SMITHSONIAN
TION OF: KATHLEEN SAMIY
is the transcript of your
imony. Please review the transcript,
distribute the signed errata sheet and
nent page to all parties, including this
30 days. Any changes and/or
ould be listed below and not made upon
itself.

E    CHANGE OR CORRECTION   REASON

_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____  _____
_____ SIGNATURE_____

Page 178

ACKNOWLEDGEMENT OF DEPONENT


I, KATHLEEN SAMIY, do hereby acknowledge
I have read and examined pages 4 through 179,
isive, of the transcript of my deposition taken
rsday, June 21, 2007, and that:

   (Check appropriate box)

   [ ] the same is a true, correct, and

plete transcription of the answers given by me
ie questions therein recorded.

   [ ] except for the changes noted in the

:hed errata sheet, the same is a true, correct,

complete transcription of the answers given by

to the questions therein recorded.


_____  _____

SIGNATURE        DATE

Page 179

```
 1        CERTIFICATE OF STENOTYPE REPORTER - NOTARY PUBLIC
 2        I, Maureen Donelson, Court Reporter, the
 3   officer before whom the foregoing deposition was
 4   taken, do hereby certify that the witness, KATHLEEN
 5   SAMIY, was duly sworn by me; that the foregoing
 6   transcript is a true, correct and complete record of
 7   the testimony given; that said testimony was taken
 8   by me stenographically and thereafter reduced to
 9   typewriting by me; and that I am neither counsel
10   for, related to, nor employed by any of the parties
11   to this litigation and have no interest, financial
12   or otherwise, in its outcome.
13        IN WITNESS WHEREOF, I have hereunto set my
14   hand and affixed my notarial seal this 28th day of
15   June, 2007.
16   My commission expires:
17   August 3, 2008
18             NOTARY PUBLIC IN AND FOR THE
19             STATE OF MARYLAND
20
21
22
```