# PLAINTIFF'S EXHIBIT 7

Fillah Deposition Excerpts—pp. 9, 25-26, 38-40, 47, 54, 83, 87

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ANTHONY BOWDEN,                    *

       Plaintiff,              *

                                *

vs.                                * Civil Action No.:

                                * 05-2022

LAWRENCE M. SMALL,                 *

Secretary, Smithsonian             *

Institution,                       *

       Defendant.              *

* * * * * * * * * * * * * * * * * * * * * * * * *

       The deposition of CHARLES FILLAH took place on Wednesday, December 5, 2007, beginning at 1:02 p.m. at the Office of Steven Silverberg 900 17th Street, NW, Suite 1250, Washington, D.C. before Stacey L. Daywalt, Court Reporter.

* * * * * * * * * * * * * * * * * * * * * * * * *


Reported by:

       Stacey L. Daywalt, Court Reporter

Page 6

1    PROCEEDING
2
3    Whereupon --
4        CHARLES FILLAH,
5    a witness, called for examination, having been
6    first duly sworn, was examined and testified
7    as follows:
8        EXAMINATION BY MR. SILVERBERG:
9    Q.  Afternoon, Mr. Fillah. Thanks for coming
10   on this snowy day and thank you for rescheduling
11   when I requested a postponement of the deposition.
12   I appreciate it. Have you ever been deposed
13   before?
14   A.  I don't think so.
15   Q.  Is that a no? You're not sure?
16   A.  I'm not sure.
17   Q.  You don't know if you ever participated
18   in an incident like this where the lawyer asks you
19   questions and there's a court reporter or some type
20   of recording of it?
21   A.  Not sure.

Page 7

1    Q.  Were you involved in some sort of court
2    proceedings that might have involved a deposition?
3    A.  No.
4    Q.  Were you ever deposed as part of an EEO
5    case, Equal Employment Opportunity case, at work?
6    A.  I'm not sure actually.
7    Q.  Okay. Let me tell you the basic rules
8    which is I try to keep it pretty relaxed. If you
9    don't understand what I'm saying or it's not clear
10   just ask me to repeat it or ask me to explain it.
11   You can break any time you want. I just ask you
12   not to break in between when I ask a question and
13   when you answer it, but you can consult with your
14   counsel whenever. Listen to what he says. Don't
15   nod because she can't record a nod. Say yes or no.
16   And that's about it. I'm going to be asking
17   questions. I'll just ask you to answer them the
18   best of your ability.
19       What is your name?
20   A.  Charles Fillah.
21   Q.  F-I-L-L-A-H?

Page 8

1    A.  That's right.
2    Q.  And what is your race?
3    A.  I'd say I'm caucasian.
4    Q.  Sex?
5    A.  Male.
6    Q.  Disability status? Do you have a
7    disability?
8    A.  No.
9    Q.  Do you know Tony Bowden?
10   A.  Yes.
11   Q.  How do you know Mr. Bowden?
12   A.  Through work.
13   Q.  Does he work for you?
14   A.  Yes.
15   Q.  What's the line of supervision there?
16   A.  Currently third line.
17   Q.  So, you're his third line supervisor?
18   A.  Yes.
19   Q.  What is your job?
20   A.  Associate director.
21   Q.  And where do you work?

Page 9

1    A.  National Zoo.
2    Q.  And what department?
3    A.  Exhibits and part management.
4    Q.  And what grade are you?
5    A.  GS-15.
6    Q.  How long have you been associate
7    director?
8    A.  Several years.
9    Q.  Like three? Four?
10   A.  Mm-hmm, yes.
11   Q.  You're his third line supervisor or his
12   second line supervisor?
13   A.  Third line.
14   Q.  Who's his immediate supervisor?
15   A.  Jeff Baxter.
16   Q.  So, Mr. Bowden is an exhibit specialist.
17   Right?
18   A.  That's correct.
19   Q.  And Mr. Baxter is what?
20   A.  His supervisor.
21   Q.  And his job title?

Page 22

```
 1      MR. NEBEKER: Same objection.
 2      BY MR. SILVERBERG:
 3   Q. Weren't you approached before you
 4  actually answered them? Weren't you?
 5   A. Probably, yes.
 6   Q. So some time before June 15th, '05,
 7  within that ballpark time. Is that accurate?
 8      MR. NEBEKER: Objection, vague.
 9      THE DEPONENT: Seems reasonable.
10      BY MR. SILVERBERG:
11   Q. Were you aware that he named you,
12  Mr. Bowden named you, as one of the alleged
13  discriminating retaliating officials?
14   A. When I saw the statement I had to respond
15  to, yes, I did.
16   Q. And what was your reaction when you
17  learned that?
18      MR. NEBEKER: Objection, vague.
19      THE DEPONENT: Reaction?
20      MR. SILVERBERG:
21   Q. Were you mad? Were you neutral?
```

Page 23

```
 1   A. I would say I wasn't mad. I was neutral.
 2  My reaction to that would probably be it's
 3  unfortunate I guess.
 4   Q. Why unfortunate?
 5   A. Why unfortunate? Well, basically you're
 6  trying to promote harmony in the workplace. And
 7  so, if somebody has a complaint that's unfortunate
 8  that it rose to that level.
 9   Q. You feel that the person filing the
10  complaint is breaking that harmony?
11   A. No. I'm saying it's unfortunate, the
12  situation. I wouldn't judge that. I'm saying
13  right now it's just any time someone has a
14  complaint I would say it's something you look at.
15  You're trying to manage effectively and then
16  something comes to this case it's unfortunate for
17  everyone. That's what I mean unfortunate, but I
18  would say as far as feelings it's neutral.
19   Q. You didn't get mad that you were being
20  called a discriminator?
21   A. No.
```

Page 24

```
 1   Q. Didn't you meet with black staff members
 2  several times about their allegations of
 3  discrimination?
 4      MR. NEBEKER: Objection, vague.
 5      THE DEPONENT: I meet with a lot of
 6  people many times for a lot of reasons.
 7      BY MR. SILVERBERG:
 8   Q. Did you tell black staff members that you
 9  knew what it feels like to be discriminated against
10  because you're of Middle Eastern decent?
11   A. I might have talked in context of showing
12  that -- somewhere in that context that discussion
13  was made.
14   Q. That you understood because you're a
15  minority too?
16   A. I'm not sure I --
17   Q. Not that you said that, but was that what
18  you were trying to convey?
19   A. I was saying that for me personally I
20  could express how I feel, yes, what that means.
21   Q. What's your I guess your ethnic original
```

Page 25

```
 1  or whatever?
 2   A. Middle Eastern.
 3   Q. What's your religion? It's relevant to
 4  this case because he's alleging religious
 5  discrimination.
 6   A. I don't want to answer that question
 7  actually.
 8   Q. Oh, boy. I'm not going to be offended
 9  whatever your religion is. I respect all
10  religions.
11   A. I'm not sure why I have to answer that
12  question honestly.
13      MR. NEBEKER: Would it suffice if you
14  asked him if he was Respondent's religion?
15      BY MR. SILVERBERG:
16   Q. You're allowed to answer it. In fact,
17  you're supposed to answer the questions I ask.
18   A. I understand that.
19   Q. Unless Counsel -- I don't want to get
20  into --
21   A. Because it's --
```

Page 26

1   Q. It's relevant to this case because
2   actually what he's alleging is that Jewish people
3   were favored.
4       MR. NEBEKER: Do we have a protective
5   order in this case?
6       MR. SILVERBERG: Yeah, we did, but I
7   don't know if it went to --
8       MR. NEBEKER: I think we're allowed to
9   designate things. Could we take a break and let me
10  talk to the witness about it?
11      MR. SILVERBERG: Yeah.
12      MR. NEBEKER: I take it you'd be okay
13  with designating this question and answer as
14  subject to the agreement?
15      MR. SILVERBERG: Well, maybe I can get
16  around it for now.
17      BY MR. SILVERBERG:
18  Q. Are you Jewish?
19  A. No.
20  Q. Are you Christian?
21  A. Yes.

Page 27

1   Q. Okay. That's fine. Who's Ernie
2   Robinson?
3   A. Another employee.
4   Q. And did you supervise him?
5   A. Yes.
6   Q. What was his job?
7   A. Exhibit specialist.
8   Q. And he worked for exhibits department?
9   A. Yes.
10  Q. Did he file an EEO complaint against you
11  and Jeff Baxter?
12  A. I'm not aware of one.
13  Q. Are you aware that Mr. Bowden's complaint
14  is now in Federal Court, that it left the EEO
15  administrative arena, that it's now in court, it's
16  no longer headed towards the EEOC? It's in court.
17  Do you understand that?
18  A. I understand why I'm here and I assume
19  that's why we're here.
20  Q. But you know he's actually suing in
21  Federal Court?

Page 28

1   A. Do I know that? I know that. You're
2   telling me that now. I know that now, yes.
3   Q. But did you know before today? You
4   didn't know his case was filed in Federal Court?
5   A. Not sure.
6   Q. You knew he had a case?
7   A. I knew he had a case, yes.
8   Q. You knew it was EEO, discrimination
9   allegation?
10  A. Yes, I knew that.
11      (Fillah Deposition Exhibit Number 3, Memo
12  dated 7/27/05, for identification.)
13      BY MR. SILVERBERG:
14  Q. You want to take a second and read this
15  letter?
16  A. I'm fine.
17  Q. Is this letter to you?
18  A. Yes.
19  Q. Had you seen this letter before?
20  A. Probably, yes.
21  Q. Who is -- it was sent to you. Correct?

Page 29

1   July 27, '05 it's dated?
2   A. Correct.
3   Q. From Janine Scott-Powell, management
4   support assistant?
5   A. Yes.
6   Q. Who is she?
7   A. She was administrative support person in
8   our department.
9   Q. And how long has she worked there?
10  A. Not sure.
11  Q. Were you her supervisor?
12      MR. NEBEKER: Objection, phrasing.
13      THE DEPONENT: Yes.
14      BY MR. SILVERBERG:
15  Q. What level of supervisor?
16  A. I'd have to go back and see whether I was
17  a section or not. I'm thinking I was section
18  supervisor.
19  Q. Who is Folami Ahota here who she refers
20  to?
21  A. She was an administrative support person.



## Page 38

1  A. I would say that to me it means
2  performing her duties. A regular duty is outside
3  of anything unusual. That's regular. And routine
4  to me is anything that's routinely done in her job.
5  It would be regular routine, something that's
6  normal and done that's a normal part of your job.
7     Q. What is the lower shop?
8     A. Lower shop in this case means a work
9  area, production shop work area I assume.
10    Q. And that's at the zoo?
11    A. At the zoo, right. It's in the service
12 building.
13    Q. Isn't that shop relatively unclean,
14 dirty?
15    A. It's like a warehouse. So, it's a
16 warehouse building.
17    Q. Is that where heavy work is done, heavy
18 lifting?
19       MR. NEBEKER: Objection, vague.
20       BY MR. SILVERBERG:
21    Q. Are there big machines there?

## Page 39

1     A. Are you talking about this particular,
2  the exhibit shop or the whole building itself?
3  What's your question in?
4     Q. I'm talking about the lower shop.
5     A. Our exhibit shop I assume.
6     Q. Yeah. Heavy machinery?
7     A. Heavy machinery? You have to clarify.
8  Does that mean bulldozer? Does that mean a lawn
9  mower? Does that mean a saw? Heavy equipment to
10 me means I want to say something that's like a
11 tractor or something. So...
12    Q. Or how about equipment that is heavy but
13 liftable that can be lifted by a person?
14    A. Like a box or something or a board?
15       MR. NEBEKER: Objection, vague.
16       THE DEPONENT: That's pretty vague. I'm
17 confused by your question. I don't understand your
18 question.
19       BY MR. SILVERBERG:
20    Q. Table saws?
21    A. Table saws are there, yes.

## Page 40

1     Q. Is it dirty down there?
2     A. It gets dirty.
3     Q. Are there chemicals down there?
4        MR. NEBEKER: Objection, vague.
5        BY MR. SILVERBERG:
6     Q. That someone could be exposed to who
7  worked there?
8     A. I'm not sure of your question actually.
9  Right now we try to, if there's chemicals we have a
10 -- we try to keep the chemicals in a safe place.
11 So, as far as anybody being put in a situation
12 that's unsafe chemical wise I would say I'm not
13 aware of that. I would expect that. I wouldn't
14 tolerate it actually.
15    Q. Was Grace Lopez required to work in the
16 lower shop?
17       MR. NEBEKER: Objection, vague.
18       THE DEPONENT: Required?
19       BY MR. SILVERBERG:
20    Q. Was she assigned sometimes to work in the
21 lower shop? Is that part of her duties?

## Page 41

1     A. I would say as a second level supervisor
2  I would say that if she had work to do that needed
3  lower shop that I would say that she would go in
4  there.
5     Q. Who was second level supervisor?
6     A. Jeff was a supervisor for this area. So,
7  in my level, not knowing the day-to-day work, I
8  would say that I expect that if she had to do work
9  and it took to be in the shop that she would be
10 expected to go in there.
11    Q. Weren't you her second line supervisor at
12 that time?
13    A. Yes, I said.
14    Q. Weren't you Mr. Bowden's second line
15 supervisor at that time?
16    A. Yes, I was. I just said that.
17       MR. NEBEKER: Objection, vague.
18       THE DEPONENT: I said as a first line
19 supervisor Jeff running, like I said earlier in
20 this document, routine work meaning things that are
21 routine, I would expect that if it needed to be

Page 46

1  Grace Lopez, for the relevant years.
2      MR. NEBEKER: We'll talk about it when
3  we're done with the deposition.
4      BY MR. SILVERBERG:
5   Q. Did Miss Lopez work in the lower shop as
6  often as Mr. Bowden?
7   A. Probably I would say no.
8   Q. Mr. Bowden worked in the lower shop a lot
9  more? That's vague. I know that's vague. Twice
10 as much? Three times as much? 1.8 times as much?
11  A. I don't know.
12  Q. But he worked more?
13  A. Yes. Basically, from my level like I
14 said earlier the work was given out and how they
15 come to work is between the supervisor and the
16 employee.
17  Q. But he did work more than Miss?
18  A. I would say yes.
19  Q. In the lower shop, more than Miss Lopez?
20  A. Yes.
21  Q. What is Gerber work? Do you know?

Page 47

1   A. I think it's working with a bottle in
2  signage.
3   Q. Is it true that Miss Lopez was assigned
4  all the Gerber work that had to be done for I guess
5  exhibit office?
6   A. She did a lot of that work, yes.
7   Q. A lot of her work was Gerber work?
8   A. Mm-hmm.
9   Q. Isn't it true that that's not really
10 physical work?
11      MR. NEBEKER: Objection, vague.
12      THE DEPONENT: Depending on what part
13 you're talking about. I assume it's got physical
14 parts of it.
15      BY MR. SILVERBERG:
16  Q. But it's not similar to lifting or
17 sawing?
18  A. It's not similar to sawing, no.
19  Q. Or mowing the lawn or putting up a sign?
20  A. When you do Gerber work also, it's
21 installing also. So, it's a combination of both I

Page 48

1  assume.
2   Q. Well, how much physical work did she do?
3      MR. NEBEKER: Objection, vague.
4      BY MR. SILVERBERG:
5   Q. I mean the heavier duties, the heavier
6  jobs?
7      MR. NEBEKER: Same objection.
8      BY MR. SILVERBERG:
9   Q. How often did she do the heavier jobs?
10     MR. NEBEKER: Same objection.
11     THE DEPONENT: I don't know that.
12     BY MR. SILVERBERG:
13  Q. Isn't it true that working with vinyl in
14 this context is less physical, less strenuous than
15 other job duties?
16     MR. NEBEKER: Objection, vague.
17     THE DEPONENT: That's pretty vague
18 question to answer.
19     BY MR. SILVERBERG:
20  Q. Did Miss Lopez ever build exhibits or
21 help build exhibits?

Page 49

1      MR. NEBEKER: Same objection.
2      THE DEPONENT: I would assume she has,
3  yes.
4      BY MR. SILVERBERG:
5   Q. You assume, but you don't know for sure?
6   A. Not really.
7   Q. You never saw her building exhibits?
8   A. Well, I mean, when you build an exhibit
9  it's a pretty big answer. So, whether you're -- an
10 exhibit, in our area an exhibit could be
11 interpretation, putting a sign up putting up
12 letters from building. If you're talking about if
13 she's ever -- so, it's a little bit vague to
14 answer.
15  Q. Did Mr. Bowden ever build exhibits?
16  A. Yes.
17  Q. Didn't Mr. Bowden do a lot more building
18 of exhibits? And I don't mean tangential parts of
19 the exhibit.
20  A. That's what it's hard to answer that
21 question.

13 (Pages 46 to 49)

Page 54

1  Q. Or more.
2  A. I can't remember.
3  Q. Did you see Mr. Bowden ever lifting
4  30 pounds or more?
5  A. Yes.
6  Q. Would you agree in the day-to-day work,
7  not their position description, Mr. Bowden lifted
8  more heavier items than Miss Lopez?
9  A. Yes.
10  Q. Thank you. Did Miss Gerber, you said she
11  was assigned a lot of the -- Miss Lopez -- assigned
12  a lot of the Gerber work?
13  A. Yes.
14  Q. Was Mr. Bowden assigned any Gerber work?
15  A. If it was -- I don't know the answer to
16  that actually.
17  Q. Was anyone else assigned Gerber work
18  besides Miss Lopez?
19  A. I don't know the answer to that.
20  Q. What is FONZ?
21  A. Friends of the National Zoo.

Page 55

1  Q. Is it part of the federal government?
2  A. No.
3  Q. It's a private organization?
4  A. Nonprofit organization.
5  Q. Nonprofit that supports the zoo?
6  A. Yes.
7  Q. Is it true that much of the Gerber work
8  performed by Miss Lopez was work that was for FONZ?
9     MR. NEBEKER: Objection, vague.
10    THE DEPONENT: I'm not sure of that.
11    BY MR. SILVERBERG:
12  Q. Didn't she perform work that was for
13  FONZ?
14  A. She has, yes.
15    MR. NEBEKER: Same objection.
16    THE DEPONENT: She performs work that
17  came through as a request for both the zoo and
18  FONZ.
19    BY MR. SILVERBERG:
20  Q. Has Mr. Bowden performed work for FONZ?
21  A. I would assume he has, yes.

Page 56

1  Q. You don't know for sure?
2  A. I don't know for sure.
3  Q. But you know Miss Lopez has?
4  A. Yes.
5  Q. Did anyone else?
6  A. Well, why it's hard to answer the
7  question because request, where originally it comes
8  from our office. Our office is really the ones who
9  assign the work. So, the supervisor, where they
10  source the work from sometimes is a little unclear.
11  Q. Now, you --
12  A. So it's hard to say. Like the FONZ and
13  the zoo relationship, where the request is from is
14  a little unclear.
15  Q. Now, you became exhibit, supervisor of
16  the exhibit shop or second line supervisor about
17  when? 2000?
18  A. Somewhere 2004.
19  Q. Who were the exhibit specialists working
20  under you then? Mr. Bowden? Miss Lopez?
21  A. Mm-hmm.

Page 57

1  Q. Was Mr. Robinson?
2  A. Yes.
3  Q. Who else? What's Mr. Robinson's job
4  title?
5  A. Ernie Robinson?
6  Q. Yes.
7  A. Exhibit specialist.
8  Q. Is he an exhibit specialist or is he a
9  designer?
10  A. He does both.
11  Q. What's his title though? Exhibit
12  specialist?
13  A. I think it's exhibit specialist.
14  Q. What about Mr. Mangum?
15  A. Also exhibit specialist.
16  Q. Sherod Mangum, he worked in that job?
17  A. Yes.
18  Q. Who else?
19  A. That's it. There might have been a
20  gentleman, Ernie Long maybe at one time. I'm not
21  sure if he was there yet or not. That's probably

15 (Pages 54 to 57)

Page 82

1  A. And what I mean by that I'm saying that
2  steps that I've taken to make it better is
3  actually, one, ensure that everybody knows we don't
4  want people in an unsafe workplace. Two, to make
5  sure that if there's a question they talk to the
6  safety officer before they do any work. Three,
7  have them access to other areas of the zoo to work
8  with saws and equipment that are used in a little
9  bigger shop, and those are some of the things. So,
10 I would say how we operate is different.
11  Q. Weren't you trying to send Mr. Bowden and
12 I guess other black coworkers, or let's just say
13 Mr. Bowden, to another shop?
14  A. I'll try to answer the question which I
15 think you mean to help you out here. Part of the
16 solutions of which we all need to work towards,
17 every one of us, Tony and everyone in the shop and
18 everyone in their office, as part of the solution
19 was ways to work as a safer way, and that's what we
20 had done. One of them was the idea of making
21 arrangements for another shop here to be used for

Page 83

1  work, and that was available for them.
2  Q. Were you aware that there are allegations
3  that racist comments were being made in that other
4  shop?
5  MR. NEBEKER: Objection, vague.
6  THE DEPONENT: No.
7  BY MR. SILVERBERG:
8  Q. You never heard that?
9  A. I mean -- I --
10  Q. Mr. Bowden worked in the lower shop more
11 than Miss Grace Lopez. Correct?
12  A. Correct.
13  Q. What about Mr. Mangum?
14  MR. NEBEKER: Objection, vague.
15  THE DEPONENT: More than Grace or more
16 than Sherod or more than?
17  BY MR. SILVERBERG:
18  Q. More than Miss Lopez.
19  A. Possibility, yeah.
20  Q. Possibility yeah?
21  A. Yeah. Like I said, my level wasn't

Page 84

1  amount -- it was really -- never mind. Possibility
2  he probably did.
3  Q. What about Mr. Robinson? Did he work in
4  the lower shop more than Miss Grace Lopez?
5  A. Don't know.
6  Q. In the letter of counseling, confirmation
7  of counseling I just gave you -- take a second to
8  review it if you would.
9  A. Okay.
10  Q. The first paragraph says that there was a
11 meeting with Chuck Fillah -- it's from Jeff Baxter
12 -- our meeting with Chuck Fillah December 10th,
13 '04, in which we discussed your conversation with
14 Sherod Mangum and Grace Lopez during which Elena
15 Lopez later reported you made a loud comment she
16 found offensive in nature. Do you remember that
17 meeting you had?
18  A. Yeah, yes.
19  Q. Who was that meeting with?
20  A. I don't remember actually. I don't
21 remember.

Page 85

1  Q. This says Mr. Mangum and Grace Lopez said
2  they do not remember hearing the phrase. Do you
3  know what the phrase was Miss Elena Lopez allegedly
4  found offensive?
5  A. No, I don't remember.
6  Q. Did you concur with there being no
7  further action on that report other than to remind
8  all staff we do work in an open office environment
9  and we need to be mindful of the content and volume
10 of our conversations? Did you concur with that,
11 basically that there be no further action?
12  A. Yes.
13  Q. Concur what it says in the letter?
14  A. Yes.
15  Q. Now, the third paragraph says in the
16 12/04 meeting we also discussed the incident on
17 12/9/04 when you called Miss Lopez a crazy lady?
18  A. Mm-hmm.
19  Q. Are you aware of that incident?
20  A. Yes.
21  Q. Did you witness it?

22 (Pages 82 to 85)

Page 86

1  A. Yes.
2  Q. You did witness it?
3  A. Mm-hmm.
4  Q. What did you see?
5  A. During that day, on the 10th of December
6  in 2004, I was in the office there and that comment
7  was said.
8  Q. What did Mr. Bowden say?
9  A. Well, part of his conversation was right
10 here in quotes. And so, in December 17th that's
11 what he said, crazy lady.
12 Q. Do you know why he was saying it?
13 A. No.
14 Q. Did he say crazy lady or she must be
15 crazy?
16 A. I would say if we put it in writing we
17 heard crazy lady or Jeff heard crazy lady?
18 Q. Isn't it true that he was responding to
19 allegations being made by her about him that
20 evidently he thought were very inaccurate?
21 A. Don't remember that.

Page 87

1  Q. Are you aware of a meeting held on
2  December 9th of 2002 I think -- no. December 9th,
3  2004. When Plaintiff requested to discuss that
4  Mr. Baxter, to discuss actions that Mr. Baxter
5  indicated he was going forward with and Mr. Bowden
6  also wanted to discuss actions that would be taken
7  against Miss Lopez for making false allegations.
8  Are you aware of any meeting held on December 2nd,
9  '04?
10 A. Can't remember. I don't remember 2004,
11 no.
12 Q. Do you remember a meeting where
13 Mr. Bowden talked about the allegations about what
14 would be done against Miss Lopez for making false
15 allegations?
16 A. I remember vaguely that Tony asked a
17 question about what was being, how we were handling
18 the situation for Miss Lopez. I vaguely remember
19 that.
20 Q. Did you meet with Mr. Bowden to discuss
21 the letter of counseling, his confirmation of

Page 88

1  counseling letter, Exhibit 5?
2  A. I think Jeff did.
3  Q. Pardon?
4  A. Jeff Baxter.
5  Q. You didn't meet with him?
6  A. To issue the letter?
7  Q. No. To discuss the letter. You didn't
8  meet with Tony?
9  A. I don't remember actually.
10 Q. Do you remember telling Mr. Bowden that
11 no further action would be taken for -- I'll move
12 on. Question 7a from your answers. Let's move on
13 from that. Question A asks you did Mr. Bowden meet
14 with you to discuss a letter confirming counseling.
15 If so, what was the letter? What was discussed at
16 the meeting and what resulted. And you said you
17 did meet in reference to such a letter confirming
18 counseling. So, you did meet with him concerning
19 the letter?
20 A. I would say when the letter was issued
21 whether I was there -- I don't think I was there,

Page 89

1  but we probably met. It was part of any kind of
2  process. We met to discuss incidents.
3  Q. Do you remember what was discussed at
4  that meeting?
5  A. Routinely, for me when I hear something
6  is to try to find out the facts. So, I'm sure it
7  was either fact based, trying to find out what the
8  fact was or trying to find out, you know. So, it's
9  pretty much. It's just kind of standard operating
10 for me. When I hear of a concern or comment that
11 needs attention just trying to find out, I guess
12 probably more I guess fact finding. That would be
13 the first thing, and then if in followup somebody
14 needed to be counseled or discussed I would do
15 that, but that's just kind of the standard
16 operating procedures for me.
17 Q. Question Number 9 it says that that
18 meeting in question included Ernest Robinson, Jeff
19 Baxter, the Complainant and you. Did Jeff Baxter
20 make the statement to Complainant that he didn't
21 trust you people and did he have an opportunity if

23 (Pages 86 to 89)

Page 234

1  District of Columbia, to wit:
2      I, Stacey L. Daywalt, a Notary Public of
3  the District of Columbia, do hereby certify that
4  the within-named witness personally appeared
5  before me at the time and place herein set out,
6  and after having been duly sworn by me, according
7  to law, was examined by Counsel.
8      I further certify that the examination
9  was recorded stenographically by me and this
10 transcript is a true record of the proceedings.
11     I further certify that I am not of
12 counsel to any of the parties, nor an employee of
13 counsel, nor related to any of the parties, nor in
14 any way interested in the outcome of this action.
15     As witness my hand and Notarial Seal
16 this 20th day of December, 2007
17
18
19 _____
20     Stacey L. Daywalt, Notary Public
21 My Commission Expires: 11/14/2010.

Page 235

1  AL BETZ & ASSOCIATES, INC.
2      Administrative Offices
3       P.O. Box 665
4      Westminster, Maryland 21158
5  VOICE - (410)752-1733  FAX - (410)875-2857
6  e-mail- productiondept@albetzreporting.com
7      www.albetzreporting.com
8
9  DATE: December 21, 2007
10 JOB NUMBER: DG26043F
11 CASE CAPTION: ANTHONY BOWDEN vs. LAWRENCE M. SMALL
12 COURT: District
13 CASE NUMBER: 05-2022
14 DEPONENT: CHARLES FILLAH
15 DATE OF DEPOSITION: December 5, 2007
16 ATTORNEYS/FIRMS:
17 STEVEN SILVERBERG, ESQUIRE
18 MARK NEBEKER, ESQUIRE/Federal District Attorney's
19 Office
20
21

Page 236

1  Dear Sir:
2
3      Bound herewith is the transcript of the
4  above-referenced deposition. Please read the
5  transcript and sign the errata pages. Any
6  additions or corrections should be listed on the
7  errata sheets provided. Please remove the signed
8  completed errata sheets, and return them to the
9  address listed above for processing.
10
11     If this process has not been completed
12 within (30) thirty days from the date of this
13 letter, we will assume that the right to read the
14 deposition has been waived. This is in accordance
15 with Rule 30(e) of the Federal Rules of Civil
16 Procedure and Rule 411 Section (a) of the Maryland
17 Rules of Procedure.

Page 237

1  READING & SIGNING PROCEDURE
2
3      The Deposition of CHARLES FILLAH, taken
4  in the matter, on the date, and at the time and
5  place set out on the title page hereof.
6      It was requested that the deposition be
7  taken by the reporter and that same be reduced to
8  typewritten form.
9      It was agreed by and between counsel and
10 the parties that the Deponent will read and sign
11 the transcript of said deposition.

60 (Pages 234 to 237)