# PLAINTIFF'S EXHIBIT 10

Bowden February, 2008 Deposition Excerpts—pp.59, 66, 68, 70-1, 73, 91,98-99, 117,124-25, 130,133-37,142 (with Dep. Ex. 49),146, 153 (Dep. Ex. 53),154 (Dep. Ex. 55), 164-65, 176-79, 183-186 (Dep. Ex. 69), 190-1, 206-10, 216-17, 224, 227-8, 230, 233-35 (Dep. Exs. 73-4), 262, 268, 278-280, 285-89, 294.

## Page 1

IN THE U.S. DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
ANTHONY BOWDEN,                   :
          Plaintiff,              :
     v.                           :   Civil Action No.
                                  :   05-2202
DR. CRISTIAN SAMPER,              :
SMITHSONIAN INSTITUTION,          :   Vol. II
          Defendant.             :
- - - - - - - - - - - - - - x

Washington, D.C.
February 20, 2008

Deposition of
          ANTHONY BOWDEN

a witness of lawful age, taken on behalf of the Defendant in

the above-entitled action, before Debra S. Derr, Notary

Public in and for the District of Columbia, at 501 3rd

Street, Northwest, Washington, D.C., commencing at 10:15 a.m.

## Page 2

APPEARANCES:

On Behalf of the Plaintiff:

STEVEN J. SILVERBERG, ESQ.
900 17th Street, Northwest
Suite 1250
Washington, D.C. 20006

On Behalf of the Defendant:

W. MARK NEBEKER, ESQ.
Assistant United States Attorney
Civil Division
555 4th Street, Northwest
Washington, D.C. 20530

## Page 3

19  - letters 10/30/98-8/27/99                             9

20  - letter, Banov to Zane 5/3/00                    10

21  - letter                                13

22  - holiday card                           16

23  - position description, GS-1035                47

24  - e-mail from Dolnick to Bowden                      51

25  - e-mail from Dolnick to Bowden                      52

26  - performance plan                       82

27  - performance plan                       82

28  - performance plan                       82

29  - performance plan                       82

30  - e-mail from Bowden to Baxter 6/5/06                  87

31  - e-mail Krebs to Bowden 8/28/03                 89

32  - e-mail exchange Samiy/Bowden 9/03                90

## Page 4

33  - e-mail Bowden to Dolnick 9/9/03               91

34  - e-mail exchange Bowden/Samiy 10/21/03              97

35  - e-mail exchange Bowden/Samiy 10/03           113

36  - e-mail exchange Bowden/Robinson/Dolnick        114

37  - e-mail Bowden to Samiy 11/6/03             114

38  - letter Bowden to associate director of zoo 11/6/03  115

39  - desk auditor's findings              121

40  - e-mail Bowden to Dolnick                128

41  - e-mail from Mickey Lew                 128

42  - document                      129

43  - document 1/12/04                131

44  - document from Bane to Bowden               141

45  - e-mail                   142

46  - e-mail                   142

47  - e-mail                   142

48  - e-mail                   142

49  - e-mail                   142

50  - letter from Samiy to Bowden                142

Page 57

1  A  Right.
2  Q  Kathleen Samiy doesn't ask us to do work, she
3  demands it. Who did she ask to do work, anybody?
4  A  Who did she ask?
5  Q  Yes.
6  A  She asked the females, you know, nice tone.
7  Q  And did the females do the work she asked them, as
8  far as you know?
9  A  I don't know whether they did it or not, you know
10  what I mean?
11  Q  And you're saying that she demanded the work of you
12  as opposed to asked you nicely to do the work; is that
13  correct?
14  A  Right.
15  Q  Is that to say that every single time Ms. Samiy
16  wanted work done from you she demanded it?
17  A  I would say after the complaints were filed and
18  after I started asking to be compensated, that's when all
19  these demands started coming.
20  Q  What complaint are you talking about?
21  A  The complaint of Ernest Robinson.
22  Q  Okay, so after Mr. Robinson filed a complaint,
23  Samiy demanded work of you?
24  A  Right.
25  Q  Okay.

Page 58

1  A  Not just that, but after me starting to ask for
2  more money. Because Ms. Samiy's problem with this, from what
3  I can understand was, from Lynn Dolnick, well, if we promote
4  Tony, that means that she's -- Lynn Dolnick specifically told
5  me that if I was promoted that I'll be making the same thing
6  as Kathleen. And I said, well, okay, what's the problem with
7  that?
8  Q  Did she say there was a problem with that?
9  A  She just said, I'm just saying, you'll be making
10  the same thing as Kathleen. I'm saying, okay, well, what's
11  the problem doing the same --
12  Q  Right, and what did she say?
13  A  -- work, okay? I'm taking on part of -- I'm taking
14  on the production side, she's doing the design side.
15  Q  Did Ms. Dolnick say that was unacceptable?
16  A  She didn't say it was unacceptable, but I mean she
17  was trying to make it as though that, you know, in other
18  words I guess that I couldn't live or make the same money as
19  a white female.
20  Q  Did she say that?
21  A  I think at some point, something may have came down
22  the line like that. I'll have to think about it a little
23  bit.
24  Q  From Ms. Dolnick?
25  A  At some point, something came out like that, if I

Page 59

1  can remember. Seemed like it.
2  Q  What were the words that you remember?
3  A  I'm trying to think now. It will come to me.
4  Q  Okay, let me know when it comes to you.
5  A  Okay, I will.
6  Q  Seems to me that would stick with you, wouldn't it?
7  A  Not with so much -- not with so many things
8  happening in the workplace such as this, everything is not
9  going to just stick with me, no.
10  Q  Would you have written that down somewhere?
11  A  I may have.
12  Q  Do you have any documents that -- in which you have
13  written down that Lynn Dolnick has said to you we can't have
14  a black person making the same amount of money as Ms. Samiy?
15  A  I don't think that's what I said out of my mouth.
16  I said, I mean, that a white female. In other words, I don't
17  think she wanted me to make the money that Kathleen was
18  making.
19  Q  And Lynn Dolnick told you that?
20  A  I'm not saying that she told me that.
21  Q  Okay.
22  A  Okay, just --
23  Q  If she had told you that, you would have written it
24  down, wouldn't you?
25  MR. SILVERBERG: Objection. Calls for speculation.

Page 60

1  THE WITNESS: I'm pretty sure I would.
2  BY MR. NEBEKER:
3  Q  And the documents that you produced to us, there's
4  nothing in there showing that Ms. Dolnick said anything like
5  that to you, is there?
6  A  No, but I'm thinking in the documents I produced to
7  you, it shows that where she had told me that -- if I promote
8  you, you'll be making the same thing as Kathleen.
9  Q  Okay.
10  A  But at that time, I would like to say, too, that
11  when I asked her what did she mean by that, she couldn't
12  answer it.
13  Q  Okay. Did she say she couldn't answer that, or did
14  she just not respond?
15  A  She couldn't answer it. I think I had sent her an
16  e-mail and asked her, you know what I mean, what did you mean
17  when you said that?
18  Q  And what did she respond?
19  A  She -- if I can remember, I don't think she
20  responded at all or she probably tried to say that I
21  misinterpreted what she said, because that was always her
22  excuse.
23  Q  Do you believe that you ever did misinterpret what
24  she was saying?
25  A  No.

## Page 65

1    A   Yeah, because I've had discussions with them and
2    I've disagreed with Kathleen as well as Lynn of the way they
3    were treating him. I was saying, you know, I was telling
4    them that, hey, you know, you can't have a guy in two places.
5    You know, but all the time I knew what they were trying to do
6    because I've been through this before. I know that, you
7    know, they try to make work impossible for you, you know,
8    they try to overload you. And basically that's what they
9    were trying to do was to overload him, you know what I mean,
10   and trying to make him responsible for.
11      Q   What facts do you rely on for that conclusion?
12      A   The fact that I've spoken to him about it.
13      Q   Anything else?
14      A   That's it.
15      Q   Hostile meetings with Kathleen Samiy where Kathleen
16   Samiy raises her voice, ignores issues that pertain to the
17   park safety, ADA rules and regulations, work safety and
18   health and wellbeing of the workers. That's paragraph number
19   9 on page 4, Exhibit 21. Do you see that?
20      A   Um-hmm. I sure do.
21      Q   Okay, would you explain in detail the facts you
22   rely on to support this statement.
23      A   The hostile meetings were meetings that, you know,
24   I think after Ernie had --
25         MR. SILVERBERG: I'm sorry, did you say beatings or

## Page 66

1    meetings?
2         THE WITNESS: Meetings. Meetings.
3         That they were held between me and her and between
4    the other males and after Ernie had filed his complaint and
5    how she would raise her voice and holler and scream and foam
6    at the mouth at us. So I don't --
7         BY MR. NEBEKER:
8      Q   What did she scream at you in these meetings?
9      A   More so things like, you're going to do as I ask
10   you to do and blah, blah, blah, you know. It wasn't pleasant
11   at all. It wasn't like, okay, somebody is asking you to do
12   something, I mean, in a pleasant way. I mean, it was more so
13   hostile.
14      Q   Anything else?
15      A   More so the voice mails, you know what I mean, by
16   me having to leave voice mails, that was one of the issues
17   I'd raise.
18      Q   Anything else? To support the assertions in
19   paragraph number 9 on page 4 or Exhibit 21.
20      A   It seemed to at some point get to a point that
21   although she didn't know anything about production, you know
22   what I mean, it seemed as though that she started, you know,
23   more so, you know, how would I say it? She started making
24   things out of more than an argument, you know what I mean,
25   instead of trying to, you know, reason or be reasonable about

## Page 67

1    things that I may have came to her about or things that she
2    brought to my attention.
3      Q   Did you ever bring the same issue to her on more
4    than one occasion?
5      A   I think we just discussed similar to that, which
6    was the electrical problem.
7      Q   Anything else?
8      A   It's been many things that I brought to her on more
9    than one occasion, but I mean --
10      Q   Identify them, if you would.
11      A   I would say like the safety of the shop is
12   something that I brought to her attention on more than one
13   occasion.
14      Q   This was the lower shop where the saw was?
15      A   Right.
16      Q   Okay. And --
17         MR. NEBEKER: To whose attention?
18         THE WITNESS: To Kathleen.
19         BY MR. NEBEKER:
20      Q   And in the lower shop, it was that there wasn't
21   sufficient ventilation to run the saw and the saw wasn't
22   bolted to the floor; is that correct?
23      A   No, it's just the -- I think the things that I
24   brought to her was that the place was filthy and --
25      Q   Okay, so that was your only safety concern you

## Page 68

1    raised with Kathleen Samiy over the lower shop?
2      A   Right, and probably the issues with the saws and
3    stuff like that, too.
4      Q   Okay, tell me about what do you mean by stuff like
5    that?
6      A   I'm just saying, machinery in general.
7      Q   What machinery, specifically.
8      A   The saw, the -- another one was a band saw or
9    something that was there.
10      Q   Was that also --
11      A   Not having proper ventilation, not having the
12   proper equipment, you know what I mean, as far as breathing
13   fumes and dust and --
14      Q   Okay. Did you have any face masks that you would
15   wear?
16      A   Face masks?
17      Q   Yeah, anything to cover your mouth and nose when
18   you were in the shop?
19      A   I mean, we had borrowed them from other units or
20   stuff like that, but we wasn't really given the things that
21   we needed to actually perform what they was asked.
22      Q   You had to go get them?
23      A   Right. We had to go probably to another shop or
24   something.
25      Q   And after you got them, could you reuse them?

18 (Pages 69 to 72)

Page 69

1    A  Sometimes, I think you would reuse them, you know
2  what I mean?
3    Q  And you had --
4    A  Say if you were doing a job and left for lunch, you
5  put the same face mask on.
6    Q  So did you ever raise the missing face masks with
7  Kathleen Samiy?
8    A  You said missing face masks?
9    Q  Yeah, the fact that you didn't have face masks?
10   A  Yes.
11   Q  Dust masks for your nose and mouth.
12   A  Not just dust, but I'm talking about respirators as
13  well.
14   Q  Okay, and you raised that with Kathleen Samiy?
15   A  Sure.
16   Q  All right.  And what did she tell you?
17   A  She just said, you know, you've just got to get
18  through it.  I mean, she wouldn't really give me no
19  explanation as to, you know, why she wasn't going to -- why
20  we wasn't getting what we needed.  But it was more so that,
21  okay, that was something that she was working on or something
22  to that degree, but it never happens.
23   Q  Was it her job to order masks for the lower shop?
24   A  I think it's her job, it was her job at that time
25  to -- to probably contact safety and to try to get us in some

Page 70

1  type of program, you know what I mean?
2    Q  What type of program did you need to get into?
3    A  Well, they have a program for like -- for like the
4  use of chemicals and, you know, things like that, more so
5  like a safety program.
6    Q  If you need a piece of wood to do your work, can
7  you order it yourself?
8    A  Can I order it myself?
9    Q  Yes.
10   A  No, I can't order it, no.
11   Q  Do you have the ability to put through paperwork to
12  begin the ordering process for a piece of wood that you need?
13   A  You mean now or what?
14   Q  Back when you were complaining about the safety in
15  the lower shop?
16   A  I would say, no, you can request it.  You might
17  write down something and say, this is what I need.
18   Q  And what would you do with that?
19   A  You would turn it into her, mostly.
20   Q  To Ms. Samiy?
21   A  Right.
22   Q  And did you ever do that for a respirator or a dust
23  mask?
24   A  You mean, have I ever gave her anything in writing
25  to say that this -- I gave her a list of things that were

Page 71

1  needed, yes.
2    Q  Okay, is that how you get a piece of wood ordered,
3  is you give her a list?
4    A  Right.
5    Q  And she has to do an order requisition form
6  herself?
7    A  She would have to because of the fact that, I mean,
8  in some of the -- like say in -- production was different
9  from the other parts of exhibits.  And like photography and
10  maybe design, they had credit cards, okay.  So if they needed
11  something, they could request it and they can go out and pick
12  it up with a credit card, okay?
13   Q  And you couldn't do that?
14   A  No, because they didn't trust me to have a credit
15  card.
16   Q  But when you needed -- say you needed a piece of
17  wood or a piece of metal to make the sign or to put up the
18  sign, you had to write out by hand a list to give to Ms.
19  Samiy so she could do a requisition form?
20   A  I would have to write it out and a lot of times we
21  would be sent to the store, like kids, okay, and I don't
22  think that was good.  Because we would have to go to the
23  store and order -- tell them exactly what we wanted and then
24  would have to call back and have somebody to pay for it with,
25  you know, with a credit card.

Page 72

1    Q  Okay, what store would you go to?
2    A  Like Home Depot or lumber store or something like
3  that.
4    Q  And they have gas -- they have respirators, right?
5    A  Right.
6    Q  Okay.  Did you ever ask her to buy a respirator so
7  that you could work in the lower shop?
8    A  I can't ask her to buy a respirator for the work --
9    Q  Did you ever ask her to approve the purchase of a
10  respirator?
11   A  I have asked her on many occasions.  But it takes a
12  lot to get a respirator.  And it's not something that I am an
13  expert, okay?  Because first of all, I think what happens
14  is that process has to go downtown and it has to be approved
15  by safety.
16   Q  To get one of those paper masks?
17   A  You just said "respirator."
18   Q  Okay, but let's talk about the paper dust mask.
19   A  Right.
20   Q  Okay.  That would protect you from sawdust,
21  correct?
22   A  Right.
23   Q  Okay.  So if you -- that was a safety concern for
24  you, couldn't you, when you were at Home Depot, say, can
25  pick up a pack of these -- these dust masks?

Page 73

1    A  I mean, we've done it.
2    Q  You have done it?
3    A  Right, we've picked up --
4    Q  All right.
5    A  You get like five in a pack or something like that.
6    Q  All right, so you could get them yourself when you
7  went to Home Depot so that they would be down there in the
8  lower shop, is that what you're saying?
9    A  You're saying I could get them myself?
10   Q  Yeah.
11   A  No, I couldn't get them myself.  I had to go
12 through her.
13   Q  Right, but then she'd pay for them, you'd have the
14 dust masks for the lower shop, right?
15   A  No, she didn't pay for anything.
16   Q  Well, she approved the payment for the Smithsonian
17 for things like the dust masks, correct?
18   A  I mean, every so often, yes.  I would say, yes.
19   Q  Did she ever specifically tell you, no, we can't
20 afford or I'm not going to approve dust masks for the lower
21 shop?
22   A  No, I think what she did is just ignored what my
23 requests were a lot of times.
24   Q  And how long did you go without dust masks in the
25 lower shop because of that?

Page 74

1    A  Only god knows how long.
2    Q  You don't remember?
3    A  Because I think we only maybe had gotten stuff like
4  that maybe on maybe a few occasions because of maybe us just
5  being out to get something.
6    Q  How did you arrange it then?
7    A  How did we arrange it?
8    Q  Yeah, would you just put it in the cart and tell
9  her, hey, we bought lumber and a couple of dust masks, will
10 you approve the payment?
11   A  Well, we would say we need to go down and get some
12 things, blah, blah, blah, whatever, you know what I mean, and
13 we had to go through a whole bunch of red tape just to get
14 it.
15   Q  And then you got it, right?
16   A  No, not necessarily.  A lot of times we didn't get
17 it.
18   Q  How many times -- would you go down to Home Depot
19 and then her decline to pay for whatever you had gotten
20 at Home Depot?
21   A  A lot of times, we wasn't even allowed to go to
22 Home Depot.
23   Q  Okay.
24   A  Okay.
25   Q  And what else -- in the lower shop, did you expect

Page 75

1  Ms. Samiy or Ms. Dolnick themselves to bolt the saws to the
2  floor?
3    A  I didn't expect for them to bolt them to the floor,
4  but I expected for them to give approval for them to be
5  bolted to the floor.
6    Q  And who would you have to get the approval from?
7    A  Who would I have to get the approval from?
8    Q  Who would Ms. Dolnick have to get the approval
9  from?
10   A  I don't know who she would have to -- I said give
11 approval, not --
12   Q  Oh, give approval.  To you?
13   A  Right.
14   Q  Oh, did you ever specifically say, can I bolt these
15 saws --
16   A  Not specifically to me.  I mean, the thing is, you
17 have other shops that were within the Smithsonian that did
18 that kind of work.  It's just like --
19   Q  That worked in that lower shop?
20   A  Huh?
21   Q  That worked in that lower shop?
22   A  I think you're cutting me off a little bit, so I
23 think that maybe we need to take a break, because we're going
24 backwards and forwards.
25      MR. NEBEKER:  Let's do that.  Let's take a break.

Page 76

1      (Recess.)
2      BY MR. NEBEKER:
3    Q  All right, Mr. Bowden, I am going to try to go
4  through Exhibit 21 some other points.  On page 5, number
5  it says you've been sent to the park alone to perform heavy
6  duties, tasks.
7      Would you tell us which heavy duties and tasks
8  you're referring to?
9    A  I would say, you know, lifting heavy signs and
10 pulling signposts out of the ground and stuff like that, you
11 know.
12   Q  Have you ever had to come back to Ms. -- one of
13 your supervisors and say, this one's too heavy, I can't lift
14 it out of the ground?  Or I can't put this sign up?
15   A  Yeah, I've had to do that on many occasions.
16   Q  And then what do they -- who do they send to help?
17   A  A lot of times, they just say, do the best you can.
18   Q  And were you able to then do it?
19   A  I mean, I was able to do it; but it was with a
20 struggle.  I mean, you're talking about lifting, you know,
21 bags of concrete that weigh maybe 100 pounds or better.
22   Q  And at the time, who else was in production with
23 you when you had to move a heavy bag of cement?
24   A  At the time, it was actually just me and Grace
25 because --

Page 89

1  one?
2  A  It rings a bell like that, I think.
3  Q  That's Exhibit 29, correct?
4  A  Right.
5  Q  All right.  Let me go through a few e-mails if I
6  may and see if you can just tell us if they are true and
7  accurate copies of e-mails that you sent or received while
8  you were working for the agency.
9         (Exhibit No. 31 was marked for
10        identification.)
11     BY MR. NEBEKER:
12  Q  All right, I'm looking at Exhibit 31, Mr. Bowden.
13  Is that a true and accurate copy of an e-mail sent to you
14  from Herman Krebs on or about August 28, 2003?
15  A  I can see where it was sent to me.
16  Q  And is it in fact true that in about August of
17  2003, the agency was in fact upgrading their QuarkXPress
18  licenses to Version 6?
19  A  That, I wouldn't know, because I'm not a designer.
20  Q  Was QuarkXPress something -- well, Mr. Krebs, was
21  he a designer?
22  A  He's a designer.
23  Q  Do you have any reason -- you don't have any reason
24  to doubt Mr. Krebs that they were in fact upgrading their
25  QuarkXPress license to Version 6, do you?

Page 90

1  A  I don't have any reason to doubt it.
2         (Exhibit No. 32 was marked for
3         identification.)
4     BY MR. NEBEKER:
5  Q  Let's move on to Exhibit 32.  Mr. Bowden, do you
6  have any reason to doubt that this is an accurate e-mail from
7  Kathleen Samiy to you dated September 15, 2003?
8  A  Okay.
9  Q  In fact, that's a string of e-mails exchanged
10  between you and Ms. Samiy in September of 2003, correct?
11  A  Correct.
12  Q  And to summarize it, is that an effort by you to
13  find out how to work a demo piece of software called File
14  Maker?
15  A  Not for me to try to figure out how to work it.  In
16  other words, I was trying to figure out was it installed on
17  my machine, because I think at that time I couldn't open it.
18  And then come to find out, it wasn't installed on the
19  machine.
20  Q  And then did you -- the last thing on here, it
21  says, when you return from leave, talk to IT, I assume that's
22  information technology?
23  A  Right.
24  Q  Lynn Judkins can help.  Did you talk to Lynn
25  Judkins about getting the File Maker software put on your

Page 91

1  machine?
2  A  Yeah, I did.
3  Q  And did she get it to work on your machine?
4  A  No, it never did.  As a matter of fact, it just
5  didn't work on my machine; it didn't work on anybody's
6  machine.
7  Q  But it did get installed on the machine?
8  A  Right, it ended up being on my machine, but it
9  never did work.
10  Q  Do you have any reason to doubt that the
11  efforts -- let's keep all these together -- that Ms. Samiy's
12  efforts to get the software up and running on your machine or
13  on everybody's machine were genuine?
14  A  Were genuine?
15  Q  She wanted it to work, right?
16  A  She wanted it to work, but I think it was she just
17  didn't know what she was doing and was kind of spinning her
18  wheels with it.  It just never actually became an actual
19  software that anybody could use.
20        (Exhibit No. 33 was marked for
21        identification.)
22     BY MR. NEBEKER:
23  Q  Have you got Exhibit 33 in front of you now?
24  A  Yes.
25  Q  Is this an e-mail from you to Lynn Dolnick dated

Page 92

1  September 9, 2003?
2  A  Yes.
3  Q  And it's regarding false allegations is what it
4  says in the subject line, correct?
5  A  Right.
6  Q  And can you tell us what the purpose of this e-mail
7  was?
8  A  Well, the purpose of the e-mail was to say, you
9  know, for them not to be making false allegations about me or
10  saying things that wasn't said out of my mouth or whatever
11  the case may be.
12  Q  Right, you talk about you -- there was some
13  discussion apparently at the agency that you and Elena Lopez?
14  A  Right.
15  Q  Had had a big blowout; is that right?
16  A  Exactly.
17  Q  Was this the instance when you allege that Elena
18  Lopez bumped into you?
19  A  No.
20  Q  Or is this a different incident?
21  A  It's a different incident.
22  Q  And it says in your e-mail how you, meaning Lynn
23  Dolnick, said that I, which would mean Mr. Bowden, called her
24  a bitch.
25  A  Right.

Page 97

1    A   Correct.

2         (Exhibit No. 34 was marked for

3         identification.)

4    BY MR. NEBEKER:

5    Q   All right.  Let's see here.  There's an October 21,

6    2003, Exhibit 34.  Have a look at that.

7    A   On Exhibit 33, I think this was like one of their

8    ways of trying to get back at me or something, you know what

9    I mean, or trying to get at me, because me either threatening

10   to file my complaint or even some way around in there.

11   Q   Okay, you don't know what Elena told the

12   supervisors in the agency about this conversation she thought

13   she overheard?

14   A   I don't know exactly.  But I know this came back to

15   me.

16   Q   And that's how you interpreted it, correct?  As

17   though it was them trying to get back at you for something?

18   A   Yeah.  Because I mean, that was their style.

19   Q   But then they never did take any action against

20   you, correct?

21   A   No.

22   Q   I'm sorry, let me rephrase it.  Did they ever take

23   any action against you as a result of you allegedly calling

24   Elena Lopez a bitch?

25   A   No.

Page 98

1    Q   All right, have you gotten Exhibit 34 in front of

2    you?

3    A   Um-hmm.

4    Q   And tell us what that exhibit is.  Is this an

5    e-mail exchange between you and Kathleen Samiy about her

6    perception that you weren't arriving at 7:00 a.m.?

7    A   Um-hmm.

8    Q   You have to say yes or no.

9    A   Yes.

10   Q   And was in fact your start time at the agency in

11   October of 2003 7:00 a.m.?

12   A   Yes.

13   Q   Following this e-mail from Kathleen Samiy, do you

14   believe that you arrived to work on time?

15   A   Yes.

16   Q   And after receiving this e-mail from Ms. Samiy on

17   October 21, 2003, did you begin to leave her voicemails

18   explaining when you were going into the park?

19   A   Yes.  But I would like to also say that this is one

20   of the things that Herman had mentioned in his deposition,

21   the way that I was being treated, that nobody else was being

22   treated.

23   Q   Do you have any facts that would support the

24   conclusion that Ms. Samiy had the same circumstances

25   occurring with respect to any other employees?  And when I

Page 99

1    say the same circumstances, I mean as she has described in

2    her October 21, 2003, e-mail to you?

3    A   Yes.

4    Q   Who are the other employees that you believe she

5    had reason to believe arrived at work two times in the week

6    preceding October 21, 2003, and that whom she looked for on

7    the premises but could not find and whose car was not in the

8    lot and for whom their place of work was dark?

9    A   Place of work was dark?

10   Q   This says, other times the shop is dark.  I assume

11   she means she knows you're not in the shop because you'd turn

12   the light on if you were in the shop, right?

13   A   Right.

14   Q   So are you aware of anyone whom she observed to be

15   out two days in the week prior to October 21, 2003?

16   A   There is no one else that she actually went after

17   like that.  And the thing is, you know, she didn't get there

18   until, like I said, around 9:00, 10:00, or whatever the case

19   may be.  But like, say, when she would come in, okay, I guess

20   she would expect for me to be just sitting there at my desk

21   or wherever she wanted me at.  But I had work to do and those

22   were one of the things that I explained to her.

23        And so there is no need me sitting idle at my desk

24   for two hours, you know what I mean, when there's work to be

25   done in the park.  But this was her way of harassing me.  I

Page 100

1    mean, why would she go on the roof to -- or up on the lot to

2    try to look for my car?  I mean, that's ridiculous to me.

3    Did she ever go on the roof looking for anybody else's car?

4    You know --

5    Q   I'm trying to --

6    A   At the same time, from what I can remember back

7    then, my car was -- was sold back to General Motors because

8    it was a defect.  The steering wheel kept locking up.  So

9    what I was in terms doing then was either getting a ride from

10   my fiancee, riding my bike, you know what I mean, or just

11   catching the train or whatever the case may be.

12   Q   Were you taking Ambien, by the way, back in 2003?

13   A   Back in 2003, I'm not sure.  I may have been.

14   Q   Is it possible you were?

15   A   I may have been.

16   Q   Did it ever cause you to oversleep?

17   A   No, it doesn't cause you to oversleep unless you

18   went to sleep late or something like that.

19   Q   And did you ever do that?

20   A   What, go to sleep late with the Ambien and get up

21   late?  Well, sometimes I would go to sleep and the Ambien

22   didn't work, so I would go to sleep and wake back up within

23   an hour or so.

24   Q   Did you ever oversleep because of the Ambien?

25   A   I have.  But when I have done it, you know what I

30 (Pages 117 to 120)

Page 117

1  letter that's Exhibit 38?
2      A   Well, all of the things that I -- the majority of
3  the things that I listed were omitted from the desk audit.
4      Q   And did you -- did they conclude that you
5  were -- that your position was at the proper GS level?
6      A   At the proper GS level?
7      Q   You were a GS-11, correct?
8      A   Right.
9      Q   And did you believe you were accurately performing
10  the work of a GS-11?
11      A   No.
12      Q   At the conclusion of the desk audit, did the
13  independent contractor conclude that you were performing
14  the GS-11 level?
15      A   He did, after all of these things were omitted from
16  it.
17      Q   Do you have any indication of the communications
18  that he had with anybody else at the zoo regarding your
19  position?
20      A   Well, from my understanding, that it was almost
21  like he couldn't get in contact with Lynn and was -- this is
22  what was told to me --
23      Q   By whom?
24      A   Huh?
25      Q   Who told you this?

Page 118

1      A   He did.
2      Q   Okay.
3      A   And even when the desk audit had first kicked off,
4  Scarlitt Proctor couldn't get in -- get in contact with
5  Kathleen, so it was almost like they were ignoring it.
6      Q   All right --
7      A   Let me finish, if I can?  Thank you.
8      Q   Please.
9      A   So when it all boiled down, it was more so like,
10  okay, once they did this --
11      Q   Once they did what?
12      A   Once they did the desk audit itself on me, then he
13  tried to contact both Lynn and Kathleen so that he could
14  schedule a sit-down meeting with them to discuss, you know
15  what I mean, all of my duties and stuff that I had listed
16  here on the desk audit.
17      Q   So the desk auditor talked to you first and then he
18  was trying to set up a meeting with Lynn and Kathleen Samiy?
19      A   Right.
20      Q   Were you --
21      A   And this is around the time when they were sitting
22  back laughing, you know what I mean, and saying that, hey,
23  Tony thinks he's a COTR, you know.  In reality, you know, I
24  mean, I don't know how Lynn forgot that she spent the money
25  that sent me out to actually take the training itself.  I

Page 119

1  mean -- but --
2      Q   How many contracts did you have to be the technical
3  representative for over the course of a year in, say -- well,
4  in 2003?
5      A   I mean, five, six.  Depending on how long they
6  lasted, you know what I mean?  Something like that.
7      Q   Five or six contracts?
8      A   Right, some of them could last for months.  So --
9      Q   How long is a scope of work on a typical contract?
10      A   I mean, you can have a scope of work that's two or
11  three pages.  You can have one that's 30, 40 pages, depending
12  on how technical it is.
13      Q   Did you have any that were 30 or 40 pages?
14      A   I've had one that was probably, I think, by the
15  time I got finished, it could have been over 30 pages, things
16  going backwards and forwards, you know what I mean?
17      Q   And who was that?  Who was the contractor?
18      A   That was Capital Exhibits, if I can remember.
19      Q   And what do they do?
20      A   You say what do they do?
21      Q   Yeah.
22      A   They -- they build exhibits.  They do more so the
23  fabrication type work.
24      Q   And you were the COTR on the contract you had with
25  them?

Page 120

1      A   Yes.
2      Q   The zoo had with them?
3      A   Yes.
4      Q   And what's the typical length of a scope of work?
5      A   The typical length?
6      Q   Right.  You said they could get as long as 30, 40
7  pages, but what's the most -- what's the average?
8      A   I mean, I couldn't really say that there's an
9  average.  Because, I mean, I can get a welder in, I mean, and
10  that can only consist of two pages.  But -- so there's not an
11  average.  It's just, you know --
12      Q   Are you unable to give an average because you don't
13  remember or because you haven't had enough contracts to be
14  able to put together a good estimate for an average?
15      A   I would say neither.  So --
16      Q   Why can't you give us an estimated average for the
17  length of a scope of work for a -- a typical contract?
18      A   Because I don't think that you can actually sit
19  down here and -- and say okay, well, this is an average, you
20  know what I mean?  It just depends on how big the job is, you
21  know, how much detail it takes, you know what I mean?  How
22  many things do you have on the list that needs to be worked
23  on.  That's how you come up with a scope of work.
24      But as far as to say okay, well, an average is 15
25  pages, you know what I mean?  I can't say that, you know what

Page 121

1   I mean?  I can say that it can be anywhere from two pages to
2   30 to 40, 50 pages depending on what you're doing.
3       Q    And so you're saying there is no typical size scope
4   of work?
5       A    Right, there is no typical size; that's what I'm
6   trying to explain.
7              (Exhibit No. 39 was marked for
8              identification.)
9       Q    Let me show you what's been marked as Exhibit 39.
10      A    I wanted to finish up on here, on 38.
11      Q    Certainly.
12      A    If I could.
13      Q    Okay, put 39 aside and finish up on 38.  That's
14  fine.
15      A    See, this is how the thing started where they got
16  confused, where the confusion came in also on my performance
17  plan and my job description because of them saying to me
18  or saying that, hey, this is what we're going to use to come
19  up with a performance plan and a job description for you.
20  Okay?  So all the things that they omitted, you get what I'm
21  saying?
22      Q    No.  In other words, things omitted from your
23  position description?
24      A    Right.
25      Q    Okay, do you know which position description -- was

Page 122

1   a position description provided to the man performing the
2   desk audit?
3       A    No, because they didn't have one.
4       Q    Okay.
5       A    So what I'm saying is, not only were they in search
6   of trying to figure out whether I was worth, say a 12 or a 13
7   or whatever it was, but they was also trying to figure out,
8   okay, what would be his day to day duties, you know, saying
9   that, hey, doing this would also give us a chance to write an
10  accurate position description, an accurate, you know, job
11  description on you.
12            So this is why it made it so confusing.  Because
13  once they started stripping all these things away, you know,
14  they couldn't come up with an accurate position description.
15      Q    Do you know what paperwork was given to the desk
16  auditor after he met with you?
17      A    You mean by them?
18      Q    Yes.
19      A    I don't know.  I can almost assure you that no
20  paperwork was given to him.
21      Q    And how do you know that?
22      A    The reason why I know that is because the desk
23  auditor told me that, I think for about maybe a week or two,
24  he was trying to set up a meeting with Kathleen as well as
25  Lynn.  And what he kept telling me is that they weren't

Page 123

1   getting back to him.  And I think what had happened after
2   that is that he finally got in contact with Kathleen and to
3   make it -- which I thought was very unprofessional and he
4   said so himself, that she refused to even really meet with
5   him.  So he had to almost force her to do the audit over the
6   phone.
7       Q    Okay, so she ultimately did the audit over the
8   phone?
9       A    Right.
10      Q    And do you know if she gave him any paperwork
11  through the mails or any other way?
12      A    He said nothing was given to him but the things
13  that he had read off to her that I was doing.  Those were the
14  things that she said that I wasn't doing.
15      Q    Okay.  How many times -- first of all, do you
16  remember the name of the desk auditor?
17      A    I can't quite remember his name right off the bat.
18      Q    How many times did you speak with him in person or
19  over the phone?
20      A    I spoke to him just that once, and then I spoke to
21  him a couple of times afterwards over the phone.
22      Q    Okay, so a total of three times, once in person and
23  twice over the phone?
24      A    Right.
25      Q    And so the first time over the phone you spoke to

Page 124

1   him was within what, a week or two of you meeting with him or
2   the desk audit?
3       A    Yeah, I would say maybe about a couple weeks after.
4       Q    And he said he still was having trouble setting up
5   a meeting with Dolnick?
6       A    Said that they weren't complying or whatever.
7       Q    And then the third time you spoke with him was how
8   much after the first phone conversation you had with him?
9   The second time you spoke with him on the phone, how long was
10  that after the first time you spoke with him over the phone?
11      A    That was around the time, I think, when I had
12  received this back.
13      Q    The desk audit?
14      A    Well, not this but it was whatever he had sent back
15  and it had showed that all of these things were omitted.
16      Q    Okay.  And you're looking at Exhibit 38 when you
17  say "these things"?
18      A    Right.
19      Q    So --
20      A    All the things with the checks.
21      Q    So the November 6, 2003, letter you wrote to him,
22  how soon did you write that after the third phone
23  conversation you had with him?
24      A    I'm not sure of how soon I wrote it, but I'm pretty
25  sure I was on it, you know what I mean?

32 (Pages 125 to 128)

Page 125

1    Q   Pretty quickly?

2    A   Pretty quickly.

3    Q   And so how much time do you think lapsed between

4    the first phone call and the second phone call with the desk

5    auditor?

6    A   I would say maybe a week or two, something like

7    that.

8    Q   And that was the time he told you he had to settle

9    for a telephone interview with Ms. Samiy?

10   A   Right.  He said he had no other choice, he said,

11   because he had been trying to --

12   Q   Okay.  And did he indicate to you whether he had

13   spoken with Ms. Dolnick over the phone?

14   A   He indicated -- I think the only -- I can't say

15   that, so -- but I do clearly remember him saying that he

16   spoke to Kathleen.

17   Q   So the things that you've checked off, I'm a little

18   confused here.  You gave him a -- did you give him a written

19   list of the things that you claimed to do in your job?

20   A   Right.

21   Q   And on Exhibit 38, is that you reiterating the list

22   of things that you gave to him?

23   A   I think it is.  I think we probably cut and cropped

24   and moved everything into this document here.

25   Q   Into Exhibit 38?

Page 126

1    A   Right.

2    Q   Okay.

3    A   And then, you know, brought it down and said, okay,

4    let's -- I think when I looked at it, I said, let me figure

5    out okay all the things that they're saying that I'm not

6    doing that I know that I'm doing.

7    Q   And when did you put the checkmarks on there?

8    A   Probably right after I got it more so.

9    Q   Right after you got what?  Exhibit 38 is something

10   you drafted.

11   A   Right.  Right after I received his findings, you

12   know what I mean?

13   Q   The findings of the desk auditor?

14   A   Right.

15   Q   And then did you ever talk with him about the

16   findings after you got the desk audit?

17   A   Yes.

18   Q   Okay.  And was this the second telephone

19   conversation you had with him or was there a third telephone

20   conversation?

21   A   This was probably the second one, if I can

22   remember.

23   Q   Okay, so you hadn't yet written the November 6,

24   2003, letter that's in Exhibit 38, correct?

25   A   You said, before I talked to him?  Is that what

Page 127

1    you're asking?

2    Q   Before that second telephone conversation you had

3    with him?

4    A   No, I hadn't -- more than likely, I hadn't written

5    anything before then.  But I think what had happened was once

6    I spoke to him and he had told me that, you know, the

7    information that they had gave him, you know what I mean, and

8    how they were saying that I wasn't doing different things or

9    whatever, then he referred me back to them as well as

10   Scarlitt Proctor.

11   Q   Okay, and was that the second telephone

12   conversation you had with the desk auditor or the first

13   telephone conversation?

14   A   I think that was the second one.  Because after

15   that, that's when I said, okay, I'm out here on my own.

16   Q   Okay.  All right, do you have Exhibit 39 in front

17   of you?

18   A   Yes.

19   Q   Okay.  Can you tell us what that is?

20       Okay, can you tell us what Exhibit 39 is?

21   A   It looks to be -- it looks to be their findings or

22   something.

23   Q   The desk auditor's findings?

24   A   Right.

25   Q   Did you ever receive that?

Page 128

1    A   I remember receiving that.

2            (Exhibit No. 40 was marked for

3            identification.)

4    BY MR. NEBEKER:

5    Q   Let me ask you to look at Exhibit Number 40.  What

6    false information -- this is an e-mail that you sent to Lynn

7    Dolnick, correct?

8    A   Um-hmm.

9    Q   Yes?

10   A   Yes.

11   Q   Okay.  And is it -- what false information did you

12   give to the auditor -- I'm sorry -- did Lynn Dolnick give to

13   the auditor?

14   A   Well, from my understanding, she was involved

15   because the auditor did say that she was involved in omitting

16   some of these duties here.

17   Q   So your understanding is, the auditor told you that

18   he talked to Lynn Dolnick?

19   A   Right, he did talk to Lynn Dolnick as well.

20   Starting to come back a little bit.

21   MR. NEBEKER:  Let me ask that this be marked as

22   Exhibit 41.

23           (Exhibit No. 41 was marked for

24           identification.)

25   BY MR. NEBEKER:

## Page 129

1  Q  Is — this exhibit here seems to have an e-mail
2  thread one here from MickeyLew@aol.com; do you see that?
3  A  Right.
4  Q  Could that have been the desk auditor?
5  A  That is him.
6  Q  And had he provided you with a copy of an
7  evaluation?
8  A  I think that he did.
9  Q  And would that have been Exhibit 39?
10  A  That looks like part of it.  But I think there was
11  more to it than that.
12  Q  And what were the things that he had left off of
13  your — you say here, this is a fraction of what I've been
14  doing for over a year and a half.
15  A  What were the things I left off?
16  Q  Yes, are they the things you checked off on —
17  A  Right, all the things that are checked off.
18  Q  On what exhibit?
19  A  On Exhibit 38.
20  MR. NEBEKER:  Okay, let me ask that we mark this
21  one as Exhibit 42.
22  (Exhibit No. 42 was marked for
23  identification.)
24  BY MR. NEBEKER:
25  Q  Can you tell us what Exhibit 42 is, sir?

## Page 130

1  MR. SILVERBERG:  I am going to object to this
2  exhibit, just that it's not to Mr. Bowden, so —
3  MR. NEBEKER:  Sure.
4  THE WITNESS:  I don't know.
5  BY MR. NEBEKER:
6  Q  You've never seen this before?
7  A  I don't remember seeing this.
8  Q  Okay.  In — let me ask this.  In number seven on
9  the exhibit, it references the ability to manage and track
10  graphic signs and files for purposes of reprinting.  Do you
11  understand what that entails?
12  A  Yeah.
13  Q  And is — was File Maker and QuarkXPress, were they
14  designed to make that job — I'm not saying they worked, but
15  was it the intention that those pieces of software could be
16  used to manage and track graphic signs and files for purposes
17  of reprinting?
18  A  Well, I mean, Quark is not a tool that you use to
19  track.  File Maker would be a tool that you could use to
20  track, but File Maker was something that they never, like I
21  said, could actually get up and running.
22  Q  If they could, that's what it would have done,
23  though, correct?
24  A  Right, exactly.
25  Q  And what about QuarkXPress?  Could you use

## Page 131

1  QuarkXPress to manage and track graphic signs and files for
2  purposes of reprinting?
3  A  No, you can't use QuarkXPress to manage and track.
4  Q  Could you use QuarkXPress for printing?
5  A  For printing?
6  Q  Yes.
7  A  I mean, you can print.  You can print File Maker.
8  You can print anything.  But QuarkXPress is more of a design
9  tool, you know what I mean.  The design is used to actually,
10  you know, design things.  It has nothing to do with tracking.
11  Q  So QuarkXPress would be used to design a sign?
12  A  Right.
13  Q  If you had a sign that you wanted to reproduce,
14  could you use QuarkXPress to reproduce the sign?
15  A  You could.
16  Q  And could you yourself, do you have the ability to
17  use — for the QuarkXPress program, or would you have
18  somebody else do it for you?
19  A  Well, I would probably more so have somebody else
20  to do it for me.  I had a little knowledge of it but not —
21  MR. NEBEKER:  Can we go off the record for a
22  second?
23  (Recess.)
24  (Exhibit No. 43 was marked for
25  identification.)

## Page 132

1  BY MR. NEBEKER:
2  Q  Mr. Bowden, do you have Exhibit 43 in front of you?
3  A  Yes.
4  Q  Can you —
5  A  I wanted to add something in on this —
6  Q  On 38, okay.  Go ahead.
7  A  If I could.
8  Q  38.
9  A  One thing that's been bothering me the whole time
10  is, you know, me taking on these extra duties that were
11  assigned to me at this time, you know, from what I saw from
12  my other coworkers that were promoted, they didn't have to go
13  through this.  My other coworkers, they were white, I'm
14  black.
15  Q  Who were they?
16  MR. SILVERBERG:  Can we go off the record for a
17  second?
18  (Discussion off the record.)
19  MR. NEBEKER:  Back on.
20  BY MR. NEBEKER:
21  Q  Mr. Bowden, would you tell us what 43 is?
22  A  I think I was speaking on 38.
23  Q  Oh, I'm sorry.  I thought you were done on 38.
24  A  Yeah —
25  Q  All right, finish up on 38 and then we'll go to 43.

34   (Pages 133 to 136)

Page 133

1   A   I just wanted to make it clear, you know what I
2   mean, if I could, to you that none of my white coworkers were
3   put to this -- subjected to this type of treatment as far as
4   just getting, you know, a promotion.
5   Q   How many of them received a promotion through an
6   accretion of duties?
7      MR. SILVERBERG: Objection. You haven't laid a
8   foundation that he would know that.
9      BY MR. NEBEKER:
10   Q   Do you know what I'm talking about when I say
11   accretion of duties promotion?
12   A   You mean, as far as doing extra duties?
13   Q   Taking on extra duties such that you get the
14   promotion that way.
15   A   Let me see, Jesse Cohen, Aaron Ferster.
16   Q   Aaron Ferster?
17   A   Right. Who else? Susan Ades, Judy Tasse.
18   Q   And who was the supervisor for Jesse Cohen when
19   Jesse Cohen got an accretion of duties promotion?
20   A   Kathleen.
21   Q   And Aaron Ferster's promotion, who was his
22   supervisor --
23   A   Actually, I think Lynn was the supervisor for Jesse
24   Cohen, but Lynn -- I think Kathleen ended up being her
25   supervisor overall.

Page 134

1   Q   Okay. What race and gender is Jesse Cohen?
2   A   I mean, she's white, Jewish, from my understanding.
3   Q   And Aaron Ferster?
4   A   White, Jewish.
5   Q   Male?
6   A   Male.
7   Q   Susan Ades?
8   A   White, Jewish.
9   Q   And Judy Tasse?
10   A   White, Jewish.
11   Q   And what is your basis for knowing the religion of
12   each of these people?
13   A   I mean, because you hear people -- I mean, you can
14   hear them around the workplace, you know. They talk about
15   their religion, I mean, and like on certain -- what do they
16   call those days that maybe Jewish people take off?
17   Q   Holidays? High holidays?
18   A   Let's just say on the Jewish holidays, they would
19   say they're taking off because of the Jewish holidays.
20   Q   And so Jesse Cohen, Aaron Ferster, Susan Ades and
21   Judy Tasse all have told you they're taking off for Jewish
22   high holidays?
23   A   I have just heard them speak on it, you know what I
24   mean.
25   Q   You've heard them speak? What did they say?

Page 135

1   A   You know, they were just saying that, hey, they
2   wouldn't be in on that particular day because it was a Jewish
3   holiday.
4   Q   Okay. And you have heard each of those four
5   persons say --
6   A   I wouldn't say each and every one. But nobody
7   in -- within our workplace, I think all the coworkers get
8   along pretty good and nobody really hides the fact that they
9   are Jewish or Christian, black or whatever.
10   Q   And what promotion did Jesse Cohen get? To what
11   level?
12      MR. SILVERBERG: Objection. Failure to build a
13   foundation.
14      THE WITNESS: Twelve.
15      BY MR. NEBEKER:
16   Q   GS-12?
17   A   Right.
18   Q   And what grade level did Aaron Ferster get promoted
19   to through accretion of duties?
20   A   Twelve.
21   Q   And what GS level did Susan Ades get promoted to
22   through an accretion of duties?
23   A   At that time, 12. She's further now.
24   Q   Is she a 13 now?
25   A   I think she is a 13.

Page 136

1   Q   And how -- did she get her 13 through an accretion
2   of duties?
3   A   Well, she got her 13 because she was a good friend
4   of Lynn's and I think everybody kind of felt like, you know,
5   that that was a part of -- I guess cronyism.
6   Q   Okay, and Judy Tasse, what GS level did Judy Tasse
7   get through an accretion of duties promotion?
8   A   Twelve.
9   Q   And are you familiar with the paperwork through
10   which each of these four individuals got their GS-12
11   promotions?
12   A   I'm familiar with it, but I don't think it's any
13   different from -- I mean, you know, they got different jobs.
14   I mean, Jesse is just a photographer, so how much paperwork
15   does it take to be a photographer?
16   Q   Okay, and you've seen the paperwork for each of
17   them?
18   A   I've seen it. I mean, I've seen things that have
19   came across my desk or whatever.
20   Q   What documents relating to the GS-12 promotion of
21   Jesse Cohen came across your desk?
22   A   You saying a document as far as --
23   Q   Documenting the way the GS-12 promotion for Jesse
24   Cohen was done.
25   A   I mean, I'm saying I've seen documents that she

Page 137

1   wrote. But I don't know exactly what her day-to-day duties
2   are, you know what I mean.
3       Q   So have you seen any documents showing how Jesse
4   Cohen got promoted to a GS-12?
5       A   No, but I mean --
6       Q   Have you seen any documents showing how Aaron
7   Ferster got promoted to a GS-12?
8       A   No.
9       Q   Have you seen any documents showing how Susan Ades
10  got promoted to a GS-12?
11      A   No.
12      Q   Have you seen any documents showing how Judy Tasse
13  got promoted to a GS-12?
14      A   No.
15      Q   And has Jesse Cohen or anyone as a supervisor at
16  the smithsonian or the zoo explained to you how it was that
17  Jesse Cohen got promoted to a GS-12?
18      A   Yes.
19      Q   Who said -- who told you how Jesse Cohen got
20  promoted to a GS-12?
21      A   Well, to cut through it, to try to cut through
22  this, I've spoke to Lynn about it because I felt that I was
23  doing extra work myself. And Lynn told me that they were
24  doing extra work, you know, that they --
25      Q   They, Cohen, Ferster, Ades and Tasse?

Page 138

1       A   Exactly.
2       Q   Okay. And so did Lynn tell you that, by virtue of
3   them doing the extra work, they got promoted without applying
4   for a promotion?
5       A   Exactly.
6       Q   Okay, and she said that for Cohen, Ferster, Ades
7   and Tasse?
8       A   Exactly.
9       Q   And was Cohen, Ferster, Ades or Tasse working in
10  production at the zoo?
11      A   No. But each one of them was like more so the lead
12  person in their particular part of the division.
13      Q   Okay. Had you yourself ever done any performance
14  evaluations for any of your -- the people that you worked
15  with in production?
16      A   I worked on Levi Marell's when he was there.
17      Q   And did you draft up a performance evaluation for
18  Levi?
19      A   I wouldn't say that I draft it up, but I had a lot
20  of input into what was going on.
21      Q   Was it verbal input to his supervisor?
22      A   It was something that I had wrote down and passed
23  on to Kathleen.
24      Q   Did you type it or did you write it by hand?
25      A   I think I probably just typed it and just gave it

Page 139

1   to her or something like that.
2       Q   How long was it?
3       A   How long was what?
4       Q   The document that you gave to her?
5       A   Probably about a page or two.
6       Q   All right, now, can we go to Exhibit 43?
7       A   Sure.
8       Q   And this is a two-page document. The second page
9   has a January 12, 2004, date on it and it is signed. Do you see
10  that?
11      A   Yes.
12      Q   And did you present this to Mary Tanner on or about
13  January 12, 2004?
14      A   No.
15      Q   Do you know if it was presented to Mary Tanner on
16  or about January 12, 2004?
17      A   Yes.
18      Q   And do you -- who do you believe presented it to
19  Ms. Tanner?
20      A   I think that -- I think that Aaron presented it to
21  her, because I'm pretty sure that he was the one that typed
22  either one or the two of these documents.
23      Q   Do you know how much time elapsed between the
24  typing of the first page of Exhibit 43 and the typing of the
25  second page of Exhibit 43?

Page 140

1       A   No, not really. Probably within a day or two.
2       Q   Do you agree with the information that's contained
3   in Exhibit 43?
4       A   Yeah.
5       Q   Can we go to Exhibit Number 44? Can you tell us
6   what Exhibit number 44 is?
7       A   This is a document from Al Bane to me.
8       Q   And is this information contained in Exhibit 44
9   accurate?
10      A   No.
11      Q   What is inaccurate in Exhibit Number 44? Let's do
12  it the quick way. Already highlighted in the exhibit --
13      A   The thing --
14      Q   Let me suggest this. The exhibit you currently
15  have has some highlighting on the first page; is that
16  correct?
17      A   Correct.
18      Q   Let me ask that we switch it out and I'll give you
19  one that doesn't have any highlighting on it yet and I'll ask
20  you if you'd just highlight the inaccuracies on Exhibit 44.
21      MR. NEBEKER: Can we do that, Counsel?
22      MR. SILVERBERG: Yeah.
23      MR. NEBEKER: Would you put a sticker on this then?
24      THE REPORTER: The next number?
25      MR. NEBEKER: No, we'll make this Exhibit 44 and

36 (Pages 141 to 144)

## Page 141

1  we're going to substitute it.
2      THE REPORTER:  Okay, 44, okay.  Do you want me to
3  put anything else on here, like substitute for?
4      MR. NEBEKER:  Sure.
5      THE REPORTER:  For what number?
6      MR. NEBEKER:  44.
7      THE REPORTER:  Okay, and it's substitute for?
8      MR. NEBEKER:  44.
9      THE REPORTER:  Oh.
10         (Exhibit No. 44 was marked for
11         identification.)
12     MR. NEBEKER:  That's great.
13     BY MR. NEBEKER:
14  Q  Mr. Bowden, do you now have a new substitute
15  Exhibit Number 44?
16  A  Yes.
17  Q  And it currently has no highlighting on it,
18  correct?
19  A  Yes.
20  Q  Okay.  Can I ask you to take this highlighter and,
21  where there are inaccuracies on Exhibit 44, would you pleas
22  highlight them?
23     (Pause.)
24     MR. NEBEKER:  Let's go off the record for a second
25  while you finish that up.

## Page 142

1      (Recess.)
2         (Exhibit Nos. 45-49 were marked for
3         identification.)
4      BY MR. NEBEKER:
5  Q  Look at Exhibits 45, 46, 47, 48 and 49.
6  A  Yes.
7  Q  Are those true and accurate copies of e-mail
8  exchanges that involved you and others at the Smithsonian
9  A  Yes.
10  Q  On Exhibit 48, Ms. Tanner indicates to you that she
11  is working 12-hour days and on weekends and holidays.  Do you
12  see that?
13  A  Yes.
14  Q  Do you have any reason to doubt that?
15  A  No.
16     MR. NEBEKER:  Mark this as 50, please.
17     THE WITNESS:  Should I hold these?
18     MR. NEBEKER:  You can just set them in the pile
19  there of exhibits, Mr. Bowden.  Thank you.
20         (Exhibit No. 50 was marked for
21         identification.)
22     BY MR. NEBEKER:
23  Q  Mr. Bowden, would you look at Exhibit 50?
24  A  Um-hmm.
25  Q  And can you identify that?

## Page 143

1  A  This looks like the letter that Kathleen had wrote.
2  Q  This is the letter, among other things, including
3  the information about the hot electrical wire; is that
4  correct?
5  A  Right.
6  Q  And are there any inaccuracies in Exhibit 50?
7  A  The whole thing is inaccurate.
8  Q  What specifically is inaccurate?
9  A  I mean, the whole thing is -- I don't know if I can
10  use the word lie, but I guess that's how I would explain it.
11  Q  So you contend that in October 2003, the safety
12  office did not find the lower production shop had cigarette
13  butts scattered about the front and back areas?
14  A  I would say, no.
15  Q  Do you remember specifically that there were no
16  cigarette butts in the lower production shop area in October
17  2003?
18  A  I do remember cigarette butts being right at the
19  front doorway, when you open the rollup doors at.  But
20  nothing in the back, you know what I mean.
21  Q  And did James Hilton bring to your attention the
22  cigarette butts in the lower shop?
23  A  Never.
24  Q  In mid-December, were you on leave?
25  A  In mid-December?

## Page 144

1  Q  Correct, which would have been 2003.
2  A  I don't remember.
3  Q  And did you return to the office on January 8 of
4  2004?
5  A  Now that you speak on that, it seems that that part
6  may be true.
7  Q  Okay.  And do you recall whether or not there were
8  cigarette butts that still needed to be swept up through
9  January 15th of 2004?
10  A  You said do I recall that?
11  Q  Yes.
12  A  No, I don't.
13  Q  You doubt that there were cigarette butts that
14  needed to be swept up between January 8 and January 15 o
15  2004 in the shop area?
16  A  Maybe I can help you with this a little bit.  The
17  thing is, that the people used to smoke, the people right
18  next to us, which is the -- like a gift shop, used to smoke
19  cigarettes and they would put their cigarettes out on the
20  ground outside of our door as well as outside of their door.
21  So when we would open up the rollup doors to bring the trucks
22  out or heavy equipment or what we were using, then the wind
23  would blow cigarette butts in the front part of the shop
24  there.
25  Q  And did there come a time on January 16th that the

Page 145

1  cigarette butts got swept up?

2     A   Yes.

3     Q   And do you know who did that?

4     A   Well, I -- pretty much back then, I kept the shop

5  as clean as possible.

6     Q   So would that have been you on January 16th that

7  cleaned up the cigarette butts?

8     A   It would have been me cleaning up cigarette butts,

9  period, or whatever was on the floor, leaves, cigarette

10  butts, trash. Everything blew up or, you know,

11  to go in and say, okay, well, you see cigarette butts, I

12  mean, you had all kinds of litter that came from outside

13  debris or whatever.

14     Q   And do you recall Kathleen Samiy having three

15  conversations with you upon your return on January 8th before

16  the trash and the cigarette butts was cleaned up?

17     A   No, that never happened.

18     Q   So did she have any conversations with you between

19  January 8th and January 16th regarding cleaning up the

20  cigarette butts and trash?

21     A   No.

22     Q   And did she have any conversations with you between

23  January 8th and January 16th of 2004 regarding cleaning up of

24  trash at all in the lower shop area?

25     A   No.

Page 146

1     Q   Were you at the time of January 8th through January

2  16, 2004, the EO safety officer?

3     A   Yes.

4     Q   What is an EO safety officer?

5     A   Well, I was the exhibit office safety person.

6     Q   And at the -- in January 2004, was it your

7  responsibility to keep the shop floor clean -- the shop floor

8  clean, organized and within all safety regulations?

9     A   Was it my responsibility?

10     Q   Yes, sir.

11     A   That wasn't something that I could handle alone,

12  no. But I could keep the shop clean and swept but not

13  actually lift the heavy equipment and move stuff around. The

14  place was just like a -- it wasn't really a shop, it was

15  actually like a -- I wouldn't even call it a warehouse; it

16  was just a place that people dumped, you know, old exhibits

17  and junk that they didn't want, old books and boxes of

18  pamphlets and just trash, you know what I mean? The place

19  was a mess.

20     Q   Okay, so you're saying it was not your

21  responsibility to keep it within all safety regulations?

22     A   Was it my responsibility?

23     Q   Yes.

24     A   My responsibility as far as the safety thing was to

25  check the fire extinguishers and stuff like that. It had

Page 147

1  nothing to do with me cleaning up of a shop or anything like

2  that, but just to make sure that the fire extinguishers and

3  stuff like that were up to par. And I had a little task

4  where I would walk around and check each fire extinguisher

5  within the exhibits area, upstairs and downstairs. I don't

6  think that it had anything to do with me keeping the shop

7  clean. I think that that would have been a joint effort of

8  everybody who used the shop or whatever the case may be.

9        I mean, to -- for them to even write as though that

10  I could actually keep things thing clean would have been the

11  wrong thing to do. You have stuff in there over 500, 600

12  pounds that needed to be moved around so I wouldn't say that

13  it was my responsibility to keep a shop clean. I mean, if

14  that's the case, then that's discrimination within itself.

15     Q   What did you need to move that was 500 pounds to

16  keep the shop clean?

17     A   I mean, you had all kind of sculptures and signs

18  and -- that had concrete bottoms. You know what I mean, you

19  had one sign that was -- that was probably 40 or 50 feet

20  high, you know, on a pole and there's no way in the world

21  that one man can move stuff like that. I mean, the place was

22  not really -- and right now, it's still not a shop. It's

23  still a dumping ground. If you can go down there now, you

24  can almost kill yourself. So --

25     Q   What was the 500-pound sign?

Page 148

1     A   What was it? It's a panda banner sign or whatever.

2  I don't know if you ever rode past the zoo and you see these

3  big signs that were placed outside.

4     Q   Did you need to move that sign in order to keep the

5  floor clean?

6     A   In order -- you had to move everything. There

7  wasn't really any floor space in there; it was like a maze.

8     Q   Next paragraph it says, on Tuesday, January 13th,

9  we had a vendor, Capital Exhibit Services, on premises to

10  remove exhibit cabinetry. Is that correct?

11     A   Had them to remove what now?

12     Q   To remove exhibit cabinetry.

13     A   I'm not too sure. I mean, Capital Exhibits moved a

14  lot of cabinetry. You can't point out a particular day, you

15  know what I mean?

16     Q   You can't say whether or not on January 13th

17  they -- they were removing exhibit cabinetry?

18     A   No, I can't.

19     Q   Do you dispute that they were?

20     A   I don't dispute that they were.

21     Q   And then you are the COTR on the project. Do you

22  dispute that you were the COTR on a project with Capital

23  Exhibit Services to remove exhibit cabinetry? Cabinetry?

24     A   COTR -- I was the COTR on Capital Exhibits, not

25  just for the sole purposes of removing an exhibit cabinet.

Page 153

1    (Exhibit No. 52 was marked for
2    identification.)
3    BY MR. NEBEKER:
4    Q   And then if you'd look at Exhibit 52 --
5    A   And what I want to say about Exhibit 50, if I can?
6    Q   Yes, sir.
7    A   If this was accurate, Exhibit 50, when Kathleen got
8    caught in a lie -- in the lies that she had told by Lynn, she
9    in turn turned around and had to rescind this letter, so it
10   couldn't have been accurate.
11   Q   Right.  Look at 52.  Is that the recision of the
12   letter?
13   A   Let's take a look.  Um-hmm, this is it.
14   (Exhibit No. 53 was marked for
15   identification.)
16   BY MR. NEBEKER:
17   Q   This will be marked as Exhibit 53.  Mr. Bowden, did
18   you write Exhibit 53?
19   A   Yes.
20   Q   On page 2 of Exhibit 53, it indicates at one
21   point -- this is the first full paragraph -- I told Kathleen
22   that, due to the work load that I was already responsible
23   for, I would not feel comfortable taking on any more work.
24   Do you see that?
25   A   Where is it?

Page 154

1    Q   One, two, three, fourth sentence.
2    A   I see it.  I see it.
3    Q   Okay, did you in fact tell Kathleen Samiy that, due
4    to the work load that you were already responsible for, you
5    did not feel comfortable taking on any more work around March
6    of 2004?
7    A   Yes.
8    (Exhibit No. 54 was marked for
9    identification.)
10   BY MR. NEBEKER:
11   Q   Mr. Bowden, is this an e-mail exchange that took
12   place between you and Lynn Dolnick in March of 2004?
13   A   Um-hmm.
14   Q   I'm sorry?
15   A   Yes.
16   (Exhibit No. 55 was marked for
17   identification.)
18   BY MR. NEBEKER:
19   Q   Mr. Bowden, is Exhibit Number 55 an e-mail exchange
20   between you and Ms. Dolnick from April of 2004 -- late March,
21   early April of 2004?
22   A   Yes.
23   (Exhibit No. 56 was marked for
24   identification.)
25   BY MR. NEBEKER:

Page 155

1    Q   Mr. Bowden, is this an e-mail that you received
2    from Kathleen Samiy on or about March 16, 2004, this Exhibit
3    56?
4    A   Um-hmm.
5    Q   And do you see at the bottom of her e-mail, she
6    lists several dates in March on which she asserts you were
7    out during the month?  Do you have any facts that would
8    contradict that you were out those periods of time?
9    A   You say do I have any what?
10   Q   In fact, were you -- let me ask it this way.  Has
11   she accurately recounted days that you were out sick or left
12   the office or left the work?
13   A   I would say that that could be true, you know what
14   I mean?  I can't remember that far back.
15   MR. SILVERBERG:  Say that louder.  I don't think
16   she heard.
17   THE WITNESS:  I said, I would say that this could
18   be true but I can't remember that far back.
19   BY MR. NEBEKER:
20   Q   No reason to doubt that it's true, is there?
21   MR. SILVERBERG:  Well, he already said he doesn't
22   remember that far back.
23   BY MR. NEBEKER:
24   Q   You don't specifically remember being at work any
25   of the times she says you weren't, right?

Page 156

1    A   Huh?  Say that again?
2    Q   You don't specifically recall being at work any of
3    the times listed on Exhibit 56 that she says you were out of
4    work?
5    A   I couldn't speak on that.
6    (Exhibit No. 57 was marked for
7    identification.)
8    BY MR. NEBEKER:
9    Q   Would you look at Exhibit 57, sir?  Mr. Bowden, is
10   that a copy of an e-mail that you sent to Mr. Dolph Sand on
11   April 16, 2004?
12   A   Yes.  Yes.
13   Q   And that responded to an e-mail also on that
14   exhibit that Mr. Sand had sent to you, correct?
15   A   Yes.
16   (Exhibit No. 58 was marked for
17   identification.)
18   BY MR. NEBEKER:
19   Q   On to 58.  And can you tell us if Exhibit 58 is a
20   true and accurate copy of an e-mail exchange between you and
21   Mr. Dolph Sand in April of 2004?
22   A   Yes.
23   MR. NEBEKER:  Off the record.
24   (Recess.)
25   //

Page 161

1  sure, but I think she had left by then. And I think that's
2  when Lynn stepped in and said, well, I'll finish up the job
3  of, you know, of harassing these black folks around here.
4  Q  When you say she said that, did she use those words
5  in your presence?
6  A  She didn't have to, but she showed it.
7  Q  But did she use the words?
8  A  She didn't have to, but she showed it.
9  Q  I understand she didn't have to, but my question
10  is, did she?
11  A  What?
12  Q  Use those words?
13  A  No.
14  Q  Okay.
15      MR. SILVERBERG: In his presence.
16          (Exhibit No. 64 was marked for
17              identification.)
18      BY MR. NEBEKER:
19  Q  Exhibit 64, is this an e-mail from you to Lynn
20  Dolnick on April 29, 2004?
21  A  Yes, it is.
22  Q  Okay. And did you look to see if Ernie had
23  received e-mails before he got to work?
24  A  You said did I look to see if he received them?
25  Q  Yes.

Page 162

1  A  No, I think what Ernie had did was forwarded a copy
2  of what she was sending him to me and I forwarded a copy of
3  what she was sending me. So we kind of compared notes and
4  then we went around the workplace to ask how our white
5  coworkers, were they being subjected to the same thing we
6  were, and they said, no.
7  Q  Now, it says here that Ernie was sent his first
8  e-mail at 7:34 a.m., saying that he was late. So this is
9  Lynn Dolnick e-mailing Ernie that he was late at 7:34 a.m.;
10  is that correct?
11  A  That's what it says.
12  Q  Okay, and did you see that e-mail yourself?
13  A  I think I saw it.
14  Q  Okay, so we knew that Lynn Dolnick was at the
15  office at 7:00 -- by 7:34 a.m. on April 29th, correct?
16  A  Right. Right.
17  Q  And were you at the office by 7:34 a.m.?
18  A  I was there before 7:34.
19  Q  And do you know if Ernie Robinson was there before
20  7:34 a.m.?
21  A  I think when I spoke to Ernie, I think he said he
22  was a little late, but I'm not sure. I'm not going to say
23  that he wasn't or he was.
24  Q  And who were the white coworkers that you spoke
25  with who said they were late?

Page 163

1  A  We spoke with Herman, Aaron -- who else did we
2  speak to? I'm pretty sure, besides, I mean,
3  what-you-call-her is Filipino, we asked her, Grace Lopez.
4  And if I can remember, Judy. We asked them were they being
5  harassed.
6  Q  Did you ask them if they were late?
7  A  Yeah. I mean --
8  Q  So you asked Hermen Krebs, Aaron Ferster, Grace
9  Lopez and Judy Tasse if they were late for work on April
10  29th, 2004?
11  A  Right. And matter of fact, the majority of the
12  people that I just named said they were late, but they
13  weren't receiving those type of e-mails.
14  Q  Okay, how late did Herman Krebs tell you he was on
15  April 29th, 2004?
16  A  I don't remember how late he was.
17  Q  And how late was Aaron Ferster on April 29, 2004?
18  A  Don't remember.
19  Q  And how late was Grace Lopez on April 29th, 2004?
20  A  Grace probably was one that wasn't, you know what I
21  mean -- prompt --
22  Q  Was she always on time?
23  A  Right.
24  Q  And was -- how late was Judy Tasse on April 29th,
25  2004?

Page 164

1  A  The thing is, is that when you say late, the thing
2  is that, for the white folks, it was more like a flex thing.
3  Okay, so they were able to come in and if they were 30
4  minutes late, they were able to make up that time at the end
5  of the day. So --
6  A  Who told me that?
7  Q  Yes.
8  A  I mean, I've heard them say, you know what I mean?
9  Q  Who?
10  A  All of them, everybody. That's the way the whole
11  place was structured. So it wasn't like, okay, like somebody
12  had to have a specific time to be there. Okay, you probably
13  were scheduled at 8:00 or 7:00 or 9:00 or whatever, okay?
14  But if you came in and you were a half hour late, then if
15  your time was to get off at 4:30, they didn't leave until
16  like 5:00 or something.
17  Q  Can you identify everyone in production who was on
18  the flexible schedule?
19  A  In production?
20  Q  Yes.
21  A  Well, I mean, in 2004, it wasn't but -- nobody but
22  me, Grace and I believe Sherod had arrived at that time.
23  Q  And was Sherod on the flexible schedule?
24  A  No, he was getting beat to death.
25  Q  And what's Sherod's last name?

42 (Pages 165 to 168)

Page 165

1    A   Mangum.
2    Q   How do you spell that?
3    A   M-A -- M-A-N-G-U-M, I think.
4        MR. SILVERBERG:  Who were the others who were on
5    flexible schedules, you said?
6        BY MR. NEBEKER:
7    Q   Who else was on the flexible schedule?
8    A   The whole -- the whole department was on the
9    flexible schedule.
10   Q   Except the people in production?
11   A   Except for the blacks, let's put it that way.
12   Q   Was Grace Lopez on a flexible schedule, or was she
13   always early or always on time?
14   A   She was mostly always on time.  But saying that the
15   days that she either had something to do or was late, she
16   wasn't really, you know, she wasn't really poked at or
17   harassed about it.
18   Q   And are you saying you were never late getting to
19   the office?
20   A   I'm not saying that I was never late.
21   Q   Okay, and when you were late getting to the office,
22   were you allowed to just work an extra 15 or 20 minutes,
23   whatever it was?
24   A   No, I was asked to put in a leave slip.
25   Q   Who asked you to do that?

Page 166

1    A   Kathleen would ask me to put in a leave slip.
2    Q   And how many times did you put in a leave slip when
3    you came late?
4    A   I can't give an amount of time.
5    Q   Can you estimate?
6    A   I can't even estimate.
7    Q   Can you tell us whether it occurred more than once
8    a month?
9    A   It may have, because at that time, I think I was
10   depressed and --
11   Q   And so it happened regularly?
12   A   I wouldn't say it happened regularly, no.
13   Q   How often do you think it happened?
14   A   I don't know, maybe once or twice a month.  I don't
15   know.  But the thing is that they didn't -- now when
16   everything was good and everything was running smooth, they
17   didn't have a problem if I would walk in there late.  Because
18   at some point, I would actually work days like, say, Mary was
19   working hers.  I would come in at 7:00 in the morning and
20   wouldn't get off until 7:00 at night.  So --
21   Q   Do you recall any specific times when Herman Krebs
22   was on the -- took part in the flexible schedule?
23   A   I think he did.  I'm pretty sure he did at some
24   point.  But then at some point, when they started harassing
25   him as well, then that probably stopped.

Page 167

1    Q   What makes you think they harassed him about it?
2    A   What makes me think?
3    Q   Yes.  Did you witness it?
4    A   Yeah, I witnessed it.  I've heard them actually
5    hollering at him and screaming and carrying on.
6    Q   Who?
7    A   Kathleen and Lynn.
8    Q   And was it regarding him being late?
9    A   It was regarding all kinds of stuff, him maybe
10   being late or maybe coming back late from -- I can remember
11   him coming back late from lunch and them hollering at him and
12   screaming.  I think they even wrote him up one time because
13   he came back a little late from lunch.
14   Q   And what about Aaron Ferster, did he ever get -- do
15   you ever recall a specific instance when he took part in the
16   flexible schedule?
17   A   Well, he was one of the ones, I think, that was
18   able to work from home at one point.  But all that stopped
19   because, remember, as I told you, that they had to try to
20   show that they wasn't just treating blacks that way, so
21   that's when they started going after the white males, more
22   so.  And that's how we arrived with the discrimination
23   against males, because of the fact that -- you get what I'm
24   saying?  In other words, they had to have a way to try to
25   hide it.  So the way of trying to hide it is to say, okay,

Page 168

1    well I'll go after, say, Mr. Nebeker because he's white.
2    Since we don't want Tony to feel that we're treating him
3    different so, if we do Mr. Nebeker here, okay, now we're
4    treating everybody the same.  But that's not good, because
5    that's the way they destroyed the workplace.
6    Q   Okay.  So you're saying that when the African
7    Americans complained that they weren't being treated the same
8    as the whites and then the bosses started cracking down on
9    the whites and Mr. Krebs and Mr. Ferster ended up losing some
10   of the privileges that they had prior to the complaints by
11   you and Mr. Robinson; is that correct?
12   A   I would say cracked down on the white males.
13   Q   Okay.  And you already indicated that Grace Lopez
14   tended to be there on time anyway.  What about Judy Tasse?
15   Was she typically on time?
16   A   Judy Tasse, I didn't really have a lot of dealings
17   with her because she kind of worked in the back like, you
18   know what I mean?
19   Q   So you don't know if she typically got there on
20   time or late; is that accurate?
21   A   I don't really know.  But I'm pretty sure that she
22   have -- you know what I mean, I've seen a lot of people come
23   in late, you know what I mean?  I see people dragging in late
24   all the time.
25   Q   Do you have any specific recollection of Judy Tasse

44 (Pages 173 to 176)

Page 173

1  June 3, 2004?
2      A  You said do I have any?
3      Q  Yes.
4      A  I may have. And so I'm not going to say that I
5  haven't and I'm not going to say that I have.
6      Q  You have a specific recollection?
7      A  I'm saying that I'm not going to say that I did and
8  I'm not going to say that I didn't.
9      Q  Right, because you don't have a specific
10  recollection one way or the other?
11      A  Not because, you know what I mean? Because I may
12  not remember at this point.
13      Q  Okay. Do you remember at this point?
14      A  It may come to me later.
15      Q  Okay. As you sit here, do you have a specific
16  recollection of having had any communications with Chuck
17  Fillah --
18      A  As I sat here, you know what I mean, something kind
19  of rings a bell, but I'm not really there yet.
20      Q  Can you tell us everything about what it is that's
21  ringing a bell in your mind about conversation with Mr.
22  Fillah by June 2, 2004, regarding your EEO complaint?
23      A  I can't tell you anything right now, not at this
24  point.
25  //

Page 174

1          (Exhibit No. 67 was marked for
2          identification.)
3      BY MR. NEBEKER:
4      Q  Do you have any knowledge of anyone calling Mr.
5  Robinson a bum?
6      A  Yep, sure do.
7      Q  And what -- who did you overhear or did you hear
8  somebody call Mr. Robinson a bum?
9      A  I overheard Miles call Mr. Robinson a bum.
10      Q  And that was on December 1, 2004?
11      A  I would say around that time, yes.
12      Q  And what was the context of -- were you talking to
13  Mr. Simmons at the time?
14      A  No, I think me and Mr. Robinson was just passing by
15  an office door, which was Chuck's office, I think.
16      Q  And what did you hear -- was Mr. Fillah in the
17  office?
18      A  I'm not sure if he was in the office.
19      Q  But you know Miles Simmons was in the office?
20      A  Right, there was some people in there.
21      Q  And what did you hear Mr. Miles say -- or Mr.
22  Simmons say?
23      A  I heard him call out. He said, he called Ernie.
24  He said, Ernie, you're a bum.
25      Q  Anything else in the conversation that you

Page 175

1  overheard?
2      A  I think after that, Ernie was ready to say
3  something. But I told him, come on, man, let's just keep
4  walking. So that's all I can --
5      Q  Do you remember Mr. Robinson saying anything to Mr.
6  Simmons prior to Mr. Simmons saying that Mr. Robinson was a
7  bum?
8      A  You mean before that?
9      Q  Yes.
10      A  No, he didn't say anything.
11      Q  So Mr. Robinson had said nothing?
12      A  No, he was just passing by.
13          (Exhibit No. 68 was marked for
14          identification.)
15      BY MR. NEBEKER:
16      Q  All right, would you look at what's been marked as
17  Deposition Exhibit 68?
18      A  Would you ask -- excuse me, this 67, when you asked
19  about the bum part, you know what I mean, the only thing I
20  think I was trying to show this is how, if he filed an EEO
21  complaint, by him filing that complaint and if he complained
22  to management, you know what I mean, I don't care if they
23  would have -- if they would have ripped his head off, they
24  would have did nothing about it. That's just the way they
25  operate. So that's why I got that there.

Page 176

1      Q  Is this a confirmation of counseling letter you
2  received from Jeff Baxter on or about December 17, 2004?
3      A  Yes.
4      Q  Do you know if this was ever withdrawn?
5      A  No, it wasn't.
6      Q  And do you recall ever referring to Ms. Lopez as
7  crazy or a crazy lady?
8      A  Not to Ms. Lopez, no.
9      Q  Okay, did you ever refer to her, even outside of
10  her presence, as crazy or a crazy lady?
11      A  I can remember saying to them that she must be
12  crazy to keep, you know, using my name or whatever the case
13  may be. Or --
14      Q  But you never used the term "crazy lady"?
15      A  Huh? No.
16      Q  Did you ever use the term "crazy lady" in referring
17  to Ms. Lopez, Grace Lopez? Or Elena Lopez?
18      A  I just remember saying that she must be crazy.
19      Q  Which Lopez was it that you said was crazy?
20      A  This was Elena.
21      Q  Elena. Okay. Why did you say Elena was crazy?
22      A  I said she must be crazy?
23      Q  Why did you say she must be crazy?
24      A  Because of the fact of all the drama that she kept
25  going in the work -- kept up in the workplace.

Page 177

1     Q    And in whose presence did you say that Elena Lopez
2  must be crazy?
3     A    This was in front of Chuck Fillah. And if I
4  believe it was Susan Ades, who both were supervisors at that
5  time.
6     Q    Was anybody else there?
7     A    I think the supervisor overtop of -- overtop of the
8  administrative office or somebody may have been there, which
9  is all of them in our division. Because what I pointed out
10 to Susan, I said that, you know, that Elena has even got into
11 it with you, and I said she's got into it with you as well,
12 to Folami. It was Folami.
13    Q    Elena spoke ill of Folami?
14    A    Yes. They almost got into a fight.
15    Q    And what happened then?
16    A    What do you mean what happened?
17    Q    They got in a verbal fight or fisticuffs?
18    A    They almost went blows to blows. It was --
19    Q    Were you present for that?
20    A    I was there. Everybody was there.
21    Q    When was that?
22    A    That was probably maybe -- I would say maybe about
23 a couple of months, two or three months before this incident
24 happened.
25    Q    Before you described Ms. Lopez must be crazy?

Page 178

1     A    Right. And then the incident where she had knocked
2  a young lady off the computer.
3     Q    Who knocked whom off the computer?
4     A    Elena Lopez took her body and rammed it into a
5  young lady while she was using the printer --
6     Q    Oh, the printer. Who is the lady?
7     A    Her name was -- her name -- she's still there. Her
8  name is Amanda Parez. And then the incident when she had
9  took some aerosol spray, a spray can or something, and
10 sprayed it into Stacey Tabellario's face.
11    Q    This is Elena Lopez?
12    A    Yes.
13    Q    And did that take place before or after December
14 10th of 2004?
15    A    That took place before. And then it was just chaos
16 with her all the time. And the reason why is because
17 Kathleen and Lynn just let her get away with it, so she did
18 whatever she wanted to do, basically.
19    Q    And do you have any reason to believe that Mr.
20 Baxter's issuance of a confirmation of counseling letter was
21 meant to do anything other than try and stem the use of name
22 calling in the agency?
23    A    I have a feeling that -- I mean, this letter of
24 counseling shouldn't have never even been written because,
25 for number one, it wasn't like I went to Elena and said it to

Page 179

1  her face, to say that, you know, you must be crazy. Okay?
2  That was my way of expressing myself, you know what I mean
3  to try to get their attention as to what this lady was doing
4  in the workplace.
5         It had nothing to do with me trying to harass her
6  or downgrade her or anything like that. You know what I
7  mean? This was my way of explaining to -- to the supervisors
8  and managers, okay, all of the things she was doing and how
9  all this stuff was coming about.
10    Q    Can you understand why Mr. Baxter would not want
11 inappropriate language in the workplace?
12    A    In the workplace?
13    Q    Yes.
14    A    It wasn't in the workplace.
15         MR. SILVERBERG: Objection.
16         BY MR. NEBEKER:
17    Q    Where was it?
18    A    That's what I'm saying. It was there -- standing
19 there with three supervisors that actually work in our unit.
20 So it wasn't like I just hollered out in the workplace.
21 There's a difference there. I mean, people --
22    Q    You were in the boss's office, is that what you're
23 saying?
24    A    I was right there at the boss's office, you're
25 right. So what I'm saying to you is, it's just like if I

Page 180

1  watch TV and the judge may look down off the bench and say,
2  you know, you're crazy if you think that I believe this, this
3  and this. So that's probably the way I was explaining.
4         MR. SILVERBERG: Do we have a lot more to go?
5         MR. NEBEKER: I would say we have another 45
6  minutes.
7         MR. SILVERBERG: Can I make a call?
8         MR. NEBEKER: Sure. Take a break.
9         (Recess.)
10        BY MR. NEBEKER:
11    Q    Okay, Mr. Bowden, do you have anything else to say
12 about the Exhibit 68 that Ms. Lopez -- being described as she
13 must be crazy?
14    A    Yes. One of the things I have to say is that from
15 what Mr. Baxter had told me about this actual letter,
16 confirmation of counseling, he said it wasn't his doing that
17 he was actually made to do it by Chuck Fillah.
18    Q    Okay.
19    A    Okay. And also I would like to say this caused me
20 a great deal of undue stress, you know what I mean, to the
21 point where I ended up in the psych ward.
22    Q    For how long?
23    A    I think I stayed there for like three days.
24    Q    Did you take sick leave for that?
25    A    Did I take sick leave for that?

Page 181

1    MR. SILVERBERG: Did you just ask that?
2    BY MR. NEBEKER:
3    Q   From the office?
4    A   No, I was told by the Smithsonian's doctor to seek
5    more medical attention than what he could offer.
6    Q   All I'm asking is, did the -- did the agency make
7    available to you sick leave to cover the pay for that period
8    of time?
9    A   I don't know what they made available because
10    I -- I mean, at that point it didn't make a difference. I
11    mean, at that time, I was under suicide watch.
12    Q   You have no reason to believe that you didn't get
13    paid for those days?
14    A   I don't know.
15    Q   Do you believe you did not?
16    A   I don't know if I did or if I didn't.
17    Q   Okay. Mr. Fillah was present at the time when you
18    discussed Ms. Lopez, that she must be crazy; is that correct?
19    A   Correct.
20    Q   And was Mr. Fillah Mr. Baxter's supervisor?
21    A   Yes.
22    Q   And do you believe Mr. Fillah was the one telling
23    Mr. Baxter that he, Mr. Fillah, felt it was appropriate to do
24    a confirmation of counseling letter for your use of the word
25    crazy in describing Ms. Lopez?

Page 182

1    A   Well, I believe that Mr. Baxter had no intention on
2    doing a confirmation of counseling.
3    Q   Right, but Mr. Fillah was his supervisor and told
4    him to because Mr. Fillah thought it was inappropriate to use
5    the word crazy in describing Ms. Lopez, correct?
6    A   That wasn't the way he explained it to me.
7    Q   Who explained it to you?
8    A   That wasn't the way that Jeff explained it to me.
9    He said he was made to do it.
10    Q   He was made to do it?
11    A   Exactly.
12    Q   And did you ever discuss with Mr. Fillah why Mr.
13    Fillah had Mr. Baxter do the confirmation of counseling
14    letter?
15    A   Well, once he said that, I was done. Once Mr.
16    Baxter told me what he had to say, I was done. And what
17    I -- I think my words to him was that maybe he needed to
18    stand up and be more of a man and make decisions on his own
19    and not let somebody else push you into doing something that,
20    you know, that you really don't want to do. So --
21    Q   So you never talked to Chuck Fillah about why he
22    had Mr. Baxter do the confirmation of counseling letter,
23    correct?
24    A   I don't think anybody wanted to talk to Chuck
25    Fillah at that time.

Page 183

1    Q   Is that a no?
2    A   That's a no.
3         (Exhibit No. 69 was marked for
4         identification.)
5    BY MR. NEBEKER:
6    Q   Okay, now would you look at Exhibit Number 69 and
7    tell me if that is an e-mail that you sent to Mr. Jeff
8    Baxter?
9    A   That's right.
10    Q   And what were the -- did you in fact have
11    conversations with Jeff Baxter about the safety conditions in
12    the shop?
13    A   Yes.
14    Q   Is this the lower shop?
15    A   Yes.
16    Q   All right, and what were the safety conditions you
17    discussed with Mr. Baxter?
18    A   The same thing that I discussed with everybody
19    else, the air quality, not having the machines bolted down,
20    the clutter of trash and junk, tripping hazards, not having
21    the proper electrical cords, not having heat.
22    Q   What about the electrical cords? What's wrong with
23    the electrical cords?
24    A   Well, you're not supposed to plug certain machines
25    up into like outlets and walls, you're supposed to have like

Page 184

1    a drop cord to come down.
2    Q   Why?
3    A   Why?
4    Q   Yes.
5    A   Because if you -- say if you use something that's
6    coming from the wall and you're using like a belt sander or
7    something, the cord gets caught up under there, it could, you
8    know what I mean?
9    Q   No.
10    A   Possibly rip it apart or whatever.
11    Q   By abrading the cord against a table, you could
12    wear the cord?
13    A   No, it's just the angle that it's coming from. If
14    the cord is coming from up and you're using it from up,
15    there's a chance that the belt sander or whatever machine you
16    use can't catch it. So if you go into most wood shops, you
17    would see, you know what I mean, that the cords are actually
18    cords that come from out of the ceiling. They are drop
19    cords.
20    Q   If the cord is too long, wouldn't it tend to get
21    stuck in the table saw, for instance?
22    A   You're not on a table -- I'm saying working on a
23    bench. If you're working on a bench, like this table here.
24    Q   Okay. So also what tools were needed to make the
25    shop area operational and safe?



Page 185

1  A  You say what tools?
2  Q  What tools were needed, yeah.
3  A  Not just tools, but it needed an exhaust system.
4  Q  What was this list of tools you describe in Exhibit
5  69 to make the shop operational and safe?
6  A  I think they were some of the things that I just
7  mentioned to you.
8  Q  Cords from the ceiling?
9  A  Right.
10 Q  Bolts for the saw?
11 A  Right.
12 Q  The dust masks?
13 A  Right.
14 Q  Anything else?
15 A  Exhaust, you know what I mean, some type of exhaust
16 system.
17 Q  For when you're using paints?
18 A  Right.
19 Q  Okay.
20 A  Heat, you know what I mean.  Didn't have any heat.
21 It was cold.  So it was like 17 degrees one morning.
22 Q  What was the wood that you were being asked to cut
23 in the lower shop?
24 A  You say what was the wood?
25 Q  Yeah.

Page 186

1  A  I'm not sure what it was at that point.  I don't
2  remember exactly what type of wood it was.
3  Q  Do you feel you could have used -- do you feel you
4  had the ability to bolt the saw down to the floor?
5  A  Do I feel I had the ability to do it?
6  Q  Yes.
7  A  No.
8  Q  Why were you not sufficiently trained in installing
9  a bolt?
10 A  Into the floor?  I'm not a -- I'm not a concrete
11 mason.
12         (Exhibit No. 70 was marked for
13          identification.)
14 BY MR. NEBEKER:
15 Q  If you'd look at Exhibit 70 and tell me if that's a
16 true and accurate e-mail exchange between you and Mr. Jeff
17 Baxter?
18     Is that a true and accurate copy of an e-mail you
19 sent to Mr. Baxter?
20 A  Right.
21 Q  Do you believe it to be accurate today?
22 A  Yes.
23         (Exhibit No. 71 was marked for
24          identification.)
25 BY MR. NEBEKER:

Page 187

1  Q  Would you look at Exhibit 71 and tell me if that is
2  an e-mail from you to Mr. Baxter.
3  A  Yes.
4  Q  And you see the second paragraph in there?  In it
5  you say, I spoke to you not being able -- I spoke on you not
6  being able to find work for us to do.
7  A  Um-hmm.
8  Q  Were you saying to Mr. Baxter that you didn't have
9  enough work to do?
10 A  What I was saying to him was that what had
11 happened -- I think the way this started is because he had me
12 doing what I felt was his duties, which was inspecting the
13 park.
14 Q  You didn't feel like your responsibilities included
15 inspection of the park?
16 A  I didn't feel like it should have been my sole
17 responsibility to inspect the park.
18 Q  Well, did he tell you you were solely responsible?
19 A  Yes.
20 Q  And did he say you are solely responsible today for
21 inspecting the park or always?
22 A  He said that that was my job, to inspect the park.
23 And I --
24 Q  And whose job was it to inspect the park?
25 A  It should have been his job.

Page 188

1  Q  Did you tell him that?
2  A  Right.  I told him that's what I was doing before
3  he came and that was only because of the fact that we did not
4  have a supervisor at that time.  That's when Rick Hyder had
5  left, you know what I mean, and Kathleen had came and they
6  had made me head of production, and so --
7  Q  So you were telling him he should be doing the
8  work?
9  A  Well, I was telling him that it seems to me that it
10 should have fell on him and not on me.  I can't inspect the
11 park and do the work, too.  I mean, it just doesn't make
12 sense to me.  I mean, why would I go out and inspect the park
13 and come back with work, give it to you, and then you turn
14 around and give it back to me?  That doesn't make sense to
15 me, is what I was --
16 Q  Why?
17 A  You say why?
18 Q  Yeah.
19 A  I mean, if that's the case, if I'm already out
20 there, then I might as well just do the job, not come back
21 and report it to you.
22 Q  Well, what if the job would take too long and he
23 had something else that he wanted you to do?  How would he
24 let you know that?
25 A  How would he let me know what?

48 (Pages 189 to 192)

Page 189

1    Q   That he wanted you to do something else?
2    A   I mean, the thing is that wouldn't it be treating
3  me different if I'm the only one that's inspecting the park
4  and doing the work too?
5    Q   Well, it wouldn't make any sense to have more than
6  one person doing one job if it only required one person,
7  right?
8    A   I mean, the thing is, if I already have enough on
9  my plate, why should I take on inspecting the park at the
10  same time?
11    Q   So were you telling Mr. Baxter that you had more
12  work on your plate than you could handle?
13    A   I don't think that that's what I was saying
14  exactly. But I was saying that I am responsible for doing a
15  lot of things around here, you know what I mean?  And
16  inspecting the park shouldn't be solely my responsibility.  I
17  think that when I applied for the position, you know what I
18  mean, in the actual -- what would you call it -- job
19  announcement that it had, you know what I mean, as far as
20  being a production manager, that you were required to inspect
21  the park.
22        So I'm saying, you know, I was being treated
23  different because why would you continue to have me to
24  inspect the park?
25    Q   Is it true that the saw in the lower shop had never

Page 190

1  been bolted down before you raised the security or the safety
2  concern with your supervisor?
3    A   I've been raising safety concerns about that shop
4  since -- since I probably -- since they started putting
5  something together down there.
6    Q   When was that?
7    A   Because at one time, it was just a storage spot.
8    Q   Okay, when was that?
9    A   They didn't start putting something together down
10  there until maybe a little after -- a little bit before Rick
11  Hyder had left.
12    Q   Do you know what year that was?
13    A   2001 or something like that.
14    Q   2001, all right.  So when did the saws make it into
15  the lower shop?
16    A   Probably around that time.
17    Q   Around 2001?
18    A   Right.
19    Q   And they were never bolted down, right?
20    A   They were never bolted down.
21    Q   When is the first time you raised the issue of the
22  saws not being bolted down?
23    A   I would probably say around the time that Kathleen
24  had arrived, because we was in between that transition.
25    Q   When was that?

Page 191

1    A   Probably in 2002 or something.
2    Q   Had you raised an EEO complaint prior to that?
3    A   About what, the saws?
4    Q   Anything.  Yeah, prior to 2002.
5    A   No.
6    Q   And were you still required to work in the lower
7  shop?
8    A   Yes.
9    Q   Can you tell us every fact you're aware of that
10  suggests that the confirmation of counseling memo that was
11  issued to you on December 22, 2004, was issued to you in
12  reprisal for engaging in EEO activity or in a -- to
13  discriminate against you based on race, color or disability?
14    A   I know for a fact that people that filed EEO
15  complaints at the zoo are not treated fairly and management
16  has a tendency to go after them.
17    Q   What facts do you have to support that?
18    A   Because everybody that I know either that I know
19  that filed a complaint, which I'm almost certain that there's
20  maybe six or seven people that filed them, you know what I
21  mean, ended up getting wrote up for some reason or they
22  started getting bad evaluations.  So that was always their
23  practice.
24    Q   Who are those people that you claim complained to
25  the EEO process and then got written up?

Page 192

1    A   I know there's three of them down in the -- what do
2  they call that place down there? -- the commissary.  There's
3  three black men down there, you know what I mean, that went
4  through all kinds of harassment and was getting wrote up and
5  getting bad performance appraisals.
6    Q   Anything else?
7    A   Ernie Robinson is another one that was getting the
8  same treatment.  A lady by the name of -- what's her name?  I
9  can't get her name out -- last name is Brown.  She has a case
10  in federal court right now as we speak.  What is her name?
11  But I can't get her name out.  But her performance appraisal
12  was attacked and I think that she was written up for some
13  reason.
14        And there may be a few others, you know what I
15  mean?  I mean, people talk --
16    Q   Can you think of their names?
17    A   So, you know, that's the practice of the
18  Smithsonian.
19    Q   So that would be --
20    A   If a black man tries to assert his civil rights,
21  you know what I mean, then they go after him.
22    Q   Okay, the three people written up in the
23  commissary, were they written up by either Mr. Baxter or Mr.
24  Fillah?
25    A   No, but they were written up by their supervisors?

52 (Pages 205 to 208)

## Page 205

1  So I said, hey, that's enough for me. And I looked at my
2  other black coworkers, I said, now you see, you know now.
3      So what he in turn did, he really just -- he really
4  just lost the trust all together for us, you know what I
5  mean? I mean, after that, nobody really had any good
6  feelings about him. How would you -- why would you want to
7  work with a person like that?
8      Q   And how do you believe the loss of trust has
9  affected your ability to work with him?
10     A   How?
11     Q   Yes.
12     A   Because the thing is, it as a racist comment that
13  he is using. I mean, even --
14     Q   So what effect does that have on your ability to
15  work with him?
16     A   It doesn't have an effect on my ability to work
17  with him, it has an effect on my ability to actually just,
18  you know, conversate with him every day from day to day. I
19  mean, if he's just having a leisure conversation, I don't
20  really want to have that with him, you know? I mean, that's
21  something that's just not there. I don't have that feeling.
22  He comes in in the morning, he said how you feel, this and
23  that? You know, I don't feel good about saying -- you know,
24  speaking about how I feel to him. I mean, I look at him
25  sometimes and say to myself, what do you care? I mean, you

## Page 206

1  don't care about blacks.
2      Q   Is it fair to say that you don't trust him?
3      A   Is it fair to say? I mean --
4      Q   You don't trust Mr. Fillah?
5      A   It's not Mr. Fillah.
6      Q   I'm sorry, Mr. Baxter.
7      A   Is it fair to say at this point if he feels that
8  way about me, yes, I don't trust him. I mean --
9      Q   And do you feel he trusts you?
10     A   Do I feel he trusts me?
11     Q   Yes.
12     A   No, he's already spoken about it. So that already
13  tells it.
14     Q   And has he ever docked your pay or denied you sick
15  leave because you didn't schedule sick leave sufficiently in
16  advance?
17     A   He's harassed me about sick leave, you know what I
18  mean?
19     Q   Has he ever docked your pay or denied you sick
20  leave because he believes you submitted the sick leave too
21  late, the request for leave too late?
22     A   Not that I can remember.
23     Q   Okay. And I understand that one of your complaints
24  is that you have been questioned about your whereabouts at
25  the workplace; is that correct?

## Page 207

1      A   Right.
2      Q   And that's because you had to step to the restroom;
3  is that right?
4      A   Right.
5      Q   And so you believe that you're singled out because
6  people ask where you been when you're in the restroom?
7      A   Not people; that's him that's asking.
8      Q   Just Mr. Baxter?
9      A   Right.
10     Q   And --
11     A   And I mean, when Kathleen was there, it was the
12  same thing.
13     Q   How many times did Kathleen ask you about your
14  whereabouts when she couldn't find you and you were in the
15  restroom?
16     A   Jesus, who knows? You know what I mean? I mean, I
17  couldn't answer -- it's getting to the point that I feel like
18  I'm almost in jail. And that's the way it always has been, I
19  mean, even with Kathleen. I mean, I can't get up and go to
20  the bathroom without you asking where I am? And that's why I
21  go to work right now on the day, you know what I mean, I
22  don't even really trust myself to go down the hallway to get
23  a candy bar, you know what I mean? Because what I'm going to
24  basically do all day is just sit at my desk, you know what I
25  mean?

## Page 208

1      Q   Would you say that --
2      A   If I don't have anything to do, I try to stay in
3  place, because I know that they're looking for any little
4  thing.
5      Q   Would you say that you were questioned by Kathleen
6  about your whereabouts when she couldn't find you on more
7  than 10 occasions?
8      A   I would say on more than 50 occasions. It's almost
9  like they sit there and they wait for you to move or
10  something and then they come in and, you know, you come back
11  okay, where you been?
12     Q   And when you explain where you've been, does she
13  have something to talk to you about?
14     A   No, she don't really have nothing to talk to me
15  about. I mean, I say -- like I've only been gone for a
16  minute or two. I mean --
17     Q   What's the longest you've ever gone when she asked
18  you about your whereabouts?
19     A   Probably about 15, 20 minutes.
20     Q   Now, what about Mr. Baxter?
21     A   Same thing, about 15, 20 minutes.
22     Q   How many times has Mr. Baxter --
23     A   I mean, that still happens. I mean, it's nothing
24  changing.
25     Q   How many times has Mr. Baxter asked you about your





Page 209

1 whereabouts?

2   A  I mean, should we say 100, 200, I don't know.

3   Q  You think it's as many as 200?

4   A  Yes, I mean, it's like almost every day or every

5 other day, I mean.

6   Q  And typically, when he asks you about your

7 whereabouts, have you always been at the bathroom?

8   A  Either that, or I might have stepped out, and

9 sometime it would be -- it's so ironic, because he would send

10 me to do a job and I would come back and he would say where

11 were you? And I'm like, what do you mean, where was I?

12 Didn't you just send me to do this, this or this? So you're

13 fishing.

14   Q  And is that --

15   A  You know what I mean?

16   Q  And is it always true that where you have been is

17 to do a job?

18   A  Right. I'm not saying as that, but I'm saying even

19 when I went to the restroom, it's crazy. I can't go to the

20 restroom? And you get questioned, how long does it take for

21 me to use the restroom? Is that a good thing to do?

22   Q  Have you ever been -- have you ever lost pay or

23 been docked pay or leave because you were in the restroom

24 getting a candy bar?

25   A  I may have. I don't know. They've been doing so

Page 210

1 many things. I can't identify anything, but there ain't no

2 telling what they're doing, you know what I mean? It's not

3 pretty there.

4   Q  You can't identify any specific date or time when

5 you've been docked, because --

6   A  I can't identify any. But I mean, I don't -- I'm

7 just not like I'm going to trust them. They may be taking

8 leave from me right now. Well, they are, I mean, while I'm

9 sitting here. I'm using leave now, ain't I? I mean, I

10 shouldn't be losing leave, but I'm losing it.

11   Q  I understand on March 1 of 2005, you claim that you

12 were given a fully successful performance appraisal; is that

13 correct?

14   A  Fully successful?

15   Q  Yes.

16   A  That would be correct.

17   Q  Okay. And do you believe that you were successful?

18 You successfully accomplished all of the critical elements on

19 your performance -- in your performance plan in the period

20 preceding March 1 of 2005?

21   A  No.

22   Q  Where do you believe you did not successfully

23 complete the critical elements of your performance appraisal?

24   A  I didn't say anything about did not.

25   Q  Oh, sorry --

Page 211

1     MR. SILVERBERG: I think he misunderstood the

2 question.

3     BY MR. NEBEKER:

4   Q  Do you believe that you were -- you successfully

5 completed each of the critical elements of your performance

6 plan leading up to the March 1, 2005, performance appraisal?

7   A  I believe that I went above successfully --

8   Q  And were there elements that you believe you were

9 rated lower than you fairly should have been rated?

10   A  Yes.

11   Q  Which elements were those?

12   A  I don't know unless I had it in front of me. Or

13 actually all of them.

14   Q  You think that all of them were lower than they

15 should have been?

16   A  Exactly.

17   Q  Do you believe that in each element of your

18 performance appraisal you should have scored at the highest

19 level?

20   A  Yes.

21   Q  And that there are no areas for your improvement

22 during the year that preceded March 1 of 2005?

23   A  Not as far as performance, no.

24   Q  Is there any way that you could improve your

25 performance as -- could have improved your performance as an

Page 212

1 employee for that year that was reflected in the March 1,

2 2005, performance appraisal?

3   A  Probably only one way that I know of?

4   Q  And that would be?

5   A  To spend the night.

6   Q  And another instance you indicate that on May 9,

7 2005, the agency failed to take appropriate action regarding

8 an assault by Elena Lopez; do you recall that?

9   A  Yes.

10   Q  And this was the instance when Elena Lopez came and

11 her shoulder struck you while you were talking with Mr.

12 Baxter; is that correct?

13   A  I don't think that's what I wrote.

14   Q  Were you speaking with Mr. Baxter at the time you

15 claim you were assaulted by Elena Lopez?

16   A  Yes, I was.

17   Q  Okay. And Mr. Baxter was looking at a piece of

18 paper; is that correct?

19   A  No.

20   Q  What was Mr. Baxter doing?

21   A  He was looking me right in my face.

22   Q  And what were you talking about?

23   A  I can't remember -- I think we was talking about a

24 job or something, but I can't remember exactly what the job

25 was.

54 (Pages 213 to 216)

Page 213

1    Q   Do you remember -- you don't remember what the
2  question was?
3    A   I don't remember exactly what job we were talking
4  about.
5    Q   How many people were in the room?
6    A   Anywhere from maybe about -- anywhere from 15 to 20
7  people.
8    Q   Okay, and are any of those people friends of yours?
9    A   Friends of mine?
10   Q   Yes.
11   A   I don't really consider them as friends. I mean,
12 they're my coworkers.
13   Q   So you don't have any coworkers who are friends of
14 yours?
15   A   I mean, I don't -- I don't really have what you
16 call friends like that, you know what I mean?
17   Q   Could you identify for us everyone that you recall
18 being in the room when you were speaking to Mr. Baxter and
19 you claim Elena Lopez assaulted you?
20   A   You mean when she rammed into me?
21   Q   If that's your claim, who was in the room?
22   A   The whole exhibit team. I mean, it was -- I can
23 almost look on this list and tell you.
24   Q   You're looking at Exhibit 65?
25   A   Right. This would help me.

Page 214

1        It would be Kara Blond, Judy Tasse, I don't
2  think -- I don't remember if Ken Stuart was still there. Of
3  course, Elena Lopez was there. Amanda Parez.
4        I don't remember whether Aaron Ferster was there.
5        I think Satcey Tabellario probably was there.
6  Herman Krebs, Ernest Robinson, Grace Lopez, Sherod Mangun,
7  Jeff Baxter, Judy -- I already said Judy Tasse. Who else
8  would it be? Susan Ades, Chuck Fillah, Patrice Paine.
9        That's probably about it that I can remember.
10   Q   How much did Elena Lopez weigh?
11   A   How much did she weigh?
12   MR. SILVERBERG: Objection. Asking him to assume
13 or speculate.
14   THE WITNESS: I'm not a scale.
15   BY MR. NEBEKER:
16   Q   Can you estimate Elena Lopez's weight back on
17 May -- May 2005?
18   A   She was just as fat as I am, so how much do it look
19 like I weigh.
20   Q   You tell me, how much do you weigh?
21   A   Probably about 165, 170.
22   Q   Okay, and so you believe Elena Lopez weighed 165,
23 170?
24   A   May have. She's pretty healthy.
25   Q   And is she taller than you or shorter than you?

Page 215

1    A   About my size.
2    Q   And how tall are you?
3    A   I'm 5'5".
4    Q   And do you believe that Sherod is not a friend of
5  yours?
6    A   Do I believe he's not a friend of mine?
7    Q   Is he a friend of yours?
8    A   No, he's not; he's a coworker.
9    Q   Is Ernie Robinson a friend of yours?
10   A   No, he would be a coworker, too.
11   Q   Is Herman Krebs a friend of yours?
12   A   No.
13   Q   Is Patrice Paine a friend of yours?
14   A   No.
15   Q   Did you note whether -- did you ask any of these
16 other people who were in the room whether they witnessed
17 Elena Lopez assault you in May of 2005?
18   A   Yeah, I did.
19   Q   And did any of them say they saw her assault you in
20 2005?
21   A   I'm almost certain Sherod said he saw it. I know
22 Ernie said he got a glimpse of what was going on, but, you
23 know what I mean, I don't -- I don't remember asking nobody
24 besides those two.
25   Q   And did you -- were you physically injured by the

Page 216

1  alleged assault by Ms. Lopez?
2    A   Physically injured?
3    Q   Yes, suffer any bruises, any broken bones, any
4  lasting effects?
5    A   Just heartbroken.
6    Q   Nothing else?
7    A   Nothing else.
8    Q   But you found that her conduct was unacceptable,
9  fair to say?
10   A   Fair to say.
11   Q   And did you notice whether Mr. Baxter's expression
12 changed at all when Ms. Lopez hit you?
13   A   Mr. Baxter, to me, actually didn't tell the truth
14 in his deposition. Because when -- after -- when it
15 happened, before that had happened, I had already warned him
16 and told him that she was doing things like bumping me and
17 blocking doorways, you know what I mean, and doing all kinds
18 of -- well, I can't say the word "crazy" can I?
19   Q   And had you ever done any blocking the doorways or
20 any bumping of her?
21   A   I had no reason to, you know?
22   Q   But did you?
23   A   No.
24   Q   Okay.
25   A   But I'm saying, by me explaining that to him, he

Page 217

1  told me that he had to actually see it. And I was like,
2  well, why can't you just speak to her about it and let's get
3  this thing in the open and at least she'll know that you're
4  aware of it. But he never made her aware of it.
5      Q  And when did you have that conversation with Mr.
6  Baxter?
7      A  This was -- as a matter of fact, this was a little
8  before, a little time before she had actually made those
9  little allegations against me.
10     Q  Okay, which allegations do you say she had made
11 against you.
12     A  The one where they had wrote me up or whatever.
13     Q  Is this where you used the phrase crazy or crazy
14 lady?
15     A  Right, "she must be crazy."
16     Q  But she wasn't there when that took place, correct?
17     A  You mean, when I had the conversation with Mr.
18 Baxter?
19     Q  Right.
20     A  No, she wasn't there when I had the conversation
21 with Mr. Baxter about her. But I was hoping that Mr. Baxter
22 would go back to her and have a conversation with her to say,
23 hey, at least that he's aware of it, so --
24     Q  This instance where she blocked the door, was this
25 prior to the May 9, 2005, incident with Ms. Lopez?

Page 218

1      A  May 9th? Yeah, this was way prior to that.
2      Q  Where were you —
3      A  Her conduct was terrible when Kathleen was there.
4  It was just --
5      Q  Where were you when she blocked the doorway?
6      A  I was coming from the printer into the -- what's
7  now the design office. It used to be our office, you know
8  what I mean, and she stood there --
9      Q  Is there only one door to get between those two
10 areas?
11     A  It is one door unless you go all the way around.
12 So that's what I ended up doing, actually just going all the
13 way around.
14     Q  Did you ask her to step out of the way?
15     A  I tried to say excuse me, but -- I mean, you know
16 what she up to. Come on.
17     Q  What was she doing?
18     A  Huh?
19     Q  What was she doing?
20     A  Just standing there, you know what I mean.
21     Q  Was she talking to anybody?
22     A  Like daring me. No.
23     Q  Okay. And then so you walked around?
24     A  I walked around.
25     Q  Was there ever a time when she blocked the doorway

Page 219

1  that you managed to get past the doorway, anyway?
2      A  No, I'd normally just turn and go the other way.
3  That was her way of getting back at me, I guess, because of
4  what was happening to her girlfriend.
5      Q  Who was her girlfriend?
6      A  Kathleen.
7      Q  Kathleen Samiy?
8      A  Right.
9      Q  Do you believe she blamed you for Kathleen Samiy's
10 departing the agency?
11     A  I think that she probably was angry and probably
12 felt that I had some involvement or something.
13     Q  Do you believe you did have involvement?
14     A  I don't know whether I did or not. I mean, there's
15 separate reasons, I mean, that she probably left. But I can
16 only hope that --
17        MR. SILVERBERG: Objection. You're calling for his
18 opinion. Go ahead.
19        BY MR. NEBEKER:
20     Q  Did Elena Lopez have anything in her hands when she
21 rammed you, I guess is the word you used?
22     A  I didn't actually see what was in her hands; I just
23 felt my body swing around.
24     Q  Oh, you didn't see her coming?
25     A  Huh?

Page 220

1      Q  You didn't see her coming past you?
2      A  No, I didn't actually see her coming past me. I
3  just saw her once she made impact.
4      Q  Okay, and where did she make impact on you?
5      A  On my shoulder.
6      Q  Which shoulder?
7      A  The right shoulder.
8      Q  And did she make impact from behind or from in
9  front?
10     A  It was kind of like from the side, like.
11     Q  So do you know where she was prior to -- with
12 respect to where you were standing, prior to bumping you?
13     A  You mean, did I know where she was standing or --
14     Q  Yeah, where did she come from? Do you know where
15 she came from?
16     A  I don't know where she was coming from.
17     Q  But you believe that she struck your right shoulder
18 and she struck it shall we say in the same direction that
19 your shoulder -- that your shoulders run from left to right?
20     A  It seemed as though that she might have caught
21 somewhat from the front and the side at the same time.
22     Q  Okay.
23     A  And I can't remember if I asked you this already.
24 But did you fall over?
25     A  No, but I did have to twist and take a couple of

56 (Pages 221 to 224)

Page 221

1  steps to keep my balance.
2    Q  And what did Mr. -- did any words exchange between
3  you and Ms. Lopez or you and Mr. Baxter after that?
4    A  I said nothing to her. I asked -- I told Jeff, I
5  said, did you see that? And he said, yes. I said, so now
6  you got a chance to see it, right? And he said, yes, you
7  know what I mean?
8        And then I asked him, what did you see? He said,
9  well, I saw her when she rammed you, I saw your shoulders
10  turn. That's what he said.
11    Q  And he used the term "rammed"?
12    A  Right.
13    Q  And what -- then what?
14    A  Then after that, all of a sudden, I guess once he
15  took it where he needed to take it, to his supervisor and
16  discussed it with her supervisor, then all of a sudden, he
17  wanted to change his story a little bit, to soften it as
18  though it wasn't as bad.
19    Q  And who was his supervisor and who was her
20  supervisor?
21    A  Chuck Fillah was his supervisor.
22    Q  And who was Elena Lopez's supervisor?
23    A  I think it was Susan at the time.
24    Q  Susan Ades?
25    A  Right. And I had a conversation with her and she

Page 222

1  got nasty, so I asked her, I mean, what she was going to do
2  about it. I think what had happened, Ernie was talking to
3  her at the time, and he was asking her to at least get Elena
4  to apologize or something. And so they had somewhat -- I
5  don't know if it was like a little heated conversation. But
6  when I walked up, I told Ernie to just leave it alone, you
7  know what I mean, don't even worry about it.
8        And then I said, well, the main thing is, I
9  asked -- I asked Susan, well, what are you proposing to do
10  about this incident? And she said to me, nothing. Now what?
11  In a smart -- in a smart voice.
12    Q  And that was who?
13    A  Susan Ades.
14    Q  Do you believe Susan Ades was friends with Elena
15  Lopez?
16    A  Well, Susan Ades was there, she was friends with
17  Lynn. That's how she got the job she got.
18    Q  She's friends with Lynn Dolnick?
19    A  Right.
20    Q  And was Lynn Dolnick friends with Elena Lopez?
21    A  Lynn Dolnick was probably closer with Kathleen, so
22  that made the connection with Elena.
23    Q  Do you know whether anyone ever spoke to Elena
24  Lopez about the incident?
25    A  Do I know whether they spoke to her?

Page 223

1    Q  Yes.
2    A  It didn't appear to, no. It didn't -- they
3  didn't --
4    Q  You were never present when they spoke with Ms.
5  Lopez, correct?
6    A  I wasn't present, no. But I'm saying, from what
7  they told me, they wasn't going to do anything about it.
8  So --
9    Q  You assume that they didn't?
10    A  I assume that they didn't. That's why,
11  because -- that's one of the reasons why I say, well, if I
12  can't, you know, protect myself, then I'm going to have to
13  call the police. And that's why I called the police.
14    Q  Oh, and the police were brought in, they did an
15  investigation, correct?
16    A  They did -- you know, I wasn't there when they
17  investigated. But from what I understand, is it's like they
18  did a half investigation or something. They didn't really
19  fully investigate what had really happened, they didn't
20  question all the people that were in the room.
21    Q  Who didn't they question?
22    A  You know what I mean? They only questioned certain
23  people, you see what I'm saying?
24    Q  Yeah. Did you give them a list of people to
25  question?

Page 224

1    A  I didn't give them a list of anything. I mean, the
2  thing is, they went to the supervisors, I guess, to try to
3  figure out who was there and who wasn't there. I wasn't
4  asked to give a list.
5    Q  But did they interview you?
6    A  They interviewed me. I gave them a writeup, you
7  know what I mean? And I think after that, from what I can
8  remember, I probably left.
9    Q  And did the police pursue any criminal charges
10  against Elena Lopez?
11    A  I'm pretty sure that they sent something down to
12  the courts or something. And when I talked to the captain,
13  the captain, Captain McCreedy, he told me that -- I don't
14  know if it's the prosecuting attorney or whoever it was that
15  said that they didn't feel as though it was something that
16  they should have to really handle on their level, that it
17  should have been something that the agency should have been
18  able to handle itself.
19    Q  And who gave you that information?
20    A  And speaking to one of the other officers, he said,
21  you know, believe -- the guy that actually did the writeup,
22  he said, believe me, if you would have bumped, you know what
23  I mean, one of the white folks in there, you know what I
24  mean, believe me, they'd have walked you to the gate, they'd
25  have had us to walk you to the gate today.

Page 225

1   Q   Who told you that?
2   A   That was one of the black officers. I don't know
3  his name. But I still see him around.
4   Q   Was he involved in the investigation?
5   A   He was involved in the investigation.
6   Q   Did you give him the names of people to investigate
7  or to question about the incident?
8   A   As I said, I think at that time, after that had
9  happened, I think I just went on and I either took leave for
10  the rest of the day or something. So --
11   Q   And did Elena Lopez ever ram you again?
12   A   Did she ever ram me again? No.
13   Q   I also understand that you claim that Mr. Baxter
14  subjected you to hostile work environment on a time when you
15  were assigned a work ticket to hang banners at the panda
16  house; is that correct?
17   A   That's correct.
18   Q   And was this in January of 2006?
19   A   2006? That doesn't --
20   Q   Could it have been August of 2005?
21   A   I don't remember exactly what the date was. I
22  don't remember exactly that.
23   Q   You go into the panda house to hang banners,
24  correct?
25   A   No.

Page 226

1   Q   Tell me about the incident then?
2   A   I was going to the panda house to see exactly what
3  he was talking about as far as hanging banners. In other
4  words, we went to scope out the job.
5   Q   You didn't have the banners with you?
6   A   No, we were trying to figure out, okay, how does he
7  want this job done, you know what I mean?
8   Q   Had Mr. Baxter told you to come get him when you
9  were ready to go to the panda house?
10   A   He told us to give him a call or something like
11  that when you're ready to hang the banners, not when you're
12  ready to go to the panda house.
13   Q   Right, when you went to the panda house, was that
14  in anticipation of hanging the banners?
15   A   No, because we didn't have a real location as to
16  where he wanted them. We had somewhat of an idea, but
17  when -- I think when me and Sherod had sat down and thought
18  about it, we said that, hey, the way he explained it to us,
19  it was like the banners to be hung somewhat
20  parallel from one pole to a fence or something, and we were
21  trying to get a good understanding of what he was talking
22  about.
23   Q   And how long did you try and get this understanding
24  at the panda house?
25   A   How long?

Page 227

1   Q   Yeah, how long were you there trying to figure out
2  what he was talking about?
3   A   Probably about maybe five or 10 minutes or so.
4   Q   Did he come up to the panda house?
5   A   You know what we did, we called him, you know what
6  I mean? I had called him, you know what I mean. And I asked
7  him to you, you know, come up and try to explain to us what was
8  going on. And once I called him, he came up and said, got
9  really loud, and a little belligerent, and started hollering
10  and said, you know, well, what if I had been in a meeting
11  and, you know? And I was like, if you was in a meeting and
12  if I'm calling you, if the meeting was that important, you
13  just didn't have to answer the phone. I mean --
14   Q   Is that what you told him?
15   A   Yeah. I said, it's no big deal. We just want to
16  know, you know, exactly what you want done here. You said
17  for us to give you a call, so I'm giving you a call. And he
18  said, well, why did you come up here? You know what I mean,
19  I told you not to come up here, you know what I mean, you
20  know, and hang those banners.
21      I said, well, we're not hanging them, we're just
22  looking to see, you know what I mean? We happened to be up
23  here in the area, we stopped, we're looking, and it was --
24   Q   Oh, so you didn't go off to the panda house with
25  the idea of checking the panda house out for the banners, you

Page 228

1  just happened to be there?
2   A   We just -- well, I think we were in the park and we
3  were doing something else and we were really close to that
4  area, so we just said, hey, because it's almost like where
5  the panda house is at is where we swing the truck out to com
6  outside the park.
7   Q   I see.
8   A   So I think the two of us said, well, let's see
9  exactly what he wants here.
10   Q   As you were driving by?
11   A   Right, you know what I mean? So we stopped and --
12   Q   Did you explain all that to him before he got up
13  there and was angry?
14   A   I didn't -- there wasn't anything to explain. I
15  told him that we were up here, I mean, look, sighting, and
16  trying to figure out what it is you want us to do here. It
17  had nothing -- I mean, it's no reason for him to come up
18  there and break bad. You can almost tell what that was
19  about. He had just got finished talking to one of them
20  investigators that came into the workplace, so he was angry.
21   Q   How do you know that?
22   A   How do I know? I mean, I knew when the
23  investigators came.
24   Q   How do you know that?
25   A   What do you mean, how do I know?

58 (Pages 229 to 232)

Page 229

1  Q  Did you see the investigator?
2  A  I saw him.
3  Q  So you were down where he was when the investigator
4  was there?
5  A  It was like a couple days -- in other words, what
6  I'm saying, it was like a day or two after that, so he was
7  agitated.
8  Q  Oh, a few days after.
9  A  Right.  He was still agitated.
10  Q  Had you had any communications with Mr. Baxter in
11  the -- earlier in the day that you went to the panda house?
12  A  No.
13  Q  When was it that Mr. Baxter told you to come get
14  him when you go hang the banners at the panda house?
15  A  You said, did I have any communication earlier in
16  the day about going to the panda house?  Let's make sure --
17  Q  Earlier on the day --
18  A  Yeah.  Yeah.  We had --
19  Q  -- when you went to the panda house?
20  A  Right, I had a communication, there was
21  communication with him.
22  Q  And how did that communication go?
23  A  He just said that he needed some banners hung at
24  the panda house.
25  Q  Nothing unusual about that conversation?

Page 230

1  A  Right, nothing unusual, you know what I mean?
2  Q  And you didn't think it was unusual that he wanted
3  to go to the panda house with you to deal with the banners,
4  correct?
5  A  I didn't think it was unusual.  I mean, because the
6  thing is, in my mind, I already knew that, hey, I don't know
7  exactly where you want them.  You got a rail that might be
8  running, say, let's say 100 meters down.  I don't know
9  exactly where you want them on that rail, but --
10  Q  And did you lose any pay or benefits as a result of
11  the incident at the panda house?
12  A  No, but I lost a lot of sleep.  Many sleepless
13  nights.
14  Q  And also I understand that you claim you were
15  discriminated based on race and color and disability and/or
16  reprisal when on February 3, 2006, you received a needs
17  improvement rating; is that correct?
18  A  That's correct.
19  Q  Now, can you tell us all the facts you have to
20  support the conclusion that the rating review as needs
21  improvement was based upon race, color, disability or
22  reprisal?
23  A  I know for a fact it was on reprisal and my race,
24  disability and everything else.
25  Q  And explain the facts you rely on for that

Page 231

1  conclusion.
2  A  The facts that I rely on is because of the names of
3  people that I gave you that also all of a sudden, their
4  performance appraisals fell apart because of these complaints
5  that were being filed.  I mean, it's not just something
6  that's new that the Smithsonian managers do.
7  Q  Did you --
8  A  I mean, this is -- this is what they do, okay?  You
9  file a complaint, your performance appraisal dips.
10  Q  And have you already given us the facts that you
11  rely on for that conclusion?
12  A  Well, I'm giving more, too.  Because the thing
13  is --
14  Q  What are those additional facts?
15  A  -- I have been rated outstanding, you know what I
16  mean?  You know --
17  Q  Were you ever rated outstanding by Mr. Baxter?
18  A  -- since I was at the zoo.  Okay?
19  Q  Were you ever rated outstanding by Mr. Baxter?
20  A  I wasn't rated outstanding by Mr. Baxter.  Mr.
21  Baxter was tainted by Ms. -- by Ms. -- what's her
22  name -- Dolnick.
23  Q  And what makes you say he was tainted by Dolnick?
24  A  Because Dolnick told him that I had a complaint in.
25  Q  How do you know that?

Page 232

1  A  He told me.
2  Q  What did he say?
3  A  He said that Dolnick had told him that I had a
4  complaint in.
5  Q  And when did he say that to you?
6  A  A little bit after he got there.
7  Q  And did he say that that made a difference to him?
8  A  He didn't say it, but he didn't look too happy
9  about it.  I mean, it was a thing where -- I think Mr. Baxter
10  felt like, okay, well, if she can't handle him, I can.
11  Q  He can or cannot?
12  A  If he -- if she couldn't handle me, he felt as
13  though that he could.
14  Q  He felt he could get along with you and not let
15  the -- your EEO complaint get in the way; is that what you're
16  saying?
17  A  No, I'm saying that he felt like, okay, I can rough
18  him up and do whatever I want to do.  It's the same thing,
19  even with Chuck was the same thing, I can rough this guy up
20  and I'm going to show you how to do it.  So that's why they
21  ended up getting wrote up.  I mean, I got one writeup.  How
22  many they got?
23  (Exhibit No. 72 was marked for
24  identification.)
25  MR. NEBEKER:  I'm going to try and go fast.

Page 233

1    BY MR. NEBEKER:
2    Q    All right, do you see Exhibit 72?
3    A    Um-hmm, sure do.  Yes, I do.  My fault.
4    Q    Is that an e-mail that you sent to Mr. Baxter
5    regarding the incident with Elena Lopez?
6    A    Yes.
7         (Exhibit No. 73 was marked for
8         identification.)
9    BY MR. NEBEKER:
10   Q    And is this another such e-mail, Exhibit Number 73?
11   Is Exhibit 73 also an e-mail exchange between you and Mr.
12   Baxter?
13   A    Yes.  Yes.
14        (Exhibit No. 74 was marked for
15        identification.)
16   BY MR. NEBEKER:
17   Q    Okay, 74.  Is this an e-mail exchange from you and
18   involving your concerns about being in meetings with Ms.
19   Lopez?
20   A    Yes, this is to Dolph Sand, because I was told that
21   I couldn't send anything to Mary Tanner and that if I had
22   anything that I needed to send to Mary Tanner, to send it to
23   Dolph Sand.
24   Q    And did you go then through Mr. Sand?
25   A    I did.

Page 234

1    Q    And did you end up attending meetings with Elena
2    Lopez present after the instance where you claim you were
3    rammed by Ms. Lopez?
4    A    Yes.
5    Q    And did she ever assault you again in those
6    meetings?
7    A    No.
8    Q    Were you allowed to stand near the exit so that she
9    wasn't between you and the exit?
10   A    I don't think I should have been allowed to stand
11   in the exit, I shouldn't have been in there, period.
12   Q    Were you allowed to stand near the exit?
13   A    I wasn't allowed to stand anywhere.  Nobody told me
14   about standing in the exit.  Was she going to shoot me?
15   Q    Well, I'm asking you.  Did you feel there was
16   anything you could do in the meetings to make it so that you
17   could protect yourself from her ramming you?
18   A    I think that I could have not been in the meeting
19   to protect myself.
20   Q    And that's the only way you could have avoided her
21   assaulting you again?
22   A    Exactly.  She had a history of that.
23   Q    Well, did you take any special precautions in the
24   meetings with Ms. Lopez to protect yourself?
25   A    Did I take any special precautions?

Page 235

1    Q    Yes.
2    A    Wasn't nothing I could do.  I mean, look, I'm
3    forced in a position where either I attend the meeting or
4    lose my job.  Which one do I do?  You know what I mean?
5    might as well.  I mean, it's no different than saying, go sit
6    in the lion's cage.  It's no different.
7         (Exhibit No. 75 was marked for
8         identification.)
9    BY MR. NEBEKER:
10   Q    Do you have Exhibit 75, sir?
11   A    I have it.
12   Q    Have you ever seen this exhibit before?
13   A    Yes.
14   Q    And did you ever talk to Ms. Scott Powell
15   about -- is this the same Janine you've described earlier in
16   your deposition?
17   A    Yes.
18   Q    And had you ever talked to her about her reasons
19   for resigning?
20   A    Yes.
21   Q    And what did you -- what did she and you discuss
22   about her reasons for resigning?
23   A    She just told me that as far as the -- the
24   discrimination in the workplace and being harassed and, you
25   know, not being treated fair, that she couldn't take it any

Page 236

1    more.
2    Q    Did she tell you what Mr. Fillah and Folami Ahota
3    ever did to harass her?
4    A    I know that she was called a limp-legged -- a
5    limp-legged B.
6    Q    And who said that?
7    A    Folami Ahota said that she was a limp-legged B and
8    he used to call all kinds of wenches and just talked bad to
9    them. I've heard her say that, myself.
10   Q    You heard Folami Ahota say that?
11   A    Of course, we have.  I mean, we have.
12   Q    And did you ever -- you were with somebody at the
13   time Folami Ahota used those words to describe Janine?
14   A    Yeah, I was with Ernest Robinson and Sherod Mangum
15   Q    And what was the context?
16   A    What was the context?
17   Q    Yeah, what was the discussion about?
18   A    I mean, that's just the way she would speak of her,
19   you know what I mean?
20   Q    What were you talking about before Folami used
21   inappropriate language?
22   A    I wasn't talking about anything.
23   Q    What was the group --
24   A    I was just sitting there, we were just sitting
25   there and she would come in and talk about that heifer this,

66 (Pages 261 to 264)

Page 261

1  track and that's it.
2      Q   And did you believe him?
3      A   Huh?
4      Q   Did you believe him?
5      A   I mean, did I have any reason not to?
6      Q   That's what I'm asking.
7      A   I believe you if you tell me something unless I see
8  something different.
9      Q   And do you see half way through Exhibit 83, there's
10  an Exhibit G-8 that I won't remark, but it's a separate
11  document, is it not?
12      MR. SILVERBERG:  What is this from, Counsel?
13      MR. NEBEKER:  From one of the EEO ROIs, reports of
14  investigation.
15      THE WITNESS:  You said G-8?
16      BY MR. NEBEKER:
17      Q   There is a page with a G-8 on it.
18      A   Okay, I'm there.  You there?
19      Q   And after that, there are some of your performance
20  appraisal forms; is that correct?  After the G-8 in Exhibit
21  83?
22      A   I see one.
23      Q   And that is from the appraisal period June '04 to
24  December '04; is that right?
25      A   June '04 to December '04.  Yeah.  Shall we discuss

Page 262

1  this?
2      Q   Is this one of your performance appraisal forms?
3      A   This appears to be.
4      Q   And who signed this form?
5      A   Jeff Baxter and Chuck Fillah, it looks like.
6      Q   If you go through the exhibit, the first four pages
7  of that, I'm sorry, three pages after the G-8, do you see
8  that?
9      A   I see it.
10      Q   That's your performance evaluation form, correct?
11      A   You say the three pages after?
12      Q   After G-8, yeah.
13      A   Yeah, this is it.
14      Q   And then there's a G-9, and that's somebody else's,
15  correct?
16      A   Right.  But on the G-8, I wanted to speak on that,
17  if I can.
18      Q   Yes, do you believe it accurately describes your
19  performance during the period June '04 to December '04?
20      A   No.
21      Q   And where do you find it to be inaccurate?
22      A   I mean, fully successful, I never worked, you know
23  what I mean, as a fully successful employee, as I've stated.
24  I've always been at the top, okay?
25      Now, what I would like to say about this, this is

Page 263

1  kind of ironic that you've brung this up and it kind of makes
2  me smile a little bit, because what's weird is that during
3  this time, Mr. Baxter, when he gave me this, he -- I think he
4  gave Ernie one and he gave Sherod one.  And he probably gave
5  Grace and maybe Herman one.  But he took theirs back, okay,
6  and said that he wasn't there long enough to appraise them.
7      So my question, you know what I mean, to someone, I
8  can't ask you, but maybe back to them is, how can you
9  appraise them -- how can you -- how could you not appraise
10  them but you appraised me.
11      Q   And who were those people?
12      A   Huh?
13      Q   Who were those people?
14      A   The other two blacks, Sherod Mangum and Ernest
15  Robinson.  And whatever happened to -- I don't know what
16  happened, it may have took Grace's and Herman's back as well
17  but I'm not sure.  But I know that he did appraise them at
18  first.  He gave them an appraisal, okay?  And once he gave
19  them the appraisal, I think Ernie -- something went on where
20  he wasn't happy or something.  Because what he had did, he
21  had rated -- I know exactly what happened.  He had rated
22  Sherod higher than he did me and Ernie.  Ernie said he wasn't
23  going to accept it.  And that it was unacceptable because of
24  the fact that how are you going to rate Sherod higher than
25  you're going to rate myself, you know what I mean, and Tony,

Page 264

1  is the way he put it.  Because we were the ones that were
2  teaching Sherod, you know what I mean, when he first came in
3  In other words, Sherod had no -- he didn't have any
4  experience.
5      Q   Was Sherod at the GS-11 level?
6      A   No, he wasn't.  But he was being taught by us.  So
7  we were trying to figure out, okay, how are you going to rate
8  this guy over top of us when we're teaching him everything he
9  knows?
10      Q   But he's doing a different job, right?
11      A   He wasn't doing a different job.  He was doing the
12  same thing we were doing.
13      Q   He was doing it at a lower level.
14      A   He wasn't doing it at a lower level; he was doing
15  the same thing we were doing.
16      Q   So do you believe he should have been paid at the
17  GS-11 level?
18      A   He should have.  I mean, he probably should have.
19  But at the same time, I'm saying that we were
20  teaching him, the same way that we were teaching Jeff.
21      Q   So if you're teaching him, you're doing more than
22  he's doing.
23      A   Exactly, you know what I mean?  We were teaching
24  Jeff, too.  So how are you going to take me and smack me down
25  and I'm teaching you, you know what I mean, as well as you're

**Page 265**

1  supposed to be my supervisor but you're going to smack me
2  down, and that's just not making sense.
3      Q    So are you saying that a supervisor can never
4  perform better than his subordinates?
5      A    Can never? I'm not saying a supervisor can't. I'm
6  saying if you hire a supervisor with no experience, you know
7  what I mean, in the field that he's working in, then you're
8  going to have some complications there.
9      Q    But were you just saying that Sherod who was at a
10  lower GS level than you?
11      A    Right.
12      Q    He couldn't be rated higher than you, who were
13  helping to train him?
14      A    He shouldn't have been rated higher than me if I
15  had to help to train him. My job is not to train anybody.
16      Q    Well, your job was in part to be a team leader,
17  wasn't it?
18      A    No, I'm not a team -- I've never been a team
19  leader. That's something they made up so they didn't have to
20  pay me. That's what I tried to explain to you.
21      Q    You've never had to lead a program or a project?
22      A    I mean, that was just some stuff that they brought
23  up all of a sudden so that they wouldn't have to pay me as
24  what they call, what, acting head of production.
25      Q    So they made that up prior to 1988?

**Page 266**

1      A    I wasn't there in '88.
2      Q    Right. So whoever was doing your job in '88 would
3  have had a performance plan that was different from yours?
4      A    They weren't doing my job; that was their job. That
5  had nothing to do with me.
6      Q    I see. So you believe that the job changed when
7  you got there?
8      A    Do I believe that the job changed? How would the
9  job change? The guy that -- the guy that had the -- the,
10  what would you call it, the job description in '88 was there
11  when I got there. So how would it have been mine, if that
12  was his?
13      Q    So you --
14      A    So he was still there when I got there. Do you see
15  understand?
16      Q    Didn't you just say that you and Sherod were doing
17  the same work?
18      A    I said that me, Sherod and Ernie were actually
19  doing the same work at the same time.
20      Q    Okay, so you could have the same job description,
21  right?
22      A    Can we have the same job description? It has
23  nothing to do with '88.
24      Q    Well, it could -- you weren't there in '88, so you
25  don't know what they were doing in '88, correct?

**Page 267**

1      A    Exactly.
2      Q    In --
3      A    But still, that doesn't neglect -- that doesn't
4  negate what they did here. Why did they take their
5  performance appraisals back, and why would he say that -- why
6  would he say that he wasn't there long enough to appraise
7  them but he can appraise me?
8      Q    In January 2005, under the topic of safety, there
9  is an indication that, we do however need to work on the
10  exhibits shop this year. Do you see that?
11      A    In 2005?
12      Q    Yes.
13      A    I don't even know whose -- I don't know who this
14  belonged to.
15      Q    I'm looking behind where it says G-8.
16      A    Okay.
17      Q    And those three pages you said were your
18  performance evaluation, correct?
19      A    Okay, now where are you look at now?
20      Q    Okay, and I'm on page 3, box 7 at the bottom,
21  safety. You have followed zoo and SI procedures and you have
22  had no safety violations. We do however need to work on the
23  exhibits shop this year.
24          Do you see that?
25      A    I see it.

**Page 268**

1      Q    Was that the first time you were ever advised that
2  you need to help work on making the exhibit shop safe?
3      A    That was the first time that I've read anything
4  like this. Because when it started, they were saying that I
5  had to do -- to actually redo the shop myself, which is
6  impossible. I can't do that by myself.
7      Q    Did they ever tell you that they would not supply
8  any assistance for you to get the shop in a safe condition?
9      A    Well, I think what he told me is that I was a
10  supervisor -- this is what Jeff told me -- that I was a
11  supervisor. And I said, I'm not a supervisor. And that I
12  can tell Sherod what to do and I can tell Ernie what to do.
13  And I said, I'm not a supervisor.
14      Q    You were not a manager, correct?
15      A    No.
16      Q    And -- but you were a project leader at times, were
17  you not?
18      A    No.
19      Q    You never led a project?
20      A    I mean, no. I never lead no projects. I mean, the
21  thing is that they try to say that was part of my -- in other
22  words, they've added that project leader stuff in when they
23  didn't want to pay me for being head of production. It had
24  nothing to do -- I mean, this is some stuff that they tried
25  to add in later.

Page 277

1    mean?
2            (Exhibit No. 88 was marked for
3            identification.)
4        BY MR. NEBEKER:
5        Q    And would you look at Exhibit Number 88?  And we
6    discussed earlier in your deposition the conclusion reached
7    by a person doing a desk audit of your job.  Do you recall
8    that?
9        A    Yeah, I recall us discussing that.
10       Q    Would you look at Exhibit 88 and tell us if you
11   believe to be the conclusion reached by the person who was
12   doing the desk audit of your position?
13       A    It appears to be.
14       Q    We've been through a lot of facts in your
15   deposition over the course of two days and I just want to ask
16   a question or two to make sure that I have covered all of the
17   bases that you're relying on, all the facts that you're
18   relying on to support your allegations in this case.  I'd
19   hate to get to trial and find out that by not asking enough
20   questions, I didn't get key evidence from you and so forth.
21           So I want to just ask if you are aware of any
22   evidence that we haven't discussed in your deposition that
23   you would tend to rely on to support your claims of
24   discrimination or retaliation?
25       A    Yeah, I am.

Page 278

1        Q    Could you tell us, please, what those are?
2        A    I mean, like these dirty, little jobs that they
3    gave me to do.
4        Q    What were those jobs?
5        A    I mean, cleaning feces off walls, I mean, going
6    into a room that was full of cockroaches.
7        Q    What room was that?
8        A    In the bat cave, and was made to do these things.
9    Although I said it was a health hazard, hey, I have to go to
10   my doctor to get excuses and say -- you know, well, the
11   doctors excuses say how this is going to impact me because of
12   my allergies and stuff like that.  I mean --
13       Q    Was that the cockroaches or the feces on the wall,
14   that you had to go to the doctor?
15       A    The feces on the wall was just to name one.  I
16   think the cockroaches was -- I mean, there was so many, but
17   there was not just cockroaches.  I mean, this place was full
18   of it.  It looked like the walls were moving, you know what I
19   mean?  You couldn't even see the walls, the floors,
20   everything.
21       Q    And what were you being asked to do in the room, in
22   the bat cave with the cockroaches?
23       A    I think we was asked to go in there and remove some
24   panels and stuff like that.  And I was like, hey, man, I
25   don't think that's too safe.

Page 279

1        Q    Was there signage on the panels?
2        A    You couldn't really tell what was on them.
3        Q    There was cockroaches on the panels, I guess.
4        A    The panels was just moving, so I mean, this was
5    like --
6        Q    Were you supposed to replace those panels with new
7    panels?
8        A    I don't know what they were doing, you know what I
9    mean.
10       Q    Who asked you to do that?
11       A    Jeff did.
12       Q    And when was that?
13       A    Probably in 2005 or somewhere around in there, you
14   know what I mean?  I mean, it's just like every time he would
15   give me something dirty like that, and I would say something
16   about it, it looked like, you know, he just wouldn't -- he
17   wouldn't bend, you know what I mean?
18       Q    And the feces on the wall, was that the giraffe
19   area?
20       A    That was the giraffe area.
21       Q    And did you ultimately end up having to clean those
22   walls in the giraffe area?
23       A    I didn't have to clean those, but it just took so
24   long for me to convince him that it wasn't safe for me.  And
25   I think that people misconstrued that I said that one of the

Page 280

1    giraffes died, it wasn't a giraffe, it was an elephant.  But
2    they're all in the same house, you know what I mean.  And he
3    died from -- I think he tied from TB or something, you know
4    what I mean?
5        Q    Was the public allowed in that area after the
6    elephant died?
7        A    I don't remember whether the public was allowed in
8    there.  As a matter of fact, I think they quarantined them
9    all for a while or something.
10       Q    And was it during the quarantine period that you
11   were asked to go into the giraffe area?
12       A    It wasn't during the quarantine thing.  But it was
13   just the idea of me being asked to clean feces.  I mean, what
14   I tried to explain to Jeff in a nice way is to say, hey, man,
15   I don't have any shots, so I'm not prepared and, you know --
16       Q    And was it -- did the way he describe it as, you
17   got to go clean the feces, or it was go in and see if you can
18   restore --
19       A    He said, clean it.  He wanted us to clean it,
20   because what had happened was the contractor that had came
21   in, he refused to clean it.  So he figured he'll come down
22   and get us to clean it, you know, me and Sherod.  Both of us
23   are black.
24       Q    Who else was in production at the time?
25       A    Grace was there.



72 (Pages 285 to 288)

Page 285

1    A   Well, the only person that was there then was
2  Ernie. And he --
3    Q   What was his reaction?
4    A   He was outraged. And I think that was something
5  that Chuck had written in his thing, to say that we were
6  outraged about something but he didn't remember what it was,
7  but I'm pretty sure he knew what it was.
8    Q   So it was you and Ernie Robinson?
9    A   Right.
10   Q   And who else was there?
11   A   And Chuck Fillah, we were talking about the way the
12  blacks were being treated in the workpaper.
13   Q   Were you -- you were discussing how blacks were
14  being treated and then he -- Jeff Baxter used the term, you
15  people?
16   A   Right. He came out and said, I have to learn to
17  trust you people, and just went on from there. And that's
18  when Ernie asked him to explain himself. You know, explain
19  what you mean, you know what I mean, by you people?
20   Q   What did he say?
21   A   He didn't answer.
22   Q   Did any black employees in your workplace, were any
23  black employees allowed to work at home?
24   A   No.
25   Q   Were any white employees?

Page 286

1    A   Most of the white employees were, I would say at
2  least over 50 percent were at some point.
3    Q   You had written to Kathleen Samiy that you were no
4  comfortable taking more work because of your workload?
5    A   Right.
6    Q   What was your workload like?
7    A   I mean, I think back then I was probably one of
8  the -- I think I was the only exhibit specialist that was
9  actually doing the -- what you call grunt work outside. So
10  my work load was really heavy. It was to the point where I
11  would come in at 7:00 in the morning and leave at 7:00 or
12  8:00 in the evening. So, you know, I couldn't really handle
13  any more after that, not to even -- not to also mention that
14  they wanted me to take on this so-called head role, I guess,
15  of acting head of production or something. So --
16   Q   How many position descriptions have you seen that
17  they said applied to you, that management said applied to
18  you?
19   A   Over -- I don't know, anywhere from what, seven to
20  10.
21   Q   Really? When you came to the zoo, you didn't have
22  a performance plan or a position description?
23   A   I wasn't presented with one. If I did, I've never
24  seen any. And I think when Kathleen came and they wanted to
25  find a way of not compensating me for -- for my extra duties,

Page 287

1  they came up with this thing, with me being a team leader,
2  somebody which is Ernest Long's, I believe, description that
3  was dated in 19988.
4    Q   Were you ever a team leader?
5    A   No, I never was a team leader.
6    Q   Are other people asked about their whereabouts?
7    A   No.
8    Q   By Jeff Baxter, other people asked about their
9  whereabouts?
10   A   No.
11   Q   How long are you usually gone for?
12   A   I mean, the longest I can remember really being
13  gone for is like maybe 20 minutes, you know what I mean?
14   Q   Are they bathroom breaks? What are they?
15   A   He questioned me about that. He said, why does it
16  take you so long? I mean, why would it take you 20, 25
17  minutes to use the bathroom? And I explained to him, it
18  depends on what I'm doing.
19   Q   Are some of these times that you're gone from work
20  having to do with your job? You have to go somewhere to
21   A   Yeah, I mean, most of my jobs are done -- the zoo
22  consists of probably 100 and some acres. So this guy can
23  give me a job and forget where he actually sends me. That
24  can be another problem, too.
25       But, I mean, he could see me one minute sitting at

Page 288

1  my desk. And then if I got up and left and came back, you
2  know, he'd say where have you been, you know? I'm being
3  questioned, you know what I mean?
4    Q   So sometimes when you're on break, it's
5  because -- when you're not there, it's because you're doing
6  zoo-related work?
7    A   Well, sometimes it's because I'm doing zoo-related
8  work. And sometimes I had to remind him that, hey, look,
9  this is what you gave me. You just gave it to me. Why are
10  you harassing me about my whereabouts if you just gave me
11  this work ticket that you just dismissed.
12   Q   You said you don't have friends. You meant at
13  work, you didn't mean in general, did you?
14   A   No, I didn't mean in general, no.
15   Q   Did management ever do anything regarding Elena
16  Lopez regarding the time she rammed your shoulder? Did they
17  ever punish her in any way or discipline her that you know
18  of?
19       MR. NEBEKER: Objection --
20       THE WITNESS: They didn't publish her, I'm pretty
21  sure of that. They may try to say they did, but they didn't.
22       BY MR. NEBEKER:
23   Q   And what happened at the panda house with Jeff
24  Baxter?
25   A   Just came up and just exploded.

Page 289

1    Q   Were there tourists there, people there?
2    A   Tourists there, you know what I mean.  It was
3  embarrassing, also.
4    Q   And what was that about?
5    A   That was because we had went up to look at a job,
6  you know what I mean, that he had gave -- assigned us to do
7  or whatever, and we just said, we'll go up and take a look at
8  it. I don't know why he just came up and exploded, but I
9  kind of felt like he was under the pressure from, you know,
10 the investigator had just been there maybe a couple of days
11 before this thing flew off the handle. Almost seemed like
12 you could almost feel it when those investigators came in,
13 because that's when times got even rougher.
14   Q   Now, when you were rated -- hold on a second.
15       (Pause.)
16       MR. SILVERBERG:  Do you know what number the first
17 appraisal was, what exhibit number?  The one where he
18 received fully successful?
19       MR. NEBEKER:  Is that the April of '04?
20       MR. SILVERBERG:  Yeah.  I don't have --
21       MR. NEBEKER:  Well, there's an exhibit number on
22 it, but go ahead and mark it again; it will save time.
23       MR. SILVERBERG:  Well -- you don't know the number
24 huh?
25       MR. NEBEKER:  I don't.

Page 290

1        MR. SILVERBERG:  Wait a minute.
2        BY MR. SILVERBERG:
3    Q   In your April '04 appraisal, which is one of the
4  exhibits in this case -- I don't want to mark it again -- I
5  believe Mr. Nebeker asked you -- hold on one second.
6        Why do you think you -- what were you rated before
7  this fully successful?
8    A   I was rated outstanding.
9    Q   Always, at the zoo?
10   A   That I can remember, yes.
11   Q   Why do you think you deserve more than fully
12 successful in this evaluation of April 22 and 29th, '04?
13   A   You're saying why do I think --
14   Q   It's from January '03 to December '03.
15   A   It was supposed to be from January, but it was
16 actually done in April, remember.  So there was like a rush
17 to judgment for them to do this, because the fact that they
18 knew that I had applied for that position.  So they needed to
19 knock me down so that I wasn't qualified for the supervisory
20 position.
21   Q   And why do you think you deserved more than fully
22 successful?
23   A   I mean, because I was a hard worker.  I mean, come
24 on, I was already doing my job and plus taking on the
25 responsibilities of head of production.  In their eyes, at

Page 291

1  least that's the way they tried to put it.  So, I mean, if
2  I'm just a plain old exhibit specialist and I'm doing
3  something as an acting manager, you know what I mean, then I
4  should have received more.
5        But as I can see, I mean, Jeff is hired shortly
6  after --
7    Q   How were you performing higher than fully
8  successful?
9    A   Because I was managing, you know what I mean,
10 contractors.  I was managing other, you know, other
11 employees.  And I was taking on more responsibility than the
12 average exhibit specialist would normally take on.
13   Q   Mr. Nebeker asked you about Exhibit 82, which is
14 the 2006 performance appraisal, where you got improvement
15 needed.  It's from January '05 to December '05.  He asked you
16 about production project leader under element number one,
17 actual performance.  He asked you if that was all accurate.
18 And you said there were more things in there that wasn't
19 listed.
20   A   Right, there was more things that I was doing.
21   Q   What wasn't listed?
22   A   I mean, me doing the -- continuing to do the work
23 of the COTR wasn't listed.  Doing those scopes of work and
24 managing contracts, none of that stuff was mentioned in
25 there.  So, I mean, when Jeff -- how would I say

Page 292

1  it? -- during this time, Jeff didn't even have a certificate
2  for managing contracts or COTR.  Matter of fact, he just
3  probably got it maybe -- got his certificate probably about
4  maybe two years ago.
5    Q   Did you have a certificate when you applied for the
6  supervisory position that Jeff got?
7    A   Yes.
8    Q   You said the EEO office is known to do things that
9  aren't quite kosher, for lack of a better word?
10   A   Right.
11   Q   What kind of things were you talking about?
12   A   Well, I mean, there's -- I guess I was speaking of
13 me turning in a complaint that they just totally ignored.
14 And speaking to other people, they say they turned in
15 complaints and their complaints was being ignored, too.  So,
16 I mean, I didn't think that that was a good thing.
17   Q   What race is Folami Ahota?
18   A   She's black, African American.
19   Q   Is she handicapped or disabled?
20   A   No.
21   Q   What race is Janine Scott Powell?
22   A   She's African American.
23   Q   And what's her disability?
24   A   As I said, she got shot in the head, so she walks
25 with a limp and has some difficulties with her hands.

74 (Pages 293 to 296)

Page 293

1    Q   How does Chuck Fillah, according to you, not
2    support the agency's mission?
3    A   Say that again, now?
4    Q   You said Chuck Fillah doesn't support the agency's
5    mission, I believe?
6    A   Right, he doesn't.
7    Q   How is that?  Can you elaborate?
8    A   Because, as I said, he's for himself, you know.
9    It's not a thing of supporting the agency's mission, right
10   now, it's more like he's trying to cover his tail a little
11   bit there.
12       I mean, how are you supporting the agency's mission
13   when you can't even treat your people right?  You know, you
14   can't treat, you know, people of other races right, you know.
15   And he just doesn't even have the knowledge really to
16   supervise our division.  I mean, as far as exhibits, he has
17   no exhibits knowledge as well.
18   Q   And which way is he only for himself?
19   A   The reasons why I say he's only for himself is, I
20   mean, why would you take on a responsibility as an associate
21   director, you know what I mean, over top of exhibits, you
22   know what I mean, when you know that you can't really do it?
23   So, I mean, it's just greed.  He's just looking for the money
24   is what I'm thinking.
25       So, he was basically, you know, just like he's just

Page 294

1    running over top of everybody and nobody has any respect for
2    him, they don't really care for him.  I mean, when he has
3    meetings, people don't really listen to him.  I mean, he
4    tries to appear to be something that he's not.
5        MR. SILVERBERG:  All right, I have nothing further.
6        BY MR. SILVERBERG:
7    Q   Oh, just one thing in general.  I mean, how are
8    blacks treated -- how are blacks treated differently than
9    whites?
10       MR. NEBEKER:  Objection, vague.
11       THE WITNESS:  I mean, they're not, like we
12   discussed here before, whites are not questioned about their
13   whereabouts, you know what I mean, they're not questioned
14   about their time.
15       BY MR. SILVERBERG:
16   Q   Are whites given dirty jobs to do?
17   A   No, not at all.
18   Q   Do whites get promotions?
19   A   Yeah.
20   Q   Particularly Jewish people?
21   A   Mainly Jewish people.
22   Q   Are men treated worse than women?
23   A   Men are treated way worse than women.
24       MR. NEBEKER:  Objection, vague.
25       BY MR. SILVERBERG:

Page 295

1    Q   Do women have to do --
2        MR. SILVERBERG:  Well, I have nothing further.
3        FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
4        BY MR. NEBEKER:
5    Q   Now, Mr. Bowden, is it safe to say that prior to
6    you coming to work at the zoo, that you had some mental
7    health problems?
8    A   Prior to me coming to the zoo?
9    Q   Correct.
10   A   Yeah, it's safe to say that.
11   Q   And is it fair to say that those originated -- did
12   they predate you arriving to work at the Smithsonian, when
13   you were working at the Natural History Museum?
14       MR. SILVERBERG:  I'm going to object as to
15   relevancy and beyond the scope of my cross.
16       THE WITNESS:  You said did they predate me?
17       BY MR. NEBEKER:
18   Q   Yeah.  In other words, did you have problems before
19   you came to work at the Smithsonian altogether?
20   A   No, I never had any problems before I came there.
21
22
23       (Concluded on following page.)
24
25

Page 296

1        MR. NEBEKER:  You have the right to waive signature
2    or you can read the transcript.
3        MR. SILVERBERG:  You want to read the transcript.
4        THE WITNESS:  Yeah.
5        MR. NEBEKER:  Okay, I don't have any further
6    questions.
7        (Whereupon, at 6:15 p.m., signature having not been
8    waived, the deposition of ANTHONY BOWDEN was concluded.)
9
10       * * * * *
11
12       I have read the foregoing pages, which are a
13   correct transcript of the answers given by me to the
14   questions therein recorded.
15
16
17   Deponent_____
18
19   Date_____
20
21
22
23
24
25

**Subject: Re: off-zoo premises / team meeting**
**Date:** Wednesday, January 21, 2004 2:22 PM
**From:** BOWDEN, Anthony <BOWDENA@si.edu>
**To:** <SamiyK@OM.NZP>
**Cc:** "Tanner, Mary" <TannerM@si.edu>
**Conversation:** off-zoo premises / team meeting

Hi Kathleen
As I said you knew where I was. I told you in front of all of my coworkers what I had to
do on Tuesday. I told you that I had to go down to Capitol Exhibit for a meeting in
Manassas VA. and to Home Depot. It has never been a problem before, you have
always trusted me. It seems to me that every since the desk audit you have been Micro
Managing me. this has never happened befor then.

>>> Kathleen Samiy 01/21/04 09:22AM >>>
Hi Tony:  I'm sorry you feel this way, and very sorry that you have drawn this parallel to
this particular circumstance. However, none of the staff I manage are exempt from
these requirements. I hope you will understand them, and not consider this
harrassement.

--Kathleen

>>> Anthony BOWDEN - 1/21/04 8:44 AM >>>
Good Morning Kathleen
I have ask you on numerous occasions to get me a credit card, so that something as
simple as buying supplies would not take us two or some times three hours. Kathleen
you knew my where.abouts, and you know what it take to get supplies for emergency
type jobs. I am only trying to do my job with out you harassing me. I feel that you are
harassing me because of my meeting with Mary Tanner.

>>> "Kathleen Samiy" <samiyk@nzp.si.edu> 01/20/04 02:46PM >>>
Hi there:

I'm aware that you needed to go to Home Depot today, but it is important that you tell
me (time) when you go, and when you'll be back (duration).  Supervisors are
responsible for staff whereabouts, at all times during your tour of duty.

Just a simple email would do. Also, today we were to have a production meeting at
2:30, while I realize you are on a deadline to complete panda photos, unless we
communicate otherwise, we all need to stick to the routine meetings.

--Kathleen



Page 1 of 1

**Subjec.: Re: Hi Dolph Sand,**
**Date:** Friday, March 12, 2004 8:06 AM
**From:** BOWDEN, Anthony <BOWDENA@si.edu>
**To:** "Sand, Dolph" <SANDDO@si.edu>
**Conversation:** Hi Dolph Sand,

Hi Mr. Sand

Thanks.
Tony.

>>> Dolph Sand 03/11/04 03:19PM >>>
I will discuss your memo with management and get back to you.


This email is intended only for the personal and confidential use of the recipient(s) designated above. It may also constitute an attorney-client communication or represent attorney work product and therefore be legally privileged. If you are not the intended recipient of this communication (or an agent responsible for delivering it to the recipient), you are hereby notified that any review, disclosure or use of the information contained herein is STRICTLY PROHIBITED. If you have received this communication in error, please notify us immediately. Thank you.


>>> Anthony BOWDEN 03/11/04 02:40PM >>>
Hi Dolph Sand,

On March 2, 2004 I went to my supervisor Kathleen Samiy and told her that I had a Doctor's appointment and had to leave. I had just gotten off the phone with my Doctor's office. She told me in front of coworkers Ernie Robinson, Sherod Mangum and Stacey Tabellario that she knows that my health is important but she needed me to go look at a job up at the RDC building and that it was going to take about a half hour. I then waited for 15 mins for us to go up to look at the job. I then told her again that I had to go. She then said to me in an angry voice to just fill out a leave slip.

To me I am being harrassed for asking for time off to see my doctor. This is not something new. I have spoken about this in letters that I have sent to Mary Tanner's office. Kathleen is aware of my illness and that I am on medication. Other staff members are aware of this as well. When I came to this office in 1999 I told everyone that I was on medication and that it sometimes makes me sleepy. From my understanding from other staff members, including Herman Krebs, Melissa Gaulding and Ernie Robinson, Kathleen told everyone in a staff meeting on a day that I was off that they needed to be careful around me because of my being on medication and

EXHIBIT
53

Page 1 of 2

having a stress disorder. I also noticed when I was in a meeting with Kathleen and Scarlitt Proctor that Kathleen had some of my Doctor's excuses and other documents spread around her office and not secured. Scarlitt informed her that the documents needed to be under lock and key.

On March 3, 2004 a staff meeting was held. We discussed upcoming projects and the status of ongoing work. At that time she informed me of new responsibilities that she expected of me. I told Kathleen that due to the work load that I was already responsible for, I would not feel comfortable taking on any more work. I am already expected to manage contractors and oversee other staff members as well as physically do the work myself. I then reminded everyone at the meeting that I am on medication and that I am being asked to do what used to be the job of five people. I also asked Kathleen not to have everyone in the office sending me e-mail telling me to put things on my schedule and giving me verbal work orders. I feel that they should go to Kathleen and then to me.

In a meeting that Kathleen called me into today, I was told by her that my saying that I am on medication was disruptive. However as I stated in the meeting I am not ashamed of my illness nor am I ashamed of being on medication for my disorder. I also feel that her overloading me with work and taking away the only person that was hired to work with me (Sherod Mangum) is a way that management is trying to make me fail. Kathleen also said in today's meeting that I will have to manage four new contrators that she's bringing in. One would have to wonder when and how they are going to hire the four additional Exhibit Specialists that they have been speaking of. Would they have to go through the same thing I have? I was told by Kathleen that Scarlitt was working on a new P.D. for me. This was over two months ago and I have not seen it yet.This makes me feel like I am being used until the new supervisor is hired.

I would also like to ask you, Mr. Sand, what happened to the revised desk audit that you and Mary spoke on in our meeting?

This shows a total disreguard for whats important for others and discrimination against the handicapped.

**Subject: Re: Todays meeting**
**Date:** Thursday, April 1, 2004 2:44 PM
**From:** BOWDEN, Anthony <BOWDENA@si.edu>
**To:** "Dolnick, Lynn" <DOLNICKL@si.edu>
**Conversation:** Todays meeting

Hi Lynn

In the staff meeting that you held on March 31, 2004 you asked if anyone knew how to use the Filemaker work order system. No one admitted that they knew. Some said that they tried to use it, but they were unsuccessful.

As you are aware, this system has not been a success. The system was installed back in November 2002 at a cost of $12,000.00, and another $3,000.00 was spent around the first part of February 2004, not to count the amount of money that was spent on the software itself. It's been 17 months since this system was installed, however it's still not operational.

In our office meeting on February 25, 2004 Kathleen mentioned that we would be going back to using work tickets because the Filemaker system was too complicated and did not work. When I spoke to Kathleen in that meeting, I asked her why would you all use Filemaker as one of the factors for the selection of the Supervisory Exhibit Specialist when after $15,000.00 plus the cost of the software, that system doesn't even work.

Lynn at what point did the job of Supervisory Exhibit Speciaist change? I had not heard that title for this job since I applied for the position. In my interview no one mentioned to me that the position had changed or would change to Project Manager. Is this legal? You have also used the title Production Manager. I would like to know what is the title and what are the responsibilities of this position?

By the way I did receive of the new P.D. it is five pages long and full of supervisory duties and responsibilities. This is stressful as well.

I would also like to know the status of Ernie being a part of Production him only working with me part time is even more stress.


>>> Lynn Dolnick 03/29/04 03:24PM >>>
Hi Tony,
It was a term of speech and in no way intended to rule anyone out.  If you are selected, you will be the new supervisor and will then refill the position you currently hold.  If you 're selected, you will be "coming in" as the new Project Manager.  It is a different position.  Does that help clarify things?  I want to be sure you understand that I have

EXHIBIT
55

Page 1 of 3

not pre-selected anyone, and am committed to selecting the best qualified person for
the position.

thanks, Lynn


Lynn Dolnick
Exhibits and Outreach
National Zoo
3001 Connecticut Ave
Washington, DC 20008

202 673.4863
fax 202 673.4892
dolnickl@nzp.si.edu

>>> Anthony BOWDEN 3/29/2004 3:02:59 PM >>>
Hi Lynn

The reason I felt that the person that would be hired had been pre-selected for the
position is because in a few of the production meetings Kathleen specifically said that
when the new person comes in that Sherod, Grace and myself would be relocated back
downstairs under the supervison of the new supervisor.

This led me and others to believe that the selection had already been determined.

In addition in the staff meeting that you held on March 26, 2004
you said the same thing that Kathleen said, and I quote "When the new Project
Manager comes in." I heard this as well as others present at the meeting.

This made me feel that you had already made up your mind and at the least I will not
get the job. It would have been different if you had said something along the line of
"when the new supervisor is selected." I hope this helps to clarify where my thoughts
were coming from.

Thanks
Tony.



>>> Lynn Dolnick 03/26/04 03:03PM >>>
HI Tony,
In no way did I mean to imply that there is preselection.  I am interviewing 6 people -
they are all qualified and we will pick the best person for the job.   The relocation

downstairs has nothing to do with who is picked.  Why do you feel it means anything?
L

Lynn Dolnick
Exhibits and Outreach
National Zoo
3001 Connecticut Ave
Washington, DC 20008

202 673.4863
fax 202 673.4892
dolnickl@nzp.si.edu

>>> Anthony BOWDEN 3/26/2004 2:16:13 PM >>>
Hi Lynn

In todays staff meeting you said :  When the new Project Manager comes. : that we will
be relocated back down stair. What did you mean by that?
This is the samething that Kathleen mentioned in a previous production meeting with
Sherod, Grace and myself This once again leads me to believe that this person has been
preselected.

**Subject: Lower Shop / unsafe Condition.**
**Date:** Friday, January 21, 2005 11:59 AM
**From:** BOWDEN, Anthony <BOWDENA@si.edu>
**To:** "Baxter, Jeff" <BaxterJ@si.edu>
**Conversation:** Lower Shop / unsafe Condition.

Hi Jeff

Per our conversation this morning you asked me to cut some wood in the lower shop.
We have discussed the safty conditions with in the shop
on several occations and I reported to you that it is unsafe. I have supplied you with a
list of tools and ideas to make the shop operational ann safe.

Thanks
Tony.



EXHIBIT
69
BOWDEN
2-07-2

**Page 1 of 1**

**Subject: Re: Assault**
**Date:** Monday, May 23, 2005 2:03 PM
**From:** BOWDEN, Anthony <BOWDENA@si.edu>
**To:** "Baxter, Jeff" <BaxterJ@si.edu>
**Cc:** "Fillah, Charles M." <FillahC@si.edu>
**Conversation:** Assault


    Hi Jeff


I just would like to let you know that I felt very uncomfortable in to days meeeting 5/23/05. I asked you last Monday 5/16/05 for permission not to attend the meeting because of my filling uncomfortable around Elena. After the meeting on 5/16/05 I vomited and felt sick all of that day. Today I did the samething befor the meeting and had to get up befor the second part of the meeting to vomited again. I know that all of this is brought by undue stress.


Thank Tony.

>>>Jeff Baxter 05/09 12:54 pm >>>
Tony,
I just came back into my office from speaking with Susan Ades, who as you know is Elena's Supervisor about this matter. It is my intension that the work environment is a good and comfortable place to work. I will do as much as I can to see that we do have a good and comfortable environment for all to work in. Thanks for your E-mail

Thanks,
J.B.

>>>Anthony BOWDEN 05/09/05 12:07PM >>>
Hi Jeff


I am sending this e-mail as a reminder of what took place at the end of the 10: 00 am meeting when Elena Lopez made physical contact by intentionally ramming me with her shoulder while I was talking to you about a work ticket.I have spoke to you twice about this and nothing was done, you told me that you could not do anything about it unless you saw it happend yourself.  This time you said that you saw my shoulder turn and you ~aw the look on my face. Jeff for the life of me, I can not understand how you all would .et this type of behavior by Ms. Lopez continue. She seem to have a problem getting

EXHIBIT

13

Page 1 of 2

along with almost everyone in this office.
I perceive this as assault. I should not have to come to work and feel uncomfortable or threatened.

Thanks for your attention in this matter.


please amend my EEO complaint.

Wed, Jul 18, 2007  4:16 PM

**Subject: Fwd: On June 6**
**Date:** Wednesday, June 8, 2005 12:44 PM
**From:** BOWDEN, Anthony <BOWDENA@si.edu>
**To:** "Sand, Dolph" <SANDDO@si.edu>
**Cc:** "Davis, Suzanne" <DavisS@si.edu>
**Conversation:** On June 6


Hi Mr Sand


Can you help me with this situation. I spoke to both Jeff Baxter and Chuck Fillah and
sent e-mails to them that were ignored asking not to attend meetings where Elena
Lopez would be present period and as part of my accommodation. I was told by Jeff
that he would have to think about it . I spoke to Chuck Fillah about this yesterday, he
told me that it was up to Jeff. It is bad enough that management is not taking the
appropiate action as far as the assault and battery is concerned. They are not taking
this serious. My not being protected I feel is worse.


Thanks Tony.

>>>Anthony BOWDEN 06/07 8:13 am >>>



    >

>>>"Tony Bowden" <abowden1214@verizon.net> 06/07 7:59 am >>>



On June 6, 2005, you and I discussed
me not attending any meetings where
Elena Lopez would be present. In this meeting I
explained to you that being in the presence of her causes me to have anxiety attacks
and causes my stress level to elevate.

**EXHIBIT**

74

Page 1 of 2

As part of my accommodation I requested not to attend meeting where she would be present due to her assault and battery against me.

Needless to say, I am not the only person whom she has assaulted. If it were I who assaulted someone, I would not be allowed to come to work until the investigation had been completed.