# PLAINTIFF'S EXHIBIT 11

Baxter Deposition Excerpts—pp.7, 10, 111-113, 118, 123-124, 135-39, 157, 219-20

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ANTHONY BOWDEN,                  *

    Plaintiff,              *

                          *

vs.                              *   Civil Action No.

                          *   05-2022

LAWRENCE M. SMALL,               *

Secretary, Smithsonian           *

Institution,                     *

    Defendant.               *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

       The deposition of JEFFERY BAXTER took place on Wednesday, September 28, 2007, beginning at 12:21 p.m. at Federal District Attorney's Office, 501 North 3rd Street, 4th Floor, Washington, D.C., before Stacey L. Daywalt, Court Reporter.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Reported by:

       Stacey L. Daywalt, Court Reporter

Al Betz & Associates, Inc.
www.albetzreporting.com

Page 6

1  you to answer them truthfully. You can consult
2  with your lawyer when you want to, but not between
3  a question and answer. Like I can't ask you a
4  question and you can't look at him and say what do
5  I say. But after the answer you can consult.
6      If you need a break just say I need a
7  break. If you need clarification ask me to clarify
8  or ask me to repeat. Do not nod or do not go
9  mm-hmm because she can't pick that up.
10     A. Okay.
11     Q. I try to keep it open and flexible and if
12 you have questions ask me and listen to your
13 counsel if he tells you not to answer. He'll make
14 a lot of objections most of which we'll go ahead
15 anyway for the record. But if he ever tells you
16 don't answer listen to him.
17     A. Thank you.
18     Q. I wouldn't not listen to Mark. So...
19     (Whereupon, a discussion was held off the
20 record.)
21     BY MR. SILVERBERG:

Page 7

1  Q. Mr. Baxter, where do you work?
2  A. National Zoo, Smithsonian.
3  Q. And how long have you been there?
4  A. June 1st, 2004.
5  Q. And what is your job title?
6  A. It was head of graphics and exhibit
7  management.
8  Q. It was?
9  A. Well, basically I'm head of production.
10 Q. What's the title? Supervisory?
11 A. Supervisory exhibit specialist.
12 Q. Did your title change?
13 A. Official title is supervisory exhibit
14 specialist.
15 Q. What grade are you?
16 A. 12.
17 Q. What grade were you when you came on?
18 A. 12.
19 Q. What's your background? What jobs did
20 you have before?
21 A. I came down to Washington in '84 where I

Page 8

1  worked for design and production where I was an
2  exhibit detailer, which entailed detailing and
3  designing casework, cabinetry, interactives for
4  museums, natural history parks and a lot of other
5  items like that or institutions like that. I
6  stayed there for approximately four years.
7      Then I worked for the Sacler Freer
8  Galleries of Art where I was a design detailer.
9  The official title was documentation specialist
10 where I designed casework, worked with the cabinet
11 shop in so far as developing construction for
12 gallery layouts, casework, anything that was being
13 built and/or fabricated to go on display for cases.
14     And then I went to the Cleveland Museum
15 of Art where I was the head of design and
16 production.
17 Q. When was that?
18 A. That was in '97.
19 Q. Till when?
20 A. Till 2003.
21 Q. And you came down here for this job?

Page 9

1  A. Actually, I was out in Iowa working on a
2  project as head of production and installation out
3  in Des Moines Art Center and then I came here.
4  Q. Why did you apply for the federal
5  government? Why did you say you wanted to work
6  here?
7  A. Basically, I wanted to come back into the
8  Smithsonian, the zoo. The position was advertised
9  and it looked like a good fit. So, I decided to
10 apply for it.
11 Q. What's your education background? What's
12 your degree?
13 A. I have an B.A. in art.
14 Q. From?
15 A. California State College in southwestern
16 Pennsylvania.
17 Q. Only California would have a college in
18 Pennsylvania?
19 A. It's a small state university now named
20 after the local town which is California,
21 Pennsylvania.




Page 10

1  Q. That's sort of like Ohio in Miami?
2  A. Yes.
3  Q. When did you graduate?
4  A. I graduated from there in '81.
5  Q. What is your religion?
6  A. I'm a Baptist. I'm a christian.
7  Q. Practicing?
8  A. Yes.
9  Q. And do you know Lynn Dolnick and Kathleen
10 Samiy?
11 A. I know Lynn Dolnick. I've never met
12 Kathleen Samiy.
13 Q. How do you know Lynn Dolnick?
14 A. She was the person who hired me.
15 Q. Did you work under her?
16 A. She was there about a week to two weeks I
17 think when I came on.
18 Q. And what religion is she? Do you know?
19 A. I really don't know.
20 Q. Do you know what her ethnic background
21 is?

Page 11

1  A. No.
2  Q. How do you know Anthony Bowden, the
3  plaintiff?
4  A. He was one of the individuals that I
5  supervised when I first came on in '04.
6  Q. Do you still supervise him?
7  A. Yes.
8  Q. Now, were you aware that Mr. Bowden had
9  prior EEO activity?
10    MR. NEBEKER: Objection, vague as to
11 time.
12    THE DEPONENT: Pardon?
13    MR. NEBEKER: I have to make my
14 objections for the record, and I was objecting
15 vague as to time. You can answer if you
16 understand.
17    THE DEPONENT: Could you repeat the
18 question?
19    BY MR. SILVERBERG:
20 Q. Were you aware within a short time of
21 getting the job that Mr. Bowden had been involved

Page 12

1  in EEO activity, either litigation or anything like
2  that?
3     MR. NEBEKER: Same objection.
4     THE DEPONENT: I'm not sure when I first
5  became aware of it, but I do believe it was around
6  August.
7     BY MR. SILVERBERG:
8  Q. And when did you come on?
9  A. June.
10 Q. So, pretty soon. And what did you know
11 or what did you find out?
12 A. Actually, I think I was responding to
13 some questionnaires that were put to me. I'm not
14 even sure what they're technically called.
15 Q. Questionnaires put to you by whom?
16 A. I believe it was a Mr. Jackson.
17 Q. Was he an EEO investigator?
18 A. Yes, I do believe.
19 Q. So, you were aware Mr. Bowden was filing
20 a complaint?
21    MR. NEBEKER: Objection, vague as to

Page 13

1  time.
2     BY MR. SILVERBERG:
3  Q. No. He said August.
4  A. I think it was August or September.
5  Q. 2000?
6  A. I think it was 2004.
7  Q. Were you aware he had filed a complaint
8  or at least had gone for EEO counseling?
9  A. At that point, yes.
10 Q. And so, August of 2004?
11 A. It was either August or September. I
12 don't have the paperwork in front of me. So...
13 Q. Were you aware of what he had alleged,
14 what kind of discrimination?
15 A. Not fully.
16 Q. What were you aware of?
17 A. He just felt that there was
18 discrimination and harassment.
19 Q. What kind of discrimination did you know
20 he was alleging? Race? Sex?
21 A. I think it was all listed as one. It was

Page 110

1  the record. Give us a formal request and we'll
2  respond to your request.
3       BY MR. SILVERBERG:
4    Q. Let's move on.
5       (Baxter Deposition Exhibit Number 14,
6  Sherod Magman's affidavit, for identification.)
7       (Baxter Deposition Exhibit Number 15,
8  Ernest Robinson's affidavit, for identification.)
9       BY MR. SILVERBERG:
10   Q. Before we get to those, do you ever
11 remember, do you remember using the phrase you
12 people in the workplace?
13      MR. NEBEKER: Objection, vague.
14      THE DEPONENT: I remember the situation.
15 I don't know if I specifically said you people, but
16 I said you people in general. I don't know how it
17 came out. It was in a meeting where a lot of
18 people were talking over each other.
19      BY MR. SILVERBERG:
20   Q. Did Tony come to welcome you your first
21 week and you told him you've got to learn to trust

Page 111

1  you people?
2    A. I said people have to learn to trust each
3  other. You don't just give it. It's something
4  that has to be earned.
5    Q. But did you say you have to learn to
6  trust you people?
7    A. I --
8    Q. If you don't know, if you don't remember?
9    A. I don't know. I don't remember the
10 conversation.
11   Q. Don't say you don't know if you don't
12 remember.
13   A. I remember the conversations afterwards
14 of it being said that I said it, but I do not
15 remember specifically saying it.
16   Q. Do you remember talking to Tony in the
17 lower shop about how the shop needed to be set up
18 and using the phrase you people?
19   A. Where is that on here?
20   Q. We're nowhere on here yet.
21   A. I do not remember that.

Page 112

1    Q. Do you remember a meeting held between
2  you, Chuck Fillah, Ernest Robinson and Tony
3  discussing allegations of unfair treatment of
4  blacks and you using the phrase you people?
5    A. I remember having the meeting, and I
6  remember there was a lot of conversation over top
7  of each other and myself being accused of saying
8  it. I'm not sure how it came out of my -- what
9  came out of my mouth.
10   Q. Do you remember saying, saying I need to
11 learn to trust you people?
12   A. I'm trying to be very careful in how I
13 answer.
14   Q. I know.
15   A. Because what I was trying to say was
16 people only trust up to a point but trust has to be
17 something that is earned and I wanted to earn my
18 staff's trust.
19   Q. You know that some of the black
20 employees, or the black employees who heard that
21 took that as a derogatory term referring to blacks

Page 113

1  as you people?
2       MR. NEBEKER: Objection, misstates his
3  testimony.
4       BY MR. SILVERBERG:
5    Q. No. I'm asking him is he aware of how
6  the black employees interpreted what you said,
7  whatever you said?
8    A. If I had said that that was not the
9  intention of what I said.
10   Q. But you may have said it? It may have
11 came out wrong?
12   A. I don't know what came out.
13   Q. In another meeting again the way, it was
14 discussed the unfair ways black staff members were
15 treated with your supervisor Chuck Fillah, the
16 ombudsman representative Shondra Heilman, Sherod
17 Magman and Ernest Robinson, did you say you people
18 have to earn my trust?
19   A. I don't remember.
20   Q. Well, let's look at B-14, Sherod Magman.
21 First of all, Number 3 says Complainant maintains

Page 118

1  the question.
2      BY MR. SILVERBERG:
3      Q. Do you disagree with what he's saying
4  here?
5      MR. NEBEKER: Same objection.
6      BY MR. SILVERBERG:
7      Q. Mr. Robinson is saying you said you
8  people at least twice.
9      MR. NEBEKER: Same objection.
10     THE DEPONENT: And what I've said is I
11  don't remember exactly what I said at the time of
12  the meeting. I do remember the essence of what I
13  was trying to say was somebody doesn't get, just
14  automatically give blind trust to people. You have
15  to earn it.
16     BY MR. SILVERBERG:
17     Q. Do you remember telling Mr. Bowden when
18  he told you he was uncomfortable with that phrase
19  that he could use those words if he wants to?
20     A. Say that again. I'm sorry.
21     Q. Do you remember telling Mr. Bowden that

Page 119

1  you could use that phrase if you wanted to, you
2  people.
3      MR. NEBEKER: Objection. I'm confused by
4  the question.
5      BY MR. SILVERBERG:
6      Q. Do you remember Mr. Bowden telling you he
7  was uncomfortable with the phrase and you said you
8  could use that phrase if you wanted to?
9      MR. NEBEKER: Objection, compound.
10     THE DEPONENT: I'm still not
11  understanding your question. Is it that he could
12  use that phrase or?
13     BY MR. SILVERBERG:
14     Q. That you can use it if you want to, you,
15  Mr. Baxter.
16     A. I don't remember saying anything of that
17  nature.
18     Q. Well, you've got three black employees
19  saying you used the term you people and said I have
20  to learn to trust you people. Are you saying
21  they're all inaccurate?

Page 120

1      MR. NEBEKER: Objection to the form of
2  the question.
3      THE DEPONENT: No, I'm not saying they're
4  all inaccurate. I said I don't remember saying it.
5  And if whatever I said was not referring to African
6  Americans. It may have been referring to the staff
7  that I'm supervising.
8      (Baxter Deposition Exhibit Number 16,
9  Document regarding meeting of 10/14/05, for
10  identification.)
11     BY MR. SILVERBERG:
12     Q. This is referring to a meeting of
13  10/14/05. In the middle it says topics discussed,
14  work coordination, inclusiveness in work, also
15  includes fair and respectful work environment. Do
16  you remember this meeting?
17     A. Yes, I do believe this is the one that
18  you're referring to that Ernie and Sherod were in.
19     Q. Now, Ernie, Sherod and Tony were all
20  three working for you?
21     A. Yes.

Page 121

1      Q. And they were one hundred percent the
2  black staff working for you. Right? There were no
3  other blacks working for you at that time?
4      MR. NEBEKER: Objection, vague.
5      THE DEPONENT: I had five people.
6      BY MR. SILVERBERG:
7      Q. And the other two were not black?
8      A. Correct.
9      Q. So, everybody who was black who worked
10  for you said you used the term you people at the
11  same incident.
12     A. Okay.
13     Q. Do you want to reconsider whether you
14  said it or not?
15     A. I said I don't remember saying it.
16     Q. Okay.
17     A. And if I could just clarify, what I was
18  saying is I don't remember saying it. I remember a
19  conversation where a number of people were talking
20  over top of each other and whatever may have come
21  out of my mouth may have been misheard,

Page 122

1  misinterpreted. It may have been chopped up. I
2  don't know.
3      Q. Did all three men approach you at a
4  different time later or together and were you
5  approached by them at all about this comment?
6      A. I don't remember.
7      Q. Weren't you by Mr. Bowden?
8      A. Yes, but you said all three of them.
9      Q. I did. Well, Mr. Bowden says at the time
10 they asked you to explain what you meant. Did you?
11     A. I do believe I tried to explain, but it
12 was not in any reference. I don't remember if in
13 fact how I said this, but I'm going to repeat what
14 I've said before. It was referring to people don't
15 just automatically trust people. It takes time.
16 It has to be earned and developed.
17     Q. Did you think after the incident, after
18 they asked you what it meant?
19     A. That whatever I said was possibly
20 misconstrued?
21     Q. Yes.

Page 123

1      A. Yes, and I tried clarifying or explaining
2  what I was saying.
3      Q. Did you realize that they may have taken
4  it as a racist comment?
5          MR. NEBEKER: Objection, calls for him to
6  get into someone else's mind.
7          THE DEPONENT: I don't know. I didn't
8  think about it. I didn't think at the time when
9  they brought it up to me, yes.
10         BY MR. SILVERBERG:
11     Q. So, were you concerned afterwards you may
12 have damaged work relationships over something as
13 explosive, because of an explosive issue of race,
14 that you may have inadvertently damaged work
15 relationships because the issue of race came up?
16         MR. NEBEKER: Same objection.
17         BY MR. SILVERBERG:
18     Q. Let me rephrase that. I don't even know
19 what I said. Were you feeling afterwards that you
20 may have damaged work relations because the
21 employees took your comments to be racial comments

Page 124

1  even if you didn't mean it that way?
2      A. It was possible, yes.
3      Q. Were you particularly worried like this
4  is serious?
5      A. I don't phrases or comments that my staff
6  say lightly because it does affect our day-to-day
7  operation and how we work together.
8      Q. But were you --
9      A. I was concerned that it would hurt how we
10 would work together if I was misunderstood.
11     Q. Were you particularly worried because it
12 involved race which obviously there's a long
13 history of discrimination intentions in our society
14 there. So, I mean, I don't have to explain this.
15 Were you particularly worried because it involved
16 race?
17     A. It was not only that, but it also
18 involved just being misunderstood and not being
19 understood.
20     Q. Well, Mr. Bowden says you used the term
21 four times. Is that accurate or you don't

Page 125

1  remember? To him.
2      A. I don't remember.
3      Q. Well, did you, you didn't think to
4  yourself -- I'm asking what you thought to
5  yourself.
6      A. Yes.
7      Q. That it was a problem with communication
8  that worried you, but also it was charged because
9  it was about race?
10     A. Yes.
11     Q. You're aware that if people are accusing
12 you of discrimination it's a serious accusation
13 that can impact your career. Right?
14         MR. NEBEKER: Objection, argumentative.
15         BY MR. SILVERBERG:
16     Q. So, what did you do to repair it?
17         MR. NEBEKER: Objection.
18         BY MR. SILVERBERG:
19     Q. Let me ask you something else. Your
20 information is, to your knowledge these three men
21 thought you meant, said certain racial terms. Is

Page 134

1    A.  We were looking at the one area of
2  turning that back into an office area.  I think
3  that was an office area at one time.
4    Q.  And why were you trying to relocate his
5  office space?
6    A.  Well, basically one of the lines of logic
7  behind it was when we were relocating production
8  downstairs I didn't want all of production to be
9  lost in so far as having input onto projects going
10 on around in the design department.  So, by having
11 a production representative still up in that area
12 it would allow to have more input.
13   Q.  So, were you giving yourself more space?
14   A.  No.  I was still in the same office where
15 I'm at now, but it was just having another
16 production person there.
17   Q.  Were you planning on relocating any other
18 staff member besides Tony?
19   A.  All the production staff were being
20 relocated at that point.
21   Q.  Do you remember directing Mr. Bowden to

Page 135

1  work in the lower shop which was very cold where
2  the temperature was about 14 degrees?
3    MR. NEBEKER:  Objection, vague.  You mean
4  on a given day or permanently?
5    BY MR. SILVERBERG:
6    Q.  I'll give you the day.  January 24th,
7  2005.
8    A.  I don't believe the temperature in the
9  shop ever got to 14 degrees.  I believe the coldest
10 that I remember it getting was 52.  We could
11 actually check with the people next door because
12 the walls are open at FONZ who worked down there
13 year round.  We were looking at a project down
14 there and I wanted to make sure that Mr. Bowden had
15 the information to do it.  So, I wanted to go down
16 there and look at it.  When he was able to do it or
17 where he needed to be able to do the project.  I do
18 believe it was for a shot box for a weight finding
19 box, a shot box is unit to hold weights.
20   (Baxter Deposition Exhibit Number 17,
21 E-mail dated 1/24/05, for identification.)

Page 136

1    BY MR. SILVERBERG:
2    Q.  Do you remember this e-mail to you from
3  Anthony Bowden dated 1/24/05?  First of all, do you
4  remember this e-mail?
5    A.  I do.
6    Q.  Do you recall the third paragraph that
7  says am I the only one being requested to work in
8  the lower shop at this time when there's very
9  little if any heat.  In fact, the outside
10 temperature was only 14 degrees yesterday morning.
11 In case you haven't noticed, singling me out to
12 work in a cold and unsafe environment can be
13 perceived as retaliation and harassment for my
14 ongoing complaint.  I have documented health
15 issues, et cetera.  Well, he also mentions working
16 in a cold and damp environment can only aggravate
17 his health problems with his knees and back.
18     Are you denying that it was cold down
19 there, very cold?
20   A.  No.
21     MR. NEBEKER:  Objection to the

Page 137

1  juxtaposition of your question to the extent that
2  you're intending your question to incorporate the
3  entire document, but I don't object to the answer
4  of just that question.
5    BY MR. SILVERBERG:
6    Q.  Do you agree with Mr. Bowden's statement
7  here that it was a cold and unsafe environment?
8    A.  I believe it was a cold environment.  It
9  was inside 52 degrees.
10   Q.  There's a big difference between 52
11 degrees and 14 degrees.
12   A.  Correct.
13   Q.  You believe Mr. Bowden is totally
14 inaccurate?
15   A.  No, because he's saying an outside
16 temperature.
17   Q.  But he's still saying it's very cold
18 there.
19   A.  It was cold in the shop, yes.
20   Q.  Was there any heat?
21   A.  The heater directly over our area was in,

35 (Pages 134 to 137)

Page 138

1  had a work ticket in for repair, but we were
2  getting supplemental heat over from FONZ.
3     Q. Was that supplemental heat working
4  adequately?
5     A. They were down there working all the time
6  in the warehouse.
7     Q. Well, was the heat adequate? Was it able
8  to heat up the whole area?
9       MR. NEBEKER: Objection, vague.
10       THE DEPONENT: Like I said the
11  temperature in that area from my understanding was
12  about 52 degrees at the coldest. I would open up
13  the shops in the morning when I first come in which
14  was probably about the coldest part of the day.
15       BY MR. SILVERBERG:
16     Q. Do you think it's logical that Mr. Bowden
17  would say it was so cold if it was 52 degrees? Let
18  me cut to the chase here. Okay? Let's try
19  something new. Let's get to the truth.
20       Mr. Bowden's saying it's very cold,
21  certainly not 52 degrees, that it's real cold and

Page 139

1  unsafe and damp. Do you disagree with his
2  perceptions?
3     A. His perception is that the shop was cold.
4  Yes, it was cold. Did I want to show him a project
5  and get him the information? Yes. Was there other
6  avenues for doing the work as in going down to the
7  OFEO shops and working down there to cut the
8  required materials? That was an option that was
9  open.
10     Q. He told you he thought it was cold.
11  Correct?
12     A. Yes.
13     Q. Why did you insist on sending him down
14  there?
15     A. I didn't. I went down to show him
16  specific work tasks that I needed him to have the
17  information so when he did do the project he would
18  have the information at hand because I wasn't going
19  to be around all that day. And when he did the
20  project I didn't specify that. I was hoping to get
21  it done that day or very soon.

Page 140

1     Q. So you wanted --
2     A. And he's not the only person who I have
3  required to go down in the shop. Other people --
4     Q. Well, funny you should mention that.
5     A. All the staff had to go down at some
6  point.
7       (Baxter Deposition Exhibit Number 18,
8  E-mail dated 1/25/05, for identification.)
9       BY MR. SILVERBERG:
10     Q. This is an e-mail from him to you dated
11  the next day, January 25th, '05. And he says in
12  the second paragraph at the end you told me that
13  Grace -- I assume Grace Lopez -- would be required
14  to work in the lower shop but that you were not
15  going to send her down until you got some heat in
16  there. Do you remember telling him that?
17     A. I don't believe that's the way the
18  conversation went. Grace -- the project that I'm
19  remember was there was some waste finding panels
20  that needed to be fabricated. Grace came to me and
21  said I have these other projects. I'd like to get

Page 141

1  these done first. So, she was setting a priority,
2  and I said I have no problem with it. In fact, it
3  will probably be a little bit warmer later on. I
4  said we can set some tables up for you down there
5  and you can work on the panels down there. And
6  then she actually came to me later on and specified
7  that she figured a way out to being able to do the
8  work she needed to get done up in the upper shop.
9     Q. So, did you send her down to the lower
10  shop when it was cold?
11     A. She figured another way of doing it
12  without having to go down to the lower shop.
13     Q. So, she did not go to the lower shop?
14     A. She did not.
15     Q. When it was cold in this incident?
16     A. In this incident she figured another way
17  of doing it, as Mr. Bowden could have taken the
18  materials down to the OFEO shop and cut them down
19  there and assembled them down there at a later
20  time.
21     Q. Didn't you just testify you were hoping

36 (Pages 138 to 141)

Page 154

1   Q. Have you seen this police statement
2  before?
3   A. Not Ernie's, no.
4   Q. Whose police statement had you seen
5  before?
6   A. Mine.
7   Q. Yours? Wait a minute. You're saying --
8  I really, seriously I'm confused. You're saying
9  you weren't there when Elena Lopez was accused of
10 assault. Is this a second incident?
11  A. This is the one I was talking with Tony
12 on. Tony had informed me that there were earlier
13 incidences. That's what I'm saying I wasn't
14 supervisor for. In this instance right here of
15 assault Tony and I were actually having a
16 conversation.
17  Q. Wasn't this the incident where him and
18 his fiancee?
19  A. I'm confusing them then, yes.
20  Q. I really want -- did you tell Mr. Bowden
21 in response to this because you didn't see it you

Page 155

1  can't do anything?
2   A. I thought I was responding to the earlier
3  ones that he said it was ongoing.
4   Q. We accept.
5   A. Now, I did present a statement in regards
6  to the one that happened I think it's the same time
7  as this one where she was carrying a number of
8  cakes for a bridal shower. Tony and I were going
9  over a work ticket and we were looking at the work
10 ticket and each other, and I do believe somebody
11 walked by and then Tony looked at me. I
12 immediately looked over to see who walked past him,
13 and it was Elena and by Tony's expression I knew
14 that she must have bumped into him.
15  Q. Now, Mr. Robinson says in here I noticed
16 that she had rammed, rammed into Anthony Bowden. I
17 approached Elena after she apologized to Tony for
18 ramming into him. Was this incident reported to
19 you?
20  MR. NEBEKER: I'm sorry. I'm going to
21 object because I don't know which one you mean.

Page 156

1   BY MR. SILVERBERG:
2   Q. The incident described in the 5/23/05
3  police report saying that Elena had rammed into
4  Tony.
5   MR. NEBEKER: I don't understand your
6  question. He's never seen this.
7   THE DEPONENT: I haven't seen this.
8   BY MR. SILVERBERG:
9   Q. But did you know about the incident?
10  A. I knew about the incident because I was
11 there. Tony was facing --
12  Q. You saw the incident?
13  A. No. Let me explain. We had our exhibit
14 staff meeting. At the end of the exhibit staff
15 meeting I asked Tony to come over because I had
16 some work tickets I wanted to go over with him very
17 quickly. I'm sitting down in a chair. Tony is
18 facing me and bending over and looking at the work
19 ticket. I'm looking at the work ticket and then
20 back up at Tony. Somebody walked by behind Tony.
21 Tony looked up at me. I looked over to see who was

Page 157

1  behind him. It was Elena Lopez. Basically, the
2  only way I knew that there was contact was Tony
3  looking up at me.
4   Q. Did Tony tell you what had happened?
5   A. He said that she had bumped into him.
6   Q. Did he say it like that?
7   A. I don't know the exact words he said.
8  What I do remember is I'd have to go back and look
9  at my statement and realizing that something had
10 occurred I immediately made a phone call to Elena's
11 first line supervisor, typed up what I had
12 witnessed as clearly as I could, went to a meeting,
13 took a copy of that because I knew Chuck Fillah was
14 going to be in that meeting. By the time I came
15 back I think I had an e-mail from Tony on this or a
16 voice mail. I'm not sure which it was at that
17 point.
18  Q. What was Mr. Bowden alleging?
19  A. Assault.
20  Q. Did he go to the police with it?
21  A. When he used the word assault basically

40 (Pages 154 to 157)

Page 218

BY MR. SILVERBERG:
1  Q. Well, that he called you and left a voice
mail and you came by 10 to 15 minutes later towards
him and also Mr. Magman who were working on it, and
in a very loud and unpleasant voice questioned him
what he was doing at the panda house and yelled at
him in front of zoo visitors?
   MR. NEBEKER: Objection, compound.
   BY MR. SILVERBERG:
   Q. Are you aware that he alleges there is an
incident where you yelled at him in front of zoo
visitors?
   A. Yes.
   Q. And what is your position on that?
   MR. NEBEKER: Objection, vague.
   BY MR. SILVERBERG:
   Q. Do you disagree with him that you yelled
or criticized him in front of visitors?
   MR. NEBEKER: Objection, compound.
   BY MR. SILVERBERG:
   Q. Let me start again. Was there an

Page 219

incident where you yelled at Tony on or about
August 19th, 2005 in front of visitors at the zoo?
   A. There was an incident where I was upset
about something. There was a work ticket that went
out to hang three signs, posters at the panda pen.
I had given verbal instructions or I do believe
verbal instructions or written that I wanted to be
notified when they were going up because there was
something about the hanging that I wanted to look
at because it was attaching it to a fence. When I
went down to the shop I asked Grace where Tony and
Sherod were, and she specified or said that they
had gone up to hang the signs, posters which I had
asked to be called before they went up so nobody's
waiting around. On my way up I got a phone call
saying that we're up here trying to hang the
posters but we have some questions.
   Again, I specified that I wanted to be
called before they went up there so nobody was
waiting. By his statement he was waiting around 10
to 15 minutes. When I got up there I was probably

Page 220

more animated than I usually am and I felt that I
did not -- I conducted myself professionally,
but probably not as professionally as I would have
liked to do.
   Q. Did you raise your voice?
   A. I was somewhat animated.
   Q. Did you raise your voice?
   A. I don't know. I can't perceive how much
I raised it or not.
   Q. Did you criticize the men in front of
visitors at the zoo?
   A. I don't know if there were visitors
around at that time.
   Q. There might have been?
   A. I don't know. I basically asked them why
they didn't call me when they were going up and
that way we could have looked at it and resolved it
because I wanted to look at the placement, the
positioning and the mounting bracket.
   Q. Why were you so upset?
   A. Because I had specifically asked to be

Page 221

notified before they go up so that nobody's
waiting, because a lot of times -- I don't like it
when people are waiting on me. If I'm in a meeting
or if I can't get to them then basically people are
standing around, and I really didn't want them just
burning up their time because they have a lot of
things on their palettes to do.
   Q. Weren't they just coming to you with
questions though?
   A. I had asked specifically to be notified
though.
   Q. So, do the employees have a right to go
out and check out the job to see how it's going to
be done?
   MR. NEBEKER: Objection, vague.
   THE DEPONENT: Yes, but I had
specifically said when you go up there please give
me a call so nobody's waiting around. And I don't
normally do that, but in this instance I had
specified it.
   BY MR. SILVERBERG:

56 (Pages 218 to 221)

Page 230

1  A. I don't know, not to my knowledge because
2  literally I have put it, tried to put it out of my
3  mind as I will put it out of my mind come Monday
4  morning.
5  Q. Do you resent Mr. Bowden for having made
6  these allegations?
7  A. No.
8  Q. Do you typically answer Mr. Bowden's
9  e-mails?
10  A. I try to. A lot of times we're under
11  staffed. So, I'm trying to get a lot of stuff
12  done, and I may not get back to any of my e-mails
13  as promptly as I should.
14      MR. SILVERBERG: I think we're done. Do
15  you have anything?
16      EXAMINATION BY MR. NEBEKER:
17  Q. Just wanted to know if you ever treated
18  your coworkers in a racially discriminatory manner?
19  A. Not to my knowledge, no.
20      MR. NEBEKER: Nothing further.
21      MR. SILVERBERG: Thank you.

Page 231

1      (Whereupon, the deposition was adjourned
2  at 4:51 p.m.)

Page 232

1  District of Columbia, to wit:
2      I, Stacey L. Daywalt, a Notary Public of
3  the District of Columbia, do hereby certify that
4  the within-named witness personally appeared before
5  me at the time and place herein set out, and after
6  having been duly sworn by me, according to law, was
7  examined by Counsel.
8      I further certify that the examination
9  was recorded stenographically by me and this
10  transcript is a true record of the proceedings.
11      I further certify that I am not of
12  counsel to any of the parties, nor an employee
13  of counsel, nor related to any of the parties, nor
14  in any way interested in the outcome of this
15  action.
16      As witness my hand and Notarial Seal
17  this 17th day of October, 2007.
18
19  _____
20      Stacey L. Daywalt, Notary Public
21  My Commission Expires:  11/14/2010.

Page 233

1  AL BETZ & ASSOCIATES, INC.
2      Administrative Offices
3      P.O. Box 665
4      Westminster, Maryland 21158
5  VOICE - (410)752-1733  FAX - (410)875-2857
6  e-mail- productiondept@albetzreporting.com
7      www.albetzreporting.com
8
9  DATE: October 19, 2007
10  JOB NUMBER: SD25894B
11  CASE CAPTION: ANTHONY BOWDEN vs. LAWRENCE S. SMALL
12  COURT: U.S. District Court
13  CASE NUMBER: 05-2022
14  DEPONENT: JEFF BAXTER
15  DATE OF DEPOSITION: September 28, 2007
16  ATTORNEYS/FIRMS:
17  STEVEN SILVERBERG, ESQUIRE
18  MARK NEBEKER, ESQUIRE
19  Federal District Attorney's Office

59 (Pages 230 to 233)

Al Betz & Associates, Inc.
www.albetzreporting.com