# PLAINTIFF'S EXHIBIT 13

Report of Investigation, Case No. 04-16-080604--Affidavit of Melissa Gaulding, Tab 14

# AFFIDAVIT

City of: Washington )
)
)
)
District of: Columbia )

I, Melissa Gaulding, am being first duly sworn on oath make the following statement freely and voluntarily to James S. Gee who has identified himself to me as an investigator assigned by the Smithsonian Institution to perform this investigation, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any party who has an official interest.

This affidavit is given in relation to the complaint of discrimination filed by Anthony Bowden, on August 6, 2004, SI Case NO.: 04-16-0080604.

Q. What is the name of the agency for which you worked the organizational unit to which you were assigned and the address of your duty station at the time of the alleged discrimination (October 2003 to May 2004)?

A. Smithsonian Institution, National Zoological Park, Office of Exhibits, General Services Building

Q. What were your position title, series and grade at the time of the alleged discrimination? How long did you hold this position?

A. Interpretive Information Specialist, GS 1001-11 for ten years

Q. During this period, who were your immediate and second-level supervisors?

A. Kathleen Samiy and Lynn Dolnick

Q. How long had you been employed by the Smithsonian Institution? What positions have you held over the past 10 years?

A. Employed by SI since 1981; same position for ten years (see above)

Q. Do you have a mental or physical disability that substantially impacts a major life activity; if so, what is your disability claim?

A. No

Q. What are your race, color, sex and religion?

A. Caucasian, white, female, none

Q Please indicate whether you have ever been involved in any prior EEO activity and describe the nature of your involvement (e.g., sought counseling, filed formal complaint, participated as witness, identified as responsible official).

A. None

Q. Did you know Anthony Bowden, the Complainant? If so, for how long and in what capacity did you know him?

A. Yes, we worked in the same office, sometimes jointly on projects, ever since he came to the Zoo—I do not recall what year that was.

Q. To your knowledge, did Mr. Bowden engage in any formal or informal EEO activity? If so please explain what you understood about his EEO activity, and when and how you became aware of it.

A. I was aware that Mr. Bowden had come to the Zoo as part of an EEO complaint resolution in his job at the National Museum of Natural History; I was aware of this situation when Lynn Dolnick asked me to find out what I could, by contacting coworkers at that museum, about why he was being transferred to our office, and what specifically was the nature of his complaint.

Q. To your knowledge did Mr. Bowden have a mental or physical disability that substantially impacts a major life activity, if so, what was his disability?

A. I am aware that Mr. Bowden is treated by a doctor and takes medication for anxiety brought on by his treatment by coworkers at the National Museum of Natural History.

1. **Complainant alleges that he was discriminated against based on race, color, sex, religion and/or disability and/or reprisal, when from October 2003 to the present; he has been subjected to discrimination which created a hostile work environment.**

Q. Explain what knowledge you have of the circumstances surrounding this allegation, your awareness of what transpired—why and how events unfolded.

A. I left the National Zoo employ as of 31 October 2003, so I am not aware in detail of specific events involving Mr. Bowden; however, the office was managed so badly that I am not surprised to hear of this complaint. Lynn Dolnick created an atmosphere of secrecy, suspicion, blame, repercussion, and reprisal, and she pitted us against each other in such heinous ways, that Mr. Bowden's complaint is totally plausible to me.

Q. Did you or someone else you know, experience similar treatment? If so, when and what were the circumstances? Please elaborate.

Initials

A. I myself certainly experienced a hostile work environment—it was my reason for leaving after 20+ years of service! My front-line supervisor, Kathleen Samiy, used intimidation tactics on me that were most unpleasant; if I asked her too many questions, attempting to gain clarity of an assignment, she would slam notebooks on her desk with great force. If I disagreed with an approach to an assignment, she would tell me the meeting was over and dismiss me from her office; and once, she backed me up into a corner behind my desk, bristling with anger, over my not offering public congratulations in a staff meeting when Ms. Samiy hired a friend for a permanent position.

2. **Complainant alleges that he was discriminated against based on race, color, sex, religion and/or disability and/or reprisal, when on April 22, 2004 he was informed that he was not selected for the position of Supervisory Exhibits Specialist, Vacancy Announcement No. 04SO-1005.**

Q. What knowledge do you have of the selection process for the position of Supervisory Exhibits Specialist, Vacancy Announcement No. 04SO-10051? Please explain if you were involved and what actions you took.

A. None

Q. What knowledge do you have that bears directly on the nonselection of the Complainant for the position in question? Please elaborate.

A. None

Q. Do you believe that the Complainant was discriminated against on the basis of race, color, sex, religion and/or disability and/or reprisal when he was not selected for the Supervisory Exhibits Specialist position? Explain.

A. Yes, I do. Mr. Bowden had been doing the work described in the position description prior to the job announcement, without any credit or remuneration. It is my belief that, because he questioned, as inappropriate or wasteful, processes and procedures put into place by Ms. Samiy, he was not considered for the job.

3. **The Complainant alleges that he was discriminated against based on race, color, sex, religion and/or disability and/or reprisal, when in or around May 2004, he received a "Fully Successful" performance rating.**

Q. What knowledge do you have of the process, procedures and outcomes in the official performance evaluation in question?

A. I know that under his previous supervisor Mr. Bowden had gotten "Outstanding" appraisals, and that under Ms. Samiy, he went down two rating categories with no notice that his performance was changing.

Initials

Q. To the best of your knowledge, were normal operating procedures adhered to in conducting the evaluation?

A. I cannot address specifics in Mr. Bowden's case, but from my own experiences and observations in that office, normal operating procedures rarely applied to performance plans or appraisals. My own were handled most irregularly, and I would not be surprised that Mr. Bowden's appraisals were also handled poorly.

Q. Do you have any information bearing on the fairness of the official performance evaluations of Mr. Bowden, compared to those of similarly situated employees? Explain how they were the same or different.

A. I can only reply that those of us who spoke out about irregular procedures, financial waste, project mismanagement, and biased treatment of employees under Ms. Samiy's supervision were punished in various ways. "Fairness" is not a word I associate with supervisory action in that office at the time I left.

Q. What was Mr. Bowden's official rating for the evaluation period in question? To your knowledge, was lowering his performance ratings for the period in question from his ratings of prior periods justified?

A. Mr. Bowden was shocked and dismayed to receive a "Fully Successful." He had not been told that his performance was flagging, or that he would be getting a lower rating. In my observations, he appeared to be working even harder than when he received an "Outstanding" rating under his previous supervisor. I do not believe he deserved a lower rating, but rather, he got a lower rating because he was "rocking the boat" on issues of mismanagement in the office.

Q. Do you believe that the Complainant was discriminated against on the bases of race, color, sex, religion and/or disability and/or reprisal when he was rated fully successful for the performance evaluation period in question? Please explain.

A. Yes, I do. Based on my own experiences in the office, Kathleen Samiy used a variety of unpleasant tactics to squelch any questioning of her decisions or abilities. Mr. Bowden often took the lead on asking why projects were being handled in unproductive and wasteful ways, and I believe his lower performance rating was one way he was punished for speaking out.

4. **The Complainant allege that he was discriminated against based on race, color, sex, religion and/or disability and/or reprisal, because his position description does not accurately reflect the number and level of the duties he performs.**

Q To your knowledge does the Complainant's position description (PD) accurately reflect the number and level of the duties he performs? If not, please explain when and how you were

Initials [signature]

        made aware of the differences between his PD and the duties he performs and if, to your knowledge, this practice conforms to Smithsonian policies and rules.

A. I cannot speak directly to this question in regard to Mr. Bowden. I can say that in that office, performance plans and appraisals rarely followed Smithsonian policies and rules. I myself often went without appraisals for years, and my appraisals were not filed in my permanent folder with Human Resources. I typically worked without a performance plan on projects at the whim of my supervisor. Frequently, I was given work beneath my abilities, while worthwhile projects went to those with less experience than mine.

Q. Is the congruency between the Complainants's PD and the duties he performs unique or do other, similarly situated, employees have duties that are outside of those set forth in their PDs. If so, who are they, what are the differences between their PDs and the duties they perform, their race, color, sex, religion, disability status and whether they have been involved in EEO activities.

A. I can only address this question from my own experiences, and say that I believe my experiences were also those of Mr. Bowden and a number of other employees in that office. I had not had an updated performance plan under Ms. Dolnick for several years, and when I was transferred to Ms. Samiy's supervision, I insisted upon a new plan. The best Ms. Samiy could come up with was a job description, and when I attempted to express that fact, she used a number of intimidation tactics to dissuade me from pursuing having a clearer plan. When I expressed the observation that my tasks were not measurable, and I would like her to express how she intended to measure the tasks, she slammed a clipboard on her desk with such intensity that her pencils all rolled to the floor! When I asked in several meetings for clarity on job assignments, she became belligerent and exclaimed that our meeting was over. And I felt coerced into signing off on an unsatisfactory work plan when she told me that my reluctance to sign meant that I wanted to sabotage her job success.

Q Is there anything more you wish to add to your statement? If so, please explain.

A. I sincerely believe that management in the Office of Exhibits was deeply biased. Management perceived knowledgeable employees as a threat. Jobs that required physical exertion were given to men (even in situations where women had the same physical requirements in their jobs), and specifically African American men—and often these jobs were not related to projects, but things like moving furniture in a supervisor's office. Favored employees—typically those who socialized with Lynn Dolnick outside of the workplace and did not question her decisions within the workplace—were assigned to the most high-profile projects. Even though the staff members heard repeatedly in meetings that no promotions were possible, favored employees received "secret," unannounced promotions. Favored employees were judged much less harshly on job quality, even when the work was observably inferior. And the expertise and opinions of men in the office were routinely ignored and dismissed in favor of outside contractors or other Zoo employees, with no adequate explanation that I ever observed. Based on all or the above, I do not find Mr. Bowden's complaint at all hard to believe.

Initials

I have read this statement consisting of ____ pages and I have made all necessary corrections and additions, and have initialed every page.

I hereby declare under penalty of perjury that the forgoing statement is true, correct, and complete to the best of my knowledge and belief.

Signature of Affiant: <underline> [signature]

Date: 1/25/05

Subscribed and sworn to before me this 25th day of January, 2005:

[signature]

Signature of EEO Investigator or Notary Public

Initials [initials]