# PLAINTIFF'S EXHIBIT 19

Ferster Deposition Excerpts--pp. 13, 17, 19, 21-2, 55, 69-70, 98, 107,134,141-42,144-51, 155-60, 163, 169-70, 172-73,176

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
ANTHONY BOWDEN,              :
         Plaintiff,          :
                             :
    v.                       : Civil Action No.
                             : 05-2202(RBW)
CHRISTIAN SAMPER, Secretary, :
Smithsonian Institution,     :
                             :
         Defendant.          :
- - - - - - - - - - - - - - - x

                    Washington, D.C.
                    Monday, January 7, 2008

Deposition of
                AARON FERSTER
a witness of lawful age, taken on behalf of the
Defendant in the above-entitled action, before Cindy
Lee Fryer, CVR, Notary Public in and for the District
of Columbia, in the law offices of Assistant United
States Attorney, Civil Division, 555 4th Street, N.W.,
Washington, DC 20530, commencing at 12:09 p.m.
          Diversified Reporting Services, Inc.
                    (202) 467-9200

Page 2

APPEARANCES:

  On Behalf of the Plaintiff:
    STEVEN J. SILVERBERG, ESQUIRE
    900 17th Street, N.W.
    Suite 1250
    Washington, D.C. 20006
    (202) 785-8499

  On Behalf of the Defendant:
    W. MARK NEBEKER, ESQUIRE
    Assistant United States Attorney
    Civil Division
    555 4th Street, N.W.
    Washington, D.C. 20530
    (202) 514-7230

  On Behalf of the Smithsonian Institute:

    MILDRED GLOVER, ESQUIRE
    Associate General Counsel
    Smithsonian Institution
    Office of General Counsel
    Post Office Box 23286
    Washington, D.C. 20026-3286
    (202) 633-5097

Page 3

CONTENTS

EXAMINATION BY:                              PAGE

  Counsel for Defendant                       5
                                             89
  Counsel for Plaintiff                      140


FURTHER EXAMINATION BY:
  Counsel for Defendant                      179
                                             202

  Counsel for Plaintiff                      198
                                             203

Page 4

1  Second Amended Nature of the Claim
   (Complaint)                                18
2  Class Action Suit entered by Ernie
   Robinson, Aaron Fester, Anthony
   Bowden, Herman Krebs                       23
3  12/08/03 document to Herman from
   Kathleen                                   89
4  Affidavit of Aaron Fester                  91
5  Note to Mary Tanner from Bowden,
   Ferster, Krebs, Robinson (two pages)      105
6  01/13/04 e-mail from Mary Tanner to
   Anthony Bowden                            110
7  04/26/04 e-mail from Herman Krebs to
   Chandra Heilman                           112
8  05/27/04 e-mail to Alexander Beim
   from Herman Krebs                         114
9  06/03/04 e-mail to Dolph Sand from
   Anthony Bowden                            117
10 01/21/05 e-mail to Jeff Baxter from
   Anthony Bowden                            122

4 (Pages 13 to 16)

Page 13

1  efficiently. We didn't have a structure for tracking
2  jobs efficiently. It was -- we often -- you know, to
3  use an example of the first exhibit I worked on, which
4  was the prairie exhibit, I think some of the work that
5  we did has a pretty subjective nature to it. You know,
6  as a writer, you can write the same thought dozens of
7  different ways. And a lot of the inefficiency was who
8  had kind of the final call on what the final product
9  was.
10    Q  When you say "the final project," you mean
11  what the ultimate --
12    A  Right. What --
13    Q  -- exhibit looked like?
14    A  Exactly. What would be installed in the
15  exhibit that the zoo visitor would read, there was a
16  lot of inefficiency in coming to that final product.
17    Q  When -- by the way, when a contractor would be
18  hired, would the contractor be hired to perform
19  everything but the writing or would they just create
20  the sign and someone from the National Zoo would
21  install the sign?
22    A  It varied by project. Sometimes things

Page 14

1  weren't installed. Again, using the prairie exhibit as
2  an example, it was the first exhibit I worked on. I
3  think that was almost entirely installed by contractors
4  with close oversight by the project manager, who, at
5  that point, was Melissa Gaulding and Rick Hider, with
6  often a lot of input from exhibit specialists on staff
7  with the zoo.
8    Q  In terms of monitoring the signs that were
9  being -- the work getting the signs installed in the
10  exhibits, the end product, did -- does Dolnick ever
11  indicate to you or to the staff that she wanted to
12  improve the efficiency of the office?
13    A  Yes. I think she monitored the efficiency of
14  the office. I think part of the inefficiency was sort
15  of a disconnect between what she -- her -- what she
16  wanted to see installed and her hands off type of
17  management.
18    Q  She was a hands off manager?
19    A  Yeah. I mean from the writer's perspective,
20  again using the same example, the prairie exhibit, a
21  lot of the inefficiency came with that exhibit,
22  because, you know, I worked directly for Melissa

Page 15

1  Gaulding, who would approve them, and they would kind
2  of move up, and the curator would approve it. And then
3  when Ms. Dolnick would see it, she would want to see
4  things changed. So a lot of the inefficiency was kind
5  of a moving target.
6    Q  All right. She would be hands off until it
7  came for her approval, and then she would set you back
8  a few spaces, is that right?
9    A  Right.
10    Q  Okay. Did you get the sense that having some
11  sort of a computer system in place to try and see
12  projects go through the design stage to the
13  installation stage, did you see that as a valuable goal
14  to adopt such a computer model?
15    A  I think that that was a valuable goal. I will
16  say that we are a small enough shop. I think anything
17  that would have increased open communication, so again
18  we -- so that people knew that -- what the end
19  product -- knew what they were aiming for would work, I
20  think a computer system would have helped a lot. But
21  we were a small enough shop that we could also -- could
22  probably also be other ways to achieve that. And the

Page 16

1  reason I say that is because I know that, for example,
2  when Rick Hider was head of the -- sort of the
3  production end of things, he used a program, I think it
4  was File Maker, where he kept everything very well
5  organized. And I thought it was a pretty good system.
6  But it really -- you know, whatever computer program
7  worked would have been a help, but it certainly would
8  not have been able to replace meetings and clearer
9  goals and --
10    Q  If it's -- one advantage to having the
11  computer program have information is if Ms. Dolnick
12  couldn't make it to a meeting, she could check the
13  computer to see what the status of a particular project
14  was, correct?
15    A  Yes. I don't think any -- any system of
16  communication that would, you know, again, clear things
17  up and any ambiguity would have helped.
18    Q  Do you have any reason to believe it was
19  Dolnick's view that either File Maker or Quark Express
20  software was chosen by her as a valuable thing for the
21  office? Do you have any reason to believe that that
22  decision was based, in any way, on race or gender or

Page 17

1  religion or disability or prior activity of any of the
2  employees of the zoo?
3     A   No. No. I don't think -- no.
4     Q   Do you know what Quark Express is?
5     A   Yes.
6     Q   What is Quark Express?
7     A   Quark Express is a graphic design desktop
8  publishing software. So it's used for the layout, you
9  know, the --
10    Q   And is that a helpful piece of software to be
11 able to understand if you're running or working in the
12 exhibits office?
13    A   I think it is. It's a -- it's helpful to
14 know it, but I think -- it's a -- you know, it's a
15 tool. You know, I don't think you have to know
16 what -- you know, you'd have to know, for example, what
17 the capabilities are to use it, but I don't think a
18 manager needs to know how to -- you know, needs to
19 know, you know, basically what are we sending out to be
20 printed. I think it's a graphic design tool. I don't
21 know -- you know, I don't know that the head of the
22 office needs to know it that well.

Page 18

1     Q   Did you find it helpful if the office has a
2  general understanding of the equipment that you have
3  available to you and the software you have available to
4  you?
5     A   Yes.
6     Q   So let me show you what we'll mark as
7  Deposition Exhibit 1.
8     A   Okay.
9         MR. NEBEKER: And I'll ask the court reporter
10 if she could mark that and then let you have it back.
11            (Ferster Deposition Exhibit 1
12            was marked for
13            identification.)
14        BY MR. NEBEKER:
15    Q   Mr. Ferster, that's the second amended
16 complaint of employment discrimination and breach of
17 contract in Civil Action 05-2202; is that correct?
18    A   Yes.
19    Q   Okay. And did you have an opportunity to look
20 through this before your deposition today?
21    A   Yes.
22    Q   Okay. What I wanted to ask you is if you can

Page 19

1  provide us, having now familiarized yourself with the
2  allegations that Mr. Bowden is making in the case, with
3  any information that would support his claim that he
4  was the victim of race discrimination, discrimination
5  on account of his color or his sex or his religion or
6  his disability or for discrimination based on reprisal?
7  Now from you observed at the National Zoo during your
8  tenure there, can you provide us a -- our account for
9  us any evidence you believe would support any of those
10 claims made by Mr. Bowden?
11    A   The most immediate support that I could give
12 for that would be gender based, which is we had a
13 common supervisor in Kathleen Samiy, who -- whose
14 treatment of her employees, of the people she
15 supervised, broke out, I think clearly to me, on gender
16 lines.
17    Q   Would you say then that, in your view, you
18 believe that complaints that Mr. Bowden has would be
19 limited to gender based complaints with respect to how
20 he was treated at the agency?
21    A   I'm not sure that I'd say that they
22 were -- you know, I can only give the perspective -- my

Page 20

1  perspective as of right now in the department. And
2  I --
3     Q   Well, let me ask it this way: For instance,
4  did you ever hear anyone use any racial epithets to
5  describe any of the employees?
6     A   No. No.
7     Q   Okay. So that even though you're not
8  necessarily --
9     A   No. Absolutely.
10    Q   -- the same race as he, that would be an
11 example of the type of evidence that you might have
12 that would support him in those --
13    A   Right. Right.
14    Q   So let me see if we can -- we're going to get
15 back to the gender based assertions.
16    A   Okay.
17    Q   But then am I correct that you don't have any
18 knowledge of any facts that would support his claim of
19 race discrimination?
20    A   That's true.
21    Q   Okay. His claim that -- Mr. Bowden's claim
22 that -- let me start the question again. I'm sorry.

6 (Pages 21 to 24)

## Page 21

1  Am I correct that you had no facts to support a
2  conclusion that Mr. Bowden was the victim of
3  discrimination on the basis of his -- the color of his
4  skin?
5    A   That's true.
6    Q   Okay. And is it correct to say that you have
7  no facts to support a claim that Mr. Bowden has been
8  the victim of discrimination based upon his religion?
9    A   That's true.
10   Q   And is it safe to say that you have no facts
11 to support the conclusion that Mr. Bowden has been a
12 victim of discrimination based on any disability?
13   A   That's true.
14   Q   And is it safe to say -- well, is -- yeah. Is
15 it safe to say that Mr. Bowden -- you have no facts to
16 support the conclusion that Mr. Bowden was a victim of
17 reprisal?
18   A   No. I don't have any facts.
19   Q   Okay. So now let us go back, if we can, to
20 the area of gender discrimination.
21   A   Uh-huh.
22   Q   And, if I understand correctly, you believe

## Page 22

1  that you have witnessed facts that would support a
2  claim that Mr. Bowden was the victim of gender
3  discrimination, is that right?
4    A   Yes.
5    Q   Okay. And can you summarize for us what those
6  facts are that would support a conclusion that Mr.
7  Bowden was the victim of gender discrimination?
8    A   Our supervisor was much more confrontational
9  with the men that she supervised then with the women
10 that she supervised. She also was intolerant of any
11 dissent that -- particularly publicly that -- in a
12 staff meeting, with other employees around, if -- of
13 anything that she perceived as dissent, a different
14 opinion, anything other than complete -- short of
15 almost complete agreement. She made it clear that that
16 she would not tolerate questioning her judgment, her
17 authority.
18   Q   And this was Ms. Samiy you're saying?
19   A   Yeah.
20   Q   Okay.
21   A   Yes.
22   Q   For the court reporter's benefit, would you

## Page 23

1  spell Kathleen Samiy?
2    A   I believe it's K-a-t-h-l-e-e-n, last name
3  is -- I believe it's S-a-m -- she pronounced it Samiy,
4  and I don't remember how to spell it. I think it's
5  S-a-m-y.
6    Q   Let me --
7    MR. SILVERBERG: I-y.
8    THE WITNESS: I-y. Yeah. That --
9    BY MR. NEBEKER:
10   Q   Let me show you another exhibit that we'll --
11   A   Yes. That looks correct, S-a-m --
12   MR. NEBEKER: Can you mark this as Exhibit
13 Number 2.
14   THE WITNESS: -- i-y.
15        (Ferster Deposition Exhibit 2
16         was marked for
17         identification.)
18   BY MR. NEBEKER:
19   Q   Can you tell us what Exhibit -- Deposition
20 Exhibit Number 2 is?
21   A   It says, at the top, "Class Action Suit.
22 Entered By: Ernie Robinson, Aaron Ferster, Anthony

## Page 24

1  Bowden, Herman Krebs. Complaint: Sex Discrimination
2  Harassment, Hostile Work Environment, Job
3  Qualifications/Not Qualified, Upper Management."
4    Q   Okay. So, first of all, does it have the
5  correct spelling of Ms. Samiy's name?
6    A   Yes.
7    Q   Okay. And it's S-a-m-i-y?
8    A   Yes. That looks right.
9    Q   Now can you tell us where this exhibit came
10 from or how it came to be created?
11   A   I'm trying to remember if I have seen this
12 before. I think Anthony wrote this up after the four
13 of us, Ernie Robinson, myself, Anthony, and Herman met
14 together.
15   Q   Approximately when was it that the four of you
16 met together to discuss --
17   A   It was --
18   Q   -- complaints of --
19   A   It was between Christmas --
20   Q   I'm sorry. Let me finish. -- the complaints
21 regarding the purported class action suit?
22   A   We met after the four of us received

Page 53

1  A  I don't remember when.
2  Q  And when you say a promotion, is this in
3  addition to you being hired on as permanent, as opposed
4  to a temporary?
5  A  Yes. Yes.
6  Q  Okay.
7  A  I was promoted from a GS-11 to a GS-12. I
8  think I had been there I think a couple of years at
9  least, in the permanent position.
10  Q  And had you taken on any additional work?
11  A  Yes.
12  Q  What additional type of work had you --
13  A  I had moved into a lot of a project
14  management, in addition to writing.
15  Q  Are you aware of instances when Mr. Bowden was
16  engaged in project management?
17  A  Yes. I know that he -- I would arrange
18  through him to have things installed by contractors.
19  So, again, we mentioned welding.
20  Q  Oh. And is that such as acting as the COTR?
21  A  I don't remember. I think so, but I don't
22  remember.

Page 54

1  Q  Okay. What types of -- did you supervise
2  anybody when you became a 12?
3  A  Not immediately. I did hire and supervise
4  Stacey Taballerio, the videographer.
5  Q  And did there come a point when you would do
6  as her supervisor, her performance evaluations?
7  A  No. She was not a federal employee. She was
8  a FONZ employee. And when Kathleen started, there was
9  discussion that I should no longer supervise Stacey,
10  that Kathleen should supervise Stacey. It was -- you
11  know, but I say "supervise Stacey," I hired her, I had
12  this pot of money.
13      THE REPORTER: You had what?
14      THE WITNESS: I had some money dedicated from
15  the funds to hire an employee from --
16      BY MR. NEBEKER:
17  Q  And FONZ is Friends of the National Zoo?
18  A  Yes. It was not much. I didn't give her -- I
19  assigned her tasks, and we worked collaboratively. It
20  was not a typical supervisory role.
21  Q  Uh-huh. Did Mr. Bowden have any similar
22  supervisory roles over FONZ members --

Page 55

1  A  No.
2  Q  -- who were employees?
3  A  Not that I'm aware of.
4  Q  Okay. Number five, "Harassed about the
5  clothes that are worn." Do you know --
6  A  Not that I --
7  Q  Were you ever harassed about clothing you were
8  wearing?
9  A  No.
10  Q  Did you ever see Mr. Bowden wearing biking
11  clothes at the zoo?
12  A  Yeah. I think so.
13  Q  Did he ride his bike to the zoo?
14  A  Yeah. Yeah.
15  Q  And would he tend to wear those clothes all
16  day long or would he come into the office and change?
17  A  No. A couple -- I mean a couple of us, Grace,
18  and Anthony, and I bicycle commuted quite often, and
19  we'd change once we came in.
20  Q  Would you tend to hang around in your bike
21  clothes an hour into the workday?
22  A  No.

Page 56

1  Q  Okay. Would Mr. Bowden tend to still be
2  wearing his work clothes an hour into his workday?
3  A  I don't think so. No.
4  Q  Were your and Mr. Bowden's hours substantially
5  similar?
6  A  I think so.
7  Q  And who else did you say biked in?
8  A  Grace Lopez.
9  Q  Grace. Did Grace tend to wear her bicycle
10  clothes after she arrived to work, you know, for an
11  hour say?
12  A  No. I don't think so. I mean an hour maybe,
13  but, you know, not well into the day.
14  Q  The next page of the Exhibit, Exhibit Number
15  2, talks about "After only two months of being
16  permanent, Elaina Lopez," a different Lopez, correct,
17  "was given the larger office space and was also named
18  senior designer." What do you know about that?
19  A  I think that's true. I think she was in a
20  larger space. But, you know, it was -- and I don't
21  know what official title she had.
22  Q  And do you know what Ms. Lopez was hired to

Page 69

1  office, it was -- the atmosphere was pretty much -- we
2  were not -- I did not feel like I was closely
3  monitored, my comings and goings.
4  Q  And did you ever observe Mr. Bowden being
5  closely monitored with his comings and goings?
6  A  No.
7  Q  And did people take advantage of that?
8  A  I don't think so.
9  Q  Was Ms. Grace Lopez, for instance, a very
10 timely -- fairly timely when she arrived at the office?
11 A  I think. But, again, I don't -- I -- my
12 impression is yes, but I didn't keep track of Grace's
13 hours. I mean what we did there was design stuff,
14 build stuff, open exhibits. And the bottom line was
15 opening an exhibit by the published opening date. So,
16 you know, my impression is -- you know, the way I work
17 was you take a long view and when you need to stay
18 late, you do, and you get things done on time.
19 Q  Did Mr. Bowden tend to stay late?
20 A  I don't know. I will say on the exhibits that
21 I needed his help and support, I could count on him,
22 and those exhibits got done. And an example of that is

Page 70

1  the bald eagle exhibit, where he -- you know, we ran
2  into challenges getting the exhibit done on time, and
3  it was done on time. And I think that was largely
4  because Anthony worked on it. So --
5  Q  Can you identify any other women in the office
6  who did not arrive on time?
7  A  No.
8  Q  Do you have any other facts to support or
9  refute the allegations in paragraph nine on page two of
10 the Exhibit 2?
11 A  No.
12 Q  The next page -- well, actually, there's
13 something down there at the bottom.
14 A  Yeah. "Kathleen Samiy sends inappropriate
15 e-mail and cards." Well, the cards we had talked
16 about.
17 Q  Okay.
18 A  And e-mails, I don't -- other than my own, I
19 don't --
20 Q  Can you describe any inappropriate e-mails
21 that Mr. Bowden received from Ms. Samiy?
22 A  No.

Page 71

1  Q  Okay. And can you describe any inappropriate
2  e-mails that you receive from Ms. Samiy?
3  A  No.
4  Q  The next page, page three, "Kathleen Samiy
5  threatened our job by saying that she was going to
6  write us up. This does not happen to our female
7  co-workers."
8  A  You know, I know that she did threaten to
9  write me up, and --
10 Q  What was she -- was this over the time of a
11 staff meeting when you --
12 A  And suggested that if, you know --
13 Q  Let me finish the question. -- the time of a
14 staff meeting when you disagreed with her about a
15 priority or a date?
16 A  Yes.
17 Q  And were you --
18 A  She suggested, at that time, that
19 insubordination could lead to her firing me, and she
20 had that authority.
21 Q  Okay.
22 A  So, you know, I don't know of that ever

Page 72

1  happening to Judy Tasse or Stacey, my office mates. I
2  don't think it ever happened to Melissa when she was
3  there.
4  Q  And did you ever hear any instances when any
5  of the women in the office said things to Ms. Samiy
6  that Ms. Samiy took as an affront to her ability to run
7  the office?
8  A  No.
9  Q  Number -- are we talking about number two on
10 page three?
11 A  Yeah.
12 Q  Okay. Number three, "I" "was told by Scarlet
13 Proctor who is a female personnel specialist that if I
14 didn't agree with what was being put in my performance
15 plan" --
16 A  Yeah, I wouldn't know --
17 Q  -- "that I should find a job someplace else."
18 A  Yeah, I wouldn't know --
19 Q  Did you hear any of that --
20 A  No.
21 Q  Okay.
22 A  Clothing I don't know.

Page 97

1  particular disability or have any particular needs?
2    A  No.
3    Q  Has he ever fallen asleep at a staff meeting,
4  to your recollection?
5    A  Yeah. You know, there was one staff meeting
6  where he kind of got sleepy, yeah.
7    Q  And what happened?
8    A  I think somebody, you know, gave him an elbow
9  and woke him up, I think. I don't really remember.
10   Q  And so he wasn't fired or demoted or --
11   A  No.
12   Q  -- lose any pay or anything as a result of
13  that, did he?
14   A  Not that I know of.
15       MR. SILVERBERG: He can only answer to the
16  extent he knows.
17       THE WITNESS: But he woke up and we continued
18  the meeting. But the one I remember was I
19  had -- again, I don't remember a specific day here, but
20  my recollection is that was when Rick was still the
21  supervisor. That was before Kathleen took over.
22       BY MR. NEBEKER:

Page 98

1    Q  Okay. Were you aware of any instances when
2  Mr. Bowden has been working with you on a project or in
3  the same room with you or in the same area with you and
4  he has said "I need to step outside to get some fresh
5  air"?
6    A  No. Not specifically.
7    Q  Are you aware of any times when he said "I
8  need to go to the bathroom"?
9    A  I -- I mean no. I don't remember
10  specifically. That wouldn't have registered with me.
11   Q  You've never experienced Mr. Bowden to need to
12  use the restroom anymore than anybody else, have you?
13   A  No.
14   Q  And when you were working with Mr. Bowden,
15  about how many times a day would you tend to see him?
16   A  It really varied on the project, 'cause we
17  didn't -- we didn't typically work together on a day
18  to day basis. So it's hard to say. I forget how often
19  we had staff meetings. I think it was once a week. I
20  mean there were probably weeks where we saw each other
21  once a week. Or when we had to coordinate to get
22  things installed, we might see each other every day for

Page 99

1  a couple weeks. So it was very variable.
2    Q  Okay. When you were working on a project with
3  him, though, you would see him daily?
4    A  Yeah. But that wasn't -- I would say that
5  that was not often.
6    Q  How many projects would you say you worked on
7  with Mr. Bowden?
8    A  The way things worked at the zoo is, at some
9  point, everything I did would need to be installed.
10  Not everything. Ninety percent of what I did had a
11  component where, at some point, it had to be installed.
12  That would, you know, work it's way eventually to
13  Anthony.
14       MR. SILVERBERG: I need to take a break.
15       MR. NEBEKER: Oh, okay.
16       (A brief recess was taken.)
17       BY MR. NEBEKER:
18   Q  Mr. Ferster, do you still have Exhibit 4 in
19  front of you, your statement in the EEO investigation?
20   A  Yes.
21   Q  Okay. I'm looking at page four of six now.
22  Number three, it asks you to describe what you could

Page 100

1  about the fully successful performance rating that Mr.
2  Bowden got in May of 2004. If I understand correctly,
3  you weren't aware of the performance rating; is that
4  correct?
5    A  Yes.
6    Q  Can you say whether or not his performance was
7  such that it -- a reasonable person couldn't conclude
8  that he was worthy of the fully successful rating?
9        MR. SILVERBERG: I'm objecting. He is a
10  coworker. He's not a supervisor. He has no basis of
11  knowledge of Mr. Bowden's performance to judge him as a
12  supervisor would.
13       MR. NEBEKER: Okay.
14       BY MR. NEBEKER:
15   Q  You can answer.
16   A  I will say that, on big projects that I
17  managed, that Tony was a big asset. And I know from
18  the -- again, to use the bald eagle exhibit as an
19  example, he saved me time and money, and it would have
20  been difficult to open that exhibit without -- on time
21  without his expertise. So, you know, I -- and I say
22  that as a coworker. So I never -- I would not know how

Page 105

1  that -- for example, Ernie Robinson did a lot of
2  installation work that other designers did not do.
3   Q  Did you ever hear Mr. Robinson complain that
4  he was being called upon to do installation work that
5  other designers weren't doing?
6   A  I don't remember specific examples of him
7  complaining, although, yeah, I think -- I don't think
8  he was happy with it.
9   Q  Do you know if he ever went to see Ms. Dolnick
10 or Ms. Samiy in an effort to try and get less
11 responsibility for installations?
12  A  I don't know.
13  Q  Do you ever recall a time when Mr. Bowden
14 complained that he didn't get help from Mr. Robinson
15 that he wanted in installing a sign?
16  A  No.
17     MR. NEBEKER:  I ask that we mark this as
18 Exhibit Number 5, I think we're up to.
19          (Ferster Deposition Exhibit 5
20           was marked for
21           identification.)
22     BY MR. NEBEKER:

Page 106

1   Q  Would you look at Exhibit 5 --
2   A  Yes.
3   Q  -- and identify it for us when you've had an
4  opportunity to review it?
5   A  Yeah.  This is a note that we sent to Mary
6  Tanner.
7   Q  Now was the item that came with the note sent
8  to you Exhibit 4 from the deposition?
9   A  I don't remember.
10  Q  Okay.
11  A  It may be.  I don't remember.
12  Q  Do you recall approximately when it was that
13 the Exhibit 5 -- do you know if it was ever sent to Ms.
14 Tanner?
15  A  I think it was.
16  Q  And it has two pages.  Do you know if they
17 were originally together?
18  A  I don't think they were together, 'cause I
19 think the second page is after she responded to us.
20  Q  Okay.  Did you sign off on page one of Exhibit
21 5 before it went out?
22  A  I think I did.  I don't know why this isn't

Page 107

1  signed.  Maybe it was sent as an e-mail.
2   Q  Okay.  Thank you.
3   A  I think so.
4   Q  But did you approve it being sent?
5   A  Yes.
6   Q  And it indicates that Ms. Samiy "has created a
7  hostile work environment in the Department of Exhibit
8  and Outreach."  Have you given us your -- all the facts
9  upon which you rely to support such a conclusion --
10  A  Yeah.
11  Q  -- in your deposition already today?
12  A  Yes.  I've given a couple examples of that.
13  Q  I'm trying to make sure that I've got them
14 all.  If you're aware of any others that you didn't
15 mention yet, please tell us what they are?
16  A  Let's see.  The card, there was threatening of
17 withholding of leave.  There may be others.  I don't
18 remember specifically.
19  Q  Okay.
20     MR. SILVERBERG:  And that was what, examples
21 of what, counselor?
22     MR. NEBEKER:  Ms. Samiy creating a hostile

Page 108

1  work environment.
2     BY MR. NEBEKER:
3   Q  And there's another reference to "overstepped
4  the bounds of inequitable treatment, or simple poor
5  judgment, that have created an atmosphere from which we
6  are legally protected."
7   A  Uh-huh.
8   Q  Are you aware of any other instances that
9  would fit into that category, that you haven't
10 mentioned in your deposition already?
11  A  No.
12  Q  Oh, in the second page --
13  A  Uh-huh.
14  Q  -- is that your signature on the second page?
15  A  Yes.
16  Q  And are all those other signatures, as far as
17 you can tell, from Mr. Bowden and Mr. Krebs and Mr.
18 Robinson?
19  A  Yes.
20     MR. SILVERBERG:  Objection.  He's -- I don't
21 know if he really has a way of knowing that.  Go on.
22     BY MR. NEBEKER:

Page 133

1  to do. I would step outside of that and do it and get
2  the money, and then, at a later date, I would be held
3  accountable for not staying within my position
4  description. So part of the mismanagement of the staff
5  in our department was directly related to what's in and
6  what's not in your position description. 'Cause on one
7  day, they might say "Oh, just thanks for giving us a
8  hand and getting this exhibit open." The next day
9  they'd say "You know, nobody asked you to do that. You
10 shouldn't be doing that. It's not in your position
11 description."
12    Q  Uh-huh.
13    A  So it's completely consistent to me that
14 position description -- what's on paper in your
15 position description would kind of be used either for
16 or against you, depending on who you were and what
17 your -- how your supervisor felt about it at the time.
18    Q  Can you give us all the examples you're aware
19 of in which that was -- that a supervisor under the
20 exhibits office at the National Zoo used something that
21 was in or was omitted from a position description to
22 the detriment of an employee?

Page 134

1    A  I would say that there was this general
2  perception in the office, with Ernie Robinson in
3  particular, that he was a graphic designer and he
4  shouldn't be out installing signs. Yet there were
5  times where Kathleen in particular would say openly "I
6  don't care how this exhibit gets done on time. Just
7  make sure it gets done on time."
8    Q  Did you get the sense that what she was
9  implying by that was that if you had to take -- if you
10 don't have enough people in the production area to get
11 the job done, borrow someone from design so that the
12 job gets done on time?
13    A  Yeah. That's how I heard it.
14    Q  And were there times -- more than one time
15 that that had to take place in order to get the job
16 done on time?
17    A  I think that that was sort of a pervasive way
18 to get things done at the zoo.
19    Q  Do you recall, beginning in June of 2004,
20 instances where Mr. Bowden was required to work in
21 unsafe conditions in that lower workshop?
22    A  No.

Page 135

1    Q  Did you ever observe that --
2    A  No.
3    Q  -- him have to work --
4    A  I wouldn't be --
5    Q  -- in that lower workshop?
6    A  Yeah. I wouldn't observe that.
7    Q  Okay. But you'd seen the work -- had you seen
8  the workshop in around June of 2004?
9    A  Probably, yeah.
10   Q  Did it look any more unsafe then it had ever
11 been?
12   A  I mean I --
13      MR. SILVERBERG: What date are we referring
14 to, counsel?
15      MR. NEBEKER: June of 2004.
16      BY MR. NEBEKER:
17   Q  Right about that time. Starting about then?
18   A  No.
19   Q  Did Mr. Bowden ever tell you about any things
20 that were unsafe -- he viewed as unsafe in the lower
21 workshop?
22   A  No.

Page 136

1    Q  Did Mr. Bowden ever discuss with you a
2  December 22nd, 2004 confirmation of counseling memo?
3    A  No.
4    Q  Did you -- were you gone by December of 2004?
5    A  When did I leave. No. I think I was still
6  there. I switched in January.
7    Q  Okay.
8    A  So I may have still been there. But I'm
9  mixing up my years.
10   Q  Okay. Well, do you ever recall a time when
11 Mr. Bowden referred to Elena Lopez as a crazy lady or
12 as crazy?
13   A  No.
14   Q  Do you ever recall a time when Mr. Bowden
15 alleged that he had been bumped or assaulted by Elena
16 Lopez?
17   A  I don't remember.
18   Q  And you never observed such a thing, I take
19 it?
20   A  No.
21   Q  Ever recall an instance, in January of 2004,
22 when Mr. Bowden complained that he was being told h

Page 141

1  instance, number one on the front page, "Females are
2  not made to do the work that is required by males,
3  however, it was written in my desk audit that Grace
4  Lopez was equal to me, Anthony Bowden," and you said
5  you never saw the desk audit, right?
6      A   Right.
7      Q   But does that mean that females -- did they do
8  the same type of work that males did, just 'cause you
9  never saw the desk audit? Do you see what I'm asking?
10     A   Yeah. I think that -- I don't know
11 that -- depending on manual labor, I don't know that
12 Grace, you know, installed heavy signs --
13     Q   Well, to your --
14     A   -- printed posts.
15     Q   To your knowledge, was it mainly the men who
16 did the heavy labor?
17     A   Yes.
18     Q   Was it mainly the black men who did kind of
19 like the grunt work?
20     A   Yes.
21         MR. NEBEKER: Objection. Vague.
22         BY MR. SILVERBERG:

Page 142

1      Q   Grunt work, dirty, heavy --
2      A   Yes.
3      Q   "Sent derogatory e-mails by Kathleen Samiy."
4  You said you never saw the e-mails, but do you know
5  anything about that, whether she sent nasty e-mails,
6  derogatory e-mails?
7      A   I don't think I got any that I would say were
8  derogatory to me.
9      Q   Uh-huh. Number four, it says "No male has
10 received a promotion," but you received a promotion,
11 right?
12     A   Yes.
13     Q   You're a white, Jewish male, right?
14     A   Yes.
15     Q   Then --
16     A   And this was before Kathleen was there.
17     Q   Oh. Do you know of any black males who
18 received a promotion?
19     A   No. Not while I was there.
20     Q   Do you know of other males besides you, black
21 or white, who received a promotion?
22     A   No.

Page 143

1      Q   Do you know about Tony being harassed about
2  the clothes that he wore, number five?
3      A   No.
4      Q   You don't know about it?
5      A   I don't.
6      Q   Number six talks about Elena Lopez given the
7  larger office. You said that was accurate?
8      A   Yes.
9      Q   Did you know Elena Lopez?
10     A   Yes.
11     Q   How did you know her?
12     A   We worked together.
13     Q   What was her reputation, in terms of
14 personality?
15         MR. NEBEKER: Objection. Vague.
16         BY MR. SILVERBERG:
17     Q   Go on, unless one of us tells you don't
18 answer.
19     A   Okay. She was border -- she could be
20 abrasive. She was difficult to work with.
21     Q   How was she difficult?
22     A   She was not -- it was hard to work

Page 144

1  collaboratively with her. She wanted to work in ways
2  that had very black and white, very strict, delineated
3  ways of who did what, which my work and her work
4  was -- for example, the work that I did with Herman or
5  Ernie Robinson would be much more of a collaborative
6  process. With her, it was much more -- it's hard to
7  describe, other than she was difficult to work with,
8  and that she wanted -- she wanted control over anything
9  that had anything to do with graphic design.
10     Q   Did she ever exhibit problems that
11 you -- would make you question her mental stability?
12         MR. NEBEKER: Objection. Vague.
13         THE WITNESS: There was a point at which -- I
14 don't know whether I would describe it as her mental
15 stability, but she got into an argument with Stacey
16 Taballerio, I forget over what, but she grabbed some
17 sort of spray, air freshener, perfume, or something off
18 of Stacey's desk and sprayed her with it.
19     Q   In her face?
20     A   I don't believe it was in her face. I wasn't
21 there when it happened.
22     Q   But did spray her --

Page 145

1   A   Yeah.
2   Q   -- her body, whatever?
3   A   Yes. Yes.
4   Q   And do you know if she was disciplined for
5   that?
6   A   As far as I know, she was not disciplined for
7   it.
8   Q   Do you know why she wouldn't have been
9   disciplined for that kind of behavior?
10  A   Because -- because Kathleen would be the one
11  responsible for disciplining her.
12  Q   And she -- Kathleen favored her?
13  A   Yes.
14  Q   Number seven says "No females are being
15  harassed, threatened or asked to do anything outside
16  their job description." You said you didn't know. I
17  think you were referring to about the job description.
18  Do you know females who were harassed or threatened?
19  A   No.
20  Q   Do you know males who were harassed or
21  threatened?
22  A   Yeah.

Page 146

1   Q   Who?
2   A   Ernie Robinson, Anthony, myself, and Herman,
3   as we talked about previously; you know, getting
4   threatening notes in the Christmas cards, that type of
5   thing.
6   Q   What was the incident with your performance
7   appraisal?
8   A   Basically the overall rating was not
9   consistent with the -- with how she had rated me on
10  individual elements. And when I questioned that,
11  she --
12  Q   Who is "she"?
13  A   Kathleen. Kathleen said that it was -- as the
14  supervisor, it was her discretion, and that whatever it
15  said -- however she rated me on the inside, it was up
16  to her discretion to give me the overall rating. And
17  that turned out to be wrong. And later I find
18  out -- found out that she had changed it after we had
19  signed out -- signed off on it, so that it would
20  reflect a lower rating.
21  Q   When was this?
22  A   I don't remember the date.

Page 147

1   Q   In the 2000s?
2   A   Yes.
3   Q   Well, Ms. Samiy was there?
4   A   Yeah. Yeah.
5   Q   Was it resolved?
6   A   It was resolved when the personnel office
7   downtown reconciled my copy with what had been signed
8   off on with their copy, what had gone downtown, and I
9   think with what was in the zoo's copy.
10  Q   So are you saying Ms. Samiy sent down the
11  wrong copy?
12  A   Yes. She -- from what I got, it had -- she
13  had changed it after it had been signed and sent it
14  down.
15  Q   After who signed it?
16  A   After I signed it, she signed it, and Lynn
17  signed it.
18  Q   So, in your mind, was that intentional on her
19  part?
20  A   Yes.
21       MR. NEBEKER: Objection. Calls for
22  speculation.

Page 148

1   BY MR. SILVERBERG:
2   Q   Well, she would have had to have known, when
3   she did, it was a different copy?
4   A   Yes.
5       MR. NEBEKER: Objection. Lacks foundation.
6   BY MR. SILVERBERG:
7   Q   How was it different?
8   A   She had changed the inside. She had changed
9   some of the ratings inside, downgraded them.
10  Q   So she changed -- downgraded your ratings
11  after you signed off on it?
12  A   Yes.
13  Q   And she sent that to what?
14  A   She sent that -- I don't know exactly how the
15  process works, but she had sent that to the Smithsonian
16  personnel office downtown.
17  Q   And --
18  A   So --
19  Q   Okay.
20  A   And then, with the assistance of the
21  ombudsman, this was discovered. They changed it, and
22  had me sign something, saying, you know, that they're

Page 149

1  going to destroy what was downtown, and it was going to
2  be changed.
3  Q  This says, on page three of this exhibit, on
4  top, "Kathleen Samiy threatened our job by saying she
5  was going to write us up. This does not happen to our
6  female co-workers." Is that true?
7  A  Yes.
8  Q  Is that accurate?
9  A  Yes.
10 Q  Number five, "Kathleen Samiy doesn't ask us to
11 do work, she demand it." Was that generally her tone
12 that she demanded instead of asked?
13 A  In my experience, it was both.
14 Q  Both what?
15 A  But she would --
16 Q  What was both?
17 A  Ask and demand.
18 Q  She did both?
19 A  She would be quite dictatorial when she wanted
20 to be.
21 Q  Was she that way with the women?
22 A  No.

Page 150

1  Q  She was that way with the men?
2  A  Yeah.
3  Q  And were black men treated especially bad?
4     MR. NEBEKER: Objection. Vague.
5     THE WITNESS: I don't know. I mean I only
6  know from my experience.
7     BY MR. SILVERBERG:
8  Q  Did they seem to be treated worse than white
9  males?
10    MR. NEBEKER: Objection. Vague.
11    THE WITNESS: I don't know. I don't think so.
12    BY MR. SILVERBERG:
13 Q  Who was asked to do the, quote, "grunt work"
14 A  That --
15    MR. NEBEKER: Objection. Vague.
16    BY MR. SILVERBERG:
17 Q  The dirty and heavy work?
18 A  The heavy lifting, installation --
19 Q  Right.
20 A  -- that type of work was primarily done by
21 Sherod, Anthony, and Ernie Robinson.
22 Q  And all are black males, right?

Page 151

1  A  Yes.
2  Q  Did you do any of the heavy work?
3  A  No.
4  Q  Why not?
5  A  I was never asked to, never required.
6  Q  You could have been asked to though, right?
7  A  Yes.
8     MR. NEBEKER: I'm sorry, Sherod, Bowden, and
9  who else?
10    THE WITNESS: Ernie Robinson.
11    BY MR. SILVERBERG:
12 Q  Wasn't there a time when Ernie Robinson filed
13 a complaint, EEO complaint?
14 A  Yeah. I think so.
15 Q  Do you know about that?
16 A  Yeah. I think he did. I don't remember. I
17 thought I was interviewed by someone for that.
18 Q  Did anything change in the office once he
19 filed a complaint?
20 A  I don't remember.
21 Q  Okay. Do you know about number six, on page
22 three, Tony having to call Kathleen Samiy whenever he

Page 152

1  arrived at work, leaving a voice mail. Do you know
2  about that?
3     MR. NEBEKER: Objection to the form of the
4  question.
5     BY MR. SILVERBERG:
6  Q  Well, are you aware of that situation?
7     MR. NEBEKER: Same objection.
8     THE WITNESS: I remember Tony mentioning that,
9  but I don't -- you know, I was never there when he
10 called --
11    BY MR. SILVERBERG:
12 Q  Were you aware of number seven, of Kathleen
13 Samiy telling the males that they couldn't take
14 vacation, use or lose, at the end of the year?
15    MR. NEBEKER: Same objection.
16    THE WITNESS: I don't remember that. But,
17 again, I never had -- I did not have any use or lose,
18 so that never happened to me.
19    BY MR. SILVERBERG:
20 Q  Oh. Number nine, on page four, "Hostile
21 meetings with Kathleen Samiy where Kathleen Samiy
22 raises her voice, ignores issues" "and regulations,

Page 153

1  work safety," et cetera, "well being of the workers,"
2  would you say that's accurate, that there were meetings
3  with Ms. Samiy like that?
4       MR. NEBEKER: Objection to the form of the
5  question as vague.
6       THE REPORTER: I'm sorry, objection what?
7       MR. NEBEKER: Objection to the form of the
8  question as vague and compound.
9       THE WITNESS: That's my general recollection
10 of meetings, was that they were poorly run and --
11      BY MR. SILVERBERG:
12   Q   This is meetings you attended where Ms. Samiy
13 ran them?
14   A   Yeah. Staff meetings were not productive.
15 Input was not welcome.
16   Q   Did she treat the men differently than the
17 women at the meetings?
18      MR. NEBEKER: Objection. Vague.
19      THE WITNESS: She -- my experience was yeah,
20 but -- that she was easily challenged or felt that her
21 authority was challenged if men disagreed with her
22 openly, particularly at meetings, whereas women

Page 154

1  can -- could bring up issues and it wasn't -- you know,
2  it wasn't seen as a threat. It was more of an open
3  discussion on how to get things done.
4       BY MR. SILVERBERG:
5    Q   Do you know about number ten, Mr. Bowden being
6  threatened by Dolnick and Samiy "because we requested
7  to speak with Mary Tanner"?
8       MR. NEBEKER: Objection to the form of the
9  question.
10      THE WITNESS: I don't know that Mr. Bowden was
11 threatened. I don't have knowledge of that. I do
12 remember that that meeting -- or that when that meeting
13 was scheduled, and this was early in Kathleen's tenure
14 there, and I do remember Lynn basically checking in
15 with me, calling me into her office and asking me
16 whether I planned to go, and suggesting that she would
17 prefer me not to go, and saying -- basically saying
18 that it was kind of a useless exercise, that Mary was
19 going to back her, and she was going to back Kathleen.
20      BY MR. SILVERBERG:
21   Q   On page five, number four -- well, number
22 three talks about Ms. Samiy, when asking questions,

Page 155

1  "snaps and raises her voice in anger." Did you witness
2  that?
3    A   I don't remember any specific instances,
4  but --
5    Q   Did you witness number four, "Males are being
6  threatened that they will be written up for speaking to
7  Kathleen Samiy supervisor who is Lynn Dolnick"?
8    A   Oh, for speaking to -- for basically going
9  over Kathleen's head and speaking to Kathleen about it,
10 about her.
11   Q   Males were threatened for that by Kathleen
12 Samiy?
13   A   I don't know. I don't know. I was threatened
14 for what Kathleen thought was insubordination to her,
15 but not because I had spoken to Lynn about it.
16   Q   Well, what did you do that was allegedly
17 insubordination?
18   A   I think I questioned -- I questioned her
19 priority setting at a meeting, which something -- you
20 know, we should be working on a particular exhibit
21 before another one.
22   Q   And what did she threaten to do?

Page 156

1    A   She threatened to withhold sick leave. I had
2  put in for annual leave, and then said that she was
3  going to write me up, and, you know, if it happened
4  again, it would lead -- that she had the authority to
5  fire me basically.
6    Q   Now this sick leave was to take your daughter
7  to the hospital?
8    A   Yes.
9    Q   And why did she need to go to the hospital?
10   A   She's -- I guess shortly after -- she's deaf,
11 and she was identified as being deaf, I can't remember,
12 shortly before or after Kathleen had arrived. She was
13 in a protocol at Johns Hopkins to get a cochlear
14 implant. So, at that time, I was spending some fair
15 amount of sick and annual leave to go through these
16 tests.
17   Q   Was Ms. Samiy aware what was going on with
18 your personal situation?
19   A   I believe she was.
20   Q   So when she threatened to withhold sick leave,
21 she knew why you needed it?
22   A   Yes.

Page 157

1  Q  For your daughter?
2  A  Yes. And she was quite -- quite willing to
3  exploit that for -- to assert her authority over me.
4  Q  Did you ever see her treat a woman that way?
5  A  No.
6  Q  What was your reaction when she was using that
7  issue against you, of your daughter's health?
8  A  I --
9  Q  You weren't happy?
10  A  No, I was not happy. I was pretty threatened.
11  I mean she was threatening my livelihood. She was
12  threatening my ability to take care of my disabled
13  daughter. I thought it was pretty out of line.
14  Q  Did she get the transplant?
15  A  She did. She is doing quite well.
16  Q  I'm glad to hear that.
17  A  Thanks.
18  Q  Okay.
19  A  And Lynn knew about that too. And when I went
20  to Lynn to talk about it, it had no effect.
21  Q  Really?
22  A  Yeah. I thought it was pretty outrageous

Page 158

1  behavior.
2  Q  Would you agree with -- on page six, number
3  six, "Kathleen Sami shows favoritism to the female
4  staff members," agree or disagree?
5      MR. NEBEKER: Objection. Vague.
6      THE WITNESS: I would agree with that.
7      BY MR. SILVERBERG:
8  Q  Do you agree with seven -- well, eight, she is
9  "hostile towards males"?
10  A  Yes.
11  Q  Number nine, "Kathleen Samiy takes the credit
12  for work done by her male staff members," would you
13  agree with that?
14  A  Yes.
15  Q  Number ten, "Kathleen Samiy gets upset when
16  the males in the office does not tell her how to do her
17  job"? Skip that one. Number 11 -- I withdraw the
18  question. Forget number 11. Number -- "Kathleen
19  Samiy," number 12, "lets her female staff members come
20  and go as they wish, the males are treated different"?
21     MR. NEBEKER: Objection to the form of the
22  question.

Page 15

1      THE WITNESS: I --
2      MR. NEBEKER: Haven't heard a question.
3      BY MR. SILVERBERG:
4  Q  Do you know if that's -- do you agree with
5  that statement?
6  A  I don't remember her really -- you know, I
7  felt that I basically came and went. You know, I
8  wasn't subjected to her questioning my hours.
9  Q  Do you know if she ever questioned female
10  staff members.
11  A  I don't think she did.
12  Q  Did she question Tony?
13  A  I don't know.
14  Q  "Upper management," number one, "ignores
15  behavior of Kathleen Samiy even after its brought to
16  their attention," is that an accurate statement?
17     MR. NEBEKER: Objection. Vague.
18     THE WITNESS: Yes. If upper management mea
19  Lynn Dolnick, yes, that was my experience.
20     BY MR. SILVERBERG:
21  Q  Number two, "Upper management consists of
22  women," is that accurate?

Page 16

1  A  In our department, yes, it was. I think that
2  when Kathleen was there --
3  Q  Number three, "When Lynn Dolnick does add
4  an issue we may be having with Kathleen Samiy, Ms.
5  Dolnick always sides with Ms. Samiy," is that accurate
6  A  Yes.
7  Q  She would always side with Ms. Samiy over the
8  men; is that accurate?
9  A  She would. I know she did express to me that
10  she was working to make things better, but it never
11  seemed to make a difference.
12  Q  Number five, on page eight, it says "The staff
13  set up a meeting with Mary Tanner to discuss Kathlee
14  Samiy and Lynn Dolnick's work practices. We were
15  threatened by Lynn Dolnick not to attend the meeting
16  Half of the staff did not attend." Is that whole
17  paragraph accurate?
18     MR. NEBEKER: Objection.
19     THE WITNESS: I was never --
20     MR. NEBEKER: Foundation and form of the
21  question.
22     BY MR. SILVERBERG:

Page 161

1  Q  Well, do you know if Ms. Dolnick threatened
2  people who wanted to attend the meeting with Mary
3  Tanner about Samiy and Dolnick?
4  A  She called --
5     MR. NEBEKER: Objection. Vague and --
6     THE WITNESS: She called me into her office
7  before the meeting.
8     BY MR. SILVERBERG:
9  Q  Who is "she," Dolnick?
10 A  Lynn Dolnick called me in her office before
11 the meeting. I don't remember exactly what she said.
12 She did not -- I did not feel threatened about going to
13 the meeting. She expressed to me her unhappiness that
14 I was considering going, and asked that -- you know,
15 basically asked me not to go. She was the supervisor
16 and head of the office.
17 Q  So that carry some weight with you, that two
18 supervisors --
19 A  Yes. Yeah.
20 Q  -- asked you not to go?
21 A  Yeah. I think, in her position, I didn't
22 personally feel threatened by her. I could certainly

Page 162

1  see why someone else would.
2  Q  Did you go to the meeting?
3  A  I did not go to the meeting.
4  Q  Number six, do you agree with that management
5  "interviewed for jobs available before an announcement
6  was released"?
7     MR. NEBEKER: Objection. Lacks foundation.
8     THE WITNESS: I don't know. I don't know when
9  they scheduled interviews.
10    BY MR. SILVERBERG:
11 Q  Is it true, number nine, "Within two to three
12 months of Elaina Lopez working in a temp position,
13 Kathleen Samiy named Elaina Lopez senior designer"?
14 A  Yes. I think that's true.
15 Q  Did Grace Lopez ever do any heavy work or any
16 grunt work, which I define as heavy and dirty work?
17 A  She did a lot of physical work making the
18 vinyl signs, but it's not of the same nature as the
19 heavy lifting, putting in sign posts, working with
20 cement, so no. But she did -- you know, her -- making
21 her signs is physical work or --
22 Q  But she --

Page 163

1  A  -- doing the vinyl.
2  Q  Did she do the dirty work you just referred
3  to?
4  A  Not that I know of, no.
5  Q  But the black males did?
6  A  Yes.
7  Q  Did any white males?
8  A  Not that I know of.
9  Q  Is it fair to say, in this office, if you had
10 to categorize, that the black males were the lowest on
11 the totem pole?
12    MR. NEBEKER: Objection. Vague.
13    THE WITNESS: I think that there was a clear
14 delineation between, you know, between writers and
15 graphic designers and exhibit developers, who sat at
16 their computers and mostly did desk based work
17 versus --
18    BY MR. SILVERBERG:
19 Q  Well --
20 A  -- people who were out in the park doing heavy
21 lifting. And, again, I'll use the example of putting
22 in a sign post. And those were African American males.

Page 164

1  Q  So, generally, African American males did the
2  heavy stuff, and the desk stuff were white males and
3  females?
4     MR. NEBEKER: Objection. Lacks -- to the form
5  of the question, and it is vague.
6     THE WITNESS: Yeah. I would say that. And
7  the only person who was assigned, you know, computer
8  desk work that still ended up in the park doing manual
9  labor was Ernie Robinson, who is an African American
10 male.
11    BY MR. SILVERBERG:
12 Q  Now who was promoted since you were there?
13 You were promoted?
14 A  I was promoted. Susan Ades was promoted.
15 Q  Is she Jewish?
16 A  Yes. I believe so.
17 Q  And you're Jewish?
18 A  Yes. And I believe the photographer was
19 promoted.
20 Q  Was that Jesse --
21 A  That's Jesse Cohen.
22 Q  Is she Jewish?

Page 169

1    Q   Do you know if Dolnick and/or Samiy reasonably
2   accommodated him or, say, treated him respectfully?
3       MR. NEBEKER: Objection.
4       MR. SILVERBERG: All right. Let me rephrase.
5       BY MR. SILVERBERG:
6    Q   Do you know if they -- if they were sensitive
7   to his -- any emotional disability?
8       MR. NEBEKER: Objection. Vague.
9       THE WITNESS: I don't know.
10      BY MR. SILVERBERG:
11   Q   Okay. Next page, you answer, in the first
12  paragraph, in the middle of the first paragraph, "Ms.
13  Samiy cultivated a hostile work environment, in which
14  employees, particularly males, were regularly subjected
15  to threats of official reprimand, hostile and
16  accusatory confrontations, ambiguous work
17  responsibilities for which they would be 'held
18  accountable,' and threats ranging from withholding of
19  sick and annual leave to outright dismissal.
20  Throughout, Ms. Dolnick openly supported and sided Ms.
21  Samiy." Do you still stand by that statement?
22   A   Yes.

Page 170

1    Q   Then you write "I do believe that the
2   treatment of certain individuals related to their race
3   and gender. In my opinion, there was a clear
4   distinction between those employees who were subjected
5   to the most hostile behavior: they were male, and
6   African American males in particular." Then you write
7   "I do not" -- you say "I do not think that African
8   American males could reasonably expect to cultivate the
9   kind of relationship that would lead to advancement
10  opportunities." Are you saying that the people that
11  Ms. Dolnick and Ms. Samiy were comfortable with were
12  more likely to get ahead --
13   A   Yes.
14   Q   -- personally come through it?
15   A   Yeah.
16   Q   And are you saying -- do you seem to be
17  saying, from here, that it was people most like them
18  they were most comfortable with?
19   A   That's -- yeah. That's my opinion.
20   Q   So white females they were more comfortable
21  with than males?
22   A   Yes.

Page 171

1    Q   Were they more comfortable with them than
2   black males?
3    A   Yes.
4    Q   What do you mean that "I do not think that
5   African American males could reasonably expect to
6   cultivate the kind of relationship that would lead to
7   advancement opportunities"?
8    A   I think that a lot of the way the department
9   was run, based on favoritism, based on the somewhat
10  capricious nature of how work assignments were done,
11  often -- you know, often people who were rewarded for
12  how close or how well they got along with Lynn, with
13  Ms. Dolnick. And I think that that translated into
14  work assignments and other areas of running the office.
15   Q   On the next page, page four, in the middle,
16  you answer "I sincerely doubt that 'normal operating
17  procedures' were adhered to in conducting the
18  evaluation. Ms. Samiy used every opportunity" -- what
19  evaluation are we talking -- we're talking about
20  evaluation of Mr. Bowden in 2004. But then you say
21  "Ms. Samiy used every opportunity at her disposal to
22  assert her authority, particularly over male employees.

Page 172

1   I expect that she used the evaluation process
2   inappropriately with Mr. Bowden, as she had with me."
3   How had she used the evaluation process inappropriately
4   with you?
5    A   Well, a couple of things. She insisted that
6   rather we -- rather than sitting in her office and
7   discussing it, she insisted we go off, you know, meet
8   in a restaurant or a coffee shop to discuss it.
9    Q   Do you know why she did that?
10   A   No.
11   Q   Were you the only one she asked that to?
12   A   I don't know.
13   Q   Did that strike you as strange --
14   A   I thought --
15   Q   -- that she wanted to meet you at a
16  restaurant --
17   A   I thought it was strange. I thought she -- I
18  don't know why. I don't know why. And then --
19   Q   This is Miss --
20   A   Samiy. And then changed it after the fact,
21  lied about the fact that she had changed it, the
22  fact --

44 (Pages 173 to 176)

Page 173

1  Q  Who did she lie to?
2  A  She lied to me, she lied to Lynn, she lied to
3  the people downtown, she lied to the ombudsman,
4  Chandra.
5  Q  Now you say, in the next paragraph, "In
6  general, women seemed to enjoy a more professional
7  relationship with Ms. Samiy, and I have the impression
8  through talking with my female coworkers that the
9  appraisal process was an opportunity to openly
10 communicate with Ms. Samiy. In contrast, Ms. Samiy
11 with much more dictatorial" was -- you mean "was much
12 more dictatorial and confrontational with male
13 employees. I believe this translated in to the
14 evaluation process, and worked against Mr. Bowden."
15 Are you saying that she -- the process of evaluation,
16 discussion of evaluation, was different with women then
17 with men?
18 A  I --
19    MR. NEBEKER: Objection. Lacks foundation.
20    THE WITNESS: I think it -- to me, it's
21 hard -- it's likely that it was. Now I wasn't there
22 when she evaluated him.

Page 174

1    BY MR. SILVERBERG:
2  Q  Well, how did your female coworkers tell you
3  how the evaluation discussions went with Ms. Samiy?
4  A  That it went -- that it was just an open
5  discussion basically about work, and work assignments,
6  and what was -- you know, what needed to be done. And
7  the discussions with me were more of a -- you know, of
8  laying down the law and her exerting her authority.
9  Q  Do you know how discussions were with other
10 men?
11 A  Other men?
12 Q  Yeah. How she discussed evaluations with
13 other men.
14 A  No. I mean --
15 Q  Did other men complain about their
16 evaluations?
17 A  Tony did. I don't remember. I think I
18 remember Herman complaining.
19 Q  Did you ever remember Kathleen or Lynn saying
20 anything about Tony having a mental illness or having
21 to be careful around Tony or he's on medication or
22 anything like that?

Page 175

1  A  I don't remember specifically. No.
2  Q  Did Tony ever explain to the group that he was
3  on medication for stress?
4  A  Yeah, he did.
5  Q  And he said it made him sleepy?
6  A  Yeah. I think that was the first staff
7  meeting that he was introduced.
8  Q  And what was your impression when he said
9  that?
10 A  My impression was -- it was just, you know, a
11 statement of fact. I -- the only impression I remember
12 thinking is that I thought it was -- pretty open about
13 it.
14 Q  So you thought it was a positive thing that he
15 was --
16 A  Yeah. I didn't think it was a negative thing.
17 Q  But you thought --
18 A  I thought he was sort of -- I thought, at the
19 time, he was expressing an openness about it, and that,
20 you know, we shouldn't be overly sensitive about it or
21 insensitive about it. We should just go about our
22 work, and he wasn't going to let it affect --

Page 176

1  Q  Was --
2  A  -- his performance.
3  Q  Was Tony a good worker?
4  A  From my experience, yes. He was a good
5  coworker.
6  Q  Did he know what he was doing, from your
7  experience?
8  A  Yes.
9  Q  Did he work hard?
10 A  Yes.
11 Q  Did he take pride in his work?
12 A  Yes.
13 Q  Did he care about the zoo?
14 A  Yes.
15 Q  There was -- in the complaint, in Exhibit --
16    MR. SILVERBERG: It's one of the
17 exhibits -- what exhibit is it, the civil action?
18    MR. NEBEKER: The complaint?
19    MR. SILVERBERG: Yeah.
20    MR. NEBEKER: It's one.
21    MR. SILVERBERG: Okay. That makes sense.
22    BY MR. SILVERBERG:

Page 201

1   Q   To your knowledge, did Ms. Samiy and Ms.
2   Dolnick know that Mr. Bowden had a previous
3   discrimination case with --
4   A   With the Smithsonian?
5   Q   Yeah.
6       MR. NEBEKER: Objection.
7       MR. SILVERBERG: Yes.
8       MR. NEBEKER: Lacks foundation.
9       THE WITNESS: Yeah.
10      BY MR. SILVERBERG:
11  Q   How do you know that?
12  A   I think Lynn said it in the first meeting or,
13  you know, when Tony was coming.
14  Q   She said Tony was coming by way of this
15  lawsuit or whatever?
16  A   I don't specifically remember. I remember
17  that, you know, the announcement was basically a slot
18  was being transferred to the zoo based on a personnel
19  action. You know, one branch of the Smithsonian giving
20  away a slot is basically unheard of unless they're
21  forced into it. So I don't remember what -- how she
22  explained it, but that was --

Page 202

1   Q   But it seemed to you she knew
2   what -- how -- by what mechanism Tony was coming to the
3   zoo?
4   A   Yes.
5       MR. SILVERBERG: I have nothing further.
6           FURTHER EXAMINATION
7       BY MR. NEBEKER:
8   Q   So you're saying you may have inferred that it
9   was in settlement of an EEO claim? And you said
10  earlier that Mr. Bowden came --
11  A   I may have, but I don't remember. Yeah.
12      MR. NEBEKER: I have nothing further. Thank
13  you.
14      Oh, you have the right, when -- wait.
15      Did you have something?
16      (No response.)
17      MR. NEBEKER: You have the right, if you wish,
18  to read the transcript that the court reporter is going
19  to put together and correct errors, the typos, and so
20  forth.
21      THE WITNESS: Yeah.
22      MR. NEBEKER: You also have the right to waive

Page 203

1   that and not hassle yourself with reading through the
2   transcript again. It's up to you.
3       THE WITNESS: I mean --
4       MR. NEBEKER: Well, typically people want to
5   read it over to see --
6       THE WITNESS: I'll take a look at it.
7       MR. NEBEKER: Thank you.
8       MR. SILVERBERG: I had one other question.
9           FURTHER EXAMINATION
10      BY MR. SILVERBERG:
11  Q   Did you have any significant problems as an
12  employee there before Ernie Robinson filed his EEO
13  complaint?
14      MR. NEBEKER: Objection. Vague.
15      THE WITNESS: I don't know when he filed his
16  complaint, so --
17      MR. SILVERBERG: Okay. Okay.
18      MR. NEBEKER: Okay.
19      THE WITNESS: Okay.
20      MR. NEBEKER: Thank you very much,
21  Mr. Ferster.
22      THE WITNESS: You're welcome.

Page 204

1       MR. NEBEKER: We appreciate your time.
2       MR. SILVERBERG: Nice to meet you.
3       THE WITNESS: Nice to meet you.
4
5       (Whereupon, at 4:55 p.m., the deposition of
6   AARON FERSTER was concluded.)
7
8           * * * * *
9
10      I have read the foregoing pages, which are a
11  correct transcript of the answers given by me to the
12  questions therein recorded.
13
14
15  Deponent_____
16
17  Date_____