Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ANTHONY BOWDEN,              :

    Plaintiff,              :

vs.                          : Civil Action No.

LAWRENCE M. SMALL,           : 05-2202 (RBW)

SECRETARY, SMITHSONIAN       :

INSTITUTION,                 :

    Defendant.              :

_____/

DEPOSITION OF ERNEST ROBINSON

Tuesday, November 6, 2007

Washington, D.C.

Job No.: 184033

Pages 1 - 254

Reported by: Kathy Savich, RPR

Page 70

1  A.  In one particular incident, he
2  actually made it to me. And our office is a
3  very casual workplace. We wear blue jeans and
4  baseball caps if we choose to. I was on my
5  computer working, and I had a baseball cap on.
6  And on that particular day I had it turned
7  around backwards. And Mr. Baxter walked into
8  the room and just said out loud, referring to
9  me, he said, "Baseball cap on backwards,
10 attitude." And I didn't see it as being a
11 joke. I didn't find the humor in it or
12 anything.
13          In other instance we were actually
14 in a meeting, and this was when Mr. Baxter
15 first came to the zoo, Mr. Baxter made a
16 comment that -- he said, "I don't trust you
17 people and you people have to earn my trust."
18 Okay. And I actually heard this myself, for
19 myself.
20  Q.  Any other incidents where you heard
21 what you believe to be racial epithets or
22 racial remarks --

Page 71

1  A.  No.
2  Q.  -- at the zoo at all?
3  A.  Well, I've heard them outside of my
4  department, you know, but it's got nothing to
5  do with his particular case.
6  Q.  Okay. So these didn't involve the
7  Exhibits and Park Management, correct?
8  A.  No.
9  Q.  They didn't involve Ms. Dolnick; is
10 that correct?
11 A.  No.
12 Q.  And they didn't involve Ms. Samiy,
13 correct?
14 A.  No.
15 Q.  We have to make sure we're getting
16 the nos and yeses in the right order. Let me
17 start over again just to make sure. Did you
18 ever hear --
19         Let me do it this way. Did you
20 ever hear Ms. Dolnick ever use racial epithets
21 or remarks?
22 A.  No.

Page 72

1  Q.  Did you ever hear Mr. Bowden claim
2  that he overheard Ms. Dolnick use any racial
3  epithets or remarks?
4  A.  No.
5  Q.  Did you ever overhear Ms. Samiy use
6  any racial epithets or remarks?
7  A.  No.
8  Q.  Did you ever overhear Mr. Bowden to
9  say that he had heard Ms. Samiy use racial
10 epithets or remarks?
11 A.  No.
12 Q.  Did you ever hear anybody in the
13 Exhibits and Park Management supervisory staff
14 use racial epithets or remarks while
15 Mr. Bowden or you were at the zoo?
16 A.  Yes.
17 Q.  And who was that?
18 A.  Well, I just explained it to you
19 the incident that I had with Mr. Baxter.
20 Q.  Okay. Aside from those --
21 A.  Yes.
22 Q.  -- anything else -- were there any

Page 73

1  other remarks that you have overheard --
2  A.  No.
3  Q.  -- by anybody in Exhibits and Park
4  Management that could be deemed by anyone to
5  be racially charged remarks --
6  A.  No.
7  Q.  -- or epithets?
8  A.  But then, you know, they didn't
9  necessarily have to operate under remarks, I
10 mean, you know.
11 Q.  Let me go back to the claims that
12 Mr. Bowden has made in the case. Actually,
13 let me back up one step.
14         Is there anything else other than
15 what you have testified to today which you
16 believe would support Mr. Bowden's claim that
17 he was the victim of discrimination based upon
18 race?
19 A.  You're saying is there anything
20 else that I --
21 Q.  Any other facts that you're aware
22 of other than what you have testified to in

Page 214

actual graphics panels that I had to purchase needed to be applied to the actual hardware that he had to get fabricated.

Q. So you needed to communicate with Mr. Bowden to get the job done?

A. That's correct.

Q. And did you tell that to Ms. Samiy?

A. I attempted to tell her that it was impossible for us to do this without us being able to work together.

Q. And her reaction?

A. She really didn't comment on it.

Q. So what happened with the job?

A. At that point, they basically -- once the money amount was awarded to the contractor, then basically we were committed. So they basically had to step back and allow it to --

Q. Do you know why Ms. --

MR. NEBEKER: Well, let him finish, please.

THE WITNESS: Well, the contract

Page 215

amount was awarded, basically, then it had to work at that point.

BY MR. SILVERBERG:

Q. Do you know why Ms. Samiy told you not to work with Mr. Bowden?

A. Ms. Dolnick.

MR. NEBEKER: Objection. Foundation.

THE WITNESS: Ms. Dolnick.

BY MR. SILVERBERG:

Q. Do you know, if you know, why -- did Ms. Dolnick say why she told you you shouldn't work with Mr. Bowden?

A. She didn't give me no particular reason, but it was obvious that -- from the beginning that this project was going to fail because I think another person in management had attempted to do this same project and was not able to, so I think it was given to us to attempt to do it.

And in the process of us making it happen, we were pretty much moving forward

Page 216

1  with -- with that, actually, you know, having
2  it done successfully.
3      Q.  Did you ever know of any white
4  employees that were told by management they
5  can't work together?
6      A.  No.
7      Q.  Did you know of any female
8  employees that were told by management they
9  couldn't work together?
10     A.  No.
11     Q.  Let's go down to last (A) on
12 page 3, answer. You said that, "I was aware
13 Mr. Bowden applied for the position" -- which
14 is supervisory exhibit specialist -- "up
15 above, and didn't make the cert to qualify. I
16 remember the job was posted a first time, then
17 reposted a second time. It appeared they
18 posted it a second time with additional duties
19 which they thought would not allow Mr. Bowden
20 to qualify."
21         How do you know this? Did you
22 actually see each posting?

Page 217

1      A.  I think I did.
2      Q.  And why do you say that it appeared
3  that they gave additional duties the second
4  time to not allow him to qualify?
5      A.  I think the second time I read the
6  position description, it had added to it other
7  graphic programs like -- you know, graphic
8  programs that we use, like Quark Express
9  and --
10     Q.  How do you know that it was
11 added -- that it appeared that it was done to
12 not allow Mr. Bowden to qualify?
13     A.  Well, I just -- he didn't have
14 the -- I don't think he really knew how to
15 work the various programs that they had listed
16 the second time around.
17     Q.  Was it your sense that management
18 didn't want him to get this position?
19     A.  Yes.
20         MR. NEBEKER: Objection. Lacks
21 foundation.
22 BY MR. SILVERBERG:

Page 218

1  Q.  Why was that your sense?
2  A.  It -- I mean, just from past
3  history. There were other blacks that had
4  applied for similar positions that were
5  denied, you know, that position as well. So
6  it was quite obvious that he wasn't going to
7  get it. And I think, from what he
8  communicated to me, that Ms. Dolnick actually
9  verbally told him that, you know, he may get a
10  12, but he'll never be a supervisor.
11  Q.  Who did get this position?
12  A.  Mr. Baxter.
13  Q.  What race is Mr. Baxter?
14  A.  I would assume that he's Caucasian.
15  Q.  Well, you know him, right?
16  A.  Yes.
17  Q.  What color is he?
18  A.  White.
19  Q.  One second.
20      Do you know the reason why -- did
21  management give a reason, as far as your know,
22  why they picked Mr. Baxter for the position?

Page 219

1  Do you know of any reason why they --
2  A.  Yes. Lynn Dolnick said that
3  Mr. Baxter was an expert at Excel software and
4  PageMaker and he was an expert at Quark
5  Express and Photoshop, which --
6  Q.  Did you -- you worked under
7  Mr. Baxter?
8  A.  Yes.
9  Q.  Was he well-versed in those areas?
10  A.  No, he wasn't.
11  Q.  So you don't think he was an expert
12  in those things --
13  A.  No.
14  Q.  -- those systems?
15  A.  No, not at all.
16  Q.  On page 4 of your affidavit, on the
17  top paragraph you say that, "Once Mr. Bowden
18  applied for a supervisory exhibit specialist
19  position, his performance rating dropped.
20  Using that as a basis, management officials
21  claimed his performance had declined, which
22  was another reason not to hire him for that

Page

1  position."
2      How do you know his performance
3  rating dropped?
4  A.  Because he communicated to me on
5  several occasions that...
6  Q.  What happened to your performance
7  appraisal after you filed an EEO complaint?
8  A.  It dropped drastically.
9  Q.  From what to what?
10  A.  From "highly successful" to,
11  actually, "needs improvement," which was the
12  lowest one on the list.
13  Q.  Were you put on a performance
14  improvement plan?
15  A.  No.
16  Q.  Was it "needs improvement" that you
17  were dropped to?
18  A.  Yes.
19  Q.  Was it "unsatisfactory" you were
20  rated or "needs improvement"?
21  A.  It was "needs improvement." It
22  actually the last one on the list which was

Page

1  one that could actually determine whether
2  not I could be terminated from my job.
3  Q.  On the top of page 5, you say,
4  "Myself as well as other blacks in the office
5  received poor evaluations."
6      To your knowledge, did blacks
7  generally receive worse evaluations than
8  whites?
9      MR. NEBEKER: Objection. Lacks
10  foundation.
11      THE WITNESS: Yes.
12  BY MR. SILVERBERG:
13  Q.  Who were examples of that, of who
14  received poor evaluations?
15      MR. NEBEKER: Same objection.
16      THE WITNESS: Like I said, myself
17  being one, and I know the gentleman Levi
18  Murrell probably received a very poor
19  evaluation as well.
20  BY MR. SILVERBERG:
21  Q.  Do you know he did?
22  A.  Yes.

Esquire Deposition Services
D.C. - 1-800-441-3376
MD - 1-800-539-63
VA - 1-800-752-89