**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
ANTHONY BOWDEN,                           )
                                          )
          Plaintiff,                      )
                                          )
     v.                                   )     Civil Action No. 05-2202 (RBW)
                                          )
G. WAYNE CLOUGH, SECRETARY,               )
SMITHSONIAN INSTITUTION,                  )
                                          )
          Defendant.[1]                   )
_____)

## <u>MEMORANDUM OPINION</u>

Plaintiff Anthony Bowden brings this action against the Secretary of the Smithsonian

Institution ("Institution") in his official capacity, alleging violations of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e-3(a), 16(a) (2000) ("Title VII"), Second Amended

Complaint of Employment Discrimination and Breach of Contract ("Second Am. Compl.") ¶¶

47-59, 66-73, 88-101, 107-110, and the Rehabilitation Act of 1973, 29 U.S.C. §§ 791, 794a

(2000) ("Rehabilitation Act"), Second Am. Compl. ¶¶ 60-65, 74-81, 102-106, 107-110, on the

basis that the Institution, an agency of the United States government and his employer, engaged

in discriminatory employment practices against him based on his race (African-American),

Second Am. Compl. ¶¶ 47-49, 66-69, 82-86, color (black), <u>id.</u> ¶¶ 50-52, 70-73, 87-91, sex

(male), <u>id.</u> ¶¶ 53-55, 92-96, religion (Baptist), <u>id.</u> ¶¶ 56-59, 97-101, and disabilities (panic

disorder, anxiety disorder and depression), <u>id.</u> ¶¶ 60-62, 74-77, 102-106, and retaliated against

him because of his participation in statutorily protected Equal Employment Opportunity ("EEO")

activity and a related lawsuit, <u>id.</u> ¶¶ 63-65, 78-81, 107-110.  The plaintiff also alleges that the

---

[1]     Pursuant to Federal Rule of Civil Procedure 25(d)(1), the Court has substituted the current
Secretary of the Smithsonian Institution, G. Wayne Clough, as the defendant in this action.

Institution violated the Rehabilitation Act, id. ¶¶ 114-17, and its settlement agreement with him,

id. ¶¶ 111-13, by failing to provide him the reasonable accommodations he requested for his

disabilities.  This matter is currently before the Court on the defendant's Motion for Judgment On

The Pleadings Or, In The Alternative, For Summary Judgment ("Def.'s Mot."), which the

plaintiff opposes, Plaintiff's Opposition To Defendant's Motion For Judgment On The Pleadings

Or, In The Alternative, For Summary Judgment ("Pl.'s Opp'n").[2]  For the following reasons, the

Court must grant the Institution's motion.

## I.  BACKGROUND

Viewing the evidence in the light most favorable to the plaintiff, the facts are as follows.

**A.      The Plaintiff's Employment with the Institution**

At all relevant times pertaining to this lawsuit, the plaintiff, a black African-American,

was a practicing Baptist and "suffer[ed] from various mental disabilities, including panic

disorder, anxiety disorder and depression."  Second Am. Compl. ¶ 4.  At the time of the filing of

this lawsuit, the plaintiff had been working for the Institution for twenty-two-years, and held the

position of an Exhibits Specialist in the production unit of the Exhibits Department at the

National Zoological Park ("Zoo"), a component of the Institution, at the GS-1010-11 pay grade

level.  Id. ¶¶ 4, 12.  At any given time during the plaintiff's employment between two and three

other employees held the same job title as the plaintiff.  Pl.'s Opp'n, Ex. 1 (Sept. 27, 2007

---

[2]       The Court also considered the following documents that were submitted in connection with this
motion: the defendant's Memorandum Of Points And Authorities In Support Of Motion For Judgment On
The Pleadings Or, In The Alternative, For Summary Judgment ("Def.'s Mem."); the defendant's Statement
Of Material Facts As To Which There Is No Genuine Dispute ("Def.'s Stmt. of Facts"); Plaintiff's
Memorandum Of Points And Authorities In Opposition To Defendants' [sic] Motion For Judgment On
The Pleadings Or, In The Alternative, For Summary Judgment ("Pl.'s Opp'n"); the Plaintiff's Statement of
Facts As To Which There Is A Genuine Dispute ("Pl.'s Stmt. of Facts"); and the defendant's Reply To
Plaintiff's Opposition to Defendant's Motion For Judgment On The Pleadings Or, In The Alternative, For
Summary Judgment ("Def.'s Reply").

Deposition of Lynn Dolnick ("Dolnick Dep.")) at 143; id., Ex. 7 (Dec. 5, 2007 Deposition of

Charles Fillah ("Fillah Dep.")) at 120.  Among the other Exhibits Specialists were one Philippine

female with a brown complexion and no religious affiliation, several African-American males of

either black or brown skin color and with various religious affiliations, and none with any known

disabilities.  Pl.'s Opp'n, Ex. 5 (Dec. 4, 2007 Deposition of Anthony Bowden ("Bowden Dep. I"))

at 66-67; id., Ex. 1 (Dolnick Dep.) at 143, 146-47; id., Ex. 7 (Fillah Dep.) at 57; id., Ex. 11 (Sept.

28, 2007 Deposition of Jeffery Baxter ("Baxter Dep.")) at 120-21; see also Second Am. Compl. ¶

27(c), (e).  The plaintiff maintains that his employment at the Institution has been marred by the

following instances of unfairness, discrimination, and hostility.[3]  Second Am. Compl. ¶ 23.

### 1. The Plaintiff's Allegation of Inadequate Compensation

At his request, the plaintiff received a "desk audit" on October 17, 2003, to determine the

accuracy of his responsibilities as compared with his grade level and compensation.  Id. ¶ 23(e)-

---

[3]     In his second amended complaint, the plaintiff alleges that the discrimination commenced in
2001. Second Am. Compl. ¶ 23(a).  Specifically, the plaintiff maintains that beginning around August
2001, he was not compensated for extra work he completed while his Jewish co-workers who "performed
higher graded duties" were promoted based on performing these additional responsibilities. Id. ¶¶ 17,
23(b)-(c).  In addition, the plaintiff alleges that in May 2003, his immediate supervisor attempted to revise
his job title to "Exhibit Specialist/Project Leader," but that he refused the revision because if his position
acquired the description of "Leader," he wanted an accompanying promotion as well.  Id. ¶ 23(d), (e).
However, because the plaintiff's oldest EEO complaint that is at issue in this lawsuit was filed in August
2004, and it only alleges unlawful conduct by the Institution as of October 2003, id. ¶¶ 17, 23; Pl.'s Opp'n,
Ex. 16 (Report of Investigation 04-16-080604, Oct. 8, 2004 Affidavit of Anthony Bowden), the plaintiff
has not exhausted his administrative remedies for any events allegedly occurring prior to October 2003.
See Brown v. Gen. Servs. Admin., 425 U.S. 820, 835 (1976); Jarrell v. U.S. Postal Serv., 753 F.2d 1088,
1091 (D.C. Cir. 1985) ("a timely administrative charge is a prerequisite to initiation of a Title VII action
in the District Court . . . 'subject to waiver, estoppel, and equitable tolling.'"); see also 42 U.S.C. § 2000e-
5(e)-(f) (setting forth the time limitations for filing charges with the Equal Employment Opportunity
Commission or a United States district court).  As with Title VII claims, the administrative exhaustion
requirement equally applies to Rehabilitation Act claims.  See Spence v. Straw, 54 F.3d 196, 200 (3d Cir.
1995) ("[A] party is barred from suing a federal agency for violation of section 501 [of the Rehabilitation
Act] if he or she has failed to exhaust administrative remedies under Title VII."); Doe v. Garrett, 903 F.2d
1455, 1458 (11th Cir. 1990) (same); McGuinness v. U.S. Postal Serv., 744 F.2d 1318, 1319-20 (7th Cir.
1984) (same).  Accordingly, the Court will address only those alleged discriminatory acts occurring as of
October 2003.

(f).  The desk audit determined that the plaintiff's position was accurately graded as an 11, which was the plaintiff's existing grade level.  Def.'s Mem., Ex. 28 (Evaluation Statement); <u>see also</u> <u>id.</u>, Ex. 34 (Federal Position Description Cover Sheet); <u>id.</u>, Ex. 32 (Grade Evaluation Guide for Visual Arts Work).  The plaintiff disputed the outcome of the desk audit, alleging that it was "discriminatory, retaliatory, and inaccurate" because the audit "did not include many of the duties [that he] actually performed."  Second Am. Compl. ¶¶ 23(e)-(g), (o), 25; Def.'s Mem., Ex. 33 (Nov. 6, 2003 Letter from Anthony Bowden to Lynn Dolnick).  The desk audit included an interview with both the plaintiff and his supervisor, and, although the plaintiff does not know what information his supervisors provided the auditor, Pl.'s Stmt. of Facts at 44, he contends that his supervisors must have "lied to the auditor about [the plaintiff's] duties in order to prevent him from receiving a promotion" and must have neglected to "include in his position description the additional duties that he was performing so that he would not be promoted."[4]  Second Am. Compl. ¶ 23(j); <u>see also</u> <u>id.</u>, ¶¶ 23(g), 25.

        In response to the plaintiff's complaints about the audit, the Institution offered to re-conduct it, but the plaintiff refused a second desk audit, stating that he "[had] given the auditor all of the info[rmation] that was needed for [the auditor] to make a clear and accurate assessment of what [his] job [entails]."  Def.'s Mem., Ex. 18 (Nov. 12, 2003 E-mail from Anthony Bowden to Lynn Dolnick).

---

[4]        Nowhere does the plaintiff indicate what these additional duties include, but, regardless, the Court is not persuaded that having the desk audit include duties that the plaintiff was actually performing was anything but proper, given that the purpose of the desk audit was to make an accurate assessment of his duties.

2.        **The Plaintiff's Performance Assessments Allegations**

The plaintiff challenges two assessments of his work performance.  The first assessment that he contests was his "Fully Successful" rating for his job performance from "June 2004 through December 2004."[5]  Second Am. Compl. ¶ 28(f).  The plaintiff alleges that the rating he received is inexplicable because it was the first time during his tenure with the Zoo that he had not received an "Outstanding" rating.  Pl.'s Stmt. of Facts at 22; Def.'s Mem., Ex. 9 (Apr. 22, 2004 National Zoological Park, Smithsonian Institution, Performance Appraisal Form).  He also challenges his "Improvement Needed" rating for his 2005 job performance.  Second Am. Compl. ¶ 42.  That assessment was rendered because although the plaintiff received a "Met" or "Exceeded" rating in six of the seven categories of that review, he received an "Improvement Needed" rating in the areas of "Communication, Teamwork and Customer Service Skills."  Id.; Def.'s Mem., Ex. 10 (Feb. 3, 2006 National Zoological Park, Smithsonian Institution, Performance Appraisal Form).  The plaintiff disputed this rating when he received it and refused to sign the appraisal form based upon his own assessment of his "strong communication skills" and the fact that the rating was inconsistent with the verbal comments that his supervisor conveyed when reviewing the performance assessment with the plaintiff, a verbal review which did not address the plaintiff's communication skills but included reassuring phrases like "everything [i]s working out fine" and "keep up the good work."  Second Am. Compl. ¶ 43.

---

[5]        The plaintiff's judicial complaint is inconsistent as to when he received his 2004 performance review and who reviewed his job performance.  In one portion of his complaint he refers to "May[] 2004" as the date when his "second line supervisor" gave him his 2004 rating, Second Am. Compl. ¶¶ 19, 23(r), 28(f), but elsewhere he refers to "March 1, 2005" as the date when Mr. Baxter, his immediate supervisor, gave him his 2004 rating, id. ¶ 28(f).  Because the record contains the plaintiff's March 17, 2005 EEO complaint, which indicates that the plaintiff received the rating on March 1, 2005, id., the Court assume that is the correct date.

### 3.     The Plaintiff's Non-Selection Allegations

The plaintiff also challenges the Institution's hiring of his superior, a job the plaintiff

aspired to acquire.  The position was filled on April 22, 2004, by the selection of a "white, male,

Christian [with] no disability" as the GS-1010-12 Supervisory Exhibits Specialist, the immediate

supervisory position over the position held by the plaintiff.  Id. ¶ 18; see also id. ¶ 24(a).  After

the vacancy of the position was first posted, the position's description was revised to include the

need for computer skills.  Pl.'s Stmt. of Facts at 38-39.  Following this revision, the plaintiff

contacted one of his supervisors to inquire about the position's computer skills requirement and

was informed by the supervisor that she would not be aware of who applied for the position until

the date for submitting applications for the position closed, although she told the plaintiff that she

was aware that he had not applied for the position before the computer-skills revision was added.

Def.'s Mem., Ex. 40 (Aug. 28, 2003 E-mail from Lynn Dolnick to Anthony Bowden).  The

plaintiff then applied for the position and he contends that his non-selection was wrongful

because he "was significantly better qualified for the position than [the selectee] and had been

performing many of the position's duties for some time."  Second Am. Compl. ¶ 24(b).  The

plaintiff also alleges that the revision for the position was made in retaliation for his prior EEO

activity because computer skills "were not relevant to the position but . . . [had] the effect of

reducing [the] [p]laintiff's ability to compete and/or qualify for the position."  Id. ¶ 24(g).  The

plaintiff also complains that his "interview for the position was different from that of other

candidates in that it lasted only about 15 minutes[,] . . . during [which] . . . he was told words to

the effect that [the interviewers] 'knew everything about [him].'"  Id. ¶ 24(d).

4.        **The Plaintiff's Hostile Work Environment Allegations**

The plaintiff provides a litany of general allegations that he contends form the basis for

the hostile work environment to which he was purportedly subjected.  Those allegations include

that he was:

> question[ed] . . . about his activities (. . . [while] other employees
> [were not subjected to such questions]); assign[ed] duties . . . that
> [he] should not be doing because they [we]re properly [his
> supervisor's responsibilities]; sp[oken] to . . . in a harsh and
> demanding manner when [his supervisor] d[id] not treat other
> employees of other protected groups in that manner; more closely
> monitor[ed] . . . than . . . other employees; re-assigned . . . to a
> small, windowless office; deliberately overloaded . . . with work
> assignments; [not] . . .  provide[d] [with] reasonable
> accommodations to which he is entitled by law and [by the terms
> of a] settlement [agreement;] and sp[oken] to . . . in an
> unprofessional manner.

Id. ¶¶ 23(t), 28(d).  He also lists the following specific incidents that he contends created a

hostile work environment: a supervisor stating "you people" in his presence, which he took as a

racial slur, id. ¶ 28(h); his supervisor calling him "broad shoulder[ed]," which he took as a

euphemism for being a black, African-American male, Pl.'s Opp'n at 11-12; see also Second Am.

Compl. ¶ 23(l)-(k), his receipt of a counseling letter after he remarked that one of his co-workers

"must be crazy," Second Am. Compl. ¶ 28(b); requiring him to "schedule in advance all sick

leave," which the plaintiff understood to include unanticipated illnesses (not simply the planned

scheduling of his doctors' appointments), id. ¶ 28(c); requiring that he "attend a meeting only for

supervisors[,] which was clearly above his . . . job responsibilities and [that] made [him] feel

uncomfortable," id. ¶ 28(e); his supervisor "yell[ing] at [him] in front of many [Zoo] visitors"

regarding one of his job related tasks, id. ¶ 41(a); being provided with "impossible work

deadlines," id. ¶ 41(c); being assigned more "work tickets" than his co-workers, id. ¶ 41(d);

"[permitting an Asian-American, brown, atheist female co-worker with unknown disability status] to work in a comfortable office environment while [he] ha[d] to do 'grunt work' [outdoors] in all types of weather," id. ¶¶ 27(e), 41(e); and being assigned "to clean a wall in the Giraffe House which was filled with animal droppings and other hazardous germs" despite the plaintiff's protestations that he "suffered from allergies," and "didn't have the proper safety equipment . . . and . . . had not been vaccinated against the germs that might be in th[e] [giraffe] area [due to one giraffe's death from tuberculosis]," id.

The plaintiff further alleges that he was mocked and ignored when he complained about having "to work alone on large and heavy projects," despite his back injury that had been caused by similar "heavy lifting" assignments.  Id. ¶ 23(k)-(l).  In particular, the plaintiff alleges that when he complained to his immediate supervisor that he "could not physically do [the work assigned to him] by himself because of the magnitude of the work and the size/weight of the machines (up to 500 pounds)," the supervisor recommended that the plaintiff "assign other employees to help," an unhelpful suggestion, according to the plaintiff, due to the fact that he was not a "supervisor" or "team leader" and therefore "ha[d] no authority to assign [these] duties [to others]" or "direct other employee [sic] to assist him."  Id. ¶ 28(g).

### 5.      The Plaintiff's Settlement Agreement Breach Allegations

In April 1999, the plaintiff was transferred to the Zoo from the American Museum of Natural History, both components of the Institution, pursuant to a settlement agreement stemming from his previous lawsuit against the Institution.  Id. ¶¶ 14-15.  The settlement agreement required that the Institution "make certain specific reasonable accommodations to [address the] [p]laintiff's medical conditions," id. ¶¶ 14-15, i.e., his panic disorder, anxiety

disorder and depression, id. ¶ 32, by "allow[ing him] short breaks to go to the bathroom or if he is not feeling well, . . . permit[ing him] to go outside for a breath of fresh air when working in the spray booth, . . . allow[ing him] to eat snacks when he takes his medication . . . [and] continu[ing] to . . . permit[] [him to take] time for doctor's appointment [sic] in accordance with agency policies and availability of leave." Id. ¶ 15.

The plaintiff alleges that on many occasions since his transfer to the Zoo he has complained to his supervisors that the Institution was not honoring the provisions of the settlement agreement to accommodate his disabilities due to his supervisor's "continuous[] question[ing]" of him when he leaves for bathroom breaks and doctors' appointments, and his supervisor's requirement that he document his medical visits. Id. ¶¶ 26, 29-34. The plaintiff also maintains that the Institution "failed to take action appropriate action [sic] regarding an assault on [him] by a [female] co-worker," id. ¶ 29, when she "intentionally and repeatedly bump[ed] against him," id. ¶ 37, and that the Institution "subject[s] [him] to physical assault, intimidation and humiliation," id. ¶ 39, by forcing him to attend meetings with this co-worker because she "aggravate[s] his disabilities," id. ¶ 38.

## B.    Procedural History

### 1.    The Plaintiff's Judicial Complaint

The plaintiff filed five EEO administrative complaints against the Institution between August 6, 2004, and May 26, 2006.[6] Id. ¶¶ 7-10. After receiving the Institution's final decisions on three of his five EEO administrative complaints, Second. Am. Compl. ¶¶ 7, 9-10, and waiting

---

[6]    Despite the plaintiff's representation in his Second Amended Complaint that he "filed four (4) individual administrative formal complaints of discrimination," throughout his complaint he actually discusses five prior complaints. Second. Am. Compl. ¶¶ 6-11.

180 days after the filing of the two remaining administrative complaints during which no action was taken by the Institute, id. ¶¶ 8, 11 (citing 42 U.S.C. § 2000e-16(c) (stating that the plaintiff may bring a lawsuit "after one hundred eighty days from the filing of the initial charge with the department, agency, or unit"), the plaintiff initiated this action, Second Am. Compl. ¶ 6.

In his Second Amended Complaint, the plaintiff has pled eighteen counts, comprising four legal theories: (1) that the Institution violated Title VII and the Rehabilitation Act by unlawfully subjecting him to a hostile work environment based on his race (Count 1), id. ¶¶ 47-49; color (Count 2), id. ¶¶ 50-52, gender (Count 3), id. ¶¶ 53-55; religion (Count 4), id. ¶¶ 56-59; and disabilities (Count 5), id. ¶¶ 60-62; (2) that the Institution violated Title VII and the Rehabilitation Act  by unlawfully discriminating against him by (a) not selecting him for the Supervisory Exhibits Specialist position based on his race (Count 7), id. ¶¶ 66-69; color (Count 8), id. ¶¶ 70-73; and disabilities (Count 9), id. ¶¶ 74-77; (b) not compensating him for the duties that he was actually performing based on his race (Count 11), id. ¶¶ 82-86; color (Count 12), id. ¶¶ 87-91; gender (Count 13), id. ¶¶ 92-96; religion (Count 14), id. ¶¶ 97-100; and disabilities (Count 15), id. ¶¶ 102-06; and (c) not providing him accommodations he was entitled to based on his disabilities (Count 18), id. ¶¶ 114-17; (3) that the Institution violated Title VII and the Rehabilitation Act when it unlawfully retaliating against him based on his prior EEO activity and related litigation by (a) harassing him and fostering a hostile work environment (Count 6), id. ¶¶ 63-65; (b) not selecting him for the Supervisory Exhibits Specialist position (Count 10), id. ¶¶ 78-81; and (c) not compensating him for the duties that he was actually performing, (Count 16), id. ¶¶ 107-10; and (4) that the Institution breached its settlement agreement with him by not

providing him reasonable accommodations according to the terms of that agreement (Count 17),
id. ¶¶ 111-13.

As a result of the allegations advanced in each count of his complaint, the plaintiff
contends that (1) he lost wages he would have otherwise received and a promotion to the proper
grade level in recognition of the responsibilities he is currently performing, (2) was unjustly
denied a promotion to the Supervisory Exhibits Specialist position when someone not of his
protected class was selected, and (3) was forced to work in a hostile and discriminatory
environment causing him to "suffer[] great emotional pain and suffering," including the
following symptoms:

> exacerbat[ion of] his anxiety disorder, panic disorder and
> depression; distress, humiliation and work related stress;
> physical pain and suffering such as shortness of breath, heart
> palpitations, dizziness, headaches, lack of appetite and lack of
> sleep . . . .

Id. ¶ 46(a)-(d).  The plaintiff maintains that he "has been forced to seek medical treatment for
[these] work-caused symptoms," resulting in hospital visits and the need to take
medications.  Id. ¶ 46(c)-(d).

### 2.       The Institution's Motion to Dismiss, Or in the Alternative, For Summary Judgment

The Institution has filed a motion to dismiss this action pursuant to Federal Rule of Civil
Procedure 12(h) or, in the alternative, for summary judgment pursuant to Rule 56.  See Def.'s
Mot.  Specifically, the Institution contends that: (1) the plaintiff cannot maintain his hostile work
environment claims because he has alleged "nothing more than ordinary work-place slights
insufficient to support an employment discrimination or retaliation claim," Def.'s Mem. at 4; (2)
the plaintiff cannot establish that the Institution's legitimate, non-discriminatory rationale for

selecting the candidate it did for the Supervisory Exhibits Specialist position was false, and the

Institution's selection decision was not based on the plaintiff's race, color, disabilities, or reprisal,

id. at 23; (3) the plaintiff cannot maintain his claims that the Institution failed to properly

compensate or promote him because he has not proffered evidence to invalidate the legitimate,

non-discriminatory rationale offered by the Institution for the classification of his position – i.e.,

an independent analysis of his position concluded that it was properly classified and

compensated, id. at 29-31; (4) the plaintiff has failed to proffer enough evidence to support the

conclusion that the Institution made any decision for the purpose of retaliating against him,

Def.'s Reply at 4; (5) the plaintiff cannot maintain his breach of contract claim because this Court

lacks subject matter jurisdiction over this claim, Def.'s Mem. at 34-35, but that even if the Court

had jurisdiction, this claim is time-barred, id. at 42, and that, in any event, he has not proffered

evidence to demonstrate a contractual breach, id. at 37-38; (6) the plaintiff cannot maintain any

claim that his disabilities were not accommodated because the acts over which he complains are

not actionable, id. at 44; and (7) the plaintiff has conceded as accurate the Institution's version of

the facts by failing to oppose them in accordance with Local Rule 7(h), which requires that the

party opposing summary judgment submit a "separate concise statement of genuine issues setting

forth all material facts as to which it is contended there exists a genuine issue necessary to be

litigated, . . . includ[ing] references to the parts of the record relied on to support the statement,"[7]

Def.'s Reply at 1-2.

---

[7]      As to the sufficiency of the Plaintiff's Statement of Facts as to Which There is a Genuine Dispute,
which the defendant contests as inadequate in his reply, Def.'s Reply at 2, while the plaintiff's submission
is prepared in a convoluted and unhelpful format that is far from "concise," it does not constitute the type
of "egregious conduct" to justify the Court treating the defendant's statement of facts as conceded as
urged by the defendant.  Burke v. Gould, 286 F.3d 513, 518 (D.C. Cir. 2002).

In opposition to the Institution's motion, the plaintiff contends that dismissal or, in the alternative, summary judgment is improper because: (1) the "complaint easily satisfies the requirements of the general rules of pleading set forth [in the Federal Rules]," Pl.'s Opp'n at 2-3; (2) he has properly pled the elements of a breach of contract claim and met the notice pleading requirements for this claim, id. at 41; (3) there are witness credibility issues that create genuine issues of material fact, id. at 4; (4) the evidence suggests that the Institution's justification for its employment decisions was discriminatory and illegitimate, id. at 7; and (5) there is ample evidence to establish the factual basis for all of his claims, id. at 8, 29, 38, 40-42.

## II.  LEGAL ANALYSIS[8]

### A.    The Defendant's Motion to Dismiss

The first issue that the Court will address the defendant's subject matter jurisdiction challenge.  See Fed. R. Civ. P. 12(h)(3).  The defendant argues that the Court does not have subject matter jurisdiction over the plaintiff's breach of contract claim (Count 17) because the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), only confers jurisdiction upon the United States Court of Federal Claims to consider a contract claim for damages against the United States government valued at over $10,000.  Def.'s Mem. at 34-35; see Second Am. Compl. ¶¶ 46, 113, 117 (alleging as part of Count 17 that the plaintiff suffered all the damages listed in paragraph

---

[8]       As the plaintiff points out, the defendant presumably intended to move in the first instance for judgment under Federal Rule of Civil Procedure 12(c), Pl.'s Opp'n at 2 n.3, because although the defendant cited Federal Rule of Civil Procedure 12(h), Def.'s Mot. at 1, and the case law assessing the pleading standard of Rule 8, Def.'s Mem. at 2, only Rule 12(c) provides for the relief the defendant is seeking, i.e., judgment on the pleadings.  Because, as set forth below, the Court finds that the plaintiff's complaint easily satisfies the general pleading standards under Rule 8, which defeats the basis underlying the defendant's alternative motion for judgment on the pleadings under Rule 12(h), and because the plaintiff has set forth "the 'grounds' of his 'entitle[ment] to relief,'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), the Court will evaluate the balance of the defendant's motion that raise non-jurisdictional challenges under the defendant's alternative basis for relief, summary judgment, which is governed by Rule 56.

46, which, in turn, incorporates the prayer for relief seeking $300,000 in economic damages based on his lost wages, medical treatment, and pain and suffering).  The plaintiff failed to address this argument in his opposition.  Pl.'s Opp'n at 39-41.

"It is to be presumed that a cause lies outside [a federal court's] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) (citations omitted).  The plaintiff has not met this burden through his silence, but even if he had addressed the jurisdictional challenge to his contract claim, the Institution's position would nonetheless prevail.  Although the Court has federal question jurisdiction under 28 U.S.C. § 1331 (2006) and 28 U.S.C. § 1343(a)(3) (2006) over the plaintiff's Title VII and Rehabilitation Act claims, only the Court of Federal Claims has jurisdiction to hear contract claims alleging damages above $10,000, as this claim does by alleging economic damages of $300,000, see 28 U.S.C. § 1491(a)(1) (2006); Second Am. Compl. ¶¶ 46, 113, 117.  And as the District of Columbia Circuit has held, "even though Title VII might have been the basis of a settlement agreement, a breach claim is a straightforward contract dispute."  Greenhill v. Spellings, 482 F.3d 569, 575 (D.C. Cir. 2007) (citing Hansson v. Norton, 411 F.3d 231, 232 (D.C. Cir. 2005) ("This court generally treats settlement agreements as contracts subject to the exclusive jurisdiction of the Court of Federal Claims."); see also Brown v. United States, 389 F.3d 1296, 1297 (D.C. Cir. 2004).[9]

---

[9]     Nor is there any basis for this Court to entertain the breach of contract claim upon the theory that the settlement agreement was approved by this Court in the plaintiff's previous case, and therefore the Court can assume jurisdiction on its inherent authority to oversee and enforce its decrees.  See Def.'s Mem. at 34 n.10.  The settlement agreement states nothing about this Court retaining jurisdiction over the matter, Def.'s Mem., Ex. 37 (Stipulation of Settlement and Dismissal), and without evidence before it indicating otherwise, the Court cannot assume that it retained jurisdiction over the settlement agreement. See Kokkonen, 511 U.S. at 381-82 ("The judge's mere awareness and approval of the terms of the settlement agreement do not suffice to make them part of his order[,] . . . . [and] [a]bsent [incorporation of
(continued . . .)

Accordingly, the Court must dismiss without prejudice Count 17 of the plaintiff's Second

Amendment Complaint based on its lack of jurisdiction to consider the merits of this claim.[10]

## B.    Summary Judgment

The Court will assess the survivability of remaining counts of the plaintiff's complaint

under the standard of review that governs summary judgment.  A motion for summary judgment

under Rule 56 is proper where "all parties both [had] a 'reasonable opportunity to present all

material made pertinent to such a motion by Rule 56' and a chance 'to pursue reasonable

discovery.'"  Taylor v. FDIC, 132 F.3d 753, 765 (D.C. Cir. 1997) (quoting Fed. R. Civ. P.

12(b)(6)) (citation omitted); see Fed. R. Civ. P. 12(b) & 56.  "Given that the [defendant's]

motion[] [was] in the alternative for summary judgment and that the parties had the opportunity

to submit . . . materials in support and in opposition, it is not unfair to [the plaintiff] to treat the

[motion] as [one for] summary judgment[]."  Americable Int'l v. Dep't of Navy, 129 F.3d 1271,

1274 n.5 (D.C. Cir. 1997).

To grant a motion for summary judgment under Rule 56(c), the Court must find that "the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c).  When ruling on a motion for summary judgment, the Court must

view the evidence in the light most favorable to the non-moving party.  Bayer v. U.S. Dep't of

---

( . . . continued)
a settlement agreement into a court order] . . . , enforcement of the settlement agreement is for state
courts, unless there is some independent basis for federal jurisdiction.").

[10]      A dismissal without prejudice is proper so that the plaintiff may seek relief for his breach of
contract claim with the United States Court of Claims, if he chooses to do so.  See Brown, 389 F.3d at
1298.

Treasury, 956 F.2d 330, 333 (D.C. Cir. 1992). However, the non-moving party cannot rely on "mere allegations or denials . . . , but . . . must set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citation omitted). In addition, the non-moving party cannot rely upon inadmissible evidence to survive summary judgment; rather, the non-moving party must rely on evidence that would be arguably admissible at trial. Greer v. Paulson, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (finding that "'sheer hearsay[]' . . . 'counts for nothing' on summary judgment" because "[t]o survive summary judgment the non-moving party must 'produce evidence . . . capable of being converted into admissible evidence'" (internal citations omitted)). Under Rule 56(c), if a party fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is warranted. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). However, the party moving for summary judgment bears the burden of establishing the absence of evidence that supports the non-moving party's case. Id.

## 1.   The Plaintiff's Hostile Work Environment Claims[11]

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII [and the Rehabilitation Act are] violated."[12]

---

[11]     Counts 1-5 of the plaintiff's complaint allege that he was subject to a hostile work environment based on his race, color, gender, religion, and disabilities. Second Am. Compl. ¶¶ 47-62.

[12]     The plaintiff also brings one of his hostile work environment claims (Count 5) under the Rehabilitation Act. To establish this claim, the following is required:

> To make out a prima facie case of a hostile work environment based on disability, plaintiff must show that (1) []he is a qualified individual with a disability; (2) []he was harassed; (3) the harassment occurred because of [his] disability; (4) the harassment affected a term, condition, or

(continued . . .)

George v. Leavitt, 407 F.3d 405, 416 (D.C. Cir. 2005) (citing Oncale v. Sundowner Offshore

Servs., Inc., 523 U.S. 75, 78 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21

(1993))) (internal quotation marks omitted).  "To establish hostile work environment claims

under Title VII . . . [the] plaintiff[] must show harassing behavior sufficiently severe or pervasive

to alter the conditions of [his] employment."  Steele v. Schafer, 535 F.3d 689, 694 (D.C. Cir.

2008) (citing Pa. State Police v. Suders, 542 U.S. 129, 133 (2004)) (internal quotations omitted).

The evidence must show that the environment was "both objectively and subjectively offensive,

one that a reasonable person would find hostile or abusive, and one that the victim in fact did

perceive to be so."  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).  "[W]hether an

environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.

These may include the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance."  Harris, 510 U.S. at 23.  In other words, the

conduct complained of "must be extreme to amount to a change in the terms and conditions of

employment," Faragher, 524 U.S. at 788, although it need not rise to the level of conduct which

"seriously affect[s] [the] employee['s] psychological well-being," Harris, 510 U.S. at 22.

However, conduct such as "simple teasing, offhand comments, and isolated incidents (unless

---

( . . . continued)
          privilege of employment; and (5) the employer knew or should have
          known of the harassment but took no action to prevent it.

Marshall v. Potter, __ F. Supp. 2d __, __, 2009 WL 2023496 at *4 (D.D.C. 2009) (citing Zeigler v. Potter,
510 F. Supp. 2d 9, 17 (D.D.C. 2007)).  Regardless whether the plaintiff's hostile work environment claims
are advanced under Title VII or the Rehabilitation Act, the essential elements of the claim are "that [the
plaintiff's] employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently
severe or pervasive to alter the conditions of the victim's employment and create an abusive working
environment.'"  Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008).

extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 788 (citation and internal quotation omitted). On the other hand, conduct which can "reasonably be perceived, and is perceived, as hostile or abusive" is actionable. Harris, 510 U.S. at 22.

The Institution argues that the plaintiff has not established the existence of a hostile work environment by objective evidence, Def.'s Mem. 13-16, because the plaintiff's interpretation of the evidence is not reasonable, and no claim can lie based on the facts alleged, Def.'s Reply at 12-14. The plaintiff responds that "[a] fair examination of the evidence . . . reveals a persistent, severe, and pervasive pattern of abuse and mistreatment, from which any reasonable jury could conclude the workplace was 'permeated with discriminatory intimidation, ridicule, and insult [that is] sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment.'" Pl.'s Opp'n at 9 (quoting George, 407 F.3d at 416). The Court finds that the Institution has the prevailing position because it cannot find that the plaintiff can demonstrate to a jury that his perception of being subjected to a hostile work environment was reasonable or that his conditions of employment changed as a result of the events alleged. In short, the plaintiff has merely complied a long list of isolated incidents, which even when considered collectively, do not give rise to the level of actionable hostile work environment claims.

The plaintiff has not alleged facts which would support a finding that he was subjected to an objectively hostile or abuse work environment. See Faragher, 524 U.S. at 787; see also George, 407 F.3d at 415. Rather, the plaintiff takes great offense to what amounts collectively to nothing more than sporadic "offhand comments[] and isolated incidents." Faragher, 524 U.S. at

788.  The plaintiff's extensive enumeration of what he alleges were hostile acts amount to

nothing more than neutral comments perceived by the plaintiff as racial slurs, especially in the

absence of any underlying racial context; supervisors' requests that he perform tasks within the

realm of his employment responsibilities, account for his whereabouts, and abide by workplace

procedures and appropriate dress standards; and irrelevant and inadmissible office place rumors.

Pl.'s Opp'n at 10-29.  While the Court considered all of the plaintiff's allegations based on the

totality of the circumstances, as it must, the following allegations warrant specific discussion.

 The plaintiff claims that a supervisor made a reference to "you people" in his presence,

which the plaintiff interpreted as a racial slur directed at the supervisor's African-American

subordinates.  Pl.'s Opp'n at 10-11; <u>see also</u> <u>id.</u>, Ex. 11 (Baxter Dep.) at 112-13, 118-20.  This

interpretation is not only irrational in the context in which it was made – made by the supervisor

about all of his subordinates without regard to race, ethnicity, gender, religion, or disabilities –

but even if the statement was intended to have a derogatory meaning, it did not alone create a

work environment of the level of severity necessary for the plaintiff's claims to survive.  While

being "subjected to the phrase 'you people'" by a supervisor may be "rude and

insensitive,""[such] comments and incidents do not describe a hostile environment under Title

VII" or the Rehabilitation Act.  <u>Caldwell v. Servicemaster Corp.</u>, 966 F. Supp. 33, 51 (D.D.C.

1997); <u>see also</u> <u>Prince v. Rice</u>, 570 F. Supp. 2d 123, 135 n.8 (D.D.C. 2008) (finding that the

"mere use" of the phrase "'you people'" did not create a triable issue of racial discrimination).[13]

---

[13] Likewise, the plaintiff's allegations that his supervisor made "an offensive racist comment" when he stated that it appeared that the plaintiff had "attitude" by wearing his hat at an angle, Pl.'s Opp'n at 11, is not objectively reasonable.  A comment regarding one's attitude being purportedly projected by the manner in which one dresses cannot be said to implicate one's race without additional evidence that proves the point; the inferential leap necessary to connect such seemingly unrelated subjects is simply too tenuous.  <u>Cf.</u> <u>Hardin v. S.C. Johnson & Son, Inc.</u>, 167 F.3d 340, 345-46 (7th Cir. 1999) (finding that

(continued . . .)

Similarly, the plaintiff complains that he was stereotypically referred to as "broad shoulder[ed]," along with the other African-American men in the Exhibits Department by two of his female supervisors after he inquired about why he was being asked to lift heavy objects.  Pl.'s Opp'n at 11-12.  The plaintiff maintains that this term was a euphemism for being a black, African-American male.  Id.  The Court cannot find a legally sufficient level of hostility in this comment to support the plaintiff's claim.  The plaintiff admits that he is stronger and has broader shoulders than the only person in his department excluded from his supervisors' broad-shouldered description, i.e., his female co-worker who weighs about 100 pounds (roughly forty to fifty pounds less than the plaintiff when the comment was made).  Pl.'s Opp'n, Ex. 5 (Bowden Dep. I) at 73, 158-62.  Without any information that the comment was factually inaccurate with respect to him and his male colleagues in comparison to his female colleague – an inference which the evidence supports – the Court again cannot import to the comment any racially discriminatory meaning or intent.

Moreover, the plaintiff has failed to proffer any evidence to demonstrate how any of the alleged remarks by his supervisors "affect[ed] a 'term, condition, or privilege' of [his] employment within the meaning of Title VII" or the Rehabilitation Act.  Meritor Sav. Bank, FSB, v. Vinson, 477 U.S. 57, 67 (1986) (citing, among others, Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971) for the principle that the "'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII")).

---

( . . . continued)
course language and comments that did not "implicate negative attitudes toward African-Americans. . . . cannot be said with any degree of certainty" to possess a discriminatory character).

Having alleged no other express comments that he contends fostered a hostile work environment, the plaintiff relies upon a cadre of circumstantial evidence, such as the amount and nature of work assigned to him, his environmental workplace conditions (including having to work with colleagues he does not wish to work with), none of which, even considered in their totality, demonstrate that the plaintiff was forced to endure a hostile working environment in violation of Title VII or the Rehabilitation Act.

First, the plaintiff makes several allegations relating to his workplace responsibilities. Specifically, the plaintiff contends that he was given extra tasks, including heavy lifting, and that he had to work outside and in the animal living quarters to a greater extent than a Filipino female on the staff who was brown-skinned and had no known religious affiliation or disability. These allegations do not demonstrate a hostile work environment for several reasons. As the plaintiff admits, he is clearly larger than the only woman on the staff, Pl.'s Opp'n, Ex. 5 (Bowden Dep. I) at 73, 158-62 (indicating that the plaintiff was about 50 pounds heavier than his female co-worker during the time period pertinent to this lawsuit). And, while all Exhibits Specialists must perform some lifting,[14] Def.'s Mem., Ex. 2 (Bowden Dep. I) 72-73, 162; id., Ex. 34 (Federal Position Description Cover Sheet) at 6, the tasks among all Exhibits Specialists vary according to their skill and experience, see Pl.'s Opp'n at 14; id., Ex. 1 (Dolnick Dep.) at 143-47; id., Ex. 5 (Bowden Dep. I) at 76; Def.'s Mem., Ex. 2 (Bowden Dep. I) at 76. In fact, sometimes Exhibits Specialists' tasks varied significantly, Def.'s Mem., Ex. 2 (Bowden Dep. I) at 67-68, 71-72, 84;

---

[14] The plaintiff makes contradictory allegations on this point. In one section of his opposition brief he argues that he and "other African-American males" were "exclusively assigned [to do] heavy moving," Pl.'s Opp'n at 11-12, but later remarks that there was one instance when he and only one of his fellow African-American male co-workers was assigned to move heavy objects, id. at 14. This latter allegation merely adds to the plaintiff's admission that the tasks assigned to the Exhibits Specialists varied.

id., Ex. 4 (Bowden Dep. II) at 23-24; Pl.'s Opp'n, Ex. 1 (Dolnick Dep.) at 142-43 – such as when the Institution was experiencing a staff shortage and often employees' tasks were dictated by necessity, Def.'s Mem., Ex. 2 (Bowden Dep. I) at 114-15, 117-18; id., Ex. 4 (Bowden Dep. II) at 23-24 – while sometimes the Exhibits Specialists have "basically the same" responsibilities, id., Ex. 2 (Bowden Dep. I) at 68.  In addition, although the plaintiff remarks that his female co-worker was able to sit at her desk all day, Pl.'s Opp'n at 13, he admits that he too has a desk, Def.'s Mem., Ex. 4 (Bowden Dep. II) at 207, where he would just sit when he had nothing else to do, id., Ex. 4 at 208.  Finally, his allegations that his supervisors were troubled when he wore biking clothes to work, Pl.'s Opp'n at 23, or that he was reprimanded on one occasion in front of Zoo visitors, Pl.'s Stmt. of Facts at 18, do not rise to the level of severity or frequency needed to establish a hostile work environment or show that the conditions of his employment were affected.

Second, as to the plaintiff's claims that his workplace conditions were unsafe "and it was beyond [his] power to improve the situation," Pl.'s Opp'n at 16, not only has the plaintiff stated that he was in charge of ordering the machinery and keeping the workshop orderly and clean, Def.'s Mem., Ex. 2 (Bowden Dep. I) at 78, 80; id., Ex. 4 (Bowden Dep. II) at 146-47; see also id., Ex. 33 (Nov. 6, 2003 Letter from Anthony Bowden to Lynn Dolnick) at 2 (representing that the plaintiff was the "Safety Officer" and "Fire Officer for Exhibit Office" and "[o]rganize[d] and supervise[d] production shop operations"), and he could have acquired the safety equipment he contends was not made available to him, id., Ex. 4 (Bowden Dep. II) at 68, 73 (acknowledging that he could have acquired the items from another "shop" at his work place or purchased them at a store)), he has acknowledged that his requests for some of the additional safety equipment

probably was beyond his supervisors' authority to approve, id. at 72.  Moreover, after the

plaintiff complained about it being unsafe to use two saws at his worksite due to improper

ventilation, id., Ex. 2 (Bowden Dep. I) at 118, he admits that he was not required to work "much"

at that location again, id. at 118, 120-21, and subsequently has not shown how his self-

designated relocation affected the conditions under which he carried out his employment

responsibilities.  Id.  On this record, the plaintiff's concerns about the safety of his work

environment fall well short of the standard necessary to establish a hostile work environment,

especially given that he could have taken steps to improve the conditions, at least to some extent.

Third, while the plaintiff complains about being required to document the time when he

left work for medical reasons and to account for his bathroom breaks, he admits that his pay was

never reduced or that he was not permitted to take leave when requested.  Id., Ex. 4 (Bowden

Dep. II) at 206.  Accordingly, the Court is unable to find that his work environment was affected

by the requirement that he document his whereabouts.  Moreover, with respect to the inquiries

made by his supervisors concerning his whereabouts when he would leave take bathroom breaks

and go to medical appointments, the plaintiff's own description of these inquiries suggests no

unlawful ulterior motives by his supervisors, other than to be apprised his whereabouts when he

was away from his workstation.  Id., Ex. 4 (Bowden Dep. II) at 207-09.  Indeed, the specific

exchange between the plaintiff and his supervisor about which he complains merely involved his

supervisor stating that he "better manage [his medical] appointments" and that he had to provide

a "doctors [sic] note" or a "regular app[ointment] schedule" to his supervisors instead of taking

"immediate" unexcused absences as he had done in the past.  Id., Ex. 7 (Mar. 16, 2004 E-mail

from Kathleen Samity to Anthony Bowden) (listing five times over 15 days when the plaintiff

either left work "immediately after talking to [his] doctors" or called to indicate that he was

taking sick leave).  Moreover, the plaintiff admits that sometimes it takes him about twenty

minutes to go to the bathroom, id., Ex. 4 (Bowden Dep. II) at 287, and that on other occasions he

just "step[s] out," id. at 209.  Considering that an employer has a general interest in ensuring that

it is accurately compensating employees for the time they are at work or for when they have

taken leave, the Court cannot find fault with the Institution requiring the plaintiff to account for

his whereabouts or provide his employer with a more predictable work schedule.

Fourth, the plaintiff's allegation that the Institution condoned at least one "assault" against

him by not adequately responding when his co-worker "rammed" him in the shoulder as she

passed,[15] causing him "anxiety, stress, and . . . attendant physical and emotional traumas," Pl.'s

Opp'n at 18 & n.4, 20, is also baseless.[16]  The plaintiff also alleges that it was a hostile act by the

---

[15]    The plaintiff also stated that his employer should have acted to prevent any altercations with his
co-worker due to her prior and repeated inappropriate behavior.  Def.'s Mem., Ex. 4 (Bowden Dep. II) at
212-18.  However, the prior behavior alleged by the plaintiff is not of the type that would lend support to
the plaintiff's claim of a hostile work environment or have put the Institution on notice that inappropriate
physical contact was imminent.  Specifically, upon questioning, the plaintiff described his co-worker's
prior objectionable behavior as including an incident where she blocked his passage through a doorway
by merely "standing there."  Id., Ex. 4 (Bowden Dep. II) at 218-19.  The plaintiff recounted that she never
acted in a manner to suggest that she was "daring" the plaintiff to pass through the door, but regardless, he
purportedly felt that he had to take a longer route to reach his intended destination, even though it would
have been shorter to walk through the doorway where she was standing.  Id.  Although the plaintiff
construed his co-worker's behavior as "her way of getting back at [him]," id. the Court cannot find that a
reasonable jury could conclude from such unremarkable behavior that the Institution was on notice that
the co-worker would assault the plaintiff.

[16]    Despite the plaintiff's allegation of physical harm, Pl.'s Opp'n at 18 n.4; see also Second Am.
Compl. ¶ 41 (seeking compensation for "pain and suffering"), the plaintiff has not established that the
ramming by his coworker, Am. Compl. ¶ 36, resulted in anything more than hurt feelings, Def.'s Mem.,
Ex. 4 (Bowden Dep. II) at 216.  When asked specifically if he was physically injured by the event,
including any bruising or broken bones, the plaintiff responded that he had sustained no physical injuries,
he was merely "sw[u]ng around" when she came into contact with his right shoulder, and the only
resultant harm was that he was left "heartbroken" by the incident.  Id. at 216, 219-20.  Further, the
plaintiff said nothing to this co-worker at the time of the incident.  Id. at 221.  Regardless, even if the
plaintiff was "'injured and inconvenienced,' [or] even 'treated somewhat unkindly, . . . there is a
significant gap between such conduct, which [appears to have arose from a] fundamentally personal

(continued . . .)

Institution when it refused to make an "accommodation" for him by allowing him to be

physically absent from any meetings when his co-worker who allegedly assaulted him was

present, for example, by allowing him to attend such meetings by telephone, the Internet, or

closed circuit television, or by allowing him to review tapes and transcripts of all meetings at

which the co-worker was present.  Id. at 21.  The plaintiff being unable to demonstrate that any

of these incidents caused him to sustain objectively reasonable and material harm, given that he

sustained no physical harm or bruising, Def.'s Mem., Ex. 4 (Bowden Dep. II) at 216, 219-20, the

Institution met its obligations by cooperating with the plaintiff in regards to the filing of a police

report, id. at 224, and upon the assurance of his supervisor and discussions with the co-worker,

no similar conduct ever occurred, id. at 225.[17]  Title VII and the Rehabilitation Act do not "set

---

( . . . continued)

[employee disagreement], and discrimination.'"  Franklin v. Potter, 600 F. Supp. 2d 38, 78 (D.D.C. 2009)
(quoting Hancock v. Potter, 531 F.3d 474, 480 (7th Cir. 2008)).

[17]      Nor was the counseling letter that the plaintiff received after the incident, see Def.'s Mem., Ex. 17
(Dec. 17, 2004 Letter from Jeff Baxter to Anthony Bowden) (seeking the plaintiff's confirmation of
receipt of the counseling letter and summarizing the circumstances of the counseling letter), indicative of
discrimination either by fostering a hostile work environment, singling him out because of his protected
statuses, or retaliation.  The plaintiff admits that the counseling letter was in response to his calling his co-
worker "crazy" in front of two of his supervisors, id., Ex. 4 (Bowden Dep. II) at 177, 213, "misconduct"
that the supervisors found unacceptable, id., Ex. 17 (Dec. 17, 2004 Letter from Jeff Baxter to Anthony
Bowden).  There is no indication that the letter targeted the plaintiff based on his protected statuses.
While the plaintiff complains that others were not counseled for similar comments, he fails to provide any
specific examples that support this allegation.  Regardless, the counseling letter was never placed in the
plaintiff's personnel file, id. (informing the plaintiff that "[the counseling letter] and any response will
NOT be filed in your Official Personnel Folder" (additional emphasis omitted)); see also Pl.'s Opp'n at 19,
and accordingly the Court cannot conclude that this unofficial reprimand for admitted conduct was
"sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an
abusive working environment," George, 407 F.3d at 416, or would "dissuade a reasonable employee from
making or supporting a charge of discrimination."  Jones v. Johanns, 264 Fed. App'x 463, 469 (6th Cir.
2007) (finding that three warning letters over three years from the employer to the employee were not
"materially adverse action[s]"); accord Williams v. Dodaro, 576 F. Supp. 2d 72, 89 (D.D.C. 2008)
(finding that a "letter [that] did not indicate that it was a reprimand, . . . was not placed in [the plaintiff's]
personnel file, and . . . did not lead to any disciplinary action . . . . did not alter any of the conditions of
[the plaintiff's] employment such that it would dissuade a reasonable employee from filing a
discrimination complaint").

forth 'a general civility code for the American workplace,'" and they do not insulate employees

from "personality conflicts at work that generate antipathy" or "snubbing by supervisors and co-

workers." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (citation and

internal quotations omitted).  And given the factual record in this case, the plaintiff cannot

demonstrate a sufficient change in his workplace conditions resulting from the conduct about

which he complains to survive summary judgment.

    In short, considering all of the plaintiff's allegations, individually and collectively, this

Court cannot conclude that a reasonable jury could find that the Institution created a severely

hostile work environment based upon any of his protected statuses (his gender, color, race,

religion or disabilities) that was "extreme [enough] to amount to a change in the terms and

conditions of [his] employment," thereby violating Title VII or the Rehabilitation Act.  Faragher,

524 U.S. at 788.  Compare Hussain v. Nicholson, 435 F.3d 359, 366-67 (D.C. Cir. 2006) (finding

that no hostile work environment existed where the plaintiff was subject to "heightened

monitoring by supervisors, . . . poor performance evaluations, . . . and [his employer] fail[ed] to

address insubordination by other employees" because "[a]lthough the work environment . . . was

hardly ideal," it did not rise to the level of being "'abusive'"), with Singletary v. District of

Columbia, 351 F.3d 519, 528-29 (D.C. Cir. 2003) (finding that a hostile work environment claim

could potentially lie where, "for over a year and a half," the employee was forced to work in a

"poorly lit," "unheated," and unventilated storage room full of "brooms [and] boxes of debris").

Simply, the frequency and severity of the allegations here fall short of the pervasive and long-

term conduct required to merit a hostile work environment claim proceeding to trial.  See, e.g.,

George, 407 F.3d at 416-17 (holding that statements by three employees over a six-month period

26

telling plaintiff to "go back where she came from," separate acts of yelling and hostility; and allegations that plaintiff was singled out for undesirable work assignments were insufficient to demonstrate a hostile work environment); Sewell v. Chao, 532 F. Supp. 2d 126, 142 (D.D.C. 2008); Singh v. U.S. House of Representatives, 300 F. Supp. 2d 48, 54-57 (D.D.C. 2004) (finding allegations that the plaintiff's employer humiliated her at important meetings, screamed at her on one occasion, told her to "shut up and sit down" on another occasion, and was "constantly hostile and hypercritical" did not amount to a hostile work environment).  The Court does not doubt that the plaintiff felt slighted when things were not done to his liking or did not go his way, but that does not mean the events the plaintiff complains about amounted to objective violations of the protections provided under Title VII or the Rehabilitation Act.

## 2.     The Plaintiff's Workplace Discrimination Claims[18]

The plaintiff asserts claims of discrimination, challenging the Institution's actions under both Title VII and the Rehabilitation Act.  Title VII provides that "personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, [or] sex."  42 U.S.C. § 2000e-16(a).  The Rehabilitation Act prohibits discrimination based upon one's disability by an entity that receives public funding.  29 U.S.C. § 794(b)(3).  Specifically, the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United
> States, as defined in section 705(20) of this title, shall, solely by
> reason of her or his disability, be excluded from the participation
> in, be denied the benefits of, or be subjected to discrimination
> under any program or activity receiving Federal financial
> assistance or under any program or activity conducted by any
> Executive agency or by the United States Postal Service.

---

[18]     Counts 7-9, 11-15, and 18 of the plaintiff's complaint allege that he was subject to unlawful discrimination.  Second Am. Compl. ¶¶ 66-77, 82-106, 114-17.

Id. at § 794(a).  The standards articulated in Title I of the Americans with Disabilities Act of

1990 ("ADA"), 42 U.S.C. §§ 12111-12210 (2008), "determine whether [the Rehabilitation Act]

has been violated in a complaint alleging employment discrimination."  29 U.S.C. § 794(d); see

also Breen v. Dep't of Transp., 282 F.3d 839, 841 (D.C. Cir. 2002) (applying ADA employment

discrimination standards to Rehabilitation Act claim).  The ADA provides: "No covered entity

shall discriminate against a qualified individual on the basis of [a] disability in regard to job

application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment."  42

U.S.C. § 12112(a).  The ADA defines discrimination as failing to "mak[e] reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual

with a disability who is an applicant or employee, unless [the employer] can demonstrate that the

accommodation would impose an undue hardship."  42 U.S.C. § 12112(b)(5)(A).

"Under Title VII[] . . . and the Rehabilitation Act, the two essential elements of a

discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because

of the plaintiff's race, color, religion, sex, national origin, age, or disability."  Baloch v.

Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008); see also Totten v. Norton, 421 F. Supp. 2d

115, 119 n.2 (D.D.C. 2006) (commenting that the "analysis would be the same" regardless

whether the plaintiff brought a retaliation claim pursuant to the Rehabilitation Act or Title VII).

Where, as here, the plaintiff has proffered no direct evidence of intentional discrimination,[19] his

---

[19]      "Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the
particular fact in question without any need for inference. [Such evidence] includes any statement or
written document showing a discriminatory motive on its face." Lemmons v. Georgetown Univ. Hosp.,
431 F. Supp. 2d 76, 86 (D.D.C. 2006) (Walton, J.) (internal quotation marks, citations, and ellipsis

(continued . . .)

claims are evaluated under the burden-shifting framework first articulated in <u>McDonnell Douglas</u>

<u>Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>See</u> <u>Porter v. Natsios</u>, 414 F.3d 13, 17-18 (D.C. Cir. 2005).

Under this framework, the plaintiff bears the initial burden of "establish[ing] a prima facie case

of . . . discrimination" by a preponderance of the evidence.  <u>McDonnell Douglas</u>, 411 U.S. at

802.  This standard requires showing that the plaintiff: "(1) [is a] member[] [of] a protected

group; (2) [is] qualifi[ed] for the job in question; (3) [was subjected to] an adverse employment

action; and (4) [the existence of] circumstances that support an inference of discrimination."

<u>Swierkiewicz v. Sorema N. A.</u>, 534 U.S. 506, 510 (2002) (citations omitted).  "If the plaintiff

establishes a prima facie case of discrimination, the burden shifts to the defendant employer to

produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate,

nondiscriminatory reason."  <u>Jackson v. Gonzales</u>, 496 F.3d 703, 707 (D.C. Cir. 2007) (quoting

<u>Reeves</u>, 530 U.S. at 142) (internal quotations omitted)).  Once "the employer offers a non-

discriminatory justification for its actions, the <u>McDonnell Douglas</u> framework falls away,"

<u>Vickers v. Powell</u>, 493 F.3d 186, 195 (D.C. Cir. 2007), and the burden shifts back to the plaintiff

to show that the employer's proffered reason is merely "pretextual," and designed to "shield[]

discriminatory motives," <u>Jackson</u>, 496 F.3d at 707 (citing <u>Murray v. Gilmore</u>, 406 F.3d 708, 713

(D.C. Cir. 2005)).  However, the prima facie test essentially becomes inconsequential when

evaluating a motion for summary judgment once an employer proffers a legitimate, non-

discriminatory rationale for its decision, and a Court's analysis should be limited to whether,

based upon the entire record, "a reasonable inference of discrimination" exists.  <u>Jones v.</u>

_____

( . . . continued)
omitted) (emphases in original). The plaintiff does not argue, nor could he, that the factual record in this
case contains any such direct evidence of discrimination.

Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009) ("Given that the Board asserted its legitimate non-

retaliatory explanation for the [plaintiff's job performance] evaluation – that it reflected an honest

assessment of [the plaintiff's] performance – the district court should have proceeded to the

ultimate issue of retaliation vel non instead of evaluating whether [the plaintiff] made out a

prima face case.").

In the Title VII context, it has been emphasized that employees who are protected

persons under the law are not guaranteed employment.  Thus, the Supreme Court has stated:

> Congress did not intend by Title VII . . . to guarantee a job to every
> person regardless of qualifications.  In short, the Act does not
> command that any person be hired simply because he was formerly
> the subject of discrimination, or because he is a member of a
> minority group.  Discriminatory preference for any group, minority
> or majority, is precisely and only what Congress has proscribed.

McDonnell Douglas Corp., 411 U.S. at 800 (quoting Griggs v. Duke Power Co., 401 U.S. 424,

430-31 (1971)); see Valentino v. U.S. Postal Serv., 674 F.2d 56, 67 (D.C. Cir. 1982) (applying

this rationale to claims of discriminatory refusal to promote under Title VII); see also Baloch,

550 F.3d at 1196-97 (assessing discrimination claims pursuant to Title VII and Rehabilitation

Act under the same principles).

### 3.    The Plaintiff's Failure to Promote or Properly Compensate Claims[20]

The plaintiff contends he was not properly compensated for his work due to a

"discriminatory desk audit" and other actions which resulted in him not being promoted or

accurately compensated for his actual duties.  Second Am. Compl. ¶¶ 23(o), 25, 82-105; Def.'s

Mem., Ex. 33 (Nov. 6, 2003 Letter from Anthony Bowden to Lynn Dolnick).  The Institution

---

[20]    Counts 11-15 of the plaintiff's complaint allege that he was discriminated against when he was
not promoted or properly compensated for his employment responsibilities based on his race, color,
gender, religion, and disabilities.  Second Am. Compl. ¶¶ 82-106.

maintains that the desk audit that it conducted to ensure that the plaintiff was being accurately compensated was reliable because it was conducted by "an independent contractor," employed by but separate from the Institution, who certified that he accurately based his determinations on official governmental guidelines, placing the plaintiff's position at the grade 11 level, for which he was compensated according to the government pay scale for that grade level.  Def.'s Mem. at 29-31.

The record includes a list of thirty-nine responsibilities that the plaintiff contends were excluded from his desk audit.  Id., Ex. 33 (Nov. 6, 2003 Letter from Anthony Bowden to Lynn Dolnick).  Short of analyzing these tasks individually, it is clear that many of them are overlapping and redundant, and by comparing them to the auditor's report, it is clear that they were all encompassed and considered in the desk audit, some expressly.  Compare Def.'s Mem., Ex. 33 (Nov. 6, 2003 Letter from Anthony Bowden to Lynn Dolnick) (listing his "areas [of responsibility] that were omitted from the desk audit:" "Lead[s] projects[;] Lead[s], direct[s] and assist[s] team members[;] Supervise[s] exhibit specialist[s]/interns[;] Develop[s] plans as necessary . . . [;] Write[s] specs and communicate[s] with outside contractors . . . [;] Prioritize[s] work load . . . [;] Prepare[s] scope of work[;] . . . Train[s] exhibit specialist[s] and interns[;] . . . Leads projects collaboratively with other exhibit staff . . . ."), with id., Ex. 28 (Evaluation Statement) (stating that the plaintiff: "performs a variety of duties involved in planning, constructing, installing and repairing exhibits;" "finalizes designs;" working with "[]other specialists or contractors [as] required" by the scope of the project; "provid[ing] technical direction to one exhibits specialist on a part-time basis and performance evaluation information to the supervisor as requested;" "consult[s] with the supervisor or client to develop specific

ideas;" "plan[s] and carri[es] out the work;" "coordinat[es] the work with others;" "us[es]
judgment in transforming ideas into finished products;" "technically and creatively
communicat[es] exhibition design and subject concepts;" and utilizes "contacts with various
Zoological personnel, personnel at other Museums, others outside the immediate organization,
and with vendors, suppliers and contractors."), and id., Ex. 34 (Federal Position Description
Cover Sheet) at 2-6 (including within the Institute's general description of Exhibits Specialist's
responsibilities: "Coordination and collaboration with other Exhibits Specialists assigned to the
project; or[]—leading other production staff in a task or series of task to complete a projection
project[;] [t]eamwork, coordination, planning, scheduling, recording and preparation of tasks,
milestones, results, specifications, scopes or work, purchasing requirements for production
materials, parts vendors, fabricators is a requirement of this position.").  The plaintiff admits that
he has no information to support his speculation that his supervisors provided inaccurate
information to the auditor about his responsibilities, but concludes nonetheless "that the so-called
'audit' was incomplete, based on false information, and was therefore fatally defective."  Pl.'s
Stmt. of Facts at 44.  Given these facts, the Court finds that the desk audit accurately determined
that the plaintiff's position was graded as an 11, which was the plaintiff's actual grade level, and
therefore he was adequately compensated according to the applicable federal government pay
grade schedule.  Def.'s Mem., Ex. 28 (Evaluation Statement); id., Ex. 32 (Grade Evaluation
Guide for Visual Arts Work).  Moreover, after his desk audit was completed, the plaintiff
informed his supervisor that he "[gave] the auditor all of the info[rmation] that was needed for
him to make a clear and accurate assessment of what [his] job [entails]," and refused a second
desk audit.  Id., Ex. 18 (Nov. 12, 2003 E-mail from Anthony Bowden to Lynn Dolnick).

Accordingly, the Court cannot find on this record that the plaintiff was improperly compensated for the responsibilities he performed or improperly denied an elevated grade level or pay raise.

The plaintiff also makes sweeping allegations that people of the Jewish religion were promoted and non-Jews, such as himself, were not.  Pl.'s Opp'n, Ex. 5 (Bowden Dep. I) at 137-38.  However, he offers no documentary or other admissible evidence regarding those promotions, merely claiming without support that the promotions were made without the individuals even applying for them simply because they performed "extra work," which the plaintiff contends he also performed.  Id.  Even assuming that the plaintiff had documentary or other admissible evidence to show that Jewish employees had received promotions as he contends, he alleges only generally in his Second Amended Complaint that he too assumed extra responsibilities without identifying exactly what these "extra work" responsibilities were, but then goes on to state that he registered his objections to taking on any extra responsibilities or a more authoritative sounding job title without receiving any additional compensation.  Second Am. Compl. ¶ 23(d) (stating that the plaintiff objected to having his job title changed to "Exhibits Specialists/Project Leader," absent a promotion); id. ¶ 28(e) (indicating that the plaintiff "fe[lt] uncomfortable" when required to "attend a meeting only for supervisors"); id. ¶ 28(g) (indicating that when the plaintiff was told by his supervisor that he could "assign other employees to help [him]," he refused to do so, stating that he had no such authority).

Given that the desk audit appears to have taken into account the essence of the responsibilities the plaintiff stated he was performing, which appear to correspond to the responsibilities of the plaintiff's grade level, Def.'s Mem., Ex. 32 (Grade Evaluation Guide for Visual Arts Work), the Court cannot find that the plaintiff could carry his burden of proof at trial

to show that the Institution discriminated against him by inadequately compensating him or

improperly denying him an increased grade level for the work he performed.

4.     **The Plaintiff's Non-Selection Claims**[21]

Claims of non-selection for promotions apply the same burden-shifting analysis adopted

in McDonnell Douglas, with slight modifications. Thus,

> to make out a prima facie case the plaintiff must show that [he]
> belongs to a protected group, that [he] was qualified for and
> applied for a promotion, that [he] was considered for and denied
> the promotion, and that other employees of similar qualifications
> who were not members of the protected group were indeed
> promoted at the time the plaintiff's request for promotion was
> denied.

Bundy v. Jackson, 641 F.2d 934, 951 (D.C. Cir. 1981).  However, as with any other type of

discrimination claim, the prima facie case assessment and burden-shifting analysis need not be

conducted by a court when considering an employer's motion for summary judgment if the

employer has offered a non-discriminatory justification for its action, because the question then

becomes merely whether discrimination actually occurred.  Jones, 557 F.3d at 678.

It must be emphasized that the law does not dictate which candidate an employer should

choose when making promotion decisions.  Indeed, an "employer has discretion to choose among

equally qualified candidates, provided the decision is not based upon unlawful criteria." Tex.

Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256-259 (1981).  The only question is whether

an employer discriminated against a plaintiff in deciding not to promote him.  Jones, 557 F.3d at

678.  Therefore, where the employer offers the candidates' relative qualifications as a basis for an

employment decision to hire (or promote) a person with a protected status over a person without

---

[21]     Counts 7-9 of the plaintiff's complaint allege that he was discriminated against when he was not
selected for the Supervisory Exhibits Specialist position based on his race, color and disabilities.  Second
Am. Compl. ¶¶ 66-77.

a protected statute, "[i]n order to justify [an] inference of discrimination, the qualifications gap

[between the candidates] must be great enough to be inherently indicative of discrimination," i.e.,

if, for instance, there is "a 'wide and inexplicable gulf' between candidates."  Holcomb, 433 F.3d

at 897 (quoting Lathram v. Snow, 336 F.3d 1085, 1091 (D.C. Cir. 2003)).  In other words, when

the qualifications of the applicants are close, the Court must give the Institution the benefit of the

doubt regarding its choice among similarly qualified candidates.  Id. ("'In a close case, a

reasonable juror would usually assume that the employer is more capable of assessing the

significance of small differences in the qualifications of the candidates, or that the employer

simply made a judgment call.'" (quoting Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1294 (D.C.

Cir. 1998) (en banc)).  This deference to an employer's judgment is appropriate because, as the

District of Columbia Circuit has said, Title VII (like the Rehabilitation Act) was never intended

to transform a court into "a super-personnel department that reexamines an entity's business

decisions," Holcomb, 433 F.3d at 897 (internal quotation marks and citations omitted), or

"misjudg[ments of] the relative qualifications of admittedly qualified candidates," Fischbach v.

D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citation omitted).  "Short of finding

that the employer's stated reason [for its selection decision] was [merely] a pretext [for unlawful

discrimination,] . . . the [C]ourt must respect the employer's unfettered discretion to choose

among qualified candidates."  Id. (citations omitted).  In this regard, "the ultimate burden of

persuading the trier of fact that the [employer] intentionally discriminated against the plaintiff

remains at all times with the plaintiff."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.

133, 143 (2000) (internal quotation marks and citation omitted).

The Institution contends that the plaintiff's non-selection claim cannot survive summary judgment because the Institution chose the candidate with "more 'production knowledge,' more 'supervisory' experience, more 'budgeting' experience, and more 'project management' experience than [the] plaintiff."  Def.'s Reply at 6 (citing Def.'s Mem., Ex. 20 (Sept. 27, 2007 Deposition of Lynn Dolnick ("Dolnick Dep.")) at 214, 230).  The plaintiff responds that the Institution's proffered rationale for its non-selection of the plaintiff is a pretext for discrimination because the Institution redrafted the job announcement to seek computer skills that the plaintiff did not have and were unnecessary in light of the actual needs of the position.  Pl.'s Opp'n at 31.  The Institution rejoins that the plaintiff was qualified for the position, both before and after the revision, and note that the plaintiff "was one of four persons who made the [final] certification list and he was interviewed for the job," Def.'s Reply at 7; however, the plaintiff "simply lost out to a more qualified candidate," id.

Given that the Institution has proffered a legitimate, non-discriminatory rationale for its decision, the question comes down to "the ultimate issue of retaliation vel non."  Jones, 557 F.3d at 678.  The plaintiff does not dispute that the Institution was seeking to implement more computer software at the Zoo, Def.'s Mem., Ex. 4 (Bowden Dep. II) at 91; id., Ex. 23 (Responses of Anthony Bowden to Ranking Factors) at 6-7 (objecting to the computer qualifications in the Supervisory Exhibits Specialist description because the "[computer] system is still being developed and is not yet operational"), and that the selectee had greater computer skill than he did, id., Ex. 4 (Bowden Dep. II) at 91, 131.  Also, the record includes evidence that the Zoo's job announcements are routinely revised, Def.'s Reply at 7 n.4 (citing Def.'s Mem., Ex. 22 (Feb. 12, 2008 Deposition of Mary Rowker Tanner) at 1, 73-74), the plaintiff's objections to the expertise

of the declarant making that representation notwithstanding, see Pl.'s Opp'n at 32 & n.8.  In any

event, the record does not indicate that the plaintiff applied for, or even that his supervisor knew

of the plaintiff's interest in the supervisory position prior to the revisions, Def.'s Mem., Ex. 40

(Aug. 28, 2003 E-mail from Lynn Dolnick to Anthony Bowden).  On this record, the Court

cannot read into the decision to revise the job description any discriminatory motives on the part

of the Institution concerning its rationale for including computer skills in the position's

description.

   Similarly, the Court cannot find any improper legal basis for the Institution's selection

decision.  The plaintiff admits that he only knew how to perform half of the job responsibilities

for the job, but because it could "go either way . . . [he] applied for it."  Pl.'s Opp'n, Ex. 5

(Bowden Dep. I) at 152-54 (emphasis added).  Beyond computer skills, given that the position

called for a successful candidate to have skill in overseeing exhibits, supervising others,

"fabrication, installation and maintenance" of exhibits, Def.'s Mem., Ex. 21 (Vacancy

Announcement for Supervisory Exhibits Specialist) at 2, and the selectee had more years of

design experience than did the plaintiff, including experience within the Smithsonian and in a

supervisory role as the head of the Exhibition of Design and Production at a major municipal art

museum, compare id., Ex. 26 (Resume of Selectee) with id., Ex. 23 (Jan. 26, 2004 Cover Letter

and Resume of Anthony Bowden), the Court cannot deem its decision improperly reasoned for

some illegal purpose.  The Institution merely exercised its "discretion to choose among

[presumably] equally qualified candidates," which it was lawfully permitted to do.  Burdine, 450

U.S. at 256-259.  The Court must therefore find that the plaintiff has not established that a

reasonable jury could find that he was "significantly better qualified for the job" than was the

successful candidate.  See Jackson, 496 F.3d at 707.  Accordingly, the Court cannot second-guess the Institution's selection decision.

> **5.      The Plaintiff's Failure to Accommodate His Disabilities Claim**[22]

As to the plaintiff's additional theories of discrimination, there is no basis for finding that the Institution discriminated against him by failing to accommodate his disabilities.  To the contrary, the record reflects that the Institution accommodated the plaintiff's disabilities by permitting him to take frequent and unanticipated leave without any compensation-related penalties.  Def.'s Mem., Ex. 7 (Mar. 16, 2004 E-mail from Kathleen Samity to Anthony Bowden) at 1 (indicating that the plaintiff had taken unanticipated absences from work five times over a fifteen-day period).  The plaintiff's supervisor's mere request that he attempt to establish some routine in scheduling his medical absences, id., cannot reasonably be viewed as the Institution failing to accommodate his disabilities.  Although the plaintiff informed his supervisors that it is "not . . . feasible" for him to inform them in advance "when [his] [d]octors will need to see [him,]" this statement seems disingenuous given that at least one of the plaintiff's absences was for a dentist appointment.  Id., Ex. 8 (Apr. 16, 2004 E-mail from Anthony Bowden to Dolph Sand).  The plaintiff has not shown that his doctors' appointments cannot be scheduled in advance, as it is not the norm for doctors to routinely initiate unanticipated appointments with their patients; indeed, patients generally self-initiate appointments with their doctors and such appointments can rarely be scheduled immediately.

Also, as to the plaintiff's contention that he was being singled out because of his disabilities based on his supervisors questioning about his whereabouts in front of his co-

---

[22]      Count 18 of the plaintiff's complaint alleges that his disabilities were not accommodated.  Second Am. Compl. ¶¶ 114-17.

workers, Pl.'s Stmt. of Facts at 30-31; <u>see also</u> Pl.'s Opp'n at 42, the nature of the plaintiff's

working environment sheds some insight on this allegation.  The record includes evidence that

the plaintiff works in an "open office environment," Def.'s Mem., Ex. 17 (Dec. 17, 2004 E-mail

from Jeff Baxter to Anthony Bowden), although the supervisors' offices may offer some privacy,

<u>see</u> Pl.'s Stmt. of Facts at 27 (stating that supervisors' offices may have offered a "confidential

setting").  While there is no indication in the record where the conversations complained of by

the plaintiff occurred, there is also no indication that these conversations revealed any

confidential information regarding the nature of the plaintiff's disabilities or amounted to

anything more inquisitive than an attempt by his supervisors to discover his whereabouts when

he was not at his workplace.  <u>See</u> Def.'s Mem., Ex. 8 (Apr. 16, 2004 E-mail from Anthony

Bowden to Dolph Sand).  Not only is an employer entitled to basic information about its

employees, such as where they are during work hours, but it is a fact of life that employees must

attend doctors appointments and are away from their workplace at times during the workday, and

revealing such information in isolation does not demonstrate discriminatory animus against the

plaintiff or the Institution's failure to accommodate his disabilities.

Similarly, the Institution did not discriminate against the plaintiff or fail to accommodate

his disabilities by not excusing him from meetings when one of his co-workers would be present.

Despite the plaintiff's position that the Institution was not "taking . . . serious[ly]" the "assault

and battery" purportedly committed by this same co-worker, Def.'s Mem., Ex. 15 (June 8, 2005

E-mail from Anthony Bowden to Dolph Sand); <u>see also</u> <u>id.</u>, Ex. 13 (May 11, 2005 E-mail from

Anthony Bowden to Jeff Baxter), the plaintiff's supervisors spoke with the plaintiff's co-worker

about the incident, assured the plaintiff that similar behavior would not happen again, <u>id.</u>, Ex.12

(May 9, 2009 E-mail from Jeff Baxter to Anthony Bowden), and authorized the plaintiff to sit near an exit in all meetings so he could slip out inconspicuously if he ever felt uncomfortable by the presence of his co-worker, Pl.'s Stmt. of Facts at 57. Moreover, there is no indication in the record that the plaintiff ever had a similar physical interaction with that co-worker. The Institution also cooperated with the plaintiff in regard to his filing a police report against his co-worker, although the prosecutor's office ultimately concluded that the allegations were "not worthy of criminal prosecution." Def.'s Mem., Ex. 16 (June 10, 2005 E-mail from Robert McCready to Anthony Bowden). Again, these circumstances do not evidence the Institution's failure to accommodate the plaintiff's disabilities in any regard.

Further, the plaintiff's request that he not be required to attend meetings when the co-worker was present was unreasonable and would have unduly burdened the Institution. See 29 U.S.C. § 794a(a)(1) (2006) ("In fashioning an equitable or affirmative action remedy under such section, a court may take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy."); cf. Carter v. Bennett, 840 F.2d 63, 68 (D.C. Cir. 1988) (finding the Rehabilitation Act obligated the employer to provide any accommodations that "made it possible for [the plaintiff] to perform his essential duties," but not necessarily all of the accommodations sought by the plaintiff). Indeed, the plaintiff self-describes his job responsibilities as: "[a]ttend[ing] meetings;" engaging in "[c]onflict resolution;" "[d]evelop[ing] positive relationships both inside and outside of the Zoo;" "[l]ead[ing] projects" and "team members;" "[d]evelop[ing] plans . . . [and] show[ing] other[s]" how to carry out those plans; "keep[ing] [others] informed of progress;" and "[o]rganiz[ing] and supervis[ing] projection shop

operations." Def.'s Mem., Ex. 33 (Nov. 6, 2003 Letter from Anthony Bowden to Lynn Donick).

It is difficult to envision that these responsibilities could be accomplished successfully without

the plaintiff attending meetings with his co-workers, including the one he disliked.  Further, the

initiatives that the plaintiff would have the Institution employ to accommodate his disabilities –

allowing him to attend the meeting by telephone, the Internet, or closed circuit television, or

allowing him to review tape recordings and transcripts of all meetings, Pl.'s Opp'n at 21 – would

likely impose undue hardship on the Institution, given that it may not have the technological or

personnel resources to accommodate the plaintiff's desire to participate in meetings in real-time

at an off-site location or to record or transcribe all meetings for him to observe later.  In any

event, permitting the plaintiff to absence himself physically from meetings with his co-workers,

especially considering his acknowledged responsibilities, would be inconsistent with advancing

the mission of any organization that necessarily requires teamwork for its success.

On this record as a whole, the Court finds that there is insufficient evidence to support the

plaintiff's allegations that his disabilities were a factor in how the Institution treated him, other

than to permissibly accommodate him as required by the law, or that his disabilities were a factor

in fostering what could be reasonably perceived as discrimination against him.

### 6.    The Plaintiff's Retaliation Claims[23]

Title VII provides:

> It shall be an unlawful employment practice for an employer to
> discriminate against any of his employees . . . because [the
> employee] has opposed any practice made an unlawful
> employment practice by this subchapter, or because he has made a

---

[23]    Counts 6, 10, and 16 of the plaintiff's complaint allege that the plaintiff was unlawfully retaliated against because of his prior EEO activity and the related litigation.  Second Am. Compl. ¶¶ 63-65, 78-81, 107-13.

charge, testified, assisted, or participated in any manner in an
investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Just as with claims for illegal discrimination, the Court must employ the

McDonnell Douglas burden-shifting test in assessing the defendant's challenge to the plaintiff's

claims for retaliation under both Title VII and the Rehabilitation Act.  Vickers, 493 F.3d at 194;

see also Baloch, 550 F.3d at 1198 (applying the same test for retaliation claims under Title VII

and the Rehabilitation Act); Totten, 421 F. Supp. 2d at 119 n.2 (commenting that the "analysis

would be the same" regardless whether the plaintiff brought a retaliation claim under the

Rehabilitation Act or Title VII).  "To make out a prima facie case of illegal retaliation, [the

plaintiff] must show that '(1) []he engaged in statutorily protected activity; (2) h[is] employer

took an adverse personnel action against h[im]; and (3) a causal connection exists between the

two.'"  Vickers, 493 F.3d at 195 (quoting Carney v. Am. Univ., 151 F.3d 1090, 1095 (D.C. Cir.

1998)).  Further, for an act of alleged retaliation to be actionable, it must be of the nature that

would "'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'"

Burlington Northern, 548 U.S. at 68 (citation omitted).  This reasonable person standard has been

employed because "[t]he anti-retaliation provision seeks to prevent employer interference with

'unfettered access' to Title VII's [and the Rehabilitation Act's] remedial mechanisms . . . . [a]nd

normally petty slights, minor annoyances, and simple lack of good manners will not create such

deterrence."  Id. (citation omitted).  In other words, only a plaintiff's claims that contest actions

that are of the type "likely 'to deter victims of discrimination from complaining to the EEOC,' the

courts, and their employers" can survive summary judgment.  Id. (citations omitted).

   Just as with the application of the McDonnell Douglas test to the plaintiff's discrimination

claims based on race, color gender, and religion, once he has made this prima facie showing of

prohibited retaliation, and the Institution offers "some legitimate, nondiscriminatory [i.e., non-retaliatory] reason' for its actions," Vickers, 493 F.3d at 195 (quoting McDonnell Douglas, 411 U.S. at 802), the framework falls away and the plaintiff must establish that the Institution's proffered reason "is [a] mere pretext and thus a 'coverup'" for its true retaliatory motive to succeed on his retaliation claims, id. (citing McDonnell Douglas, 411 U.S. at 805).  "In order to prove [that] the [Institution's] explanations for [the] alleged acts of . . . retaliation are pretextual, [the plaintiff] must show 'both that the reason [the Institution provided] was false, and that . . . [retaliation] was the real reason [for the Institution's decision].'"  Weber v. Battista, 494 F.3d 179, 186 (D.C. Cir. 2007) (citation and emphasis added).

### a.    The Plaintiff's Workload, Job Related Responsibilities, and Non-Selection Claims[24]

The plaintiff cannot make out a case for retaliation on many of the theories he advances because most of the alleged actions by his employer do not amount to adverse employment actions actionable under Title VII or the Rehabilitation Act.  While "an adverse employment action need not entail a loss of salary, grade level, or benefits," the plaintiff must show some action, such as a change in his employment responsibilities or a reassignment, that "left [the plaintiff] with 'significantly different' – and diminished – . . . responsibilities" or "qualitatively inferior work requiring . . . less skill or knowledge." Baloch, 550 F.3d at 1196-97 (citations omitted) (emphasis in original).

---

[24]    Counts 6 and 10 of the plaintiff's complaint allege that the plaintiff was retaliated against based on his prior EEO activity and related litigation when he was subject to a hostile work environment and not selected for the Supervisory Exhibits Specialist position.  Second Am. Compl. ¶¶ 63-65, 78-81.

The plaintiff argues that the Institution did not promote him,[25] did not compensate him commensurate with his responsibilities, habitually questioned his whereabouts, assigned him "inappropriate (sometimes dirty) work," and did not accommodate his disabilities.  Pl.'s Opp'n at 38-39.  The plaintiff also contends that the tone of one of his supervisors became more "hostile" than "nice" after another co-worker filed an EEO complaint against her, and she started making more "demands" than "requests" when assigning him tasks, Def.'s Mem., Ex. 4 (Feb. 20, 2008 Deposition of Anthony Bowden ("Bowden Dep. II")) 57, 65-66.  As already set forth in the above analysis, only the plaintiff's allegation regarding the Institution's failure to promote him into a supervisory position appears to set forth facts which could support a legally sufficient retaliatory act.  Yet, as the Court discussed above, the plaintiff has not supplied any information to sufficiently challenge the Institution's selection of another candidate for that position, either in that the decision was a pretext for its actual intention to discriminate against him based on his protected status or to retaliate against him for his prior EEO activity he had engaged in.  And, without some factual basis, the Court cannot find that a reasonable jury could make the inferential leap to reach either conclusion based on the plaintiff's unsupported allegations alone.

Similarly, the plaintiff has presented no evidence which demonstrates that the various duties he was allegedly assigned amounted to "significantly different . . . and diminished . . . responsibilities" in comparison to either the duties he had performed previously or the duties of his co-workers.  Baloch, 550 F.3d at 1196 (D.C. Cir. 2008) (citation and emphasis omitted); see, e.g., Pl.'s Opp'n at 11 (stating, based on evidence in the record, that the "job description . . .

---

[25]      In discussing the purported "adverse actions and . . . disparate treatment taken against [him]," the plaintiff references events that allegedly occurred prior to October 2003.  Pl.'s Opp'n at 38.  For the reasons set forth earlier, see supra n.3, the Court may not consider allegations that were not included in the plaintiff's oldest EEO complaint that is at issue in this case.

required <u>any</u> Zoo Exhibits Specialist . . . be able to lift 45 pounds).  The plaintiff admits that the

work responsibilities assigned to all of the Exhibits Specialists varied due to any number of

factors, including workplace experience with a task, Pl.'s Opp'n, Ex. 5 (Bowden Dep. I) at 76,

and situational needs due to staffing shortages, Def.'s Mem., Ex. 2 (Bowden Dep. I) at 117-18;

<u>id.</u>, Ex. 4 (Bowden Dep. II) at 23.  At bottom, even if the plaintiff was "required [comparatively]

. . . to do more outside work than [a Philippine female co-worker with a brown complexion and

no religious affiliation, Second Am. Compl. ¶ 27(e)]," Pl.'s Opp'n at 11, the evidence clearly

shows that she too was required to perform outdoor work, Pl.'s Opp'n, Ex. 3 (Nov. 11, 2007

Deposition of Herman Krebs) at 195-96; <u>id.</u>, Ex. 4 (Deposition of June 21, 2007 Deposition of

Kathleen Adib-Samiy) at 171-72; <u>id.</u>, Ex. 5 (Bowden Dep. I) at 68-69, 72-72, and in the lower

shop, Pl.'s Opp'n, Ex. 7 (Fillah Dep.) at 40-41, 83.  In other words, the plaintiff was required to

perform nothing more than a task that was part of his job description.  Moreover, the plaintiff

was told only to "do the best [job] [he could]" in regards to lifting heavy objects, Pl.'s Opp'n, Ex..

10 (Bowden Dep. II) at 76, and to seek help from his co-workers if he needed it, Second Am.

Compl. ¶ 28(g).  On this record, the plaintiff has not demonstrated that his work assignments

were pretextual indicators of concealed retaliatory intent on the part of his supervisors.

        **b.**        **The Plaintiff's Performance Assessments and Compensation Claims[26]**

As to the plaintiff's claim that he received negative performance assessments after he

started to pursue EEO activity, this claim also fails.  Even if the plaintiff could somehow show

---

[26]      Count 16 of the plaintiff's complaint alleges that he was unlawfully retaliated against based on his prior EEO activity and its related litigation when he was not compensated for the duties that he was actually performing, coupled with the alleged inaccurate assessments of his performance.  Second Am. Compl. ¶¶ 107-13.

that the performance assessments were retaliatory, he has failed to demonstrate that he suffered

any negative consequences as a result of the assessments.

Poor performance assessments that do not result in a change to a plaintiff's grade or

salary are generally not adverse employment actions that violate either Title VII or the

Rehabilitation Act.  See Taylor v. Small, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (finding that the

plaintiff could not establish a prima facie case of employment discrimination under Title VII as a

result of her low performance evaluation where she "did not present evidence suggesting she

suffered any 'significant change in [her] employment status'"); Baloch, 550 F.3d at 1196

(observing that "an adverse employment action [under Title VII, the Rehabilitation Act or the

Age Discrimination in Employment Act] need not entail a loss of salary, grade level, or

benefits[,] [so long as] the plaintiff has 'raised a genuine issue as to whether the reassignment left

[the employee] with 'significantly different'—and diminished—supervisory and programmatic

responsibilities.'" (emphasis and some alternations in original)); accord Russell v. Principi, 257

F.3d 815, 818 (D.C. Cir. 2001); Brown v. Brody, 199 F.3d 446, 458 (D.C. Cir. 1999); Weigert v.

Georgetown Univ., 120 F. Supp. 2d 1, 17 (D.D.C. 2000); Carter v. George Wash. Univ., 180 F.

Supp. 2d 97, 108-109 (D.D.C. 2001); Mack v. Strauss, 134 F. Supp. 2d 103, 112-13 (D.D.C.

2001).  The theory underlying this conclusion is that such performance assessments are unlikely

to objectively deter a reasonable employee from making Title VII or Retaliation Act claims.  See

Burlington Northern, 548 U.S. at 68; see also Russell, 257 F.3d at 818 ("Performance evaluations

are likely to be '[i]nterlocutory or mediate decisions having no immediate effect upon

employment.'  The result of an evaluation is often speculative, making it difficult to remedy."

(citation omitted)).

Moreover, on whole, the plaintiff's assessments are not overly negative.  Def.'s Mem., Ex. 9 (Apr. 22, 2004 National Zoological Park, Smithsonian Institution, Performance Appraisal Form); id., Ex. 10 (Feb. 3, 2006 National Zoological Park, Smithsonian Institution, Performance Appraisal Form).  The assessments contain both compliments and ordinary "job-related constructive criticism, which [is aimed at] '. . . prompt[ing] improve[d] . . . performance.'" Baloch, 550 F.3d at 1199.  Such evaluations "typically" are not actionable as an "adverse actions" because the plaintiff has not linked them to resultant "financial harm[]" that "[has] affect[ed] his position, grade level, salary, or promotion opportunities."  Id. (finding that "letter of counseling, letter of reprimand, and unsatisfactory performance review" were not the type of evaluations that "could affect [the plaintiff's] position, grade level, salary or promotion opportunities"); accord Weber, 494 F.3d at 185-85 (stating that negative performance evaluations "do qualify as adverse actions insofar as they resulted in [the employee] losing a financial award or an award of leave, because a reasonable jury could conclude that such a loss 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'").  While it is understandable why the plaintiff would be unhappy about two assessments that contain constructive criticism and note areas where he could improve, "not everything that makes an employee unhappy is an actionable adverse action."  Russell, 257 F.3d at 818.

Similarly, as to the plaintiff's claim that he received inadequate compensation after he started to pursue EEO activity, this claim fails because the plaintiff has not shown that his compensation ever changed, or, as already addressed, that he was entitled to any increase in his compensation because he was entitled to an increased grade level or that he was improperly denied a promotion to a supervisory position because the Institution's rationale for choosing the

47

selectee was a pretext for an unlawful purpose.  Accordingly, for all of these reasons, the Court

cannot find that the plaintiff can succeed on any of his retaliation claims.

## IV.  CONCLUSION

Discrimination in the workplace, the creation of a hostile work environment for illegal

purposes, and retaliation against employees who exercise their legal right to engage in activities

protected by our nation's laws remain realities even at this time in the evolving history of the

country.  However, this is not one of those situations.  Accordingly, for all of the reasons set

forth above, the Court must award summary judgment to the Institution with respect to all of the

plaintiff's claims other than his breach of contract claim. And as to that claim, it must be

dismissed without prejudice because the Court lacks jurisdiction to address the claim.[27]


_____/s/_____
REGGIE B. WALTON
United States District Judge

---

[27]      An Order consistent with the Court's ruling accompanies this Memorandum Opinion.